**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| MIDWAY GAMES, INC. | : | Case Number 09-10465-KG |
| a Delaware Corporation | : | |
| | : | Jointly Administered |
| Debtors | : | **Hearing Date: April 1, 2009 at 10:00 a.m.** |
| | : | **Objection Deadline: March 27, 2009 at 5:00 p.m.** |

**ACTING UNITED STATES TRUSTEE'S OBJECTION TO
MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF AN
ORDER APPROVING A KEY EMPLOYEE INCENTIVE PLAN (D.E. 63)**

In support of her Objection to Motion of the Debtors and Debtors in Possession for Entry of an Order Approving a Key Employee Incentive Plan (D.E. 63) ("Motion"), Roberta A. DeAngelis, Acting United States Trustee for Region 3 ("UST"), by undersigned counsel, avers:

1. This Court has jurisdiction to hear and determine this Objection.

2. Pursuant to 28 U.S.C. § 586(a)(3), the UST is charged with administrative oversight of the bankruptcy system in this District. Such oversight is part of the UST's overarching responsibility to enforce the laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Systems, Inc. (In re Columbia Gas Systems, Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that UST has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the UST as a "watchdog").

3. Under 11 U.S.C. § 307, the UST has standing to be heard on the issues raised by this Objection.

4. In the Motion, the Debtors seek authority to pay bonuses to a selected group of officers and managers which are four hundred percent greater than bonuses paid to the same group in 2008 when the Debtors were not before the Bankruptcy Court. The 2008 bonuses exceed the 2007 bonuses paid to

the same group by more than two hundred percent. Given the current state of the general economy, coupled with historical data related to incentive bonuses paid by these Debtors, the Motion constitutes an outrageous request and is not justified by the facts and circumstances of the case. Adding to the outrage is the fact that one portion of the proposed incentive payments involves a request for payment based upon events that took place before the Debtors filed this Motion: execution of a distribution agreement for the Wheelman™ game and receipt of the proceeds pursuant to the agreement. Accomplished events cannot be incentivizing.

**STATEMENT OF FACTS**

5. The Debtor filed this case on February 12, 2009.

6. The Motion was filed on February 23, 2009.

7. The Motion proposes to pay approximately 29 "...officers, management level employees, and other non-insider key employees" (Motion at ¶4) incentive bonuses of approximately $3.75 million.

8. On February 18, 2009, five days prior to the date the Motion was filed, the Debtors issued a press release entitled: "Midway and Ubisoft Announce Strategic Relationship to Publish Wheelman." The first paragraph of this press release reads in full as follows:

> "Midway Games Inc. (NYSE: MWY), a leading interactive entertainment publisher and developer, announced today that *it has entered into a strategic relationship with Ubisoft to publish Wheelman™, the highly-anticipated open-world driving game starring action-film megastar Vin Diesel as an expert driver for hire*. Ubisoft will handle sales, marketing, and distribution of the title in North America, South America, Australia, New Zealand, France, Germany, Austria, Ireland and the United Kingdom. Midway will continue to direct the development of the title and retains all future rights to the franchise and will sell the title in all other European countries". (Emphasis added).

See the Declaration of Michael West, Bankruptcy Analyst ("West Declaration"), accompanying this objection. The West Declaration contains a copy of the press release.

9. The Incentive Plan proposes payments of $3.75 million divided into three segments that are designated as Milestones in the Motion.[1] The first milestone would pay approximately $497,500 to some, but not all, of the Eligible Employees if the Debtors have entered into "...the Wheelman Agreement, performance by the Company entitling it to gross proceeds therefrom of at least $6 million no later than March 1, 2009, and the Company's receipt of these proceeds." The proceeds were received by Midway prior to the filing of the Motion. See the West Declaration.

10. The second milestone is described as the earlier of execution of an asset purchase agreement(s) to sell the Company's Mortal Kombat® franchise assets or filing a Plan of Reorganization for the Company to continue as a going concern. Payments under this milestone are proposed to be $1,292,502.

11. The third and final proposed milestone is the earlier of consummation of a sale of the Mortal Kombat® franchise assets, or confirmation of a Plan of Reorganization or Liquidation. Achievement of this milestone would trigger additional bonus payments of $1,959,003.

12. Certain of the Eligible Employees received incentive bonuses aggregating $919,258 in calendar year 2008. The Incentive Plan's proposal to pay $3,749,000 in Incentive Payments exceeds by almost four times the incentive bonuses paid to the Eligible Employees during calendar year 2008. See the West Declaration..

13. The 2008 incentive payments to the Eligible Employees ranged from 0-65% of their annual salaries. In contrast, under the Incentive Plan, Eligible Employees receive payments ranging from 34-140% of their annual salaries. The average incentive bonus paid to the Eligible Employees in 2008 was approximately 16% of their combined annual salaries. In contrast, the average bonus

---

[1] Terms shall have the same meaning that are ascribed to them in the Motion.

payable under the proposed Incentive Plan would be approximately 64% of their combined annual salaries.

