# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

---------------------------------------------------------x
:
In re: : Chapter 11 Case No.
:
MIDWAY GAMES INC., *et. al.*[1] : 09-10465 (KG)
:
: (Jointly Administered)
:
: **Hearing Date: April 1, 2009 at 10:00 a.m.**
Debtors. : **Re: Docket No. 63**
---------------------------------------------------------x

## OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF AN ORDER APPROVING A KEY EMPLOYEE INCENTIVE PLAN

The Official Committee of Unsecured Creditors (the "Committee") in the chapter 11 cases of the above-captioned debtors (the "Debtors" or the "Company") hereby submits this objection (the "Objection") to the *Motion of the Debtors and Debtors in Possession for Entry of an Order Approving a Key Employee Incentive Plan* [Docket No. 63] (the "Motion"), and in support thereof, respectfully states as follows:

### PRELIMINARY STATEMENT

1. The Committee acknowledges the importance of the Debtors' employees (senior executive, middle management and rank and file, alike) to the Debtors' estates. Consequently, the Committee would not object to an employee incentive plan (a) designed to bear a reasonable relationship to results obtained for the benefit of the estates, (b) reasonably priced in relationship to the Debtors' assets, liabilities and earning potential and (c) consistent

---

[1] The Debtors and the last four digits of their respective tax identification numbers are: Midway Games Inc., a Delaware corporation (6244); Midway Home Entertainment Inc., a Delaware corporation (3621); Midway Amusement Games, LLC, a Delaware limited liability company (4179); Midway Interactive Inc., a Delaware corporation (6756); Surreal Software Inc., a Washington corporation (1785); Midway Studios - Austin Inc., a Texas Corporation (2584); Midway Studios - Los Angeles Inc., a California corporation (1153); Midway Games West Inc., a California corporation (8756); Midway Home Studios Inc., a Delaware corporation (8429); and Midway Sales Company, LLC, a Delaware limited liability company.

LA1:#6401068
RLF1-3381740-1

with plans proposed in similarly-sized bankruptcy cases. Similarly, the Committee would not object to the implementation of a reasonably-priced, rationally-structured retention or incentive plan for the benefit of non-insider employees that appropriately links an employee's receipt of the retention or incentive benefit to whether such employee is actually retained following confirmation of a sale or plan.

2. Indeed, the Committee already has supported initial bonus payments to employees of the Debtors of no less than $450,000 in the first month of these cases [Docket Nos. 143, 144]. The Debtors also have a pending motion before this court seeking to approve an additional $4 million in bonuses to employees that are not executive officers of the Debtors [Docket No. 63].[2]

3. But the so-called "incentive" plan (the "Proposed Plan") now proposed by the Debtors bears no rational relationship to the realities of these Debtors or their chapter 11 cases. First and foremost, the Proposed Plan is not an incentive plan. Unlike the incentive plan approved by this Court in In re Global Home Products, LLC, 369 B.R. 778 (Bankr. D. Del. 2007), the Proposed Plan "walks, talks and is a retention" plan. In re Dana Corporation, 351 B.R. 96, 102 (Bankr. S.D.N.Y. 2006) ("Dana I"). As a consequence, the Proposed Plan may not benefit insiders because the Debtors have not and are not able to satisfy the statutory predicates of section 503(c)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code").

4. Moreover, even assuming, *arguendo*, that the Proposed Plan properly could be characterized as an "incentive" plan (which it cannot), the Proposed Plan does not represent a sound exercise by the Debtors of their business judgment, as required under section 363 of the Bankruptcy Code. The Proposed Plan is not reasonably priced for these Debtors. It is

---

[2] The Committee also has withdrawn any objection to the Debtors' employee relocation program (the "Relocation Program"), a program which will obligate the Debtors to pay, in the aggregate, as much as $220,000 to reimburse the prepetition out-of-pocket expenses of certain employees whom the Debtors' relocated to work in their San Diego, California studios following the closing of the Debtors' Los Angeles studios in 2008.

LA1:#6401068
RLF1-3381740-1

2

not consistent with any plan that the Debtors have implemented in the past. It is not consistent with incentive plans proposed in recent, similarly-sized cases. It has not been calculated to achieve performance for the Debtors' benefit. The Proposed Plan does not, even remotely, satisfy the standards for approval set forth by this Court in Global Home. Id. As such, the Proposed Plan cannot be approved.

