## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------- x
                        :

In re:                             :   Chapter 11

MIDWAY GAMES, INC., *et al.*,        :   Case No. 09-10465 (KG)
                        :

             Debtors,          :   (Jointly Administered)
                        :

                        :   Hearing Date: April 1, 2009
                        :

------------------------------------------- x

## PRE-HEARING STATEMENT BY ACQUISITION HOLDINGS SUBSIDIARY I LLC

Thomas Moers Mayer, Esq.
Timothy P. Harkness, Esq.
Gordon Z. Novod, Esq.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Email: tharkness@kramerlevin.com
       tmayer@kramerlevin.com
       gnovod@kramerlevin.com

*and*

Laura Davis Jones (Bar No. 2436)
Michael R. Seidl (Bar No. 3889)
Timothy P. Cairns (Bar No. 4228)
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 1899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
       tcairns@pszjlaw.com  ·

*Counsel to Acquisition Holdings Subsidiary I LLC*

March 30, 2008

## TABLE OF CONTENTS

Page

I  PRELIMINARY STATEMENT ...................................................................................1

II  ADEQUATE PROTECTION OF AHS'S CASH COLLATERAL IS WARRANTED .....4

  A.  The Facts Learned In Discovery Concerning The NAI Refinancing And The NAI/AHS Transaction Support AHS's Proposed Final Cash Collateral Order ..................................................................................................................4

    1.  Debtors Are Required To Provide Adequate Protection To Secured Lenders Against Diminishing Value Of Cash Collateral............................5

    2.  The Proposed Interim Cash Collateral Order Agreed Upon By The Debtors And AHS Was Entirely Reasonable..............................................7

    3.  Neither Midway Nor The Committee Has Shown That AHS Is Adequately Protected...........................................................8

  B.  The Limitations On The Use Of Cash Collateral For Investigations And Prosecution Of Claims Versus The Secured Creditor Are Mandated By Section 506(c) Of The Bankruptcy Code, Which Prohibits An Entity From Surcharging A Creditor's Collateral Unless Such Surcharge Directly Benefits The Creditor ...................................................................................................14

  C.  Courts Routinely Approve Limitations On The Use Of Cash Collateral For Investigations And Prosecution Of Claims Versus The Secured Creditor ...........15

III  DISCOVERY HAS CONFIRMED THAT THE 2008 REFINANCE, THE FACTORING AGREEMENT AND THE NAI/AHS TRANSACTION DO NOT ALTER AHS'S RIGHTS TO THE CLAIMS IT ASSERTS...........................................16

  A.  Midway Has Long Relied On Debt To Finance Its Business .................................17

  B.  The February 2008 Refinancing .........................................................................17

    1.  In February 2008, Midway Turned To NAI For Help ...............................17

    2.  Midway's Board And Special Independent Committee Were Well Aware Of And Adhered To Their Fiduciary Duties................19

    3.  The February 2008 Refinancing Was Negotiated At Arm's Length For Midway's Benefit .....................................................20

    4.  The February 29, 2008 Transaction Was A Refinancing Of The Wells Fargo Facility....................................................21

- i -

C.    The Factoring Agreement Was Negotiated At Arm's
      Length For Midway's Benefit.............................................................................22

D.    By The Fall Of 2008, Midway Was Facing Mounting Uncertainty ......................23

E.    Despite Midway's Efforts To Make The Company Profitable,
      Midway Missed Its Earnings Forecasts In The
      Fourth Quarter Of 2007 And In Two Out Of Three Quarters For 2008 ................24

F.    The NAI/AHS Transaction Was Negotiated At Arm's Length
      To Help NAI, And Did Not Harm Midway ..........................................................24

      1.     The NAI/AHS Transaction .......................................................................25

G.    There Is No Evidence That The Noteholders, Or Anyone Else,
      Was Harmed By The NAI/AHS Transaction.........................................................27

      1.     There Is No Evidence That The NAI/AHS
             Transaction Eliminated Any Deferred Tax Assets ...................................27

      2.     The Noteholders, Not AHS And Not Mr. Thomas, Made The
             Decision To Accelerate Their Debt After The NAI/AHS Transaction......28

      3.     The Noteholders' Right To Put Their Notes
             Would Have Arisen In Spite Of The NAI/AHS Transaction ....................28

IV    EQUITABLE SUBORDINATION OR RECHARACTERIZATION OF AHS'S
      CLAIM IS UNWARRANTED HERE ...............................................................................29

A.    The Facts Learned In Discovery Concerning The 2008 Refinancing Do Not
      Support The Equitable Subordination Or Recharacterization Of AHS's
      Claims ..................................................................................................................29

B.    The Facts Learned In Discovery Concerning The NAI/AHS Transaction Do
      Not Support The Equitable Subordination Or Recharacterization Of AHS's
      Claims ..................................................................................................................33

      1.     The Consideration Paid In The NAI/AHS Transaction Has No Legal
             Relevance To The Assessment Of The Transaction ..................................33

      2.     The Price Paid Had No Impact On Midway ..............................................34

C.    Although Creditors Claim They Have A Breach Of Fiduciary Duty
      Claim Against Sumner Redstone And NAI, Such A Claim Does
      Not Impact The Rights Of AHS Or Mark Thomas ...............................................35

CONCLUSION....................................................................................................................38

KL3 2710287.3

# TABLE OF AUTHORITIES

## CASES

*Agincourt, L.L.C. v. Stewart (In re Lake Country Inv.)*,
Nos. 99-20287, 00-6064, 2001 WL 267475 (Bankr. D. Idaho Mar. 19, 2001).....................32

*Bank of N.Y. v. Epic Resorts-Palm Springs Marquis Villas, LLC
(In re Epic Capital Corp.)*,
307 B.R. 767 (D. Del. 2004)................................................................................................30

*Benihana of Tokyo, Inc. v. Benihana, Inc.*,
906 A.2d 114 (Del. 2006)....................................................................................................30

*In re Bidermann Indus. U.S.A., Inc.*,
203 B.R. 547 (Bankr. S.D.N.Y. 1997)............................................................................12, 34

*In re Blackwood L.P.*,
153 F.3d 61 (2d Cir. 1998) ..................................................................................................14

*In re C.S. Assocs.*,
29 F.3d 903 (3d Cir. 1994) ..................................................................................................14

*Cohen v. KB Mezzanine Fund II, L.P. (In re SubMicron Sys. Corp.)*,
291 B.R. 314 (D. Del. 2003), *aff'd*, 432 F.3d 448 (3d Cir. 2006)...........................................30

*In re CompuCom Systems, Inc. Stockholders Litig.*, No. Civ.A. 449-N,
2005 WL 2481325 (Del. Ch. Sept. 29, 2005)........................................................................35

*Fairfield Executive Assocs. v. Hyperion Credit Capital Partners (In re Fairfield Exec.
Assocs.)*,
161 B.R. 595 (D.N.J. 1993)..................................................................................................34

*Harris v. Carter*,
582 A.2d 222 (Del. Ch. 1990) .............................................................................................36

*In re Hartford Underwriters Ins. Co. v. Union Planers Bank, N.A.*,
530 U.S. 1 (2000)................................................................................................................14

*In re Heatron, Inc.*,
6 B.R. 493 (Bankr. W.D. Mo. 1980) ......................................................................................7

*Heritage Sav. & Loan Ass'n v. Rogers Dev. Corp. (In re Rogers Dev. Corp.)*,
2 B.R. 679 (Bankr. E.D. Va. 1980)........................................................................................6

KL3 2710287.3

*In re Hill,*
    399 B.R. 472 (Bankr. W.D. Ky. 2008) ...............................................................................33

*HMG/Courtland Properties, Inc. v. Gray,*
    749 A.2d 94 (Del. Ch. 1999) ...............................................................................37

*Jedwab v. M.G.M. Grand Hotels, Inc.,*
    509 A.2d 584 (Del. Ch. 1986) ...............................................................................36

*MBank Dallas, N.A. v. O'Connor (In re O'Connor),*
    808 F.2d 1393 (10th Cir. 1987) ...............................................................................6

*Malpiede v. Townson,*
    780 A.2d 1075 (Del. 2001) ...............................................................................37

*Midstate Res. Corp. v. Burgess & Fenmore,*
    756 A.2d 605 (N.J. Super. Ct. App. Div. 2000) ...............................................................................34

*Mr. R's Prepared Foods, Inc.,*
    251 B.R. 24 (Bankr. D. Conn. 2000) ...............................................................................32

*Odyssey Partners, LP v. Fleming Cos., Inc.,*
    735 A.2d 386 (Del. Ch. 1999) ...............................................................................36

*Official Committee of Unsecured Creditors v. Tennenbaum Capital Partners (In re
Radnor Holdings Corp.),*
    353 B.R. 820 (Bankr. D. Del. 2006) ...............................................................................31

*Omnicare, Inc. v. NCS Healthcare, Inc.,*
    818 A.2d 914 (Del. 2003) ...............................................................................35-36

*Orman v. Cullman,*
    No. 18039, 2004 WL 2348395 (Del. Ch. Oct. 20, 2004) ...............................................................................35

*Roe Excavating, Inc. v. Thorp Discount, Inc. (In re Roe Excavating, Inc.),*
    52 B.R. 439 (Bankr. S.D. Ohio 1984) ...............................................................................5

*Sharon Steel Corp. v. Citibank, N.A. (In re Sharon Steel),*
    159 B.R. 165 (Bankr. W.D. Pa. 1993) ...............................................................................12

