1                IN THE UNITED STATES BANKRUPTCY COURT

2                   FOR THE DISTRICT OF DELAWARE

3   IN RE:                          :
                                    : Chapter 11
4   MIDWAY GAMES INC., et al.,      :
                                    : Case No. 09-10465 (KG)
5        Debtors.                   :
    . . . . . . . . . . . . . . . .

6
                             Wilmington, Delaware
7                              April 1, 2009
                                10:02 a.m.
8
                          TRANSCRIPT OF HEARING
9               BEFORE THE HONORABLE KEVIN GROSS
                  UNITED STATES BANKRUPTCY JUDGE
10
    APPEARANCES:
11
    For the Debtors:           Michael D. DeBaecke, Esquire
12                             Steven Caponi, Esquire
                               Victoria Guilfoyle, Esquire
13                             Blank Rome, LLP

14  For Acquisition
    Holdings Subsidiary        Thomas Mores Mayer, Esquire
15  I, LLC                     Gordon Z. Novod, Esquire
                               Timothy P. Harkness, Esquire
16                             Kramer Levin Naftalis & Frankel, LLP

17                             Laura Davis Jones, Esquire
                               Pachulski Stang Ziehl & Jones
18
    For Official Committee
19  of Unsecured Creditors:    Daniel M. Perry, Esquire
                               Linda Dakin-Grimm, Esquire
20                             David B. Zolkin, Esquire
                               Milbank Tweed Hadley McCloy, LLP
21
                               Marcos Ramos, Esquire
22                             Richards Layton & Finger, P.C.

23  For UST:                   David L. Buchbinder, Esquire
                               U.S. Trustee Programs
24                             Department of Justice

25

1  For National
   Amusement, Inc.:              John Dorsey, Esquire
2                                Young Conaway Stargatt & Taylor, LLP

3                                Jaculin Aaron, Esquire
                                 Shearman & Sterling, LLP
4
   For the Board:               Timothy Karcher, Esquire
5                                Dewey & LaBoeuf, LLP

6  VIA TELEPHONE:

7  For Shari Redstone:          Elizabeth B. Burnett, Esquire
                                 Bill Cowan, Esquire
8                                Mintz Levin Cohn Ferris Glovsky &
                                 Popeo, P.C.
9
   For National Amusement
10 Inc.:                         Curt E. Goldman, Esquire
                                 Shearman & Sterling, LLP
11

12 Court Recorder:              Brandon McCarthy

13 Transcription Service:       Perfect Pages Transcription, Inc.
                                 18 Tuckerton Road
14                               Shamong, NJ 08088
                                 www.perfecttranscripts.com
15                               (609) 654-8880

16

17 Proceedings recorded by electronic sound recording;
   transcript produced by transcription service.
18

19

20

21

22

23

24

25

<u>INDEX</u>

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

<u>Witnesses For Debtors:</u>

Ryan O'Desky
(By Mr. Caponi)          29                    186
(By Mr. Harkness)                   61                    198, 207
(By Ms. Dakin-Grimm)               94       202

<u>Witnesses For Acquisition Holdings:</u>

Mark E. Thomas
(By Mr. Harkness)        214
(By Ms. Dakin-Grimm)     255

| <u>EXHIBITS:</u> | | <u>Marked</u> | <u>Received</u> |
|---|---|---|---|
| 4 | Form 10-K | 94 | |
| 5 | Motion for cash collateral | 49 | |
| 6 | Final Order for use of cash collateral | 53 | |
| 7 | Minutes | 116 | |
| 8 | E-mail | 119 | |
| 10 | Draft minutes | 123 | |
| 11 | Document | 124 | |
| 13 | E-mails | 142 | |
| 15 | E-mail | 147 | |
| 16 | June 25 Board meeting minutes | 120 | |
| 17 | E-mail | 148 | |
| 20 | Curriculum vitae | 255 | |

| 21 | Declaration | 259 |
| 22 | South Middlesex County Registry of Deeds | 267 |
| 24 | Declaration | 216 |
| 25 | Curriculum vitae | 222 |
| 26 | Letter from Shearman & Sterling | 290 |
| 27 | E-mails | 265 |
| 28 | E-mails | 292 |
| 31 | E-mails | 296 |
| 40 | Board meeting document | 205 |
| 42 | E-mails | 206 |
| 44 | Memorandum | 181 |
| 45 | E-mails | 302 |
| 47 | Draft of meeting | 184 |
| 48 | E-mails | 307 |
| 49 | Transcript of 2008 first quarter earnings | 76 |
| 57 | Resolution of Board | 65 |
| 59 | Potential structures for additional funding for NAI | 110 |
| 61 | Memorandum | 71 |
| 62 | Board of Directors minutes | 72 |
| 63 | Draft minutes | 114 |
| 66 | Memo written by Mr. O'Desky | 40 |
| 69 | E-mails | 67 |
| 72 | Analysis | 138 |

| | | | |
|---|---|---|---|
| 1 | 73 | Analysis | 140 |
| 2 | 78 | E-mail | 165 |
| 3 | 87 | Draft memo | 131 |
| 4 | 88 | Analysis | 134 |
| 5 | 89 | Minutes | 155 |
| 6 | 91 | Memorandum | 169 |
| 7 | 93 | Draft Board minutes | 172 |
| 8 | 98 | 8/28/08 draft memo | 172 |
| 9 | 99 | 13D | 257 |
| 10 | 100 | Draft unanimous consent | 179 |
| 11 | 107 | E-mails | 118 |
| 12 | 119 | E-mails | 171 |
| 13 | 120 | October 28th memorandum | 174 |
| 14 | 121 | Draft minutes | 174 |
| 15 | 122 | Draft minutes | 176 |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

1      (Call to order of the Court.)

2           THE COURT:  Good morning, everyone.  Thank you, and

3    please be seated.

4           ALL:  Good morning, Your Honor.

5           THE COURT:  Good morning.  Mr. DeBaecke, good

6    morning.

7           MR. DEBAECKE:  Good morning, Your Honor.  May it

8    please the Court, Michael DeBaecke and Steve Caponi and Tory

9    Guilfoyle, on behalf of the Debtors, Midway Games, Inc., et

10   al.

11          THE COURT:  Yes.

12          MR. DEBAECKE:  As Your Honor is aware, today is the

13   day scheduled for primarily the contested cash collateral

14   hearing that Your Honor has been hearing about since, I guess,

15   the second day of the case.

16          THE COURT:  Yes.

17          MR. DEBAECKE:  We do have an amended agenda that was

18   submitted yesterday with multiple filings from the evening

19   before, but we have a couple matters on the agenda that I hope

20   to get through in very fast, very quick fashion.

21          THE COURT:  Okay.

22          MR. DEBAECKE:  If I may turn to item number 2, which

23   is the Debtors' application to employ Aquila Commercial as

24   their real estate broker --

25          THE COURT:  Yes.

Perfect Pages Transcription & Reporting, Inc.
(609) 654-8880

1      MR. DEBAECKE: -- to market and hopefully get us to

2 a transaction on the Austin, Texas lease. The Debtors, as the

3 application reflects, closed their Austin, Texas studio in

4 December in connection with a larger workforce reduction. The

5 lease is still ongoing, it was as of the Petition date. There

6 is some personal property that is still left in the location

7 but a bunch of property has been moved to other locations at

8 this point in time, but we would like to try and market that

9 lease to see if we can't get somebody in there to take that

10 lease off our hands so to speak. The Debtors, in entering

11 into the lease, had to post a letter of credit as, essentially

12 a security deposit, initially in -- about in the amount of $1

13 million. It has, under the terms of the lease, reduced now to

14 about $667,000. That amount of cash has been segregated to

15 support the LC as a backstop, so the Debtor obviously would

16 like to get out from under the lease and get out from under

17 that letter of credit so we can bring the cash back into the

18 estate for, hopefully, use or at least to use for other things

19 like payment of Creditors and whatnot, so that is why we seek

20 to employ this real estate broker. They were involved Pre-

21 petition trying to help us and we would like to continue that

22 effort Post-petition, hopefully, to a concluded transaction in

23 the near future. The application did not receive any formal

24 objections. We did receive a couple informal comments from

25 Mr. Buchbinder.

1    THE COURT:  I saw his hand.  I was looking at the

2  black line.  Yes.

3    MR. DEBAECKE:  Okay.  And we have addressed his

4  comments in a revised Form of Order that Your Honor has in

5  front of him.  I can tell Your Honor that the supplemental

6  affidavit of Sloan Spaeth on behalf of the real estate broker,

7  was filed yesterday.  The only additions to that affidavit

8  were specific references to having no connections with the

9  Office of the United States Trustee for Region 3, as well as

10  no connections or no -- they're not a relative of Your Honor,

11  who's handling the bankruptcy case.

12    THE COURT:  Okay.

13    MR. DEBAECKE:  So I assume you knew that but I

14  wanted to tell you that anyway.  So with that --

15    THE COURT:  No one claims me, Mr. DeBaecke, I'll

16  tell you that.

17    MR. DEBAECKE:  With that, Your Honor, Mr. Buchbinder

18  has approved the revised Form of Order that's been tendered,

19  and I would ask that Your Honor approve it.

20    THE COURT:  All right.  And I assume that the

21  Committee is on board with this.  It's clearly in the best

22  interest of the Debtors' estate to move this process along,

23  and I am pleased to sign the Order.

24    (Order signed.)

25    THE COURT:  All right.  That's done.

MR. DEBAECKE: Thank you. Number three, Your Honor, is the Debtors' application to employ Huron Consulting as consultants in these cases, and the specific purpose for seeking to employ Heron is really a narrow purpose. And we have revised the proposed Order to reflect the comments of Mr. Buchbinder, who gave us informal comments on this application, all except one comment, which we have not agreed to reflect in the proposed Order at this time and this is the, as I understand it, the only open issue for Your Honor on this application that's in dispute between the parties, specifically, the Debtors and Mr. Buchbinder's office of the United States -- Office of the United States Trustee Client.

The request for this application was to establish an invoice objection process for Huron in replace of any obligation of their part to file a fee application. The nature of the engagement is essentially twofold. This is their primary, if not sole purpose, and that is they're helping the Debtors prepare their schedules and SOFAS. That has been going on since on or about March 10th. They were required to come in and help the Debtors get that done because -- mostly because of all the demands of these bankruptcy cases has really stretched the Debtors' resources, in addition to having lost a couple of people from the accounting department who would typically be doing what Huron is now doing.

THE COURT: Certainly.

MR. DEBAECKE:  We decided that we needed to get some help to get these schedules and SOFAS on file in all deliberate speed, so Huron has come in and has worked, as I understand it, very diligently to help us do that.  We were trying to get it so that they did not have to file fee applications and we would request that.  And the primary purpose of that is really to avoid the expense, as well as to keep them going and hopefully on a shorter basis than, perhaps, other professionals in these cases who have to wait for the fee application process.  And I'm not complaining about that, but it does take a while and they are in there, and I think given the amounts involved, and I can't give you an exact amount as to what we anticipate being paid to Huron over the life of the engagement, but their hourly rates are very reasonable.  The lead hourly rate is $140 an hour.  The second hourly rate is $125 an hour.  There are two Huron employees who are basically on site helping get the schedules and SOFAS together.  I don't anticipate having more than that, perhaps a third if we really get into a crunch coming up on the April 15th date for getting those schedules filed, but right now there are two, and we do not anticipate major fees in connection with this.  So we felt comfortable proposing sort of an invoice objection period process, similar to what you've seen in, I guess, in the Cash Collateral Order with perhaps the Lender fees and expenses, where the Lender's legal

1   fees -- legal advisors and financial advisors submit invoices.

2   People have an objection period if they don't file an

3   objection, then those fees can get paid.

4          THE COURT:  Yes.

5          MR. DEBAECKE:  This is a similar concept that we're

6   proposing for Huron.  Mr. Buchbinder has objected and he's

7   certainly more than able to carry his objection, and I'm going

8   to cede the podium in a second to him, but I wanted to get

9   that out there and see if Your Honor has any questions about

10  that.

11         THE COURT:  No, I don't.  I certainly understand the

12  issue.  In fact --

13         MR. DEBAECKE:  Okay.  And I would reflect for the

14  record that a supplemental affidavit from Huron was also filed

15  yesterday --

16         THE COURT:  Yes.

17         MR. DEBAECKE:  -- covering the same two points that

18  I described for Mr. Spaeth on behalf of Aquila.

19         THE COURT:  Exactly.  Thank you, Mr. DeBaecke.  Mr.

20  Buchbinder, good morning.

21         MR. BUCHBINDER:  Good morning, Your Honor.  Dave

22  Buchbinder, for the record, on behalf of the United States

23  Trustee.  Your Honor, the only open issue, as Mr. DeBaecke has

24  indicated, is whether or not Huron should be waived from the

25  requirement to file fee applications.  We don't know how much

they're going to spend.  We don't know how long they're going

to take.  I've seen cases where financial advisors have

charged over $50,000 to prepare schedules in cases smaller

than this one.  The Bankruptcy Code and the Bankruptcy Rules

require that professionals have their fees subjected to review

through the fee application process.  Huron is not a newcomer

to this Court.  Huron acts as a financial advisor for

Committees.  Huron acts as financial advisor for Debtors on

occasion.  Huron knows what the rules are and knows that they

need to be followed.  Yes, we are extremely busy.  There are

many cases being filed, but that is not -- a ground expedition

or necessity or expediency is not a ground to obviate the fee

application rules.

     This is a unique district because this is a district

where the interim Compensation Order is entered on a routine

basis and unlike most of other districts in the country, where

professionals have to wait four months or longer to get

interim compensation, in this district a professional like

Huron is able to apply for their fees in the month following

the services they rendered.  There should be no exception of

the fee application rules.  Huron knows the rules.  They've

complied with them in the past and they should be required to

do so here, Your Honor.  The fact that this is a reasonably

small engagement should not be grounds to obviate the use of

the rules.  Thank you, Your Honor.

1        THE COURT:  Thank you, Mr. Buchbinder.  Well, let me

2   just decide the issue, and I have to agree I think here with

3   Mr. Buchbinder that the process should be followed.  I think

4   however, if it is a -- is it of a particular financial burden

5   upon Huron in this situation, Mr. DeBaecke, or is it simply

6   really more of a cost savings issue?

7        MR. DEBAECKE:  Your Honor, I think from a cost

8   savings perspective, I think it's more from the estate

9   perspective.

10       THE COURT:  Yes.

11       MR. DEBAECKE:  And it's either going to be Huron

12  preparing the fee application or, I guess, we will be helping

13  them do that.  Either way, we're going to be incurring costs

14  from the expense from the estate standpoint.

15       THE COURT:  I --

16       MR. DEBAECKE:  That was really the issue.

17       THE COURT:  Okay, I understand.  Hopefully, it will

18  not be especially costly to the estate, and I do agree with

19  Mr. Buchbinder that given that their retention is pursuant to

20  Sections 327 and 328, the pre-seizure should be followed even

21  for Huron here.

22       MR. DEBAECKE:  Can I have a moment, Your Honor?

23       THE COURT:  You may.

24       MR. BUCHBINDER:  Your Honor, Dave Buchbinder, again,

25  for the record.  Mr. DeBaecke has given me a proposed black

line Order that expressly deletes the request for no fee

application.

        THE COURT:  Okay.

        MR. BUCHBINDER:  And I'm fine with this revised

black line.

        THE COURT:  Okay, Mr. Buchbinder.  Thank you.  Thank

you, Mr. DeBaecke.

        MR. DEBAECKE:  I was --

        THE COURT:  You must have been a boy scout.  You're

ready.

        MR. DEBAECKE:  Your Honor, I was optimistic coming

over here on this but in case the optimism was misplaced, I

brought an alternative Form of Order.

        THE COURT:  All right.

        MR. DEBAECKE:  And if I could hand that up?

        THE COURT:  Absolutely.  Thank you, Mr. DeBaecke.

    (Counsel complies.)

        THE COURT:  Thank you, sir.  All right.  I'm going

to sign this Order and then we'll get Huron officially

retained here.

    (Order signed.)

        THE COURT:  All right.  Thank you.

        MR. DEBAECKE:  Thank you, Your Honor.

        THE COURT:  Just a couple of small housekeeping

matters.  As always, if any party would like to have a break,

no one should be bashful about asking for one.  Secondly, if I
stand up throughout the proceedings, no one needs to be
alarmed.  I just might be, you know, kind of stretching my
muscles a bit, and let me just talk for one moment because I
know we have a very full day just on the cash collateral
matter.  And I am sensitive to the Debtors desire to get the
Key Employee Incentive Program Motion heard promptly.  I do
want to say this, I've read the papers and the objections
quite carefully.  I do have some concerns about them and I do
think that I just want to sort of alert the Debtors that I am
concerned particularly about -- I think the objections are
well stated and the only reason I'm even raising it at the
outset is that I would hate to have a hearing a week from now
or so and for the first time to raise those concerns when the
Debtors may be able to go back and revisit the Motion and the
terms of the program.  And I think the amounts, in particular,
are excessive here given this case.  I say that -- again, I
haven't heard -- taken evidence on it yet but -- and I do
maintain an open mind on matters such as this, but I do think
in fairness to the Debtors, I should at least raise my
concerns and give of the Debtors an opportunity to at least
look at it again to see whether or not some modifications
might be made and whether or not some modifications in
consultation with the objecting parties would not perhaps move
things along more expeditiously.

1    MR. DEBAECKE:  Thank you for those comments, Your

2  Honor.  May I inquire as to whether your comments go to the

3  schedule that was delivered to chambers last night or the

4  original proposal that was included in the discussion in the

5  objections?

6    THE COURT:  Even the schedule last night.

7    MR. DEBAECKE:  Okay.  Thank you.  And we will

8  certainly take Your Honor's comments to heart.  Now, on the

9  KEIP, Your Honor --

10    THE COURT:  Yes.

11    MR. DEBAECKE:  -- we broached the subject last night

12  about the hearing with Your Honor and we understand that and

13  we certainly did not come over here thinking we were moving

14  forward with the KEIP at all.  We've discussed with our client

15  as -- when they arrived last night as to the two dates that

16  Your Honor gave us.

17    THE COURT:  Yes.

18    MR. DEBAECKE:  And their reaction was Monday the 6th

19  would be a date that works for us.

20    THE COURT:  All right.

21    MR. DEBAECKE:  And I believe it was at 9 o'clock.

22    THE COURT:  Yes.  Was that good for other parties?

23    MR. ZOLKIN:  Your Honor, David --

24    THE COURT:  Good morning.  Yes.

25    MR. ZOLKIN:  Good morning, Your Honor.  David

1    Zolkin.  Yes, that would be acceptable.

2           THE COURT:  All right.  So let's schedule that for 9

3    o'clock on the sixth.  Thank you.

4           MR. DEBAECKE:  Thank you.  And so working off the

5    amended agenda, Your Honor, the KEIP was at number seven.

6           THE COURT:  Right.

7           MR. DEBAECKE:  And the Creditors' Committee's Motion

8    to file under seal their objection to the Motion was at number

9    six.

10          THE COURT:  Yes.

11          MR. DEBAECKE:  So number six and seven from the

12   amended agenda will be moved to an agenda for the Monday

13   hearing.

14          THE COURT:  Excellent.

15          MR. DEBAECKE:  And we will get that over to Your

16   Honor tomorrow.

17          THE COURT:  All right.  Thank you.

18          MR. DEBAECKE:  And that brings us to the main event,

19   I believe, Your Honor.

20          THE COURT:  Mr. Buchbinder?  Yes, sir.

21          MR. BUCHBINDER:  Your Honor, Dave Buchbinder, again,

22   for the record.  I'd like the Court to refer back to item

23   number six.

24          THE COURT:  Yes.

25          MR. BUCHBINDER:  I did -- we did file an objection

1   to that Motion yesterday and because of the way the pleadings

2   were flying across ECF screens very quickly yesterday, in the

3   objection that I filed to number six, I included a footnote

4   that also objected to the Motions that were filed to place the

5   cash collateral briefs under seal.  I approached the parties

6   informally just prior to the hearing and proposed to them,

7   well, let me set the stage, Your Honor.  Both parties in

8   connection with the Cash Collateral Motion, filed their entire

9   briefs under seal --

10          THE COURT:  Right.

11          MR. BUCHBINDER:  -- with the request to seal them.

12  This is a public reporting company.  Glancing at the list of

13  exhibits the parties have filed for today, a vast number,

14  perhaps even a majority of the exhibits, are public

15  information that are either on file with the Securities and

16  Exchange Commission or have been recorded in various places or

17  are pleadings on file in this case.  And there's a blanket

18  request by both sides to seal their entire briefs.  To

19  dispense with the formalities and the flowery speech so we can

20  get onto the main event, what I proposed to the parties just

21  prior to the hearing is that they present to the Court and to

22  our office, later today or tomorrow, it doesn't have to be

23  done this moment, and we have other matters to proceed with,

24  that they present to both the Court and our office proposed

25  redacted briefs so that we can look at the portions they want

1   to redact and rule properly on these requests for seal.  There

2   may be some information that is legitimately subject to seal,

3   and I raise this point at this time before we proceed with the

4   cash collateral because I think many of these issues are going

5   to arise this morning and in the public interest, I am going

6   to do all I can to make sure we have an open and accessible

7   courtroom for the public today, Your Honor.

8           THE COURT:  Well, certainly I take your comments

9   very seriously, Mr. Buchbinder, and I understand that the

10  parties were operating at white heat here on this, and in an

11  abundance of caution were filing everything under seal.  But I

12  agree that the more appropriate procedure is to submit

13  proposed redacted versions, exchange them, include the Office

14  of the United States Trustee in that exchange and then that

15  way you give everyone an opportunity to determine whether or

16  not there should be more or less included in the copies to be

17  filed with the Court and then copies can be filed for the

18  public interest.

19          MR. BUCHBINDER:  Exactly, Your Honor.  And I believe

20  that we may have some of these issues arise during the hearing

21  and I think we'll probably have to deal with them on an ad hoc

22  basis because some of the information will be subject to

23  appropriate protection.

24          THE COURT:  Absolutely.  And hopefully the parties

25  will, as we discussed briefly, be able to sort of group the

1  more sensitive confidential testimony or exhibit presentation

2  together so that we will have as little disruption as

3  possible.

4  　　　　MR. BUCHBINDER:  Thank you, Your Honor.  With the

5  public interest preserved, I defer to the main event.

6  　　　　THE COURT:  All right, Mr. Buchbinder.  Thank you,

7  sir.  Mr. Caponi?

8  　　　　MR. CAPONI:  Good morning, Your Honor.

9  　　　　THE COURT:  Good to see you, sir.

10  　　　　MR. CAPONI:  Thank you very much.  Again, Steve

11  Caponi, for the record, from Blank Rome for the Debtor.  Just

12  following up on Mr. Buchbinder's comments and our discussion

13  yesterday on the phone --

14  　　　　THE COURT:  Yes.

15  　　　　MR. CAPONI:  -- the expeditious nature of this

16  proceeding is what precipitated the filing under seal.  I

17  think all the parties had agreed to operate under the sin now

18  ask for forgiveness later, and we fully intend to address Mr.

19  Buchbinder's concerns and it's part of the plan.

20  　　　　THE COURT:  Understood.

21  　　　　MR. CAPONI:  With respect to today, I think we are

22  going to be able to limit, if not completely eliminate, any

23  issues with respect to confidentiality --

24  　　　　THE COURT:  Good.

25  　　　　MR. CAPONI:  -- by when we get to the most sensitive

1  topic of bids.  I think all the parties are in agreement that

2  we can address those in a general framework which does not

3  implicate confidentiality.  And there's one other topic that

4  the Debtors' concerned about and that is an evaluation that

5  was done for one of its main game titles and, again, that may

6  or may not come up, but they're the only two areas.  And

7  again, I don't anticipate any significant disruptions to the

8  proceedings --

9         THE COURT:  Okay.

10        MR. CAPONI:  -- to address those.

11        THE COURT:  And, of course, I have your briefs or

12  your, I should say your filings, and the exhibits myself.  And

13  to the extent you can refer generically to those as opposed to

14  any specific information that may obviate the need to ask

15  anyone to leave the courtroom, too.

16        MR. CAPONI:  And then as Mr. DeBaecke aptly

17  described it, the big show, which I think is what's on the

18  agenda now, I'd like to give Your Honor a very brief preview.

19  I think the way the mornings going to proceed or into the,

20  hopefully not, evening too late, will be, I will be putting

21  on, the Debtor will be putting on Mr. O'Desky, its CFO, for a

22  brief direct examination.  That will be the -- essentially the

23  entirety of the Debtors' witnesses case --

24        THE COURT:  Okay.

25        MR. CAPONI:  -- will then be turned over to the

1  Lender, Mr. Thomas.  Mr. Harkness, representing the Lender and

2  Mr. Thomas, who has filed the Motion and jointly supports the

3  Motion for Use of Cash Collateral, followed by the Committee,

4  and then I'm sure there'll be I'm sure some follow up back and

5  forth rebuttal on that point.  The parties, my understanding

6  also, wish to make brief, I'm told brief opening statements.

7  I've not heard them so I'll say brief is slightly suspect, and

8  with respect to the Debtor, Your Honor, I'll limit my comments

9  as simply saying, I think as the papers bear out and the

10  testimony will bear out, the use of cash collateral is

11  critical to this estate.  To its being able to continue to

12  function through a hopefully of a prosperous sale process that

13  will benefit the estate and the failure to get access to the

14  cash collateral or the use of it under the reasonable terms

15  that we think have been proposed are -- could be devastating.

16      With that being said, I think the thrust of today's

17  presentation will be on the larger picture of the

18  relationships between the parties, and I think you'll hear

19  more of that from Mr. Harkness and Ms. Dakin-Grimm.

20          THE COURT:  All right.

21          MR. CAPONI:  So I'll turn it over to Mr. Harkness.

22          THE COURT:  Thank you, Mr. Caponi.  And I don't

23  think anyone questions the necessity of the use of cash

24  collateral.  The only question, of course, is the terms of

25  that use and whether it is consensual or over objection.

1      MR. CAPONI:  Sure.

2      MR. NOVOD:  Your Honor?

3      THE COURT:  Yes.  Good morning.

4      MR. NOVOD:  My colleague Tom Mayer has joined me

5  today.  He'd like to address the Court.

6      THE COURT:  Please.  Good morning.

7      MR. MAYER:  Good morning, Your Honor.  Tom Mayer

8  from Kramer Levin.

9      THE COURT:  Yes.

10      MR. MAYER:  My application for pro hac is before the

11  Court this morning.

12      THE COURT:  Yes, sir.  You certainly are admitted.

13      MR. MAYER:  Not opening argument, just a statement

14  of where we are.

15      THE COURT:  Okay.

16      MR. MAYER:  My understanding as to what separates

17  the parties, and this is not in an attempt to pretermit this

18  hearing because we intend that it go forward and we intend

19  there to be a full and fair record.  It's in our interest as

20  much as anyone else.

21      THE COURT:  Certainly.

22      MR. MAYER:  First, what's before the Court is a cash

23  collateral matter and a correlative Motion for Relief from

24  Stay, and with respect to adequate protection, my

25  understanding and my adversaries may feel free to contradict

1   me, is that there are three basic areas of adequate protection

2   where there was a clash. One was the current payment of

3   interest which was escrowed at the last hearing. We are

4   prepared to have that escrow continue. We just wanted to make

5   sure that was understood.

6         THE COURT: Okay.

7         MR. MAYER: Second is somewhat new, which is after

8   -- last night, I had a chance to talk to my client. My

9   understanding is that from the papers that were exchanged

10   yesterday that there is an objection to the continued payment

11   of fees of Lender's counsel.

12         THE COURT: Yes.

13         MR. MAYER: We are prepared to have those escrowed

14   as well so that at the end of the day, if it turns out we're

15   right, we'll get the money, and if it turns out we're wrong,

16   well, then the client bore the cost.

17         THE COURT: Okay.

18         MR. MAYER: I just wanted to make -- put that on the

19   record. That last point is subject to a condition which is,

20   that the third point that is at issue as we understand it, is

21   that the Committee has objected to a limitation on the use of

22   cash collateral for the payment of their fees.

23         THE COURT: Yes.

24         MR. MAYER: And that we do not agree on. We have, I

25   think, on an amended basis $50,000. As a number, they think

1  that's insufficient.  We are not prepared to consent to a

2  greater use of what we believe will prove to be our cash

3  collateral to sue us.  They want more access to the money, in

4  our view, sauce for the goose, sauce for the gander, but

5  that's argument and I'm violating my pledge.  And so with

6  that, I think we should get to the main event and --

7           THE COURT:  Thank you, Mr. Mayer.

8           MR. MAYER:  -- Ms. Grimm is welcome to come up here.

9           THE COURT:  Thank you.  Ms. Dakin-Grimm, good

10 morning.

11          MS. DAKIN-GRIMM:  Good morning, Your Honor.  I think

12 that opening statements were probably what was delivered to

13 you last night --

14          THE COURT:  Yes.

15          MS. DAKIN-GRIMM:  -- in the briefs and knowing Your

16 Honor's practices, I'm sure that you read them carefully.

17          THE COURT:  I did.  I've never seen a situation

18 where, essentially, the facts are not very much in dispute,

19 it's the interpretation of those facts where the parties are

20 very far apart.

21          MS. DAKIN-GRIMM:  I agree with that, Your Honor.  I

22 respectfully with what Mr. Mayer just said, I'm happy to hear

23 that they're now in agreement that the interest payments,

24 which they previously sought to receive, should be in escrow.

25 That is a good step forward.  With regard to Mr. Mayer's

firm's fees being escrowed, that is not what the Committee is looking for. We believe that that escrow could severely hamper the Debtors' ability to use its cash, and that given the evidence that you'll hear today, that the Thomas entity should stand in line at the end of the case and wait to get its fees paid, if justified, and if it can make a proper showing at that time. And then, I guess, with regard to Mr. Mayer's comment about sauce for the goose and the gander, respectfully, there's not a goose and a gander here. The Committee's fees are subject to Court review and approval.

THE COURT: Yes.

MS. DAKIN-GRIMM: The Thomas entity's fees would not be. The Committee is statutorily entitled to have its counsel and professionals paid. Mr. Thomas is not. Milbank and FTI, as a state professionals, are fully subject to Orders of the Court, including the Clawback Orders, and as you'll recall --

THE COURT: That's right.

MS. DAKIN-GRIMM: -- Mr. Thomas sought to have fees and interest paid to himself without any Clawback Orders. Those are all things that, you know, we'll get into; the hows and whys of why Mr. Thomas thought those were things he should grab at the outset in the course of the evidence.

THE COURT: And the Committee's concern about the ability to even effectuate a Clawback I think is also an issue.

1          MS. DAKIN-GRIMM:  Yes, Your Honor.  And based on, I

2     don't know if you saw the declaration that Mr. Thomas filed

3     last night, but we're going to have --

4          THE COURT:  No.  I did not.

5          MS. DAKIN-GRIMM:  -- some perjury issues here about

6     Mr. Thomas's wherewithal.

7          THE COURT:  Okay.  I did not see that affidavit, but

8     --

9          MS. DAKIN-GRIMM:  You did not see it?

10         THE COURT:  I did not see it.

11         MS. DAKIN-GRIMM:  I didn't see it until this

12    morning.  I saw it flash by on my e-mail, but a new --

13         THE COURT:  Was this delivered, is this the

14    affidavit that was delivered -- okay, I did see that one.  I'm

15    very sorry.

16         MS. DAKIN-GRIMM:  Okay.

17         THE COURT:  I thought maybe it was new one.

18         MS. DAKIN-GRIMM:  Well, we can hand it up if you'd

19    like to make sure.

20         THE COURT:  No.  I've seen it, Ms. Dakin-Grimm.

21         MS. DAKIN-GRIMM:  Okay.  Thank you.

22         THE COURT:  Certainly.  Thank you.  All right.  I am

23    prepared to hear evidence.

24         MR. CAPONI:  Well, Your Honor, with the Court's

25    permission, again, Steve Caponi, for the record.  I would call

1  Mr. Ryan O'Desky as the first witness.

2       THE COURT:  All right.  Mr. O'Desky, if you will

3  stand in the witness box and remain standing, Mr. O'Desky.

4            RYAN O'DESKY, DEBTORS WITNESS, SWORN

5       THE CLERK:  Please state your full name and spell

6  your last name for the record?

7       THE WITNESS:  Ryan Gary O'Desky.  O, apostrophe,

8  capital D-E-S-K-Y.

9       THE CLERK:  Thank you.  You may have a seat.

10      THE COURT:  Thank you, Mr. O'Desky.

11      MR. CAPONI:  Good morning, Mr. O'Desky.

12      MR. O'DESKY:  Good morning.

13      MR. CAPONI:  We'll try to move some of the

14  perfunctorily things along somewhat quickly, Your Honor.  Mr.

15  O'Desky has submitted an extensive affidavit with the Court

16  detailing --

17      THE COURT:  Yes.

18      MR. CAPONI:  -- his background.

19      THE COURT:  Yes.

20      MR. CAPONI:  I'm going to touch briefly on his

21  background, but avoid the details if the Court feels they've

22  been adequately presented --

23      THE COURT:  I --

24      MR. CAPONI:  -- on such occasion.

25      THE COURT:  I certainly think that that portion of

1   his affidavit is acceptable and admissible.

2         MS. DAKIN-GRIMM:  Agreed.  And Your Honor, we don't

3   intend to cross-examine him on his --

4         THE COURT:  His qualifications or background.

5         MS. DAKIN-GRIMM:  No.

6         THE COURT:  Okay.  Fine.  But take your -- Mr.

7   Caponi, he is your witness and you may do with him as you

8   like.

9         MR. CAPONI:  Hopefully, that will mean brief.

10         THE COURT:  Okay.

11                 DIRECT EXAMINATION

12   BY MR. CAPONI:

13   Q.  Mr. O'Desky, with whom are you currently employed?

14   A.  Midway Games, Inc.

15   Q.  Okay.  And, again, can you just briefly reiterate the

16   positions you've held since you've been with Midway?

17   A.  Yes.  In May of 2007 I joined Midway as the Chief Internal

18   Auditor, and in November of 2007 I then became the Vice-

19   President of Finance Controller and Assistant Treasurer.  I

20   continued doing that job but added on the job in February of

21   2008 of interim Chief Financial Officer and Treasurer.  In

22   November -- October of 2008 I then became the full-time Chief

23   Financial Officer and Treasurer and no longer did the Vice-

24   President of Finance and Controller job.

25   Q.  Okay.  During your employment with Midway, are you

1  familiar with the financing transaction that occurred in early

2  2008 between Midway and National Amusements, Inc., NAI?

3  A.  Yes.

4  Q.  Okay.  And can you briefly describe for the Court, the

5  structure of that transaction?

6  A.  The structure of the transaction was three different

7  financing credit facilities that were put in place.  There's a

8  $30 million secured credit facility.  There's a $40 million

9  unsecured credit facility and a $20 million unsecured

10  subordinated facility put in place.

11  Q.  Okay.  And how was it that you first became aware of this

12  transaction, I assume that you were aware, but as a

13  contemplated transaction before it finalized?

14  A.  I became aware of it when in January of 2008 when we

15  decided that -- when there was a cash need and we decided that

16  National Amusements was where we were going to get the money

17  from.

18  Q.  Okay.  And who at National Amusements directed you to

19  become involved in this transaction?

20  A.  Nobody at National Amusements did.

21  Q.  (Indiscernible), Midway directed you to become involved in

22  this transaction.

23  A.  The CEO at the time, David Zucker.

24  Q.  Okay.  And what was generally your nature of your

25  involvement?

1  A.   I became involved mainly when I became the Chief, interim

2  Chief Financial Officer as the negotiator of the business

3  terms in the agreement.

4  Q.   Okay.  And what was the situation at Midway that

5  necessitated it entering into this transaction with NAI?

6  A.   There's a couple different pieces.  First, there was a

7  cash need that developed in early 2008 due to sales of our

8  2007 holiday games which were not as robust as we had hoped

9  they would be, so there's a cash need that was created.  Based

10 on that cash need, our external auditor's, Ernst & Young, had

11 talked to us and the Board that there was the possibility of a

12 going-concern opinion that would have been placed on our

13 audits -- audit opinion if that cash need was not somehow

14 remedied prior to that audit opinion being issued.  And third,

15 as part of the facility that we had in place with Wells Fargo,

16 there were some financial covenants that on March 1st we do not

17 believe the company would have been able to meet.

18 Q.   Okay.  With respect to the cash need, could you, A,

19 describe the nature of the need and then, B, quantify the

20 value of the cash need?

21 A.   At the time, in the late December early January time

22 frame, the cash need was determined to be about 30 to $35

23 million that we needed for the 2008 year basically, again, due

24 to, the main reason was due to the sales of some of the games

25 in 2007 that were not as robust as we had expected.

1  Q.  Okay.  And did that cash need remain consistent throughout

2  the time period you were in discussions with NAI?

3  A.  It did not.  In late January early February of that year

4  there was an error or mistake that was found in a newly

5  implemented system that we had put into our financial planning

6  and analysis system that was put in in late 2007, and that

7  error or mistake changed that amount that we believed we

8  needed from the 30 to $35 million range to the 80 to $90

9  million range.

10  Q.  What was the nature of the error or the mistake?

11  A.  There were many different pieces to it, but the main one

12  had to do with the way that the accounts payables were

13  calculated within the system, and it just did not reconcile

14  and did not, basically, work the right way and was not checked

15  prior to a lot of those things actually coming into place

16  because the system was put in so late in the year.

17  Q.  Am I correct in understanding this is a software glitch

18  more than a performance issue for the company?

19  A.  More of a software glitch and not enough review at the

20  time put onto it.  Yes.

21  Q.  Turning back to the NAI transaction, what was your

22  involvement with that transaction?

23  A.  I was the negotiator of the business terms of the

24  Agreement with National Amusements.

25  Q.  Was there anyone else on behalf of Midway that was

1  involved with negotiating the NAI facility?

2  A.  Yes.  Our general counsel, Deborah Fulton, was negotiating

3  the main legal terms of the document.

4  Q.  Okay.  And who on the other side at NAI, were you

5  negotiating with or against?

6  A.  Me personally, I was negotiating with Dick Sherman, who I

7  believe is a CFO of National Amusements.

8  Q.  Okay.  Again, reflecting back to your testimony, am I

9  correct that you were the -- you started out as the interim

10  CFO and during the negotiations became CFO?

11  A.  No.  No, there -- no.  I was the controller at the very

12  beginning of the negotiations.  Towards the end of me being

13  just controller and then I became interim CFO in February of

14  2008 when I did the majority of the negotiations.

15  Q.  Okay.  Did you have any involvement with the decision by

16  Midway to pursue a transaction with NAI?

17  A.  No.

18  Q.  Did you ultimately reach agreement with your counterpart

19  at NAI on a final set of business terms for that transaction?

20  Q.  Yes.

21  A.  Okay.  And can you describe for me generally the main

22  business terms?

23  Q.  The main business terms that I just previously mentioned

24  were the three different facilities.  The 20 -- the 30

25  million, the 40 million and the $20 million.  We also had put

1  into place the reporting requirements which were daily,

2  weekly, monthly, quarterly and yearly business requirements

3  that we had to provide to National Amusements.  There were

4  financial covenants that were in the Agreement.  There was a

5  cash sweep mechanism, which basically says that if at the end

6  of any given week we had more than $10 million of cash on

7  hand, we had to sweep that back to National Amusements to pay

8  down the debt and the interest rates.

9  Q.  Okay.  How would you compare the reporting covenants, the

10  interest rates and the other provisions of the facility with

11  NAI as compared to prior financings by Midway held?

12  A.  Well, compared to the Wells Fargo facility that was in

13  place just prior to the National Amusements facility, the

14  reporting requirements were less than what they were under

15  Wells Fargo because there were a lot of reporting requirements

16  done under that Agreement that both sides agreed were not

17  relevant to be able to continue on a daily, weekly, monthly or

18  quarterly basis, but the main reporting requirements were

19  still there.  The interest rates were different.  We went and

20  did an analysis of the interest rates that were being offered

21  by National Amusements and through the research, we determined

22  that over the three to twelve months prior to the Agreement

23  being signed, these rates were in line with what other market

24  conditions would have held from other parties from analysis

25  that we did.  The financial covenants were less than what they

1  were under the Wells Fargo Agreement because, again, there was

2  a covenant we did not believe we would be able to make as of

3  March 1st, so the covenants were different.  And the cash sweep

4  mechanism was not in the Wells Fargo Agreement and that was

5  something that was just in the National Amusements Agreement.

6  Q.  How did the transaction with NAI address three issues that

7  motivated the discussion in the first place, which were the

8  issue raised by your auditors, the cash flow and the potential

9  default, upcoming default on the covenant?

10  A.  It actually addressed all three.  The cash needs of the 80

11  to $90 million at the $90 million facility and availability of

12  the $90 million facility and it allowed us to be able to use

13  the cash when we needed it for what our cash need was.  Ernst

14  & Young, after we were able to finalize this Agreement, they

15  had to issue their 12/31/07 10-K and issued a clean opinion

16  based on the review of the Agreements themselves and

17  determined that that would fulfil what they believed would be

18  a possible going-concern issue.  And the third one was, we

19  were able to use the availability and the money with the

20  National Amusements facility to pay off the Wells Fargo

21  facility so we did not have any covenants that came into play

22  on March 1st.

23  Q.  Okay.  Who at Midway approved the final terms for the

24  transaction with NAI?

25  A.  Our Board of Directors.

O'Desky - Direct

1  Q.  Okay.  And who executed the actual transaction documents

2  on behalf of Midway?

3  A.  I signed the documents.

4  Q.  Okay.  Fast forwarding a little bit into 2008.  Did there

5  come a time where Midway was in need of additional capital?

6  A.  There was a time where we needed additional cash.  Yes.

7  Q.  Okay.  And what precipitated that need?

8  A.  In the spring of 2008 after our CEO was let go and Matt

9  Booty became the interim CEO, management sat down and looked

10  at our schedule of games that were to be released during the

11  year and one of the games in particular, a TNA Wrestling,

12  which is the first time this game was going to be released, it

13  was supposed to go out in May of 2008.  After reviewing this,

14  we determined that that would not be the best time in order to

15  maximize the revenue and cash flow, and to try and make this

16  game into the franchise that we hoped it would become and

17  become an annual-type game.  So what we had to consider was

18  moving that from May into a much better time frame where we

19  believed it could accomplish those goals, which would have

20  been in September of 2008.  By doing that, that created an

21  additional cash need of the company for its short time frame.

22  Q.  How did moving the release date of TNA create a cash need?

23  A.  In our business and for our company in particular, before

24  we release a game there are a large amount of cash costs that

25  need to be done right away, so before a game gets released, we

1   need to pay up-front all the manufacturing costs to the

2   manufacturing companies, which are Nintendo and Sony and

3   Microsoft who manufacture the games for us.  We need to pay

4   those up-front, as well as many of the marketing costs also

5   need to be paid up-front for a game that gets released.  So if

6   TNA was released in May, we would have had to pay all those

7   cost in April, get the game manufactured and it delivered to

8   our warehouse, then shipped to our customers at the release

9   date in May, and then we would have had to wait 30, 60, 90

10  days after that to be paid by our customers to get the cash

11  flow back.  So there's a large gap from the time we have to

12  put a lot of money out the door until the time we receive it

13  from our customers.  By taking that game and moving it from

14  May until September, September was a time frame where we had

15  other games that were being released in a short window of

16  time, so besides TNA that we were talking about, we had Blitz:

17  The League II, one of our games that was coming out in the

18  same time frame.  Game Party 2 was being released.  Touch

19  Master 2 was being released and Mortal Kombat versus DC

20  Universe, our biggest game of the year, was all being released

21  around the couple months time frame that we were looking to

22  move TNA Wrestling to maximize the revenue and cash from that

23  game.  So if we would have kept it where it was, we would have

24  received some of the receipts in from that game from the May,

25  June, July time frame in order to start paying the

1  manufacturing costs of the other games that were coming out.

2  By moving that to the September time frame, all those cash

3  receipts we were expecting were not going to be coming in, and

4  we would have a cash need to manufacture all of the other

5  games that we were talking about in the fall, without having

6  the receipts in from TNA.  So it's a short term cash need for

7  a time frame just due to moving the game from one period to

8  the other without any additional cash actually being needed,

9  it's just a cash need in the time frame.

10 Q.  Just to break down what you said, you said quite a lot.

11 The -- am I correct, you moved the game, you anticipated

12 moving the game from May until the fall?

13 A.  Correct.

14 Q.  Okay.  And in doing that it did not require the company to

15 spend more money, it just required it to spend it at a

16 different time frame you were anticipating spending a lot more

17 money on other games?

18 A.  Correct.

19 Q.  So am I correct that you, the money that you spent to

20 release TNA, the company had planned all along to spend, it

21 was just the timing changed?

22 A.  Correct.

23 Q.  Okay.  Now, how -- what did the company do to try to

24 address this cash flow issue it was anticipating by moving

25 TNA?

1  A.  Well, the management team brought to the Board's attention

2  by moving this game we'd be able to hopefully maximize some

3  more revenue and cash flow, and we believe that a factoring

4  facility, a selling of our accounts receivable, would be the

5  best way to go about this due to the short term cash need.

6  Q.  Okay.  Can you briefly describe your understanding about a

7  factoring facility?

8  A.  Sure.  A factoring facility is something that's very

9  commonplace in the business arenas where basically companies

10 would go and sell the invoices for games that they have sold

11 to their customers to a factor, and the factor would pay up-

12 front the cash that would be received or a portion of the cash

13 that they would receive for those invoices, up-front for a

14 fee.

15 Q.  Okay.  And once Midway made the decision to consider

16 factoring, what steps were taken to see if that was a viable

17 option for addressing the cash flow issue?

18 A.  Well, after talking to the Board about this, we went and

19 discussed with a number of different places to see if they

20 would be willing to factor our accounts receivable in the time

21 frame for the amounts we were looking for.

22        MR. CAPONI:  I'm going to hand the witness up an

23 exhibit.  I believe it's -- it would be --

24        UNIDENTIFIED SPEAKER:  The binder's over here.

25        MR. HARKNESS:  Which one are you looking for?

1        MR. CAPONI:  Sixty-six.

2    (Pause in proceedings.)

3        MR. CAPONI:  It's -- Your Honor, it's Exhibit 66 in

4    the --

5        MR. HARKNESS:  Yeah, go ahead.  You want us to put

6    it up?

7        MR. CAPONI:  Oh, it's up on the screen?

8        MR. HARKNESS:  You want us to put it up for you?

9        MR. CAPONI:  If you could, that would be great.

10        MR. HARKNESS:  Can you pull it up?

11        MR. CAPONI:  I think it's coming up on the screen,

12    Your Honor.

13        THE COURT:  Oh, thank you.

14        MR. CAPONI:  After the Debtor, looking at paying for

15    each side's AV, we didn't think we could afford our own, so I

16    was going to go with paper, but Mr. Harkness is going to be

17    kind enough to let me use his.

18    (Exhibit 66 previously marked for identification.)

19    BY MR. CAPONI:

20    Q.  Mr. O'Desky, this has been marked as Exhibit or identified

21    as Exhibit 66 by the Lender.  Are you familiar with this

22    document?

23    A.  Yes, I am.

24    Q.  Okay.  Can you tell me briefly and the Court what this

25    document is?

1  A.  Yes.  This is a memo that I wrote to the Special Committee

2  of the Board of Directors with regards to this receivable

3  Factoring Agreement that we had talked about and basically how

4  we got to the point that we were going to use National

5  Amusements, Inc. for this factoring facility.

6  Q.  Okay.  And can you briefly tell us how you got to the

7  point, in your words, to do a transaction with NAI?

8  A.  Sure.  Would you mind moving that to the bottom of this

9  page?  Perfect, thank you.  Basically, after we had talked to

10  the Board about going after getting a factoring facility in

11  place, I went out and talked to four unrelated parties in

12  order to determine if they would be willing to factor the

13  amounts of receivables that would be necessary.  I talked to

14  Finacity Corporation, which is a mid-size factoring company in

15  the U.S., Textron Financial Company, which is a small

16  factoring company, CIT Commercial Services, which is the

17  largest, right now, AR factoring company in the U.S. and we

18  were not sure if we wanted to do U.S. or European receivables,

19  so I also talked to Barkley's Bank in Europe to see if they'd

20  be willing to do any of our factoring in Europe.

21  Q.  Okay.  And what, when you approached these four companies,

22  how did those discussions progress?

23  A.  Well, basically after discussing and doing diligence with

24  them and many conversations, Finacity, Textron and Barkley's

25  all, due to the size of what we needed and the financial

1  condition of the company, did not have enough money --

2  basically they would not provide enough money that we believed

3  we needed, so their terms were not what the company could use.

4  CIT on the other hand, had believed that they could fund us

5  with the amount of money we needed for the factoring under

6  terms that we could live with and go through in order to do

7  this, except for one term.  And the one term and condition

8  that they had was that National Amusements put up a $20

9  million guarantee or letter of credit against the factoring

10  facility, which from my understanding, NAI was not willing or

11  able to do.

12  Q.  So of the four entities, then three were not interested in

13  entering into a factoring relationship and CIT was under terms

14  that was acceptable to Midway, but for a requirement that NAI

15  secure in some form or fashion, $20 million.

16  A.  Well, parts of the other three were willing just not at

17  the levels that we needed, but CIT was at those levels.

18  Q.  Okay.  Who on behalf of Midway approached NAI regarding

19  the concept of entering into a factoring arrangement?

20  A.  I did.

21  Q.  Okay.  And what prompted you to approach NAI?

22  A.  Basically is through discussions with the Board that we

23  were going to go ahead and do this, NAI was one of the other

24  counterparties that we figured, besides talking to third

25  parties that we would approach on NAI as well to see if they'd

1  be willing to do the Factoring Agreement.

2  Q.  Okay.  And who on behalf of Midway negotiated the terms of

3  the factoring arrangement with NAI?

4  A.  I did the business terms and Deborah Fulton did the legal

5  terms.

6  Q.  And who was the counterparty at NAI with whom you were

7  negotiating?

8  A.  For me, on the business side, it was Dick Sherman, the CFO

9  of NAI.

10  Q.  Okay.  And did you ultimately agree upon final terms for a

11  factoring arrangement with NAI?

12  A.  Yes, we did.

13  Q.  Okay.  How would you compare the terms that you ultimately

14  agreed upon with NAI to what the four companies on Exhibit 66

15  had discussed with Midway?

16  A.  Well, mainly compared to the CIT, which was almost

17  everything that we would have needed, the terms with NAI for

18  the factor Agreement were at least as good and some instances

19  better than what the CIT Agreement would have provided, and we

20  did not have to have the $20 million letter of credit put into

21  place because it was with NAI rather than with another

22  company.

23  Q.  Okay.  Who at Midway ultimately approved the transaction,

24  the factoring arrangement with NAI?

25  A.  The Board of Directors.

1  Q.  Okay.  And with respect to the factoring arrangement, was

2  that after filing its consummation, was it publicly disclosed?

3  A.  Yes, it was.

4  Q.  How was it disclosed and when was it disclosed?

5  A.  As required as part of a public company, we were required

6  to disclose it within four business days as part of an 8-K,

7  which we did, as well as it was disclosed in our third quarter

8  10 Q.

9  Q.  Okay.  And jumping back to the February transaction with

10  NAI, I think I intended to but did not ask you, was that

11  disclosed following its consummation and if so, when and how?

12  A.  Yes.  Again, it was required to be disclosed within four

13  business days, which it was, within an 8-K and it was also

14  disclosed in our 12/31/07 10-K, which went out a few weeks

15  later.

16  Q.  Moving forward now to the end of 2008, did there come a

17  time when you learned that NAI had sold or transferred its

18  interest in Midway to a third party?

19  A.  Yes.

20  Q.  Okay.  And when did you learn that and how did you learn

21  that?

22  A.  I learned that on Saturday night, November 29th when the

23  CEO, Matt Booty, gave me a call while I was having a weekend

24  Thanksgiving dinner with my in-laws.

25  Q.  And what did Mr. Booty say to you regarding the transfer

1 from NAI?

2 A.   He basically said that Sumner Redstone had sold his 87

3 percent stake in the company and a portion of the debt to a

4 third party.

5 Q.   Okay.  Did anyone at NAI have a role in proposing,

6 structuring or negotiating that transaction between NAI and

7 with what you now know to be Mr. Thomas?

8 A.   I have no idea if NAI proposed any of that stuff.

9 Q.   So did Midway, anyone at Midway --

10 A.   No, I --

11 Q.   -- have any involvement?

12 A.   No.

13 Q.   Mr. O'Desky, are you familiar with the term, net operating

14 loss, NOLs, that are being referred to in this proceeding?

15 A.   Yes.

16 Q.   Okay.  And are you aware that there's a disagreement among

17 some of the parties as to the impact, if any, of the NAI

18 Thomas transaction, on NOLs that may have been in the -- to

19 the benefit of Midway?

20 A.   Yes.

21 Q.   Okay.  Focusing on the NOLs, can you briefly describe for

22 us what an NOL is?

23 A.   In laymen terms, it's basically the company had had losses

24 for a number of years that were able to -- acute taxable

25 losses that we've been able to accumulate over the years, and

1  basically get to use them and offset future taxable gains with

2  those NOLs.  And the company had, again, had losses for a

3  number of years that had a quite sizable NOL position.

4  Q.  Okay.  Prior to the NAI Thomas transaction, did Midway

5  possess or have the ability or benefit of NOLs?

6  A.  Prior to the transaction, we had a gross amount of over

7  $600 million of NOLs that, because we did not view that we

8  would be able to utilize them in the current time frame, we

9  had what's called, a valuation allowance or a reserve placed

10  against those NOLs to net it down to a zero dollar amount, but

11  the gross amounts were still available and we were able to

12  utilize them if certain things in the business would have

13  changed.  So even though it showed zero on the balance sheet,

14  we're still able to utilize them and they were still out

15  there.

16  Q.  If I understand what you just said correctly, although you

17  for your financial statements, you reported the value of the

18  NOLs as zero.  They didn't disappear, they were still

19  available to the company should it turn a profit in the

20  future.

21  A.  Correct.

22  Q.  Okay.  Has the -- following the NAI Thomas transaction,

23  has the company conducted any form of analysis to determine if

24  that transaction had any impact on Midway's NOLs?

25  A.  Yes.

O'Desky - Direct

1    Q.  Okay.  And what, start with where does that analysis

2    stand?

3    A.  The analysis is almost final because we need to have that

4    finalized for our 12/31/08 10-K, which is going to be released

5    here over the next couple of weeks, so we are almost finalized

6    with that right now.

7    Q.  Okay.  Is there a written report or, you know, written

8    conclusion as to that, your analysis?

9    A.  Not yet.  No.

10   Q.  Okay.  And where does the analysis stand with respect to

11   answering the question as to whether or not there was an

12   impact on Midway's NOLs as a result of the NAI Thomas

13   transaction?

14   A.  At this point in time, we believe that, again, as of

15   12/31/08 after the transaction happened, that there will be

16   over $600 million of NOLs that will still be able to be

17   utilized by the company going forward.

18   Q.  Okay.  Do you recall at your deposition being questioned

19   regarding the impact on Midway's NOLs of the NAI Thomas

20   transaction?

21   A.  Yes.

22   Q.  Okay.  And could you briefly tell me what your testimony

23   was during your deposition?

24   A.  At that point in time, I believed that it would be at

25   least half of the NOLs that we would still be able to utilize;

O'Desky - Direct

1  still say that that's true but I believe it's much more than

2  at least half and should be over $600 million that we'll be

3  able to use.  There was some lost but not a significant amount

4  when you're talking about 600 million.

5  Q.  So when you refer to, at your deposition, half may have

6  been lost, half of 700 million, so roughly 350 million?

7  A.  300 to 350 million.  Correct.

8  Q.  And as you --

9  A.  As of --

10  Q.  -- refined your analysis for now, you believe there would

11  be 600 million that were available?

12  A.  600 million still available.  Yes.

13  Q.  Okay.  Is your testimony today inconsistent with what you

14  testified to at your deposition?

15  A.  It was not inconsistent, it's just that I have better

16  knowledge now as we're working through the process of

17  finalizing the 10-K.

18  Q.  Okay.  I believe I know the answer to this question, but

19  I'll ask it anyway.  Mr. O'Desky, are you familiar with the

20  core purpose of today's hearing?

21  A.  Yes.

22  Q.  And what is that purpose as you understand it?

23  A.  The use of cash collateral by the company.

24  Q.  Okay.

25          UNIDENTIFIED SPEAKER:  I have it right here.

O'Desky - Direct

1      MR. CAPONI:  Your Honor, I'm going to hand to the

2  witness Exhibit 5 in the agenda binder.

3      THE COURT:  Okay.  Certainly.

4      MR. CAPONI:  I'm just not sure if it was in one of

5  parties' scanned in exhibits.

6      UNIDENTIFIED SPEAKER:  Steve, what is the

7  (indiscernible.)

8      MR. CAPONI:  Do you have the binder?

9      UNIDENTIFIED SPEAKER:  You know what, I just -- I'm

10  not sure I knocked something out from under here.

11      MR. CAPONI:  Would you look to (indiscernible.)

12     (Exhibit 5 previously marked for identification.)

13  BY MR. CAPONI:

14  Q.  Mr. --

15      MR. CAPONI:  Yes.  It does exist.

16  BY MR. CAPONI:

17  Q.  Mr. O'Desky, can you tell me --

18      UNIDENTIFIED SPEAKER:  No.

19      THE WITNESS:  Those are not the same thing.

20      UNIDENTIFIED SPEAKER:  It's not the same thing.

21  BY MR. CAPONI:

22  Q.  -- what this document is that I just handed to you?

23  A.  Yes.  This is the -- authorizing the Debtors' use of cash

24  collateral.  It's the motion for that.

25  Q.  This is a joint request by the Debtor and the Lender to

1   allow the Debtor to use its cash collateral.  Is that correct?

2   A.  Correct.

3   Q.  Okay.  Why did the Debtor chose to pursue a financing

4   essentially to bankruptcy through the use of cash collateral?

5   A.  Well, the company needed to be able to use its cash to

6   continue operations and not be forced to shut down its

7   operations.

8   Q.  Did the company explore other options other than the use

9   of cash collateral for financing its bankruptcy?

10  A.  Yes.

11  Q.  Okay.  And what options were explored?

12  A.  We did explore trying to get Debtor-in-Possession

13  financing for the company through a couple of different

14  sources, all of which did not come to fruition.

15  Q.  And why did they not -- those efforts not come to

16  fruition?

17  A.  The terms and the way the company was, they would not do

18  Debtor-in-Possession financing and because we were, you know,

19  basically told that we would not be able to use cash

20  collateral and a DIP financing because the DIP financing was

21  not going to work.

22  Q.  Who told the -- who told Midway they could not use cash

23  collateral and pursue DIP financing?

24  A.  Mr. Thomas.

25  Q.  From whom did Midway request the ability to use its cash

1  collateral to fund the bankruptcy?

2  A.  The Lender.

3  Q.  Okay.  And by the Lender, you're referring to Mr. Thomas?

4  A.  Yes.

5  Q.  Okay.  And why did Midway approach Mr. Thomas?

6  A.  Because Mr. Thomas held the $30 million secured position

7  and having the secured position, he had the ability to seize

8  and take our cash so we had to go to him in order to have the

9  use of the cash.

10  Q.  Did the company, being Midway, take any steps to verify or

11  determine whether or not Mr. Thomas was, in fact, a proper

12  party with whom to hold these discussions?

13  A.  Yes.

14  Q.  And what steps did the company take?

15  A.  Well, we read the press release and the SEC documents that

16  were filed based on the transaction between National

17  Amusements and Mark Thomas, and we also talked to our

18  counterparts at National Amusements to ensure that the

19  transaction actually happened.

20  Q.  When you say that the transaction actually happened,

21  meaning that NAI, in fact, sold its interest to Mr. Thomas

22  specifically?

23  A.  Yes.

24  Q.  Okay.  Who on behalf of Midway negotiated the terms of the

25  proposed Order which is in the Exhibit in front of you, to

1 | allow the Debtor to use its cash collateral?
2 | A.  I negotiated the business terms and Deborah Fulton
3 | negotiated the legal terms.
4 | Q.  And who on the other side were you negotiating with or
5 | against?
6 | A.  We were negotiating with Kramer Levin on the legal side
7 | and Mesirow Financial on the business side.
8 | Q.  And who --
9 | A.  Mesirow --
10 | Q.  -- was Mesirow Financial representing?
11 | A.  Representing Mark Thomas.
12 | Q.  Did Midway have an understanding or reach a conclusion as
13 | to what would occur if it was unable to use its cash
14 | collateral when entering into the bankruptcy?
15 | A.  Yes.  If we were not able to use our cash collateral we
16 | would not be able to continue funding operations and basically
17 | probably would have had to liquidate.
18 | Q.  If you again look at the Exhibit which I handed you, it
19 | has the outlines of terms --
20 | A.  Yes.
21 | Q.  -- for which the Debtor had agreed with the Lender for the
22 | consensual use of cash collateral?
23 | A.  Yes.
24 | Q.  Okay.  Are you familiar with those terms?
25 | A.  Yes.

1   Q.  Okay.  When negotiating those terms, how would you

2   describe the Debtors negotiating position?

3   A.  We did not have much leverage while negotiating the

4   position for the Cash Collateral Motion compared to the

5   Lender.

6   Q.  Was Midway prepared to accept anything that was proposed

7   by Mr. Thomas?

8   A.  No, not anything.  No.

9   Q.  Okay.

10  A.  But we were willing to accept quite a bit in order to have

11  our use of cash collateral.

12          MR. CAPONI:  Will you pull up Exhibit 6 in your --

13      (Exhibit 6 previously marked for identification.)

14  BY MR. CAPONI:

15  Q.  Mr. O'Desky, I'm showing you what's been marked as Exhibit

16  6 by the Lender, Mr. Thomas.  Are you familiar with this

17  document?

18  A.  Yes.

19  Q.  Okay.  Can you tell us what this document is?

20  A.  This is the final Order to authorize the use of our cash

21  collateral.

22  Q.  And this Order is being -- was submitted jointly by Midway

23  and the Lender?

24  A.  Yes.

25  Q.  Okay.  And are the terms outlined here of the use of cash

1  collateral the same or different than the terms that are

2  contained in Exhibit 5 that I showed you immediately prior to

3  this Exhibit?

4  A.   Somewhat different.

5  Q.   Okay.  And with respect to the different terms, in your

6  opinion, are they more or less favorable to Midway?

7  A.   The final Order is more favorable to Midway than what the

8  interim Order was.

9  Q.   Okay.  And in the Debtors' business judgment, are these

10  terms acceptable to Midway?

11  A.   Yes.

12  Q.   I want to switch gears a little bit and get into the

13  company's operations.

14  A.   Okay.

15  Q.   Can you tell the Court, going back to the date when Midway

16  filed its Bankruptcy Petition, what its cash position was?

17  A.   Yes.  At the time that we had entered into bankruptcy we

18  had approximately $18 million of cash.

19  Q.   Okay.  And since filing for bankruptcy, how would you

20  describe the Debtors' operations?

21  A.   Well, we've continued to sell our games on a weekly basis.

22  We've continued to make and produce our games and put them

23  out, as evidenced by the Wheelman game that just was finalized

24  and released, and we've been able to maintain our cash

25  position and stay within the budgets and disbursements and

1  nets and exceeded some of those in certain places, from what

2  we expected.

3  Q.  Okay.  With regard to the normal operations, you've

4  qualified normal.  I know we're in bankruptcy, but with

5  respect to the operations of Midway, do you engage in any

6  regular forecasting or projections as to anticipated sales and

7  revenues and expenses?

8  A.  Yes.

9  Q.  Okay.  And how do you do that?

10  A.  Well, we have for over a year now, have done a rolling 13

11  week cash forecast of what we expect the next 13 weeks to be.

12  Q.  Okay.  And relying upon that forecast -- well, let me ask

13  you this question.  How often do you update your 13-week

14  rolling forecast?

15  A.  Once a week.

16  Q.  Okay.  Using that as a benchmark, how have Midway's sales

17  since entering -- of games since entering bankruptcy matched

18  up to your forecast?

19  A.  We've met or exceeded our weekly sales forecasts each

20  week.

21  Q.  And with respect to the expenses in Midway's normal

22  operating expenses, how have they compared to the 13-week

23  rolling forecast?

24  A.  The normal operating expenses have been less overall since

25  we went into bankruptcy than what we expected them to be.

1    Q.   Okay.  And you used the term, normal.  Are there non-

2    normal operating expenses?

3    A.   Not non-normal operating expenses.  There are other non-

4    normal expenses here.

5    Q.   Okay.  And what would those expenses be?

6    A.   Those would be for probably everyone sitting in this room

7    and others.

8    Q.   With respect to collections, how collections performed

9    with respect, measuring them against your 13-week rolling

10   forecast?

11   A.   Since we've entered into bankruptcy, the cash collections

12   and receipts from our customers have been significantly less

13   than what we have expected them to be.  Our customers took a

14   long time to understand what the -- was approved by the Court,

15   the Pre-petition credits outstanding, how they were able to

16   utilize them, what they were able to do, and basically where

17   the company was going to be at.  So our major customers that

18   held the majority of our receivables were not paying us at

19   all.  As of this week, that has now changed, where our large

20   customers have -- are in the process of paying us some large

21   sums of money, and this week alone, I'm expecting to get $8

22   million of cash receipts in the door.

23   Q.   And so in your opinion, have you resolved the issue with

24   your major customers in order to get them to pay on a more

25   regular basis?

1    A.  I believe on this week we have and that we should start

2    seeing regular payments as was prior to bankruptcy coming

3    forward and --

4    Q.  Okay.

5    A.  -- you know, going in the future.

6    Q.  Is it correct then to assume that in light of meeting or

7    slightly exceeding your forecast for game sales, now that

8    you've ironed out the wrinkle in collections, that you will be

9    -- collections will, at the end of the day, exceed your 13-

10   week rolling forecast?

11   A.  They will exceed the -- each week, we update that 13-week

12   rolling forecast so based on that, from what we had last week

13   to this week, yes, they would exceed that.

14   Q.  Okay.  What do you anticipate the Debtors cash position to

15   be, say at the end of this week, say to the end of March with

16   a couple days of April thrown in?

17   A.  I expect our cash position to be in the 20 to $22 million

18   range.

19   Q.  Again, I don't think it's any mystery, but am I correct in

20   that the Debtor is pursuing a potential sale of substantially

21   all, if not all of its assets through this bankruptcy

22   proceeding?

23   A.  Yes.

24   Q.  Okay.  And if such a sale were to take place, does the

25   company have an understanding as to a likely time frame for

1  such a transaction?

2  A.  From what we've been told by our advisers, we would expect

3  it to occur hopefully sometime at the end of May.

4  Q.  And what do you anticipate would be Midway's cash position

5  at the end of May of this year of 2009?

6  A.  I'm expecting, based on all the circumstances from this

7  week and just rolling it forward, to be about 8 to $10 million

8  of cash.

9  Q.  And what would you anticipate Midway's accounts receivable

10  to be at that same time?

11  A.  Based on the way that sales have performed and

12  collections, I expect it, you know, and again this is an

13  estimate, it's very hard to estimate receivables, but between

14  8 to $12 million of net receivables.

15  Q.  And in your opinion, how likely is it that those

16  receivables would be collectable?

17  A.  Well, I would say that a majority of those receivables

18  would be from our large customers which make up a majority of

19  our sales.  The Wal-Marts, the Gamestops, the Best Buys, the

20  Targets, the Worlds, which I believe are very sound companies,

21  so I believe that they would be potentially collectable.

22  Q.  Okay.  So then, adding up your numbers, by the end of May,

23  the likely time frame for a transaction, Midway would be

24  sitting with 8 to $10 million in cash and another 8 to $12

25  million in accounts receivable?

1   A.   Correct.

2   Q.   So roughly 20 to $22 million?

3   A.   That's my belief at this point in time.  Yes.

4   Q.   Okay.  With respect to the Debtors' efforts to pursue or

5   consummate a sale or a transaction, have any third parties

6   expressed an interest to Midway in acquiring substantially all

7   or all of its assets?

8   A.   Yes.

9   Q.   Okay.  And again, we've discussed previously with the

10  Court, and I know that there are issues of confidentiality, so

11  I'd like in discussing these bids, not to get in -- to divulge

12  names or specific parties that there may be discussions with

13  or to get too detailed about the transactions, but kind of

14  stay at a higher level.

15  A.   Okay.

16  Q.   Okay?  Roughly, how many parties have expressed an

17  interest in acquiring assets from the Debtor?

18  A.   Parts or all, five.

19  Q.   Okay.  And how would you gauge the level of interest?

20  A.   Strong kind.

21  Q.   Okay.  Are you familiar, I'm sure if you weren't, you are

22  now, with the term, the stalking-horse bidder?

23  A.   Yes.

24  Q.   Okay.  Is Midway -- excuse me.  Have any parties

25  expressed an interest in being a stalking-horse bidder for the

1  sale of assets of Midway?

2  A.  Yes.

3  Q.  Okay.  And do you have an understanding as to how many

4  parties and if any have expressed an interest?

5  A.  Expressed an interest, three.

6  Q.  Okay.  And again, without disclosing the identity or, you

7  know, the specific terms, what is the likely value the Debtor

8  anticipates of that stalking-horse bid?

9  A.  The value that we, at right now, would expect it to be

10 would be approximately $30 million for all of the U.S.

11 entities and assets, excluding the cash receivables and

12 inventory on hand.

13 Q.  So that stalking-horse bid would not include what you

14 previously testified would be the 8 to $10 million in cash on

15 hand by the end of May and the 8 to $12 million in accounts

16 receivable?

17 A.  Correct.

18 Q.  Okay.  You also mentioned it would not include inventory.

19 A.  Correct.

20 Q.  Again, with respect to the level of interest expressed by

21 parties to be a stalking-horse, how would you describe that

22 level of interest?

23 A.  High interest.

24 Q.  So Mr. O'Desky, if a sale were to be consummated at the

25 end of May, and as to what you've testified, am I correct,

1  we're looking at somewhere in the range of $22 million of cash

2  on hand and strong receivables, plus a minimum of $30 million

3  for the sale price?

4  A.  That's my best estimate.

5  Q.  And that would exclude any revenue that would be generated

6  through the sale of inventory?

7  A.  Correct.

8       MR. CAPONI:  That's all the questions I have at this

9  time.

10      THE COURT:  Thank you, Mr. Caponi.  Ms. Dakin-Grimm

11 or --

12      MR. CAPONI:  I think it's Mr. Harkness.

13      THE COURT:  I'm sorry.  I'm sorry.  Certainly.

14    (Pause in proceedings.)

15      THE COURT:  You may proceed when ready?

16      MR. HARKNESS:  Thank you, Your Honor.

17                    CROSS-EXAMINATION

18 BY MR. HARKNESS:

19 Q.  Good morning, Mr. O'Desky.

20 A.  Good morning.

21 Q.  How are you?

22 A.  Good.

23 Q.  I'm going to try not to replow too much ground here.

24 Let's just go back.  We're going to go through the chronology

25 again, if that's okay with you?

1  A.  Sure.

2  Q.  So just to reorient ourselves, January of 2008 you are the

3  controller of the company.  Is that right?

4  A.  Correct.

5  Q.  And you became the interim CFO about a month later in

6  February.  Is that right?

7  A.  February 4th.  Yes.

8  Q.  And during January of 2007, the company learned that the

9  sales for two of its games from -- two of its games have been

10  disappointing.  Is that right?

11  A.  Not in January of '07.

12  Q.  Oh, excuse me, I misspoke.

13  A.  It was January of '08.

14  Q.  January of '08, let me back up.

15  A.  Yes.

16  Q.  December '07, the company has two games it was hoping

17  would be successful in the marketplace.  Correct?

18  A.  Correct.

19  Q.  And the sales, the company learned soon thereafter, were

20  not as good as the company had hoped.  Correct?

21  A.  Correct.

22  Q.  And so January comes and the company is in not a good

23  position financially as it thought it would be.  Is that

24  right?

25  A.  Sure.  Correct.

O'Desky - Cross

1   Q.  And beginning in December '07 and continuing into January

2   '08, the company had had discussions with Ernst & Young, its

3   outside auditors, about the potential for a going-concern

4   qualification to the audit opinion.  Correct?

5   A.  Yes.

6   Q.  Now, you used to be an auditor.  Correct?

7   A.  Yes.

8   Q.  You were an internal auditor at Midway before you were the

9   controller.  Correct?

10  A.  Yes.

11  Q.  And then before that, you were an external auditor, I

12  believe, at Deloitte & Touche.  Is that correct?

13  A.  And at Anderson before that.

14  Q.  And Anderson before that.

15  A.  Yes.

16  Q.  So you understood what a going-concern qualification was?

17  A.  Yes.

18  Q.  And you understood it to mean that the auditor had a

19  concern that at some point in the ensuing reporting period,

20  ensuing year, that unless the company refinanced, it might

21  have a problem continuing as a going concern.  Right?

22  A.  Refinanced, restructured, somehow found a way to alleviate

23  the cash need.  Yes.

24  Q.  Okay.  It didn't mean that the company was insolvent in

25  January of '08.  Correct?

1   A.  Insolvent, again, is not truly an accounting term so --

2   Q.  Two different things.

3   A.  Yes.

4   Q.  And so is it fair to say the company started to --

5   management started to think about what options it should

6   explore as to how to deal with the concern Ernst & Young had

7   raised, and the cash shortfall the company knew it had.

8   Correct?

9   A.  Yes.

10   Q.  And did you -- and the company's management discussed that

11   with the Board.  Is that right?

12           MS. DAKIN-GRIMM:  Objection.  Leading.  This is

13   direct testimony of a proponent to the witness.

14           THE COURT:  I'll sustain the objection.  If you can

15   ask it in a less leading manner, Mr. Harkness.

16           MR. HARKNESS:  I will ask him in a less --

17   BY MR. HARKNESS:

18   Q.  So did you -- did the company's management share its

19   concerns with the Board about the cash in 2008?

20   A.  I was not involved in any of the Board discussions until

21   late January 2008, early February 2008 so I'm not exactly sure

22   what time frame you're referring to.

23   Q.  Well, did there come a point in which you started to talk

24   to the Board about the Ernst & Young going concern and the

25   cash shortfall?

1   A.  Yes.

2   Q.  And when did you start having those discussions with the

3   Board?

4   A.  My discussions with the Board started either a week or two

5   before I became interim Chief Financial Officer when I knew

6   that that's the position I was about to be in.

7   Q.  And did you participate in any of the deliberations or the

8   Special Committee that was ultimately formed?

9   A.  Their own personal deliberations or as part of discussions

10  with them?

11  Q.  Did you -- let's just take it one step at a time.  Did the

12  company form a Special Committee?

13  A.  The Board formed a Special Committee.  Yes.

14  Q.  Okay.  And can we look at Exhibit 57, please?

15      (Exhibit 57 previously marked for identification.)

16  BY MR. HARKNESS:

17  Q.  Do you have Exhibit 57 in front of you?

18  A.  Yes.

19  Q.  Now, is this a resolution of the Board?

20  A.  I believe so.

21  Q.  And turning your attention to the first whereas clause, it

22  refers there to the Ernst & Young going-concern issue.  Is

23  that right?

24  A.  Yes.

25  Q.  And then going to the, therefore be it resolved, a little

1  further down, did the company ultimate conclude that it was in

2  the best interest of the company and to all of its voting

3  stockholders to enter into a proposed Financing Agreement with

4  NAI?

5  A.  Yes.

6  　　　　MS. DAKIN-GRIMM:  Objection.  Foundation.  The

7  document speaks for itself and the witness hasn't established

8  he's ever seen or was involved in its preparation.

9  BY MR. HARKNESS:

10  Q.  Were you involved with the --

11  　　　　THE COURT:  Sustained.  Thank you.

12  BY MR. HARKNESS:

13  Q.  Okay.  Did the company establish a Special Independent

14  Committee?  Did the Board establish a Special Independent

15  Committee?

16  A.  Yes.

17  Q.  You can take this down.  And did the Special Independent

18  Committee seek assistance from you?

19  A.  Yes.

20  Q.  Did you provide that assistance?

21  A.  As requested.  Yes.

22  Q.  And did you help the Special Independent Committee

23  consider financing options?

24  A.  No.

25  Q.  Can we look at Exhibit 58, please?

1    MR. HARKNESS:  I'm sorry.  I might have marked it --
2    I was looking at -- it should be O'Desky number 6.
3    UNIDENTIFIED SPEAKER:  From -- was it that?
4    MS. DAKIN-GRIMM:  And it's your 59.
5    MR. HARKNESS:  Excuse me, I can't read my own
6    writing.  It's 69.
7    (Exhibit 69 previously marked for identification.)
8    BY MR. HARKNESS:
9    Q.  Is this a -- are you familiar with this document, sir?
10   A.  Yes.
11   Q.  Is this a document you reviewed during the course of your
12   employment at Midway?
13   A.  Yes.
14   Q.  And is this a document that was prepared in the normal
15   course of business at Midway?
16   A.  I guess so.  Yes.
17   Q.  And was this a document that you used to consider the
18   financing options available to Midway?
19   A.  Me personally?  No.
20   Q.  Did you review this document in January of 2008?
21   A.  I don't know when the first time I saw this document was.
22   It was sometime in either January or February 2008.
23   Q.  Okay.  And was the document prepared by people at Midway?
24   A.  I believe so.  Yes.
25   Q.  And looking at number one, it says, "Relevant

1 considerations if Midway is to use funds provided by NAI to

2 pay off credit facility with Wells Fargo." Do you see that?

3 A. Yes.

4 Q. Wells Fargo's who in this context --

5 A. Wells Fargo at the time is who held the secured position

6 and has, you know, the availability to use $30 million of a

7 revolver from them, a term loan end revolver.

8 Q. Okay. And ultimately was the Wells Fargo facility

9 replaced and refinanced by the NAI facility in February of

10 2008?

11 A. Yes.

12 Q. So is this one of the considerations that management made?

13 Is number one, does that reflect a financing option that

14 management considered in January and February of 2008?

15 A. Yes. Management did, but again, I was not part --

16 specifically part of those negotiations and determinations.

17 Q. Ultimately, you were. Were you?

18 A. Ultimately, when I became part of this as part of the

19 interim Chief Financial Officer, I was told that I was to

20 negotiate terms of the National Amusement Agreement.

21 Q. Okay. And during those negotiations, did you coordinate

22 with the Special Committee?

23 A. Yes.

24 Q. And was it your understanding that the Special Committee

25 had taken -- well, was the Special Committee advised by

1  counsel?

2  A.  Yes.  I believe so.

3  Q.  And was it independent counsel, different from the

4  company?

5  A.  Yes.

6  Q.  Who was the counsel?

7  A.  The firm of Dewey LeBoeuf.

8  Q.  And I'm not asking you to discuss what the substance of

9  the communications were, but were you ever in any meetings

10 with people within the Special Independent Committee in which

11 they discussed their fiduciary duties?

12 A.  Yes.

13 Q.  Were fiduciary duties something that the Special Committee

14 discussed in front of you more than once?

15 A.  Yes.

16 Q.  Were fiduciary duties something that the Special Committee

17 discussed in the presence of counsel in front of you?  I'm not

18 asking for the substance but did they discuss fiduciary duties

19 with counsel in front of you?

20 A.  Yes.

21 Q.  Are you familiar with the concept of fiduciary duties?

22 A.  Yes.

23 Q.  Was it something that you were focused on during your work

24 with the Special Committee in February of 2008?

25 A.  With regards to my own fiduciary responsibilities or

1  theirs?

2  Q.  Both.

3  A.  Mine obviously, yes.  And theirs, to the point that we

4  needed to inform them what they were and our counsels did

5  that, yes.

6  Q.  And did you ultimately sign the 2007 10-K?

7  A.  Yes.

8  Q.  And did you sign a Sarbanes-Oxley certification with

9  regard to the 2007 10-K?

10  A.  Yes.

11  Q.  Did you have any reluctance to sign either of those

12  documents?

13  A.  No.

14  Q.  Ultimately there was an amendment to the 10-K.  Do you

15  recall that?

16  A.  Yes.

17  Q.  And did the 10-K A, reflect the 2008 refinancing from NAI?

18  Do you recall?

19  A.  I believe that was in our -- actually our -- the

20  subsequent events of our 10-K or the 10-K A.

21  Q.  Okay.  And did you have any reluctance to sign any of the

22  certifications in 2008 you needed to under Sarbanes-Oxley?

23  A.  No.

24  Q.  As far as you know, that all the representations in the

25  10-K are correct?

1   A.  Yes.

2   Q.  You have no reason to doubt them?

3   A.  No.

4   Q.  I think when you were speaking with Mr. Caponi, you

5   referred to an analysis you did about interest rates --

6   A.  Yes.

7   Q.  -- and the terms.  Do you remember that?

8   A.  Yes.

9   Q.  Can you pull up Exhibit 61, please?

10      (Exhibit 61 previously marked for identification.)

11  BY MR. HARKNESS:

12  Q.  Is Exhibit 61 a memorandum you prepared?

13  A.  Yes.

14  Q.  Is this the memorandum you were referring to when you were

15  discussing the analysis with regard to the terms of the NAI

16  free financing with Mr. Caponi?

17  A.  Yes.

18  Q.  Turning to the second page and down below its got a

19  conclusion which reads, "The rates being offered to the

20  company for the NAI LSA are lower than those the company could

21  get in the marketplace today under a -- or at least as good as

22  the company could get from an arms length transaction."  Do

23  you see that?

24  A.  Yes.

25  Q.  Was that your conclusion?

1    A.  Yes.

2    Q.  And then it goes on to say, "In addition, the rates are

3    within the range of those rates that have closed over the last

4    12 months and especially the last 3 months.  As such,

5    management believes that the rates being proposed for the NAI

6    LSA are reasonable and justified."  Was that your conclusion?

7    A.  Yes.

8    Q.  And did you do the work that supports that conclusion?

9    A.  The analysis of the interest rates were performed by other

10   members of management but I did review the results, they are

11   what it compiled.

12   Q.  Can you turn to Exhibit 62, please?

13       (Exhibit 62 previously marked for identification.)

14   BY MR. HARKNESS:

15   Q.  These are Board of Directors minutes for February 27th,

16   2008.  Do you see that?

17   A.  Yes.

18   Q.  Did you attend a telephonic meeting with the Board of

19   Directors on February 27th, 2008?

20   A.  Yes.

21   Q.  Turning to the second page, it says, proposed financing

22   transaction with National Amusements, Inc.  Do you see that?

23   A.  Not yet.

24   Q.  It's towards the bottom.

25   A.  Yes.

1   Q.  It says, "Mr. Brown reported that much work had been done

2 by the Committee to monitor the negotiations between the

3 Corporation and National Amusements, and that the Committee

4 recommended that the Board approve the proposed transaction

5 providing that Ernst & Young agreed that the final form of the

6 transaction was such that there would be no going-concern

7 qualifier in Ernst & Young's opinion pointing to 2007

8 financial statements." Do you see that?

9   A.  The first half of it, yes.

10   Q.  Okay. Well --

11   A.  But, yes.

12   Q.  Do you recall, did Mr. Brown say that?

13   A.  Yes.

14   Q.  And do you agree with Mr. Brown's characterization that

15 much work had been done by the Committee?

16   A.  Yes.

17   Q.  As interim CFO, were you happy that -- with the terms of

18 the February 2008 refinancing?

19   A.  Happy?

20   Q.  Well, did you think -- let me rephrase the question. Did

21 you think that the 2008 refinancing would allow the company to

22 proceed and become profitable?

23   A.  Yes.

24   Q.  Did you think it was in the best interest of Midway to

25 enter into the 2008 refinancing?

1   A.  Yes.

2       (Pause in proceedings.)

3   BY MR. HARKNESS:

4   Q.  Now Mr. Caponi asked you about the Factoring Agreement.  I

5   don't want to go over that testimony in too much detail again.

6   Did you think that the -- let me just ask you this.  With

7   regard to the Factoring Agreement, was the company counting on

8   the Factoring Agreement's funds to be available to it in

9   December of 2008?

10  A.  Yes.  If there were invoices that we needed to factor into

11  to be able to do what we needed to.  Yes.

12  Q.  Okay.  And did you, I think you mentioned in response to

13  some of Mr. Caponi's questions, something about a 13-week cash

14  projection.

15  A.  Yes.

16  Q.  When did you start doing those?

17  A.  We started doing an eight-week cash projection right after

18  I became Vice-President of Finance, and Controller, November

19  '07 because I determined that there was not a good way to

20  project what our short term cash needs were going to be.  We

21  started doing the 13-week right around when Lazard was hired

22  in November of 2008.  They requested it to move from 8 weeks

23  to 13 weeks.

24  Q.  And focusing your attention on NAI for a second, did you

25  send the -- did you or anyone working for you send those

1   projections to NAI?

2   A.  That's part of the requirements under the Debt Agreements,

3   we were required to send eight-week cash projections on a

4   weekly basis to NAI, rolling updated each week.

5   Q.  And did NAI -- did Midway do that every week?

6   A.  Every week.  Yes.

7   Q.  Did you also provide cash projections to independent

8   members of the Board?

9   A.  Yes.

10  Q.  How frequently did the company do that?

11  A.  Starting in February of 2008 certain members of the Audit

12  Committee had asked to see the rolling eight-week cash

13  projections on a weekly basis and to discuss those with them,

14  and did that up until the point in time that they didn't

15  require it anymore.

16  Q.  Okay.  And as part of your cash projections, in November

17  of 2008 did you include money coming in from the Factoring

18  Agreement for the way you were going to manage your cash in

19  December 2008?

20  A.  Yes.

21  Q.  If the flow of cash from the Factoring Agreement had been

22  interrupted in December of 2008, would that have been --

23  caused difficulty for the company, financial difficulty?

24  A.  Yes.

25  Q.  Significant financial difficulty?

1   A.  Yes.

2   Q.  Okay.  Can we please have Exhibit 48?  I'm sorry, excuse

3   me, 49.

4       (Exhibit 49 previously marked for identification.)

5   BY MR. HARKNESS:

6   Q.  Do you recognize this document, sir?

7   A.  Yes.  It's the transcript of our first quarter 2008

8   earnings column.

9   Q.  Right.  And on the second page, it's got your name.

10  A.  Yes.

11  Q.  And are these comments you made during the earnings call

12  for the first quarter?

13  A.  Yes.  I believe so.

14  Q.  Okay.  When was the first quarter earnings call, do you

15  remember?

16  A.  When did it occur?

17  Q.  Yes.

18  A.  It would have been the beginning of May 2008.

19  Q.  Okay.  Now, just going a couple of paragraphs down under

20  your name, it refers to a short fall in EPS guidance.  Do you

21  see that?  It's the one, two, three, fourth paragraph under

22  that.  Do you see that?

23  A.  Yes.

24  Q.  What is a short fall in EPS guidance?

25  A.  Well, each quarter the company puts out what we believe

1  our earning per share are going to be for the next quarter

2  forthcoming, and basically a short fall in EPS guidance would

3  be the amount earnings per share that we didn't hit or

4  basically that's a short fall from what we had projected to be

5  to what it actually is.

6  Q.  Okay.  And you earlier in the paragraph, you indicate some

7  reasons for the company's missing the EPS guidance.  Do you

8  see that?

9  A.  Yes.

10  Q.  You don't mention the NAI refinancing in that paragraph,

11  do you sir?

12  A.  No.

13  Q.  Did you do that anywhere in the call, do you recall?

14  A.  I'm sure at some point in the call, we might have talked

15  about the refinancing but I, again, I need to see the entire

16  document.

17  Q.  But as a reason for missing the EPS guidance, did you ever

18  indicate that the NAI refinancing in any way, impacted the

19  company's ability to hit its EPS numbers?

20  A.  No.

21  Q.  Okay.  And why not, sir?

22  A.  Because per the guidance, we would have already factored

23  that in, and then the short fall hopefully would have been,

24  you know, what we expected it to be, and there's not a

25  material amount of interest or income and expense charges that

1   results it from the initial -- or from the NAI Agreement.

2   It's more of a balance sheet than income statement.

3   Q.  So is it fair to say that the NAI refinancing, in your

4   view, was not material to the income statement of Midway?

5   A.  At that point in time, no.

6   Q.  Now, turning your attention to December 2008, after the

7   transaction between NAI and Acquisition Holdings.

8   A.  Okay.

9   Q.  Mr. Caponi's covered the NOLs so I'm not going to replow

10  that ground, but let me ask you, did there come a point in

11  which the company had discussions with the note holders?

12  A.  After December of 2008?

13  Q.  After the transaction in November of 2008, during the

14  month of December, did the company -- well, let me back up.

15  Did the company have note holders?

16  A.  Yes.

17  Q.  Okay.  And there are two sets of notes.  Correct?

18  A.  Yes.

19  Q.  There's a six percent notes and a seven and an eight

20  percent notes.  Right?

21  A.  Yes.

22  Q.  And the note holders have rights to put -- well, what

23  rights do they have with -- after the change of control?

24  A.  After the change of control occurred per the note

25  Agreements, the note holders had the ability or the option to

1  put back to us or to make the company redeem a portion or all

2  of the notes within 50 days of its exchange of control.

3  Q.  Okay.  So they weren't required to but they could redeem

4  the notes if they wanted to.  Correct?

5  A.  Yes.

6  Q.  Now, did the note holders contact the company about

7  whether or not they were going to put their notes back to the

8  company?

9  A.  We did receive some communications from them that they

10  would; written and I believe a couple by telephone as well.

11  Q.  And as part of that, those discussions, did the company

12  ultimately enter into a Forbearance Agreement with some of the

13  note holders?

14  A.  Yes.

15  Q.  And pursuant to that Forbearance Agreement, did the

16  company agree to pay certain professional fees?

17  A.  Yes.

18  Q.  After the company started paying those professional fees,

19  did you personally head conversations with representatives of

20  the note holders?

21  A.  Yes.

22  Q.  Did you have those conversations every day, every week,

23  once in a while, how frequently did you have those

24  conversations?

25  A.  Starting in January of 2008, maybe the end -- no.  it

O'Desky - Cross

1  would have to be the end of December of 2008 through January

2  2009 and February, they were extensive, at least a couple

3  times a week.

4  Q.   Okay.  And did you or other members of management discuss

5  the negotiation of the terms of the Cash Collateral Order with

6  representatives of the note holders during January or February

7  of 2008 prior to the filing of the bankruptcy?

8  A.   Sorry, can you repeat the question?

9  Q.   Okay.  You had multiple conversations with representatives

10  of the note holders after December 2008.  Right?

11  A.   Yes.

12  Q.   Then in February, in the middle of February, I can't

13  remember the exact date, I think it's the 12th, the company

14  filed for bankruptcy.  Right?

15  A.   Yes.

16  Q.   Okay.  Between December and the filing of the bankruptcy,

17  did you or anyone else in Midway management, to your

18  knowledge, have conversations with the note holders or the

19  representatives about the Cash Collateral Order?

20  A.   I am sure that other members of management might have, but

21  I don't believe that I did.

22          THE COURT:  Mr. Harkness, I think you meant to be

23  referring to 2009.

24          MR. HARKNESS:  Excuse me, you're right.  I did mean

25  to mean 2009

1          THE COURT:  Yes.

2          MR. HARKNESS:  Thank you, Your Honor.

3          THE COURT:  Certainly.

4          MR. HARKNESS:  I did misspeak.

5   BY MR. HARKNESS:

6   Q.  And ultimately, is it fair to say that Midway -- well,

7   strike that.

8        (Pause in proceedings.)

9   BY MR. HARKNESS:

10  Q.  Going back then to the decision by the note holders to put

11  their notes back to the company.  Had you discussed with

12  anybody at management the possibility of the notes being put

13  back in April --

14  A.  Yes.

15  Q.  -- of 2009?

16  A.  Yes.

17  Q.  Okay.  So, like I said, we were talking earlier, there are

18  two sets of notes.  Right?

19  A.  Yes.

20  Q.  The six percent notes, when did you believe that they were

21  going to be redeemed?

22  A.  The first chance they had they related to was April, I

23  believe it was April 2009.

24  Q.  Okay.  And was the fact that the six percent notes could

25  put their shares back to the company in April 2009 something

1  that the company discussed in 2008?

2  A.  Yes.

3  Q.  What did you discuss with regard to those six percent

4  notes?

5  A.  With whom?

6  Q.  Well, what did you discuss with the Board with regard to

7  the six percent notes and the possibility that they would be

8  put back to the company in April of 2009?

9  A.  We discussed with the Board of that exact possibility in I

10  think the late spring, early summer of 2008 that that

11  possibility existed, and that we should try and get in front

12  of it in order to determine the best course of action.

13  Q.  And when you say, get in front of it, what do you mean?

14  A.  To get in front of the possibility that there could be $75

15  million of notes put back to us in April of 2009.

16  Q.  Okay.  And did the company ultimately form a Special

17  Committee in the fall of 2008 to consider refinancing and

18  restructuring options?

19  A.  Yes.

20  Q.  And it was one of the things that the Special Committee

21  was considering as, to use your words, how to get in front of

22  the issue, with regard to the six percent notes.

23  A.  Yes.

24  Q.  Did Midway have a view as to whether it was likely or

25  substantially likely that the note holders would put their

1  notes back to the company in June of '09?

2          MS. DAKIN-GRIMM:  Objection.  This states as

3  testimony.

4          THE COURT:  Sustained.

5  BY MR. HARKNESS:

6  Q.  Well, did Midway make any disclosure with regard to the

7  likelihood of the notes, the six percent note holders putting

8  their shares back -- their notes back to the company?

9  A.  Yes.

10  Q.  And what disclosure did the company make?

11  A.  I believe it was in our second quarter Q of 2008.  We non-

12  disclosed in our liquidity section that that possibility

13  existed.

14  Q.  And if they had -- well, how much of those six percent

15  note holders, how much would that have cost the company if

16  they put it back to the company?

17  A.  All of them?

18  Q.  All of them.

19  A.  It would have been a little over $75 million.

20  Q.  And were there any other potential triggers for the notes

21  to be put back to the company that the company was considering

22  in the end of 2008?

23  A.  The company was considering making --

24  Q.  Yes.  Was the company facing delisting by the New York

25  Stock Exchange --

1  A.  Yes.

2  Q.  -- at the end of 2008?

3  A.  Yes.

4  Q.  And would the delisting of the company have triggered the

5  rights of both sets of notes to put their shares -- their

6  notes back to the company?

7  A.  I believe so.  I do not remember exactly the -- what is in

8  those notes, of whether the delisting would have done it or

9  certain pieces, but I know that there were some clauses in the

10  notes.

11          MR. HARKNESS:  At this point, I don't have any

12  further questions, Your Honor.

13          THE COURT:  All right.  Thank you very much.  Yes?

14          MR. MAYER:  May I take one break to confer with my

15  --

16          THE COURT:  Mr. Mayer, yes.

17          UNIDENTIFIED SPEAKER:  Oh, excuse me.

18          THE COURT:  Certainly.

19          MR. O'DESKY:  Is it okay if I stand up to stretch my

20  legs for a second?

21          THE COURT:  I'm sorry, Mr. --

22          MR. O'DESKY:  May I stand up to stretch my legs for

23  a --

24          THE COURT:  You sure may.  In fact, I think --

25          MR. HARKNESS:  Actually I do have a few follow up

1    questions, Your Honor.

2            THE COURT:  I think we'll take a few minute break

3    after Mr. Harkness is finished.

4            MR. O'DESKY:  Not a good chair.

5    BY MR. HARKNESS:

6    Q.  Let me ask you this:  If -- you've talked to Mr. Caponi

7    about stalking-horse bidders and the possibility of selling

8    some or all of the company?

9    A.  Yes.

10   Q.  If the transaction, if a transaction doesn't close in May,

11   if it takes another month, what would be Midway's cash

12   position at the end of June?

13   A.  My rolling 13 weeks does not bring us to the end of June

14   at this point.  I'm not there yet, I'm in the middle of June.

15   Q.  Okay.  Well, let's do the middle of June.  Where will you

16   be in a cash basis in the middle of June?

17   A.  I would need to actually look at my most recent cash

18   projections but it would be less than what it would be at the

19   end of May.

20   Q.  How much less?  Do you know?

21   A.  I do not off the top of my head.  No.

22   Q.  Do you have those projections with you here today?

23   A.  No.  Not for that piece, no.

24   Q.  Okay.  How about the accounts receivable, where would

25   those be in the middle of June if there's no transaction

1  close?

2  A.  If sales continue at the same rate and collections

3  continue at the same rate, I would expect that receivables do

4  somewhere near the same area that they are now, that I had

5  expected before.

6  Q.  Okay.  How long have you estimated it will take for Midway

7  to actually sign an agreement with a stalking-horse?

8  A.  I have no basis to answer that.

9  Q.  Have you ever done a transaction like that before?

10  A.  Not from this side.  No.

11  Q.  When you say, this side, do you mean the company side?

12  A.  Correct.

13  Q.  And when does Midway run out of cash if it doesn't close

14  on a sale of its assets?

15  A.  I believe at this point it would be, you know, just

16  looking at trends, and I do not have an exact date, but it

17  would be, you know, late June or early July time frame.

18  Q.  Thank you.

19          THE COURT:  Thank you, Mr. Harkness.  Why don't we

20  take a 10 minute recess.  I think it will do well for all of

21  us to stretch a little bit and then we'll return.  Thank you.

22          MS. DAKIN-GRIMM:  Thank you, Your Honor.

23      (Recess from 11:41 a.m. to 11:54 a.m.)

24          THE CLERK:  Please rise.

25          THE COURT:  Thank you everyone.  Please be seated

1  again.  Thank you.

2        MR. CAPONI:  Your Honor, I think we misinformed the

3  Court that we were all ready.  Mr. Harkness was not at his

4  seat so I don't know if this is a good time to go for a

5  default judgment since he's not here.  We can --

6        THE COURT:  Oh, I'm not that quick on the trigger.

7        MR. CAPONI:  There is one issue before we continue

8  with the testimony.  I guess we were a little hasty in saying

9  that we've resolved confidentiality issues.

10        THE COURT:  Okay.

11        MR. CAPONI:  Counsel for NAI would like to address

12  the Court regarding the use of material they designated

13  confidential.

14        THE COURT:  All right.

15        MR. CAPONI:  Their counsel's here.  I don't know if

16  we want to wait for, it's really Ms. Grimm is going to be

17  using the documents in her examination that's why it's being

18  teed up now.  I don't know if you want to wait for Mr.

19  Harkness or get started?

20        THE COURT:  Oh, I think out of courtesy, we can wait

21  for a minute.

22        MR. CAPONI:  Okay.

23        MS. DAKIN-GRIMM:  It's also the Trustee.  The

24  depositions that (indiscernible).

25        MR. CAPONI:  And also, Your Honor, in addition I was

1  just informed of a mistake by Ms. Grimm.  It's not only the

2  exhibits but also all the depositions of the NAI, the entire

3  depositions --

4        THE COURT:  Okay.

5        MR. CAPONI:  -- they're seeking, which would be

6  several hours worth I believe --

7        THE COURT:  Okay.

8        MR. CAPONI:  -- as we discussed yesterday.

9        THE COURT:  Thank you.

10     (Pause in proceedings.)

11        UNIDENTIFIED SPEAKER:  My apologies, Judge.  My

12  partners seems to still be in the (indiscernible).  May I

13  check?

14        THE COURT:  I will wait for him.  Thank you.  Take

15  your time.

16        UNIDENTIFIED SPEAKER:  We're just finalizing terms

17  of the default judgment, too.  I don't know if you anyone who

18  wants to weigh in on that?

19        UNIDENTIFIED SPEAKER:  Just spell my name right.

20        THE COURT:  Okay.

21        MR. CAPONI:  Your Honor, so I'll restate my remarks

22  for the benefit of Mr. Harkness and for the record that

23  counsel for NAI is looking to designate all the documents they

24  produced and the video of their employees or clients as

25  confidential and therefore want the courtroom cleared for the

O'Desky - Cross

1    entirety of the presentation of the depositions and use of any

2    of the documents Ms. Grimm, Dakin-Grimm intends to use in her

3    examination of Mr. O'Desky and with that I will turn the

4    podium over.

5         THE COURT:  Mr. Dorsey, good afternoon.

6         MR. DORSEY:  Good afternoon, Your Honor.  John

7    Dorsey, Young Conaway Stargatt & Taylor, on behalf of National

8    Amusements, Inc.  I'm just going to introduce my co-counsel,

9    Your Honor, Jaculin Aaron of the firm of Shearman & Sterling,

10   who has been admitted pro hac in this case.

11        THE COURT:  Thank you, Mr. Dorsey.  Good afternoon,

12   Ms. Aaron.

13        MS. AARON:  Good afternoon, Your Honor.  We're not

14   exactly asking for what Mr. Caponi described.  Under the

15   Protective Order, the procedure was that for any materials

16   that had been designated confidential, and as Your Honor

17   knows, we're a third party.

18        THE COURT:  Yes.

19        MS. AARON:  We're not part of these proceedings.

20   We're here watching and obviously have some concern about the

21   confidentiality of our information.  Under the Protective

22   Order, the procedure was that any party that had designated

23   confidential material was to be given notice by any party that

24   was going to be using the materials at trial or in the

25   hearing.  We've not received notice of that.  I'm happy to

1  consider whatever it is they plan to use, I wouldn't

2  necessarily say that we would insist on everything we

3  designate be confidential as being so confidential that you

4  have to clear the courtroom for it, but obviously matters that

5  are related to NAI and the internal workings of NAI, which is

6  a privately held company, not a public company --

7          THE COURT:  Right.

8          MS. AARON:  -- should be -- should remain

9  confidential, and I don't know what Ms. Dakin-Grimm is

10  planning to use on her cross-examination.  I don't know what

11  exhibits they're actually planning to use or what they're

12  doing so I'm happy I'm here.  I'm happy to look at things and,

13  but I do request that we be given some relief with respect to

14  confidentiality.

15          THE COURT:  Well, let me ask this.  Would it be at

16  all helpful to take ten minutes for the two of you to talk or

17  is it, Ms. Dakin-Grimm, let me hear from you first.

18          MS. DAKIN-GRIMM:  Thank you.

19          THE COURT:  Let's do that.

20          MS. DAKIN-GRIMM:  Your Honor, for the sake of

21  clarity, I think I did tell Mr. Caponi that there might be

22  documents in my cross-examination for Mr. O'Desky that I would

23  use.  I've just shuffled through my papers and I don't believe

24  any of the NAI produced materials are there for Mr. O'Desky,

25  although we will certainly be talking about NAI.  So I think

O'Desky - Cross

1  the question relates to largely to our playing of the video

2  tapes of NAI's corporate representative, a senior executive

3  and Sumner Redstone.

4          THE COURT:  Okay.

5          MS. DAKIN-GRIMM:  And those depositions, counsel

6  attempted under the Protective Order to mark confidential in

7  the entirety.  We obviously used documents with those

8  witnesses, and at the deposition I informed counsel, a Ms. --

9  I'm sorry, Jackie, I don't remember her last name, but --

10          THE COURT:  Harran is it?  I'm sorry, Harran.

11          MS. AARON:  Ms. Aaron.

12          THE COURT:  Oh, Ms. Aaron, I'm sorry.

13          MS. AARON:  A-A-R-O-N.

14          THE COURT:  I'm sorry, Ms. Aaron.

15          MS. DAKIN-GRIMM:  Ms. Aaron was present in at least,

16  well, two of the three depositions, and we specifically made

17  arrangements with the Shearman & Sterling firm, well,

18  requested that they have the witness sign and review

19  transcripts on a very expedited basis as we intended to play

20  their depositions at this hearing.  We let them know the date

21  of the hearing, obviously the time period has been extremely

22  expedited so that's why they didn't get the notice until last

23  week.  The Protective Order itself says, "Use of protected

24  material at trial or in deposition, nothing herein shall

25  prevent any of the parties from using protected material in

1  connection with any trial, hearing, deposition," etcetera.

2  But then it says, "That before a party may use the protected

3  material in connection with a trial, hearing or other

4  proceeding open to the public, it must first inform the

5  designating party of its intent to do so in a manner that

6  affords the designating party sufficient time to seek

7  appropriate relief."

8      We did that, Your Honor, at the depositions themselves.

9  I believe, if I go back and look in the transcripts that the

10  arrangements we made and the comments to that effect are

11  actually on the record in the deposition, but if not, they

12  were done right at the conclusion of the deposition.

13  Nevertheless, I am happy to provide a printed copy of our

14  excerpts of the depositions of the three NAI witnesses,

15  including its Chairman and CEO, Sumner Redstone, and perhaps

16  while I'm examining Mr. O'Desky, she can advise whether she

17  has any problems with any portions.

18          THE COURT:  Ms. Aaron, is that helpful?

19          MS. AARON:  Yes, Your Honor.  That's very helpful.

20  I would add to that list of the three, Shari Redstone.  We are

21  not her counsel, but she is a representative of NAI and some

22  of her -- the information in her deposition could be

23  confidential as to NAI.

24      And I'm not really sure what I'm supposed to do during, I

25  don't want to pop up during the middle of Ms. Dakin-Grimm's

1  cross-examination.

2          THE COURT:  My impression is the video depositions

3  will probably not be used until after lunch or a little bit

4  later.

5          MS. DAKIN-GRIMM:  I believe we'll be doing Mr.

6  Thomas directly after lunch, live, so there should be a couple

7  of hours, at least, here --

8          MS. AARON:  And that sounds fine.

9          MS. DAKIN-GRIMM:  -- for Ms. Aaron to look things

10  over.

11          THE COURT:  All right.  Good.  Ms. Aaron, if you

12  find yourself still in difficulty, you'll let me know.

13          MS. AARON:  Yes.

14          THE COURT:  But perhaps it's an easy way to rectify

15  things.

16          MS. AARON:  Right.

17          THE COURT:  And I see Mr. Buchbinder rising to

18  address the issue as well.

19          MR. BUCHBINDER:  Your Honor, Dave Buchbinder, again,

20  for the United States Trustee.  At this moment, given the

21  procedural posture, I will simply reserve all of our rights

22  and refer everyone to my earlier comments on the

23  confidentiality issues.

24          THE COURT:  You bet.  Okay.  Thank you, Mr.

25  Buchbinder.

1         MS. DAKIN-GRIMM:  Oh, okay.  Good.

2         UNIDENTIFIED SPEAKER:  (Indiscernible.)

3         MS. DAKIN-GRIMM:  Sumner, Jankowsky, Steele and now

4    Shari Redstone.  She wants to --

5         THE COURT:  Thank you.  Thank you, Ms. Dakin-Grimm.

6    That's helpful.

7         MS. DAKIN-GRIMM:  Thank you, Your Honor.  I guess

8    it's my turn now?

9         THE COURT:  It is and you may proceed with your --

10        MS. DAKIN-GRIMM:  Thank you.

11        THE COURT:  -- cross-examination when ready.

12                        CROSS-EXAMINATION

13   BY MS. DAKIN-GRIMM:

14   Q.  Good afternoon, Mr. O'Desky.

15   A.  Good afternoon.

16   Q.  I am a big fan of chronology but I want to cover a couple

17   of points out of order that the other counsel have addressed.

18   There should be, behind you there, a couple of volumes that

19   constitute the Committee's exhibits, and they'll also come up

20   on the screen, whichever you prefer.  I'm going to start with

21   Exhibit 4.  If you would take a look at that.  I think we need

22   to have the screen switched over to our side.

23        (Exhibit 4 previously marked for identification.)

24        MR. O'DESKY:  Okay.

25   BY MS. DAKIN-GRIMM:

O'Desky - Cross

1    Q.  And I believe you said that you had seen this before on

2    the direct examination.  For the record, this is the Form 10-K

3    filed with the SEC by Midway during 2008 for the year-ended

4    December 2007.  Correct?

5    A.  Yes.

6    Q.  All right.  Now within that document, if you could turn

7    to, I'm just going to refer to the numbers at the top right

8    hand corner, page 177 of 210, which is the printed page.

9    A.  Okay.

10   Q.  Okay.  And in the third paragraph that starts, we paid

11   foreign income taxes.

12   A.  Yes.

13   Q.  Okay.  Within that paragraph, the second sentence reads,

14   "At December 31, 2007, we had a net operating loss carry-

15   forward of 593,504,000 for federal income tax purposes which

16   expires from 2019 to 2027."  That was correct, wasn't it?

17   A.  Yes.

18   Q.  And it was accurate when this document was filed?

19   A.  Yes.

20   Q.  And then it goes on, "And aggregate net operating loss

21   carry forwards of another $161,442,000 for state income tax

22   purposes."  And then it states their expiration.  And that was

23   also correct, wasn't it?

24   A.  Yes.

25   Q.  All right.  Now, going on a sentence.  "Stockholder

1  ownership changes as defined under Section 382 of the Internal

2  Revenue Code of 1986 as amended may limit the annual amount of

3  net operating loss carry forward we may use to offset future

4  taxable income."  And that statement also was true, was it

5  not?

6  A.  Yes.

7  Q.  I believe on examination from Mr. Caponi, you suggested

8  that you're aware of analysis being done to try and support an

9  argument that the change of control affected by Mr. Thomas's

10  purported acquisition wouldn't cause you to lose those net

11  operating losses after all.  Right?

12  A.  It says here, it may end.

13  Q.  Right.

14  A.  Correct.

15  Q.  And Midway's trying to find a way around it right now,

16  aren't they?

17  A.  No.  We're not trying to find a way around it.  We're just

18  going by the letter of the tax law.

19  Q.  Okay.  And you're not a tax expert, are you?

20  A.  No.  I am not.

21  Q.  And you're not purporting to testify here as a tax expert,

22  are you?

23  A.  No.

24  Q.  And you don't have an opinion from a tax lawyer at Blank

25  Rome opining that you would be able to get around this

1  provision, do you?

2  A.  Again, I don't agree with getting around but, no, I do

3  not.

4  Q.  Okay.  And you don't have a tax opinion from an outside

5  accounting firm like Ernst & Young opining that Midway would

6  still be able to use its net operating losses notwithstanding

7  the change in control, do you?

8  A.  No.  I do not.

9  Q.  Okay.  Now, you testified that you're familiar with the

10  process of filing a 10-K document like this, right?

11  A.  Yes.

12  Q.  And you have to run it by the SEC before it becomes

13  public, don't you?

14  A.  No.

15  Q.  You don't have to do that?

16  A.  It needs to be filed with the SEC.

17  Q.  Right.  The SEC has not advised Midway that it agrees that

18  Midway still has access to the net operating losses and net

19  carry forwards notwithstanding the change in control affected

20  by the purported transaction of Mr. Thomas.  Right?

21  A.  You're talking about after the transaction in November of

22  2008 has the SEC given an opinion on whether they believe in

23  that operating loss is still there or not?

24  Q.  Yes.

25  A.  No.

1  Q.  You don't have that?

2  A.  No.

3  Q.  Good.  Now, within this document Midway was required as of

4  year-end 2007 on a financial reporting basis to indicate what

5  it believed its then ability to use its net operating losses

6  and carry forwards were.  Correct?

7  A.  Yes.

8  Q.  And in that context, as of December 31, 19 -- I'm sorry,

9  2007, the document indicated that the company did not then

10  have an ability to use the net operating losses.  Right?

11  A.  At that point in time?  No, we did not.

12  Q.  Right.  But would you expect that a sophisticated reader

13  of a 10-K who purports to be an expert in mergers and

14  acquisitions, would understand that that representation didn't

15  mean that the NOLs just disappeared or went away forever?

16  A.  I'm not going to speculate on what someone else would do.

17  Q.  You understood that, right?

18  A.  I did.  I'm an accounting -- I've been an accounting

19  expert; I have an accounting degree, so yes, I understood

20  that.

21  Q.  Right.  And you would understand that simply including in

22  a 10-K, the then anticipated ability to use the NOLs didn't

23  mean that they went away forever.  Right?

24  A.  Yes.

25  Q.  All right.  Now, another issue that counsel asked you

1  about that I'll come back to later chronologically, but I

2  believe Mr. Caponi asked you whether Midway did any

3  investigation of the Thomas transaction and you said, yes.

4  Right?

5  A.  Yes.

6  Q.  And I believe you said that your investigation was, you

7  read the press materials.  Right?

8  A.  I read the press materials.  I've reviewed the information

9  from the SEC filings that were done and talked to my

10  counterpart at National Amusements.

11 Q.  To make sure that they'd actually signed these remarkable

12 documents.  Right?

13 A.  That they signed the documents.  Yes.

14 Q.  Okay.  And that's it, right?  That was your investigation.

15 Right?

16 A.  Yes.

17 Q.  You didn't do, for example, any investigation into whether

18 the transaction was appropriate.  You just investigated

19 whether it was actually signed.  Right?

20 A.  Whether it was appropriate at the time did not matter.

21 Q.  Okay.

22 A.  As long as it just --

23 Q.  You didn't do any investigation into whether it was

24 appropriate, did you Mr. O'Desky?

25 A.  No, did not.

1  Q.  You didn't hire professionals to investigate whether

2  Midway had any possible ways to void the transaction, did you?

3  A.  No.

4  Q.  And you didn't consult with any professionals to determine

5  whether Midway had any potential legal claims against either

6  NAI or Mr. Thomas, did you?

7  A.  No.

8  Q.  Now, Mr. Caponi asked you whether the final interim Cash

9  Collateral Order, the one that was entered after we had the

10  hearing here on the first day, was acceptable to Midway, and

11  you said, yes.  Right?

12  A.  Yes.

13  Q.  Right.  And wouldn't it be better for the company if it

14  didn't have to currently pay Mr. Thomas's attorney's fees?

15  A.  Yes.

16  Q.  So you weren't suggesting that it was, the best possible

17  Cash Collateral Order, were you?

18  A.  What I believe I said, it was the best possible that we

19  were able to get.

20  Q.  Right.  Okay.  And that's because Mr. Thomas imposed a

21  bunch of conditions on you and you were really willing to do

22  whatever it took to get access to the cash.  Right?

23  A.  Not whatever it took, but at the Order that you see was

24  where we were willing to go.

25  Q.  Well, the Order that the Judge entered is not what you

1 presented to the Court, was it?

2 A.  No.

3 Q.  And you presented a different Order to the Court and the

4 then note holders made a bunch of objections, and the result

5 was you got a better result.  Right?

6 A.  Yes.

7 Q.  Okay.  And can you identify for me what it was that Mr.

8 Thomas insisted on in the original Order you presented that

9 the Debtor resisted?

10 A.  No.  I really cannot because most of those were legal

11 terms not the, per se, business terms that I had negotiated.

12 Q.  Okay.  So you don't know of a single thing that Mr. Thomas

13 asked for that the Debtor said, no.  Right?

14         MR. CAPONI:  Objection, Your Honor.  I think he

15 answered that question already, and it was at -- the legal

16 terms were done by somebody else.

17         THE COURT:  I'll sustain that objection.  I think

18 that's accurate.  When I say accurate, Mr. Caponi's point is

19 accurate.

20         MS. DAKIN-GRIMM:  I understand, Your Honor.

21 BY MS. DAKIN-GRIMM:

22 Q.  That being said then sir, you didn't mean to opine here

23 that the legal terms that were contained in the first proposed

24 Cash Collateral Order that the Debtor submitted to the Court,

25 were the best possible terms the Debtor could get one way or

1  the other because you weren't involved in them.  Right?

2  A.  For the legal portions, correct.

3  Q.  Okay.  Wouldn't it be better for the Debtor if it didn't

4  have to stipulate that Mr. Thomas had any legitimate claim

5  here?

6          MR. HARKNESS:  Objection.  He said he didn't have

7  anything to do with the legal aspect of the negotiation.

8          MS. DAKIN-GRIMM:  I'm not asking about negotiations.

9          THE COURT:  I overrule that objection.

10          MR. O'DESKY:  Can you repeat the question?

11  BY MS. DAKIN-GRIMM:

12  Q.  Well, if Mr. Thomas doesn't have any legitimate claim

13  here, the Debtor doesn't have to worry about that supposed $30

14  million secured indebtedness.  Right?

15  A.  Correct.

16  Q.  Wouldn't that be better for the Debtor if that were the

17  case?

18  A.  I have not thought through that analysis completely.

19  Q.  Okay.  Would it be better as the CFO of the company, if

20  the company didn't have to pay $30 million to Mr. Thomas?

21  A.  It would be better if we did not have to pay $30 million.

22  Yes.

23  Q.  Okay.  All right.  And yet, in the first Cash Collateral

24  Order presented to the Court, the company was willing to

25  stipulate that Mr. Thomas had a valid position even though it

1  had done no investigation into whether the transaction was

2  valid beyond reading the press, looking at the SEC filings and

3  calling NAI.  Correct?

4  A.  We -- from what our view was, and we're -- doing that

5  investigation that we did, was that it was a transfer of the

6  $30 million from the NAI facility to Mark Thomas, and we truly

7  believe and still do, that the NAI facility $30 million, is

8  valid and enforceable so it didn't change anything besides who

9  it was to.

10  Q.  I'm going to ask you the question again.  You know what,

11  I'll let that one just lie that way.  Mr. Thomas -- sorry,

12  Freudian slip.  Mr. O'Desky, you were with the company in the

13  end of 2007.  Correct?

14  A.  Yes.

15  Q.  And at the end of 2007, it's true that the company was

16  having cash difficulties.  Right?

17  A.  Yes.

18  Q.  Okay.  Severe cash difficulties, correct?  December 2007?

19  A.  Define severe.

20  Q.  What does severe mean to you as an accountant?

21  A.  That's a judgment and it all depends on the circumstances

22  and timing of it.

23  Q.  Okay.

24  A.  So we had cash difficulties.  Yes.

25  Q.  In your view, as an accountant who is aware of the

1  circumstances here, wasn't Midway having severe cash

2  difficulties in December of 2007?

3  A.  In late 2007 I was not -- did not have all the available

4  facts because I was doing the Controller job not the CFO job.

5  I did not have all the projections of where the company was at

6  at that time.

7  Q.  You've seen them now though, sir.

8  A.  Now, I have.  Yes.

9  Q.  As the CFO, looking at 2007, isn't it true that the

10  company was having severe financial difficulties?

11  A.  Looking back, yes.

12  Q.  All right.  And isn't it true sir, that at no time in 2007

13  did the company retain anyone to perform a solvency analysis

14  of the company?

15  A.  I do not believe so.

16  Q.  Okay.  And I think you said earlier that solvency is not

17  an accounting term.  Are you familiar with how that term is

18  used in the bankruptcy context?

19  A.  I believe so.

20  Q.  And what's your understanding of that?

21  A.  My understanding would be that the solvency is looked at

22  by taking the fair value of what the assets are of the company

23  at a certain point in time against the liabilities of the

24  company to determine if it's positive or negative.

25  Q.  Okay.  And nobody undertook that analysis in 2007 as far

1  as you know, did they?

2  A.  No.

3  Q.  All right.  Isn't another way of looking at it whether the

4  company is paying its bills as they become due?  Are you aware

5  of that standard?

6  A.  Yes, but that's not the same thing as the insolvency

7  definition I just gave you.

8  Q.  All right.  Well, keep both of those issues in mind.

9  A.  Sure.

10  Q.  And we'll look at some of the documents in the company.

11  Let's move ahead to the beginning of 2008 if you will.  Are

12  you aware that management in that time period was proposing to

13  the Board of Directors doing, RIF's, reductions in force and

14  cuts?

15  A.  I was aware after the fact.  Yes.

16  Q.  Okay.  And that was due to the severe financial

17  difficulties, was it not?

18  A.  I believe that that was one of the issues.  Yes.

19  Q.  Okay.  Now, as of January 2008, the company was facing, I

20  think we heard in the direct examination, a potential covenant

21  breach of its Wells Fargo facility.  Right?

22  A.  Correct.

23  Q.  And also the going-concern issue that Ernst & Young had

24  raised.  Right?

25  A.  Correct.

O'Desky - Cross

1    Q.  And the target date for Armageddon, if you will, you know,

2    if nothing happened everything's going to go south, was end of

3    February, wasn't it?

4    A.  I don't believe that Armageddon would have happened, but

5    the first date of the two things you had talked about was on

6    March 1st.

7    Q.  Okay.  So you had to come up with some way to deal with

8    the Wells Fargo situation and the going-concern situation by

9    the end of February.

10   A.  They both didn't have to happen by the end of February.

11   The Wells Fargo had to happen by March 1st and the going

12   concern had to happen before they issued their opinion, which

13   was due at sometime in March.

14   Q.  Okay.  Well, wasn't your earnings call scheduled to be in

15   February, your fourth quarter earnings call for --

16   A.  Scheduled, but it didn't have to be in February.

17   Q.  All right.  But wasn't the company concerned that if it

18   didn't happen on the timing that it always had happened, there

19   would be chatter and it would further damage the company?

20   You've seen that in the documents, haven't you, sir?

21   A.  I've seen that in the documents but, yes.

22   Q.  Okay.  So the goal was to fix both of these issues by the

23   end of February, wasn't it?

24   A.  That was our goal.  Yes.

25   Q.  Okay.  And staying in that January, February time period,

1  the company also had outstanding, the $150 million in bonds.

2  Right?

3  A.  You know it's correct.

4  Q.  Right.  And we've already established that of the 150, 75

5  million of them could be put to the company in April of 2009.

6  A.  Correct.

7  Q.  There was no analysis in that January, February 2008

8  period of any kind of contingency plan that encompassed how to

9  pay back the bondholders in 2009, was there?

10  A.  Not to my knowledge.

11  Q.  Okay.  And that's because that was tomorrow's problem, you

12  were dealing with the urgent cash crisis of the moment.

13  Right?

14  A.  I'm not going to speculate on what the former CEO and CFO

15  were looking at while doing that analysis.

16  Q.  Now, in January of 2008 the company was making its cash

17  projections and attempting to figure out how to deal with the

18  Wells Fargo and Ernst & Young going-concern issues based on

19  its cash forecasting system.  Right?

20  A.  Correct.

21  Q.  And I believe on direct examination you used the words,

22  software glitch, to describe a problem that you found.

23  A.  One of the problems.  Yes.

24  Q.  Okay.  It was way more than a software glitch, wasn't it,

25  sir?

O'Desky - Cross

1  A.  No.

2  Q.  Okay.  We'll come back to the reasons for that in a

3  second.  Could you look at Exhibit 6 in your binder, which is

4  also Exhibit 61?  Exhibit 6 is a heavily redacted agenda for a

5  Midway Games Board meeting, January 7 and attached to it a

6  PowerPoint presentation I believe.  Well, attached to it, I

7  assume this is part of the document on Bates page 00148 an

8  item entitled, liquidity discussion.  Were you aware, Mr.

9  O'Desky, that management discussed with the Board, at very

10  early January, the proposed head count reductions and the 2008

11  liquidity issues that are identified on Bates page 148.

12  A.  Again, after the fact as I was not part of any of these

13  discussions.

14  Q.  Okay.  And we see that January 7, the company was saying,

15  cash tight but manageable through quarter two, though

16  additional waivers will be required by Wells Fargo beginning

17  in March.  That's the waiver we're talking about already,

18  right?

19  A.  I believe so.

20  Q.  Okay.  And then if you look at the third bullet, it says,

21  "Additional funding likely needed by summer regardless of

22  scenario."  Right?

23  A.  That's what it says.

24  Q.  That was the state of affairs in the first quarter of

25  2008, wasn't it?

O'Desky - Cross

1  A.  Again, this is the first time I've seen this document, so

2  yes.

3  Q.  Mr. O'Desky, you were there in the first quarter of 2008,

4  --

5  A.  Yes, I was.

6  Q.  -- weren't you?

7  A.  Uh-huh.

8  Q.  And you were working under the CFO, correct?

9  A.  Yes.

10  Q.  That was a true state of affairs based on your experience?

11  A.  Yes.

12  Q.  And then the third line --

13  A.  Wait.  Additional funding likely needed by summer.  This I

14  do not believe takes into account the $90 million that we got.

15  I think this was -- I think that that's got an accelerated

16  time frame for it.  I don't think this is in addition to that.

17  Q.  Right.  At January 7, you hadn't even discovered that --

18  A.  Right.  Exactly.

19  Q.  -- you really needed $90 million.

20  A.  Exactly.

21  Q.  You still thought you needed 30 to 35.

22  A.  No, then I agree with that, yes.

23  Q.  Okay.  And then in the next line, "Ernst & Young

24  evaluation on going-concern opinion under way with

25  determination mid-February."  That was the state of play in

1  the first week of January, right?

2  A.  Yes.

3  Q.  And to sum up, no consideration at this point was being

4  given to how to pay back the bond holders if they put the 75

5  million in notes in April of 2009?

6  A.  Do not believe so, no.

7  Q.  Okay.  Now, if you could look at Exhibit 59 in the binders

8  that counsel showed you this morning, I apologize, these are

9  not in my binders, but we'll put it up on the screen.  It's a

10  document that Mr. Caponi or Mr. Harkness showed you.  And I

11  believe you said you hadn't seen this before, that you weren't

12  part of it, but this is potential structures for additional

13  funding for National Amusements.

14      (Exhibit 59 previously marked for identification.)

15  BY MS. DAKIN-GRIMM:

16  Q.  And now if you could --

17      MS. DAKIN-GRIMM:  Could you make the whole document

18  bigger, Chuck?

19  BY MS. DAKIN-GRIMM:

20  Q.  You can see that a number of options are discussed in mid-

21  January, including the option of issuing convertible preferred

22  stock to NAI.  Do you see that in 2C?

23  A.  Yes.

24  Q.  And it says, "Midway could issue non-convertible preferred

25  stock to NAI, but you'd have to get Wells Fargo's consent and

1  it could trigger a Redstone super premium; i.e., an increase

2  of conversion rates of 2005 and 2006 notes, if it causes the

3  Redstone parties to own 90 percent or more of the aggregate

4  fair market value of Midway's outstanding capital stock."

5      Now, isn't it true, Mr. O'Desky, that in January of 2008,

6  the company considered issuing more stock to Mr. Redstone and

7  his entities, but decided not to do it because of the issue

8  we're seeing here and instead decided to characterize the

9  transaction as a loan?

10 A.  That's a loaded question so I'm going to take it in three

11 pieces.

12 Q.  Please do.

13 A.  First of all, per this document, we did, at some time --

14 and again, I was not involved in this process here of what we

15 were going to do.  That was not my job at the time.  But per

16 this document, which I had seen later on, yes, it was

17 considered that we were going to issue -- one of the options

18 was to issue preferred --

19      MR. CAPONI:  Excuse me, Your Honor.  I just want to

20 object to -- continuing with this document, I think Mr.

21 O'Desky was here testifying as Mr. O'Desky.  He's not the

22 30(b)(6) who was required to be knowledgeable about every

23 document the company created.  He has already testified this

24 was not within the purview of his responsibilities at the

25 time.  He has no personal knowledge of it, and he simply

1    agreed with Mrs. Grimm the document says what it says.

2           MS. DAKIN-GRIMM:  But, Your Honor, --

3           MR. CAPONI:  I don't think we need him to say that

4    or to speculate as to what the people who created this

5    document were thinking.  Again, he's testified he has no idea.

6           MS. DAKIN-GRIMM:  Respectfully, Mr. O'Desky was the

7    company's 30(b)(6) witness.  It was in that capacity that we

8    deposed him last week.

9           MR. CAPONI:  And this was not the line of

10   questioning he was examined on.  He was not asked to be

11   prepared to go into this today.  Again, he's already testified

12   he has no knowledge of this document and is simply agreeing

13   that the words -- the print says what it says.

14          MS. DAKIN-GRIMM:  But --

15          MR. CAPONI:  Asking him to characterize it and to

16   get behind the thinking of people who created this is not

17   within his purview.

18          MS. DAKIN-GRIMM:  I don't believe I've done that,

19   Your Honor.

20          THE COURT:  No.

21          MS. DAKIN-GRIMM:  I'm asking about the events.  I

22   believe he is the 30(b)(6) witness.  I can get the designation

23   of areas of testimony if that's helpful, but I'm happy to ask

24   him about the event apart from the document.  I was using

25   Counsel's document that he offered to the witness merely as a

1   means to refresh his recollection.

2           THE COURT:  Okay.

3           MR. CAPONI:  I -- just to clarify, I did not offer

4   this document.  I believe Mr. Harkness has not offered this

5   document.

6           THE COURT:  All right.  I'll overrule the objection.

7           MS. DAKIN-GRIMM:  Thank you.

8           THE WITNESS:  To follow along my thoughts, so,

9   number one, per this document, yes, it's -- it was considered.

10  The second or third part was that we did not -- I think you

11  had asked, and I apologize if I'm mistaken, that because of

12  this super premium, we did not characterize it as equity, I

13  disagree with that wholeheartedly, that we went through a very

14  rigid negotiation, discussions with lawyers, discussions and

15  business discussions to insure that what we were doing was

16  really debt, and that all parties involved believed that it

17  was debt and not equity.

18  Q.  Okay.  Mr. O'Desky, isn't it true that after this

19  discussion, we're seeing a document about it in mid-January,

20  the idea of pursuing an equity infusion, so labeled, was

21  abandoned by the company and, instead, you pursued a

22  transaction that would be called debt?

23  A.  I don't know.  What I was told to do when I became the

24  interim CFO was to do the business negotiations of the NAI

25  debt facility that had been talked about.

1  Q.  Okay.  And you were told to pursue that transaction right

2  around this time, weren't you?

3  A.  Right after this time, yes.

4  Q.  Okay.  And you weren't involved in anything else that

5  would have been labeled equity infusion, were you?

6  A.  No.

7  Q.  Could you look at Exhibit 63 in my binder, please?

8  Exhibit 63.  I apologize.

9  A.  Oh.  Yes, okay.

10      (Exhibit 63 previously marked for identification.)

11  BY MS. DAKIN-GRIMM:

12  Q.  Exhibit 63 is draft minutes of the Audit Committee of the

13  Board of Directors of Midway, a telephonic meeting on January

14  15th, 2008, and I see in the last line of the first paragraph

15  that you attended; is that correct?

16  A.  Yes.

17  Q.  And at this point, you were Vice-President, Finance

18  Assistant, Treasurer, and Controller of the Corporation?

19  A.  Yes.

20  Q.  Okay.  And you can see in the next paragraph, under 2007

21  audit, that the then CFO reported on Ernst & Young's possible

22  inclusion of a going-concern opinion, right?

23  A.  Yes.

24  Q.  And that actually happened?

25  A.  Yes.

1  Q.  Okay.  And then about five lines down, it says, "Mr.

2  Powell described amounts the Corporation would need to raise

3  based on management's 2008 cash projections and the

4  requirements of the credit facilities covenant."  And then a

5  little bit further down, it says, "The discussion then turned

6  to a possible cash infusion from National Amusement and the

7  Board's fiduciary duties relating to such a transaction."  The

8  Board actually discussed having a cash infusion, didn't they?

9  A.  This is the Audit Committee not the Board.

10  Q.  The Audit Committee of the Board so discussed.

11  A.  Yes.  Their discussion happened in that meeting.

12  Q.  Right.  Okay.  Now, at this time, January 15th, 2008, you

13  still hadn't figured out that there was this problem with the

14  cash forecasting system everybody was looking at, right?

15  A.  Correct.

16  Q.  And you were still thinking we need 30 or 35 million?

17  A.  Correct.

18  Q.  Okay.  And you'd agree with me that 90 million is

19  materially more than 30 million?

20  A.  Yes.

21  Q.  Shockingly more for the finances of a company like Midway?

22  A.  I'm in accounting.  I'll stick with materially, so yes.

23  Q.  Okay.  At this point in time, January 15th, the Audit

24  Committee never considered having a solvency analysis done of

25  Midway, did they?

1   A.  I don't know what they had talked about when I was not in

2   the meeting, but at the meetings, no.

3   Q.  Okay.  And now let's look at Exhibit 7 in the -- in our

4   binders, which is the same-day minutes of the full Board of

5   Director meeting, and you'll see in the first -- second

6   paragraph that you attended that as well.

7       (Exhibit 7 previously marked for identification.)

8   BY MS. DAKIN-GRIMM:

9   Q.  You did attend, didn't you, sir?

10  A.  Yes.

11  Q.  Okay.  And you can see that the Audit Committee reported

12  to the Board about the possible going-concern qualification in

13  the 2000 audit opinion.  And then four lines down, it said,

14  "Mr. Steele then discussed possible financing arrangements the

15  Corporation might make with National Amusements to address

16  these matters, including amounts that National Amusements

17  would need to provide to the Corporation under different

18  scenarios, and possible structures of such arrangements."

19      Isn't it true, sir, that at this point, the focus turned

20  to how can we get some money from National Amusements and no

21  other option?

22  A.  No.  It started in the Audit Committee as a discussion,

23  and followed through the Board meeting later that -- that day

24  from where it had started as an idea.

25  Q.  Right.  But none of the other ideas on that list we looked

1  at like maybe doing equity infusion or other kinds of

2  transactions with third-party financiers, none of that was

3  discussed at the Board level.  Only the idea of let's go to

4  National Amusements and get some cash was discussed, wasn't

5  it?

6  A.  I honestly don't remember.  I remember that there were

7  different -- it says here that possible financing transactions

8  between the Corporation and National Amusements.  I don't

9  remember exactly what all of -- what all or any of those were.

10  Q.  But you're familiar with these minutes --

11  A.  Oh, yeah.

12  Q.  -- of the Board generally, and if --

13  A.  After the fact, yeah.

14  Q.  -- other kinds of transactions were discussed, surely they

15  would have been appropriately memorialized, wouldn't they have

16  been, sir?

17       MR. CAPONI:  Objection, Your Honor.  Again, I don't

18  think as CFO, Mr. O'Desky, has any -- he's not on the Board

19  nor is he responsible or has it been established he has any

20  responsibility for documenting what takes place or what's

21  required to be documented or what transpires in a Board

22  meeting.

23       THE COURT:  I'll sustain that objection.

24  BY MS. DAKIN-GRIMM:

25  Q.  Neither the Audit Committee nor the Board of Directors

1  retained an outside financial advisor in January of 2008, did

2  they, sir?

3  A.  I don't believe so.

4  Q.  All right.  Could you look at Exhibit 107, please?

5      (Exhibit 107 previously marked for identification.)

6  BY MS. DAKIN-GRIMM:

7  Q.  Exhibit 107 is an exchange of e-mails between CFO Tom

8  Powell and Board members.  And in the e-mail at the top of the

9  page, this is dated January 17th, you'll see that Peter Brown,

10 who was a Board member, and with AMC Theaters was providing to

11 Mr. Powell certain information about the notes.  And then in

12 the e-mail at the bottom, Mr. Brown writes, "The Special

13 Independent Committee met yesterday and discussed how best to

14 proceed on the issue we need to address.  We are working on

15 getting a financial advisor hired, as well as legal counsel.

16 I made contact with the potential advisor today," and so

17 forth.

18     To the best of your knowledge, Mr. O'Desky, the Special

19 Committee, the Board, the Audit Committee, none of them

20 followed through and retained a financial advisor in this time

21 period, did they?

22 A.  I do not believe so, no.  No.

23 Q.  And now, if you could look at Exhibit 8 please, sir.

24 A.  I'm sorry, 8?

25 Q.  8.

1    (Exhibit 8 previously marked for identification.)

2    BY MS. DAKIN-GRIMM:

3    Q.  Exhibit 8 is an e-mail from Mr. Powell to a number of

4    people including you, sir, dated January 17.  Mr. Powell

5    writes -- you remember receiving this, don't you?

6    A.  Yes.

7    Q.  Right.  He writes, "I don't know whether a $30 million

8    commitment with additional money available, subject to NAI

9    Board approval, will be adequate to convince E & Y."  And does

10   this help you recall, Mr. O'Desky, that from January 17th

11   forward, no other options were being discussed other than how

12   to get money from NAI?

13   A.  I was not involved in conversations about other made --

14   other ways.  I was just talking about NAI.  I don't know if

15   the former CEO or former CFO were working on other options at

16   that point in time.  I was --

17   Q.  Well, --

18   A.  -- just told to do what I was doing.

19   Q.  Okay.  And you would expect, wouldn't you, Mr. O'Desky,

20   that if such documents existed, they would have been produced

21   to us in response to our request for information in this case,

22   wouldn't you?

23   A.  If they existed, then yes.

24   Q.  Sure.  Mr. Powell goes on, we -- "we'll still project

25   negative cash balances in October and November unless the

1  additional money gets approved."  And then they show a

2  contemplated $30 million contribution from National

3  Amusements, but that would still result in a negative amount,

4  right?

5  A.  Yes.

6  Q.  And that was the view of the finance people at Midway on

7  January 17th; was it not?

8  A.  That's why I said we needed the 30 to $35 million, yes.

9  Q.  Right.  And now if you could look at Exhibit 16, please.

10      (Exhibit 16 previously marked for identification.)

11  BY MS. DAKIN-GRIMM:

12  Q.  Exhibit 16 is another -- minutes of another Board of

13  Director's meeting, June 25, 2008.  Oh, I'm sorry.  I've got

14  this out of order, I apologize.  Exhibit 69.  Exhibit 69 is an

15  exchange of e-mails.  This was produced to us by one of the

16  independent directors we subpoenaed last week, and this is

17  between Frederick Kanner, their attorney at Dewey, and some of

18  the Directors.  And I'd like to focus your attention on the e-

19  mail on the bottom half of the page sent February 17, 2008.

20  Mr. Kanner writes, "After the description of the transaction,

21  we would have a paragraph that would probably read as follows:

22  You have" -- I'm sorry, I don't think this is brought from Mr.

23  Kanner.  It's from Houlihan, Lokey, David Brown.  He writes,

24  "You have requested that Houlihan, Lokey provide an opinion as

25  to whether as of the date hereof the financial terms of the

1  senior credit facility and the junior debt are fair to the

2  company from a financial point of view.  For purposes of our

3  analysis and the opinion, we have analyzed fairness from a

4  financial point of view", and then he goes on with a

5  qualifier, as Mr. Kanner describes it.

6       You were aware that the company sought a fairness opinion

7  from Houlihan, Lokey, and Houlihan was unwilling to provide it

8  without the qualifier language here, weren't you?

9  A.  I had never seen any of this before, so no.

10 Q.  Had nobody told you that a fairness opinion was sought?

11 A.  No.

12 Q.  They didn't tell you that when they asked you to write a

13 memorandum stating that the interest rate and then the loans

14 was appropriate from your perspective?

15 A.  No.

16 Q.  Let's look at the next document, Exhibit 70.

17      (Exhibit 70 previously marked for identification.)

18 BY MS. DAKIN-GRIMM:

19 Q.  Exhibit 70 is another exchange between Mr. Kanner, the

20 Board members counsel, and Houlihan, Lokey advising Houlihan

21 that they were not being retained -- decided not to retain

22 your firm to provide an opinion on its proposed financing, and

23 will not higher another banker to render an opinion.  Nobody

24 told you the company had tried to get a fairness opinion, got

25 something back with qualified language and then abandoned the

1  effort?  No one ever told you that?

2  A.  No.

3  Q.  They didn't tell you that when you became CFO?

4  A.  No.

5  Q.  Okay.  Would you look at Exhibit 110, please?  Exhibit 110

6  is the exchange of e-mails between certain Board members, and

7  if you could turn the page, within the document -- it's highly

8  redacted so I can't put it in context for you, but Mr. Steele

9  apparently writes, "NAI discussions, earnings called 10-K.

10 Based on the current plans for the pacing of the NAI

11 Independent Committee discussions, we are a little concerned

12 about things getting completed prior to our earnings call and

13 release date."  Do you see that in the text?

14 A.  Yeah.  I'm reading this for the first time, yeah.

15 Q.  And it says, "Our earnings call is currently scheduled for

16 February 21st.  Midway has historically released its full year

17 earnings in the third week of February.  We have not announced

18 this date, would not typically announce it until the second

19 week in February.  We can move our earnings call but it would

20 be difficult," and so forth.

21     Isn't it true, sir, that the company was aiming to get a

22 transaction with NAI done in advance of the earnings call that

23 was being discussed here?

24 A.  Yes.

25 Q.  Now, let's move to Exhibit 10, please.

1    (Exhibit 10 previously marked for identification.)

2   BY MS. DAKIN-GRIMM:

3   Q.  Exhibit 10 is draft minutes of Midway's Board of Directors

4   dated February 7, 2008.  And in the fourth or fifth line of

5   the second paragraph, it indicates that you attended.  Do you

6   recall that, sir?

7   A.  Yes.

8   Q.  This was a momentous meeting of the Board; was it not?

9   A.  It was a Board meeting.

10  Q.  It was a very difficult Board meeting, wasn't it, sir?

11  A.  It was a -- it was a Board meeting, yes.

12  Q.  Well, let's look under Discussion of Revisions to

13  Financial Projections.  "At the request of the Chair, Mr.

14  Zucker *(ph)* received two memoranda explaining the revisions to

15  the cash projections attached hereto as Exhibit B.  A

16  discussion then ensued, especially regarding the deeply

17  disturbing nature of the incident and the frequency of cash

18  reporting to the Board," and so forth.  Does this refresh your

19  recollection that this was a difficult Board meeting?

20  A.  Yes.  But that's -- most of our Board meetings were

21  difficult, so yes.

22  Q.  Well, this was the Board meeting where you told the Board

23  -- you and Mr. Powell told the Board, gee, we have two weeks

24  to get things in order, and it turns out we don't need 30

25  million, we need 90 million, wasn't it?

O'Desky - Cross

1  A.  Mr. Powell was no longer employed.  It was Mr. Zucker who

2  explained this to the Board.

3  Q.  That's right.  And then Mr. Zucker was fired shortly after

4  this, right?

5  A.  It was in March, late March time frame, I believe.

6  Q.  Right.  But a month or so after this.

7  A.  Uh-huh.

8  Q.  Right.  And then you became CFO and things went on, right?

9  A.  So far.

10  Q.  Okay.

11      (Exhibit 11 previously marked for identification.)

12  BY MS. DAKIN-GRIMM:

13  Q.  And let's look at Exhibit 11 and discuss the reasons for

14  what you describe is a software glitch.

15  A.  In one of the errors.

16  Q.  Oh.  It wasn't all a software glitch.

17  A.  No.

18  Q.  Is that what you're saying?

19  A.  That's what I'm saying, yes.

20  Q.  Oh, okay.

21  A.  I said that a portion of it was --

22  Q.  Okay.

23  A.  -- a software glitch.

24  Q.  All right.  Exhibit 11 is an e-mail dated February 7, the

25  same day as the document we just looked at from David Zucker

1   to the Board members containing overview cash forecast change

2   since plan.  And then if you look at, I believe, the third

3   page in of the document, there's a chart showing changes.  Is

4   that correct?

5   A.  Yes.

6   Q.  And that's a document that the finance department at

7   Midway prepared to show the difference between what you used

8   to think and what became clear in this first week of February?

9   A.  Just to be clear, yes.  It's our financial planning and

10  analysis group because there's two different finance groups,

11  but yes.

12  Q.  Okay.  And now if you could go back to the overview that

13  Mr. Zucker provided, do you know whether Mr. Zucker got input

14  from you and Mr. Powell in explaining this to the Board in

15  this e-mail?

16  A.  Mr. Powell was not --

17  Q.  I apologize.

18  A.  -- around for this, but --

19  Q.  Did he get input from you?

20  A.  Yes, from me and from the Financial Planning Analysis

21  Group, yes.

22  Q.  Okay.  Because this was a serious thing to bring to a

23  Board of Directors, wasn't it?

24  A.  Yes.

25  Q.  Okay.  Mr. Zucker writes, "Attached is the summary of the

O'Desky - Cross

1  drivers of the change in the cash balance in the revised

2  forecast versus the previous plan."  Then it says, the primary

3  drivers are two forecasting errors:  Debt discount

4  amortization, and the second one is accounts payable

5  forecasting error which impacts immediately and is somewhat

6  offset over time.  Let me draw your attention to the second

7  one first, the accounts payable forecasting error.

8  A.  Uh-huh.

9  Q.  You're familiar with that issue, right?

10  A.  Yes.

11  Q.  Okay.  And that issue, if I'm reading this correctly,

12  starting in the fourth line down says, "As" -- well, let me

13  start in the second line.  "As Tom and Jerry" -- Tom is the

14  former CFO?

15  A.  Yes.

16  Q.  -- "and the financial planning team were finalizing the

17  plan for the Board in early January, they knew that a manual

18  adjustment would be required because Tom had been paying bills

19  more slowly through the holidays than we had historically, and

20  thus, out of zinc with our assumed payment curve."

21  A.  Uh-huh.  Yes.

22  Q.  That was happening, wasn't it?

23  A.  Yes.

24  Q.  Midway was slow paying its bills through this holiday

25  season, right?

1    A.  Yes.

2    Q.  Okay.  And as a result, the system assumed that the slow

3    paying pattern was the right pattern.  Is that essentially

4    what it is?

5    A.  I believe it's the opposite.  The system --

6    Q.  Okay.

7    A.  -- assumed that everything was being paid normally, but in

8    essence, we were slow paying due to the slow cash receipts we

9    were getting due to the low sales of the two games in 2007.

10   Q.  Sure.  So if you had been paying bills as they became due,

11   your cash forecasting system would have projected that you

12   needed more because it would have had the right information.

13   Do I have it?

14   A.  Yes and no.

15   Q.  Go ahead.

16   A.  This was a very difficult concept because it was a new

17   system and I came in at the very end of this, but basically

18   there is lots of adjustments that get put in to put from what

19   actually happens from a month-to-month basis.  You put in the

20   actuals and you roll forward the budget from theirs.  And in

21   the December time frame is when this slow paying of payables

22   started happening due to the lack of cash receipts coming in.

23   The system did not pick that up properly, and so it was

24   assuming that the payments were still going out on time, which

25   caused a discrepancy of, I believe -- it has to be in here, of

1  --

2  Q.  I believe it says, $19 million.

3  A.  $19 million.  So that was a $19 million portion of that

4  just due to the inaccurate way that the system was picking up

5  the timing of the payables and accruals being paid.

6  Q.  Well, you could say it's due to the system or you could

7  say it's due to the fact that Midway wasn't paying its bills

8  as they became due.  Either way, right?

9  A.  Well, but that happens in the course of any business, and

10 based on timing of your cash receipts.  We have a very unique

11 industry because we have a 12/31 year-end, and most of our

12 customers have, in retail, the 1/31 or a 2/28 year-end, so our

13 customers like to keep as much cash on hand as they possibly

14 can for their year-end balance sheets before they pay us, so

15 if we're not getting some of our cash receipts in, we are

16 starting to slow pay some of our vendors at the same time.  So

17 that's a common occurrence.

18 Q.  Well, Mr. O'Desky, my clients would say that Midway always

19 slow paid.  This was really slow.  Is that true in your

20 experience?

21 A.  I -- you're using -- can you -- could you --

22 Q.  Well, --

23 A.  -- please expound on --

24 Q.  Midway never paid its bills in 30 days, did it?

25 A.  The time frame that I was there, we paid bills as -- when

1    I became controller, we were not paying dues as they became

2    due, and we were slow paying them as it states here.

3    Q.  And is -- that's -- that's --

4    A.  But before that, I was not part of that --

5    Q.  Okay.

6    A.  -- process.

7    Q.  Now, when this issue hit, when you all figured this out,

8    --

9    A.  Yes.

10   Q.  -- did you think not paying bills as they become due, hmm,

11   in dish of insolvency, we better get an analysis and see where

12   we are?

13   A.  No.

14   Q.  Okay.  And did you think, hmm, having a problem paying our

15   bills as they become due, how are we going to pay back the

16   note holders in April 2009?

17   A.  No.

18   Q.  That was next -- next year's problem, right?

19   A.  That was not in the near term horizon or even in the next

20   12 months at this point.

21   Q.  So in February -- on February 7, 2008, isn't it true that

22   your only concern was how do we get enough money from National

23   Amusements to keep the doors opened right now?

24   A.  How do we get enough money to continue our operations for

25   the next 12 months.  Yes.

Q.  Okay.  And isn't it also true, sir, that no analysis was
done, not on cash forecasting but on how we are going to be
able to pay back all the money we're borrowing from National
Amusements, plus the $150 million in bond debt, plus our trade
debt before the NAI loan was signed up?
A.  But you're messing up -- well, what I believe is you're
messing up some terms.  Again, the NAI agreement had three
different tranches or facilities that were due in different
times between 2009 and 2012.  So a lot of that stuff wasn't
due for, at this point, four years in the future, so no, I was
not thinking about how I pay stuff back four years in the
future.  No.  As far as the notes, at this point in time, it
wasn't until the second quarter 10-Q that we really believed
that a portion -- substantially all or a portion of the note
holders would actually put back the notes to us in April in
2009.  Based on what we were expecting our company to look
like going forward, we didn't think at this point in time that
that was going to be an -- a substantial all or most of the
note holders would do that.  Later on in the summer is when
the analyst came to it and said, wow, they're really probably
going to do this based on the way the company is looking.
Q.  I'm going to ask you again, just my question, --
A.  Sure.
Q.  -- and thank you for that answer.  Isn't it true, sir,
that at this point in time, when you realized these errors,

1  you did not sit down and come up with a comprehensive business

2  plan that would explain how you were going to pay back not

3  only the NAI anticipated debt but also the bond holders?  You

4  didn't do that?

5  A.  No.  We do do three-year projected plans of the company.

6  Q.  Would you look at Exhibit 87, please?

7  A.  87 or 97?

8  Q.  87, please.

9  A.  Yes.

10      (Exhibit 87 previously marked for identification.)

11  BY MS. DAKIN-GRIMM:

12  Q.  This is a draft memo of a meeting of the Special Committee

13  of the Board of Directors.  Mr. O'Desky, you never observed

14  the Special Committee evaluating anything other than the NAI

15  transaction, did you?

16  A.  I don't believe so.

17  Q.  Their purpose was simply to work on the NAI --

18  A.  Uh-huh.  Yes.

19  Q.  -- transaction because Ms. Redstone was the president of

20  NAI and also on the Board, right.

21  A.  Correct.  You're really correct, yes.

22  Q.  Okay.  So there was no Special Committee established to

23  look at all financing options, was there?

24  A.  No, you're correct.

25  Q.  And there was no Special Committee established to look at

1  whether it was prudent for the company to layer on any more

2  debt at all, was there?

3  A.  No.

4  Q.  Okay.  And just to be clear, Wells Fargo had concluded

5  that the company should not have access to the last 10 million

6  of its existing loan facility, correct?

7  A.  No.  I disagree with that.

8  Q.  Weren't there covenants in their loan documents that

9  precluded you from borrowing the last 10 million revolver

10  portion of their loan?

11  A.  At that point in time, but --

12  Q.  Right.

13  A.  -- when the original agreement was put into place, we

14  didn't know at that point in time we wouldn't be able to reach

15  that last $10 million.

16  Q.  As of January of 2007 -- 2008 you were not able to reach

17  the last 10 million, right?

18  A.  Correct.

19  Q.  And Wells Fargo wasn't going to let you, were they?

20  A.  I don't know.  Did not have those discussions with them.

21  Q.  Okay.  Exhibit 87, in the proposed transaction with

22  National Amusements, says you reported -- you were there,

23  weren't you?

24  A.  Yes.

25  Q.  Okay.  It says you reported on the status of the

1  transaction with National Amusements, the negotiations, the

2  due diligence and overall timing.  You did those things,

3  correct?

4  A.  Yes.

5  Q.  And then it says, "A discussion then ensued, especially

6  concerning the Corporation's cash needs and other issues

7  arising and when if the Corporation failed to consummate the

8  transaction."  Now, isn't it true, sir, that what was

9  discussed was if we don't get a whopping amount of cash from

10 National Amusements, we will have to file a bankruptcy?

11 A.  Bankruptcy was not discussed in any of these meetings.

12 Q.  Okay.  You discussed that you would not get a going -- you

13 would get a going-concern qualification from Ernst & Young,

14 right?

15 A.  If we were not able to consummate this transaction in the

16 time frame before they put out their audit opinion, yes.

17 Q.  And you discussed that you would breach your loan

18 agreement with Wells Fargo, right?

19 A.  Again, if something was not done before the -- the March

20 1st deadline, yes.

21 Q.  Okay.  And we've already established you didn't do a

22 solvency analysis, but wasn't it your view, Mr. O'Desky, that

23 if you did not get this money, you would not be able to

24 continue to operate the business?

25 A.  My personal view?

1  Q.  Your view as an attendee at this meeting as interim Chief

2  Financial Officer of the company at that time.

3  A.  I'm going to be honest with you, after being on the job

4  for three days, I had not had the chance to go through that

5  entire analysis.

6  Q.  Okay.  This morning, you talked a bit about one of the

7  products, TNA?

8  A.  Yes.

9  Q.  Right.  And that anticipated ship date was May --

10  A.  May of 2008.

11  Q.  May of 2008?

12  A.  Correct.

13  Q.  Okay.  What -- wasn't it June?

14  A.  I believe it was May.  Late May or early June, right

15  around there.

16  Q.  Well, look at Exhibit 112.

17  A.  112?

18  Q.  Please.  Oh, I -- you know, I'm not going to show you

19  Exhibit 112, I apologize.  That is one of NAI's documents and

20  I have represented I wouldn't use it.  Let's move ahead to

21  Exhibit 88.

22  A.  Okay.

23     (Exhibit 88 previously marked for identification.)

24  BY MS. DAKIN-GRIMM:

25  Q.  Exhibit 88 is the document that was shown to you this

1  morning on your direct examination.  This is your analysis of

2  February 26th, 2008 of the fairness of the transaction, isn't

3  it?

4  A.  I didn't write this, no.  This is not mine.  This is from

5  Ms. Fulton.

6  Q.  Oh, I apologize.  I've shown you -- that's not the right

7  document.  That's -- we'll get to that next.  Let's look at

8  this one, though.

9  A.  Okay.

10  Q.  You received a copy of it, right?

11  A.  Yes.

12  Q.  Okay.  This is a document that explains that National

13  Amusements wanted additional collateral beyond what Wells

14  Fargo had, right?  That's in the first paragraph.

15  A.  Yeah, I'm just -- I'm sorry, I'm just reading, yes.

16  Q.  Oh, sure.  Take your time.

17  A.  I guess.

18  Q.  And then going down a little bit further in the document,

19  in the third paragraph, it says, "It eliminates the liquidity

20  covenant of the Wells Fargo, Foothill facility."  You see

21  that?

22  A.  Yes.

23  Q.  All right.  That's something Wells Fargo wasn't willing to

24  do but you were able to persuade National Amusements to do,

25  right?

1   A.   Honestly, I'm not sure if those conversations ever

2   happened with Wells Fargo to ask if they would.

3   Q.   Well, Wells Fargo's loan agreement didn't permit it, did

4   it?

5   A.   At that time, no, but we had received lots of other

6   amendments from Wells Fargo.

7   Q.   Okay.  And then under point Number 1, increased

8   availability.  As a practical matter, the borrowing base

9   concept in the Wells Fargo facility often limited your ability

10   to draw on the revolving line of credit.  The borrowing base

11   concept is eliminated and the revolver is now all what's

12   available.

13       That's one of the things that you testified on direct you

14   accomplished, right?

15   A.   Yes.

16   Q.   And I saw no evidence in your files of any analysis to

17   substantiate why that was appropriate and why Midway would be

18   able to pay back the newly-expanded facility when it wasn't

19   allowed by Wells Fargo.  Did you create such an analysis?

20       MR. CAPONI:  Objection, Your Honor.  I think -- if

21   the question is did he create an analysis, that's a valid

22   question.  The testimony that Ms. Dakin-Grimm did not see

23   anything in the file I don't think there's any relation to the

24   question.

25       MS. DAKIN-GRIMM:  I'll restate the question.

1        THE COURT:  That -- okay.  That --
2  BY MS. DAKIN-GRIMM:
3  Q.  Did you ever prepare an analysis like that, sir?
4  A.  Analysis like what?  I'm sorry.
5  Q.  An analysis explaining why, although Wells Fargo wouldn't
6  let you get access to the last 10 million, it was prudent for
7  the company, nevertheless, to get a facility that would let
8  you get access?
9  A.  I've never heard of such an analysis.
10 Q.  Okay.  Well, you're aware, aren't you, Mr. O'Desky, that
11 -- you know, read any newspaper today and you'll see in the
12 press that the country is kind of in a boatload of trouble
13 because lots of people borrowed money that they didn't really
14 turn out to have the ability to pay back.
15 A.  Yes.
16 Q.  Okay.  I'm looking for your analysis that you did
17 internally to justify to yourselves, we really do have the
18 ability to pay back.
19 A.  Our three-year projections that we had created, we
20 believed that we would be able to pay back the facilities at
21 that time when they became due.  Again, they were rateably
22 over a three-year period.
23 Q.  Did you do an analysis or are you just talking about your
24 cash forecasting?
25 A.  I'm talking about our three-year operating projections for

1  the company.

2  Q.  Regular course forecasting, right?

3  A.  Yes.

4  Q.  Okay.  Well, in the next document that I'd like you to

5  look at, Exhibit 72, that's an analysis, isn't it?  Would you

6  agree with me?

7  A.  Sorry, I'm trying to find it.  72?

8  Q.  72.

9      (Exhibit 72 previously marked for identification.)

10 BY MS. DAKIN-GRIMM:

11 Q.  Isn't that an analysis that you prepared?

12 A.  This is an analysis to talk about basically the main

13 portions of -- business portions of the agreements that we

14 were about to enter into.

15 Q.  Okay.

16 A.  The interest rates, in particular.

17 Q.  Right.  Well, I'm looking for something like this, an

18 analysis that you prepared where you write Wells Fargo won't

19 let us access the last 10 million of our 30 million facility,

20 nevertheless, based on the following factors that we, at

21 Midway, have studied and presented to the Board of Directors,

22 we still believe it's prudent to borrow not just an additional

23 10 million but 90 million.  Is there such an analysis in

24 existence?

25 A.  There's not an analysis -- the exact analysis that you are

1  looking for in existence, no.

2  Q.  Okay.  And this document where we're looking at where you

3  conclude that the transaction is -- that the rates purposed by

4  the transaction are reasonable and justified, your conclusion

5  on the second page --

6  A.  Yes.

7  Q.  Nobody told you that Houlihan, Lokey wouldn't give that

8  conclusion without qualifying, right?

9  A.  No.

10  Q.  Do you know why that is?

11  A.  (No verbal response.)

12  Q.  Had you known that Houlihan, Lokey intended to issue such

13  an opinion with qualifiers if asked, would that have caused

14  you to reevaluate your conclusion?

15  A.  I have no idea.

16  Q.  Let's look at this document just a bit.  On the second

17  page where you write, "Market for interest rates," I don't see

18  anything in this document other than the second paragraph

19  where you say, "The company had discussions with Wells Fargo

20  to determine what the rates on the amended LSA would be in

21  today's marketplace."  Anything to justify or to suggest that

22  you actually approached any other potential lenders directly?

23  A.  Me, personally?

24  Q.  Yes.

25  A.  Again, I was told when I took the job to go and negotiate

1  the Wells -- the National Amusement agreements.

2  Q.  Okay.  And then your next paragraph on the page says in

3  addition, there have been numerous reports and articles, that

4  there aren't any debt facilities being offered.  Again, you

5  didn't actually try and find them yourself.  You're just

6  citing the Wall Street Journal, right?

7  A.  Correct.

8  Q.  Okay.  And isn't it true, sir, that this document, which

9  you wrote on February 26th, just three days before the deal

10 closed, was your attempt to justify to the files, you know,

11 sort of substitute for a third-party fairness opinion?

12 A.  No.  It was a fairness of what the interest rates because

13 the Board -- or the Special Committee was looking to see if

14 what National Amusements were proposing to us as interest

15 rates were fair in the marketplace today.  That's what I was

16 asked to provide.

17 Q.  Would you look, sir, at Exhibit 73?

18 A.  Okay.

19     (Exhibit 73 previously marked for identification.)

20 BY MS. DAKIN-GRIMM:

21 Q.  Exhibit 73 is another meeting of the Board of Directors,

22 February 27, 2008, where the Board approved the transaction.

23 And I see your name as having appeared in the second

24 paragraph.

25 A.  Yes.

1 Q.  You attended this meeting, right?

2 A.  Telephonically, yes.

3 Q.  Telephonic meeting.  And it says, "Ms. Fulton reported

4 that Ms. Redstone wishes to be recuse from consideration of

5 the proposed transaction."  But isn't it true that Ms.

6 Redstone, nevertheless, stayed on the call for the whole

7 meeting?

8 A.  I have no idea if she dropped off the call or not.

9 Q.  Well, we'll see what she has to say about that.

10 A.  Okay.

11 Q.  Mr. Steele doesn't purport to ask to be recuse, does he?

12 A.  I don't think so.  He just abstained.

13 Q.  Right.  And he stayed on the call the whole meeting, too,

14 didn't he?

15 A.  I -- he must have, yes.

16 Q.  He just abstained from the vote.  And isn't it true, sir,

17 that it was at this meeting, after the entire NAI deal was

18 negotiated, that Mr. Steel, who for the record works for NAI,

19 was removed from the Audit Committee?  Up to this point, he

20 stayed on Midway's Audit Committee, right?

21 A.  Yes.

22 Q.  Okay.  And the NAI transaction for the aggregate $90

23 million amount took away Ernst & Young's going-concern issue,

24 didn't it?

25 A.  Yes.

1   Q.  So would it be fair to say that between February 7 and

2   February 27, the company was able to persuade NAI and Mr.

3   Redstone, its controlling shareholder, to invest $90 million

4   in the company?

5   A.  I'm not sure persuade's the right term, but yes, they were

6   -- they did commit to giving $90 million of availability to

7   the company.

8   Q.  Okay.  And isn't it true, sir, that within five weeks of

9   obtaining that $90 million commitment, Midway determined that

10  that wasn't going to be enough to get through the year?

11  A.  No.

12  Q.  Let's look at Exhibit 13, please.

13      (Exhibit 13 previously marked for identification.)

14  BY MS. DAKIN-GRIMM:

15  Q.  Exhibit 13 is an exchange of the e-mails between Ms.

16  Fulton and the Board members attaching an e-mail from Mr.

17  Booty, the current CEO of the company, and that's what I'm

18  going to focus you on, the second e-mail on the bottom,

19  members of the Board of Directors.  Okay.  This is April 3rd.

20  That's about five weeks after February 29th, right?

21  A.  Yes.

22  Q.  Mr. Booty writes, "Apologies that this information is

23  coming so soon before the scheduled phone meeting.  Attached

24  is a summary PDF showing the cash and NAI debt each month,

25  resulting need for additional cash starting in September if we

1  were to proceed with certain changes recommended by

2  management."  You remember this, don't you, sir?

3  A.  Yes.

4  Q.  Okay.  Now, this morning you testified that this was

5  attributable to a decision to move the shift date of one of

6  the company's games called, TNA from June to September.

7  A.  Uh-huh.

8  Q.  Okay.  That was one of the pieces, wasn't it?

9  A.  Yes.

10  Q.  That wasn't the only piece, was it?

11  A.  That was the main driver.

12  Q.  It wasn't the only piece, was it, sir?

13  A.  No, it was not.

14  Q.  And it was your view and Mr. Booty's view that if the TNA

15  game were released in May, it would not produce as much

16  revenue for the company as if it were released later.

17  A.  Correct.

18  Q.  Okay.  So releasing it on the scheduled date in May was

19  not a viable option in the view of you and Mr. Booty, correct?

20  A.  Could have still been done but it was not the best way to

21  release a game that had been in production for two years, to

22  put it out three months before it could've maximized revenue

23  and cash.  That's just not -- that's not --

24  Q.  So you --

25  A.  -- the prudent way to do things.

1  Q.  Right.  You would've been wasting money if you did that,

2  right?

3  A.  Possibly, yes.

4  Q.  Okay.  But let's look at the second paragraph of Mr.

5  Booty's e-mail, he writes, "The bottom line, which I no way

6  present lightly, is that a conservative, realistic 2008 plan,

7  taking into account all known potential downsides and risks

8  combined with moving the TNA ship date to August, in its

9  attempt to maximize its success, would create the need for an

10  additional 28 million beyond the 90 million."  Okay.  That's

11  what you and Mr. Booty believe, right?

12  A.  Yes.

13  Q.  And it was not only the TNA ship date, but also taking

14  into account all the other known potential downsides and

15  risks, right?

16  A.  Yes.

17  Q.  And $28 million on top of the $90 million obtained just

18  five weeks earlier is another giant amount of money, isn't it?

19  A.  Yes.  But what you're not reading here is that $28 million

20  was not a need for the foreseeable future.  It was a short-

21  term cash need due to a couple of these things.  So that money

22  was going to be needed at a certain period of time and fully

23  paid back, and not an additional long-term cash need such as

24  the $90 million was.

25  Q.  Okay.  Well, let's talk about that then.  As of April 3rd,

1  2008, you still owed the bond holders their amounts.  That was

2  still on your debt side of the ledger, right?

3  A.  Yes.

4  Q.  And you knew that there was the put right for 75 million

5  in April 2009, just 12 months later, right?

6  A.  Yes.

7  Q.  And this analysis, you're not thinking about how are we

8  going to get that 75, right?  This is just to get through the

9  year.

10 A.  As I testified before, we didn't really believe that the

11 put was going to happen by the note holders until we --

12 Q.  Mr. O'Desky, would you just answer my question?

13 A.  Sure.

14 Q.  You didn't consider --

15 A.  No, we did not.

16 Q.  -- how to pay them back, did you?

17 A.  Nope.

18 Q.  All right.  And at this time, you've already signed up the

19 NAI facility, correct?

20 A.  The debt facilities, yes.

21 Q.  Yeah.  And the $40 million unsecured piece was also due in

22 April of 2009, wasn't it?

23 A.  Yes.

24 Q.  And you weren't giving any consideration here on how to

25 pay that back either, were you, just a year from the date?

1  A.  No.

2  Q.  Okay.  So there's 115 million sitting out there, a year

3  out, with no plan on how to pay it back as of this date,

4  correct?

5  A.  You're taking the 70 -- you're doing the 75 plus the 40

6  plus the 28 to get to your number?

7  Q.  Well, I probably added it up wrong.

8  A.  Okay.

9  Q.  I was just talking about the 40 and the 75.

10  A.  So 115, yes.

11  Q.  Yeah.  Did I do it right?

12  A.  Well, if you're just talking about those two, yes.

13  Q.  Yeah.  Just those two pieces.  Okay.  And at this point in

14  time, no solvency analysis, right?

15  A.  No.

16  Q.  No analysis about how we're going to pay back all this

17  debt we're mounting up, right?

18  A.  No.

19  Q.  Aren't you like the consumers that are buying houses they

20  can't afford?  Withdrawn.

21      Isn't it true, Mr. O'Desky, that by July, the company

22  needed to go back to NAI to try and get amendments and waivers

23  to the NAI facility?

24  A.  In July of '08, yes.

25  Q.  July of '08.  Right.  Because the terms that we saw were

1   so beneficial were already too restrictive.

2   A.   That's not why we needed amendments.

3   Q.   Weren't they too restrictive given issues you were having

4   with your European operations?

5   A.   There were laws in Germany that no one had contemplated

6   prior to the new piece that was more restrictive than the

7   Wells Fargo piece in the cash sweep.  No one had understood

8   the laws in Germany at the time it was put in, so amendments

9   had to be made to allow for changes in -- due to the German

10  laws so the cash sweep mechanism would work.

11  Q.   Would you look at Exhibit 15, please?

12  A.   Yes.

13       (Exhibit 15 previously marked for identification.)

14  BY MS. DAKIN-GRIMM:

15  Q.   Exhibit 15 is an e-mail exchanged between Ms. Fulton and

16  certain Board members July 1, 2008.  There should be an

17  attachment but it wasn't produced to us.  It says, "Attached,

18  per our conversation, are the proposed first amendments to

19  each of the three credit agreements constituting Midway's

20  credit facility with NAI."  This is the issue we're

21  discussing, is it not?

22  A.   Yes.

23  Q.   And then look at the last paragraph before Ms. Fulton's

24  name.  "As we discussed these changes were requested by Midway

25  to avoid restrictive covenants in the agreements preventing

O'Desky - Cross

1  Midway from carrying them out.  Small but desirable changes,"

2  etcetera.  Isn't this a fair recitation of why Midway was

3  seeking to loosen the terms of its facility with NAI?

4  A.  It was seeking to loosen the terms of the facility due to

5  the cash sweep provisions, which were more restrictive than

6  the Wells Fargo provisions.  So those had to be loosened a

7  little bit in order to allow us to use our cash freely in part

8  of our operations.

9  Q.  All right.  Isn't it true that in this July time period,

10  the company came up with the idea of let's factor our

11  receivables.

12  A.  I don't know if it was July or before that, but yes.

13  Q.  You were able to actually get an agreement signed until

14  September, but it was in this time period that you decided

15  that might be a way to bring in some cash, right?

16  A.  Again, I don't remember if it's here before this but yes.

17  Q.  Would you look at Exhibit 17, please?

18      (Exhibit 17 previously marked for identification.)

19  BY MS. DAKIN-GRIMM:

20  Q.  Exhibit 17 is an e-mail from Mr. Booty to the Directors

21  copied to you.  You remember this, don't you?

22  A.  Yes.

23  Q.  Mr. Booty attached two PDF documents which together

24  outlined the scenarios and strategic direction that you

25  proposed to present with Bob Steele next Monday in New York,

1  right?  I'm just reading you the first --

2  A.  I know.

3  Q.  -- on the first page.

4  A.  And I'm trying to remember meeting with Bob Steele in New

5  York.  So I'm just having -- oh, yes.

6  Q.  Okay.  And again, for the record, Mr. Steele was then a

7  Midway Board member and also a senior executive at NAI

8  reporting to Ms. Redstone as President, right?

9  A.  I don't know if that's who he reported to but yes, he

10  worked for NAI.

11  Q.  Okay.  And let's look at the first page of the document

12  attachment.  If you could just focus on "decisions, resources

13  needed to proceed."  At this point, you're focusing on getting

14  permission from NAI to factor receivables.  This is an urgent

15  issue, right?

16  A.  Well, yes.  But that's not what it really means.  What it

17  really means is in order to factor our receivables, NAI had to

18  give permission.  So --

19  Q.  Right.

20  A.  -- whether we did it with them or with anyone else.

21  Q.  That's because they had securities and your receivables

22  was one of their assets, right?

23  A.  Correct.

24  Q.  Okay.  So you couldn't do it without them giving you the

25  go-ahead?

A.   Correct.

Q.   Okay.  And then you wanted, here, permission and direction to engage a banker about the 75 million of convertible debt due April 2009 and company capitalization in general.

A.   Yes.

Q.   Isn't it true that you and Mr. Booty, in July, were quite concerned that the company's Board didn't really get the significance of the problems that were going on?

A.   I'm not sure what they got or didn't get, but we viewed it as a looming issue, yes.

Q.   Isn't it true, sir, that you didn't think the Board truly understood or even knew about these issues?

A.   I'm not sure I've -- in this period of time, in July 1st?

Q.   Yes.

A.   No.  I think they knew that the debt was coming due.

Q.   Let's put up your deposition at page 72.

A.   Sure.

Q.   I don't have a video to play for you but we'll look at your deposition.  There's a binder of depositions --

A.   Yes.

Q.   -- sitting behind you if you'd like to read along.

A.   This one here?

Q.   I believe so.

      MS. DAKIN-GRIMM:  Your Honor, may Mr. Ramos approach the Court?

1     THE COURT:  Certainly.

2        (Counsel approaches.)

3     THE COURT:  Oh, and thank you, Mr. Ramos.  Thank

4  you.

5  BY MS. DAKIN-GRIMM:

6  Q.  On page 72, I ask you, "Have you ever met with Mr. Steele

7  outside of the context of a Board meeting?"  Answer, "Yes."

8  "When did you do that?"  "Over the phone a number of times

9  when he was on the Audit Committee.  And also, Matt Booty and

10  I went to go meet with him in Boston soon after Matt was made

11  the interim Chief Executive Officer."

12     That's the meeting you were talking about, isn't it?

13  A.  No.

14  Q.  Oh, it's the meeting in May?

15  A.  Yes.

16  Q.  This is an earlier meeting?

17  A.  Yes.

18  Q.  You write -- I state, "What did you discuss with him?"

19  "At that point, we discussed what our concerns and fears were

20  for the short term, basically the rest of 2008, from a

21  financial and cash perspective, and many issues that we

22  weren't sure that the Board truly understood or knew about

23  prior to us meeting with them."

24     MR. CAPONI:  Your Honor,

25  Q.  Isn't --

1          MR. CAPONI:  I'm sorry.  Just putting clarification

2     on it, we've been running around like (indiscernible) not --

3     and she's saying you stood -- you were not at this deposition.

4     Just wanted to point that out.  I believe your colleague

5     questioned Mr. O'Desky.

6          MS. DAKIN-GRIMM:  Am I saying I asked?

7          THE WITNESS:  Yeah.

8          MR. CAPONI:  Yes.

9          THE WITNESS:  Yes.

10         MR. CAPONI:  Yes.  I just want to clarify that.

11         THE COURT:  Okay.

12         MS. DAKIN-GRIMM:  I wasn't there, --

13         THE COURT:  All right.

14         MS. DAKIN-GRIMM:  -- you were right.  I didn't do

15    this deposition.

16      (Laughter.)

17         MR. CAPONI:  I'm forgetting where I am half the

18    time.  I just thought I'd clarify that.

19         MS. DAKIN-GRIMM:  That's totally true.  I also left

20    my keys outside my door last night so --

21         THE COURT:  Oh.

22         MS. DAKIN-GRIMM:  -- I apologize for that.

23         THE COURT:  It's been a tough time.

24         MS. DAKIN-GRIMM:  Yeah.  All right.

25         THE COURT:  So we'll just sort of amend that to be

1  you were asked.

2          MS. DAKIN-GRIMM:  Yes.

3  BY MS. DAKIN-GRIMM:

4  Q.  You were asked and my colleague, Alisa Schlesinger, posed

5  these questions, right?

6  A.  Yes.

7  Q.  Okay.  And isn't it true, sir, that in the springtime of

8  2008, you didn't believe that the Board truly understood or

9  knew about some of the issues that we're looking at on the

10  memorandum that is Exhibit 17?

11  A.  Well, neither -- Matt was the new interim CEO; I was the

12  new interim CFO, and we weren't sure exactly what everyone

13  knew and understood.

14  Q.  Well, there were a number of issues that you felt that the

15  Board didn't understand, weren't there?

16  A.  That we didn't know if they understood.

17  Q.  Okay.  You wanted to bring their attention to the puts.

18  You didn't know if they understood those, right?

19  A.  I didn't know if they knew everything there was to know

20  about them, no.

21  Q.  Okay.  And you didn't know about -- whether the Board

22  understood or even knew about the timing of when the puts

23  could be first made to the company, right?

24  A.  It had been in our 10-K's since the time of the -- the

25  notes actually happened and they all signed off on the 10-K's,

1  so I'm sure that they knew when the puts were possibly going

2  to be due.

3  Q.  Well, in your testimony here that we've been looking at

4  you said, "Many issues that we weren't sure that the Board

5  truly understood or knew about prior to us meeting with them."

6  And then if you could look at page 73, starting at line 5, the

7  question's asked, "What are the issues?"  And you say, "There

8  are a number of issues.  We wanted to bring to their attention

9  that there was a possible put of the convertible notes the

10  first half of the following year."

11  A.  We wanted to ensure that they knew that and that

12  management was looking at it in the front of it.

13  Q.  Okay.  And you didn't think the Board understood the

14  European cash problems the company was facing either, did you?

15  A.  That's why we needed those amendments.  It was due to the

16  cash sweep issues that there were European restricted cash

17  issues, and no, they definitely would not have known about

18  that unless I brought it to their attention.

19  Q.  And you didn't think that they understood the issues about

20  why putting out the TNA game in May would reduce the potential

21  profitability, did you?

22  A.  There's no way that they could have known about that

23  without us bringing it to their attention.

24  Q.  Okay.  And Mr. Steele was appreciative and said he would

25  go talk to the Board members about the issues, right?

1  A.  Yes.

2  Q.  And isn't it true that this is the first time that the

3  Board addressed -- and I'm referring at Exhibit 72.  The Board

4  was asked to think about how to deal with the puts due to 75

5  million of the notes.

6  A.  For the meetings that I attended, yes.

7  Q.  In the meetings that you attended, that's true, right?

8  A.  Yes.

9  Q.  Would you look at Exhibit 89, please?

10      (Exhibit 89 previously marked for identification.)

11  BY MS. DAKIN-GRIMM:

12  Q.  Exhibit 89 is minutes of a July 2 Board meeting that you

13  attended; did you not?

14  A.  Yes.

15  Q.  Again on the telephone, correct?

16  A.  Yes.

17  Q.  And this is the meeting where you presented -- you and Mr.

18  Booty presented four scenarios, including a recommended growth

19  plan for the company, right?

20  A.  Yes.

21  Q.  That's in the --

22  A.  Yes.  And I apologize.  I was on this telephonically in

23  Alaska, so I was doing it by (indiscernible), so yes.

24  Q.  Okay.  All right.  And you see in the sentence three lines

25  from the bottom, it says that reliability of the projection's

O'Desky - Cross

1  models for later years and the continued importance of

2  achieving a hit game.  That sentence, that phrase, the company

3  needed a hit game.  The company needed something serious to

4  happen to meet its obligations, didn't it?

5  A.  No.  But a hit game definitely, in the video game,

6  industry turns around a company completely.  There are many

7  examples of one game for a company that's in huge distress,

8  you know, a Tony Hawk comes around, a Guitar Hero comes

9  around, all of a sudden, that company that could have been in,

10  as you would put, dire straits, all of a sudden turns around

11  and is able to make their cash flow for years to come.

12  Q.  Would you look at Exhibit 16, please?

13  A.  16?

14  Q.  Exhibit 16, is the Board meeting June 25th.  I've gone

15  slightly out of order here because I stuck this back in my

16  pile in the wrong place, but if you could page into the

17  document on -- to Bates page 196.  And I'll note for the

18  record, that you attended this meeting as well.

19  A.  Yes.

20  Q.  Did you not?

21  A.  Yes.

22  Q.  Okay.  And on page 196, under financial report, it says,

23  at the request of the Chair, Mr. O'Desky reviewed the current

24  financial forecast, and you distributed a second quarter

25  forecast and a restructuring scenario forecast.

1      By this point in time, isn't it true, Mr. O'Desky, that

2   the company knew that it was insolvent?

3   A.  No.

4   Q.  Okay.  And in your view, when did that occur?

5   A.  When we became insolvent?

6   Q.  Yes.

7   A.  When we had to file for bankruptcy.

8   Q.  In your view, the company didn't know it was insolvent

9   until the day it filed?

10  A.  The time frame around the -- no, that's not true.  We knew

11  we were -- basically, when we were not able to negotiate any

12  further and that we were going to have to file bankruptcy.

13  Q.  Well, you operated for a time after you were insolvent but

14  before the company filed, didn't you?

15  A.  Yeah.

16  Q.  Let's look under the Review and Discussion of Issues at

17  page three.  I'm sorry.  Bates page 51.

18  A.  I'm --

19  Q.  Bates page 51.

20  A.  -- sorry.  I don't -- are we still in section --

21  Q.  I'm in the actual attachment now of --

22  A.  Oh, oh, oh.

23  Q.  -- the Board meeting.

24  A.  Yes.  I'm sorry, which page?

25  Q.  Review and Discussion of Issues, page 51, this sets the

1  stage.  And if you could look at AR factoring, which is on

2  Bates page 52 --

3          THE COURT:  Let me just interrupt.  I'd like to give

4  people time to have some lunch and -- what do you think --

5          MS. DAKIN-GRIMM:  Twenty minutes?  Or we can break

6  now.  I'm --

7          THE COURT:  I'm just concerned that I think that

8  people may be, you know, tiring a little bit and -- but I

9  don't want to interrupt at a key point.  I want to interrupt

10  --

11         MS. DAKIN-GRIMM:  It's not a key point.  I'm happy

12  to --

13         THE COURT:  All right.

14         MS. DAKIN-GRIMM:  -- break.

15         THE COURT:  All right.  Then why don't we take --

16  you know, I'd like it to be short but I know practically

17  speaking, this is Wilmington, it's going to take an hour for

18  people to eat and get back here, and we do have -- we don't

19  have time limitations.  So why don't we -- why don't we break

20  until -- oh, do you think you can do it faster?

21         UNIDENTIFIED SPEAKER:  2:15.

22         THE COURT:  2:15?  Let's do 2:15.  All right.  Thank

23  you.  Thank you very much.  We'll stand in recess.

24     (Recess from 1:19 p.m to 2:20 p.m.)

25         THE CLERK:  Please rise.

1    THE COURT:  Thank you, everyone.  Please be seated.

2  Thank you, very much.  Mr. O'Desky, your back --

3    THE WITNESS:  I'm back.

4    THE COURT:  -- in the box.  Ms. Dakin-Grimm, --

5    MS. DAKIN-GRIMM:  I'm up?

6    THE COURT:  -- whenever you're ready.

7    MS. DAKIN-GRIMM:  Thank you, Your Honor.

8    THE COURT:  Good.

9  BY MS. DAKIN-GRIMM:

10 Q.  Can we return to Exhibit 1 -- Exhibit 16, please?  And I

11 believe we established that there is a Board presentation

12 attached to the minutes of the June 25th Board meeting, and it

13 starts at page -- Bates page, Midway 49.

14 A.  Yes.

15 Q.  Okay.  And then the next page is the agenda.  The page

16 after that is Review and Discussion of Issues.

17 A.  Yes.

18 Q.  And then if you turn to the page after that is the

19 presentation on factoring.

20 A.  Yes.

21 Q.  And this -- you participated in preparing this Board pact;

22 did you not?

23 A.  Yes.

24 Q.  And the first issue under factoring is cash need from

25 September, so that would be 2008, right?

O'Desky - Cross

1   A.  Yes.

2   Q.  Through November, beyond the 90 million NAI facility,

3   which peaks at 32 million.  That means that the company had

4   determined, by this point, that it needed up to 32 million

5   more than the 90 million obtained in end of February, right?

6   A.  Yes.

7   Q.  Board approved solution is to factor receivables, and that

8   decision was taken at that point, correct?

9   A.  I'm sorry, that decision --

10  Q.  Let me try it again.  The decision to factor the

11  receivables had been taken before the date of this meeting,

12  correct?

13  A.  The decision, yes.

14  Q.  Okay.  Now, let me just back up a step in the chronology

15  and make sure that I have a clear point.  Before February 29th,

16  the date that the NAI facility was signed up, you never

17  prepared a business plan for the company showing how the $90

18  million would be repaid, did you?

19  A.  I disagree with that.  We made a three-year operating plan

20  that showed the company's projections for the coming three

21  years.

22  Q.  It wasn't -- the document -- whatever document you have in

23  your mind was not characterized as a business plan to justify

24  that loan, was it?

25  A.  No.  We did not create a business plan just to justify the

1 loan, no.

2 Q. Is it your testimony that there exists, in Midway's file,

3 a document that specifically calls out the NAI 90 million

4 facility and explains how it would be repaid?

5 A. There is a document that shows balance sheet and income

6 statement and cash flow projections for three years going

7 forward that shows, yes, the $90 million or the parts of it

8 that would be outstanding at that time each month, where it

9 was and where it would be, yes.

10 Q. Makes specific reference to the NAI facility?

11 A. There's a line item on the balance sheet on those

12 projections that say -- it doesn't say NAI facility. I'm sure

13 it says facility.

14 Q. Okay. Hold that in your mind. Now, staying with this

15 document on factoring, the fourth, fifth, sixth line down

16 says, "If we are unable to bridge the cash shortfall, we will

17 not be able to fund the manufacturing of any games past TNA

18 Wrestling, and we would not be able to fund operations past

19 October." This three-year plan you were talking about

20 apparently was not accurate by June, correct?

21 A. This was due to the movement of T --

22 Q. Before you explain it, can you just tell me, it wasn't

23 going to be accurate as of the date this document was

24 prepared, right? The three-year plan was obsolete.

25 A. The three-year plan that was done in February for this,

1  yes.

2  Q.  And the action recommended here is we need help from NAI

3  to facilitate and allow factoring of receivables.  This was a

4  pretty desperate situation, wasn't it?

5  A.  At this point, if we were going to move the game and do

6  everything we wanted to, yes.

7  Q.  Look at the next page, if you will.  On the AR factoring

8  update, there's apparently two remaining companies that you're

9  talking to.  One of them didn't have the capacity to do the

10  kind of deal you were talking about, right?

11  A.  It wasn't a capacity.  It was based on the way that their

12  structure was and the analysis they did, and they would only

13  offer 6 million at any one time.

14  Q.  The next company would offer 40 million, but they required

15  you to get a guarantee of some sort from the Redstones, right?

16  A.  Yes.

17  Q.  And you asked the Redstones for that guarantee and they

18  said no, right?

19  A.  Yes.

20  Q.  Now, if you could turn the page, under Capitalization.

21  This is the first document I'll represent to you, sir, that

22  I've seen that references all of the issue we've been

23  discussing, the 75 million of convertible debt that could be

24  put to Midway, April of 2009, and the April of 2009, 40

25  million piece of the NAI facility, and purports to address how

1  are we going to pay this back.  Are you aware of other

2  documents that explain that?

3  A.  A single document that --

4  Q.  Yes.

5  A.  -- has all of that in there --

6  Q.  Yes.

7  A.  -- at the same place?  No, I'm not aware of anything

8  earlier than that.

9  Q.  Okay.  So the solution on the -- under convertible debt is

10  non-cash solutions to the convertible debt could create

11  delusion issues for exiting shareholders.  That's delusion

12  issues for Mr. Redstone, correct?

13  A.  Yes.

14  Q.  Okay.  That's the super premium issue we were talking

15  about, or a related concept?

16  A.  It could be the super premium or other types of delusion,

17  yes.

18  Q.  Right.  And you -- the Board didn't want to do something

19  that would delute Mr. Redstone's interest, right?

20  A.  I'm not saying that.  I was just -- we were just reporting

21  the facts.

22  Q.  Under NAI facility, you note that in April of 2009, 40

23  million of it expires and then you say, "Our peak cash needed

24  in 2009 is projected to be 171 million in October if the

25  convertible debt is put; 96 million, if it is not."  That's

O'Desky - Cross

1   the 76 *(sic)* that your adding to 96, right?  75 plus 96?

2   A.  Yeah.

3   Q.  Thanks.  And then the last point says, "If NAI credit

4   facility is maintained at 90 million in April of 2009."  That

5   means that you are starting to think, we're going to have to

6   tell NAI we can't repay that $40 million piece, can we have an

7   extension of it at April 2009, right?

8   A.  Yes.

9   Q.  Okay.  And at this point in time, the point of this

10  presentation in June, Mr. O'Desky, Midway didn't have any way

11  to pay back the $40 million facility to NAI or the $75 million

12  to the note holders in April 2009, did it?

13  A.  If they were fully put to us, the 75 million and the 40

14  that was due at that point in time, no, we did not.

15  Q.  Could you turn the page?  There's a plan -- if the NAI

16  credit facility is reduced to 40 million, then our plan to

17  stay solvent would be -- but nobody had done a solvency

18  analysis, had they?

19  A.  If it was reduced 50 million not 40 million.

20  Q.  If I misspoke, I apologize.  Let me try it again.  You see

21  the first two lines?

22  A.  Yes.

23  Q.  No one had done a solvency analysis, had they?

24  A.  Again, a solvency analysis is not an accounting-type

25  analysis.  They were using that as a legal term.  It's

1  something we wouldn't use in the accounting functions for --

2  for that.  So no, it was not.

3  Q.  To your knowledge, the company had not retained any

4  professionals to perform such an analysis, had they?

5  A.  No.

6  Q.  Now, if you could read down in the document under Action

7  Decision, management was actually seeking permission from the

8  Board and the shareholder group.  That means the Redstones,

9  right?

10  A.  Yes.

11  Q.  To engage a banker on all of these issues that we've been

12  talking about, right?

13  A.  Yes.

14  Q.  And you didn't do it, did you?

15  A.  It was done.  It was just not done that day.

16  Q.  It wasn't done until fall; was it sir?

17  A.  Fall is when the -- it was engaged.  The formal

18  engagement, yes.

19  Q.  Right.

20  A.  We had talked to bankers before that.

21  Q.  Okay.  Would you turn now, please, to Exhibit 78?

22      (Exhibit 78 previously marked for identification.)

23  BY MS. DAKIN-GRIMM:

24  Q.  Exhibit 78 is an e-mail from Mr. Booty to the Board

25  members, copied to you, and it says, "Midway strategy

1  documents for July 2 Board teleconference."  So just a few

2  days after the document that we were looking at.  And Mr.

3  Booty writes, "Please find attached two PDF documents, which

4  together outlined the scenarios and strategy direction that

5  Midway management proposes to present with Bob Steele next

6  Monday in New York."  Now, you were going to present those

7  scenarios and strategic directions with Mr. Steele, an NAI

8  employee, to a Mr. Dauman, an NAI Board member, weren't you?

9  A.  Yes.

10  Q.  Okay.  Now, let's look at them.  If you could turn to the

11  third page in the document, there's a chart, Midway 00028.

12  And this is your strategic plan alternatives for the company

13  given the situation you were then in, correct?

14  A.  Yes.

15  Q.  And there were four alternative scenarios:  The drastic

16  plan, the proposed operating plan, the growth plan and the

17  strategic growth plan.  And each of them had different

18  assumptions, right?

19  A.  Yes.

20  Q.  Okay.  Look under the Additional Investment Required

21  through 2010 row.  Am I reading this correctly, sir, that in

22  any of the plans that you were proposing, you were going to

23  require significant additional investment?

24  A.  Yes.

25  Q.  Okay.  So there was no plan being offered as of July 1,

1  2008 in which the company didn't require a minimum of 65

2  million in new investment, correct?

3  A.  Yes.  Yes.

4  Q.  Okay.  And the most that you want -- were seeking under

5  this strategic growth plan was a new 230 million, right?

6  A.  Yes.

7  Q.  Okay.  And wasn't it the assumption in the plan that drove

8  these additional investments required that the convertible

9  debt put options were not exercised?

10  A.  Yes.  That's one of the assumptions in each of these

11  plans, yes.

12  Q.  Right.  So if the convertible debt was put to the company

13  in April 2009, we'd need to bump all these numbers up by 75

14  million?

15  A.  Yes.

16  Q.  And another assumption of the plan was that NAI wasn't

17  going to require you to repay the $40 million piece of their

18  loan facility in April of 2009?  I'm pointing now to the line

19  that says, "NAI facility" --

20  A.  Yes.

21  Q.  -- "remains at" --

22  A.  You are correct.  You're correct.

23  Q.  -- 50 million -- "90 million".

24  A.  Yes.

25  Q.  That means that you weren't going to repay 50 of it -- 40

O'Desky - Cross

1  of it?

2  A.  At that time, when it was due, yes.

3  Q.  Okay.  And so if neither of those assumptions -- you

4  didn't have control over either of those assumptions, did you?

5  A.  No.

6  Q.  If neither of those assumptions turned out to be true,

7  each of the additional investments required for any of your

8  operating scenarios would have required bumping up by 75 and

9  40 million, right?

10  A.  Yes.

11  Q.  Okay.  And the rest of the document is pictorial.  Maybe

12  you could just turn the page to page 0030.  Those are

13  pictorial representations of the company's needs over that

14  time period, right?

15  A.  Yes.

16  Q.  Okay.  And you still believe, Mr. O'Desky, that the

17  company was solvent?

18  A.  Again, that's a lawyer term not an accounting term and --

19  Q.  Okay.

20  A.  -- did not perform that analysis per the legal terms that

21  you are giving me, no.

22  Q.  Okay.  Nobody on the Board of Directors asked you to do

23  that, did they?

24  A.  They did not ask me to do that, no.

25  Q.  Okay.  And -- I already covered that.  The company's Board

1  formed a Special Committee to work -- after the decision was

2  made to pursue a factoring arrangement with National

3  Amusements, Midway's Board formed a Special Committee to

4  negotiate that because of Ms. Redstone and Mr. Steele's dual

5  roles, correct?

6  A.  I don't know if a new one has been formed or if it was the

7  same one that had already existed.

8  Q.  Okay.  And isn't it true that that Committee considered

9  getting a fairness opinion on the factoring transaction but

10 ultimately declined to do that?

11 A.  I remember talking about that.  I don't remember the

12 specifics around it.

13 Q.  Would you look at Exhibit 91, please?

14      (Exhibit 91 previously marked for identification.)

15 BY MS. DAKIN-GRIMM:

16 Q.  Exhibit 91 is a memorandum of the Special Committee of the

17 Board of Directors dated July 17th, 2008, and it states,

18 "Discussion of factoring transaction.  A discussion ensued of

19 how to assess the fairness of the factoring transaction with

20 National Amusements, Inc.  Management data is needed.  Mr.

21 Kanner advised that management data may be enough, thus no

22 financial advisor is needed."

23      Does that refresh your recollection about whether any

24 outside opinion was taken?

25 A.  It does, but again, I was not at this meeting.

1  Q.  Fair enough.  And no outside advice was obtained, was it,

2  sir?

3  A.  No.  The outside advices obtained were the comparisons to

4  the other outside factoring facilities that I had gotten.

5  Q.  They turned to you to give an opinion?

6  A.  No.  They did not ask for an opinion.  They asked for an

7  analysis of what the market would show, which is what I did by

8  going to other companies.

9  Q.  Okay.  Now, in July of 2008, did there not come up, arise,

10  the issue of getting a waiver from National Amusements of

11  their sweep entitlements under their loan agreements?

12  A.  Not of the entire sweep.  To change some of the terms

13  under it, yes.

14  Q.  Okay.  And you desperately needed that sweep to be waived,

15  didn't you?

16  A.  No.  We did not need the entire sweep to be waived.  There

17  are certain amendments, as we discussed earlier, that had to

18  do with restriction of European cash flow and some other minor

19  things that needed to be amended in order for us to continue

20  to operate.

21  Q.  Minor things?

22  A.  Oh, God.  There was -- I remember there was either a 40 or

23  a $50,000 issue with France for something, and there were just

24  lots of minor things that needed to be done in order to allow

25  this to happen.

O'Desky - Cross

1  Q.  Mr. O'Desky, weren't they serious enough that if you

2  didn't get the waiver, you, personally, believed you wouldn't

3  be able to run the business?

4  A.  I thought it'd be extremely difficult to run a worldwide

5  business with the cash sweep in place the way it was at the

6  $10 million mark, with only having six and a half or so

7  million dollars to use on a weekly basis.  I thought it would

8  be extremely difficult and time consuming.

9  Q.  You thought you couldn't run the business at all, didn't

10  you, sir?

11  A.  I'm not sure I didn't think I could run the business at

12  all.  I think it would be extremely difficult to do.

13  Q.  Let me show you Exhibit 119, please.

14  A.  Sure.

15      (Exhibit 119 previously marked for identification.)

16  BY MS. DAKIN-GRIMM:

17  Q.  Exhibit 119 is an exchange of e-mails concerning a one-

18  month extension to the waiver modification of the sweep.  And

19  you wrote, on July 29th, "John, this is nuts.  We must" in all

20  caps, "have a waiver until this is complete.  We cannot run

21  the business otherwise."  Those were your words, were they

22  not, Mr. O'Desky?

23  A.  Taken out of context, yes.

24  Q.  But did I read that incorrectly?

25  A.  No.  You read it correctly, but --

1   Q.  Thank you, sir.  Now, would you look at Exhibit 98,

2   please?

3       (Exhibit 98 previously marked for identification.)

4   BY MS. DAKIN-GRIMM:

5   Q. Exhibit 98 is your draft memorandum dated August 28, 2008

6   concerning the factoring?

7   A.  Yes.

8   Q.  Okay.  And you wrote this memo to memorialize the

9   negotiations that were then ongoing with NAI concerning the

10  factoring transaction?

11  A.  Yes.

12  Q.  Did Mr. Jankowski at NAI tell you that NAI became

13  concerned about Midway's solvency when it requested the

14  factoring arrangements?

15  A.  Mr. Jankowski to me directly, no.

16  Q.  Did you ever hear that Mr. Jankowski said that?

17  A.  Said that he was -- repeat that.

18  Q.  That NAI was concerned about Midway's solvency when you

19  requested the factoring.

20  A.  No.

21  Q.  Now if you could turn to Exhibit 93, please.

22      (Exhibit 93 previously marked for identification.)

23  BY MS. DAKIN-GRIMM:

24  Q.  Exhibit 93 is another draft Board minutes of the Midway

25  company Board of Directors dated September 11th, 2008, and I'll

1   note in the second paragraph it says -- it states that you

2   attended.  You did that didn't you?

3   A.  Telephonically, yes.

4   Q.  Right.  And this is the document in which the Board

5   approved the factoring agreement between Midway and NAI,

6   correct?

7   A.  Yes.

8   Q.  And prior to September, you hadn't been able to factor

9   your receivables, right?

10  A.  Correct.

11  Q.  Now, isn't it true, sir, that in the September/October

12  time period, Midway learned that it would not be able to get

13  any new infusions of cash from NAI due to NAI's own financial

14  problems?

15  A.  I'm not sure we learned that from NAI.  We kind of assumed

16  that.

17  Q.  Okay.  And given the four strategic plans that we saw, all

18  of which called for a minimum of 65 million of new cash, that

19  was very troubling for Midway, was it not?

20  A.  We knew that we needed to find a way to get some more

21  cash.  It was an obstacle we needed to overcome.

22  Q.  Isn't it true, sir, that Midway's Board determined that it

23  was insolvent in October of 2008?

24  A.  I have no recollection of ever hearing that.

25  Q.  Okay.  Would you look at Exhibit 120, please?

1    (Exhibit 120 previously marked for identification.)

2  BY MS. DAKIN-GRIMM:

3  Q.  Exhibit 120 is a memorandum from Ms. Fulton on October 28th

4  copied to you setting up the Board of Directors meetings with

5  some handwritten notes.  Do you know whose handwriting that

6  is?

7  A.  I do not.

8  Q.  Okay.  I'm going to focus your attention on the second

9  indented bullet point.  It says, "PCB."  Is that Peter Brown?

10 A.  Possibly.  I don't know.

11 Q.  Well, look in the "to" line.

12 A.  Yes.  I see that those are initials that are his but I

13 don't know if that's what it is.  I've never seen this before.

14 Q.  Do you recall in the meeting that's discussed -- that's

15 noticed here, "Mr. Brown asks management to come up with a

16 plan to operate without additional cash for full BOD, Board of

17 Directors."  Do you remember being so asked in October of

18 2008?

19 A.  Yes.

20 Q.  Okay.  And now, if you'd look at Exhibit 121, please.

21    (Exhibit 121 previously marked for identification.)

22 BY MS. DAKIN-GRIMM:

23 Q.  Exhibit 121 is the draft minutes of the Special Committee

24 of the Board of Directors for the October 29th, 2008 meeting.

25 And halfway down the second paragraph, it states that you

1   attended this meeting, right?

2   A.  Telephonically, yes.

3   Q.  Right.  And it states under Financial Update and Planning,

4   "At the request of the Chairman, Mr. Booty expressed

5   management's desire to assist and support the Committee.  He

6   reported that management had put aside the planning previously

7   requested by the Board that anticipated additional funding,

8   and instead was creating an operating plan on the assumption

9   that no new funding would be obtained."

10      Isn't it true, sir, that before October 29, Midway knew

11  that it was not going to get any additional funding from NAI

12  due to NAI's own financial difficulties?

13  A.  We anticipated that we would not.

14  Q.  Okay.  And isn't it also true, Mr. O'Desky, that the

15  Board, at that point in time, decided now's a good time to

16  hire a financial advisor and perhaps bankruptcy counsel?  I'm

17  referring to the penultimate paragraph on the first page.

18  A.  The -- I'm sorry.  Which paragraph are you referring to?

19  Q.  The second to the last paragraph --

20  A.  Oh.

21  Q.  -- on the first page, that reads, "The Chairman stated

22  that the Committee intended to move rapidly to engage a

23  financial advisor and specialized legal counsel."

24  A.  Yes.

25  Q.  Okay.  And at this point in time, the Board anticipated

1  that its only option would be to file a Chapter 11 proceeding

2  for Midway, right?

3  A.  That was never discussed.  It might have been discussed,

4  but I don't remember that, that that was the only option.

5  Q.  Would you turn to Exhibit 122, please?

6     (Exhibit 122 previously marked for identification.)

7  BY MS. DAKIN-GRIMM:

8  Q.  Exhibit 122 is a draft Board minutes of the entire Board

9  for the October 29th, 2008 meeting.  You attended this meeting,

10 didn't you, sir?

11 A.  Telephonically, yes.

12 Q.  Okay.  And all these meetings were telephonic, weren't

13 they?

14 A.  No.  There was a lot of in-person meetings as well.

15 Q.  We've seen many telephonic meetings, --

16 A.  Yeah.

17 Q.  -- right?

18 A.  Yes.

19 Q.  You didn't consider that if you attended telephonically,

20 you weren't really participating, did you?

21 A.  No.  But when you're saying if I'm at the meeting, I'm

22 just saying I'm not there.

23 Q.  Fine, thank you.  Look under the last section on the first

24 page, "Discussion of Financial and Operational Challenges and

25 formation of a Special Committee to address same."  You were

1   aware, weren't you, that the Board had discussed the
2   desirability of forming a Special Committee of Directors to
3   address the financial and operational challenges facing the
4   Corporation at -- just read the rest to yourself.  You were
5   aware of that, weren't you?
6   A.  Yes.
7   Q.  Now, if you could turn the page, under subsequent reports,
8   the very last paragraph, you see it says, Mr. Kelsh *(ph)* and
9   Kanner.  Those are the Board's lawyers, right?
10  A.  Yes.  Well, Kelsh, I believe, was the company's lawyer and
11  Kanner was the Board's lawyer.
12  Q.  Okay.  Subsequently reported that during the executive
13  session, the Board had attained advice concerning the
14  Directors' fiduciary duties to all of the Corporation's
15  relevant stakeholders including its minority stockholders and
16  creditors.
17      Were you aware that that advice had been given, sir?
18  A.  Not directly but by reading this, it doesn't shock me,
19  yeah.
20  Q.  Okay.  And are you aware, as a business person, a CFO, and
21  the company's designee to give testimony here, that when a
22  company is insolvent, the duties, the fiduciary duties, of its
23  Board members expand to include its minority stockholders and
24  creditors?
25          MR. MAYER:  Objection.  Calls for a legal

1   conclusion.

2          MS. DAKIN-GRIMM:  I'm asking him if he's aware.  If

3   he's not aware, he can just tell me he's -- I'm not asking him

4   to conclude that --

5          MR. HARKNESS:  He's not -- and I'm not sure that

6   that properly states the law either.

7          THE COURT:  I'll overrule that objection.  I'd like

8   to hear the witness's answer, too, to the best of his

9   knowledge.

10         MS. DAKIN-GRIMM:  Sure.

11  BY MS. DAKIN-GRIMM:

12  Q.  As the company CFO, as the company's 30(b)(6) designee,

13  meaning its representative to testify here today on behalf of

14  the company, are you aware, sir, that when a company

15  determines it's insolvent, its judiciary duties to all of its

16  relevant stakeholders, including its minority stockholders and

17  creditors, expand?

18  A.  I did not know the -- that's a legal definition.  I did

19  not know that, no.

20  Q.  Okay.  And isn't it true, Mr. O'Desky, that the company

21  decided to hire professionals to file a Chapter 11 proceeding

22  before Mr. Redstone and his entities engaged in the

23  transaction with Mr. Thomas?

24  A.  No.  We hired professionals in order to assist in the

25  possible restructuring of the business, not just to file or

1   only to file a bankruptcy proceeding.

2   Q.  Okay.  Would you look at Exhibit 100, please?

3       (Exhibit 100 previously marked for identification.)

4   BY MS. DAKIN-GRIMM:

5   Q.  Exhibit 100 is a draft unanimous consent of the Board of

6   Directors.  Mr. Steele, you can see is mentioned in here, is

7   an NAI employee, and he's still on the Board of Directors at

8   this point and time; is he not?

9   A.  Who -- I'm sorry.  Mr. --

10  Q.  Mr. Steele.

11  A.  He's not on the Board of Directors.

12  Q.  He's on the Board of Directors.  Look at the signature

13  page.

14  A.  That's fine, but there's no date on this whatsoever.

15  Q.  Well, --

16  A.  I don't know what date --

17  Q.  -- let me --

18  A.  -- I'm looking at.

19  Q.  -- help you with that.  Turn to Bates page Midway 00174.

20  This is the order in which these pages were provided to us,

21  which is why it is ordered this way.  And you can see the e-

22  mail going from Debbie Fulton to a number of people --

23  A.  Okay.

24  Q.  -- including Robert Steele.  And it says, "Attached, per

25  the Board's instructions today, is a proposed unanimous

1  written consent and here's the signature page for you."  Now,

2  if you look at the three previous pages, would you agree with

3  me that that is the attachment to the e-mail we're looking at,

4  the proposed unanimous consent?

5  A.  Yes.

6  Q.  All right.  Does that help establish in your mind that

7  this document existed at least by November 5, 2008?

8  A.  Yes.

9  Q.  All right.  Now, if you'll look at the third page, you'll

10  see that there's a signature line for Mr. Steele.

11  A.  Yes.

12  Q.  And if you look within the document, you'll see Mr.

13  Steele's name appears in the fourth whereas.

14  A.  Yes.

15  Q.  So is it clear to you now that Mr. Steele is still a

16  Director?

17  A.  Yes.

18  Q.  All right.  And the document reads, in the first whereas,

19  "Whereas, Sumner M. Redstone and his related parties,

20  including National Amusements, control over 87 percent of the

21  company's outstanding stock.  Whereas, NAI has also provided

22  substantial debt financing to the company, outstanding."  And

23  the third point, "Whereas the Board of Directors believes it

24  may be necessary to attempt to restructure or refinance the

25  company's outstanding debt or to consider other strategic

1  alternatives, including a sale of substantially all of the

2  company's assets or business or the filing of a voluntary

3  petition for reorganization under Chapter 11 of the Bankruptcy

4  Code."

5      Are you aware, sir, that the company considered filing a

6  petition under Chapter 11 of the Bankruptcy Code, on November

7  5th, and that Mr. Steele was aware of that?

8  A.  Yes.  It was one of the options, yes.

9  Q.  Okay.  And Mr. Steele, in fact, received this document,

10  you can tell from the e-mail trail, right?

11  A.  Yes.

12  Q.  Okay.  And if you look at Bates page 00180, you can see

13  that Mr. Steele responded after he received it, right?

14  A.  Yes.

15  Q.  Okay.  So is it fair to say, sir, that Mr. Steele, at NAI,

16  knew that the company was considering filing bankruptcy on

17  November 5, 2008 or before?

18  A.  Yes.  It's one of the options, yes.

19  Q.  Okay.  I'm going to move you ahead in time now to after

20  you found out about the transaction that Mr. Redstone and his

21  folks did with Mr. Thomas.  Would you look at Exhibit 44,

22  please?

23  A.  Okay.

24      (Exhibit 44 previously marked for identification.)

25  BY MS. DAKIN-GRIMM:

1 Q. Exhibit 44 is a memorandum that you prepared; is it not?

2 A. Yes.

3 Q. And this is dated January 12th, 2009 concerning Midway's

4 independent external auditors on issues regarding Mark Thomas.

5 A. Yes.

6 Q. Do you remember these events?

7 A. Yes.

8 Q. And essentially, Ernst & Young needed information about

9 Mr. Thomas to determine if it could continue to act as your

10 auditors and be independent.

11 A. Yes.

12 Q. And they asked you for information about Mr. Thomas

13 repeatedly and you didn't have it to provide.

14 A. Yes.

15 Q. And you asked, through counsel for Mr. Thomas, for them to

16 provide information and it was declined, your request,

17 correct?

18 A. No. They provided it to -- they provided it directly to

19 Ernst & Young, not to me.

20 Q. Well, let's look at what you wrote in the document under

21 Mark Thomas. "Since the NAI/Thomas transaction, there has

22 been no direct contact with Mark Thomas." That was true,

23 wasn't it?

24 A. Yes.

25 Q. "And per information received from his representatives,

1   his lawyers at Kramer, Levin, Naftalis & Frankel, he wishes to

2   remain a passive investor.  There has been no ability by the

3   company or the Board of Directors to perform any diligent

4   procedures around Mark Thomas.  Even to the extent of

5   determining his middle initial." As of January 12th, that was

6   true when you wrote it, wasn't it?

7   A.  Yes.

8   Q.  And you had attempted to find out information about Mark

9   Thomas, and up to this point, you had not been successful,

10  right?

11  A.  Correct.

12  Q.  Now, if you could turn the page, you write, "The

13  independent external auditors of Midway, Ernst & Young, EY,

14  under the guidelines set forth by the SEC and their internal

15  procedures, were required to determine if they would be able

16  to continue as Midway's auditors.  To do this, they needed to

17  perform procedures surrounding the Thomas purchasers.  Through

18  discussions with Kramer, E&I *(sic)* was able to obtain

19  information needed to perform these procedures, but were

20  required to keep them confidential and not share the

21  information either with Midway nor the Board." That was true,

22  wasn't it?

23  A.  Correct.

24  Q.  And if Mr. Thomas took the stand and said this wasn't

25  true, he'd be inaccurate, right?

1   A.  I would believe so, yes.

2   Q.  I'm going to ask you about a document that I would like to

3   not put up on the screen, and I'm going to ask in your answers

4   that you not use any numbers in your response.  But if

5   everybody could turn to Exhibit 47, please.

6       (Exhibit 47 previously marked for identification.)

7   BY MS. DAKIN-GRIMM:

8   Q.  Exhibit 47 --

9       MS. DAKIN-GRIMM:  I'm sorry, I'll wait until

10  everybody's ready.

11  BY MS. DAKIN-GRIMM:

12  Q.  Exhibit 47 is a draft of a Midway Board of Directors

13  telephonic meeting from January 13th, 2009.  This is another

14  meeting that you attended telephonically, right?

15  A.  Yes.

16  Q.  And now, if you could turn to the third page of the

17  document, without repeating any of the numbers in there,

18  you'll see it states, "Mr. O'Desky reports on," and then it

19  relates to one of the potential bids for the company, right?

20  A.  Yes.

21  Q.  That was correct when you -- as of the date you wrote

22  this, right?

23  A.  I did not write this.

24  Q.  I'm sorry.  It was correct -- this document is correct

25  that you reported that information we're looking at as of the

1  date it states?

2  A.  Yes.

3  Q.  Okay.  And then it says, "Mr. O'Desky reports on the," and

4  then it refers to a valuation of one of the company's assets

5  and gives numerical information, right?

6  A.  Yes.

7  Q.  And you, in fact, reported on that information at the

8  meeting that we're -- the minutes of which we are looking at,

9  right?

10  A.  Yes.

11  Q.  And there does, in fact, exist a valuation from this

12  entity of that asset in these amounts; is there not?

13  A.  Yes.

14         MS. DAKIN-GRIMM:  Is that an okay way to do that,

15  Your Honor?

16         THE COURT:  Yes.

17         MS. DAKIN-GRIMM:  All right.

18         THE COURT:  Yes.  That was very good.

19         MS. DAKIN-GRIMM:  Thank you.

20  MS. DAKIN-GRIMM:

21  Q.  That's all I have for you, sir.

22  A.  Okay.

23         THE COURT:  Mr. Caponi.

24         MR. CAPONI:  Brief redirect, I hope, Your Honor.

25         THE COURT:  Yes, sir.  You're not finished yet, Mr.

1  O'Desky.

2        MR. CAPONI:  For the record Steve Caponi from Blank,

3  Rome on behalf of the Debtors.

4                    REDIRECT EXAMINATION

5  BY MR. CAPONI:

6  Q.  Mr. O'Desky, I'm going to try to touch upon a couple

7  subjects that Ms. Dakin-Grimm had -- you and her had talked

8  about for the last -- I want to say couple minutes, but it was

9  a little more than that.  Turning your attention to the,

10  again, subject of the NOLs.

11  A.  Yes.

12  Q.  Do you recall the questions from Mr. -- Ms. Dakin-Grimm

13  regarding whether the company had conducted an analysis of the

14  impact of the NIA, Thomas transaction on Midway's NOLs?  Do

15  you recall that line of questioning?

16  A.  I do.

17  Q.  Okay.  And in the question, Ms. Dakin-Grimm suggested that

18  the document of the analysis was done to, quote, support the

19  argument, close quote, that the NOLs had not been damaged and

20  were, in fact, completely available to the Debtor.  Do you

21  recall that question?

22  A.  Yes.

23  Q.  Okay.  Was that the reason the Debtor has been conducting

24  an analysis of the NOLs and whether or not they were impacted

25  by the Thomas transaction?

1   A.  No.

2   Q.  All right.  What was the -- what is the reason that the

3   company has been analyzing the NOLs?

4   A.  I -- we need to perform that analysis in order to make

5   sure that our financial records are correct, especially with

6   the 12/31/08 10-K about to be due that we need to file.  The

7   numbers have to be correct.  That's why we've been performing

8   the analysis.

9   Q.  Okay.  Is it necessary to discuss NOLs in a 10-K,

10  generally speaking?

11  A.  Yes.

12  Q.  So is this something that Midway -- analysis Midway's

13  conducted every time it's had to file a 10-K?

14  A.  I believe since I've been doing it, yes.  And --

15  Q.  Okay.

16  A.  -- I'm sure before that.

17  Q.  (Indiscernible) again focus on another line of questioning

18  regarding the NOLs which was a sort of challenge as to whether

19  or not Midway had consulted a tax expert or received an

20  opinion regarding the impact, if any, on the NOLs?  Do you

21  recall that line of questioning?

22  A.  Yes.

23  Q.  All right.  Is there a reason Midway did not go out and

24  retain a tax expert?

25  A.  Well, at this point, we don't believe we need to.

1  Q.  Okay.  In reporting and filing previous 10-K's, other than

2  the one you're working on right now, in prior years, had

3  Midway ever gone out and retained an expert to render advice

4  regarding the value or the availability of its NOLs?

5  A.  I do not know that answer.

6  Q.  Okay.  With respect to the 10-K's you were involved in, do

7  you recall anybody seeking outside advice regarding the

8  availability of the NOLs?

9  A.  Not to my knowledge, no.

10 Q.  Does Midway, within its own ranks, have anyone that can

11 render advice or provide guidance with respect to tax issues?

12 A.  Yes.

13 Q.  And who is that?

14 A.  My tax director.

15 Q.  And what does -- what is the responsibility of the tax

16 director?

17 A.  Tax director's responsible for the worldwide tax

18 situations, tax planning, and tax returns of the company.

19 Q.  And are NOLs and the use of NOLs, the availability and the

20 impact, something within his expertise or the purview of his

21 responsibilities?

22 A.  Yes.

23 Q.  Just to clarify, were you, since joining Midway, an

24 attendee at every Board meeting?

25 A.  No.

1  Q.  Okay.  At what point in time, is -- was there a point in

2  time when you became a regular attendee at Board meetings?

3  A.  Yes.

4  Q.  And when was that?

5  A.  It was mid to late January 2008.

6  Q.  Prior to that mid to late January 2008, how frequently or

7  infrequently had you attended Board meetings?

8  A.  I don't think I had ever attended a Board meeting prior to

9  that.

10  Q.  Okay.  Did you interact with -- strike that.  With respect

11  to the extent the Board had discussions outside the course of

12  a regular Board meeting, were you included in those

13  discussions?

14  A.  No.

15  Q.  So to the extent one Board member wants to discuss with

16  another Board member issues with respect to Midway, you would

17  not necessarily know if that conversation took place, or what

18  was discussed in that conversation.

19  A.  Not unless it was in an Audit Committee meeting that I had

20  attended for Board members to discuss things.  No.

21  Q.  I also want to focus on, real quick, the part of your

22  testimony where you were questioned regarding -- in 2008,

23  beginning early 2008, as to whether or not or why not Midway

24  had not conducted an analysis regarding its ability to repay

25  bonds the following April of '09.  Do you recall that

1  testimony?

2  A.  Yes.

3  Q.  Okay.  Why did yourself or Midway not conduct an analysis

4  regarding its ability to repay the bonds the following year?

5  A.  Because at that time, we didn't -- you know, there are

6  many obstacles that the company was facing and we were going

7  through them as they occurred, but they were just obstacles

8  and we were just going through them step by step up until the

9  change of control happened.  So there was no need to perform

10  that type of analysis at that point in time, in early -- in

11  January/February 2008.

12  Q.  Do you -- take early 2008, the time of the Midway/NAI

13  transaction, was there any concern within Midway that it would

14  be unable to pay -- service its bond debt in the future?

15  A.  Its bond debt?

16  Q.  Yes.

17  A.  So you're saying the put of the bonds or are you talking

18  about the interest payments that we owed on that?

19  Q.  Either or the entire -- the entirety of your -- the

20  obligations under the bonds.

21  A.  No, not at that point in time.

22  Q.  Okay.  At what point in time, did Midway first become

23  concerned that it may not be able to service -- service its

24  bond debt, either the payments or a put option, if it were to

25  occur in April?

1  A.  Sometime in the second quarter, early in the second

2  quarter, when -- when Matt Booty took over as interim CEO, we

3  started talking about that in extensive detail.

4  Q.  Would that have been before, during or after the

5  negotiations of the factoring arrangement?

6  A.  Before the factoring arrangement.  After the $90 million

7  and NAI transaction, no.

8  Q.  I believe you testified that, at least, in the early part

9  of 2008, Midway did not anticipate that a majority of the

10  bondholders would, quote, "put the bonds back to the company

11  in April; is that correct?

12  A.  I don't think we believed that at that time, no.

13  Q.  Okay.  And what was the basis of that believe?

14  A.  Our -- I believe it would have been just the projections

15  of -- of the company, where we expected to be at that point

16  and time, and over the next year, where it expected to be.

17  Q.  Was there a point in time where the -- Midway believed

18  that conclusion had changed and that, in fact, a significant

19  portion or a majority of the bond debt would put its

20  obligation back on the company?

21  A.  Yes.

22  Q.  And when was that?

23  A.  Publicly, we said that in our second quarter queue that

24  was released, but in -- during the second quarter's when we

25  started believing that substantially all or all or a portion

1  of the bondholders could put back in April 2009.

2  Q.  Okay.  Had anything, with respect to the company's

3  operations, changed from January of '08 until that point in

4  time where, again, you concluded that majority of the bond

5  debt may be put back on the company?

6  A.  Yes.

7  Q.  What had changed?

8  A.  A number of things had changed.  We had run the business

9  for -- for five, six months at that point.  One of our games

10 that was released did not do well at all and was a very large

11 cash drain on the company.  And, you know, with a new CEO in

12 place and a new CFO, there were changes to operations that

13 happened during that course.  So everyday something else was

14 different than it was in January.

15 Q.  So the core operations of the company had materially

16 changed from January until the second -- by the second quarter

17 of 2008.

18 A.  Yes.

19 Q.  To the negative?

20 A.  Yes.

21 Q.  Do you recall testimony or the questions along the lines

22 of that Wells Fargo would not permit Midway to access the last

23 $10 million of --

24 A.  Yes.

25 Q.  -- its facility?  Is that an accurate statement, that you

1   were not permitted to access the $10 million?

2   A.  I don't believe that that's the correct way to say it.

3   Q.  All right.  How -- what, in your opinion, is the correct

4   way to --

5   A.  When --

6   Q.  -- phrase that?

7   A.  -- the Wells Fargo facility was put into place, and I

8   apologize, I don't remember what date that was, there were

9   certain requirements that thresholds had to be met in order to

10  be able to utilize the availability of the entire $30 million

11  of debt, so it's when it was put into place.  And at that

12  point in time, in early 2008, we were not at a point where we

13  would have had access to that last $10 million due to those

14  requirements that had been put in when the facility was put

15  into place.

16  Q.  Okay.  If you could please turn to Exhibit 119, which you

17  had looked at a few minutes ago.  It's an e-mail from yourself

18  --

19  A.  Yes.

20  Q.  --(indiscernible) and Ms. Fulton.

21  A.  119?

22  Q.  119, 1-1-9.

23  A.  Okay.

24  Q.  In your testimony, your answer was, I'll paraphrase, yes,

25  Ms. Dakin-Grimm, you're correct, if you want to take it out of

1  context.  Would you like to put it in context?

2  A.  Yes.  Well, this was an e-mail that I had sent to our

3  counsel, Sidley & Austin, and basically it said this is nuts.

4  We must have a waiver until it's complete.

5      It you read this entire e-mail chain, this in regards to

6  what I discussed earlier, the issue of the restricted cash in

7  Germany, that basically when we put into the NAI agreement, we

8  did not realize that there were these issues there that we

9  would not be able to utilize some of the money that was ours,

10  and it was restricted.  And it had taken almost a month and a

11  half or two months for what ended up being a very simple

12  amendment and waiver to do that didn't hurt anybody neither

13  way and only needed to be done due to the cash sweep that was

14  in place.  And it was becoming very -- because at this point

15  in time is when I was about to go over the threshold that said

16  I had to have the cash sweep in place.  Prior to this, there

17  was no cash sweep.  So if this wasn't done, I was going to

18  have to manage a worldwide business where we had reorders, had

19  things that came up everyday, on six and a half million

20  dollars of worldwide cash, which was something that running

21  the business would have been almost impossible to do without

22  this minor amendment that took forever to do.

23  Q.  Sure.

24  A.  So I was a little emotional and agitated with our lawyers

25  and the other lawyers from NAI at this point.

1  Q.  Lawyers are used to their clients being agitated.  Look --

2  focusing at, you know, end of '07 thru the 2008, the -- in

3  your testimony, a number of times, you've referred -- you have

4  referred to issues as obstacles.

5  A.  Yes.

6  Q.  Okay.  The need to or the desire to replace the Wells

7  Fargo facility to deal with the E&Y issue and the covenants,

8  is that -- was that, in your view, an obstacle?

9  A.  Those were all obstacles, yes.

10  Q.  Okay.  What other obstacles, major obstacles, had you

11  faced throughout the course of 2008?

12  A.  In 2008, there's lots of them.  Obstacles such as the

13  desire to move TNA to maximize thing and the obstacle that

14  that cash need created where we had to do the factoring

15  agreement; the obstacle that our game that was released in the

16  spring, NBA Ballers, did not come close to hitting the

17  expectations that we had hoped for then; obstacles of our

18  Austin facility that was not performing how it should and

19  ended up having to close that down in order to save cash;

20  obstacles of certain contracts that we, in September, were

21  able to terminate.  There were obstacles to try and get that

22  done.  There were obstacles for the company that, you know,

23  management was able to terminate and get for the better for

24  the company, but those were huge obstacles.  The obstacles of

25  dealing with the unknown in 2008 -- because that's what your

1  asking about, the unknown of what the Mark Thomas acquisition

2  meant; the unknown and obstacles of dealing with the large

3  risks that we had to do in December to cut 25 percent of the

4  company down.  There were many, many obstacles that we faced

5  over the last 12 months to try and keep the ship upright and

6  right the ship.

7  Q.  Putting aside the impact of the NAI/Thomas transaction,

8  was Midway able to overcome the very -- litany of obstacles

9  you just articulated.

10  A.  Yes.

11  Q.  And was it able to do so, in your opinion, on commercially

12  reasonable terms that were acceptable to Midway?

13  A.  Yes.

14  Q.  Okay.  Focusing on the impact of the NAA -- NAI/Thomas

15  transaction, was one of those obstacles the fact that the --

16  as a result of that transaction, there was a change of control

17  that allowed the bond debt to be accelerated and there was a

18  put?

19  A.  Yes.

20  Q.  Okay.  Was that an obstacle Midway was able to overcome?

21  A.  No, more of a brick wall.

22  Q.  Hence, why we're standing here today?

23  A.  Yes.

24  Q.  Okay.  Throughout the course of your cross-examination by

25  Ms. Dakin-Grimm, there was a lot of characterizations of dire

1  Armageddon, you name it, for how to describe the company's

2  position -- financial position through 2008, and specifically

3  those adjectives with respect to these various obstacles.  How

4  would you describe, having been there, the severity of these

5  obstacles?  Did they rise to the level of Armageddon or was

6  there some other adjective or phrase that you would apply to

7  those obstacles?

8  A.  I don't use words like Armageddon.  I use extremely

9  difficult, hard times that took lots of work to overcome, but

10  again, they were very difficult obstacles but each step of the

11  way, we worked on it in order to get it resolved.  So tough,

12  hard, difficult.  Not Armageddon.  Armageddon means we would

13  have been here a long time ago.

14  Q.  And when is the first time that you recall that Midway

15  reached the conclusion that there was no viable, reasonable

16  alternatives to overcome an obstacle in order to continue as a

17  going concern?

18  A.  Basically with the puts of the notes in mid-January.

19  Q.  Okay.  Did --

20  A.  Well, before the waivers and forbearances and all that

21  stuff.

22  Q.  Did Midway enter into discussions with the bondholders to

23  see if they would forego or push off a put of the bond debt?

24  A.  Yes.

25  Q.  Okay.  And what was the result of those discussions?

O'Desky - Recross

1   A.  We were able to from mid-January to mid-February, and have

2   those discussions.

3   Q.  And then, I take it, that at some point in time, the

4   bondholders were no longer willing to forego a put of the

5   bonds.

6   A.  In essence, yes.

7   Q.  Thank you.

8           MR. CAPONI:  Your Honor.

9           THE COURT:  Thank you, Mr. Caponi.  Mr. Harkness.

10          MR. HARKNESS:  Just a handful of questions, Your

11  Honor.  I ain't going to bring my whole book.

12                      RECROSS-EXAMINATION

13  BY MR. HARKNESS:

14  Q.  Ms. Dakin-Grimm was asking you about whether the company

15  would be better off if it didn't owe $30 million.  And I --

16  you seem to be trying to say something, and let me just ask

17  you.  Does it matter to the company -- if it owes $30 million,

18  does it matter to whom it has to pay it?

19  A.  No.  If we owe $30 million, we owe $30 million.

20  Q.  Okay.  All right.  With regard to the Special Independent

21  Committee from early in 2008, are you familiar with the people

22  who are on that Committee?

23  A.  Yes.

24  Q.  Is Mr. Waxman one of those people?

25  A.  Yes.

1  Q.  Do you know Mr. Waxman's background?

2  A.  Yes.

3  Q.  What is it, please?

4  A.  I believe he was a partner at Deloitte & Touche and now

5  runs his own -- I believe, it's a forensic accounting firm.

6  Q.  Okay.  Do you -- you're a CPA, correct?

7  A.  Yes.

8  Q.  Do you have an opinion as to Mr. Waxman's competence?

9  Have you seen him do his job?

10 A.  I've seen him do his job, yes.

11 Q.  He's good -- is he good at his job?

12 A.  I believe so.  We talked -- you know, what a lot of people

13 might find boring, we talked accounting things, so yes.

14 Q.  Have you ever had any question about the independence he

15 brings to the task that he performs for Midway?

16 A.  No.

17 Q.  Do you have any question about the independence -- his

18 independence with regard to determining whether the NAI loans

19 were appropriate or not?

20 A.  No.

21 Q.  If you didn't think the NAI loans, the refinancing in

22 2008, was prudent in the company, would you have participated

23 in the transaction?

24 A.  I would have definitely voiced my concerns to anyone and

25 everyone who would listen to me.

1   Q.  Okay.  And did you voice any concern about it being

2   imprudent to enter into that loan?

3   A.  No.

4   Q.  Did anyone on the Special Committee voice a concern like

5   that to you?

6   A.  To me, no.

7   Q.  To anyone?

8   A.  I can't speak to who else they --

9   Q.  Right.

10  A.  -- might have talked to so, --

11  Q.  Okay.

12  A.  -- no.

13  Q.  There was some questions about Mark Thomas and his

14  identity.  Did Mark Thomas's identity have anything to do

15  whether or not the company had NOLs?

16  A.  No.

17  Q.  Did Mark Thomas's identity have anything to do about --

18  anything to do with whether or not the note holders could or

19  could not put their notes to the company?

20  A.  No.

21  Q.  Now, there was some testimony about the Redstone premium.

22  Do you know what that is?

23  A.  Yes.

24  Q.  The note holders have a conversion right, right?

25  A.  Yes.

O'Desky - Recross

1  Q.  What's a conversion right?

2  A.  Basically, that they are able to convert their debts to

3  equity at a certain set price.

4  Q.  Okay.  And the Redstone premium changes how much equity

5  they get at the set price if Mr. Redstone's shares -- percent

6  of equity ownership in the company gets above a certain level;

7  is that right?

8  A.  That's one of the ways it would have changed it, yes.

9  Q.  Okay.  And does that -- if Mr. Redstone's shares get above

10  90 percent, according to those notes, what would happen to the

11  note holders rights?

12  A.  It would have changed their conversion rate.  I don't

13  remember what it would have changed it to.

14  Q.  It would give them the right to convert -- to get more

15  shares --

16  A.  Yes.

17  Q.  -- if they converted, correct?

18  A.  Correct.

19  Q.  So if -- what was the practical consequence if that

20  Redstone premium would kick in?

21  A.  If the Redstone premium would have kicked in -- well, it

22  kind of depends on what time we're at.  If it would have

23  kicked in and the debt holders wanted to convert to equity,

24  they would have been able to get more equity which would have

25  deluded -- and then would have deluded the Redstone entity

1   even more.

2   Q.  Okay.  So if Mr. Redstone and his entities had given more

3   money to the company in exchange for equity, there was a

4   chance, with this Redstone premium, that it would delude his

5   shares so much that he'd actually just be giving the money

6   away; is that right?

7   A.  I did not do that analysis but -- but in essence, yes.

8   Q.  Thank you, nothing further.

9           THE COURT:  Thank you, Mr. Harkness.  Yes.  Ms.

10  Dakin-Grimm.

11          MS. DAKIN-GRIMM:  Very briefly, Your Honor.

12                      RECROSS-EXAMINATION

13  BY MS. DAKIN-GRIMM:

14  Q.  Mr. O'Desky, isn't it true that you explained to Midway's

15  Board in February of 2008 that there would be a financial

16  doomsday if you couldn't find a way to get around the Wells

17  Fargo issue and the EY going-concern issue?

18  A.  That there could be a financial doomsday.

19  Q.  That's the kind of words you use, isn't it, sir?

20  A.  I believe in quotes, once, yes.

21  Q.  In your deposition, under oath, didn't you?

22  A.  That there could be, yes.

23  Q.  Yes.

24  A.  Not that there would be.

25  Q.  And you testified that you told the Board at that time

1  that if you couldn't find a way around those problems, the

2  company would be forced into bankruptcy in February 2008,

3  didn't you, sir?

4  A.  I'm not sure I ever told the Board that we would be forced

5  into bankruptcy in 2008.

6  Q.  Let's look at your deposition, sir, at page 49.

7  A.  Sure.

8  Q.  You can see, starting about line 21, question, "What would

9  have happened to the company if the March 1st deadline had

10  passed with the covenant being violated in the Wells Fargo,

11  Foothill, March 15th came and Ernst Young issued a going-

12  concern qualification on the financials?"  Answer, "What I

13  believe would have happened would have -- on March 1st, Wells

14  Fargo would have been able to seize our cash, basically stop

15  us from operating in order to pay down the debt that was owed

16  to them, which was at that time, I believe, was a little over

17  19 million which wouldn't have allowed us to continue our

18  operations and probably would have forced us into bankruptcy

19  at that point in time."  That was your testimony under oath,

20  wasn't it, sir?

21  A.  If nothing in the world --

22  Q.  Sir, was that your testimony under oath as I read it?

23  A.  Yes.

24  Q.  And now if you could continue with the question on line

25  23, "Did there ever come a time when you had to explain to the

1  Board or you were present when someone else explained to the

2  Board what the ramifications would be for violating the Wells

3  Fargo covenant?"  Answer, "Yes."  Question, " And what was

4  described to the Board?"  Answer, "Pretty much what I just

5  explained."  Question, and this is from Mr. Harkness, "Sort of

6  the financial doomsday for the company?"  Answer, "Yes."  That

7  was also your testimony, wasn't it, sir?

8  A.  Yes.

9  Q.  Isn't it true, Mr. O'Desky, that Lazard advised the

10 company that it would lose it -- that it had lost its net

11 operating loss, carry-forward abilities as a result of the

12 Thomas transaction?

13 A.  I don't think they ever concluded that.  They said that

14 they thought it might be.

15 Q.  Okay.  And you don't have any opinion from Lazard stating

16 anything to the contrary, do you, sir?

17 A.  I don't even know if they have tax experts that would

18 issue an opinion, so no.

19 Q.  You don't know if your financial advisor being paid out of

20 the estate has the capacity to advise and opine on the use of

21 net operating losses?

22 A.  I don't know -- no, that they are able to opine on that?

23 That's a very specific --

24 Q.  Sure.

25 A.  -- financial thing that some companies do and some

1  companies don't.  So no, I don't.

2  Q.  Look at Exhibit 40, if you will.

3  (Exhibit 40 previously marked for identification.)

4  BY MS. DAKIN-GRIMM:

5  Q.  Now, this is a Board of Directors meeting just as the

6  company was learning of Mr. Thomas.  This is dated December 4,

7  2008.  You were in attendance; weren't you, sir?

8  A.  Yes.

9  Q.  Physically, right?

10  A.  Yeah.

11  Q.  Now, if you could turn to the second page under the

12  caption, Report of Lazard, Frères and Company.  You know Mr.

13  Seacrest *(ph)*, don't you?

14  A.  Yes.

15  Q.  He came to the First-Day Hearing.  He's the senior guy

16  there, right?

17  A.  He was not at the First-Day Hearings.

18  Q.  Oh, that was somebody else?

19  A.  Yes.

20  Q.  Oh.  "Mr. Seacrest hands out a book which he will take

21  back.  Introduces Lazard team.  He has reviewed immediate term

22  liquidity, the business models and alternatives.  Mr. Seacrest

23  reports that the November 28 transaction changed matters,

24  especially, the net operating losses."  Isn't it true that at

25  this Board meeting, Mr. Seacrest advised the Board that the

1  transaction likely had eliminated its ability to use net

2  operating losses going forward?

3  A.  That was his opinion.

4  Q.  Isn't it true, sir, that he so advised?

5  A.  Yes.

6  Q.  And he is the professional retained by the Debtor and paid

7  for with the Court's permission, right?

8  A.  Yes.

9  Q.  Now, if you could look at Exhibit 42, please.

10     (Exhibit 42 previously marked for identification.)

11  BY MS. DAKIN-GRIMM:

12  Q.  The second e-mail on the first page is from Mr. Seacrest

13  to Peter Brown, then Chairman of the Board of Midway, dated

14  December 7, 2008 --

15         MS. DAKIN-GRIMM:  Oh, can you please take it down?

16  I'm sorry.  We'll do this without having it on the screen, if

17  you --

18         THE COURT:  Okay.

19         MS. DAKIN-GRIMM:  -- don't mind, Your Honor.

20         THE COURT:  Not at all.

21         MS. DAKIN-GRIMM:  It has some other information that

22  I wasn't going to focus on but I think we're not supposed to

23  put it up.

24         THE COURT:  Could you give me that number again?

25         MS. DAKIN-GRIMM:  It's 42.

1    THE COURT:  All right.

2    MS. DAKIN-GRIMM:  I apologize for that, Your Honor.

3    THE COURT:  That's quite all right.

4  BY MS. DAKIN-GRIMM:

5  Q.  I'm going to point your attention to point number four.

6  Mr. Seacrest writes, this is on the second page, "It sounds

7  like from a report I heard secondhand from Debbie" -- that's

8  the in-house lawyer correct?

9  A.  Yes.

10  Q.  -- "that the Kramer, Levin people will not even reveal the

11  full name and address of Mark Thomas to Midway.  Not an

12  encouraging sign of how they may be to deal with.  Can't quite

13  figure out why they are being so secretive."  That was a true

14  recitation of the conduct of your new supposed investor at

15  that point in time, wasn't it?

16  A.  At that point in time, yes.

17    MS. DAKIN-GRIMM:  Thank you, Your Honor.

18    THE COURT:  Thank you.  Anyone else?

19    MR. HARKNESS:  Just one moment.

20    THE COURT:  Yes.  Mr. Harkness, you may proceed.

21    MR. HARKNESS:  Thank you.

22            FURTHER RECROSS-EXAMINATION

23  BY MR. HARKNESS:

24  Q.  I just want to turn your attention back to Exhibit 40 from

25  Mr. Dakin-Grimm's book.  Who from Midway is doing the tax

1  analysis with regard to the NOLs?

2  A.  My tax director.

3  Q.  And what is your tax director's background?

4  A.  My tax director's been a tax professional for over 20 to

5  25 years.

6  Q.  Do you know Mr. Seacrest who's mentioned on the second

7  page of Exhibit 40 here?

8  A.  Do I know him?  Yes.

9  Q.  Okay.  And what's Mr. Seacrest's background?

10  A.  I believe, and I only know it from listening to the

11  conversations with him, that he is a mergers and acquisitions

12  consultant, basically, for Lazard.

13  Q.  And does Mr. Seacrest have a particular specialty within

14  the M&A field?  Do you know?

15  A.  I believe he specializes in video games and entertainment

16  type of areas.

17  Q.  Does Mr. Seacrest have any specialized training with

18  regard to NOLs to your knowledge?  Do you know one way or the

19  other?

20  A.  Not that I've ever heard of, no.

21  Q.  How about your tax director?  Does your tax director have

22  any specialized training with regards to NOLs?

23  A.  Yes.

24  Q.  Thank you.

25        THE COURT:  Anyone else?

1         MR. CAPONI:  No, Your Honor.  We're done with Mr.

2  O'Desky.

3         THE COURT:  Mr. O'Desky, you may step down.

4     (Witness excused.)

5         UNIDENTIFIED SPEAKER:  Exemplary service?

6         THE COURT:  Yes.  Thank you.

7         MR. DEBAECKE:  May we have one minute, Your Honor?

8         THE COURT:  Of course.

9         MR. DEBAECKE:  Thank you.  Not even a minute.

10    (Pause in proceedings.)

11        THE COURT:  You should leave while the going is

12  good.

13        THE WITNESS:  Thank you, Your Honor.

14        MR. CAPONI:  One ministerial issue, Your Honor,

15  would be the moving of exhibits.  And with the Court's

16  indulgence, what we'd like to do because there are some --

17  there is some confidential information, is at the end of the

18  proceeding, as we go along, counsel will make note of anything

19  that may need to be redacted that was not discussed and may be

20  on another part of an exhibit.

21        THE COURT:  Okay.

22        MR. CAPONI:  And we'll just provide the Court with

23  one set and ask that they be moved in evidence.

24        THE COURT:  That would be fine.  I think that's a

25  good way to handle that.

1    MR. CAPONI:  With that, Your Honor, the Debtor, with

2  respect to putting on any affirmative evidence, is done.

3    THE COURT:  Okay.

4    MR. CAPONI:  Other than we reserve the right to

5  (indiscernible) in any helpful thing that anyone else may do

6  --

7    THE COURT:  Okay.

8    MR. CAPONI:  -- in the next, hopefully, day and not

9  two days.  I don't know if Mr. Harkness has an affirmative

10 case he wants to put on as a co-movant or could we go right to

11 the objection?

12    MR. HARKNESS:  Well, I think that our next step is

13 to call Mr. Thomas --

14    THE COURT:  Yes.

15    MR. HARKNESS:  -- to the stand.  Can we have a two-

16 minute break just to --

17    THE COURT:  Absolutely.

18    MR. HARKNESS:  Before we get going?

19    THE COURT:  You want five minutes or --

20    MR. HARKNESS:  How about five minutes?

21    THE COURT:  Five minutes.  We'll take a recess.

22    MR. HARKNESS:  Thank you, Your Honor.

23    THE COURT:  I'll be right back.

24     (Recess from 3:22 p.m. to 3:31 p.m.)

25    THE COURT:  Thank you.  Please be seated.  Mr.

Harkness.

MR. HARKNESS:  I call Mark Thomas.

THE COURT:  Mr. Thomas.

MS. DAKIN-GRIMM:  Your Honor, I have one -- I'm not
sure if it's housekeeping, but an issue related to Mr. Thomas
with us.

THE COURT:  Yes, please.

MS. DAKIN-GRIMM:  The Committee was very surprised
and not a little bit disturbed last night to receive while we
were in transit here, a so-called supplemental declaration,
provided to us by the Kramer Levin firm, supplementing an
unsolicited declaration that Mr. Thomas had filed in the Court
after the first-day hearings.  That declaration wasn't
pursuant to any existing proceeding, he just filed a
declaration under penalty of perjury in the Court.  We then
deposed him extensively on the matters in that declaration,
obviously under penalty of perjury to prepare to cross-examine
him today.  And then last night, he provided this supplemental
document purporting to correct and take back things that he
had said in both of those documents.  It's highly irregular,
to say the least, and we would object to its usage, at least
on the direct examination here today.  A witness doesn't get
to twice testify under penalty of perjury and then say, you
know, I didn't mean it.  There are serious consequences to
that kind of conduct, so we would suggest to you that that

1  supplemental declaration not be considered evidence and -- but

2  be available for purposes of cross-examination.

3          THE COURT:  Your position, Mr. Harkness?

4          MR. HARKNESS:  Well, we clearly disagree.  I mean,

5  as the Court observed earlier today, the parties have been

6  moving at a very, very rapid pace.

7          THE COURT:  Yes.

8          MR. HARKNESS:  And the truth of the matter is that

9  Mr. Thomas put in the declaration, he was deposed.  Ms. Dakin-

10  Grimm made her record with regard to statements in the

11  declaration.  She cited in her brief, we cited in ours, how

12  Mr. Thomas thought about the statements he made in that

13  declaration.  After -- you know, in preparation for today, we

14  wanted to make sure that the record was very clear as to what

15  his testimony was going to be.  I don't want it to -- didn't

16  want to come in here and sandbag the other side, and we wanted

17  to make a very clear record here.  What we're trying to do is

18  make sure that a proceeding that's moving very, very quickly

19  has as clear a record as possible.  Certainly, Ms. Dakin-

20  Grimm's a very, very able cross-examiner and if she wants to

21  cross-examine the witness before or after the direct, that's

22  fine.  But our position is this is a way to make sure that the

23  record was clear before we started today, so we think it's

24  completely permissible.

25          MS. DAKIN-GRIMM:  Your Honor, this is not a matter

1  of a reply brief or a, you know, even an unauthorized reply

2  brief.  This is the document that was not -- doesn't even on

3  its face purport to be -- have been created until after the

4  declaration, days after the deposition and after the witness

5  had a chance to read the Committee's brief that was filed in

6  the Court citing to his testimony.  And I will also note for

7  the record, that his own counsel cited to that testimony in

8  the prior declaration, so after the witness saw the briefs

9  that the parties filed, realized the serious nature of the

10  misstatements that he had been caught making in the

11  deposition, he tried to fix it, and that's just not

12  appropriate.  It should not be that the witness is permitted

13  to come in here with a script in hand and say, here's my new

14  testimony.  There are consequences to these things.  I'm not

15  really sure how to handle this, Your Honor, but I wanted to

16  bring it to your attention and let you know the Committee's

17  position.

18          THE COURT:  Mr. Harkness, what --

19          MR. HARKNESS:  Well, like I said, we did not want

20  anyone to be sandbagged here.  If you want us to do this via

21  direct testimony, just me asking the questions, I'm happy to

22  do it.

23          THE COURT:  I think that's how we should proceed.

24  I'm not sure how to handle the Committee's issue about not

25  using it for direct but being able to use it for cross-

1    examination.  And I think what I would prefer to do is not to

2    use it at all today and I will then take under consideration a

3    Motion to Strike that declaration from the record, the

4    supplemental declaration.  So let's proceed that way where --

5              MS. DAKIN-GRIMM:  Thank you, Your Honor.

6              THE COURT:  -- you'll have an opportunity to -- I

7    will not be considering the supplemental declaration and will

8    consider whether or not it should be stricken, and you can

9    obviously elicit from Mr. Thomas all of the information that

10   is in that declaration on direct.

11             MR. HARKNESS:  Fair enough.

12             THE COURT:  Mr. Thomas, you're back.  You'll remain

13   standing, Mr. Thomas, while you're sworn.

14             MR. THOMAS:  Okay.

15        MARK THOMAS, ACQUISITION HOLDING'S WITNESS, SWORN

16             THE CLERK:  Please state your full name and spell

17   your last name for the record?

18             MR. THOMAS:  Mark Evan Thomas, T-H-O-M-A-S.

19             THE CLERK:  Thank you.

20             THE COURT:  Thank you, Mr. Thomas.  All right, Mr.

21   Harkness, when you're ready to proceed, you may.

22             MR. HARKNESS:  Thank you, Your Honor.

23                        DIRECT EXAMINATION

24   BY MR. HARKNESS:

25   Q.  Good afternoon, Mr. Thomas.

1   A.  Hi.

2   Q.  Well, I think we all know who you are but what --

3           THE COURT:  We even know his middle name now.

4           MR. HARKNESS:  Yes, Your Honor.

5   BY MR. HARKNESS:

6   Q.  Can you please tell the Court where you live?

7   A.  495 Hugh Cargill Road, Concord, Massachusetts.

8   Q.  Okay.  And are you married, sir?

9   A.  Yes.  I'm married.

10  Q.  To whom are you married?

11  A.  My wife's here today.  We've been married for 28 years.

12  Q.  And what's her name?

13  A.  Marcia Thomas.

14  Q.  Do you and your wife have any children?

15  A.  Yes.  We have one daughter, Jennifer Thomas, age 24, has

16  Downs Syndrome, lifetime dependent.

17  Q.  When you say lifetime dependent, what do you mean?

18  A.  I mean she will be -- we provide all of her financial

19  support.

20  Q.  Does she live at home now?

21  A.  She's just moved into an apartment in Cambridge by herself

22  on -- in the middle of August.

23  Q.  Does she have a job?

24  A.  She has a job but she makes no money.

25  Q.  And what do you do for a living, sir?

1   A.  I'm a private equity investor.

2   Q.  I see.  I see.  Well, we've had a lot of discussion about

3   the declaration so why don't we just get it out, look at it

4   and talk about it.

5   A.  Okay.

6   Q.  It's Exhibit 24 in our binders.  There's a binder behind

7   you, it's open to Exhibit 24 if you like or it will be on the

8   screen, whichever you prefer.

9       (Exhibit 24 previously marked for identification.)

10  BY MR. HARKNESS:

11  Q.  Now, this is a declaration signed by you on March 4th.  Is

12  that right?

13  A.  Let me check the date.  Yes, March 4th.

14  Q.  All right.  And it says, number one, I am the sole

15  principle and sole owner of MT Acquisitions Holding, LLC, MT

16  Acquisition, the 100 percent owner of Acquisition Holding

17  Subsidiary I, LLC.  Do you see that?

18  A.  Yes.

19  Q.  Now, what is MT Acquisition Holdings, LLC?

20  A.  That's a single purpose entity which was created for this

21  transaction.

22  Q.  Okay.  And what's Acquisition Holding Subsidiary I, LLC?

23  A.  It's a single purpose entity created for this acquisition.

24  Q.  Okay.  And where are these two entities located?

25  A.  Delaware.

1  Q.  And do they have offices?

2  A.  They have no offices other than Kramer Levin's offices for

3  notices.

4  Q.  And then the next sentence says, "No other entity has an

5  interest in or claim on the assets owned by AHS."  Is that

6  true?

7  A.  That's correct.

8  Q.  Paragraph two says it -- I formed AHS to purchase certain,

9  one, certain loans and advances made by National, it says

10  Assessments II, Inc., I think it should be National

11  Amusements, II.  Midway Home Entertainment, Inc., Midway

12  Amusements Games, LLC, et al., comprised of $30 million of

13  secured debt, $40 million of unsecured debt.  Do you see that?

14  A.  Yes, I do.

15  Q.  And was AHS formed to do the NAI purchase?

16  A.  Yes, it was.

17  Q.  And was it also formed to purchase the shares as indicated

18  later?

19  A.  Yes, it was.

20  Q.  Okay.  Just turning to number three on the next page, it

21  says, "Prior to November 14th, 2008, I had never met or spoken

22  with Mr. Redstone or his daughter, Ms. Shari Redstone."  Is

23  that true?

24  A.  That is true.

25  Q.  "I did not meet or speak with either of them during the

1 negotiations of the AHS's purchase of certain loans

2 (indiscernible) and interest in Midway or its affiliates or

3 subsidiaries, nor have I spoken with either of them since."

4 Do you see that?

5 A.  Yes, I do.

6 Q.  Okay.  It says, "In addition to being the sole member of

7 MT Acquisitions, 100 percent owner of AHS, I'm also sole

8 Managing Director of Estabrook Partners, LLC, a private equity

9 firm which I founded in 2007."

10 A.  That is correct.

11 Q.  And where is Estabrook Partners located?

12 MS. DAKIN-GRIMM:  Objection, Your Honor.  It's not

13 appropriate to direct examine your own witness by reading to

14 him his declaration and say, do you see that, do you see that.

15 If there's anything inaccurate, the witness can tell us that,

16 but otherwise it should be testimony coming from the witness.

17 MR. HARKNESS:  And we're getting there, Your Honor.

18 I've got two more questions.  I'm just walking through his

19 declaration so he sees where we are.

20 MS. DAKIN-GRIMM:  I move to strike the testimony

21 given so far where counsel has read the testimony -- read the

22 declaration to the witness and said, do you see that, and

23 we've not gotten any testimony from the witness himself.

24 THE COURT:  I think we ought to proceed normally as

25 direct examination, Mr. Harkness.

1          MR. HARKNESS:  All right.

2     BY MR. HARKNESS:

3     Q.  It says here, my net worth exceeds $10 million and I have

4     no debt.  Was that true when stated?

5          MS. DAKIN-GRIMM:  Objection, Your Honor.  This is

6     the same approach.

7          MR. HARKNESS:  No.  It's -- I have two questions,

8     Your Honor.  And I'm getting there to go directly to the issue

9     that Ms. Dakin-Grimm raised.

10          THE COURT:  Well, we have --

11          MR. HARKNESS:  Was it true when stated, and then I'm

12     going to ask the follow up questions to talk about the $10

13     million.

14          THE COURT:  Well, I think what Ms. Dakin-Grimm would

15     like, and the Court would like as well, is to have Mr. Thomas

16     testify on direct as opposed to testify through his

17     declaration.

18          MR. HARKNESS:  Fair enough.

19     BY MR. HARKNESS:

20     Q.  Sir, what's your net worth?

21     A.  My view of my net worth is that I have a net worth of

22     approximately $20 million; $12 million of it is my home with

23     my wife another 5 to $6 million is in cash and securities some

24     of which are in my wife's name, some of which are in my name

25     and another 2 million I would say is in personal property.

1  Q.  I see.  Now, when you give that answer, how are you

2  viewing the -- are you thinking about the strict ownership of

3  interest in each piece of property you just described?

4  A.  No.

5  Q.  Please describe your point of view?

6  A.  My view, and I know it's my wife's view is, is that we

7  don't have her money, my money --

8  MS. DAKIN-GRIMM:  Objection.  I move to strike, Your

9  Honor.  The witness can't testify about his wife's view.

10  THE COURT:  I agree.

11  THE WITNESS:  My view is that all of my money is her

12  money and we've lived that way for 28 years.

13  BY MR. HARKNESS:

14  Q.  And was that view the view you had when you signed your

15  declaration?

16  A.  Yes.

17  Q.  Now, during deposition you had questions about the

18  ownership of the home.

19  A.  Yes.

20  Q.  Who owns your home?

21  A.  My wife has legal title to my home.

22  Q.  But you included the home in your statement here when you

23  said your net worth exceeds $10 million.

24  MS. DAKIN-GRIMM:  Objection, leading.  And the

25  witness --

1    MR. HARKNESS:  Well, I said --

2    MS. DAKIN-GRIMM:  -- has not so testified.

3    MR. HARKNESS:  I was about to ask why.

4    MS. DAKIN-GRIMM:  The witness has not so testified.

5  This is leading, Your Honor.

6    MR. HARKNESS:  I --

7    THE COURT:  Sustained.  If you'll rephrase the

8  question, Mr. Harkness.

9  BY MR. HARKNESS:

10  Q.  Did you include the home that you live in with your wife,

11  when you said my net worth exceeds $10 million?

12  A.  Yes.

13  Q.  Why?

14  A.  Because I viewed it as our asset, our net worth, our

15  wealth.  I'm -- that's how we live our life.  It's not your

16  money; it's not my money.  It's our money.

17  Q.  I see.  And when you gave answers, when you said a few

18  minutes ago that you had a certain amount of cash, how much do

19  you have in cash and securities?

20  A.  I'd say the cash and securities, and it fluctuates because

21  obviously some of the securities are stocks and if you have a

22  400-point rise in the market one day, it goes up, but I would

23  say 2 -- 5 to $6 million in cash and securities.

24  Q.  Okay.  And how much of that is in funds, your money or

25  securities that are maintained in accounts that either you own

1  entirely in your name or jointly with you and your wife?

2  A.  About 3 -- a little over $3 million.

3  Q.  Did you mean to mislead the Court or anyone else in any

4  way when you filed your declaration on March 4th?

5      MS. DAKIN-GRIMM:  Objection.  Relevance and beyond

6  the scope of the proceeding issued here.  Intent is not an

7  element of anything we're dealing with.

8      MR. HARKNESS:  Ms. Dakin-Grimm used the word perjury

9  earlier today.  It goes directly to the heart of the

10 accusation about Mr. Thomas's credibility, Your Honor.  Intent

11 certainly is in play when she uses a word like perjury.

12     THE COURT:  I'll overrule the objection then.

13     THE WITNESS:  Absolutely not.

14 BY MR. HARKNESS:

15 Q.  Can you please turn to the next exhibit in your binder

16 which is Exhibit, I think it's 25.  Is this your curriculum

17 vitae?

18 A.  Yes, it is.

19    (Exhibit 25 previously marked for identification.)

20 BY MR. HARKNESS:

21 Q.  Can you, and I just really have this here for the Court to

22 follow along, can you describe what your educational

23 background is, sir?

24 A.  I have a Bachelors Degree in Business from the University

25 of Alabama where I graduated summa cum laude --

1  Q.  And --

2  A.  -- in 1977.

3  Q.  -- after you graduated from the University of Alabama,

4  what did you do next?

5  A.  Well, then I graduated from the University of Alabama Law

6  School in 1980.

7  Q.  And are you admitted to practice anywhere?

8  A.  I'm admitted to practice in the state of Tennessee.

9  Q.  When's the last time -- do you practice law now?

10  A.  Last time I practiced law was probably about 1994, late

11  '93, '94.

12  Q.  Okay.  Let's just concentrate on the period of time when

13  you were a practicing lawyer.  What kind of law did you

14  practice?

15  A.  I've always done deal work, mergers, acquisitions, that

16  type of activity.

17  Q.  Okay.  And have you ever been a litigator?

18  A.  I've never been a litigator.

19  Q.  Have you ever been a bankruptcy lawyer?

20  A.  No.  I've never been a bankruptcy lawyer.

21  Q.  What's the first nonlegal job that you had?

22  A.  It was -- for the first nonlegal job I had was as the -- I

23  was the head of Mergers and Acquisitions and Development for

24  ITT Sheraton Corporation.  And then that was -- lasted for a

25  very short period of time and I became the head of ITT

1  Corporation's Conglomerate Worldwide, mergers -- head of

2  Mergers and Acquisitions and that entity had companies like,

3  ITT Hartford, Sheraton and then the -- it was a huge

4  conglomerate with operations in 60 some countries around the

5  world.

6  Q.  And when you were -- had that job at ITT, the head of M

7  and A, can you describe what your job responsibilities were,

8  please?

9  A.  My job responsibility at ITT was for all mergers,

10 acquisitions, anything that involved a capital expenditure on

11 behalf of any of the companies in the -- worldwide, that all

12 of that filtered up to me, and then I presented every major

13 capital matter to the ITT Corporate Board of Directors.

14 Q.  How many deals did you do in that job?

15 A.  Hundreds of deals.  We could easily do, with all the

16 various companies, we could easily do a hundred deals a year,

17 and again, that was not me personally, that would be people

18 that reported to me up from around the world.

19 Q.  Okay.  And after -- when you were the head of M and A for

20 ITT, did you ever perform any legal functions?

21 A.  No.

22 Q.  After you -- well, what was your next job after that job?

23 A.  Well, ITT, we broke up -- well, Envirotest, and then that

24 was my next job, and I was hired as the Executive Vice-

25 President, Chief Development Officer for Envirotest.

1  Q.  And what where your job responsibilities with regard to

2  Envirotest?

3  A.  I was hired by the Board of Directors to come in and

4  restructure and sell the Corporation.

5  Q.  And did you do that?

6  A.  Yes.  We took this company in from, it was trading at

7  around $7 a share and we successfully sold it, even in a very

8  difficult financial market in 1998 when the credit markets

9  closed up, for $17.25.

10  Q.  What was your next job after that?

11  A.  My next job after that, I was a private equity -- I joined

12  the private equity firm, Georgetown Partners, and I became a

13  48 percent partner in the firm.

14  Q.  And what did you do at Georgetown Partners?

15  A.  The biggest transaction we did was the -- we bought the

16  cellular licenses for Missouri and Illinois as a -- that came

17  available as the result of the merger of SBC, the telephone

18  company and Ameritech, the telephone company.  They were --

19  the Government had required them because they had both

20  licenses, and did the best one.

21  Q.  And how long were you at Georgetown Partners?

22  A.  About ten years.

23  Q.  Okay.  And then what did you do after that?

24  A.  Then I formed my own firm, Estabrook Partners.

25  Q.  And Estabrook Partners, where does Estabrook Partners have

1  its offices?

2  A.  It's in my office at my home.

3  Q.  Okay.  And are there any other employees?

4  A.  No.

5  Q.  So let's turn to the chronology of events here.  When was

6  the first time you heard about Midway?

7  A.  I received a phone call from -- the first time I heard of

8  it was November 14th, 2008.

9  Q.  How did you hear about Midway?

10  A.  I received a phone call in the morning of November 14th

11  from Creighton Condon, a senior partner at Shearman & Sterling

12  and one of Mr. Redstone's long-term attorney's and another

13  lawyer who I knew named Peter Lyons, who's the head of Mergers

14  and Acquisitions Worldwide for the law firm Shearman &

15  Sterling.

16  Q.  Had you ever met Mr. Creighton (sic) or Mr. Lyons before?

17  A.  Yes.  I had met both of them before.

18  Q.  In what context?

19  A.  In -- I met Peter Lyons at first in -- when I was hired by

20  the Board of Directors of Envirotest to run that process, he

21  was hired by the Board of Directors as the legal counsel to

22  the Board for that transaction.

23  Q.  So they called you on November 14th, what day of the week

24  was that?

25  A.  That was a Friday.

Thomas - Direct

1  Q.  What time did they call you?

2  A.  I don't know the exact time but it was in the morning.  It

3  was in the morning and, you know, I'd say midmorning but I'd

4  say, you know, maybe 10 o'clock or something like that.

5  Q.  Okay.  And did they call you at home?

6  A.  Yes.  They called me in my home office.  It's a regular

7  office in my home.

8  Q.  What did Mr. Condon and Mr. Lyons say to you?

9  A.  They said to me that they had been thinking about firms

10  and individuals that they could contact that could work on a

11  potential acquisition or transaction, I would probably

12  describe it as, involving Midway Games and my name was on the

13  list of names of people to call because of my expertise in

14  this field.

15  Q.  Okay.  And when you say, this field, what do you mean?

16  A.  Working in mergers and acquisitions, transactions and

17  sometimes very difficult and complex transactions, and I've

18  historically been able to close transactions very quickly and

19  see through and do what's necessary to get things done.

20  Q.  Did they say anything else about that call -- on that call

21  rather?

22  A.  No.  No, not really.  It was just basically that

23  information, you know, this is the possible transaction and

24  this is why we called you.

25  Q.  And what did you say to them back?

Thomas - Direct

1    A.  Well, I kind of laughed and said, well, I guess that's

2    nice.  And I said, well, let me do this and I'll call you back

3    in about two hours.

4    Q.  Okay.

5    A.  Approximately two hours.

6    Q.  And did you call them back in two hours?

7    A.  Yes, I did or approximately --

8    Q.  Okay.

9    A.  -- give or take, you know, I don't know if it was an hour

10   and a half or two hours exactly, but roughly say in that kind

11   of time frame.

12   Q.  Okay.  What did you do, just briefly describe what you did

13   between hanging up the phone and calling them back?

14   A.  Well, the first thing I did is because, again, they didn't

15   tell me anything about the company, Midway, when the call

16   happened so I had to go and look online in at the public

17   documents.  I went and looked at as many of them quickly as

18   you can review in a hour and a half, two hour period, and then

19   I went and looked at -- in Fidelity and pulled down as many

20   analyst reports as I could get and looked at it.  And during

21   that time, I made some assumptions about the company.

22   Q.  And what assumptions did you make about the company during

23   that two hour period?

24   A.  I made the -- I determined that this company was in need

25   of a serious restructuring; that it would need tens of

millions of dollars to be restructured; that it would need
manpower with people with expertise in the restructuring area,
and I went through a thought process of who do I know, because
those capabilities were not -- the financial capability of
spending tens of millions of dollars to restructure this
company was beyond my financial capability.  So I thought
through with my colleagues that I knew in this area and one of
those persons that came to my mind was, his name is Mark
Gallogly, and I knew him, he was the head of Mergers and
Acquisitions Worldwide for the Blackstone Group.  He then left
the Blackstone Group and formed a new firm called
Centerbridge.  Centerbridge specializes in distressed asset
purchases, for instance, they offered to pay one dollar for
Chrysler.  So I knew his firm, I knew him and I thought to
myself, well, he would be a good person to call to do --
Q.  Let me just stop you there.  Did you call Mr. Gallogly
right away?
A.  No, I did not.
Q.  Okay.  Did you call -- well, what did you do next?
A.  Then I called back to -- for both Peter and for Creighton
and Peter Lyons was not available so I spoke with Creighton
and I told him what my preliminary analysis of this company
was.  And I said, but because of these specific needs,
financial needs, people needs, you know, all the things that
you would want to do, all the resources that you'd want to

1  bring to bear if you could possibly turn it around because in
2  this environment, you know, you couldn't get any debt.  You
3  had to go to a real entity and this entity that had like had
4  seven and a half billion dollars in capital available to
5  invest.
6  Q.  Okay.  When you say, this entity, who are you referring
7  to?
8  A.  Centerbridge.
9  Q.  Okay.  Did you tell the lawyers at Shearman & Sterling
10  about Centerbridge?
11  A.  Yes, I did.  They didn't know Centerbridge.
12  Q.  Okay.  Did you ask for permission to call Centerbridge?
13  A.  Yes, I did.
14  Q.  What did the lawyers from Shearman & Sterling say?
15  A.  They said, I understand your point of view, Mark.  You
16  know, that was probably part of the reason they thought of me
17  is if I couldn't do it myself, by myself, that I might have
18  contacts that could make it happen.  And so I got their
19  permission and they said, well, just tell him it's
20  confidential and as we move forward, again, I had no real
21  information from them, that as we move forward we'll have to
22  get Confidentiality Agreements signed.
23  Q.  When you say you have no real information from them, who
24  are you referring to in that?
25  A.  Shearman & Sterling.

1  Q.  Okay.  When you say no real information, what do you mean?

2  A.  All the information I had was is that there was a

3  potential transaction involving Midway.

4  Q.  In the -- other than the two conversations you just

5  described, did you have any other conversations on November

6  14th, 2008 with Shearman & Sterling?

7  A.  Not to my knowledge.

8  Q.  Okay.  During those two conversations, was there any

9  discussion of the price NAI's client was looking for, for its

10 share of Midway?

11 A.  There was never a discussion of price.

12 Q.  Well, ultimately there was a discussion of price, wasn't

13 there?

14 A.  Not on November 14th.

15 Q.  On November 14th, okay.

16 A.  Right.

17 Q.  Did you know who Shearman & Sterling was calling on behalf

18 of on November 14th?

19 A.  I assumed it was Mr. Redstone and NAI.  That was just my

20 assumption.

21 Q.  Okay.

22 A.  I mean, I don't know if anybody made a big deal about it

23 because it really wouldn't have mattered -- it didn't matter

24 to me who was selling, it just mattered to me the assets you

25 buy.  That's how I look at things, I, you know, if a seller

1  wants to sell it, that's really the most important thing to

2  me.

3  Q.  So the second phone call, they gave you permission to call

4  Centerbridge.  Did you do so?

5  A.  Yes, I did.  Immediately thereafter I called Centerbridge

6  and it made me feel good and Mark Gallogly came out of --

7          MS. DAKIN-GRIMM:  Objection, Your Honor.  This issue

8  came up in the deposition.  The witness wants to tell you

9  about what Centerbridge said --

10          THE COURT:  Oh.

11          MS. DAKIN-GRIMM:  -- and that would be hearsay, so

12  we request that you instruct him not to disclose anything that

13  Centerbridge said in any of his conversations.

14          MR. HARKNESS:  Let me lay -- may I lay a foundation,

15  Your Honor?

16          THE COURT:  Yes.

17  BY MR. HARKNESS:

18  Q.  Mr. Thomas, what I'd ask you to do is I'm going to ask you

19  a series of questions, please try to keep your answers

20  contained, and we're going to take this one step at a time --

21  A.  Okay.

22  Q.  -- through the following chronology.

23  A.  Okay.

24  Q.  So you called -- did you call Centerbridge on November

25  14th?

1  A.  Yes, I did.

2  Q.  With whom did you speak?

3  A.  Mark Gallogly.

4  Q.  Okay.  Did you transmit the information that Shearman &

5  Sterling had shared with you to Mr. Gallogly?

6  A.  Yes, I did.

7  Q.  Okay.  Without getting into the substance of what you

8  talked about, did you schedule a subsequent meeting?

9  A.  Yes, I did.

10  Q.  Okay.  And during the course of -- when was the -- did

11  you, in fact, have a subsequent meeting?

12  A.  That was on Monday.

13  Q.  Okay.  And on Monday -- and so that would have been

14  November 17th.  Is that correct?

15  A.  That's correct.  Friday was the 14th, so Monday was the

16  17th.

17  Q.  Okay.  And so did you meet with Centerbridge on November -

18  -

19  A.  Seven --

20  Q.  Seventeenth?

21  A.  Seventeenth, yes.  Monday the seventeenth --

22  Q.  Okay.

23  A.  I met with Steve Price.

24  Q.  Okay.  Just --

25  A.  Oh, okay.

Thomas - Direct

1   Q.  Okay.  Just --

2   A.  Okay.

3   Q.  -- we want to take this --

4   A.  Okay.

5   Q.  -- one step at a time.

6   A.  Okay.

7   Q.  I know you want to tell your story and I'm going to help

8   you get there so just bear with me.

9   A.  Okay.  Sorry.

10  Q.  Okay.  So on November 17th you met with Centerbridge.

11  Right?

12  A.  Correct.

13  Q.  Okay.  Did you have a meeting on November 18th with

14  Centerbridge and Shearman & Sterling?

15  A.  Yes, I did.

16  Q.  Did you have a meeting on Wednesday the 19th of November

17  with Centerbridge?

18  A.  Yes, I did.

19  Q.  Okay.  Did you have any further meetings after that

20  Wednesday with Centerbridge with regard to the Midway

21  transaction?

22  A.  I think it was Wednesday or Thursday was the last meetings

23  I had.

24  Q.  Okay.  And during the course of those meetings, and this

25  is just a yes or no question, during the course of those

1  meetings did you discuss Midway with the people at

2  Centerbridge?

3  A.  Extensively.

4  Q.  Okay.  Did you pass financial information back and forth

5  with Centerbridge?  Just yes or no.

6  A.  Yes.

7  Q.  Did you ask their opinion and advice about the

8  transaction?

9  A.  Yes, I did.

10 Q.  Did you seek to partner with them and do a transaction

11 together with them to acquire the interest in Midway?

12 A.  Yes, I did.

13 Q.  Did the discussions that you had ultimately inform the

14 price you were willing to pay for Midway?

15 A.  Yes, it did.

16     MS. DAKIN-GRIMM:  Objection, Your Honor.  Imbedded

17 in that question is hearsay and what he's trying to do is say,

18 now I want to know what the discussions were.  It doesn't

19 matter whether the witness relied on something that he heard

20 as hearsay, we can't cross-examine Centerbridge about their

21 half of the conversation, and this side of the table could

22 have brought the Centerbridge people if they wanted to rely on

23 their views of the transactions, so this testimony should be

24 stopped.

25     MR. HARKNESS:  Your Honor --

1        THE COURT:  Mr. Harkness.

2        MR. HARKNESS:  -- this goes to the state of mind.

3    We have had from the very first hearing in this case, a

4    question of why in the world would Mark Thomas pay $100,000

5    for his interest.  And the meetings with Centerbridge, the

6    financial analysis that he did with people that he recognizes

7    as experts in the field, goes to his state of mind of what he

8    was willing to pay.  And so I think that we're not offering

9    this for the truth of the matter, certainly we're offering

10   this for what Mr. Thomas's state of mind is and the series of

11   meetings that led up to finally one offer and then another,

12   and embedded in that is the communications he had with

13   Shearman & Sterling.

14       MS. DAKIN-GRIMM:  But, Your Honor, we know today

15   that Centerbridge passed on whatever it was that Mr. Thomas

16   offered them.  That's all we need to know.  But Mr. Thomas

17   cannot tell us why they passed, and then try and bootstrap his

18   conduct on that.  We don't have those witnesses to ask them

19   for example, gee, Centerbridge folks, you didn't want to do

20   this because you knew it was going to lead to a fraudulent

21   conveyance suit, right?  I can't ask those kind of questions

22   so Mr. Thomas doesn't get to present the evidence just from

23   his viewpoint, that's classic hearsay.

24       MR. HARKNESS:  And, Your Honor, this goes to state

25   of mind because it goes to what the group reviewed.  The

1  factors that were considered in a group setting throughout

2  that week on how they ultimately came to the price.

3       MS. DAKIN-GRIMM:  There is no group, Your Honor,

4  there's just Mr. Thomas, his entities.

5       THE COURT:  That's the problem.

6       MS. DAKIN-GRIMM:  It's all just Mr. Thomas.

7       THE COURT:  That is the problem, Mr. Harkness, and I

8  do believe it is hearsay under these circumstances.  We're

9  getting beyond really just his state of mind.  We're getting

10  to the ultimate result, the ultimate conclusion that he

11  arrived at based upon those discussions and I think that is

12  hearsay, so I'm going to have to sustain the objection.

13       (Pause in proceedings.)

14  BY MR. HARKNESS:

15  Q.  All right.  What we're going to do is walk through, and I

16  just need you to answer the questions succinctly as I do.  So

17  I think you mentioned that there was a meeting on Tuesday.

18  The -- you have a meeting with Centerbridge on the Monday.

19  Correct?

20  A.  Correct.

21  Q.  And on the Tuesday you had another meeting and that

22  meeting was with Shearman & Sterling, Centerbridge and you.

23  Is that right?

24  A.  Correct.

25  Q.  So just concentrating on that meeting, okay.  Who

1  attended?

2  A.  The meeting at Shearman on Tuesday was at around 11

3  o'clock at Shearman & Sterling, and it was Peter Lyons, who I

4  already mentioned is their head of their Mergers and

5  Acquisition Worldwide, Creighton Condon joined by telephone,

6  Scott Petepiece, a partner at Shearman & Sterling, attended on

7  the other side and then I think they had two associates there

8  also, Alana Rubinoff *(ph)* and Daniel Lenowitz *(ph)*, Lenwitz,

9  I'm not -- I can't pronounce his name correctly, on their

10  side.  On my side was Steven Price, a Senior Managing Director

11  at Centerbridge, Brent Buckley, a Managing Director at

12  Centerbridge and an expert in distress debt, and I believe one

13  other individual, Viv Melwanney *(ph)*, who is a Managing

14  Director at Centerbridge and a bankruptcy type lawyer, a

15  distress debt lawyer.

16  Q.  Okay.  And just --

17  A.  And myself.

18  Q.  Was price discussed at that meeting?

19  A.  No.

20  Q.  Did you ask at that meeting, did you ask to meet with

21  management?

22  A.  Yes.

23  Q.  Were you allowed to meet with management?

24  A.  No.

25  Q.  Were you allowed to speak to management?

1  A.  No.

2  Q.  Did you ask to speak to management?

3  A.  Yes.

4  Q.  I believe you said that Wednesday of that week was the

5  last time you spoke --

6  A.  Wednesday evening.

7  Q.  -- was the last time you spoke to Centerbridge about

8  Midway?  Did they proceed in any way after Wednesday with the

9  Midway transaction?

10  A.  No.  They did not.

11  Q.  Okay.  Did you?

12  A.  Yes, I did.

13  Q.  Okay.  What is the next thing you did after your last

14  meeting with Centerbridge?

15  A.  I believe that would have been Thursday the 20th, was that

16  the right, the 20th?

17  Q.  The 20th, yes.  I think so.

18  A.  Thursday the 20th and I had a meeting with Scott Petepiece

19  of Shearman & Sterling, the partner in charge of this

20  transaction and Alana Rubinoff and Daniel, that I tried to

21  pronounce his name before, advised them that Centerbridge

22  would not move forward and that, in fact, that for them to

23  move forward --

24      MS. DAKIN-GRIMM:  Objection, Your Honor.  The

25  witness is trying to testify about Centerbridge's views.

1    THE WITNESS:  Well, I'm --

2    MR. HARKNESS:  Okay.  Just answer --

3    THE COURT:  Sustained.

4  BY MR. HARKNESS:

5  Q.  Let's just go, we're going --

6  A.  Okay.

7  Q.  -- to take it one --

8  A.  Sorry.

9  Q.  -- step at a time.

10  A.  Sorry.  I am sorry.

11  Q.  Okay.  Did you indicate, yes or no, whether Centerbridge

12  was going to move forward with the transaction?

13  A.  I told them they would not move forward.

14  Q.  Okay.  You told Shearman & Sterling that they would not --

15  that Centerbridge would not move forward?

16  A.  Correct.

17  Q.  And did you discuss anything else not related to

18  Centerbridge with Shearman & Sterling's lawyer in the

19  conversation that Thursday morning?

20  A.  Yes, I did.

21  Q.  What did you discuss?

22  A.  I told them that I had decided, however, I would be

23  willing to move forward and pay a million dollars for the

24  company.

25  Q.  All right.

A.  Not for the company, for the stock and the debt.

Q.  Okay.  What factors did you have in your mind, and I don't want you to tell about what other people told you, I want to know what was in your mind to formulate that $1 million figure, and try and to be succinct.

A.  A week of analyzing it from only public documents that I was able to have and basically, I would say looking at it a company in a black box, you know, not knowing, from public documents you can't tell everything about a company.  That's just not possible.

Q.  What factors about the company did you consider in reaching your million-dollar price?

A.  Well, the first factors were if you look at page 10 of their 10-K, if you go from page, I think, 17 to 28, I mean, they list huge business factors.  I mean, just from, you know, that they had not been making money on their games to, you know, it's just a whole litany of things.  And another thing that I took into consideration is the corporate restrictive provisions that were outlined in the 10-K that said that, basically, even if I bought the company and bought -- not the company, I keep saying the company.  If I bought Mr. -- the stock and the bonds, I couldn't really do anything from a control point of view or make any changes to the company, even if I wanted to, because of the provisions in the document that wouldn't let you do that until June of 2009, so therefore you

1  could buy a company but really not have any legal rights to

2  make any changes until June of 2009, so it's seven or eight

3  months later.

4  Q.  Did you consider at all the intellectual property of the

5  company?

6  A.  I did.

7  Q.  What did you consider?

8  A.  Well, I viewed that the most important thing, other than

9  probably the people because I actually think people make

10  companies, is the -- was what value would there be in the

11  intellectual property.  But again, at that stage, I had no

12  information as to, you know, what means and what encumbrances,

13  or all of that, those things that you would normally do on due

14  diligence.  If you buy this intellectual property and then it

15  turns out that they assigned it to somebody else or sold it or

16  whatever, then you would be buying nothing.

17  Q.  So that's Thursday, what was the reaction from the

18  Shearman & Sterling attorneys?

19  A.  They said, well basically, like something like interesting

20  and then they did typical lawyer thing and they just said

21  okay, we'll -- but took in the information.  They basically

22  took in the information and didn't respond really one way or

23  the other.

24  Q.  Okay.  And what did you do next?

25  A.  Well, what I did next was thought about law firms.  If

1   they hadn't said no, then at least I wanted to be prepared if

2   they said let's proceed ahead, so I would be prepared.

3   Q.  Okay.  And what did -- did you proceed ahead?

4   A.  On Friday, I did.  Yeah, on Friday --

5   Q.  Did you proceed ahead?

6   A.  Yes, I did.  Sorry.

7   Q.  Okay.  When did you do your next thing relating to Midway?

8   A.  Friday.

9   Q.  Okay.  What did you do?

10  A.  On Friday, I interviewed two law firms.  I interviewed a

11  law firm, Emanuel Quinn, a big New York law firm, and I

12  interviewed Kramer Levin.

13  Q.  Okay.  Did you do anything else on Friday?

14  A.  On Friday I also spoke to my Massachusetts lawyer, Steven

15  Graham, who helps my -- it's one of my family's lawyers who

16  helps with all kinds of things, including some estate planning

17  and had a discussion with him about --

18  Q.  I'm not asking you --

19  A.  Oh, okay.

20  Q.  -- to get into the substance of your conversation with

21  your lawyer.

22  A.  Okay.  Sorry.

23  Q.  I'm just instructing you, don't --

24  A.  Okay.

25  Q.  -- discuss what your lawyer -- what you discussed --

1   A.   Right.  I'm sorry.

2   Q.   -- between your lawyers.

3   A.   I'm sorry.

4   Q.   Okay.  Now, with regard to your conversation with your

5   Massachusetts lawyer, --

6   A.   Yes.

7   Q.   -- did you retain him to do any work with regard to your

8   house?

9   A.   Yes.

10  Q.   Okay.  And so -- and you interviewed two law firms that

11  day.  Did you do anything else, vis a vis, the Midway

12  transaction?

13  A.   No.

14  Q.   Did you -- what did you think the odds were that you would

15  actually be able to conclude the Midway transaction that

16  Friday?

17  A.   I'd say less then 10 percent.

18  Q.   And what was the basis of your belief?

19  A.   Well, I made an offer for a million dollars for this

20  company and I actually thought they would say, well, go back

21  to Concord but -- so I -- and I didn't hear anything but since

22  they didn't say go back to Concord, I thought well, maybe

23  there's a shot.  But I thought -- because I also believed at

24  this time, that there was other people in the process because

25  remember, the first conversation was a list of people and

1  firms.

2  Q.  Can you remind me what you meant by that, the list?

3  A.  That they were contacting -- they said to me on the first

4  phone call that there was a list of people they going to

5  call so my assumption is, is that I wasn't the only person

6  they were calling nor the only person they were talking to.

7  Q.  Okay.  And when you say they, you mean Shearman &

8  Sterling?

9  A.  Shearman & Sterling.

10  Q.  Okay.  And did you ultimately retain counsel to help you

11  in the Midway transaction?

12  A.  Yes, I did.  I did on Sunday.  I called Peter Abruzzese, a

13  lawyer that's one of the top 100 intellectual property lawyers

14  in the country, and is also a lawyer that was my intellectual

15  property lawyer at ITT.

16  Q.  Okay.  Does he --

17  A.  And then --

18  Q.  What firm is he with?

19  A.  He's with Kramer Levin.

20  Q.  Okay.  And did you indicate to him, and I just need a yes

21  or no, whether you were going to retain Kramer Levin?

22  A.  Yes.

23  Q.  Okay.  And did you start -- what is the next thing that

24  happened with regard to the Midway transaction?

25  A.  On the Midway transaction Kramer Levin, Peter organized a

1  team of lawyers of all different skill sets, obviously he had

2  the intellectual property skills, but a whole corporate

3  lawyer, deal lawyers, all the distress debt lawyers, and so we

4  had a team of lawyers that he headed in his office, arranged

5  to meet me like first thing Monday morning.

6  Q.  Okay.  And did you meet with them?  Just yes or no.

7  A.  Yes, I did.

8  Q.  Okay.  Did you have any conversations with anyone from

9  NAI, representing NAI on Monday?

10  A.  No.  Oh, anybody representing NAI?

11  Q.  Okay.  Did you speak with anyone from NAI on Monday?

12  A.  No.

13  Q.  Did you speak to anyone representing NAI on the Monday

14  before Thanksgiving?

15  A.  Yes.

16  Q.  Who'd you speak to?

17  A.  Shearman & Sterling lawyer, Scott Petepiece.

18  Q.  Okay.  What did you say to him and what did he say to you

19  in that Monday conversation?

20  A.  I said to him, I changed my mind.  I'm not willing to pay

21  a million dollars for this opportunity.  I'm willing to pay

22  $100,000 for this opportunity because I still feel very

23  uncomfortable about if I buy these assets, are they really

24  going to be worth anything.

25  Q.  Okay.  And what did he say to you in return?

Thomas - Direct

1  A.  He said, well, I think you should keep working and then

2  the lawyers, and that's all he said, keep working and the

3  lawyers took it from there.

4  Q.  Okay.  What factors caused you to go from a million

5  dollars to $100,000 in your offer?  And I'm not -- please

6  don't repeat anything anyone told to you.  I want to know what

7  was in your head; what were the things that got it from a

8  million dollars to $100,000?

9  A.  Concerns that were raised about the intellectual property

10  and unknown factors that I didn't know about the business of

11  the company of what would not be disclosed publicly.  In other

12  words, yeah, that's probably the best way to describe it.

13  Q.  Now, did you hear back from Shearman & Sterling?

14  A.  I personally did not hear back from Shearman & Sterling.

15  Q.  Okay.  Did you meet with Shearman & Sterling anytime later

16  that week?

17  A.  Yes.

18  Q.  Okay.  And when was that?

19  A.  Well, there was a meeting scheduled at Shearman & Sterling

20  on Wednesday, the day before Thanksgiving at 10 o'clock in the

21  morning and at that -- 10 o'clock in the morning.

22  Q.  Okay.  10 o'clock.  Now, on the Tuesday before that

23  Wednesday meeting, did you transfer your interest in your

24  house in Concord to your wife?

25  A.  Yes.

Thomas - Direct

1    Q.  Okay.  And I believe you said your lawyer in Massachusetts

2    had -- you had retained your lawyer in Massachusetts to do

3    that transaction?

4    A.  Correct.

5    Q.  Did you retain any other lawyers to do that transaction?

6    A.  No.

7    Q.  During Monday, Tuesday and Wednesday of that week, were,

8    excuse me, were Acquisition Holdings Subsidiary I, LLC and the

9    other SPC you mentioned, were those formed during those days?

10   A.  Correct.

11   Q.  Did those single purpose entities ever have any interest

12   in your home?

13   A.  No.

14   Q.  Have you used special purpose entities in any other

15   transaction in your career?

16   A.  I've used special purpose entities in every transaction in

17   my career.  Every time you buy an asset you put it in a

18   special purpose entity.

19   Q.  And why do you that?

20   A.  Because you want to lock that as an entity.

21   Q.  Okay.  And are those special purpose entities something

22   you're very familiar with through your work?

23   A.  I've dealt with hundreds of special purpose entities.

24   Q.  Now, let's turn to the Wednesday meeting.  Wednesday

25   morning 10 a.m. before Thanksgiving, that's when you met with

1  Shearman & Sterling?

2  A.   Correct.

3  Q.   And that morning when you went to Shearman & Sterling, did

4  you know whether or not the deal was going to close?

5  A.   Absolutely not.  I thought -- I didn't think that the deal

6  was going to close; that's the short answer.

7  Q.   And during the course of the day, did that change?

8  A.   I didn't think the deal was going to happen until about 9

9  o'clock on Wednesday evening and, in fact, they said they were

10  going to go make a call to talk to their Board and I thought

11  well, maybe it is going to happen, but then they stayed away

12  for a significant period of time and so I was actually telling

13  the lawyers I think that well, you know, I've spent all this

14  money and I don't think we're going to get this deal.

15  Q.   Now, just going back to the Tuesday transaction, had you

16  consulted -- had you sought advice prior -- well, first of

17  all, why did you transfer the home to your wife?

18  A.   For estate planning purposes.

19  Q.   Had you discussed estate planning issues with your wife

20  before the Friday you called your Massachusetts lawyer?

21  A.   Yeah.  We've been really focused on this, as I said

22  earlier, since there's been a change in my daughter's

23  situation.  We've been very focused on updating our wills and

24  trusts for her and how we proceed.

25  Q.   So going back to the Wednesday, how late did that meeting

1  go?

2  A.  That meeting went until about midnight the night before

3  Thanksgiving.

4  Q.  Okay.  And when you left the midnight before Thanksgiving,

5  did you think you had a deal?

6  A.  I believed that we would get the deal because the lawyers

7  advised me that they just had a little things to work out but

8  I was extremely nervous.  In my career, there -- I hate to

9  tell you how many times I've been in this exact situation and

10  didn't get the deal so I was plenty nervous through all day

11  Friday.

12  Q.  And during Wednesday, Thursday and Friday, were there any

13  other discussions with Shearman & Sterling or anyone from NAI

14  or representing NAI about the price?

15  A.  You mean with me?

16  Q.  Yeah.

17  A.  No.

18  Q.  So when did the transaction close?

19  A.  Well, we closed Friday but it was pretty scary because,

20  again, I was very worried that until it closed it closed.

21  Again, that's a, I mean, a deal person that's their thing.

22  But unfortunately they had the thing in Mumbai where everybody

23  was shot up at the hotel, so everybody got mixed up and

24  they're all, back off because of J.P. Morgan, which is my

25  private bank, J.P. Morgan, and Sumner Redstone's J.P. Morgan,

1  but his was part of Bear Sterns and J.P. Morgan.  So we were

2  very concerned and they at the -- late at night they got

3  figured out that they actually -- all the transfers had

4  happened.

5  Q.  So after the transaction happens, you own the stock in

6  Midway and you own the debt.  Right?

7  A.  Correct.

8  Q.  Well, first of all, let me ask you this.  Have you

9  received any money with regard to the interest you have in the

10 Midway debt?

11 A.  Yes.  I've received approximately $300,000.

12 Q.  Okay.  And did you have any concerns about disclosing who

13 you were or talking publicly about the transaction?

14 A.  Yes.

15 Q.  What were your concerns?

16 A.  One is because I was a passive investor, the last thing I

17 wanted to do is say something in the press or say something to

18 anybody in management that could be construed as interfering

19 with their operations because I had decided that absolutely I

20 was going to be just strictly a passive investor.  So you have

21 to be very careful when you're in that situation because you

22 say things and they get completely misconstrued and then, you

23 know, you have problems.

24 Q.  What are your hopes for the company?

25 A.  At that time my hope was, and is because during those

1  meetings it became clear to me that time was such of the

2  essence that they would not let -- did not have time to wait

3  for what we call, what I call, a strategic buyer, which would

4  be to do the due diligence, like an Activision or a Take-Two

5  or Electronic Arts that would be -- or a Warner Brothers, they

6  just couldn't move that fast, and so my hope was, because then

7  I could hold it for that period of time while Lazard was

8  looking for strategic alternatives that could find somebody

9  and we could a structured workout for the company.  That was

10 my hope, well, at that time; was that we could find -- give

11 the strategic people time to get through the process so that

12 the company could continue on on that path.

13 Q.  And you used in your last answer the word, passive

14 investor.  What's a passive investor?

15 A.  A passive investor is one who does not get involved in

16 management and just is basically holding the stock and holding

17 the debt.  And that was all I did.

18 Q.  And now, at this point in the transaction, what is it that

19 you want out of the transaction?

20 A.  Well, now the stock has obviously been delisted so there's

21 nothing out of that, and then I want to get what I -- the

22 secured -- what the contract says my secured debt is worth.

23 And if there happens to be money out of the -- that goes to

24 the unsecured debt, that I get my portion of the unsecured

25 debt.

1   Q.  I see.  And during the negotiation of Cash Collateral

2   Order, prior to the filing of the bankruptcy claim here, did

3   you have any personal concerns or interests in the Cash

4   Collateral Order?

5   A.  Well, yeah.  And, again, I'm not an expert.  This is my

6   first bankruptcy so I'm not an expert at bankruptcy so --

7   Q.  And I'm not suggesting you are.

8   A.  Okay.

9   Q.  But what was on your mind?

10  A.  Well, the concept I understood is that my security

11  interest controlled the cash of the company and my concern was

12  that that cash was being depleted very quickly.  So one of my

13  concerns as a business person always is, okay, let's have a

14  proper budget and, you know, hold management responsible to a

15  budget.  That's what a business person does.  So that was one

16  piece of my concern.

17  Q.  And since the entry of the interim Cash Collateral Order,

18  has the company come to you through your advisers to ask for

19  changes to the budget?

20  A.  Yes.  I believe they have.

21  Q.  And have you agreed to them?

22  A.  I believe I've agreed to all of them.  I --

23  Q.  Do you have something else?

24  A.  I have one more thing that's really important to me and

25  is, is the employees.  I mean you can't run a company without

1  keeping the employees happy so -- and, you know, I've been

2  through this with all the companies I'm involved, you have to

3  make sure that you keep the employees motivated and you keep

4  the employees working the best you can in an extremely

5  difficult situation because if you lose your employees, then

6  really all that's left of this company is you can sell the

7  franchise rights, which is not nearly as valuable to me or to

8  the unsecured creditors.  The most value to this company is if

9  the employees keep doing their jobs and we find a buyer that

10  can continue on this operation.

11         MR. HARKNESS:  May I have one moment, Your Honor?

12         THE COURT:  Yes, sir.

13     (Pause in proceedings.)

14         MR. HARKNESS:  I'll pass the witness, Your Honor.

15         THE COURT:  All right.  Thank you, Mr. Harkness.

16  Mr. Caponi?

17         MR. CAPONI:  Yes, Your Honor.  Again, this is Steve

18  Caponi for the record.  At this time the Debtor would have no

19  questions for Mr. Thomas and I'll turn it over to Ms. Dakin-

20  Grimm.

21         THE COURT:  All right.  Thank you.  Ms. Dakin-Grimm,

22  when you're ready proceed.  Take your time.

23         MS. DAKIN-GRIMM:  Thank you.

24         THE COURT:  Mr. Thomas, if you need a break at some

25  point, let me know.

1       THE WITNESS:  Okay.

2       MS. DAKIN-GRIMM:  I'm ready, Your Honor.

3       THE COURT:  All right.

4       MS. DAKIN-GRIMM:  Okay.

5                   CROSS-EXAMINATION

6   BY MS. DAKIN-GRIMM:

7   Q.  Good afternoon, sir.

8   A.  Hi.

9   Q.  I know we met at your deposition.

10  A.  Yes.

11  Q.  All right.  Let's start with your CV, which is Exhibit 20

12  in the binders that are behind you, you're going to have to

13  switch documents.  I'm working off the ones we used in your

14  deposition and it should be in two binders behind you.  Is

15  that right?  Okay.  Yeah, those two binders.

16      (Exhibit 20 previously marked for identification.)

17  BY MS. DAKIN-GRIMM:

18  Q.  Okay.  Exhibit 20 is the CV that your counsel showed you,

19  is it not?

20  A.  Yes, it is.

21  Q.  And you prepared this CV expressly for the Court's viewing

22  after the first-day hearings at which some of the things that

23  your side had proposed for the Cash Collateral Order were

24  rejected.  Right?

25  A.  No.  That was not the purpose of why I prepared the CV.

1  Q.  Listen to my question, sir.  This CV was not prepared

2  until after the first-day hearings in the case.  Correct?

3  A.  That's correct.

4  Q.  Right.  And looking within the document, you claimed to

5  have been a deal lawyer for 14 years.  Right?

6  A.  Approximately 14; 1980 to approximately 1993-94.

7  Q.  Okay.  And you were never in private practice.  Right?

8  A.  Correct.

9  Q.  You were doing deals for ITT.  Right?  Not for your own

10  benefit, like this deal that you're here trying to defend.

11  You were working for ITT.  Correct, sir?

12  A.  Correct.  That was one of the companies I've worked for.

13  Q.  Okay.  And you don't have any experience in the video

14  gaming industry, do you?

15  A.  No.  I have no experience in the video gaming industry.

16  Q.  Okay.  And I think counsel brought to the floor the issue

17  that these entities that are all over the papers, like MT

18  Acquisitions and Acquisition Holdings, they didn't exist

19  before you got the idea of buying this entity.  Right?

20  A.  These are single purpose entities for the purpose of this

21  transaction.

22  Q.  And if you could look at Exhibit 99 in the binders there

23  in front of you?

24  A.  Is the one that you're referring to is UCC Exhibit 99?

25       (Exhibit 99 previously marked for identification.)

1  BY MS. DAKIN-GRIMM:

2  Q.  It is, yes.  It should be yes.  The third page in of the

3  document you'll see is a Rule 13D-101 document.  Do you see

4  that?

5  A.  Yes.

6  Q.  Okay.  And this purports to be concerning Acquisition

7  Holdings Subsidiary, LLC and the name of the entity for

8  contact information is Peter Kolevzon at Kramer Levin.  This

9  is the 13D for your formation of Acquisition Holdings, is it

10  not, sir?

11  A.  This is -- I'll have to take a minute to look at it.  Yes.

12  Q.  Okay.

13  A.  It appears to be.  It appears to be.  It was prepared by,

14  like you said, Kramer Levin for me.

15  Q.  Right.  They're the lawyers that you hired to help you in

16  this deal.  Right?

17  A.  Correct.

18  Q.  Look within the document at Bates page 1049.  The second

19  paragraph under Identity and Background says, "Acquisition

20  Holdings is a Delaware limited liability company."  It goes on

21  saying that its principle business is investing in and owning

22  all of National Amusements right, title and interest, and then

23  it describes what you claim to have purchased here.  Correct?

24  A.  If you're referring to what's stated in the second

25  paragraph, that is correct.

Thomas - Cross

1   Q.  Okay.  And the address of the principle business and

2   principle office is just your lawyers office.  Right?

3   A.  Correct.

4   Q.  Okay.  You have no employees at Acquisition Holdings.

5   A.  No.

6   Q.  You have no employees at MT Acquisition.

7   A.  No.

8   Q.  These are just paper companies formed for purposes of

9   insulating you from liability in connection with this

10  transaction, isn't that true, sir?

11  A.  No.  They're single purpose entities that are used for

12  transactions like this.

13  Q.  Isn't it true, sir, that Estabrook Partners, the other

14  entity on your CV that you formed in 2007 also has no

15  employees?  It's just you working out of your home.

16  A.  It's me working out of my home office.  That is correct.

17  Q.  Okay.  Now, looking a little bit further down on your CV,

18  you mentioned that you were a partner in Georgetown Partners,

19  LLC.  Do you see that?

20  A.  Where are --

21  Q.  I'm on your CV now, it's Exhibit 20.

22  A.  I'll have to go back to that.  Yes.

23  Q.  And you state that you are a 48 percent owner of that

24  private equity firm.  That was the minority participation, was

25  it not?

1    A.  Yes.

2    Q.  And the majority shareholder was an African-American

3    business man?

4    A.  Correct.

5    Q.  And the deals that you describe here in this paragraph are

6    deals that you were able to acquire because of his status as

7    an African American, right; minority owned business deal.

8    A.  Yes, that's correct.

9    Q.  But you're not a minority, are you sir?

10   A.  No.  I don't think so.

11   Q.  Okay.  And you ended that relationship in 2007 and then

12   struck out on your own.

13   A.  Correct.

14   Q.  Okay.  Now, if you could look at the declaration that you

15   filed in this case after the first-day hearing, which is

16   Exhibit 21 in the binder.

17   A.  Yes.

18       (Exhibit 21 previously marked for identification.)

19   BY MS. DAKIN-GRIMM:

20   Q.  Okay.  This document is dated March 4 of 2009 and I'll

21   represent to you, sir that there was no pleading or

22   declaration due from you on that date.  You chose to file this

23   declaration voluntarily, didn't you?

24   A.  Yes, I did.

25   Q.  Okay.  And if you look at the last page, you say, "A true

1  and correct copy of my most current CV is attached to this

2  declaration as Exhibit A."  And on the first line you purport

3  to be filing the document under penalty of perjury.  You were

4  aware of those representations when you created this

5  declaration, weren't you sir?

6  A.  Yes.  And I took completing this declaration very

7  seriously as I did preparing my CV.

8  Q.  Right.  Because you knew you were presenting information

9  to the Court in a very serious proceeding.  Right?

10  A.  Correct.

11  Q.  And you understood the penalty of perjury, right?  You're

12  a lawyer.

13  A.  Correct.

14  Q.  So you didn't put together the financial information in

15  this document in some slipshod or approximating kind of way.

16  Did you sir?

17  A.  Yes, I did.

18  Q.  Oh, you did.  You did it in a slipshod way?

19  A.  No.  I did it in an approximating way.

20  Q.  Okay.  Well, let's be more specific.  You didn't just

21  guess, did you?

22  A.  No.  I keep track of how much my family's net worth is; my

23  net worth is the way I've explained previously.

24  Q.  And you were intending that the Court would read this

25  declaration and rely on it, were you not?

Thomas - Cross

1  A.  Yes.

2  Q.  Okay.  Now, let's look at paragraph 4 of the declaration.

3  You start out by referring to MT Acquisition and Estabrook

4  Partners and AHS and you're the sole member, sole managing

5  director, all of those entities are just you.  Right?  There's

6  nobody other than you.

7  A.  Yes.  That is correct.

8  Q.  Okay.

9  A.  One hundred percent correct.

10  Q.  And you say you reside in Concord, Mass. and you say, "My

11  net worth exceeds 10 million and I have no debt."  And you

12  understood when you wrote this, that those were serious

13  representations that you intended this Court to rely on.

14  Right?

15  A.  Yes.  And as I've said earlier today, I actually think my

16  net worth is around 20 million.  The way I look at what my net

17  worth is and the way my wife looks at our assets.

18  Q.  Sir, when you provided this declaration, you intended it

19  to include what you believed to be the value of your house,

20  did you not?

21  A.  I included it, as I said earlier, in my view --

22  Q.  Sir, it's a yes or no question.  Did you include the value

23  of your house?

24  A.  Yes.

25  Q.  All right.  And in your view your house, which you like to

1  refer to as an estate, is worth $12.5 million.  Right?

2  A.  Correct.

3  Q.  Okay.  And based on everything that you have in your mind

4  about your net worth, including the 12 and a half million-

5  dollar estate, you believe that your personal net worth is $20

6  million.  Right?

7  A.  Correct.

8  Q.  And you so testified under penalty of perjury in your

9  deposition, too.

10 A.  Correct.

11 Q.  And you understood that that deposition was a serious

12 proceeding, too.  Correct?

13 A.  Correct.  And I explained --

14 Q.  And you had --

15 A.  -- in that deposition about how I viewed that.

16 Q.  You had an opportunity before the deposition if you had

17 any doubts about what you had said in your declaration, to go

18 back and review your records to make sure that you gave true

19 testimony under penalty of perjury.  Right, sir?

20 A.  Correct.

21 Q.  All right.  Okay.  And isn't it true, sir, that you

22 believe you have 2 million in stuff, you know, personal

23 things, your furniture and your cars and things like that?

24 A.  And artwork and stuff.

25 Q.  And artwork.  And 5 to 6 million in cash and securities.

1  Right?

2  A.  Five to six million in cash and securities, yes.  As I --

3  Q.  Okay.  But of --

4  A.  -- said earlier, it's 5 to $6 million in cash and

5  securities my family has.

6  Q.  No.  I'm asking you, sir.  You say my net worth exceeds 10

7  million and I asked you questions in your deposition about

8  you.  Your testimony is that you have 5 to 6 million in cash

9  and securities.  Right?

10  A.  The way I interpret that, yes.  I have 5 to 6 million in

11  cash and securities.

12  Q.  And of that 5 to 6 million in cash and securities, about

13  two and a half million of it is actually cash.  Right?

14  A.  I would say probably two -- I said I think two, two and a

15  half is cash, yes.

16  Q.  Okay.  And the rest of it is securities.  Right?

17  A.  Correct.

18  Q.  And some of the securities are in retirement accounts.

19  A.  Yes, some of them.

20  Q.  Right.  And that would require you to experience some kind

21  of penalty were you to try and access those --

22  A.  Yes.

23  Q.  -- accounts.

24  A.  Yes, I think so.  I assume so.

25  Q.  Right.  Now, between the time of your declaration and the

1  deposition, you reviewed your records but you didn't produce
2  them to us, your financial records, did you?
3  A.  No.
4  Q.  So all we have to go on is this piece of paper and what
5  you say.  You haven't given us the actual statements to
6  determine, for example, whether your house really is worth 12
7  and a half million or whether you really have the money you
8  testified you have.  Right?  Just your word.
9  A.  Well, yes.  That's correct.
10 Q.  Okay.  Now, you testified that on November 25th you were
11 having meetings with your lawyers concerning this transaction.
12 Right?
13 A.  What day of the week is November 25th?
14 Q.  Well, I think you testified that November 29th was Friday.
15 A.  Okay.  So that would be -- you got me so is it the front
16 Monday?
17 Q.  Yes.
18 A.  Okay.
19 Q.  It's true, isn't it?  You were having meetings with your
20 lawyers?
21 A.  On Monday?
22 Q.  Yes.
23 A.  November 21st before Thanksgiving.
24 Q.  Meetings with the lawyers concerning this transaction.
25 A.  Kramer --

1  Q.  You were involved in this transaction.

2  A.  Kramer Levin lawyers on Monday, November 25th.  Yes, I had

3  those meetings.

4  Q.  Okay.  Now, could you turn to Exhibit 27?

5      (Exhibit 27 previously marked for identification.)

6  BY MS. DAKIN-GRIMM:

7  Q.  Exhibit 27 is an exchange of e-mails between your lawyer,

8  Peter Kolevzon at Kramer Levin and Daniel Litowitz and Gordon

9  Novod, two attorneys at Kramer Levin.  I'm sorry, one attorney

10  at Kramer Levin and one attorney at Shearman Sterling.  Right?

11  Peter Kolevzon is your attorney, is he not, sir?

12  A.  Yes, he is.

13  Q.  Daniel Litowitz is at Sterling.  Right?

14  A.  Correct.

15  Q.  Gordon Novod is the bankruptcy attorney that was brought

16  on to your team when you retained Kramer Levin, is he not?

17  A.  He's one of the bankruptcy's attorneys.

18  Q.  Okay.

19  A.  Yes.

20  Q.  And this e-mail from your lawyer to Shearman & Sterling

21  states, and I'm going to start reading four lines from the

22  bottom, "In addition, the purchaser," that would be you.

23  Right?

24  A.  I'd make an assumption that they're referring to me.

25  Q.  "The purchaser should have the benefit of an expressed

1  indemnity for its costs and expenses in defending any third

2  party claim for corporate waste, fraudulent conveyance or the

3  like, and any damages it is required to pay in connection with

4  any such claim."  And your lawyers were acting with your

5  authority in communicating this to Shearman & Sterling, were

6  they not?

7  A.  That my lawyers were given full authority to negotiate

8  everything about this transaction.

9  Q.  Okay.  And isn't it true, sir, that on November 25th you

10  were worried, gee, if I go through with this transaction that

11  the Centerbridge guys didn't go through with, I might get hit

12  with a lawsuit for corporate waste, fraudulent conveyance or

13  the like and suffer damages, so --

14  A.  That's --

15  Q.  -- I better ask the Redstone's for an indemnity.

16  A.  I -- that is so false that I don't even know how to

17  respond.

18  Q.  So you don't know why your lawyers so communicated to

19  Shearman & Sterling?

20  A.  Absolutely not.

21  Q.  Okay.  They --

22  A.  They -- my lawyers --

23  Q.  But I'm not asking you to tell you (sic) what your lawyer

24  said, sir.  I think you'll be instructed not to do that.

25      Now, the very next day, after your lawyers wrote to

1  Shearman & Sterling about corporate waste, you transferred

2  your house to your wife.  Right?  The 26th.

3  A.  That's correct.

4  Q.  And you did that in the offices of Kramer Levin.  Correct?

5  A.  Correct.

6  Q.  Hold on a minute and I'll show that document.  Could you

7  turn to Exhibit 22, please?

8  A.  Okay.

9     (Exhibit 22 previously marked for identification.)

10  BY MS. DAKIN-GRIMM:

11  Q.  Exhibit 22 is a document we obtained from the South

12  Middlesex County Registry of Deeds that shows that on November

13  26th, 2008 you, grantor, Thomas Mark Evan, I believe that means

14  Mark Evan Thomas, and the grant, Thomas Marcia Morris,

15  transferred to Thomas Marcia Morris.  Correct?

16  A.  Correct.

17  Q.  Okay.  And then the deed is attached.

18  A.  Yes.

19  Q.  And if you'll turn to the last page, you signed that in

20  the offices of Kramer Levin in New York.  Right?

21  A.  Correct because that's where my wife -- my wife came to

22  New York for Thanksgiving.

23  Q.  You were in New York there.

24  A.  That we were in New York.

25  Q.  Right.  And you were working on this deal.  Right?

Thomas - Cross

1   A.  I was working on this deal.

2   Q.  Right.

3   A.  And actually another deal, too but I was working --

4   Q.  And, sir, you would agree that the value of your estate is

5   not measured by the less than $100 amount that's referenced on

6   Exhibit 22.  Right?

7   A.  I'm sorry?

8   Q.  You don't think that the value of your estate is $100, the

9   amount that you -- that is listed on this document, do you?

10  A.  No.  It's -- the $100 is like you used to put a dollar in

11  whatever and do (indiscernible) consideration in a document.

12  Q.  Well, did you actually get a $100 from your wife or was

13  this just a sham?

14  A.  No, it wasn't.  I got the $100.

15  Q.  Wasn't it a dollar actually, sir, that she gave you for

16  this deal?

17  A.  I don't know how much she gave me for this deal.

18  Q.  You don't remember?

19  A.  A hundred dollars, no.

20  Q.  You don't remember any actual any money changing hands?

21  A.  Our money changes hands every day.

22  Q.  Yeah, okay.  And you did this transfer, in your words, to

23  protect your family and their assets.  Right?

24  A.  Well, I think what I've said is, is that I did this

25  transaction as part of estate planning for my family.

1  Q.  Let's look at what you said in your deposition, sir.  This

2  is Clip Number 14 at page 20, lines 13 through 24.

3      (Video deposition excerpt played from 4:49 p.m. to 4:50

4  p.m.)

5  BY MS. DAKIN-GRIMM:

6  Q.  That was true testimony when you gave it, sir.

7  A.  Yes.  And I --

8  Q.  And you meant by that, protect at the assets, that you

9  wanted to put the assets out of reach of people that might sue

10  you in a lawsuit.  Right?

11  A.  The answer to the question is, is no.  I was worried about

12  my family's estates.

13  Q.  And --

14  A.  Estate planning based on --

15  Q.  Sir --

16  A.  -- conversations I had with my lawyers in Massachusetts.

17  Q.  I'm not asking you about your communications with your

18  lawyers, sir.

19  A.  Okay.

20  Q.  You transferred the house to your wife in an attempt to

21  protect the asset from being subject to creditors that might

22  sue you in a lawsuit.  Right?

23  A.  That actually is not correct why I made those decisions.

24  My decisions were made for the protection of my family's

25  estate.

1  Q.  How did it protect your family's estate to put the house

2  in your wife's name, sir?

3  A.  Well, it was part of my estate planning.

4  Q.  How did it protect your assets to put the house in your

5  wife's name?

6  A.  You said you didn't want me to go into what I talked about

7  with my lawyers so I'm not going to.  I did this --

8  Q.  I don't want to know --

9  A.  -- since -- I did this --

10  Q.  -- your lawyers testimony --

11  A.  -- I did --

12  Q.  Sir, I want to know why you think it --

13  A.  -- I did estate --

14  Q.  Please, one at a time.

15  A.  Okay.

16  Q.  I wanted to know, sir, why you think transferring your

17  house to your wife, while you're in Kramer Levin's offices,

18  the day after your counsel writes to Shearman & Sterling about

19  claims of corporate waste and fraudulent transfer, protects

20  the assets?

21          MR. HARKNESS:  I'm going to object to the extent

22  that the answer calls for attorney/client communication.

23          THE COURT:  Yes.  I don't know that it does, but to

24  the extent that it does, of course, Mr. Thomas does not have

25  to answer but --

1          THE WITNESS:  Everything that I have done is based

2     on, with my estate planning in Massachusetts, had to do with

3     advice that I received from my family lawyer about estate

4     planning, and so that's what I did.

5     BY MS. DAKIN-GRIMM:

6     Q.   So isn't it true, sir, that you don't have an estate

7     planning lawyer?

8     A.   That's not, well, that's not true.  When you asked --

9     Q.   Let's look at what you said in your deposition, sir.

10    A.   Well, let me finish if you --

11         MR. HARKNESS:  Objection, Your Honor.  It doesn't --

12    BY MS. DAKIN-GRIMM:

13    Q.   Is it true or not, sir --

14         MR. HARKNESS:  I object.  The witness was in the

15    middle of answering the question.

16         THE COURT:  All right.  Let's --

17         MR. HARKNESS:  He was interrupted.

18         THE COURT:  We'll give him a chance to answer before

19    you --

20         THE WITNESS:  My --

21         THE COURT:   -- go to the deposition.

22         THE WITNESS:  When my wife and I recently did the

23    wills and trusts, we had an estate planning, quote, estate

24    planning lawyer expert -- 100 percent expert lawyer, that's

25    all he did, estate planning, at Hale & Dorr of what's now,

1  Wilmer & Hale.  He had retired so we had been working with a

2  lawyer that's not, like, not a 100 percent estate planning,

3  not 100 percent bankruptcy or 100 percent this, so when you

4  said to me, you have an estate planning lawyer, I didn't -- I

5  don't have a lawyer that's all that lawyer does, just like --

6  but normally that's how I think of specialists and lawyers,

7  but I had this lawyer, my family lawyer's been working with,

8  work with me on estate planning, including -- but for the last

9  several years.

10  BY MS. DAKIN-GRIMM:

11  Q.  Let's play Clip 56 from Mr. Thomas's deposition at page

12  82, line 7 through 15.

13      (Video deposition excerpt played from 4:53 p.m. to 4:54

14  p.m.)

15  BY MS. DAKIN-GRIMM:

16  Q.  And isn't it true, Mr. Thomas, that the purpose of

17  transferring your house to your wife was an attempt to get it

18  out of the hands of your creditors?

19  A.  No.

20  Q.  Okay.  And you can't explain the purpose, in your own

21  words, without revealing what lawyers told you?  Is that your

22  position?

23  A.  That's my position.  Yes.

24  Q.  Okay.  As a lawyer and somebody who purports to be an

25  expert in M and A transactions and a sophisticated business

Thomas - Cross

1  person, can you think of a reason for transferring an asset

2  out of your own hands and into somebody else's, other than to

3  keep it out of the hands of your creditors, sir?

4  A.  No.  Personally, I couldn't think of a reason.  I, but I,

5  in talking to my estate planning lawyers, they had lots of

6  reasons.

7  Q.  You just can't think of any yourself.

8  A.  I'm not an expert at estate planning.

9  Q.  Okay.  Now, I believe in your declaration, you included

10  the value of your home when you were creating the declaration.

11  Correct?

12  A.  Yes, that's correct.

13  Q.  And you wrote this declaration after you transferred the

14  home to your wife, but you didn't include that fact in the

15  declaration.  Right, sir?

16  A.  No.  I explained earlier --

17  Q.  Sir, I'm not asking for --

18  A.  Okay.

19  Q.  -- an explanation.

20  A.  I said --

21  Q.  Did you include it or not?

22  A.  Would you ask the question again?

23  Q.  Yes.  Did you include in the declaration the fact that,

24  although you were including the value in paragraph 4, you had

25  actually transferred the house to your wife previously?

1  A.  No.

2  Q.  All right.  And in your mind, your home is worth 12 and a

3  half million dollars.  Right?

4  A.  Actually, it could be worth more than 12 and a half

5  million dollars.

6  Q.  And that's because you've spent 12 and half million

7  dollars on it.  Right?

8  A.  We bought the land, built the house and we spent 12, over

9  12 and half million dollars on it.  We built -- we bought the

10  land in 2003 and built the house, open -- finished the house

11  in 2005 and we had spent about, over $12 million.

12  Q.  Okay.  And your belief that the house is still worth 12

13  and a half million dollars, not withstanding what's happened

14  to property values in every community across the U.S.,

15  including your's, is that that's how much you put into it.

16  Right?

17  A.  No.  It's actually a little different than that because it

18  was completed prior to the bubble run up in real estate in

19  2006.  In that period of time it probably was worth

20  significantly more than the amount of money we put in it, so I

21  assume -- but now has moved back down to probably what we put

22  in it, you know, somewhere in that range.

23  Q.  Okay.  Let's play Clip 16 and see what you've told me in

24  your deposition; page 22, line 13 through 18.

25      (Video deposition excerpt played from 4:57 p.m to 4:57

1    p.m.)

2    BY MS. DAKIN-GRIMM:

3    Q.  And you have had no valuation performed at the property

4    lately, have you, sir?

5    A.  You know, I made a mistake on that.

6    Q.  Sir, please answer my question.

7    A.  Yes.

8    Q.  You have had no valuation performed, --

9    A.  No.  Wrong.

10   Q.  -- have you?

11   A.  Yes, I have.

12   Q.  Let's look at Clip 15 --

13   A.  I said I --

14   Q.  -- page --

15   A.  I said it -- I had made mistake in that --

16   Q.  Page 22.  Your lawyers can redirect you, sir.

17   A.  Oh, okay.

18   Q.  Page 22, lines 2 through 9.

19       (Video deposition excerpt played from 4:57 p.m. to 4:58

20   p.m.)

21   BY MS. DAKIN-GRIMM:

22   Q.  That was true testimony when you gave it, under penalty of

23   perjury, wasn't it, sir?

24   A.  And that is the truth.  The tax record filing for this

25   house, this estate is, in Concord, Massachusetts and I just

1    got the tax bill yesterday, it's like $6,024,000 or something.

2    Q.   And are you aware, sir, of what Money Magazine says has

3    happened to property values in your community in the last

4    year?

5    A.   Yeah.  I'm not --

6    Q.   What's happened to them?

7    A.   I mean, they have dropped.

8    Q.   Significantly, no?

9    A.   Well, not like California, Arizona and that.  I mean --

10   Q.   And they're projected to drop another 7 percent in the

11   next 12 months, aren't they, sir?

12   A.   I don't know that.

13   Q.   Okay.  And I asked you at your deposition about what

14   Zillow recorded as the value of your property --

15   A.   I think --

16   Q.   -- and you weren't familiar with that.  Right?

17   A.   No.  I have no idea what that is.

18   Q.   Have you gone to look at it since your deposition?

19   A.   No.

20   Q.   And in your view, it's not possible that Zillow's price

21   range estimate for your house, 3.7 to --

22            MR. HARKNESS:  I object.

23   BY MS. DAKIN-GRIMM:

24   Q.   -- to 4.8 million is true.

25            MR. HARKNESS:  I object, Your Honor.  I object.

1  Zillow, she complained about hearsay, I mean, we're going to

2  have Wikipedia as our citation now?  I mean, this is pure

3  hearsay.

4        THE COURT:  I'll sustain that objection.

5  BY MS. DAKIN-GRIMM:

6  Q.  In your view, Mr. Thomas, you have no valuation of your

7  house from an outside entity and in your view it's simply not

8  possible that the house is worth less than 12 and a half

9  million that you paid for it.

10 A.  That's not true.  I just was telling you that I do have a

11 valuation from an outside entity and, in fact, in 2005 Chubb

12 sent an appraiser to our house in 2005.  Just for the house

13 alone, they appraised the house at no real estate, no

14 landscape, no pools, no koi ponds, no waterfalls, they valued

15 just the house at $6,250,000 in replacement cost and they've

16 now raised it to $7,580,000 -- $82,000 for replacement cost.

17 And they came with a complete appraisal, they took pictures of

18 the whole house and came up with that valuation.

19 Q.  That's less than 12, isn't it, sir?

20 A.  Well, if you add the -- that's the real estate, I mean,

21 that's the house.  They don't insure the 3 and a half million

22 dollars -- $3.2 million we paid for the land.  The, you know,

23 $3 million in landscape and the construction work, so that's

24 how you get to $12 million.

25 Q.  Well, let's make sure we're clear here.  First of all,

Thomas - Cross

1  you're admitting that what you testified to in your deposition
2  was wrong.
3  A.  Yes.
4  Q.  Right?
5  A.  It's because I had forgotten.  My wife reminded me they
6  had come and done --
7  Q.  Okay.
8  A.  -- the appraisal and that we actually have a book, a
9  hardbound book, that has on the front top page of it, Home
10 Appraisal.
11 Q.  And yet, knowing that we had delved into this, you didn't
12 produce those materials so that we can satisfy ourselves that
13 what you're telling is the truth right now, did you, sir?
14 A.  I have them here.
15 Q.  Oh, you brought them to Court today?
16 A.  I think --
17 Q.  But your lawyers didn't produce them to us.  Is that what
18 you're testifying to, sir?
19 A.  I have them.  I --
20 Q.  All right.  Well, perhaps what we'll deal with that at a
21 break.  And that your testimony is, that that amount added to
22 a $3 million 6 point something and 3, adds to 12.5?
23 A.  If you take 7.58 -- 7,582,000 you add in it 3,250,000 for
24 land cost, you add in $500,000 to build the road, the mile-
25 long road that goes to this estate, and the -- to bring all

1  the utilities, and then you add in the two and a half million

2  dollars of cost it cost to do the landscape, the hardscape

3  pools, all that, it adds up to, and in this case using their

4  evaluation, just taking everything at cost, it adds up to $14

5  million.

6  Q.  And this is what you transferred to your wife?

7          MR. HARKNESS:  Your Honor, I'd just like -- I'm

8  going to impose an objection.  I think we've already -- I

9  think we've spent more time on the value of this house than we

10  have on the value of Midway and the transactions we're here to

11  deal with, which is goes to cash collateral, I'm lost.  Other

12  than trying to show that Mr. Thomas may be a less than

13  truthful person, I think we've beaten that horse beyond

14  recognition.

15          MS. DAKIN-GRIMM:  But --

16          MR. HARKNESS:  And I think Mr. Thomas is also, at

17  the beginning of the hearings, counsel indicated that he's

18  willing to escrow all monies.  I don't see how his personal

19  net worth, value of his house, of his driveway, of his

20  landscaping, impacts on this Debtors' being able to continue

21  the use of cash collateral, therefore, maximize the value of

22  this estate and not Mr. Thomas's estate.

23          MS. DAKIN-GRIMM:  I would agree, Your Honor, that

24  perhaps this is a dead horse by now, and I do believe that it

25  reflects that Mr. Thomas is a less than truthful person.  That

1  is exactly the purpose that we're offering this testimony for.

2  And I'm particularly surprised to hear that documents were

3  withheld, testimony was given, and that Mr. Thomas thinks he's

4  going to come in and give brand new testimony today without

5  disclosing the documents, but I can move on because I think

6  the point's been established.

7          THE COURT:  Okay.  That will helpful.

8          MS. DAKIN-GRIMM:  Thank you.

9  BY MS. DAKIN-GRIMM:

10  Q.  Now, let's talk about the -- well, let's talk about the

11  transaction and how you got involved in it, sir.

12          MR. CAPONI:  I don't mean to interrupt.

13          MS. DAKIN-GRIMM:  Yes.

14          MR. CAPONI:  I don't mean to interupt but, I mean,

15  we've been going a couple of hours.  Can we take a --

16          THE COURT:  Are you ready for a break?

17          MR. CAPONI:  I personally am, but I don't want to

18  interrupt the --

19          MS. DAKIN-GRIMM:  Well, I haven't been going for a

20  couple --

21          MR. CAPONI:  -- cross-examination.

22          MS. DAKIN-GRIMM:  -- of hours, but if you'd like a

23  break, I'm happy to do that.

24          MR. CAPONI:  I --

25          THE COURT:  I'd say --

1    MR. CAPONI:  -- personally I would, but --

2    THE COURT:  -- we haven't gone for --

3    MR. CAPONI:  -- if you -- I don't want to interrupt

4  your cross --

5    THE COURT:  I think you're changing the subject.

6    MS. DAKIN-GRIMM:  I am changing horses to one that

7  hopefully is still alive.

8    THE COURT:  That this pony will ride, so we will

9  take a break.

10    MS. DAKIN-GRIMM:  Okay.

11    MR. CAPONI:  Thank you, Your Honor.

12    THE COURT:  How about 10 minutes?

13    MR. CAPONI:  That would be great, Your Honor.

14    (Recess from 5:03 p.m. to 5:20 p.m.)

15    THE CLERK:  Please rise.

16    THE COURT:  Thank you, Sherry.  Please be seated

17  everyone.  Mr. Caponi?

18    MR. CAPONI:  Yes, Your Honor.  As the honorary MC

19  for today --

20    THE COURT:  Yes.

21    MR. CAPONI:  Two issues I'd like to address with the

22  Court.

23    THE COURT:  Please.

24    MR. CAPONI:  One, is personal with myself and that

25  is around 6:30 I need to slide out of here to head to Chicago

Thomas - Cross

1  for the -- an appearance in the Northern District tomorrow

2  morning.

3          THE COURT:  All right.

4          MR. CAPONI:  Mr. DeBaecke will carry on diligently

5  without me.  I believe, hopefully, he's in a backroom

6  somewhere cutting a favorable deal for the estate.

7          THE COURT:  Good.

8          MR. CAPONI:  Which may avoid issues in the future.

9  The second issue just goes with respect to this evening.  I

10 still think at best guess, Mr. Thomas will be a while longer.

11         THE COURT:  Okay.

12         MR. CAPONI:  And then when we get into the video

13 presentations --

14         THE COURT:  Right.

15         MR. CAPONI:  -- you're still looking at probably

16 four plus hours --

17         THE COURT:  All right.

18         MR. CAPONI:  -- making it unlikely, I would think,

19 that we would conclude this evening unless, Your Honor, really

20 is enjoying himself and wants to stay until the wee hours; not

21 sure how the Court wants to handle that.  I know, obviously,

22 Monday is set for KEIP.  That may be resolved and may be a

23 possibility there, Your Honor.  Maybe you have a preference to

24 just continue this Monday.  I know you had mentioned Thursday,

25 tomorrow -- yesterday, actually I will be out of town, I

1  believe Mr. Harkness will be unable to attend as well, so not

2  working out so much for us.

3        THE COURT:  Okay.  I understand.  Well, you know I'm

4  not unaccustomed to staying late.

5        MR. CAPONI:  Yes.

6        THE COURT:  But at the same time, I also respect all

7  of you who are working harder than I am today, and I don't

8  want people to be hesitant to tell me, you know, you've had

9  enough for the day and you will come back on Monday.  But in

10  all seriousness, if -- I'm prepared to stay until the wee

11  hours of the morning if necessary.

12        MR. CAPONI:  And, Your Honor, when I'm on the plane,

13  I'm prepared to have everybody stay as well.

14        THE COURT:  Okay.

15        MR. CAPONI:  It won't bother me at all.

16        THE COURT:  I just hand Mr. Caponi --

17        MR. CAPONI:  We will just then proceed until

18  somebody throws in the towel.

19        THE COURT:  Or until you say, you know, this is a

20  good point to stop and we can continue it until another --

21  until Monday.  I --

22        MR. CAPONI:  I just wanted to --

23        THE COURT:  -- but I want counsel to know, that I am

24  here.  I'm prepared to stay.

25        MR. CAPONI:  Okay.  Great, Your Honor.  I'm sure

1   they'll apprise you of that.

2        THE COURT:  If anyone falls asleep at the lectern

3   though, that means we stop.

4        MS. DAKIN-GRIMM:  Your Honor, we're trying to see if

5   we can, in light of what's already come out with some of the

6   witnesses --

7        THE COURT:  Yes.

8        MS. DAKIN-GRIMM:  -- make edits to the video, so

9   that process is going on, and maybe we can cut it down as

10   well.

11        THE COURT:  All right.

12        MS. DAKIN-GRIMM:  It's -- once you've had one or two

13   witnesses, it can become cumulative and in a way that you

14   can't really see at the beginning, so --

15        THE COURT:  Okay.  Thank you, Ms. Dakin-Grimm.  I

16   appreciate that and -- but let's proceed.

17        MS. DAKIN-GRIMM:  Thank you.

18   BY MS. DAKIN-GRIMM:

19   Q.  Mr. Thomas, isn't it true that you will not make any kind

20   of significant cash infusion into Midway?

21   A.  That is correct.

22   Q.  You will not use any of your assets that we've been

23   discussing to contribute to Midway.  Right?

24   A.  That is correct.

25   Q.  Okay.  Now, you talked about how this transaction came to

1  you on direct examination.  You said you first heard of it on

2  Monday, November 14th.  Right?

3  A.  That is correct.

4  Q.  And you got a call from lawyers at Shearman & Sterling

5  about potentially buying Midway.  Right?

6  A.  Correct.

7  Q.  And you didn't say to them, gee, you know, I only have a

8  few million in cash.  Why would you call me about something

9  like that, did you?

10  A.  On the first call, no.

11  Q.  Okay.  And they told you that they were looking for an

12  individual who meant certain criteria, didn't they?

13  A.  Criteria or experience, yes.

14  Q.  Yeah.  And they told you that they wanted you because of

15  what they saw as your unique experiences.  Right?

16  A.  Something like that, yeah.

17  Q.  And your unique attributes, as they explained them to you,

18  were that you're an expert in M and A.  Right?

19  A.  Correct.

20  Q.  You're an attorney.  Right?

21  A.  Correct.

22  Q.  And you're all by yourself.  You can make decisions.  You

23  can do what you want, you don't have to report to a board or

24  consult with employees or anything like that.  Those were the

25  three attributes.  Correct?

1   A.  I think on the last one, you know, probably that would be

2   right.  I can move -- but I don't know if it was just because

3   of that situation, but I historically, in transactions move

4   very quickly, either to do a deal or not do a deal.

5   Q.  Okay.  And you never told the Shearman & Sterling lawyers

6   at any point, I'm, you know, I'm a man of relatively limited

7   means.  I can't buy a company like Midway, did you?

8   A.  Yes, I did.

9   Q.  Let's see what you said in your --

10  A.  It probably would be --

11  Q.  -- deposition at --

12  A.  -- but that's why I said that about -- that's why I said

13  it when I called back and asked them if I could contact

14  Centerbridge because --

15  Q.  Mr. Thomas, I don't want to hear about what Centerbridge

16  said and --

17  A.  No, no.

18  Q.  -- and didn't say to you.

19  A.  That's what I said to the Shearman & Sterling lawyers.

20  Q.  Let's see what you said on that question in your

21  deposition, Clip 35, page 47, line 10 through 15.

22      (Video deposition excerpt played from 5:25 p.m. to 5:25

23  p.m.)

24  BY MS. DAKIN-GRIMM:

25  Q.  That was true testimony, wasn't it, sir?

1    A.   Yeah.  We never talked about price.

2    Q.   Sir, yes or no.

3    A.   Yes, that's true.

4    Q.   Thank you.  And after the first call that you got from the

5    Shearman & Sterling lawyers, you spent a couple hours looking

6    up Midway on Google and you went to your Fidelity broker and

7    got their research.  Right?

8    A.   Correct.

9    Q.   Okay.  You didn't mention any other research in your

10   deposition.  You didn't mean to omit anything, did you?

11   A.   No.  I think I -- well, I don't know what other research I

12   did.  I just --

13   Q.   Right.

14   A.   -- went online and got all the research I could get for

15   free --

16   Q.   Okay.

17   A.   -- that was available to me whether it was Fidelity or

18   Yahoo or whatever --

19   Q.   Okay.

20   A.   -- or Google.

21   Q.   And from that research you understood, just from looking

22   at the publicly available information, including the 10-K's

23   and that sort of thing, that the company needed an owner with

24   a significant amount of money, tens of millions of dollars, a

25   great deal of manpower and resources.  Right?

1  A.  That's correct.

2  Q.  Okay.  And you knew that you didn't have that kind of

3  assets and resources.

4  A.  Yes, that's correct.

5  Q.  And that was the reason that you asked if you could go

6  talk to the fellow you knew of who was at Centerbridge.

7  Right?

8  A.  That's correct.

9  Q.  And Centerbridge did not do the transaction with you.

10  Correct?

11  A.  That's correct.

12  Q.  You went forward on your own.  Right?

13  A.  With a different premise.

14  Q.  Well, at the -- you went forward with the transaction with

15  no partner, did you?

16  A.  That's correct.

17  Q.  Okay.  And at the time that you went forward with the

18  transaction, knowing that you didn't have what Midway needed

19  to turn itself around, you looked at it really as just buying

20  the debt.

21  A.  I looked at --

22  Q.  Right?

23  A.  -- pretty much just buying the debt.  I figured the

24  equity, you know, if in fact that, well, I was able to work

25  with a strategic buyer, maybe the equity would be worth

1    something but it would probably -- the equity was not really

2    valuable, though the debt may have value from buying the debt,

3    but I was seeking the value out of the debt.

4    Q.  And we've established that you paid $100,000 for what you

5    claim to be your interest in the debt and the equity.  Right?

6    A.  Correct.

7    Q.  Nothing more, right?  You didn't pay anything beyond the

8    $100,000, did you, sir?

9    A.  To NAI or Sumner Redstone?  No.

10   Q.  Yes.

11   A.  That's correct.

12   Q.  Right.  And you believe that you should get $30 million

13   for a secured piece of the loan before any other creditor gets

14   anything because you bought the debt.  Right?

15   A.  I believe that I bought a contract which says -- for

16   $100,000 that says that I am entitled to whatever assets or

17   values for the secured debt.

18   Q.  Sir, isn't your answer that you believe you should get $30

19   million on your $100,000 investment because you bought the

20   debt?

21   A.  Well, if $30 million is available, then that would be a

22   wonderful experience.

23   Q.  Let's see what you said in your deposition, Clip 41, page

24   167, line 2 to 168, line 8.

25        (Video deposition excerpt played from 5:28 p.m. to 5:30

1  p.m.)

2  BY MS. DAKIN-GRIMM:

3  Q.  Now, sir, you also explained to me in your deposition that

4  you think that the risk/reward analysis that you did justifies

5  your being paid before any other creditors.  Right?

6  A.  Well, what I recall is, is that it was pretty much what I

7  was saying is what I said there.  It's just that I bought the

8  debt and under the contract that goes along with the debt,

9  speaks for itself.

10  Q.  Let me ask to you look at Exhibit 26, sir.

11  A.  Yes.

12     (Exhibit 26 previously marked for identification.)

13  BY MS. DAKIN-GRIMM:

14  Q.  Isn't it true that before you made any offer for the

15  Midway assets you claim to have, you obtained two CD's from

16  Shearman & Sterling containing all of documents described in

17  the attachments?

18        MR. HARKNESS:  Objection.  Mischaracterizes the

19  testimony.

20        MS. DAKIN-GRIMM:  I didn't ask him about any

21  testimony.  I just asked a question.

22        THE COURT:  I'm sorry.  I'm not sure --

23        MR. HARKNESS:  I think she's assuming facts not in

24  evidence, but go ahead.  You can answer the question.

25        THE COURT:  Okay.

1    THE WITNESS:  I don't even know what the question

2  is.

3  BY MS. DAKIN-GRIMM:

4  Q.  We've already established, sir, that Gordon Novod, you

5  identified him as one of your bankruptcy lawyers that was on

6  your deal team.  Correct?

7  A.  Yes.  It was Gordon Novod.

8  Q.  Okay.  And Exhibit 26 is a letter from Shearman &

9  Sterling, the lawyers for Mr. Redstone and his side, addressed

10  to your lawyer, dated November 25th, 2008.  Isn't it true, sir,

11  that you received, through your lawyers, all of the

12  information referenced on the attachments to Exhibit 25, which

13  include all of the debt documents, other corporate documents

14  and so on?

15  A.  I didn't receive it but the lawyers that represent me

16  received it.

17  Q.  They acted on your behalf, did they not, sir?

18  A.  Yes.  I mean, they --

19  Q.  And --

20  A.  -- negotiated every aspect of this transaction.

21  Q.  Sure.  And you're not contending that you're not taxed

22  with having this information if your lawyers neglected to give

23  it to you, are you?

24  A.  I'm just saying I haven't read this information nor am I

25  aware of this letter, other -- until you showed it to me at

1 the deposition.

2 Q. Okay. And your lawyers, as we saw in an earlier e-mail,

3 asked for an indemnity from Mr. Redstone's side on account of

4 the risk that you would face of lawsuits for things like,

5 corporate waste and fraudulent conveyance. Do you remember

6 that e-mail?

7 A. Yes. That you showed it to me by what -- up until the

8 time you showed it to me, I was completely unaware of the e-

9 mail.

10 Q. Okay. Your lawyers asked that of Shearman & Sterling, and

11 Shearman & Sterling refused to give an indemnity, did they

12 not?

13 A. I didn't know that.

14 Q. Let's look at Exhibit 28.

15 A. Which Exhibit?

16 Q. 28.

17    (Exhibit 28 previously marked for identification.)

18 BY MS. DAKIN-GRIMM:

19 Q. Exhibit 28 is an exchange of e-mails between your

20 bankruptcy lawyer, Gordon Novod, and Alana Rubinoff and

21 Creighton Condon, the other Shearman & Sterling lawyers you

22 identified, which apparently contained an attachment which is

23 their comments to the Draft Purchase Agreement and you can see

24 in Mr. Litowitz's response, which is on the first page

25 carrying over, he writes, "Peter, Gordon thanks for the

1  comments.  One question I have is what you mean by a customary

2  indemnity.  What precisely would you expect to see covered?"

3  And then he writes, "Again, one more thought."  I'm sorry,

4  then Mr. Kolevzon writes back, "One more thought, the

5  Indemnitor's right to defend should be subject to the usual

6  carve-out for conflict," etcetera.  And Mr. Litowitz,

7  representing the Redstone's writes back, "Thanks for the

8  feedback, Peter.  I'm asking so I can raise the request with

9  the client but I'm not sure that NAI is inclined to agree to

10  an indemnity at this point."  Isn't it true, sir, that on

11  Tuesday, November 25th the Shearman & Sterling lawyers said,

12  we're not going to indemnify you if somebody sues you in

13  connection with this transaction?

14  A.  I have no -- I had at that time I had and up until you

15  showed me this, I had no knowledge about this going back and

16  forth.  But, yes, my lawyers were in negotiations with their

17  lawyers doing what lawyers do.

18  Q.  And then it's just a complete coincidence that the next

19  day you transferred your house to you wife.

20  A.  It had absolutely nothing to do with this.

21  Q.  Right.  And you didn't get an indemnity in the deal, did

22  you either, sir?

23  A.  As I said the other day, I don't even know.

24  Q.  You're a sophisticated expert at M and A, aren't you?

25  A.  Yes.

Thomas - Cross

1  Q.  And you didn't bother to look to see --

2  A.  I read the --

3  Q.  Please let me finish, sir.

4  A.  Okay.

5  Q.  You didn't look to see in the documents you signed,

6  whether you got the indemnity that your attorneys were asking

7  for?

8  A.  I read the documents on Wednesday evening after they had

9  finished negotiating them and they told me that these

10 documents were the best that they could negotiate.  I read

11 them.  They seemed okay to me.  One type of Agreement I had

12 never even seen before, the Participation Agreement, and then

13 so the answer to the questions is, I relied on my counsel to

14 do 100 percent of the negotiations and that's what they did.

15 And then I reviewed the documents at the -- Wednesday evening,

16 read the documents in that conference room that Wednesday

17 evening.

18 Q.  Sir, isn't it true that you changed your purchase price

19 offer of a million dollars to $100,000 in light of the risks

20 that you would be taking in the absence of an indemnity that

21 your attorney sought?

22 A.  That's absolutely false.

23 Q.  Isn't it true, sir, that you believed that the risk of

24 litigation was a significant one for you?

25 A.  I thought there would be potentially a potential of

Thomas - Cross

1  litigation, sure.

2  Q.  And that was one of the drivers of your lowering of your

3  offer from a million to 100,000, wasn't it?

4  A.  It was not.  The primary driver for me lowering the price

5  from a million to 100,000 was my advisers pointing out to me

6  that the intellectual property --

7        MR. HARKNESS:  I'd just like to instruct --

8        THE WITNESS:  Okay.

9        MR. HARKNESS:  -- the witness not to get into what

10 lawyers told him.

11       THE WITNESS:  All right.  It's -- but my decision

12 was that --

13 BY MS. DAKIN-GRIMM:

14 Q.  I'll ask you a different question, sir.

15 A.  Okay.  My decision was based on risk related to

16 intellectual property.

17 Q.  Isn't it true, sir, that the risks that you considered in

18 the transaction were the risk that you might lose your 100

19 grand, the risk that you might have to spend millions of your

20 money on litigation and the risk that you might have to spend

21 a lot of time and effort and get pounded by people like me,

22 cross-examining you?

23 A.  I don't and I -- and the first and the last one are

24 correct.  The 100,000, the litigation.  To be perfectly honest

25 with you, I didn't understand at the time what all of the

Thomas - Cross

1  litigation meant.  I knew that there could potentially be a

2  bankruptcy proceeding and all that so, yes, litigation is part

3  of that.  But it could also be other kinds of negotiations and

4  with, as I said earlier, my concern -- my hope was that I'd be

5  doing further negotiations with third parties to do another

6  transaction, plus a strategic buyer.  Litigation would be an

7  element of it if everything else failed, I guess.

8  Q.  Let's see what you said in your deposition, sir, at Clip

9  42.  That is page 141, line 9 through 142, line 13.

10      (Video deposition excerpt played from 5:38 p.m. to 5:39

11  p.m.)

12  BY MS. DAKIN-GRIMM:

13  Q.  That was true testimony when you gave it, was it not, sir?

14  A.  Yes.  Yes.

15  Q.  Excuse me.  Now, if you would turn to Exhibit 31, please?

16      (Exhibit 31 previously marked for identification.)

17  BY MS. DAKIN-GRIMM:

18  Q.  Exhibit 31 is an exchange of e-mails dated November 26th,

19  2008 at 6 a.m. inquiring about or advising about people at

20  Kramer Levin to whom you address the e-mail who will attend

21  the meeting, as will Mark Thomas, and then the e-mail below

22  refers to a meeting tomorrow.  Is this the universe of people

23  that were setting up the meeting at Shearman & Sterling to

24  discuss the transaction on November 26th; the all-day meeting

25  you told us about?

Thomas - Cross

1   A.   I think the -- you'll have to repeat your question.  I'm

2   not sure of your question.

3   Q.   Sure.  This e-mail concerns the all-day meeting --

4   A.   Wednesday --

5   Q.   -- that was to happen on Wednesday, November 26th, doesn't

6   it?

7   A.   Right.  Right.

8   Q.   Okay.  Now, prior to attending that meeting, you, Mr.

9   Thomas, had already concluded that -- I did this in your

10  deposition, too.  I want to bring my firm into somehow.

11  A.   Okay.

12  Q.   That Midway was in desperate financial condition and

13  needed significant assets invested.  Right?

14  A.   My view was, was that this company, if it couldn't find a

15  strategic buyer or somebody to invest, that it would be very

16  difficult for it to continue.

17  Q.   And you were not bringing a strategic buyer to the deal.

18  A.   That is correct.

19  Q.   Okay.  And you, yourself, had never asked for -- asked

20  anyone to conduct a professional valuation of Midway, did you?

21  A.   I did not.

22  Q.   And you had not asked anybody to do a solvency analysis to

23  find out if you were buying a company that was already

24  insolvent.  Right?

25  A.   I did not.

1  Q.  But you believe that you yourself are one of the better

2  people in the country to value companies and you did it

3  yourself.  Right?

4  A.  I would say somebody that has my background valuing

5  companies for the last 30 years, and particularly, in one of

6  the world's largest conglomerates, would have a pretty good

7  understanding of valuating companies.

8  Q.  You never got any kind of analysis or evaluation of what

9  the controlling shareholder Mr. Redstone's fiduciary duties

10  were if Midway was insolvent at the time you did your

11  transaction, did you?

12  A.  No, I did not.

13  Q.  But you did get advice on litigation risk, didn't you,

14  from Kramer Levin?

15  A.  Well --

16  Q.  It's a yes or no question.

17  A.  Well, I thought I'm not --

18  Q.  I'm not asking what --

19  A.  -- supposed to talk about --

20  Q.  -- the advice was.

21  A.  -- when I was -- every time I get up to talk about what --

22  Q.  Yes.

23  A.  -- my lawyers you -- they told me --

24          MR. HARKNESS:  Can you repeat the question, please?

25          MS. DAKIN-GRIMM:  Yes.

1  BY MS. DAKIN-GRIMM:

2  Q.  It's a yes or no question.  You did get advice on

3  litigation risk from Kramer Levin before you signed the

4  documents, did you not?

5        MR. HARKNESS:  I'm not objecting, but if it's a yes

6  or no question, you can answer the question.

7        THE WITNESS:  Yes.

8        MR. HARKNESS:  All right.

9  BY MS. DAKIN-GRIMM:

10 Q.  Okay.  And you did, in fact, evaluate the impact that the

11 transaction would have on Midway, didn't you?

12 A.  Yes.  You know, I thought through a lot, as I do in any

13 time I try to do a deal, what the impact will be on the

14 company, particularly the employees in the company.  And in

15 this case, the minority shareholders, the secured -- the

16 bondholders and then the creditors.  I thought about all of

17 that and what could happen.

18 Q.  Well, the things that you specifically considered in terms

19 of impact on Midway if you went through with the transaction

20 were, first, you knew that the transaction would effect a

21 change of control that would trigger rights of Midway's note

22 holders.  Correct?

23 A.  I knew for a fact that they would have the right, they

24 didn't have to do it, but they would have the right to, the

25 bondholders would have the right to accelerate payments on

Thomas - Cross

1  their bond with the change of control.  Yes, I knew about

2  that.

3  Q.  And you also knew that there would be a negative impact on

4  the company's and the minority stockholders stock price,

5  didn't you?

6  A.  Well, I didn't know that.  And interest --

7  Q.  You --

8  A.  -- the stock price was already in the penny stock being

9  threatened to be delisted and interesting, I thought it could

10  have a negative impact.

11  Q.  Right.

12  A.  But as it turned out, it almost had no impact.  I think it

13  went from 43 cents or 35 cents to, you know, something right

14  in the same range.  Didn't really have any impact that I

15  recall.

16  Q.  And you considered the issue of the change of control

17  impact on the availability to Midway of net operating losses

18  and other tax assets, but your personal conclusion was that

19  the 10-K said those assets were worthless so you didn't worry

20  about it.  Right?

21  A.  I didn't worry about much about that then.  No.

22  Q.  But you thought about it?

23  A.  I thought about it a little bit.

24  Q.  Okay.

25  A.  Not --

Thomas - Cross

1  Q.  You didn't confer with a tax professional to see if your
2  conclusion was right, did you?
3  A.  That's correct.  That's correct.
4  Q.  Okay.  Now, after you signed up the transaction, you took
5  the position that you would not communicate with anyone
6  directly, it all had to go through Kramer Levin, didn't you?
7  A.  That's correct.
8  Q.  Okay.  And you knew before you closed the deal that Mr.
9  Redstone was doing the transaction for purposes of creating a
10  huge tax loss for his side of the table, didn't you?
11  A.  That was my understanding of the purpose of the
12  transaction.
13  Q.  Okay.  And you think your $100,000 payment is more than de
14  minimis for Midway, don't you, sir?
15  A.  I'm sorry?
16  Q.  You think that your 100,000 payment is more than de
17  minimis for what you acquired in Midway, don't you, sir?
18  A.  Yes.
19  Q.  And you wouldn't reveal yourself to Midway's auditors
20  after the transaction, would you?
21  A.  That's not true.
22  Q.  Okay.  And when Mr. O'Desky wrote the memorandum stating
23  that you refused to allow Midway or the Board of Directors
24  even to know your middle initial, your testimony is that he
25  was wrong, isn't it?

Thomas - Cross

1   A.  That's correct.

2   Q.  Okay.  Would you look at Exhibit 45, sir?

3       (Exhibit 45 previously marked for identification.)

4   BY MS. DAKIN-GRIMM:

5   Q.  Exhibit 45 is an exchange of e-mails between Jeffrey

6   Taylor and Alana Rubinoff at Shearman & Sterling and some

7   others, with an attachment.  It was produced by you, Mr.

8   Thomas.  You can tell that from the Bates numbers at the

9   bottom.  The AHS is the prefix of your documents, and it says,

10  "Please find attached the schedule of Midway's interest

11  payments."  And if you look at the attached schedule of

12  payments to you before the bankruptcy filing, you'll see on

13  the left column, debt paid or to be paid.  And then there's

14  four different entries, description, Cash Payment, and along

15  the right side, Interest Paid, and four payments aggregating a

16  million dollars.  It's your position that you only received

17  300,000 isn't it, sir?

18  A.  Yes.

19          MR. HARKNESS:  Objection.  Lack of foundation.

20          MS. DAKIN-GRIMM:  This is a document that was

21  produced by the witness.

22          MR. HARKNESS:  And, Ms. Dakin-Grimm has said that

23  it's interest payments paid to Mr. Thomas, and she's had no

24  foundation for that, none.

25          THE COURT:  Can I look at the previous page of the

Thomas - Cross

1    Exhibit?  (Indiscernible.)  Please find the attachment --

2           MS. DAKIN-GRIMM:  Attachment, interest paid on Mark

3    Thomas participation debt.  I believe that's what I said.

4           MR. HARKNESS:  And that does not say that the

5    interest payments went to Mr. Thomas.  There was a

6    Participation Agreement in which NAI had certain rights and

7    Mr. Thomas had certain rights, so there's no foundation that

8    the payments on this page went to Mr. Thomas.

9           THE COURT:  All right.  Perhaps you could just

10   clarify --

11          MS. DAKIN-GRIMM:  Sure.

12          THE COURT:  -- that with some questions, Ms. Dakin-

13   Grimm.

14          MS. DAKIN-GRIMM:  Right.  I was actually just

15   building up to the document.

16   BY MS. DAKIN-GRIMM:

17   Q.  You see the columns that I've identified.  The date paid

18   or to be paid.  Correct?

19   A.  Yes.  They say 11/28; 11/28; 12/08; 12/12.

20   Q.  Right.  And then you see the amounts of interest paid,

21   over on the right.

22   A.  Yes.  The far right?

23   Q.  Aggregate up to about a million dollars.

24   A.  Yes, that's correct.

25   Q.  And then there's a line at the very bottom that says, "All

1   amounts have been paid or will be paid to NAI per the

2   Agreements." Mr Thomas, what is the percentage of

3   participation that you agreed to in the transaction with the

4   Redstone entities?

5        MR. HARKNESS: Objection. Lack of foundation.

6   (Indiscernible.)

7        THE COURT: I'll overrule that objection.

8        THE WITNESS: I would be entitled to receive 100

9   percent participation.

10  BY MS. DAKIN-GRIMM:

11  Q.  And it's your testimony that you didn't get all this money

12  from the Redstone's?

13  A.  I didn't receive all this money because I wasn't entitled

14  to it on the 11/28 day.  If you add up the last two columns,

15  which are the dates that after the transaction closed, the

16  12/08 which was the 20,288 and 98,820, that's like 300,090 --

17  900 dollars.  That's what I received, but they were entitled

18  to receive the money that's ahead of that's on the 11/28

19  money, the 242 and 458, that was their money.

20  Q.  Mr. Thomas, what percentage return is the 390 or whatever

21  it is that you say received, on 100,000?

22  A.  Three times.

23  Q.  What percentage is that?

24  A.  Three hundred percent or I don't know.

25  Q.  That's what you've received to date --

1   A.   Yes.

2   Q.   -- on your investment?

3   A.   Well, no, because all that money has gone to pay lawyers.

4   Q.   Well, that's a different question.  You received the 300

5   percent return.

6   A.   Yeah, I received the three times that.  I have received --

7   I'm not going to go and do math.  I have received $300,000 in

8   interest payments.

9   Q.   Right.  Three hundred percent return on your 100,000

10  investment.  Correct?

11  A.   Okay.

12  Q.   Three hundred.

13  A.   I've -- yeah, but I'm not going to do the math.

14  Q.   All right.

15  A.   I'm too tired for that.

16  Q.   Sure.  Now, we've heard some discussion about the note

17  holders being asked to agree to a forbearance of their right

18  to put their notes to the company after the change in control

19  effected by your transaction.  Isn't it also true, Mr. Thomas,

20  that you were approached to agree to a forbearance on your

21  entitlement to payment of the $40 million loan that you claim

22  to have obtained in the transaction with the Redstone's?

23  A.   You have to -- I didn't understand the question.  I'm

24  sorry.

25  Q.   Okay.  Isn't it true, sir, that after you signed up the

Thomas - Cross

1  deal with the Redstone's, the company had to approach you and

2  ask you to forbear on certain of your rights to collect

3  monies?

4  A.  I recall that, yes.  And I think we did do something to

5  that affect.

6  Q.  Okay.  And you had Kramer Levin representing you in that

7  negotiation.  Right?

8  A.  Kramer Levin has represented me in all negotiations on

9  this matter.

10  Q.  Right.  And you required, now this is before the

11  bankruptcy, you required the company to pay Kramer Levin's

12  fees that it incurred in negotiating the forbearance with

13  Midway, didn't you?

14  A.  I would have to say, yes.  I think that's true.

15  Q.  Right.

16  A.  I don't know that for a fact.  I assume that based on

17  customary practices, I think that's what they negotiated.

18  Q.  Okay.  And you didn't mean in your testimony to suggest

19  that it was inappropriate for the note holders attorney's fees

20  to be paid when your fees were being paid, did you?

21  A.  Well --

22  Q.  You need to look at me and the Court, not the lawyers for

23  the answer, sir.

24  A.  Well, he was standing up so I --

25  Q.  I don't think so.  You need to answer the question --

1  A.  Okay.

2  Q.  -- Mr. Thomas.

3  A.  Can you repeat the question again?

4  Q.  Let's look at Exhibit 48, sir.

5  A.  Okay.

6      (Exhibit 48 previously marked for identification.)

7  BY MS. DAKIN-GRIMM:

8  Q.  Forty-eight.

9  A.  Mine's upside down.

10 Q.  I apologize for that.  Maybe you could turn it the right

11 way or look on the screen.

12 A.  Yeah, hold on a second to make sure I got the right

13 document.

14 Q.  Okay.

15 A.  It's the document that says Midway Board Telephonic

16 Meeting, January 13.  Is that the document you're referring

17 to?

18 Q.  Exhibit 48 is an exchange of e-mails between Pamela

19 Flaherty and Tad Jankowski and others, including your lawyer,

20 Peter Kolevzon.  It's on the screen there in front of you.

21 A.  Okay.  Hold on a second because that's not what I have

22 here.  Hold on.

23      MS. DAKIN-GRIMM:  Dan, can you go check what he has

24 and make sure he has the right thing or help him out?

25      THE WITNESS:  If maybe you could show me that.

1  Okay.  Repeat the question?

2  BY MS. DAKIN-GRIMM:

3  Q.  All right.  This is an exchange of e-mails concerning the

4  consent and waiver document that was being negotiated by the

5  Blank Rome lawyers with both your lawyers and the note holders

6  lawyers.  You were aware that such a negotiation was being

7  conducted, weren't you, Mr. Thomas?

8  A.  Yes.

9  Q.  Okay.  And take a look at this document, you can see that

10  Ms. Flaherty, on behalf of, now the Debtor, but then the --

11  Midway, is communicating with both the note holders' lawyers

12  and your lawyers.  She says, "I have tried to combine

13  everyone's comments.  This has not been reviewed by our client

14  so is subject to comments they have.  Please note that we have

15  at least one issue open, which is Clause 5 of Section 10.  I

16  have bolded the language which is at issue.  My understanding

17  is that the last positions of the parties was that NAI and

18  Kramer Levin want Clause 5 out entirely, and the note holders

19  want something in."

20      Okay, so just to be clear, NAI is Mr. Redstone's entity

21  and Kramer Levin is the lawyer for you, so those are the

22  parties to the transaction you entered into.  Right?

23  A.  Well, I assume so, yes.

24  Q.  Okay.  And the note holders are in an entirely different

25  transaction with Midway.  Correct?

1  A.  I assume so.

2  Q.  Okay.  Now, let's look at Section 10, Clause 5 that your

3  lawyers and NAI wanted removed --

4  A.  Section --

5  Q.  -- and that appears on Bates page 5768.  This is Limited

6  Effect of Agreement.  Right?  This is a provision that said,

7  "Except as expressly provided, all of the terms and conditions

8  of the Loan and Security Agreement and the Loan Agreements

9  remain in full force and affect and this Agreement shall not

10  be deemed or otherwise be construed as," and then it has a

11  list of things, so the Agreement shall not be deemed or

12  otherwise be construed as, now go to the bolded language, "To

13  be a waiver of or prejudice any right or claim that any person

14  may have relating to the decision by NAI to transfer its

15  interest in parent to participant."  I will represent that

16  parent, by definition of this document is Midway, and you are

17  the participant.

18      Isn't it true, sir, that one of the conditions that you

19  were seeking in order to agree to a forbearance of your right

20  with Midway before the bankruptcy was filed, you were seeking

21  to have the note holders agree never to challenge your rights

22  here?

23  A.  I would say based on this document that would be correct,

24  but to, again, I didn't negotiate the document and this is not

25  my area of expertise by -- at all.

Thomas - Cross

1   Q.   Your lawyers acted with your authority, didn't they, sir?

2   A.   My lawyers always act with my authority.

3   Q.   Thank you.  And isn't it true, Mr. Thomas, that all the

4   things that your lawyers asked for in the first proposed Cash

5   Collateral Order that was presented to the Court at the first-

6   day hearing, all of those things were requested with your

7   approval?

8   A.   Again, this is my first bankruptcy, so I rely 100 percent

9   on my counsel to put forward to the Court what is appropriate

10  for a person in my situation.

11  Q.   Well, let's just take one example then.  You believed and

12  continue to believe that it is appropriate for the Court to

13  limit any investigation by the Official Committee of Creditors

14  into the transaction you engaged in with the Redstone's to no

15  more than $50,000.  Right?

16  A.   Yes.  I think, I believe and based on my understanding of

17  how this process works that they should -- the Creditors

18  should not be using the money from the company that I have a

19  security interest over to investigate me or sue me or do

20  whatever.  That seems, again, I'm not a bankruptcy expert, it

21  seems odd to me that you give somebody money that you have

22  security over, to make your life miserable.

23  Q.   Because you concluded in your own mind, that that's your

24  money, haven't you, sir?

25  A.   Well, I concluded in my mind that whatever that piece of

1  paper says, and it could be up to 30 million it could less

2  than 30 million, whatever the number is, that in my mind that

3  I would get that interest, yes.

4  Q.  You've --

5  A.  I have concluded, with lots of input, that I have bought a

6  piece of debt and that that piece of debt has certain rights -

7  - piece of paper has certain rights that go along with it, and

8  it's not really relevant about whether or not I paid $1 or $10

9  million for that debt.  I bought an instrument for a price.

10 Q.  And it's the Creditors position, Mr. Thomas, that you

11 bought equity and in doing so, aided and abetted a fraudulent

12 conveyance, notwithstanding that position, your view is that

13 the Creditors should not be allowed to use any of the Debtors

14 money to investigate that position.  Right?

15 A.  I think I've stated my position on that.

16        MS. DAKIN-GRIMM:  I don't have anything further,

17 Your Honor.

18        THE COURT:  All right.  Thank you, Ms. Dakin-Grimm.

19 Any redirect?

20        MR. CAPONI:  Not from the Debtor but I suspect Mr.

21 Harkness will.

22        THE COURT:  Yes.

23        MR. CAPONI:  In a minute.

24        MR. HARKNESS:  No questions, Your Honor.

25        THE COURT:  All right.

1          MR. CAPONI:  I was wrong.

2          THE COURT:  Mr. Thomas, you may step down, sir.

3          THE WITNESS:  Thank you.

4          THE COURT:  Thank you.

5      (Witness excused.)

6          THE COURT:  All right.

7          MS. DAKIN-GRIMM:  Does that mean it's my case?

8          THE COURT:  Are you --

9          MR. HARKNESS:  We just have to work out how we're

10   going to play the video.

11          MS. DAKIN-GRIMM:  Well, my suggestion would be, Your

12   Honor, that I think we're the only entity that designated

13   witnesses by video in our affirmative case.

14          THE COURT:  Yes.

15          MS. DAKIN-GRIMM:  But the --

16          MR. HARKNESS:  You can play ours now

17   (indiscernible).

18          MS. DAKIN-GRIMM:  -- Thomas entities have counter

19   designations, I guess my suggestion would be that we go

20   witness by witness, you know --

21          THE COURT:  Oh, yes.

22          MS. DAKIN-GRIMM:  -- rather than all of ours.  It

23   doesn't make sense so if for example, if we play Mr. Redstone

24   now, we should play our version of him and then go right to

25   yours.

1          THE COURT:  I agree.

2          MR. HARKNESS:  I think that makes sense.

3          MS. DAKIN-GRIMM:  Okay.

4          THE COURT:  Sure.

5          MS. DAKIN-GRIMM:  So --

6          THE COURT:  Now, well, let me ask, are we now going

7    to be getting into some confidential material?

8          MS. DAKIN-GRIMM:  Yes.

9          THE COURT:  Ms. Aaron, I see has remained here

10   patiently all day long just to protect her client's interest.

11         MS. DAKIN-GRIMM:  We would need to resolve those

12   issues now, Your Honor.

13         THE COURT:  I don't know who is in the courtroom and

14   what their interest may be and whether or not their even, you

15   know, interested parties here.

16         MS. AARON:  Well, Your Honor, a nice man from the

17   Daily Deal gave me his card.

18         THE COURT:  Okay.

19         MS. AARON:  So we have a reporter here.

20         THE COURT:  So we --

21         MS. AARON:  At least one.

22         THE COURT:  -- know we have a reporter.  Yes, Mr.

23   Buchbinder.  You've been here to protect other interests all

24   day.

25         MR. BUCHBINDER:  Yes, Your Honor.  We have no idea,

1   we being the Court and the Office of the United States

2   Trustee, and frankly, everyone else who isn't one of the

3   litigating attorneys in the courtroom, we have no idea what's

4   going to be presented and what may or may not be confidential.

5   And as I indicated earlier today, I think we have to deal with

6   it on an ad hoc basis.  There may be some items that are

7   subject to confidentiality and there may be some items that

8   are not.  As I pointed out earlier and as everyone concedes,

9   this is a public reporting company.  Much of the information

10  is contained in the SEC documents, a lot of information is

11  contained in documents that have been recorded.

12          THE COURT:  Yes.

13          MR. BUCHBINDER:  And until we know what it's going

14  to be, we simply can't make a decision on what is or is not

15  confidential.

16          THE COURT:  I think we're more --

17          MR. BUCHBINDER:  It may difficult but that's where

18  we are.

19          THE COURT:  I think we're more concerned about

20  information relating to National Amusement which is not a

21  public reporting company.  Am I incorrect, Ms. Aaron?

22          MS. AARON:  No.  You are correct.

23          THE COURT:  And I sit here like you.  I've read

24  through the depositions, not carefully --

25          MR. BUCHBINDER:  I don't --

1          THE COURT:  -- but I've read through them.

2          MR. BUCHBINDER:  I don't know how we reconcile them

3    easily beforehand.

4          MS. DAKIN-GRIMM:  Your Honor, Ms. Aaron has marked -

5    -

6          THE COURT:  Oh --

7          MS. DAKIN-GRIMM:  -- in yellow --

8          THE COURT:  -- I forgot we asked you to do that.

9          MS. AARON:  (Indiscernible.)

10          MS. DAKIN-GRIMM:  She marked in yellow portions of

11   the depositions that we intend to play --

12          THE COURT:  Yes.

13          MS. DAKIN-GRIMM:  -- to which she has an objection

14   and maybe if we could hand those up, we could maybe take a

15   recess.  You could take a look and see if it's the kind of

16   material you believe is appropriately protected.

17          THE COURT:  And we could share it with Mr.

18   Buchbinder as well.

19          MS. DAKIN-GRIMM:  Yes.

20          THE COURT:  I know you only have one yellow marked

21   version.

22          MS. DAKIN-GRIMM:  Right.  It's all right.

23          THE COURT:  I'd really be even more concerned about

24   that and if Mr. Buchbinder has an issue with some of that,

25   then we can raise it with me.

1          MR. BUCHBINDER:  I think that would be a perfect way

2   to proceed, Your Honor.

3          THE COURT:  Yes.

4          MR. BUCHBINDER:  And it would expedite things.

5          THE COURT:  Absolutely.  Let's take a brief recess.

6   Ms. Aaron, did you want to say something first?

7          MS. AARON:  Just a couple of things, Your Honor.

8   That, I mean, as Your Honor has -- understands, NAI is a

9   privately held company and I tried to limit the objections or

10  sort of the confidential portions to relate to internal NAI

11  deliberations.  And we're a third party here.  We don't really

12  -- it's not really proper for us to present our side of the

13  case.

14         THE COURT:  Right.

15         MS. AARON:  There are a lot of question, you know,

16  it's like we weren't able to respond to something, I mean,

17  sometimes we objected to the form if the question seemed to

18  have inferoneous *(ph)* facts embedded in them or seemed

19  argumentative, but we don't really have a chance to respond to

20  any of this.  And as Your Honor understands, there might be

21  some level of public interest in this and we're out, you know,

22  it's fine to obviously to have the Court read this but we

23  really don't want to be seeing this, you know, public -- out

24  in the public.

25         THE COURT:  I understand.  Mr. Buchbinder, did you

1  start to say something?

2        MR. BUCHBINDER:  No.  Your Honor, I just think that

3  to what the Court has suggested is fine.  It would be almost

4  like looking at a proposed DIP Order --

5        THE COURT:  Right.

6        MR. BUCHBINDER:  -- at a first-day hearing because

7  if we agree that items are going to be confidential, we can

8  take the appropriate action at the appropriate time, and if we

9  have issues we can find a way to discuss them at sidebar or to

10  close the courtroom to discuss them.

11        THE COURT:  Excellent.  All right.  Then let's take

12  a 10-minute recess or so or whatever, however long it takes

13  you, Mr. Buchbinder.  You'll just let us know.

14        MR. BUCHBINDER:  Thanks to the Court, Your Honor.

15        THE COURT:  Thank you.

16        MS. DAKIN-GRIMM:  Your Honor, may we hand up the

17  copies?

18        THE COURT:  Yes.  Oh, do you have a copy for me as

19  well, even marked?

20        MR. HARKNESS:  I only have one copy of the markings.

21        MS. DAKIN-GRIMM:  All right.  We'll mark them

22  together so everybody has it.

23        THE COURT:  Good.

24        MS. DAKIN-GRIMM:  And then knock on the door?

25        THE COURT:  That's fine.

1      MS. DAKIN-GRIMM:  Okay.

2      THE COURT:  I'll be right inside.

3      MS. DAKIN-GRIMM:  All right.

4    (Recess from 6:06 p.m. to 7:05 p.m.)

5      THE CLERK:  All rise.

6      THE COURT:  Thank you, everyone.  Please be seated.

7  Mr. Buchbinder.

8      MR. BUCHBINDER:  Yes, Your Honor.  What we've done

9  is I've gone through four different packages of --

10      THE COURT:  Yes.

11      MR. BUCHBINDER:  -- materials that were marked and

12  I've had a discussion with counsel for the Creditor.  And

13  frankly, in my opinion, with very few exceptions, I think that

14  virtually all of the material is not subject to Section 107 or

15  9018.  Counsel disagrees.  They've gone through the documents

16  and they've marked areas that they want to still discuss, and

17  so it might be most efficient, instead of some of us retiring

18  to chambers, to perhaps clear the courtroom, and then we can

19  discuss the remaining issues and then let the courtroom open

20  again.

21      THE COURT:  All right.  I think that's a good

22  suggestion.

23      MR. BUCHBINDER:  I think that's probably the

24  quickest and most efficient way to handle it.

25      THE COURT:  Yes.  There are fewer people who have to

1    leave the courtroom.  So if I may ask people in the rear of

2    the courtroom to leave for a few minutes while we discuss

3    these issues, with the exception, of course, of anyone who is

4    here representing NAI.

5         (Sealed portion of transcript, page 319, line 5 through

6    page 341, line 3, contained in a separate sealed transcript.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4          (Recess from 7:36 p.m. to 8:02 p.m.)

5               THE CLERK:  All rise.

6               THE COURT:  I'll give you a chance to get started.

7     Thank you everyone.  Please be seated.  All right.  You may

8     take off your jackets if it's warm in here.  I mean that.

9     Please be comfortable.

10              UNIDENTIFIED SPEAKER:  Thank you, Your Honor.  I'll

11    take you up on that.

12              THE COURT:  Please.

13              MS. DAKIN-GRIMM:  Your Honor --

14              THE COURT:  Yes.

15              MS. DAKIN-GRIMM:  -- I -- it was me knocking on your

16    door --

17              THE COURT:  Yes.

18              MS. DAKIN-GRIMM:  -- because Mr. Vaughn is ready but

19    I'm just advised that the Kramer Levin people went somewhere

20    to get pizza, and apparently they're not here.

21              THE COURT:  Oh.

22              MS. DAKIN-GRIMM:  And I may have knocked on the door

23    too early, if you want to wait for them, or they certainly

24    have seen the video and were not going to be --

25              THE COURT:  Were they going --

1          MS. DAKIN-GRIMM:  -- speaking.

2          THE COURT:  -- to object to any portions of it, do

3     you know?  I mean, were they going to raise --

4          MS. DAKIN-GRIMM:  The --

5          THE COURT:  -- any objections?

6          MS. DAKIN-GRIMM:  The only objections that would

7     have been interposed were by Ms. Aaron's firm, so if there's

8     anything to be addressed, I think she's here.

9          THE COURT:  Well, I think this is one of those

10    situations where we ought to proceed.

11         MS. DAKIN-GRIMM:  Great.

12         THE COURT:  I'm always a little reluctant to do that

13    especially, you know, at 8 o'clock at night but I think we

14    should proceed.

15         MS. DAKIN-GRIMM:  We're going to start with Mr.

16    Redstone.

17         THE COURT:  Okay.

18       (Video deposition of Sumner Redstone played on behalf of

19    the Creditors' Committee.)

20         MS. DAKIN-GRIMM:  And now I think we would have to

21    switch the service to (indiscernible) Mr. Redstone.

22       (Video deposition of Sumner Redstone played on behalf of

23    the Debtors.)

24         THE COURT:  Okay.

25         MS. DAKIN-GRIMM:  Next, Your Honor, we would offer

1   testimony from Shari Redstone.

2            THE COURT:  Thank you.

3        (Video deposition of Shari Redstone played on behalf of

4   the Creditors' Committee.)

5            MS. DAKIN-GRIMM:  And that's our presentation for

6   Ms. Redstone.

7            THE COURT:  All right.  Did you have a cross

8   presentation?

9        (Video deposition of Shari Redstone played on behalf of

10  the Debtors.)

11           THE COURT:  All right.  I guess we've got, what,

12  three more?

13           MS. DAKIN-GRIMM:  We do.  Should we talk about an

14  alternate plan or do you want to continue?

15           THE COURT:  It's getting to be that time, you know,

16  and I'm not sure how much longer these will take, and we're

17  talking about an hour probably for the three?

18           MS. DAKIN-GRIMM:  More than two hours, Your Honor.

19           THE COURT:  Oh.

20           UNIDENTIFIED SPEAKER:  We have 11 minutes.

21           THE COURT:  That's a long time, two hours, you know.

22  And I mean this sincerely, you know, I'm content to continue

23  but I don't know about the rest of you.  And I really would

24  like you to speak up honestly and not be bashful and hesitant,

25  you know, about just pushing through for the sake of toughing

1  it out.  If we adjourn this, are we in good shape as far as

2  the continued use of the cash collateral is concerned?

3           MS. DAKIN-GRIMM:  Your Honor, I have a proposal.

4           THE COURT:  Yes.

5           MS. DAKIN-GRIMM:  We could play Mr. Jankowski and

6  then -- and the -- obviously the counter-designations, and

7  then move into admission the remaining two transcripts on the

8  assumption that Your Honor would --

9           THE COURT:  Move them.

10          MS. DAKIN-GRIMM:  -- review them in your own time

11 before making a ruling --

12          THE COURT:  Okay.

13          MS. DAKIN-GRIMM:  -- but wouldn't have to be

14 tonight.

15          THE COURT:  That makes sense, if that's acceptable

16 to everyone.

17          MR. HARKNESS:  How long is (indiscernible) for Mr.

18 Jankowski's deposition?

19          UNIDENTIFIED SPEAKER:  Fifty minutes.

20          MS. DAKIN-GRIMM:  Fifty minutes.

21          UNIDENTIFIED SPEAKER:  Fifty.  But I've been --

22          MR. HARKNESS:  5-0.

23          MS. DAKIN-GRIMM:  5-0, but we've been tapering it,

24 as the other proceedings.  Is that after you've taken stuff

25 out?

1          UNIDENTIFIED SPEAKER:  That's after I took all this

2     stuff out.

3          THE COURT:  That would at least allow us to conclude

4     the evidence.

5          MS. DAKIN-GRIMM:  Right.

6          THE COURT:  So there is some sense in that.

7          MS. DAKIN-GRIMM:  Your Honor, were you anticipating

8     having argument after the evidence?

9          THE COURT:  I was, but that, we could do on Monday.

10         MS. DAKIN-GRIMM:  Okay.

11         THE COURT:  If that's acceptable.

12         MS. DAKIN-GRIMM:  Sure.

13         THE COURT:  And I won't know where we are on the

14    employee motion.  Your don't have to tell me.  If you're still

15    talking, that's fine.  If you've resolved it, that's fine.

16         MR. HARKNESS:  I'll tell you we have not resolved

17    it, Your Honor.

18         THE COURT:  Okay.  All right.

19         MR. HARKNESS:  I've -- I am personally -- I mean,

20    this is a personal issue for me.  I need to go back

21    Connecticut --

22         THE COURT:  Tonight?

23         MR. HARKNESS:  Yes.  I've got four kids and a wife

24    who's out of town on work.

25         THE COURT:  Please.

1    MR. HARKNESS:  I've got my sister taking -- I need

2  to go.

3    THE COURT:  Well, let me ask you this:  I don't

4  think you even need to be here for the --

5    MR. HARKNESS:  To play the tape, now.

6    THE COURT:  For the video of -- Mr. Harkness,

7  provided we're not going to argue anything tonight, I'm just

8  going to watch the video.

9    MR. HARKNESS:  That's fine with me.

10    MS. DAKIN-GRIMM:  I can tell you --

11    THE COURT:  And likewise, anyone else who wishes to

12  leave.

13    MS. DAKIN-GRIMM:  I'm content to watch a video, but

14  I'm not going to be at my best if you were going to have

15  argument after that --

16    THE COURT:  No.

17    MS. DAKIN-GRIMM:  -- so I would rather do that later

18  anyway.

19    THE COURT:  Okay.  So --

20    MR. HARKNESS:  So we have argument on Monday?

21    THE COURT:  Yes.  Is that acceptable to everyone

22  else?

23    MR. DEBAECKE:  Michael Debaecke for the Debtors.

24  It's certainly acceptable to the Debtors, and I'm assuming

25  that that is with the understanding that we have consensual

1  cash collateral use 'til --

2          THE COURT:  Until Monday.

3          MR. DEBAECKE:  Yes.  Because right now, we have it

4  until tomorrow.

5          THE COURT:  That's what I was concerned about.

6          MS. DAKIN-GRIMM:  Your Honor, I have one more

7  thought.  Mr. Perry has these thoughts and hands them to me,

8  and then I'm just the puppet.  He suggested that if we are

9  going to convene on Monday, we could do Mr. Jankowski on

10  Monday, which would then give us time to try and truncate it

11  more efficiently.  That's an alternative.

12          MR. DEBAECKE:  Michael Debaecke for the Debtors.  My

13  only concern there, Your Honor, if we are having a full-blow,

14  Key Employee Incentive Plan Motion Hearing --

15          THE COURT:  Yes.  Every -- an hour -- even a half an

16  hour is something that we --

17          MR. DEBAECKE:  I don't know how much time you have

18  on Monday but we would be concerned about that.

19          THE COURT:  Yeah.  And I take it you want me to

20  watch this deposition as opposed to read it.  Is that correct?

21  I'm truly asking.

22          MS. DAKIN-GRIMM:  Well, if you could watch at least

23  fifteen minutes of Mr. Jankowski, I think his manner and

24  demeanor is important.  The other two, I'm not so sure.

25          THE COURT:  All right.

1          MS. DAKIN-GRIMM:  The other two, I think a written

2     transcript would be -- would suffice.

3          THE COURT:  I mean, I am pleased -- I leave it up to

4     you.  I'm pleased to stay and watch while those of you who

5     have already seen it don't need to be here frankly.  And we

6     could at least complete that portion.  I'm asking.  I would

7     not take offense --

8          MS. DAKIN-GRIMM:  Your Honor, why don't we play 20

9     minutes of Mr. Jankowski and leave you to the rest with the

10    other two witnesse?

11         THE COURT:  That sounds good.

12         MS. DAKIN-GRIMM:  And that would get us out of here

13    before 10:30.

14         THE COURT:  Excellent.  If we could just take a

15    five-minute break --

16         MS. DAKIN-GRIMM:  Thank you.

17         THE COURT:  -- and then we'll come right back in and

18    resume.

19         MR. NOVOD:  Your Honor, when you come back, I will

20    probably be gone.

21         THE COURT:  You will not be here.

22         MR. NOVOD:  Thank you very much.

23         THE COURT:  Of course.  Have a safe trip back.

24         MR. NOVOD:  Thank you.

25         (Recess from 9:50 p.m. to 9:56 p.m.)

1          THE CLERK:  All rise.

2          THE COURT:  All right, everyone.  Thank you.  Be

3   seated, please.

4          MR. NOVOD:  Pardon me, Your Honor.  May I address

5   the Court for a moment?

6          THE COURT:  Yes, please.

7          MR. NOVOD:  Yes, again, Gordon Novod on behalf of

8   Acquisition --

9          THE COURT:  Yes, Mr. Novod, of course.

10         MR. NOVOD:  Just a process point and question, Your

11  Honor.

12         THE COURT:  Yes.

13         MR. NOVOD:  Is there a time in which you need us to

14  clear out our materials before tomorrow, or does that need to

15  be done this evening?

16         THE COURT:  Tomorrow will be fine.

17         MR. NOVOD:  Okay, what time would be best for Your

18  Honor?

19         THE COURT:  Let's see.  Like 8:30, 9 o'clock.

20         MR. NOVOD:  Okay.  Very good.  Thank you, Your

21  Honor.

22         THE COURT:  You're talking about all of the video

23  equipment?

24         MR. NOVOD:  I'm talking about more of the binders --

25         THE COURT:  Yes.  That would be fine.

1          MR. NOVOD:  -- and the exhibits which are all --

2    they've all been obviously filed under seal.

3          THE COURT:  Yes, that's right.  They're sensitive

4    matters.

5          MR. NOVOD:  Yes.

6          THE COURT:  The courtroom will be locked.

7          MR. NOVOD:  Okay.

8          THE COURT:  I would say 8:30-ish, 9 o'clock.  I have

9    a hearing at 10:00.

10          MR. NOVOD:  Okay.  So I will --

11          THE COURT:  But for that matter, I mean, they could

12   even remain here for the hearing -- through the hearing but --

13          MR. NOVOD:  Well, I'll coordinate, of course, with

14   Ms. Davis-Jones' firm and --

15          THE COURT:  Yes.

16          MR. NOVOD:  -- have somebody come by, you know,

17   preferably by 8:30.

18          THE COURT:  Okay.  Very well.

19          MR. NOVOD:  Thank you, Your Honor.

20          THE COURT:  Okay, Mr. Novod.  Is that well for

21   everyone else?

22          UNIDENTIFIED SPEAKER:  Yes.

23          THE COURT:  Okay.

24      (Video deposition of Tad Jankowski played on behalf of

25   the Creditors' Committee.)

1          MS. DAKIN-GRIMM:  Your Honor, we can stop there.  I

2    think that gives you a sense of the witness --

3          THE COURT:  Certainly.

4          MS. DAKIN-GRIMM:  -- and we could entrust you to

5    read the rest, and we would submit the other depositions.  We

6    can provide you with a excerpts if -- well, I guess --

7          THE COURT:  Do I have those already?

8          MS. DAKIN-GRIMM:  We did.

9          THE COURT:  Is that what I reviewed earlier in the

10   day?

11         MS. DAKIN-GRIMM:  It's getting late.  Yes.

12         THE COURT:  Yes.

13         MS. DAKIN-GRIMM:  But that would be it.  So if -- we

14   would be pleased to trust you to read the rest on your own.

15         THE COURT:  Absolutely.  I certainly will.

16         MR. PERRY:  Your Honor, there are two other

17   witnesses that I think weren't excerpted because there wasn't

18   a confidentiality concern for them.

19         THE COURT:  Let's see.

20         MR. PERRY:  Mr. Steele and Mr. Waxman.

21         THE COURT:  Okay.  Those, I don't have.

22         MR. PERRY:  Okay.

23         THE COURT:  That's correct.

24         MR. PERRY:  We'll make arrangements to messenger

25   those over to your chambers in the morning.

1          THE COURT:  That would be fine.

2          MS. DAKIN-GRIMM:  I thought that we had them.

3          MR. PERRY:  Do we?  We may have them, and with your

4   permission, I'll hand them up, Your Honor.

5          THE COURT:  Absolutely.

6      (Pause in proceedings.)

7      (Counsel approaches.)

8          THE COURT:  Thank you.

9          MR. PERRY:  Hugh Waxman.

10          THE COURT:  Perfect.  Thank you very much.  Ms.

11   Aaron, did you wish to be heard?

12          MS. AARON:  Yes, I'm standing on my issues.  With

13   regard to our discussion about confidentiality which is sort

14   of the in-court but in-chambers discussion, I just wanted to

15   know whether that was recorded and it'll become part of the

16   transcript --

17          THE COURT:  Yes.

18          MS. AARON:  -- because -- and I guess can it be

19   marked confidential and not be made available, or be under

20   seal?

21          THE COURT:  Yes, of course.

22          MS. AARON:  Okay.  Thank you.

23          THE COURT:  Thank you for noting that, and I'm just

24   trying to think how to best make certain that happens.  I will

25   talk with Brandon about how we'll go about doing that

1 logistically. Marking that portion of the transcript
2 confidential.
3         UNIDENTIFIED SPEAKER: Okay, which --
4         THE COURT: Or it doesn't get -- it will not be
5 placed on the docket immediately, in any event.
6         UNIDENTIFIED SPEAKER: No.
7         THE COURT: So that will give you an opportunity to
8 reel it, just so you're content as to what pages should we be
9 redacting, and then we will take care of that redaction and
10 get in on the docket at that point.
11         MS. AARON: All right. Thank you, Your Honor.
12         THE COURT: Good. Yes, Mr. Ramos.
13         MR. RAMOS: Good evening, Your Honor. One
14 housekeeping issue from our side was the movement into
15 evidence of the exhibits that were used by the Committee, not
16 only live during the course of the day, but also in the
17 deposition testimony that you've just read.
18         THE COURT: Yes.
19         MR. RAMOS: There may be some clean-ups, some
20 additional exhibits that might need to be moved based on the
21 additional transcripts that Your Honor is reading. I'm not
22 sure about that standing here right now. But at least we
23 wanted to move the admission of the exhibits that we had used
24 during the course of today.
25         THE COURT: Okay.

1          MR. RAMOS:  I'm happy to run through a list.  I have

2     a long list of numbered -- numbers in terms of the exhibits --

3          THE COURT:  That's okay.

4          MR. RAMOS:  So why don't I just try to do that.  And

5     some of these are out of order Your Honor.

6          THE COURT:  No problem.

7          MR. RAMOS:  Exhibits -- and this refers -- in terms

8     of exhibit numbers, Your Honor, I'm referring to the exhibits

9     --

10          THE COURT:  In the binders?

11          MR. RAMOS:  -- in the binders that the Committee

12     submitted.

13          THE COURT:  Okay.

14          MR. RAMOS:  All of which bear the exhibit numbers in

15     the lower right-hand corner of the first page of each

16     document.  And we have a following list of exhibits --

17          THE COURT:  In other words, they won't be the

18     exhibits -- will they be the tabbed numbers or are they going

19     to be the --

20          MR. RAMOS:  Our --

21          THE COURT:  -- exhibit tab -- tag numbers?

22          MR. RAMOS:  It's actually the Bates typed number on

23     the lower right-hand corners.

24          THE COURT:  Okay.

25          MR. RAMOS:  It says UCC, and then --

1    THE COURT:  Yes.

2    MR. RAMOS:  -- the exhibit number.  That's the

3 exhibit number for purposes --

4    THE COURT:  Okay.

5    MR. RAMOS:  -- of this list.  And apparently for

6 most of them, it does --

7    THE COURT:  Coincide?

8    MR. RAMOS:  Meets up with the deposition numbers.

9 So, Your Honor, I have Exhibit 4, 6, 63, 7, 107, 8, 69, 70,

10 110, 10, 11, 87, 88, 72, 73, 13, 15, 17, 89, 16, 78, 91, 119,

11 98, 93, 120, 121, 122, 100, 44, 47, 40, 42.  And, Your Honor,

12 with respect to Exhibits Number 47 and 42, I believe we may

13 need to look at those for purposes of redaction for

14 confidentiality --

15    THE COURT:  Okay.

16    MR. RAMOS:  -- at least in part for those two

17 exhibits.  And we'll touch -- be back in touch with Your Honor

18 regarding those two.

19    THE COURT:  And we have time.  We keep the exhibits

20 in chambers and so they're not going to be on the record of

21 any kind.

22    MR. RAMOS:  Very Good.  Thank you, Your Honor.

23    THE COURT:  You bet.

24    MR. RAMOS:  Exhibit Number 20, 99, 21, 27, 22, 26,

25 28, 31, 45, 48, Exhibit 5, Exhibit 9, Exhibit 82, 83, 33, 36,

1 | 107, 108, and 109. I may have said 107 twice. And that's the

2 | list, Your Honor, at least as of this evening.

3 |       THE COURT: All right. Is there any objection to

4 | their admission?

5 |       MR. DEBAECKE: None from the Debtors, Your Honor.

6 |       THE COURT: Ms. Jones, we're just getting into your

7 | second wind.

8 |       MS. DAVIS-JONES: (Indiscernible) the second shift,

9 | Your Honor. Your Honor, for the record, Laura Davis-Jones,

10 | Pachulski, Stang, Ziehl & Jones. Your Honor, Mr. Harkness had

11 | to leave.

12 |       THE COURT: Yes.

13 |       MS. DAVIS-JONES: I don't know if him and Ms. Dakin-

14 | Grimm, had talked about the exhibits or not, I'm not aware of

15 | any issues, Your Honor, but frankly, I haven't been in the

16 | middle of it. So, Your Honor, I do know Mr. Harkness will be

17 | back on Monday morning. I'm going to say no objection, but if

18 | I may, Your Honor, condition upon him correcting me on Monday

19 | morning, just because I have not been in that loop, or

20 | otherwise, I'd ask Your Honor to hold your ruling on the

21 | admission 'til Monday.

22 |       THE COURT: I think that's fair. And as well, you

23 | may have exhibits that you're moving in as well.

24 |       MS. DAVIS-JONES: Yes, Your Honor. I know that that

25 | was talked about at the close of the affirmative case, and I

1   don't -- I also don't know where that ended.  I know that
2   there were documents that they said they needed to look at
3   again for confidentiality, so it might be best to ask Your
4   Honor to hold the ruling on this until Monday morning when
5   we're here.
6           THE COURT:  That's fair.  I allowed Mr. Harkness to
7   leave, you know, without -- on the understanding we weren't
8   going to be doing anything really substantive, so I think
9   that's fair.
10          MS. DAVIS-JONES:  Thank you, Your Honor.
11          THE COURT:  Certainly.  Mr. Buchbinder.
12          MR. BUCHBINDER:  Yes, Your Honor, I had one more
13  procedural point before we forget, because this one came up at
14  -- many hours ago, more than 12, I think.  I would just like
15  to remind the parties and invite the parties if they could
16  provide to the Court and to our office their redacted --
17  proposed redacted versions of their pretrial statements so
18  that the Court and our office can look at that.  And if we
19  have a chance to do it before Monday, that would be wonderful
20  because then we could deal with it at the hearing.
21          THE COURT:  All right.  If it is physically possible
22  for the parties to do so after a long day and obviously some
23  more preparation to do, that's wonderful.  A best effort sort
24  of request.
25      Yes, Mr. Debaecke?

1    MR. DEBAECKE:  Thank you, Your Honor, Mike Debaecke

2 for the Debtors.  On the exhibits issue, I, quite frankly,

3 don't recall whether we had any exhibits that would not have

4 been from the Committee's binders or the Lender's binders.  I

5 don't believe we did but I can't swear to that right now.  So

6 --

7    THE COURT:  Yours -- I think yours may -- no, you're

8 right.  I don't think you did.

9    MR. DEBAECKE:  I don't think we did, so I guess if

10 we could just hold our -- hold open our moving into admission

11 any exhibits that we would need to that would be different

12 than what the Lender and Committee were moving in.  I don't

13 think there is any difference but I'd like to talk to Mr.

14 Caponi about that.

15    THE COURT:  That is certainly fine.

16    MR. DEBAECKE:  And then finally -- thank you, Your

17 Honor.  Finally, on -- for purposes of Monday --

18    THE COURT:  Yes.

19    MR. DEBAECKE:  -- I am planning on -- I was planning

20 on sending over an agenda tomorrow for the Monday Hearing on

21 the KEIP Motion and the related Creditors' Committee Motion to

22 Seal their objection to the KEIP.

23    THE COURT:  Yes.  Let's see.  We're --

24    MR. DEBAECKE:  And I was going to put the KEIP

25 papers and that -- Committee's seal papers in a binder so that

1  you had them in one smaller binder than what you have

2  presently.

3          THE COURT:  All right.

4          MR. DEBAECKE:  And now that we're going to have

5  argument on Monday, is it sufficient to rely upon what Your

6  Honor has regarding the cash collateral documents?

7          THE COURT:  It certainly is.

8          MR. DEBAECKE:  And not include those in the binder

9  (indiscernible).

10         THE COURT:  Absolutely.

11         MR. DEBAECKE:  That would be great.  Thank you.

12         THE COURT:  And for that matter -- well, it might be

13  safer on the KEIP documents just in case they've been sort of

14  intermingled with others --

15         MR. DEBAECKE:  It'll --

16         THE COURT:  -- that I happen to review.

17         MR. DEBAECKE:  We're fine.  And hopefully that was

18  don't today while we were over here but we'll get that over to

19  you tomorrow.

20         THE COURT:  All right.  And Monday morning, I see

21  we're staring at 9:00?

22         MR. DEBAECKE:  Yes.

23         THE COURT:  And that will give us at least four or

24  five hours and hopefully that will be sufficient.  If not, I

25  have a hearing at 2:00, but if need be, we could pick, you

1  know, shortly thereafter.  I'm not sure how long that 2

2  o'clock hearing is going to last.

3  MS. DAKIN-GRIMM:  Your Honor, I know my other

4  colleagues are not here but sometimes it's helpful in

5  preparing an argument to know what kind of time you have

6  available.  Is there a suggestion in that regard?  I don't

7  even want to make one since they're not here to counter it but

8  I'm sure we would all work to whatever would most suit Your

9  Honor.

10  THE COURT:  Well, just thinking about the other

11  matters that we've got, I'm thinking, oh -- this is an

12  important matter and I don't want to cut anyone short.  I was

13  thinking perhaps an hour in total for argument on the cash

14  collateral, which we'd need essentially, you know, a half an

15  hour for the Committee.  I don't know whether the Debtor and

16  the Lender can split that time -- a half an hour, if you would

17  each like 20 minutes or, you know, I'm not sure how much

18  overlap you'll be having.

19  MR. DEBAECKE:  Michael Debaecke for the Debtors.  I

20  view the argument on Monday as being -- I would suggest that

21  the Creditors' Committee and the Lender take the lead on the

22  arguments back and forth and the Debtors will see how that

23  goes, hear how that goes, and then if we need to add our two

24  cents in at the end, we certainly will, but I think the -- we

25  saw this cash collateral fight as between the Creditors'

1   Committee and the Lender for the most part --

2           THE COURT:  Yes.

3           MR. DEBAECKE:  -- anyway.  And we will certainly

4   follow the lead of the Court for Monday, but I think the

5   primary arguers on Monday will be the Lender and the

6   Creditors' Committee, and the Debtors will chime in as

7   necessary.

8           THE COURT:  All right.  Thank you, Mr. Debaecke.

9   And that's how --

10          MS. DAKIN-GRIMM:  Thank you --

11          THE COURT:  -- we'll proceed.

12          MS. DAKIN-GRIMM:  -- Your Honor.

13          THE COURT:  And we will proceed with that issue

14  first, all right, because -- before we get into the Key

15  Employee Incentive Program.  Anything else, counsel?

16          MR. DEBAECKE:  Thank you very much, Your Honor.

17          THE COURT:  Well, I wish you -- whatever remains of

18  the evening, a good one.  And I will see you here on Monday

19  morning, and thank you.

20          ALL:  Thank you, Your Honor.

21          THE COURT:  And we'll stand in recess until then.

22  Good evening.

23          UNIDENTIFIED SPEAKER:  Thank you.

24      (Court adjourned at 10:25 p.m.)

25

1                    CERTIFICATE

2        I certify that the foregoing is a correct transcript

3  from the electronic sound recording of the proceedings in the

4  above-entitled matter.

5

6   /s/April J. Foga                        April 10, 2009
    April J. Foga, CET, CCR, CRCR
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25