14. Statements and Schedules have not yet been filed in this case.

## SUMMARY OF ARGUMENT

15. The first milestone seeks to make incentive payments for a *fait accompli*. The second and third milestones are based solely upon the occurrence of events without regard to when the events may take place, or to results obtained. Based on the circumstances of this case, the proposed bonuses are not justified under the standards of 11 U.S.C. § 503(c)(3). To the extent that the Incentive Plan is primarily a retention plan, the Motion fails to satisfy the burden of proof with respect to 11 U.S.C. § 503(c)(1).

## ARGUMENT

**A. The Plan Does not Comply with 11 U.S.C. § 503(c)(3)**

16. 11 U.S.C. § 503(c)(3) provides: "(c) Notwithstanding subsection (b), there shall neither be allowed, nor paid– (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition." Under the facts of this case, the proposed payment of $3,749,000 is more than four times the total incentive bonus payments made to the affected group during 2008, when the Midway Debtors were not before the bankruptcy court. As a percentage of the affected persons' annual salaries, the proposed Incentive Payments are an average of 64% of their annual salaries. In selected cases, the percentage is as high as 140%. See the West Declaration.

17. The proposed Milestones outlined in the plan are not incentivizing. The first Milestone, as already noted, is a *fait accompli*. The Milestone was achieved before the Motion was filed. The second

Milestone is based upon nothing more than entering into an APA or filing a plan of reorganization, without regard to terms or results achieved. The third Milestone simply requires the consummation of a sale of the Mortal Kombat assets or the confirmation of a Plan without regard to timing or financial results. The proposed payments to the Eligible Employees represent monies that would otherwise be available for the payment of priority and unsecured claims.

18. In *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787 (Bankr. D. Del. 2007), in approving an incentive plan based on quantifiable results in an operating case, the court opined that the incentives must be material for a proposed bonus plan to not be considered within the purview of Section 503(c)(1).

19. In *Dana I*, supra, Judge Lifland rejected a proposed bonus plan as encompassing poorly disguised retention payments. The plan proposed payments of a Completion Bonus based solely upon the debtor's emergence from Chapter 11, *"...regardless of the outcome of these cases. Without tying this portion of the bonus to anything other than staying with the company until the Effective Date, this Court cannot categorize a bonus of this size and form as an incentive bonus."* 351 B.R. at 102. (Emphasis added). The court rejected the plan without prejudice. Similarly here, Milestones two and three are payable solely upon the occurrence of events, irrespective of the results achieved.

20. Dana Corporation brought a second motion before the court to amend its rejected bonus plan. The modified plan proposed a variable scale based upon EBITDAR results. The court approved the modified plan. Comparing the modified plan to the rejected plan, the court stated: "The plan before the Court today, unlike the previous iteration, has *no guaranteed payments* to the CEO or Senior Executives other than base salary and is a substantial retreat from the original proposals." *In re Dana Corporation,* 358 B.R. 567 (Bankr. S.D.N.Y. 2006, hereinafter referred to as "*Dana II*").

21. In each of the reported cases to date interpreting Section 503(c)(3), the primary factor that the courts have looked to is whether the incentives are material, as noted by Judge Sontchi in *Nellson*

5

*Nutraceutical*, supra. In each of the reported cases approving incentive based performance bonuses, the plans rewarded defined measurable operating results, or an increased sales price over a stated minimum. In either situation, the reward came for making the asset pool bigger. There is no reward for maintaining the status quo.

22. In *In re Nobex Corporation*, 2006 WL 4063024 (Bankr. D. Del. 2006), Judge Walrath approved an incentive based plan pursuant to 11 U.S.C. § 503(c)(3). The incentives were based upon the affected officers obtaining a sales price for substantially all assets of the estate higher than a stalking horse bid of $3.5 million. To obtain the bonus, the affected officers would have to produce a tangible result, a higher bid.

23. In *In re Global Home Products*, 369 B.R. 778 (Bankr. D.Del. 2007), the court approved an incentive program based upon EBITDAR results. The court found the program to be based on quantifiable benchmarks and upon historical results of the debtor. In *Nellson Nutraceutical*, supra, the court approved an incentive based program also based upon performance results tied to EBITDAR.

24. In each of the above cases, the officers seeking bonuses were required to produce a tangible measurable financial result to receive their bonuses. In the present case, the second and third proposed Milestones require no quantifiable economic results. If this Incentive Plan is approved, over $1 million in Incentive Payments would be payable upon the filing of a plan of reorganization, or when an APA to sell Mortal Kombat is signed, without any regard whatsoever to the terms of the plan or sale. Almost $2 million in payments are triggered when a sale of the Debtors' other assets is consummated or a plan is confirmed, again without any regard to the timing or results achieved.

25. Another reason for the failure of the second and third milestones as proposed is that it is the duty of a Debtor-in-Possession to file a plan of reorganization within the exclusivity period. Failure to do is a ground to dismiss or convert the case pursuant to 11 U.S.C. § 1112(b). The filing of

a plan without making any effort to prosecute the plan to confirmation is also a ground to dismiss or convert the case pursuant to 11 U.S.C. § 1112(b). Senior management should not be paid incentive bonus payments (that are four times the amount historically paid) to perform duties required to be performed by their obligations under the Bankruptcy Code.