5. These estates cannot reasonably bear employee bonus programs that will obligate them to pay bonuses to senior management and others that, in the aggregate, will exceed $8 million. These Debtors are not worth hundreds of millions of dollars. Recoveries to unsecured creditors could very possibly be quite small. While the Debtors' employees are certainly important, their ongoing job satisfaction under such circumstances cannot be so greatly elevated as to warrant a complete usurpation of creditor recoveries.

6. As such, the Motion should be denied.

## BACKGROUND FACTS

7. On February 12, 2009 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. An order has been entered providing for the joint administration of the chapter 11 cases (the "Cases").

8. On February 23, 2009, the United States Trustee appointed the Committee.

9. As of the Petition Date, the Debtors employed approximately 410 persons, 336 of which were employed on a full-time basis. Declaration of Ryan G. O'Desky in Support of Chapter 11 Petitions and First Day Relief (the "O'Desky Declaration"), ¶ 78. [Docket No. 2].

10. As of the Petition Date, in addition to the purported secured claims asserted by the Debtors' majority shareholder, Acquisition Holdings Subsidiary I LLC ("AHS"), the Debtors have estimated unsecured claims against their estates of no less than $286,000,000. O'Desky Declaration, ¶¶ 27-34.

11. To date, the Debtors have filed three "bonus" motions in these cases. In addition to the Motion, the Debtors have also filed:

a. The *Motion of the Debtors and Debtors in Possession for Entry of an Order Approving Payment of Discretionary Bonuses to Non-Insiders of the Debtors* [Docket No. 55] (the "$70,000 Bonus Motion"). Pursuant to the $70,000 Bonus Motion, the Debtors sought authorization to pay, in the aggregate, $70,000 in bonuses to certain eligible employees in the Debtors' controller, IT and forecasting departments. The Debtors represented that the bonuses were for the purpose of recognizing and motivating those employees who bore additional responsibilities as a result of the Debtors' commencement of the Cases. As set forth in the $70,000 Bonus Motion, no employee eligible to participate in these bonuses would receive more than $5,000. The Committee did not oppose the $70,000 Bonus Motion and the Court entered an order thereon on March 10, 2009 [Docket No. 143].

b. The *Motion of Debtors for Entry of an Order Authorizing, But Not Directing, (I) Debtors to Honor Certain Employee Programs Postpetition and (II) Payment of Prepetition Claims in Connection With Such Programs* [Docket No. 56] (the "Employee Programs Motion"). Pursuant to the Employee Programs Motion the Debtors have sought authority to pay prepetition and postpetition sale bonuses to its sales staff (the "Sale Bonus Plan"), video game design teams (the "Design Team Bonus Plan") and to the designer (the "Key Designer") responsible for creating the Debtors' Mortal Kombat franchise (the "Key Designer Bonus Plan") (together with the Sale Bonus Plan and Design Team Bonus Plan, the "Bonus Plans"). All told, pursuant to the Bonus Plans and the $70,000 Bonus Motion, the Debtors have sought authority to pay out bonuses that, in the aggregate, would exceed $4.45 million. The Committee already has not objected to the Debtors' payment of bonuses of up to $130,000 under the Sale Bonus Plan, $190,000 under the Designer Team Bonus Plan and $60,000 under the Key Designer Bonus Plan, without prejudice to its right to object to the balance of the relief sought in the Employee Programs Motion. On March 10, 2009, this Court entered an order approving the payment of the uncontested portion of these bonuses, and continued the balance of the relief sought under the Bonus Plans to April 23, 2009 [Docket No. 144].

The Debtors also have sought, as part of the Employee Programs Motion, approval of payments not to exceed $220,000 in connection with the Relocation Program and the authority to continue a supplemental health care plan, referred to as Exec-U-Care, that exclusively benefits fourteen executives of the Debtors (the "Exec-U-Care Program"). As mentioned above, the Committee has withdrawn its objection to the Relocation Program. It continues, however, to object to the Exec-U-Care Program.

12.