*Shaw Indus., Inc. v. First Nat'l Bank (In re Shaw Indus., Inc.),*
    300 B.R. 861 (Bankr. W.D. Pa. 2003) ...............................................................................12

*In re Stoney Creek Techs., LLC,*
    364 B.R. 882 (Bankr. E.D. Pa. 2007) ...............................................................................12

KL3 2710287.3

*In re The Brown Schools,*
 386 B.R. 37 (Bankr Del. 2008)......................................................................................31 n.4

*In re Timber Prods., Inc.,*
 125 B.R. 433 (Bankr. W.D. Pa. 1990).............................................................................12, 13

*Trenwick Am. Litig. Trust v. Ernst & Young,*
 906 A.2d 168 (Ch. 2006), *aff'd sub nom., Trenwick Am. Litig. Trust v. Billett,*
 931 A.2d 438 (Del. 2007)..................................................................................................31

## STATUTES

8 Del. C. § 144(a)(1).......................................................................................................30

11 U.S.C. § 361(1) (2006) ..............................................................................................6

11 U.S.C.§ 361(2) (2006) ...............................................................................................6

11 U.S.C. § 362(d) (2006) ...........................................................................................5, 7

11 U.S.C. § 363(a) (2006)...............................................................................................5

11 U.S.C. § 363(c)(2) (2006) ..........................................................................................5

11 U.S.C. § 363(c)(2)(B) (2006)......................................................................................5

11 U.S.C. § 363(e) (2006)................................................................................................5

11 U.S.C. § 363(p)(1) (2006)...........................................................................................5

11 U.S.C.§ 506(c) (2006)..........................................................................................14, 15

## OTHER AUTHORITIES

H.R. No. 95-595, 95th Cong., 1st Sess. (1977)................................................................6

U.S. Code Cong. & Admin. News 1978, p 5787 .............................................................6

KL3 2710287.3

## PRE-HEARING STATEMENT

Acquisition Holdings Subsidiary I LLC ("AHS") submits this Pre-Hearing Statement in advance of the April 1, 2009 hearing before the Court on (1) the Preliminary Limited Objection (the "Preliminary Objection" [Docket No. 14]) of Certain Individual Beneficial Holders of Debtor's 6 % Senior Convertible Notes Due 2025 and 7.125% Senior Convertible Notes Due 2026 to Debtor's Motion for Order Authorizing Use of Cash Collateral (the "Interim Cash Collateral Order" [Docket No. 41]); (2) the Joinder in that Limited Objection of the Official Committee of Unsecured Creditors (the "Committee") (the "Committee's Joinder" [Docket No. 88]); and (3) AHS's Limited Objection to the Debtors' Motion for Authorization to Use Cash Collateral and (II) in the Alternative, Cross-Motion for Relief from the Automatic Stay (the "Cross Motion" [Docket No. 100]).[1] AHS respectfully states as follows:

## I. PRELIMINARY STATEMENT

1.      At the First Day hearing in this matter, certain creditors objected to Debtors' Motion for an Order Authorizing the Use of Cash Collateral and raised questions about certain of the transactions that preceded the Midway bankruptcy. The Court even labeled certain of the facts relevant to Midway as "curious." The parties have now conducted intensive discovery, including ten depositions, and have exchanged thousands of pages of documents. The Committee's questions about three 2008 transactions --

- the February 2008 loans by Sumner Redstone's National Amusements, Inc. ("NAI") to Midway;

- the September 2008 factoring agreement between NAI and Midway; and

- the November 2008 transfer by NAI of those loans to AHS

---

[1] "Debtors" means Midway and Midway's affiliated entities that are debtors and debtors-in-possession in the above-captioned jointly administered cases.

have now largely been answered and discovery has confirmed that there is nothing "curious" or otherwise inappropriate about the transactions.

2.      Discovery has refuted any contention that the February 2008 loans from NAI to Midway (the "February 2008 Refinancing") were somehow harmful to Midway and were forced on Midway by board members loyal to NAI. To the contrary, the evidence shows that:

**a.**    Because of poor sales in 2007, by January 2008, Midway faced the possibility of violating its covenants with its secured lender, Wells Fargo Foothill, and having its auditor issue a "going concern" qualification if it did not find a source of additional funding;

**b.**    A Special Independent Committee of the Midway Board (*i.e.* independent because the members were not associated with NAI in any way) considered multiple financing options and ultimately decided that having NAI replace and refinance the Wells Fargo Foothill Facility was in the best interests of Midway;

**c.**    The Special Independent Committee of the Midway Board, advised by independent counsel, reviewed the terms of the NAI Facility that was ultimately agreed to, concluding that it was fair and in Midway's best interests;

**d.**    The February 2008 Refinancing allowed Midway to avoid defaulting on the Wells Fargo Foothill Facility, develop new games, and pay its creditors; and

**e.**    Midway missed its earnings guidance in three out of four quarters from the end of 2007 through 2008, citing non-cash expenses associated with the 6% Notes, which were coming due in April 2009, but never citing the NAI Facility as a cause for earnings shortfalls because the cost of servicing the NAI debt was, in the words of the Midway CFO, "immaterial" to Midway's income statement.

3.      Discovery has also confirmed that the 2008 Refinancing was a loan in every sense. Tellingly, the Noteholders had no complaints about the 2008 Refinancing when, at NAI's risk, it kept Midway afloat and gave Midway the ability to continue operating (and make payments to the Noteholders) and a fighting chance to develop some hit games that could turn Midway around.

4.      Discovery has refuted the Committee's suggestion that the September 2008 factoring agreement between NAI and Midway (the "Factoring Agreement") was somehow

not in the best interest of Midway. In 2008, Midway's management made the decision that it would be in the best interest of Midway to push back the launch of its TNA Impact game, which was hoped to be Midway's next hit game. Delaying the launch created short-term cash flow problems, which were solved with the Factoring Agreement. Midway's management explained that the Factoring Agreement allowed it to continue to refine TNA Impact, and ultimately to have a successful launch. Like the February 2008 Refinancing, the Factoring Agreement was negotiated at arm's length by a Special Independent Committee, with the NAI-affiliated board members walled off on both sides from the negotiations, and only entered into by Midway after it explored various alternatives and concluded that the Factoring Agreement was the best available option.

      5.     Discovery has also refuted the Committee's allegations concerning NAI's sale to AHS of its interest in Midway (the "NAI/AHS Transaction"). The NAI/AHS Transaction was an arm's length transaction between two entities that had no prior relationship. There is no basis for the Committee's allegations that the NAI/AHS Transaction damaged Midway by affecting Midway's tax attributes or by forcing Midway into chapter 11. To the contrary, discovery has shown that there was no material harm done to the value of Midway's tax attributes through this transaction and that the NAI/AHS transaction did **_not_** cause Midway to file for bankruptcy. Although the NAI/AHS Transaction triggered a change of ownership (as would a sale from NAI to any counterparty, including back to Midway) giving the Noteholders the right to "put", or sell, their Notes to Midway in February 2009, the Noteholders could have waived those rights. In any event, the "put" rights would have matured in April 2009, just two months later, even if the NAI/AHS Transaction had never taken place. The NAI/AHS

3

Transaction thus did no more than give the Noteholders a "put" right they could have waived, only two months before the "put" matured on its own terms.

6.

**REDACTED**

7. Finally, discovery has shown that protection of AHS's cash collateral is warranted. Midway is rapidly spending down its remaining cash

**REDACTED**

8. These facts, AHS respectfully submits, lead to the conclusion that AHS's Proposed Final Cash Collateral Order (attached to the Cross Motion as Exhibit A) (the "Proposed Final Cash Collateral Order") should be entered as proposed. If the Proposed Final Cash Collateral Order is not entered, AHS respectfully further submits that it has proved its case for relief from the automatic stay and the stay should be lifted to allow it to enforce its rights against its collateral.

## II. ADEQUATE PROTECTION OF AHS'S CASH COLLATERAL IS WARRANTED

### A. The Facts Learned In Discovery Concerning The NAI Refinancing And The NAI/AHS Transaction Support AHS's Proposed Final Cash Collateral Order

9. The Creditors' Committee has alleged inequitable conduct by National Amusements, by Sumner Redstone, by members of the Midway board of directors, and by AHS, but the record plainly shows that all that has happened in this case is that a company that needed

4

an infusion of cash got it, and a stockholder who wanted to sell his stake in a company for valid and legitimate reasons did so. The Committee would like to shift the focus of this proceeding from the straightforward question of how AHS's collateral can be adequately protected to the question of whether the creditors' rights can be altogether reordered and AHS sent to the back of the line. Nothing in the bankruptcy code permits such a reordering in this case.

**1.    Debtors Are Required To Provide Adequate Protection To Secured Lenders Against Diminishing Value Of Cash Collateral**

10.    AHS holds a perfected security interest in Midway's inventory and the proceeds thereof, including accounts receivable and cash – in short, "cash collateral" as defined in 11 U.S.C. § 363(a). If Midway desires to continue to utilize AHS' cash collateral, Midway must first obtain either AHS's consent or the authorization of a bankruptcy court. *See* 11 U.S.C. § 363(c)(2). Midway obtained AHS's consent in return for the protections negotiated in the Proposed Interim Cash Collateral Order attached to the Cash Collateral Motion (the "Proposed Interim Cash Collateral Order") most of which are contained in the Proposed Final Cash Collateral Order. If that order is not entered, there is no deal on the use of cash collateral and the Court may authorize the use of AHS's Cash Collateral only if Midway proves – and it is Midway's burden of proof, 11 U.S.C. § 363(p)(1) -- that AHS is adequately protected despite Midway's plans to spend down AHS's Cash Collateral. *See* 11 U.S.C. §§ 363(c)(2)(B), 363(e).