**B.      11 U.S.C. § 503(c)(1) Applies**

26.    11 U.S.C. § 503(c)(1) provides:

> Notwithstanding subsection (b) [allowing the payment of administrative expenses in certain circumstances], there shall neither be allowed, nor paid –
>
> (1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based upon evidence in the record that –
> 	(A)  the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
> 	(B)  the services provided by the person are essential to the survival of the business; and
> 	(C)  either
> 		(i)  the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or
> 		(ii)  if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred [.]

27.    Simply because the Debtors have self-styled the plans as an incentive plans does not make it so. There are no meaningful incentives in the plan. The first Milestone is a *fait accompli* that took

place prior to the filing of the Motion. The second and third Milestones are nothing more than holding dates that will trigger payments without regard to when the triggering events take place, and without regard to the results achieved. In *In re Dana Corporation*, 351 B.R. 96 (Bankr. S.D.N.Y. 2006, hereinafter referred to as "*Dana I*"), Judge Lifland found a proposed completion bonus, payable upon the Effective Date of a Plan to be nothing more than a retention bonus. With respect to the Second and Third Milestones here, the Incentive Plan is no different from that rejected in *Dana I*. As to any affected officers here, the Debtor has made no effort to comply with Section 503(c)(1). The complete lack of incentives makes the proposal nothing more than a retention plan payable on different dates.[2] The fact that an affected employee must be employed full time by the Debtor to receive an Incentive Payment when a trigger event takes place offers further support for the proposition that the plan proposed herein is nothing more than a retention plan.

28. Sections 503(c)(1) and (2) are to be determined without regard to the Debtor's business judgment. In *Dana I*, Judge Lifland stated: "This recent amendment to the Bankruptcy Code makes it abundantly clear that, to the extent a proposed transfer falls within sections 503(c)(1), or (c)(2), then the business judgment rule does not apply, irrespective of whether a sound business purpose may actually exist." 351 B.R. at 100-101. To this extent, the Debtors' reliance upon 11 U.S.C. § 363(b)(1) and 11 U.S.C. § 105(a) are inappropriate.

C. **The Business Judgment Rule is not the Appropriate Standard**

29. To the extent that the Motion asserts that the business judgment rule is the proper standard for determining whether the bonus payment, to be made outside the ordinary course of business, is

---

[2] Milestone 2 proposes to pay $1,292,502, or 34% of the proposed total for the Company entering into an APA for the sale of Mortal Kombat or filing a Plan of Reorganization. No time limit or financial incentives are attached to this milestone. Milestone 3 proposes to pay $1,959,003, or 52% of the proposed total for closing any such sale or confirming a Plan or Reorganization or Liquidation, again without regard to time limits or financial incentives.

8

justified by the facts and circumstances of the case, the Motion fails to accord proper meaning to the restrictions imposed by section 503(c)(3). Section 503(c)(3) commences with the statement: "notwithstanding subsection (b), there shall be neither allowed nor paid—". In enacting Section 503(c)(3), Congress clarified and specifically limited what might otherwise be allowed as an administrative expense under Section 503(b).

30. Section 503(b) of the Bankruptcy Code provides in pertinent part:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including-
(1)(A) th actual, necessary costs and expenses of preserving the estate including-
(i) wages, salaries, and commissions for services rendered after the commencement of the case;

Administrative expenses may not be allowed unless they are actual and necessary to preserve the estate. *In re Unidigital, Inc.*, 262 B.R. 283, 288 (Bankr. D. Del. 2001). The Debtors must demonstrate that the bonus payment is necessary to preserve the value of the estate and is "justified by the facts and circumstances of the case."

## **CONCLUSION**

31. To the extent that the Motion is nothing more than a retention plan, the Motion fails to satisfy the burden of proof with respect to 11 U.S.C. § 503(c)(1). To the extent that the Motion purports to be an incentive program, there are no material incentives and the Motion must be denied as to 11 U.S.C. § 503(c)(3). One of the proposed milestones was a *fait accompli* prior to the filing of the Motion. The remaining milestones are based solely upon the occurrence of events and not upon any results obtained. Tied solely to the occurrence of events, the Motion is a retention plan because , among other things, the plan only pays employees who are employed by the Debtors when the trigger event takes

9

place. Additionally, the Motion proposes to pay the group bonuses more than four times greater than any prior incentive bonuses paid to the group as a whole for which the UST has obtained information. The UST leaves the Debtors to their burdens and reserves and any all rights, remedies and obligations to, *inter alia*, complement, supplement, augment, alter and/or modify this Objection and to conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

WHEREFORE, the United States Trustee respectfully requests that the Court deny the Motion and grant such other relief as is appropriate.

>                             Respectfully submitted,
>
>                             **Roberta A. DeAngelis**
>                             **ACTING UNITED STATES TRUSTEE, REGION THREE**

Dated: March 27, 2009          **BY:**            /s/
                               David L. Buchbinder, Esquire
                                Trial Attorney
                                J. Caleb Boggs Federal Building
                               844 King Street, Suite 2207, Lockbox 35
                               Wilmington, DE 19801
                               (302) 573-6491
                               (302) 573-6497 (Fax)