REDACTED

**THE PROPOSED PLAN**

13. By the Proposed Plan, the Debtors seek authorization to pay $3,755,000 to twenty-nine of their senior-most employees, at least five of whom (and perhaps more) appear to be officers and insiders of the Debtors. As filed, the Motion contains no detail as to the individuals who will participate in the Proposed Plan. The Debtors, however, subsequently shared with the Committee, on a confidential basis, the names and titles of the participants as well as detail regarding the amounts each would receive and the participants' current base compensation information. Attached hereto as Exhibit A is a chart identifying by title, but not name, each employee that would be entitled to participate in the Proposed Plan, if approved.

14. As evidenced by Exhibit A hereto, REDACTED

For four of the five officers, the Proposed Plan payments would amount to approximately 133%-140% of such officer's total annual base salary. For the balance of senior management, the Proposed Plan payments would amount to anywhere from approximately 34%-82% of annual base salaries.

15. The vesting of each bonus under the Proposed Plan is subject to the occurrence of three milestones. The milestones, however, are not in any way tied to the Debtors' future financial performance or to the estates' recoveries from asset sales. Instead, the milestones are tied to one past event and two events that are virtually certain to occur. They are as follows:

> a. Milestone 1: the Debtors' (a) entry into a publishing/distribution agreement for its newest video game release, "Wheelman" (the "Wheelman Agreement"), and (b) performance under the agreement by the Debtors entitling them to gross proceeds of at least $6 million by no later than March 1, 2009, and (c) receipt of such proceeds;
>
> b. Milestone 2: the earlier to occur of the Debtors' (a) execution of an agreement to sell their Mortal Kombat franchise, or (b) submission of a plan of reorganization to this Court; and
>
> c. Milestone 3: the earlier to occur of (a) the closing of the sale of the Mortal Kombat franchise, or (b) the approval of a plan of reorganization or liquidation.

Motion, Exhibit A, ¶ 4.

**16.**

## REDACTED

---

3

## REDACTED

Moreover, the Debtors' majority shareholder and purported

17. Upon the occurrence of Milestone 2, the Debtors propose to pay bonuses to all eligible plan participants in the total aggregate amount of $1,292,500.

REDACTED

18. Upon the occurrence of Milestone 3, the Debtors propose to pay bonuses to all eligible plan participants in the total aggregate amount of $1,965,000.

REDACTED

## OBJECTION

### A. The Proposed Plan Cannot Be Approved as to the Debtors' Insiders if it is a Retention or Severance Plan.

19. The test to determine whether a bankruptcy court may approve a retention or a severance plan that benefits an insider is strict. Bankruptcy Code § 503(c)(1) prohibits a debtor from paying any amount to an insider to induce that insider to remain with the debtor, unless:

(i) The insider has a bona fide job offer from another business at the same or greater rate of compensation;

(ii) The insider's services are essential to the survival of the debtor's business; and

(iii) The amount paid to the insider does not exceed ten times the mean of similar payments made to non-management employees during the calendar year or, if no such payments were made, the amount does not exceed 25 percent of similar payments made to the insider during the prior calendar year.

11 U.S.C. § 503(c)(1).

20. Section 503(c)(2) prohibits a debtor from paying severance to an insider unless the payment is part of a program generally applicable to all full-time employees and the amount to be paid is not greater than 10 times the amount of the mean severance pay given to non-management employees during the calendar year.

---

secured lender, AHS, has required the Debtors to escrow the proceeds generated from the Wheelman Agreement.

21. Because the Proposed Plan contemplates paying insiders no less than $1.8 million in benefits, the Proposed Plan, if it is either a retention or a severance plan, cannot satisfy the standards set forth in Sections 503(c)(1) or (c)(2). There is no evidence that any of the factors set forth in Sections 503(c)(1) or (c)(2) can be satisfied. Certainly, the Debtors cannot establish that the proposed payments to insiders would not exceed ten times the mean of similar payments made to non-management employees or 25% of similar payments made to the insider during the prior calendar year because (i) the Debtors' non-management employees are not entitled to receive payments under the Proposed Plan and (ii) the Debtors have not previously introduced a plan similar to the Proposed Plan.