11.    AHS is entitled, as a matter of right and not as a matter of discretion, to receive adequate protection of its security interests in the Cash Collateral to protect it against the risk of diminution in the value of such collateral during the course of these bankruptcy proceedings. *See* 11 U.S.C. §§ 362(d), 363(e); *see also Roe Excavating, Inc. v. Thorp Discount, Inc. (In re Roe Excavating, Inc.)*, 52 B.R. 439, 440 (Bankr. S.D. Ohio 1984) (citing *In re Nixon Machinery Co.*, 9 B.R. 316, 317 (Bankr. E.D. Tenn. 1981).)

5

12.     Although not explicitly defined, section 361 of the Bankruptcy Code provides some suggestions of what constitutes "adequate protection." One such example is periodic cash payments by a debtor to a creditor (or to approve a debtor's request to do the same) to adequately protect the creditor against the depreciation of its collateral to preserve the status quo and prevent any erosion of the secured creditor's position with respect to the property until the filing of a plan of reorganization. *See* 11 U.S.C. § 361(1). The payment of current interest and a lender's professionals' fees falls within the broad parameters of section 361(1) as well. Section 361(2) also explains that replacement liens to the extent of use of diminution in the value of the secured creditor's interest in the cash collateral may provide adequate protection. The third prong of Section 361 is a "catch-all" provision that affords the Bankruptcy Court the discretion to formulate an appropriate method of adequate protection based on the facts and circumstances of each case. *See MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396-97 (10th Cir. 1987) (adequate protection is "a concept which is to be decided flexibly on the proverbial 'case-by-case' basis").

13.     A determination by a bankruptcy court that a secured creditor is adequately protected involves a valuation of the indebtedness owed to such secured creditor and of the property securing the indebtedness. *See Heritage Sav. & Loan Ass'n v. Rogers Dev. Corp. (In re Rogers Dev. Corp.)*, 2 B.R. 679 (Bankr. E.D. Va. 1980). Although there is no set standard of valuation applicable to resolve disputes concerning adequate protection, H.R. No. 95-595, 95th Cong., 1st Sess. (1977), U.S. Code Cong. & Admin. News 1978, pp. 5787, 6295, if the debtor is unable to carry its burden of proposing a satisfactory method of "adequate protection," a secured creditor threatened with a decline in the value of its security interest in the estate's property is entitled to relief from the automatic stay to pursue its remedies against the property in

6

which it has an interest. *See* 11 U.S.C. § 362(d)(1); *see also In re Heatron, Inc.*, 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980); *see generally* Cross Motion.

### 2. The Proposed Interim Cash Collateral Order Agreed Upon By The Debtors And AHS Was Entirely Reasonable

14.     The Debtors have acknowledged an immediate need to access and use AHS's Cash Collateral in order to meet their ongoing working capital obligations to purchase goods and services and to pay operating expenses in accordance with the Budget. (Exh. 69 at 114; Exh. 71 at 178) Moreover, the Debtors recognize that the consensual use of AHS's Cash Collateral is in the best interests of the Debtors since debtor-in-possession financing was extremely difficult to obtain in light of the current state of the credit markets. (Exh. 69 at 115; Exh. 71 at 110-11, 121) Nor can it be disputed, as discussed below, that based upon the Debtors' thirteen week forecasted Budget (*see* Interim Cash Collateral Order (Exhibit B), Exh. 4), the Debtors are projected to spend AHS's Cash Collateral without replenishment.

15.     Notwithstanding the fact that the value of AHS's Cash Collateral is rapidly deteriorating, AHS has nevertheless agreed to the limited use of its Cash Collateral to enable the Debtors to continue its operations and explore any possible restructuring options.

16.     The terms governing the consensual use of that Cash Collateral, set forth in the Proposed Interim Order attached to the Cash Collateral Motion, were carefully and extensively negotiated among the Debtors and AHS. The Proposed Final Cash Collateral Order contains no provision that is not routinely sought, and routinely granted, in chapter 11 cases before this court, and the Committee has not suggested otherwise.

17.     If the Proposed Final Cash Collateral Order is not entered, AHS is simply unwilling to underwrite the risk of continued operations for the sole benefit of unsecured creditors. Accordingly, to the extent the Committee seeks to modify the terms contained in the

7

Proposed Final Cash Collateral Order, AHS withdraws its consent to the use of its Cash
Collateral.

### 3. Neither Midway Nor The Committee Has Shown That AHS Is Adequately Protected

18.     If AHS does not to consent to the Debtors' use of its Cash Collateral,
Midway (or the Committee) must prove that Midway has provided AHS with adequate
protection. In such case, Midway (or the Committee) will have the burden of proving that
AHS's security interest in the deteriorating Cash Collateral is adequately protected. In order to
prove that AHS's security interest in the Cash Collateral is adequately protected, Midway (or the
Committee) must prove that the value of the collateral securing the Loan and Security
Agreement significantly exceeds the amount of debt owed to AHS. Midway (or the Committee)
will not be able to carry this burden.

#### (i) Although AHS Is Oversecured, AHS Is Not Adequately Protected Against The Declining Value Of Its Cash Collateral

19.     Although the exact value of the collateral has yet to be determined, the
parties agree that AHS is oversecured. *(See* Exh. 2 ¶1; *see also* Exh. 71 at 115) However,
AHS's equity cushion does not provide meaningful adequate protection against the decline in the
value of AHS's Cash Collateral.

20.     Under the Loan and Security Agreement, Midway's present outstanding
obligations owing to AHS are $28,952,831 plus interest, fees and expenses due under the Loan
and Security Agreement. *(See* Exh. 8) The Loan and Security Agreement is secured by liens on
substantially all of Midway's assets, including, without limitation, accounts, deposit accounts,
equipment, intellectual property, and money.

21.     There is similarly no dispute that the Cash Collateral is declining rapidly.
According to the Budget, the total amount of cash available to the Debtors would deteriorate

8

from $16,657,333 as of the week of February 9, 2009 to $4,264,735 as of the week ended May 4, 2009, representing a staggering consumption of $12,392,599 or 74.4% of AHS's Cash Collateral. (*See* Interim Cash Collateral Order (Exhibit B), Exh. 4; *see also* Exh. 71 at 119 (cash is decreasing over the last month).) Moreover, the Debtors have conceded that if they continue consuming the cash at the current rate, the Debtors' cash will be depleted by late June 2009. (Exh. 71 at 120) The consideration of appropriate adequate protection must consider the rapid use of such cash collateral and thus the rapidly declining value of AHS's cash collateral. Furthermore, the Debtors do not have any new, major video game releases which could have provided an influx in cash between now and June 2009. (Exh. 71 at 120)

> **(ii)    The Value Of The Debtors' Assets As Demonstrated In The Sale Process Suggests That AHS Is Oversecured, But Not By A Significant Margin**

22.    Although AHS is oversecured, it is not oversecured by a significant margin. Midway's cash is insufficient to secure AHS's loans. While Midway did obtain a 2008 appraisal which purports to show substantial value for Midway's assets, an examination of that appraisal shows that it was based on unrealistic and unreasonable assumptions. In any event, bids actually received by Midway for its assets show that that the appraisal is unreliable. AHS is not, in fact, oversecured by a substantial margin and will quickly become undersecured as Midway burns through its cash to a liquidation.

> **a.      Debtors Overstate The Value Of Mortal Kombat**

23.

**REDACTED**

9

**REDACTED**

24.

**REDACTED**

25.          **REDACTED**                    , the Debtors'

bankers, Lazard, embarked on a marketing process of the Debtors' assets for sale, either as a

whole or in part.  During early 2009, Lazard solicited indications of interest from a number of

strategic and financial buyers.          **REDACTED**

> **b.**  **Actual Bids Confirm That The AHS Is Not Oversecured By A Substantial Margin**

26.     Actual bids on Midway confirm that AHS is **_not_** oversecured by a

substantial margin.  These bids suggest that the market value of Midway's assets does not

substantially exceed the amount of AHS's secured debt.

**REDACTED**

10

27.     Notwithstanding these disappointing actual indications of interest by

**REDACTED**                the Objecting Noteholders (joined by the Committee) argue that

"the value of the Debtors' ongoing business could range in the tens of millions of dollars." (Exh.

2 ¶18) It appears based on the actual bids and the cash on hand that AHS is oversecured, but not

by the margin that the Objecting Noteholders purport.

### (iii)     The Record Confirms That Adequate Protection Is Appropriate Here

28.     The record confirms that the Court should provide adequate protection for

AHS. Given the uncertain and dire economic condition of the U.S. and global economy, there is

no guarantee that a sale transaction will be consummated and that the value of the Debtors'

assets will be realized in a sale. Even if the Court were to assume that, in the best case scenario,

the highest bidder, **REDACTED** would eventually purchase the Debtors' assets, the proceeds

available to satisfy AHS's secured claim would only be the sale proceeds ($30 million), plus

cash on hand as of May 4, 2009 totaling $4,264,735; this is hardly an equity cushion that

provides comfort to AHS given Midway's continuing cash burn and obligations for accrued

administrative expenses, such as payroll, benefits and FICA that could soon push Midway into

administrative insolvency.