### B. The Proposed Plan is a Retention Plan, Not an Incentive Plan; As Such, it Cannot Be Approved as to Insiders.

22. As this Court and others inside and outside of the Third Circuit have recognized, incentive plans are not subject to the strict dictates of either 503(c)(1) or (c)(2). See In re Global Home Products, LLC, 369 B.R. at 785-86; In re Dana Corp., 358 B.R. 567, 575 (Bankr S.D.N.Y. 2006) ("Dana II"); see also, In re Nobex Corp., 2006 WL 4063024 (Bankr. D. Del. Jan. 19, 2006). Rather, they remain subject to a "business judgment" standard of review pursuant to Bankruptcy Code § 363. Id.

23. In an effort to take advantage of this less stringent standard of review, the Debtors have attempted to characterize the Proposed Plan as an incentive plan. But the Proposed Plan is not an incentive plan. Neither the facts present here nor the compensation plans proposed in other comparable cases support that characterization.

24. For instance, in Global Home, this Court agreed with the Dana II court that a plan that rewards employees based upon the achievement of short-term incentive targets, consistent or similar with plans historically implemented by a debtor, is an incentive plan and not a retention plan. 369 B.R. at 786. Thus, in Global Home, this Court was able to conclude that

the debtor's compensation plan, which was tied to short-term EBITDAR and cash flow performance targets, was a legitimate "pay for value" compensation plan. Id.

25. In contrast to the Global Home compensation plan, the annual incentive plan proposed by the debtors in Dana I entitled executives to receive a completion bonus. One component of the completion bonus was a fixed bonus, "awarded without regard to performance or creditor recovery, payable in cash on the effective date of a plan of reorganization."[4] 351. B.R. at 99. Judge Lifland essentially balked at the notion that the completion bonus could be characterized as an "incentive" plan. He stated:

> Without tying this portion of the bonus to anything other than staying with the company until the Effective Date [of a plan of reorganization], this Court cannot categorize a bonus of this size and form as an incentive bonus. Using a familiar fowl analogy…this compensation scheme walks, talks and is a retention bonus.

Id. at 102.

26. In Nobex, the debtor entered bankruptcy in order to sell substantially all of its assets pursuant to Bankruptcy Code § 363 and, in connection therewith, proposed a program providing sales-related incentive pay to two of its most senior managers. The debtors originally proposed a plan pursuant to which the executives would receive a bonus payment irrespective of the sale proceeds obtained. Following the creditors committee's objection to the compensation plan (on the ground that it constituted a disguised retention plan), the debtors and the committee agreed to a modified compensation plan that not only materially reduced the amount of bonus payments to be made, but also tied, on a sliding scale, the vesting and receipt of the bonus payments to gross sale proceeds recovered in excess of the stalking horse bid. As a consequence, Judge Walrath was able to conclude that the plan was an incentive plan.

---

[4] The other component was a variable bonus that depended upon the total enterprise value of the debtors six months after the plan effective date.

27. The Debtors represent that the Proposed Plan is consistent with incentive plans approved in Global Home and Nobex. But, as evidenced by the above discussion of those cases, that simply is not the case. The incentive plans approved in Global Home and Nobex were each designed to incentivize employees by tying bonuses to short-term financial performance targets.[5] Neither plan rewarded employees regardless of outcome, as the Proposed Plan would reward the Debtors' employees here.

28. The Proposed Plan is very similar to the compensation plan that Judge Lifland in Dana I found to be a retention plan. Indeed, the Proposed Plan is an even more extreme example of a retention plan than was the Dana I compensation plan. The Proposed Plan would reward participants for past, not future achievements. It would also reward participants for (i) the Debtors' entry into an asset sale agreement or filing of a plan of reorganization, irrespective of the terms thereof and (ii) the closing of such asset sale or confirmation of such plan of reorganization or liquidation, irrespective of the actual outcome of these estates and their creditors.