11

29.     This fact underscores the fragile nature of AHS's equity cushion and requires AHS to bear the risk of the Debtors' efforts and declining cash balance. Accordingly, the Debtors are required to provide AHS with adequate protection to minimize this risk. *See In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 549 (Bankr. S.D.N.Y. 1997) ("The conduct of bankruptcy proceedings not only should be right but must seem right."). An equity cushion does not by itself provide adequate protection when the Debtors cannot demonstrate a reasonable likelihood of reorganization. *See Sharon Steel Corp. v. Citibank, N.A. (In re Sharon Steel)*, 159 B.R. 165, 169-71 (Bankr. W.D. Pa. 1993).

30.     Furthermore, while an equity cushion may provide adequate protection in certain circumstances, an equity cushion alone is not determinative of adequate protection. *See Shaw Indus., Inc. v. First Nat'l Bank (In re Shaw Indus., Inc.)*, 300 B.R. 861, 865-66 (Bankr. W.D. Pa. 2003) (finding that the apparent equity cushion at the petition date was likely to erode and the secured lenders were not adequately protected); *In re Timber Prods., Inc.*, 125 B.R. 433, 436 n.11 (Bankr. W.D. Pa. 1990).

31.     The valuation of assets should not be evaluated in a vacuum. *In re Sharon Steel*, 159 B.R. at 169-70. Instead, the Court should evaluate several factors to determine whether an equity cushion exists and can be maintained: (1) does the accrual of interest erode the equity cushion; (2) is the collateral depreciating or increasing in value; (3) has the debtor shown an inability to obtain refinancing since the petition; (4) has the debtor offered any other method of adequate protection; (5) do current economic conditions suggest no possibility of reorganization; and (6) has the debtor's conduct of the litigation been more than a deliberate delaying tactic. *In re Timber Prods., Inc.*, 125 B.R. at 433-34; *see also In re Stoney Creek Techs., LLC*, 364 B.R. 882, 891 (Bankr. E.D. Pa. 2007).

12

32.     AHS's equity cushion is not adequately protected as demonstrated by

applying the *Timber Products* factors to this case:

(1) The accrual of interest is eroding AHS's equity cushion. Interest payable to AHS continues to accrue interest at $4,770.11 per day (or $1.7 million annually).

(2) AHS's collateral is depreciating in value. As previously described, the Debtors' continue to use AHS's Cash Collateral in the ordinary course of the Debtors' business, thus diminishing its value as it is consumed, and without new video game products to release to market, there is no near-term prospect to replenish the cash that is utilized in the Debtors' businesses.

(3) The Debtors have shown no ability to refinance the obligations under the Loan and Security Agreement. The Debtors were unable to obtain debtor-in-possession financing.

(4) The Committee has not offered to provide AHS with adequate protection beyond replacement liens. Indeed, counsel for the Committee stated in Court that "nothing . . . in Mr. O'Desky's declaration . . . justif[ies] anything beyond replacement liens to protect the apparent lender from diminution in the value of the collateral. . . ." (February 13, 2009 Hearing Transcript, Exh. 3 at 69-70)

(5) Reorganization of the Debtors is admittedly difficult considering the current economic conditions. The Debtors' poor historical financial performance combined with their existing game franchises and future prospects for sales success do not indicate that a successful reorganization as a going concern will be possible. Rather, the Debtors will soon liquidate, selling their assets to one or several interested bidders, with many employees associated with the design process leaving the employment of the Debtors for the eventual acquirer. The creditor with the most to lose as a result of this fragility is AHS - the creditor with the highest priority lien on all of the Debtors' assets.

(6) The Debtors most recent publicly-filed cash flow projection, attached to the March 10, 2009, Stipulation and Consent Order Regarding Further Interim Use of Cash Collateral, shows a declining cash balance, leaving a slim cash balance at the end of the period for Midway to operate.

(7) The Committee seeks to set up a process that delays payment to AHS (pending constant litigation) and shifts all of the risk to AHS, while it explores expansive and time consuming litigation against AHS.

33.     All of these factors weigh in favor of providing adequate protection to

AHS as set forth in Proposed Final Cash Collateral Order. (Exh. 6) Accordingly, because the

Debtors cannot provide adequate protection with respect to AHS's Cash Collateral, AHS

13

requests that the Court enter a final order authorizing the use of Cash Collateral in the form attached to AHS's Cross Motion, or in the alternative, lifting the automatic stay to permit AHS to exercise its rights and remedies under the Prepetition Facility and applicable nonbankruptcy law.

**B.** **The Limitations On The Use Of Cash Collateral For Investigations And Prosecution Of Claims Versus The Secured Creditor Are Mandated By Section 506(c) Of The Bankruptcy Code, Which Prohibits An Entity From Surcharging A Creditor's Collateral Unless Such Surcharge Directly Benefits The Creditor**

34.     Section 506(c) of the Bankruptcy Code provides that a debtor may not, absent a secured creditor's consent, surcharge (e.g., draw on or use) a creditor's collateral unless such use benefits the creditor. *See In re Blackwood L.P.*, 153 F.3d 61, 68 (2d Cir. 1998). A committee is not even entitled to seek to surcharge a secured creditor's collateral, a right expressly reserved to the trustee. *See In re Hartford Underwriters Ins. Co. v. Union Planers Bank, N.A.*, 530 U.S. 1, 6 (2000) (holding that administrative claimant does not have independent right to seek payment of claim under 506(c) from property encumbered by secured creditor's lien since statute reserves that right only for trustee); *see also In re C.S. Assocs.*, 29 F.3d 903, 906 (3d Cir. 1994) (stating that an expense must directly benefit the secured creditors before there can be a surcharge against the collateral of such creditor).

35.     In the instant case, the Committee's use of Cash Collateral to fund its investigation and litigation would harm AHS, whose cash collateral would be drawn upon to fund such a litigation even though the outcome of the litigation itself cannot inure to the benefit of AHS. Rather, the Committee's use of AHS's Cash Collateral can only deplete or destroy the value of the collateral by reducing the amount available to repay AHS's secured claims.

36.     Thus, the Committee's right to use *any* cash collateral to finance its investigation absent AHS's consent is, at best, questionable under section 506(c) of the

14

Bankruptcy Code. The Committee is prohibited from even attempting to surcharge AHS's collateral under section 506(c), because such a right is expressly reserved to the trustee.

C. **Courts Routinely Approve Limitations On The Use Of Cash Collateral For Investigations And Prosecution Of Claims Versus The Secured Creditor**

37.     Consistent with the prohibition in section 506(c), investigation and prosecution carveouts contained in paragraph 30 of the Interim Cash Collateral Order (Paragraph 29 of the Proposed Final Cash Collateral Order) are customary in cash collateral orders and are routinely approved by courts. *See, e.g., In re Smurfit-Stone Container Corp.*, (Bankr. D. Del.) (Case No. 09-10235 (BLS)) [Docket No. 383, p. 17- 8] (limiting the investigation carve out to $30,000 and prohibiting the use of cash collateral for the prosecution of claims against the secured party); *In re Hawaiian Telcom Communications, Inc.,* (Bankr. D. Del.) (Case No. 08-13086 (PJW)) [Docket No. 41, p. 15-6] (limiting the investigation carve out to $50,000 and prohibiting the use of cash collateral for the prosecution of claims against the secured party); *In re Blue Tulip Corp.*, (Bankr. D. Del.) (Case No. 09-10015(KG)) [Docket No. 136, p.16-8] (limiting the investigation carve out to $30,000 and prohibiting the use of cash collateral for the prosecution of claims against the secured party); *see also* Judge Peter J. Walsh's Letter Re: First Day DIP Financing Orders (April 2, 1998) (permitting orders which prohibit use of cash collateral to fund prosecution of claims against the secured party).

38.     The Committee is free to investigate or undertake any other activities it believes reasonable or appropriate – it is simply not free to look to the Cash Collateral of AHS to assure the payment of such activities. There is no requirement under applicable bankruptcy law that the payment of professional fees be guaranteed and this is the risk of the chapter 11 process that all administrative claimants face and must decide whether or not to take. If the Committee really believes that its claims have merit, and that it can recover value from AHS, then the

15

Committee should take comfort that the value it will realize if it prevails under such claims will pay its professionals' fees. In addition, on information and belief, the Noteholders who initially objected to the Proposed Interim Cash Collateral Order, whose representatives sit on the Committee and whose counsel represents the Committee, are all substantial moneyed institutions with the ability to fund any litigation, including through a subordinated debtor-in-possession loan, out of their own pockets.

39.     In spite of the foregoing and without a legal obligation to do so, AHS agreed to permit up to $50,000 of AHS's cash collateral to be used for a Committee investigation even though such investigation will not provide any benefit to, and in fact diminish the value of AHS's collateral. It should not be forgotten that Milbank, counsel to the Committee, has already received $396,587.30 related to its prepetition activities representing the Objecting Noteholders in connection with the negotiation of two prepetition waiver agreements and other undisclosed activities. *See* Application to Employ Milbank, Tweed, Hadley & McCloy LLP; Exhibit B, Declaration of Gregory A. Bray, ¶ 21.

## III. DISCOVERY HAS CONFIRMED THAT THE 2008 REFINANCE, THE FACTORING AGREEMENT AND THE NAI/AHS TRANSACTION DO NOT ALTER AHS'S RIGHTS TO THE CLAIMS IT ASSERTS

40.     The Creditors' Committee has stated its intention to seek to recharacterize or equitably subordinate AHS's secured claims. As set forth below, AHS respectfully disagrees that these legal theories are viable given the record in this case. But that issue is not before the Court. The issue before the Court is whether the Debtors should fund the efforts by the Committee to investigate and litigate issues of recharacterization and equitable subordination and any other causes of action it may assert. Discovery has confirmed that the subject secured debt was negotiated at arm's length, for Midway's benefit, and at terms favorable to prevailing market

rates. Because of the record established in the last several weeks, we respectfully submit that should the Committee wish to pursue any causes of action, it should fund such litigation itself.