29. The Committee appreciates the fact that the Debtors' senior management members worked hard to obtain the Wheelman Agreement. But senior management members' work in this regard, virtually all of which appears to have taken place prepetition, falls well within the sphere of the duties and responsibilities for which these senior management members already have been generously compensated by way of substantial base compensation (see Exhibit A). The notion that a bonus program designed to reward employees for past accomplishments could constitute an "incentive" is simply disingenuous. The same is true of the Proposed Plan as

---

[5] The Debtors also represent that the Proposed Plan is consistent with the incentive plan approved by Judge Sontchi in In re Advanced Marketing Services, Inc., No. 06-11480 (CSS) (Bankr. D. Del. Mar. 13, 2007). But in that case, in order to be eligible to receive their allocated bonus under the approved plan, the six plan participants had to successfully close a proposed asset purchase transaction with a purchase price of $64 million and collect a substantial portion of $50 million of accounts receivable. They also had to successfully wind-up the debtors' foreign subsidiaries and complete the debtors' inventory return program. The total aggregate bonus pool was $635,000. Ultimately, the unsecured creditors in Advanced Marketing Services received a distribution of between 30% to 40% on their claims.

it relates to Milestones 2 and 3, which would permit bonuses without regard for performance or creditor recoveries.

30. As the Proposed Plan is a retention plan, it cannot be approved by this Court as to the Debtors' officers and other insiders for the reasons set forth in Section A above.

### C. The Proposed Plan Does Not Represent an Exercise of the Debtors' Sound Business Judgment.

31. As to the Proposed Plan's non-insider participants, the Debtors must show under Bankruptcy Code § 363(b) that the Proposed Plan is the result of a proper exercise of the Debtors' sound business judgment. Global Home, 369 B.R. at 786. This Court has adopted Judge Lifland's view of the factors to be used in determining whether a proposed compensation plan represents an exercise of sound business judgment. Id. The questions to be considered are as follows:

(a) Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

(b) Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

(c) Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

(d) Is the plan or proposal consistent with industry standards?

(e) What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

(f) Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

Id.

32. In this case, the answers to the relevant foregoing questions clearly indicate that the Proposed Plan does not represent a sound exercise of the Debtors' business judgment.

33. <u>No Reasonable Relationship to Results Obtained</u>. There is no reasonable relationship between the Proposed Plan and the results to be obtained. Aside from the fact that the Proposed Plan requires nothing from the participants, other than to continue to do the jobs for which they are being generously paid, in order to receive a bonus, the Proposed Plan contains no provision that would condition any participant's receipt of a bonus, on an agreement to remain in the Debtors' employment or to not compete with the Debtors following termination of the participant's employment. Once a milestone has been achieved and the bonuses attributable to that milestone have been paid, participants are free to leave the Debtors' employ and compete with the Debtor. If a particular participant is essential to the next milestone, that participant will have received substantial benefit under the Proposed Plan, without a concomitant obligation to see to it that the Debtors attain the next milestone. The Proposed Plan entirely disregards the possibility that a prospective buyer of the Debtors' assets may condition its purchase of those assets on its ability to retain certain key employees post-closing. The Debtors thus could be paying hundreds of thousands, or even millions of dollars in bonuses to employees who elect to leave and compete against the Debtors (or the buyer of the Debtors' assets) just when such employees could be needed most.

34. <u>The Proposed Plan's Costs are Not Reasonable</u>. The costs of the Proposed Plan would be extraordinary. Without any guarantee or pre-condition as to the results obtained for the estates and their creditors, the Debtors, in the aggregate, would be paying 29 participants $3.755 million **REDACTED** simply to retain them until the passage of milestones, one of which has already passed and two of which require little more than the participants' performance of the very jobs for which they are already generously compensated. In a survey prepared by the Committee's financial advisor, FTI Consulting, Inc. ("<u>FTI</u>"), of compensation plans proposed in some twenty comparable

bankruptcy cases over recent years, the Proposed Plan is, by far, the richest compensation plan that has been proposed, despite the unusually poor conditions of the current economy. Of the cases surveyed by FTI, the mean aggregate incentive bonuses totaled approximately $910,000, an amount substantially lower than the aggregate bonus amount contemplated under the Proposed Plan. A true and correct copy of the FTI survey is attached hereto as Exhibit B.

35. The proposed bonuses are particularly glaring in the context of the Debtors' assets, liabilities and earning potential. Although the Debtors report asset book value of approximately $220 million, the actual value that can be realized in a going concern sale of the Debtors' business will be substantially less than $220 million. The Committee is informed and believes that the real value of the Debtors' business is far less. The Debtors' liabilities exceed $335 million, approximately $30 million of which is purportedly secured. The Debtors' earning potential remains uncertain. Historically, the Debtors have operated at a loss for each of the past 8 years.