41.     To provide the Court with a basis to evaluate this issue, we briefly summarize the facts established during discovery:

## A.     Midway Has Long Relied On Debt To Finance Its Business

42.     Midway operates in a highly competitive industry. (Exh. 69 at 35; Exh. 72 at 30) With the need to develop next-generation video games in a tightly competitive marketplace, and with continuous operating losses for nearly a decade, Midway repeatedly turned to lenders for financing. On March 3, 2004, Wells Fargo Foothill Inc. ("Wells Fargo") and Midway entered into a loan agreement (the "Wells Fargo Loan and Security Agreement", Exh. 26), secured by all of Midway's assets. On June 29, 2007, Midway and Wells Fargo amended and restated the 2004 Wells Fargo Loan and Security Agreement. (*See* Wells Fargo Foothill Amended and Restated Loan and Security Agreement, Exh. 17; Midway Games Inc. 8-K filed July 3, 2007, Exh. 43.)

43.     Pursuant to indentures dated September 19, 2005 (the "6% Indenture," Exh. 19) and May 30, 2006 (the "7.125% Indenture," Exh. 18, and together with the 6% Indenture, the "Indentures") respectively, Midway issued two series of convertible senior notes: $75 million of 6% Convertible Senior Notes due in 2025 (the "6% Notes"); and $75 million of 7.125% Convertible Senior Notes due in 2026 (the "7.125% Notes" and collectively with the 6% Notes, the "Notes"). The Notes remain outstanding.

## B.     The February 2008 Refinancing

### 1.     In February 2008, Midway Turned To NAI For Help

44.     In December 2007, Midway's independent auditors, Ernst & Young ("E&Y"), informed Midway that it was considering whether to issue a "going concern"

17

qualification in its audit report because it did not believe that Midway would be able to continue as a going concern for the next twelve months. (Exh. 71. at 42) This qualification was based on the then projected $30-35 million cash shortfall for the year 2008 as a result, in part, of poor 2007 holiday sales. (Exh. 71 at 42, 196, 198-99)

45.     To address E&Y's concerns Midway had to "obtain a non-contingent agreement with a lender, or otherwise obtain non-contingent capital financing, ensuring the Corporation would remain solvent and avoid breaching the minimum available capital covenant in its credit facility agreement with Wells Fargo Foothill." (Exh. 56; Exh. 71 at 45)

46.     Midway had two pending deadlines by which it had to refinance the Wells Fargo Facility: March 1, to satisfy a Wells Fargo loan covenant (Exh. 71 at 47), and March 15, 2008, the date for E&Y to issue a clean audit opinion without the going concern qualification. In short, if Midway had not refinanced the Wells Fargo Facility by March 1, 2008, it would have faced a "financial Doom's day." (Exh. 71 at 50, 51; Exh. 72 at 48)

47.     Realizing the tight time period, Midway began to explore its options and considered a possible cash infusion from NAI. (Exh. 56) Although other options were considered, because the debt markets were starting to dry up in January 2008, making it extremely difficult to obtain debt financing at all (let alone for a company with Midway's poor track record), Midway considered NAI to be its best option for refinancing. (Exh. 71 at 49, 70)

48.     To explore available financing options to avoid the going concern qualification, on February 1, 2008, Midway's Board of Directors established by unanimous consent a Special Independent Committee of the Board, composed of independent directors. (Exh. 57; Exh. 71 at 55-56) The purpose of the Special Committee was to "advise the Board whether the Special Committee believes it to be in the best interest of the Company and all of its

18

voting stockholders to enter into such proposed financing transaction with NAI." (Exh. 57; *see also* Exh. 40)

## 2. Midway's Board And Special Independent Committee Were Well Aware Of And Adhered To Their Fiduciary Duties

49. In exploring the possibility of NAI refinancing the Wells Fargo Facility, Midway's Board of Directors and Midway management were keenly aware of their fiduciary responsibilities. (Exh. 71 at 54-55; Exh. 72 at 23; Exh. 69 at 23-24; Exh. 75 at 165-68) [2] The Board of Directors also received legal advice with regard to its fiduciary responsibilities from Midway's General Counsel (Exh. 71 at 53), and the Special Independent Committee received legal advice from the law firm of Dewey LeBoeuf to ensure that they were following their fiduciary responsibilities with regard to possible financing from NAI. (Exh. 71 at 67) There is no question that the Special Independent Committee kept itself as informed as possible regarding the NAI transaction, made sure that the "terms were at arm's length," and "compar[ed] it to other transactions that transpired on or around or before that time with other companies." (Exh. 72 at 86-87)

50. Shortly after the Special Independent Committee was formed in early February 2008, the Board was informed about a "deeply disturbing" incident involving Midway's cash projections for 2008. (Exh. 60) It was discovered that Midway's financial planning and analysis department had implemented a new system to run financial projections and discovered an error in the budgeting which created a much larger shortfall within the accounts payable line of the balance sheet. (Exh. 71 at 34-35) Midway's initial projection of a $30-35 million shortfall turned out to be a shortfall of $85-90 million. *Id.*

---

[2] Ms. Redstone also testified that NAI's board was also "always very cognizant of all of our fiduciary responsibilities and trying to meet them." (Exh. 75 at 101)

19

51.     Even before this mistake was discovered, Midway had begun to explore refinancing the Wells Fargo Facility with NAI. Midway's Special Committee considered taking on additional debt, selling additional equity, or a sale of assets to eliminate the going concern opinion, but as Midway focused on the problem, Midway realized that debt was the only option. (Exh. 72 at 67) "[W]e didn't believe that there would be any investor who would put in money as equity, there was no such investor out there, and we didn't believe there was." (Exh. 72 at 68). Midway Management did a written summary of Midway's options, similarly concluding that debt was the only viable option to Midway. (Exh. 59; Exh. 71 at 60-66)

## 3.     The February 2008 Refinancing Was Negotiated At Arm's Length For Midway's Benefit

52.     Ultimately, the Special Committee concluded that the NAI refinancing was in the best interests of Midway, relying in part on a February 26, 2008 memorandum by Mr. O'Desky that concluded that the "rates being offered to the Company for the NAI LSA are lower than those the Company could get in the marketplace today and are at least as good as the Company could get from an arms length transaction. In addition, the rates are within the range of those rates that have closed over the last 12 months and especially the last 3 months. As such, management believes that the rates being proposed for the NAI LSA are reasonable and justified." (Exh. 61; *see also* Exh. 71 at 67-68; Exh. 72 at 89)

53.     The NAI refinancing was recommended to and approved by Midway's Board on February 27, 2009. (Exh. 62) Before the board considered the proposed NAI refinancing, Ms. Redstone, who was also the President of NAI and a member of NAI's Board, recused herself from consideration of the loans and Peter Brown replaced her as chair during the meeting. (Exh. 62; Exh. 71 at 88-89) Mr. Steele, a Vice President of NAI, was replaced on the Audit Committee by Mr. Califano, an independent director. (Exh. 62) Ms. Redstone and Mr.

20

Steele abstained from voting for the resolutions approving the NAI refinancing. (Exh. 62; Exh. 71 at 89-90)

54.　　Midway Management, the Midway Board, and the Outside Auditors all reviewed and approved the NAI refinancing and Midway closed the $90 million refinancing of the Wells Fargo Facility on February 29, 2008.

### 4.　The February 29, 2008 Transaction Was A Refinancing Of The Wells Fargo Facility

55.　　The Committee insinuates (Exh. 2 ¶¶ 4-5) that the so-called "insider loans" saddled Midway with new and onerous debt, leaving Midway "highly leveraged and insolvent." (Exh. 2 ¶ 8.) That is not the case. The NAI Secured Facility was simply the refinancing of the preexisting Wells Fargo Secured Facility. (Exh. 71 at 90-91)

56.　　Many of the material terms of the Wells Fargo Secured Facility and the NAI Secured Facility are substantially similar, if not identical.

| | Wells Fargo Secured Facility | NAI Facility |
|---|---|---|
| **Facility Amount** | $30,000,000 | Identical |
| **Borrowers** | Midway Home Entertainment Inc. and Midway Amusement Games, LLC | Identical |
| **Credit Parties** | Midway Games Inc., Midway Games West Inc., Midway Interactive Inc., Midway Sales Company, LLC, Midway Home Studios Inc., Surreal Software Inc., Midway Studios – Austin Inc., and Midway Studios – Los Angeles Inc. | Identical |
| **Maturity** | June 29, 2012 | Identical |
| **Interest** | • LIBOR plus 2.75% or<br>• Bank of America Prime Rate plus 1.5%<br>Minimum Rate: 4.0%<br>Default Rate: applicable rate plus 2.0% | Identical, except that Eurodollar denominated loans accrue interest at LIBOR plus 3.75% |
| **Permitted Indebtedness** | See § 7.1 of the Wells Fargo Secured Facility | Expanded upon the scope of indebtedness permitted under the Wells Fargo Secured Facility to allow for the incurrence of $40 million in unsecured loans and $20 million of unsecured subordinated debt. (§ 7.1) |

57. As a result of the 2008 Refinancing, E&Y issued a clean audit opinion for 2007, without the going concern qualification. (Exh. 71 at 70) This transaction allowed Midway to continue to pay its creditors in 2008 (including the Noteholders) and there has been no evidence that any creditor complained about the NAI refinancing at the time.