36. Moreover, the bonuses that would be paid under the Proposed Plan cannot be viewed in a vacuum. In addition to those bonuses, the Debtors are still proposing to pay an additional $4.45 million in employee bonuses pursuant to their Employee Programs Motion. All told, the Debtors seek to pay in excess of $8 million in bonuses. For a company of this size, that figure is staggering. It is even more remarkable when taking into account the *de minimis* creditor recoveries anticipated here.

37. Finally, notwithstanding the hefty bonuses the Debtors now propose, the Proposed Plan does not in any way ensure that the recipients of those bonuses would remain with the business following the Debtors' filing of a plan of reorganization or entry into an agreement to sell substantially all of their assets to a third party. The Debtors could easily find themselves in a position in which they have paid a "key" employee a substantial bonus, only to have that employee refuse to commit to remain in the employment of the reorganized Debtors or, in the case of a sale, a third party purchaser. No employee should receive a bonus absent such

employee's concomitant commitment to stay with the business following the effective date of any plan of reorganization or the closing of any going concern asset sale.

38. <u>The Proposed Plan Does Not Appear to be Consistent with Past Plans and There is No Evidence that It is Consistent with Industry Standards</u>. Even a cursory review of the milestones for the Proposed Plan (in particular, Milestones 2 and 3) evidences that the Debtors have never in the past proposed a plan like the Proposed Plan. Moreover, the Debtors have submitted no evidence that the Proposed Plan is remotely consistent with any plan proposed in the video game or entertainment industry.

39. <u>There is no Evidence Regarding the Debtors' Diligence Efforts in Investigating the Need for the Proposed Plan or the Debtors' Receipt of Independent Counsel in Connection with the Proposed Plan</u>. The Motion does state that the Compensation Committee of the Debtors' board of directors approved the Proposed Plan "after numerous discussions with members of senior management." (Motion, p. 8 ¶ 17). But the Motion otherwise is silent as to the diligence efforts undertaken to formulate the Proposed Plan. The Debtors do not anywhere state in the Motion that they received independent counsel in performing due diligence in either creating or authorizing the Proposed Plan. As a consequence, it is impossible to assess what factors the Debtors considered in formulating the Proposed Plan.

### D. The Facts and Circumstances of these Cases do not Warrant the Implementation of the Proposed Plan.

40. Bankruptcy Code § 503(c)(3) prohibits

> other <u>transfers of obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case,</u> including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c)(3) (emphasis added).

41. The Debtors contend that the "facts and circumstances" test under §503(c)(3) is akin to the lower threshold business judgment rule under §363(b). Courts have rejected this approach and held debtors to a higher standard. See, e.g., In re Pilgrim's Pride Corp., 08-45664 (DML), 2009 WL 499257, *4 (Bankr. N.D. Tex. Feb. 26, 2009)(citing In re Dura Auto Sys. Inc., 06-11202, Docket No. 1369 (Bankr. D. Del. June 29, 2007) and In re Supplements LT, Inc., 08-10446 (KJC), Docket No. 277 (Bankr. D. Del. Apr. 14, 2008)). Thus, the Debtors must not only show that there is a valid business reason for the proposal, but must also demonstrate that the plan serves the interests of the creditors and Debtors' estates. Id. at *5.

42. For all of the reasons previously set forth herein, the Debtors cannot do that here. The Proposed Plan is extraordinarily costly for estates of this size (particularly when viewed together with the other bonuses the Debtors seek to pay certain of their employees). The Proposed Plan does not require that the participating employees do anything to earn their bonuses other than perform the jobs for which they already are generously being compensated. It very richly rewards upper management and others without any regard for the results obtained for the Debtors, the estates or their creditors. It provides no assurances that the participants will agree to continued employment by the reorganized debtor or any third party purchaser once the milestones have passed. Creditors have no assurances that their recoveries will be enhanced in any way by the Proposed Plan.