58. NAI also believed that the 2008 Refinancing made good business sense for all involved because it was "a great thing for Midway to receive additional funding, and National was a significant shareholder in Midway and I think the success of Midway is something that was certainly important to National." (Exh. 75 at 66) Mr. Redstone repeatedly testified that the NAI refinancing was in the best interests of Midway, was an appropriate transaction, and was done to protect, help, and keep Midway going. (Exh. 77 at 37-38, 40, 79, 81, 95) He added that he approved the transaction and would approve it again today. (Exh. 77 at 38)

## C. The Factoring Agreement Was Negotiated At Arm's Length For Midway's Benefit

59. In March 2008, after becoming Interim CEO and Interim CFO, Mr. Booty and Mr. O'Desky reviewed Midway's planned releases for 2008, concluding that that the game TNA Impact, scheduled for launch in the spring, was not ready to be released and decided to push the release date back to September 2008. (Exh. 71 at 18) The delayed launch of TNA Impact caused a short-term cash need that could not be covered by the $90 million NAI Facility. (Exh. 71 at 20; Exh. 69 at 48-50) This shortfall prompted Midway to enter into the Factoring Agreement with NAI. Mr. Booty testified that he proposed the Factoring Agreement, and that the idea did not come from NAI. (Exh. 69 at 44-45)

60. Prior to entering into the Factoring Agreement with NAI, Midway explored other options of getting a factoring agreement with other entities, but ultimately concluded that NAI had the best proposal. (Exh. 71 at 96; Exh. 75 at 173; Exh. 69 at 78-80; Exh.

22

66) The Factoring Agreement with NAI was entered into at arm's length. (Exh. 72 at 108) The Board concluded, after a review by the Special Independent Committee, that the terms offered by NAI were at least as good as those available elsewhere. (Exh. 75 at 173; Exh. 65)

61.     On September 11, 2008, Midway's Board approved the Factoring Agreement with NAI and on September 15, 2008, Midway and NAI entered into the Factoring Agreement to finance inventory purchases and fund operations related to product offerings in the fourth quarter of 2008. (Exh. 1 at ¶¶ 29-30) The Factoring Agreement allowed Midway to push back the release date of TNA Impact and to continue to operate from September through November 2008. (Exh. 6. at 128) This agreement expired on December 31, 2008. (Exh. 1 at ¶ 31)

## D.     By The Fall Of 2008, Midway Was Facing Mounting Uncertainty

62.     Midway was concerned about the impending conversion of the 6% notes that were coming due in April 2009. In October 2008, Midway created another special committee of the board to address the financial and operational challenges facing the corporation and to study financing options. (Exh. 71 at 96) This committee was formed to address the reasonable likelihood that the 6% noteholders would exercise their option to put their notes to Midway in April of 2009 for $75 million. (Exh. 71 at 97) Midway would not be able to pay out the notes at that time.

63.     The Board of Directors also hired consultants, Lazard, in November 2008, to help assess the restructuring of the 6% notes. (Exh. 71 at 98) Lazard was hired to assist Midway in assessing its financial options *before* the AHS/NAI transaction in November 2008, including a bankruptcy restructuring. (Exh. 71 at 98)

**E.** **Despite Midway's Efforts To Make The Company Profitable, Midway Missed Its Earnings Forecasts In The Fourth Quarter Of 2007 And In Two Out Of Three Quarters For 2008**

        64.    Midway hosted earnings conference calls for the fourth quarter of 2007 through the third quarter of 2008. Mr. O'Desky participated in these calls in his capacity as Interim CFO and CFO. (Exh. 71 at 27; Exhs. 48, 49, 51) During these calls in which Mr. O'Desky reported on the financial state of Midway, Mr. O'Desky reported a shortfall in EPS ("earnings per share") guidance and attributed the shortfall in EPS guidance to the accelerated amortization of certain product development costs, additional price protection and non-cash expense relating to the 6% Notes. (Exh. 71 at 27-28; Exhs. 48, 49, 51) Midway never mentioned the 2008 Refinancing as a cause for its earnings shortfalls because the NAI Facility was "not material enough" to impact whether or not Midway hit its EPS guidance. (Exh. 71 at 31)

**F.** **The NAI/AHS Transaction Was Negotiated At Arm's Length To Help NAI, And Did Not Harm Midway**

        65.

**REDACTED**

    NAI hired Citigroup to look for potential purchasers. (Exh. 73 at 122) Citi failed to find interested investors. **REDACTED**

24

### 1. The NAI/AHS Transaction

#### (ii) Who Is Mark Thomas?

66.     Mark Thomas is a high net-worth individual who lives in Massachusetts and who makes private equity investments from time to time. (Exh. 24 ¶¶ 1, 4) His net worth exceeds $10 million and he has no debt. (Exh. 24 ¶ 2)[3]

67.     In addition to being the principal of AHS, Mr. Thomas is currently the sole Managing Director of Estabrook Partners, LLC, a private equity firm that he founded in 2007. His business savvy is evident from his vast prior experience in structuring, negotiating, and executing complex business transactions and restructurings from 1980 to the present. (Exh. 24 ¶ 2, *see also* Exh. 25)

#### (iii) Mark Thomas Entered The NAI/AHS Transaction In Good Faith

68.     On November 14, 2008, Mr. Thomas was approached by lawyers at Shearman & Sterling, Mr. Redstone's longtime lawyers and advisors, on whom he relied, about participating in what became the NAI/AHS transaction. (Exh. 74 at 43-44; Exh. 73 at 127-28) The Shearman & Sterling lawyers contacted him because they knew Mr. Thomas from past transactions and of his vast experience in executing mergers and acquisitions over the past thirty years. (Exh. 74 at 46) Mr. Thomas had closed complex transactions quickly, efficiently, and successfully. (Exh. 74 at 46-47)

---

[3] At his deposition, Mr. Thomas explained that his net worth includes $5 million to $6 million in cash and liquid securities, approximately $2 million in personal property, and his home, worth approximately $12 million. (Exh. 74 at 17-18) Thomas explained that, for estate planning purposes, he transferred his interest in his home to his wife on November 26, 2008, but that the value in the home is practically available to him should the need for cash arise. (Exh. 74 at 19-20)

69.     Prior to the NAI/AHS transaction, Mr. Thomas had not done business with Sumner Redstone or Shari Redstone, did not know them, and had never met them. (Exh. 24 ¶ 3; Exh. 77 at 67, 75) Ms. Redstone testified that she does not "know anything really about the transaction at all" (Ehx. 75 at 111), "knew nothing about the sale" (Exh. 75 at 147), and still does not know who Mr. Thomas is (Exh. 75 at 159, 174). Mr. Redstone testified that he would not know Mr. Thomas if he was in the room with him. (Exh. 77 at 76)

70.     Mr. Thomas informed Shearman & Sterling that he needed some time to investigate the transaction and he spent a couple of hours initially looking at public information about Midway to see if he was even interested. (Exh. 74 at 49) Mr. Thomas reviewed Midway's publicly filed documents and analyst reports and determined that it would take tens of millions of dollars to restructure Midway. (Exh. 74 at 49-50) He realized that given the current economic meltdown, it would be extremely difficult to raise the amount of debt necessary to finance Midway's restructuring. (Exh. 74 at 58) Mr. Thomas contacted Centerbridge, a $7.5 billion firm with experience in buying distressed companies, to see if it would be interested in doing the deal with him. (Exh. 74 at 60) After looking into Midway, Centerbridge informed Mr. Thomas that it was not interested in doing the deal, it was not worth its time and effort (Exh. 74 at 139), and that in fact, NAI or Sumner Redstone would have to pay them to do the deal. (Exh. 74 at 72)

71.     Mr. Thomas decided to pursue the opportunity on his own. On November 20, 2008, he made an initial offer of $1 million. (Exh. 74 at 72) After investigating the risks involved in the deal further and consulting with financial and legal experts, Mr. Thomas decided that the risks were higher than he initially thought and reduced his offer to $100,000 on November 24, 2008. (Exh. 74 at 73-74, 75-76) Due to the speed with which the deal had to be done, Mr. Thomas was not afforded the opportunity to engage in a full due diligence process.

26

After arm's length negotiations, the parties agreed to this purchase price on November 26, 2008. (Exh. 74 at 88-89)

72.     On November 28, 2008, Sumner Redstone, NAI, and NAI's affiliate Sumco, Inc. (as sellers) entered into the Stock Purchase Agreement, providing for the sale of 87.2% of the total issued and outstanding shares of Midway's common stock to AHS; and a Participation Agreement whereby AHS purchased a 100% participation interest in the NAI Secured Facility and the NAI Unsecured Facility (collectively the "November 2008 Transaction"). On January 20, 2009, AHS's participation interest was elevated to the status of "Lender" under the NAI Secured Facility and NAI Unsecured Facility, pursuant to the Assignment and Acceptance Agreement between NAI and AHS.