43. Whether construed as an incentive plan, or as a retention plan, because the Debtors' fail to meet their burden under Bankruptcy Code §§ 503(c)(1), (c)(3), and 363(b), the Motion must be denied.

## CONCLUSION

For all the foregoing reasons, (i) the Motion should be denied in its entirety or, in the alternative, should only be granted to the extent the relief sought therein is modified to address the concerns set forth herein in a manner acceptable to the Committee and consistent with the Bankruptcy Code; and (ii) the Committee should be granted such other and further relief as the Court deems just and proper.

Dated: March 27, 2009
       Wilmington, Delaware

Respectfully submitted,

/s/ Mark D. Collins

Mark D. Collins (No. 2981)
Marcos A. Ramos (No. 4450)
Maris J. Finnegan (DE admission pending)
Andrew C. Irgens (No. 5193)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Linda Dakin-Grimm (admitted *pro hac vice*)
Gregory A. Bray (admitted *pro hac vice*)
David Zolkin (admitted *pro hac vice*)
MILBANK, TWEED, HADLEY & MCCLOY LLP
601 South Figueroa St. 31st Floor
Los Angeles, California 90017
Telephone: (213) 892-4000
Facsimile: (213) 629-5063

*Counsel for the Official Committee of Unsecured Creditors*

# EXHIBIT A

## [Filed Under Seal]

# **EXHIBIT B**

**[FTI Survey]**

LA1:#6401068
RLF1-3381740-1

**Incentive and Retention Plan**

| Company Name | Industry | Filing Date | Sales ($M) | Liab's ($M) | Type of Company | Type of Plan - Incentive Plan | Type of Plan - Retention Plan | Type of Plan - Mngt and Rank & File included | Incentive Bonus ($M) | Retention Bonus ($M) | Plan Participation | Company Employees | % of Total | Incentive Structure - EBITDA Based | Incentive Structure - Asset Sale Based | Incentive Structure - POR/Turnaround Based | Retention Based |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Advanced Marketing Services Inc.[12] | Communications & Media | 12/29/2006 | 912 | 291 | Public | X | X | X | $0.64 | $0.82 | 73 | 1,500 | 4.9% | | X | | X |
| Aegis Mortgage Corporation | Financial Services | 8/13/2007 | 296 | 4 | Private | X | | X | $0.27 | | 15[1] | 3,000 | 0.5% | | X | | |
| Apex Silver Mines Ltd. | Metals & Mining | 1/12/2009 | 391 | 931 | Public | X | | | $0.67 | | n/a | n/a | n/a | | X | X | |
| Ascendia Brands | Consumer Products | 8/5/2008 | 100 | 279 | Public | X | | | $0.175-$0.275+ | $0.175-$0.275+ | 9 | 324 | 2.8% | | X | X | |
| Big A Drug Stores Inc. | Retail | 11/19/2007 | 116 | 54 | Private | | X | X[2] | | $0.02 | n/a | 400 | n/a | | | | X |
| Blue Water Automotive Systems | Automotive & Transport | 2/12/2008 | 113 | 86 | Private | | X | | | $0.50 | 25 | 1,500 | 1.7% | | | | X |
| Delta Financial Corp. | Financial Services | 12/7/2007 | 163 | 7,108 | Public | X | | X[3] | n/a | | 7 | 1,056 | 0.7% | | X | X | |
| Diamond Glass | Consumer Services | 4/1/2008 | 211 | 45 | Private | X | | | $0.70 | | 21 | 1,826 | 1.2% | | X | X | |
| Empire Beef | Food & Beverages | 9/6/2007 | 103 | 5 | Private | | X | X | $0.35 | | 275 | 275 | 100.0% | | | | X |
| Fedders North America | Consumer Products | 8/22/2007 | 133 | 2,710 | Private | X | X | X[4] | $0.90 | $0.33 | 162 | 1,500 | 10.8% | X | | | X |
| Global Home Products LLC[10] | Consumer Products | 4/10/2006 | 453[11] | 381 | Private | X | X | X | $4.30 | $0.07 | 79 | 1,950 | 4.1% | X | X | | X |
| Gottschalk Inc[11] | Retail | 1/14/2009 | 636 | 130 | Public | X | X | X | $.3 - $.5[17] | $0.50 | 32 | 5,282 | 0.6% | | X | X | X |
| Heller Ehrman[14] | Business Services | 12/28/2008 | 142 | 41 | Private | X | X | X[5] | $0.10 | $0.43 | 55 | 55 | 100.0% | | | | X |
| Homebanc Corporation[14] | Financial Services | 8/9/2007 | 133 | 3,118 | Public | X | X | X[6] | $0.39 | $0.85 | 87 | 184 | 47.3% | | X[15] | | X |
| Joan Fabrics Corp.[14] | Industrial Manufacturing | 4/10/2007 | 230 | 80 | Private | X | | | Sales Based[13] | | 10 | 700 | 1.4% | | X | | X |
| KB Toys Inc. (2008) | Retail | 12/11/2008 | 480 | 362 | Private | X | | | $0.34 | | 7 | 10,850 | 0.1% | | X[16] | | X |
| Landsource Communities Development LLC | Real Estate | 6/8/2008 | 194 | 1,234 | Private | X | | | $1.95 | | n/a[7] | 155 | N/A | | | X | X |
| Nellson Nutraceutical Inc. (Lender Approved Modified 2006 OCP) | Food & Beverages | 1/28/2006 | 297 | 377 | Private | X | | X | $1.32 | | 133 | 425 | 31.3% | X | | | |
| Nobex Corp. | Pharmaceutical | 12/1/2005 | n/a | 13 | Private | X | X | X[8] | Sales Based[9] | $0.06 | 10 | n/a | n/a | | X | | X |
| Pacific Lumber[14] (ScoPac, BrittCo, Palco) | Industrial Manufacturing | 1/18/2007 | 122 | 1,038 | Private | X | X | | $0.33 | $1.09 | n/a | 436 | N/A | | | X | X |
| Paul Reinhart | Industrial Manufacturing | 10/15/2008 | 580 | 247 | Private | X | | | $1.20 | | 7 | n/a | N/A | | | X | |
| Propex | Manufacturing | 1/18/2008 | 740 | 527 | Public | X | | X | $4.30 | | 1933 | 3,200 | N/A | X | | X | |
| Midway Games | | 2/12/2009 | 220 | 135 | Public | X | X | X | $3.75 | $0.07 | 39[17] | 409 | 9.54% | | X | X | X |