### (iv)     The Possibility Of Such A Sale Was Long Known To The Noteholders

73.     The sale of NAI's interests in the NAI Secured Facility, the NAI Unsecured Facility, and 87.2% of Midway's common stock should not have come as a surprise to the Noteholders. Midway had long disclosed the possibility of such a transaction, as well as its potential implications. (Exh. 71 100-02) Indeed, Midway's 10-Ks clearly disclosed the possibility of such a transaction. (*See, e.g.,* Exh. 37 at 24-25) Additionally, the very notes held by the Noteholders specifically contemplated such transactions. (*See* 6.0% and 7.125% Prospectuses, Exhs. 20, 21)

## G.     There Is No Evidence That The Noteholders, Or Anyone Else, Was Harmed By The NAI/AHS Transaction

### 1.     There Is No Evidence That The NAI/AHS Transaction Eliminated Any Deferred Tax Assets

74.     The Committee contends that because of the NAI/AHS transaction, "it appears that the Debtors immediately and irretrievably lost their ability to utilize tens of millions,

27

and perhaps, even hundreds of millions, of dollars in favorable tax attributes." (Exh. 2 ¶ 9) The Debtors have yet to be able to quantify any loss of "tax attributes." And, that is no surprise. Midway has long ascribed no value to its domestic NOL position for financial reporting purposes because of its view that its history of losses rendered the domestic NOLs essentially worthless. (Exh. 38, Note 8; *see also* Exh. 39, Note 7; Exh. 71 at 82, 83-84, 102-03) And, Midway did not view the NOLs as important to the operational finances of Midway and they never played any role in its cash planning. (Exh. 69 at 166-68)

75.     Perhaps more importantly, Mr. O'Desky testified that Midway is coming to the view that the November transaction between NAI and AHS did not eliminate Midway's NOLs. (Exh. 71 at 86)

## 2.     The Noteholders, Not AHS And Not Mr. Thomas, Made The Decision To Accelerate Their Debt After The NAI/AHS Transaction

76.     The Committee contends that the NAI/AHS transaction triggered redemption obligations under the Indentures that Midway was unable to satisfy because Midway lacked the cash to repurchase the Notes. Under the Indentures for both the 6% Notes and the 7.125% Notes, a change of control such as the NAI/AHS transaction gave the holders of the Notes an immediate (but optional) right to demand the repurchase of their Notes. (Exh. 71 at 104; Exhs. 18, 19) The Noteholders could have decided not to put their Notes. (Exh. 71 at 105) The NAI/AHS transaction did not *cause* the Noteholders to put their Notes; it merely gave the Noteholders the option. The decision was theirs.

## 3.     The Noteholders' Right To Put Their Notes Would Have Arisen In Spite Of The NAI/AHS Transaction

77.     The Committee faults the NAI/AHS Transaction for pushing Midway into bankruptcy, but it was the decision of the *Noteholders* to exercise their own repurchase options that pushed Midway to the brink. Under the Indenture for the 6% Notes, Midway was contractually

28

obligated to repurchase some or all of the Notes on April 30, 2009, only five months after the

NAI/AHS transaction. (Exh. 19 § 3.08) Midway was well aware of this inevitable event and

expressed concern regarding this in its 2008 second-quarter 10-Q:

> "Based on current market conditions, we believe it is reasonably likely that a substantial number of the holders of the 6 percent rights will exercise their repurchase rights on April 30, 2009."

(Exh. 41 at 21; *see also* Exh. 69 at 93-95) This prompted Midway to hire Lazard in November

2008, before the NAI/AHS transaction, to deal with the restructuring of the Notes. (Exh. 71 at

98).

78.     Midway faced other potential default triggers. Midway's stock price

began an inexorable slide at the end of 2005 and had fallen below one dollar by early November

2008, before the NAI/AHS transaction, which occurred November 28, 2008. In fact, for the

month of November 2008, Midway's common stock traded at an average of $0.43 per share. By

virtue of trading below a dollar, Midway was already at risk of being delisted by the NYSE, a

fact about which Midway warned the public on November 11, 2008. (*See* Exh. 42 at 23; Exh.

45) Midway was in fact delisted on February 12, 2009. (*See* Exh. 46) Such a delisting would

also trigger the noteholder's put rights. (Exh.19 § 3.09(J)(ii) at 29; Exh. 18 § 3.09(J)(ii) at 28)

## IV. EQUITABLE SUBORDINATION OR RECHARACTERIZATION OF AHS'S CLAIM IS UNWARRANTED HERE

## A.     The Facts Learned In Discovery Concerning The 2008 Refinancing Do Not Support The Equitable Subordination Or Recharacterization Of AHS's Claims

79.     The Creditors' Committee first questions the 2008 Refinancing. Because

the record makes clear, among other things, that this transaction was the subject of a robust and

independent review, that its terms were fair to Midway, and that the servicing of this debt was

"immaterial" to Midway's financial performance, it cannot form the basis of either a sustainable

equitable subordination or recharacterization claim. Accordingly, there is no basis for Midway

KL3 2710287.3

to fund (with AHS's Cash Collateral) the investigation into, let alone the litigation of, such claims.

80.     Equitable subordination is an "extraordinary" and "sparingly" applied remedy, *Bank of N.Y. v. Epic Resorts-Palm Springs Marquis Villas, LLC (In re Epic Capital Corp.)*, 307 B.R. 767, 773 (D. Del. 2004), that courts consider to be "drastic." *Cohen. v. KB Mezzanine Fund II, L.P. (In re SubMicron Sys. Corp.)*, 291 B.R. 314, 329 (D. Del. 2003), *aff'd*, 432 F.3d 448 (3d Cir. 2006).

81.     If the standard for insiders is applied to AHS's interests, the Court will require a showing of three elements before ordering equitable subordination: (a) the claimant must have engaged in inequitable conduct; (b) the misconduct must have caused injury to the creditors or conferred an unfair advantage on the claimant; and (c) equitable subordination of the claim must not be inconsistent with provisions of the Bankruptcy Code. *In re SubMicron Sys. Corp,* 432 F.3d at 462.

82.     Here, the Creditors' Committee cannot prevail because, put simply, there was no conduct that was even arguably inequitable with regard to the 2008 Refinancing. Midway, its board members, and NAI acted with great care in undertaking the loan transactions. The transaction was considered and negotiated by an independent, special committee that was advised by its own counsel, Dewey LeBoeuf, and by Midway's in-house counsel, on fulfilling its fiduciary obligations. *See* 8 Del. C. § 144(a)(1) (providing safe harbor for interested transactions approved by majority of independent directors); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906 A.2d 114, 120 (Del. 2006) (after approval by disinterested directors, courts review interested transaction under business judgment rule). The Special Committee walled off from its deliberations the two members of the board who were associated with NAI, both of

30

whom abstained from voting on the resolution to approve the loan. This was an arm's length transaction undertaken for the sole purpose of helping Midway through a rough financial period so that Midway could produce and market a new crop of games already scheduled for release. Management and the board believed this strategy would make Midway profitable and was, therefore, in the best interest of Midway.

83.     The Creditors' Committee would have the Court overlook the absence of inequitable conduct and instead focus on Midway's purported approaching insolvency. But the Delaware Supreme Court has roundly rejected deepening insolvency as a cause of action under Delaware law. *Trenwick Am. Litig. Trust v. Ernst & Young*, 906 A.2d 168, 204 (Ch. 2006), *aff'd sub nom.*, *Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007). Delaware Bankruptcy Courts have similarly rejected "deepening insolvency" causes of actions cast by using other names. *Official Committee of Unsecured Creditors v. Tennenbaum Capital Partners (In re Radnor Holdings Corp.)*, 353 B.R. 820, 842 (Bankr. D. Del. 2006). To the extent that the Creditors' Committee claims that the NAI Refinancing was a "loan to own" scheme like the one alleged in *Radnor*, this Court should reject such a claim just as this Court did in *Radnor*.[4] To be sure, if NAI's plan was to ready itself to benefit from Midway's bankruptcy, why did NAI advance $90 million when only $30 million could be secured? The answer is that no one – not NAI, not Midway management, and not the Midway directors – was angling for a good position in bankruptcy. To the contrary, all were working assiduously to turn Midway around.

---

[4] *In re The Brown Schools*, 386 B.R. 37 (Bankr De. 2008) does not alter this conclusion because, among other things, its facts are distinguishable from the facts established in this case. For instance, there was no Independent Special Committee in *The Brown Schools*, as there was here.

KL3 2710287.3

84.     And, the Creditors will have difficulty showing how the 2008 Refinancing harmed them. They are in no worse position than they were prior to the February 2008 Transaction. To the extent the February 2008 Transaction prolonged Midway's bankruptcy filing, the Noteholders, for instance, actually gained by getting interest payments along the way. *See Mr. R's Prepared Foods, Inc.,* 251 B.R. 24, 30 (Bankr. D. Conn. 2000) (where insider's purchase of bank note left other creditors in same position as they would have been had the bank collected the debt itself, no unfair advantage was gained, accordingly the Court held that equitable subordination did not apply); *see also Agincourt, L.L.C. v. Stewart (In re Lake Country Inv.)*, Nos. 99-20287, 00-6064, 2001 WL 267475, at *12 (Bankr. D. Idaho March 19, 2001) (holding that insider's acquisition of secured debt in and of itself, without injury to the debtor or unfair advantage, does not justify equitable subordination).

85.     The Creditor's Committee is on no firmer ground in seeking to recharacterize NAI's infusion of cash as equity rather than debt. The Third Circuit has expressly stated that the "overarching inquiry" in recharacterization cases is "whether the parties called an instrument one thing when in fact they intended it as something else." *In re SubMicron Sys. Corp.*, 432 F.3d at 456. Here, the parties' intent was clearly expressed not only in the names of the instruments but in their terms, and in the parties' actions: all three of the loans had fixed maturity dates, all had interest rates spelled out in the loan agreements, and all granted NAI the right to enforce payment of principal and interest. Witnesses testified that Midway treated the NAI financing as debt and specifically considered but rejected seeking an equity infusion from NAI. NAI's $30 million secured loan refinanced an existing secured debt under terms that were nearly identical. That Midway was facing financial difficulty is not, without more, grounds to recharacterize the loans as equity. *In re SubMicron Sys. Corp.*, 432 F.3d 456-57.