| | | |
|---|---|---|
| High | $4.30 | $1.09 |
| Low | $0.10 | $0.02 |
| Mean | $0.91 | $0.47 |
| Median | $0.65 | $0.46 |

Note:

[1] 15 in total: 9 senior employees, 4 officers, 2 servicing employees.

[2] The Bonus Incentive Program provided bonuses of up to $100 for store managers, $75 for assistant store managers, and up to $50 for other employees. Bonuses will be paid if the employee remains through the end of the GOB sale. The total was not exceed $15,000.

[3] 5 employees; 1 Accounting Professional, 1 Accounting Manager, 2 VP and Associate General Counsels, and 1 Sr VP.

[4] 162 employees in total: 155 divisional and corporate level employees and 7 officers.

[5] Levels not specified.

[6] The Incentive Bonus was for 5 management level employees

[7] Certain critical employees (participants and amount filed under seal).

[8] Nobex involved two programs, one specifically for senior management, and one for the rest of the employees.

[9] Nobex's plans involved asset sale plan based incentives – one for senior management and one marketing employees. At a purchase price between $3.5m and $10m, the marketing team to receive 1% of price after $3.5m (not to exceed $65K), CEO to receive 6.5% of price after $3.5m (not to exceed $422K), CEO to receive $422K and 4.5% of price after $10m (% bonus not to exceed $225K), VP of Finance to receive, $162K and 2% of price after $10m (% bonus not to exceed $100K). If purchase price at Full Payment Target, marketing team to receive 1% of purchase price, CEO to receive 6.5% of purchase price, and VP of Finance to receive 2.5% of purchase price. If the price above $15 million, VP of finance to receive $262K and 1.25% of price after $15m, and CEO to receive $647,500 and 2.75% of price after $15m.

[10] Global Home Products involved four programs serving both executives and employees.

[11] Revenue for 11 month year to date March 31, 2006

[12] Included Management Incentive Plan and Key Employee Retention Program