32

**B. The Facts Learned In Discovery Concerning The NAI/AHS Transaction Do Not Support The Equitable Subordination Or Recharacterization Of AHS's Claims**

86.     The Creditors Committee has made much of the price paid by AHS for the NAI stake in Midway Games. It has also complained loudly about the purported damage done by Sumner Redstone and NAI because of the NAI/AHS Transaction. The facts established through discovery show that despite how much this transaction may have upset the Creditors, and even though the price paid by Mark Thomas' AHS may have been only $100,000, there is no basis to unwind the transaction or alter Mr. Thomas' security interest in Midway's assets.

**1. The Consideration Paid In The NAI/AHS Transaction Has No Legal Relevance To The Assessment Of The Transaction**

87.     The Committee objects to the price AHS paid for its claim but that objection is a sideshow. The price paid is irrelevant. Courts have uniformly held that the consideration paid for a claim is irrelevant *as a matter of law* to the allowance of the claim in the absence of special circumstances or obligations, none of which are present here. The recent case of *In re Hill*, 399 B.R. 472, 474 (Bankr. W.D. Ky. 2008) illustrates the point.

88.     In *Hill*, a debtor challenged the claim of a creditor who had purchased the debtor's credit card debt from a prior creditor at a deep discount, paying only a nominal fee for it. *Id.* at 473. The debtor argued that allowing a full recovery on a debt purchased for a nominal amount would unjustly enrich the purchaser of the debt, providing a windfall. *Id.* The Bankruptcy Court was unconvinced:

> Debtor's argument defie[d] common sense and the law. The Debtor somehow equates the transfer of accounts with equitable subrogation. The Court has been unable to find any authority to support the Debtor's tortured logic. The Court again agrees with [the creditor] that the **consideration paid for these accounts has absolutely no bearing on the allowance or disallowance of this claim** and will not dignify the argument with further discussion.

33

*Id.* at 474 (emphasis added). *See also In re Bidermann Indus. U.S.A., Inc.,* 203 B.R. at 552 ("The debtors and the committee of unsecured creditors attempt to turn this dispute around to an attack on the motives of the objectants, who, they say, are simply trying to obtain more than the windfall which they will already be receiving for the claims which they acquired at a discount. There is, however, nothing inherently improper about purchasing claims at a discount. There is something to be said, in contrast, about the liquidity given to creditors through the existence of a secondary market for their claims."); *Fairfield Executive Assocs. v. Hyperion Credit Capital Partners (In re Fairfield Exec. Assocs.),* 161 B.R. 595, 605 (D.N.J. 1993) ("the manner in which [the creditor] acquired the claim and the amount it paid for the loan are not relevant to the legal status of the claim"); *Midstate Res. Corp. v. Burgess & Fenmore,* 756 A.2d 605, 607 (N.J. Super. Ct. App. Div. 2000) (rejecting argument that plaintiff's losses must be capped at purchase price because plaintiff would obtain a "windfall" by collecting more than it paid).

89.     There is a strong public policy underlying this rule. Disallowing a claim negotiated at arms length on the basis that the purchaser would gain a significant return discourages the acquisition of distressed debt. Yet, the market for distressed debt is crucial to financial viability, especially in this troubled economy. Accordingly, the amount AHS paid for its position in the Debtors has no bearing on the validity of the claim.

### 2.     The Price Paid Had No Impact On Midway

90.     In any case, the price that AHS paid to acquire NAI's shares and debt in Midway is irrelevant to the Debtors. The Noteholders and Midway would be in the exact same position today no matter what price AHS had paid to NAI. Midway owed the same amount in debt before and after the transaction. The transaction only changed to whom the debt was owed. In fact, when asked to give its consent to an assignment of NAI's rights as a lender to AHS, the Midway Board concluded that it was a good idea to take NAI out of the payment arrangement

34

"[b]ecause it didn't really matter one way or the other. Didn't affect what we were doing at all. We didn't believe there was any benefit or detriment one way or the other." (Exh. 71 at 163) And the Noteholders themselves admit that AHS's acquisition of the Redstone interest in Midway did not result in the encumbrance of any previously unencumbered assets. (Exh. 70 at 74-75)

**C.** **Although Creditors Claim They Have A Breach Of Fiduciary Duty Claim Against Sumner Redstone And NAI, Such A Claim Does Not Impact The Rights Of AHS Or Mark Thomas**

91.     The Creditors' Committee has insinuated that Sumner Redstone engaged in misconduct by selling a stake he could no longer afford in Midway and that this purported misconduct impacts AHS's claims in this case. This line of argument fails for a number of reasons.

92.     First, the conduct of Mark Thomas does not give rise to either a claim for equitable subordination or recharacterization (or anything else, for that matter). Mark Thomas, through AHS, purchased equity and debt of Midway in an arm's length transaction that others,

**REDACTED**          . had turned down. That simply is not actionable conduct and to suggest otherwise would be to advocate a dramatic departure from current law.

93.     Second, it is not at all clear how the Creditors' Committee has a breach of fiduciary duty claim against either Sumner Redstone or NAI with regard to the NAI/AHS transaction. Shareholders – even controlling shareholders – are free to sell their shares. *In re CompuCom Systems, Inc. Stockholders Litig.*, No. Civ.A. 449-N, 2005 WL 2481325, at *6 (Del. Ch. Sept. 29, 2005) (controlling shareholder has right to sell control share without regard to others so long as transaction is in good faith). Majority shareholders have the right to act in their own self-interest when they are acting in their capacity as shareholders. *See, e.g., Orman v. Cullman*, No. 18039, 2004 WL 2348395, at *5 (Del. Ch. Oct. 20, 2004); *see also Omnicare, Inc.*

35

*v. NCS Healthcare, Inc.,* 818 A.2d 914, 938 (Del. 2003) (finding that majority shareholders have "an absolute right to sell or exchange their shares with a third party at any price.")

94.     Although the law may impose a duty on a controlling shareholder when he or she sells to an outsider to take due care to "ascertain that the buyer does not intend or is unlikely to plan any depredations of the corporation," *Harris v. Carter*, 582 A.2d 222, 233 (Del. Ch. 1990), that duty is not implicated here. Mr. Thomas was known to Mr. Redstone's advisors and had no plans – and still has no plans – to loot Midway or defraud anyone. The fact that Mr. Thomas has testified that he does not intend to provide additional money to Debtors in the form of financing or otherwise and that he does not have the means to do so (Thomas Tr. at 24-25), does not alter the conclusion. A controlling shareholder does not have an obligation to provide further funds to a corporation in which he holds shares. *Jedwab v. M.G.M. Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986) (Delaware law does not require controlling shareholders to sacrifice own financial interests for sake of corporation); *Odyssey Partners, LP v. Fleming Cos., Inc.*, 735 A.2d 386, 415 (Del. Ch. 1999) (controlling shareholder's obligation does not require self-sacrifice).

95.     And, it is likely that Midway and its creditors actually benefitted from the NAI/AHS transaction.

## REDACTED

96. Even assuming *arguendo* that Sumner Redstone or NAI breached a fiduciary duty, the Committee cannot show that AHS aided and abetted Mr. Redstone in a breach of fiduciary duty. The elements of aiding and abetting a breach of fiduciary duty are: (1) the existence of a fiduciary relationship, (2) a breach of a fiduciary's duty, and (3) *a knowing participation in the breach by the non-fiduciary. In re Radnor Holdings Corp.*, 353 B.R. at 844. A plaintiff must prove that the non-fiduciary "knowingly participated not just in the transactions but in the breach of fiduciary duties." *Id.; see also HMG/Courtland Properties, Inc. v. Gray*, 749 A.2d 94, 121 (Del. Ch. 1999) (parties must have understanding "with respect to their complicity in [the] scheme to defraud or in [a] breach of fiduciary duties"); *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001) (plaintiff must establish that the defendant acted "with the knowledge that the conduct advocated or assisted constitutes such a breach [of fiduciary duty].") There are simply no facts in the record supporting an allegation that Mr. Thomas participated knowingly in a breach of Mr. Redstone's duties.

37

## CONCLUSION

WHEREFORE, for these reasons and those set forth in AHS's Limited Objection and Lift Stay Motion, AHS respectfully requests that the Court enter a final Cash Collateral order in the form attached as Exhibit A to AHS's Limited Objection and Lift Stay Motion.

Dated: March 30, 2009

PACHULSKI STANG ZIEHL & JONES LLP

_____

Laura Davis Jones (Bar No. 2436)
Michael R. Seidl (Bar No. 3889)
Timothy P. Cairns (Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 1899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
        tcairns@pszjlaw.com

and

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Thomas Moers Mayer, Esq. (admission *pro hac vice* pending)
Timothy P. Harkness, Esq. (admitted *pro hac vice*)
Gordon Z. Novod, Esq. (admitted *pro hac vice*)
1177 Avenue of Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Email: tmayer@kramerlevin.com
        tharkness@kramerlevin.com
        gnovod@kramerlevin.com

Counsel to Acquisition Holdings Subsidiary I LLC

KL3 2710287.3