```
              IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE DISTRICT OF DELAWARE

IN RE:                        )    Case No. 09-10465
                              )    (Jointly Administered)
                              )
MIDWAY GAMES, INC             )    Chapter 11
     Et al                    )
                              )    Courtroom 3
                              )    824 Market Street
           Debtors            )    Wilmington, Delaware
                              )
                              )    April 6, 2009
                              )    9:06 a.m.


                   TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE KEVIN GROSS
                 UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Debtor:               Blank Rome LLP
                          BY:  STEVEN CAPONI, ESQ.
                          BY:  MICHAEL D. DEBAECKE, ESQ.
                          1201 Market Street
                          Suite 800
                          Wilmington, DE  19801
                          (302)425-6400


For Trustee:              U. S. Trustee
                          BY:  DAVID BUCHBINDER, ESQ.
                          844 King Street, Rm. 2207
                          Wilmington, DE  19899-0035
                          (302)573-6491


ECRO:                     NICKITA BARKSDALE

Transcription Service:    DIAZ DATA SERVICES
                          331 Schuylkill Street
                          Harrisburg, Pennsylvania 17110
                          (717) 233-6664


Proceedings recorded by electronic sound recording;
transcript produced by transcription service
```

APPEARANCES:
(Continued)

For Creditors' Committee:        Milbank, Tweed, Hadley &
                                 McCloy LLP
                                 BY:  LINDA DAKIN-GRIMM, ESQ.
                                 BY:  DAVID ZOLKIN, ESQ.
                                 601 South Figueroa Street
                                 30th Floor
                                 Los Angeles, CA  90017-5735
                                 (213)892-4000

                                 Richards Layton & Finger
                                 BY:  MARCOS A. RAMOS, ESQ.
                                 BY:  ANDREW C. IRGENS, ESQ.
                                 One Rodney Square
                                 920 North King Street
                                 Wilmington, DE  19801
                                 (302)651-7700

For Acquisition Holdings:        Pachulski, Stang, Ziehl &
                                 Jones
                                 BY:  LAURA DAVIS JONES, ESQ.
                                 919 North Market Street
                                 17th Floor
                                 Wilmington, DE  19899-8705
                                 (302)778-6401

                                 Kramer, Levin, Naftalis &
                                 Frankel LLP
                                 BY:  TIMOTHY P. HARKNESS, ESQ.
                                 BY:  GORDON Z. NOVOD, ESQ.
                                 1177 Avenue of the Americas
                                 New York, NY  10036
                                 (212)715-9100

TELEPHONIC APPEARANCES:

For Creditors' Committee:        Milbank, Tweed, Hadley &
                                 McCloy LLP
                                 BY:  DANIEL PERRY, ESQ.
                                 601 South Figueroa Street
                                 30th Floor
                                 Los Angeles, CA  90017-5735
                                 (213)892-4546

```
 1   For Shari Redstone:          Mintz, Levin, Cohn, Ferris,
                                  Glovsky & Popeo, P.C.
 2                                BY:  WILLIAM W. KANNEL, ESQ.
                                  BY:  ELIZABETH BURNETT, ESQ.
 3                                One Financial Center
                                  Boston, MA  02111
 4                                (617)348-1613

 5   For National Amusement,
     Inc.:                        Shearman & Sterling LLP
 6                                BY:  CURT E. GOLDMAN, ESQ.
                                  599 Lexington Avenue
 7                                New York, NY  10022
                                  (212)848-4167

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

WILMINGTON, DELAWARE, MONDAY, APRIL 6, 2009, 9:06 A.M.

   THE CLERK: Please rise.

   THE COURT: Good morning, everyone. Thank you.
Please be seated.

   MS. DAKIM-GRIMM: Good morning, Your Honor.

   MR. CAPONI: Good morning.

   MR. RAMOS: Good morning, Your Honor.

   THE COURT: It's a pleasure to see you this
morning. Good morning, Mr. Caponi.

   MR. CAPONI: Good morning, Your Honor.

   THE COURT: It's a little bit warm in here, I
know, but we're trying to make an adjustment. Hopefully, it
will cool down a little bit.

   MR. CAPONI: Maybe it'll cause everyone to be a
little lethargic, and we'll get over a little more quickly.

   THE COURT: Perhaps, but I don't think in this
case that will happen.

   MR. CAPONI: Yeah.

   THE COURT: I've been thinking about it much of
the weekend. It's occupied a great deal of my thought.

   MR. CAPONI: Your Honor, unless you have a way
you'd like to proceed, do you just want to take care of --

   THE COURT: Well, as a preliminary matter, I
think we ought to sort of complete the record -- the
evidentiary record in the case. I know that there were

issues remaining with regard to exhibits, in particular.

The Committee had proposed its list OF exhibits, and I have

not heard back yet from Mr. Harkness.

Good morning, Mr. Harkness.

MR. HARKNESS: Good morning, Your Honor.

MR. CAPONI: Your Honor, on that note, I guess,

before we get to exhibits -- and just for the record, this

is Steve Caponi from Blank Rome for the debtors. There is

one evidentiary issue that came up last -- over the weekend.

THE COURT: Yes.

MR. CAPONI: The Committee would like the record

to be opened to get a point of clarification in -- with Mr.

O'Desky's testimony, which I'll -- I'll do as a proffer, if

it's okay with Your Honor.

THE COURT: That's fine.

MR. CAPONI: And the issue is the following: As

Mr. O'Desky testified when his 13-week rolling forecast for

the company is updated on a weekly basis, towards the end of

the week. He testified on a Wednesday. The following day,

Thursday, they re-ran the forecast.

THE COURT: Yes.

MR. CAPONI: And it appears that the company will

have not the 8 to $12 million cash on hand that has been

testified to, but more along the lines of $15 million of

cash on hand by the end of May, which would be the

anticipated timeframe for a sale.  And that best estimate at
this time is, that amount of money would last the debtor not
through the end of June, but through the end of July, at
this point in time.

        THE COURT:  All right.

        MR. CAPONI:  Both parties are aware of that, and
I don't believe there's any objection to that coming into
the record.

        THE COURT:  Okay.  It's basically to stipulate
the fact at this point?

        MR. CAPONI:  Yes, Your Honor.

        MS. DAKIM-GRIMM:  It is, Your Honor.

        MR. RAMOS:  Yes.

        THE COURT:  All right.  Thank you.  All right.

        MR. CAPONI:  And then with respect to the
exhibits, I will turn it over to the Creditors' Committee
and the lender to address that issue.

        MR. RAMOS:  Good morning, Your Honor.  Marcos
Ramos with Richards, Layton & Finger on behalf of the --

        THE COURT:  Mr. Ramos, good morning.

        MR. RAMOS:  Good morning.  Your Honor, as you
mentioned on Wednesday, we ran through a list of the
exhibits --

        THE COURT:  Yes.

        MR. RAMOS:  -- that the committee wanted to move

into evidence.  Since then -- well, Your Honor might recall
that we submitted a number of depositions, as well.  And --

THE COURT:  Yes, and which, by the way, I did
complete reading.

MR. RAMOS:  Excellent, thank you, Your Honor.
There were exhibits related to those depositions.  And what
I have now, essentially, is sort of a comprehensive list of
the exhibits that I identified earlier, as well as those
that may only appear in the depositions.  And if it pleases
the Court, what I'd like to do is just quickly run through
the numbers again.

THE COURT:  Okay.

MR. RAMOS:  I believe -- and Counsel can correct
me if I'm wrong -- but we've shared this list of exhibits
with counsel for HS, and I believe that they're all okay,
not subject to objection.

THE COURT:  Okay.

MR. RAMOS:  But I'll run through the list now,
Your Honor.  Exhibits 4, 5, 7, 8 --

THE COURT:  I had a 6.  Not 6?  Or are they --
are they in order or --

MR. RAMOS:  They should be in order, Your Honor.
And if I said 6 before, I'd ask counsel to look at Exhibit
6, as well, to see if he had some issue.

MR. HARKNESS:  We had - we looked at 6.  It was

on your list from the other night.

        MR. RAMOS:  Okay.  Very good.  Thank you, Your Honor.  7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 19, 20, 21, 22, 26, 27, 28, 31, 32, 33, 36, 40, 42, 43, 44, 45, 47, 48, 56, 60, 61, 62, 63, 64, 69, 70, 72, 73, 75, 78, 79, 80, 81, 82, 83, 87, 88, 89, 90, 91, 93, 98, 99, 100, 103, 105, 107, 108, 109, 110, 113, 114, 119, 120, 121 and 122.

        THE COURT:  Okay.

        MR. RAMOS:  Your Honor, with respect to 56, I believe we're only -- if I read that number out --

        THE COURT:  You did.

        MR. RAMOS:  -- it's only a demonstrative.

        THE COURT:  Okay.

        MR. RAMOS:  And there were two exhibits that we talked about on Wednesday, 42 and 47, which we believe may have some confidential information that needs to be redacted --

        THE COURT:  Exactly.

        MR. RAMOS:  -- so we'll need to submit those to you.  There were several documents.  Exhibits 9, 15, 36, 69, 70, 72, 99, 109, 113 -- those were initially designated as confidential.  I believe that the -- on Wednesday, frankly, all of the issues related to those exhibits were worked out, so I'm not aware that they are confidential and need to be kept under seal.

THE COURT:  Okay.  So it's just the two, 42 and 47, at the moment, that require confidentiality?

MR. RAMOS:  That's correct, Your Honor.

THE COURT:  Okay.  Thank you.

MR. RAMOS:  Thank you very much, Your Honor.

THE COURT:  Thank you.

MR. HARKNESS:  We also have a list of exhibits, Your Honor.

THE COURT:  Yes.

MR. HARKNESS:  And I've gone through, generally, with counsel the areas in which we have them.  It's exhibit -- and this is from the AHS exhibits.

THE COURT:  All right.

MR. HARKNESS:  What I've tried to do is that some of the exhibits from the Committee's binder, particularly the 10K and the 10KA, I'm just going to rely on their exhibit.

THE COURT:  Fine.

MR. HARKNESS:  It's the same document.  We have Exhibits 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 27, 33, 34, 35, 36, Exhibits 48, 49, 51, 59, 61, 62, 64, 65, 66, and 67.  I'm just double-checking.  Is that right? I also have four other documents that should be confidential in total.

THE COURT:  Oh.

1           MR. HARKNESS:  52, 53, 54, and 55.

2           THE COURT:  All right.  Thank you, Mr. Harkness.

3           Now, next question, I guess, is, are there any

4 objections to the admission of these exhibits from either

5 side?

6           MR. CAPONI:  Not from the debtors, Your Honor.

7           MR. HARKNESS:  We have no objections to those.

8           THE COURT:  Mr. Ramos?

9           MR. RAMOS:  No, Your Honor.

10          THE COURT:  All right.  Mr. Harkness, no

11 objection to the Committee's exhibits?

12          MR. HARKNESS:  No, Your Honor.

13          THE COURT:  All right.  Then, all of these

14 exhibits are admitted into evidence.  And I understand as

15 far as confidentiality is concerned, I know that's one of

16 Mr. Buchbinder's concerns.  And what I suggest is that if

17 Mr. Buchbinder has any issue with regard to the

18 confidentiality of any of these exhibits, I'll certainly

19 give you an opportunity, Mr. Buchbinder, to raise an

20 objection.

21          MR. BUCHBINDER:  Thank you, Your Honor.

22          THE COURT:  Mr. Caponi.

23          MR. CAPONI:  Your Honor, I guess --

24          THE COURT:  It's time for argument.

25          MR. CAPONI:  So on to the show --

THE COURT: Yes.

MR. CAPONI: -- as they say?

THE COURT: Yes.

MR. CAPONI: Your Honor, I think the debtor has, you know, very minimal comments at this time. One issue I'll just raise for the Court is a practicality, and that is obviously cash collateral. There's two aspects of it. One is, what we're trying to -- you know, we're looking to achieve here is consensual use with respect to the lender. The Creditors' Committee is challenging the lender's ability to have any say in cash collateral, which would then possibly put us into a contested use of cash collateral context. With respect to that contested aspect of it, the debtor's just going to -- would like the ability to reserve its comments to see if we actually end up in that posture and address it at that time, as opposed to launching into some more argument on a hypothetical at this point in time.

THE COURT: All right.

MR. CAPONI: If that's okay with the Court?

THE COURT: That's fine.

MR. CAPONI: Okay. Turning to the cash collateral itself, Your Honor, you know, obviously, the hearing last week went quite long. A lot of it, from the debtor's perspective, is flavor for a dispute or argument that may be coming down the line which deals with potential

re-characterization or equitable subordination, possible
claims, et cetera. But with respect to cash collateral, I
think the only relevance that information has really ties to
whether or not the Court has sufficient confidence that down
the line, Mr. Thomas will be able to keep the cash
collateral, the money -- assuming the money that's paid
under the cash collateral order, or whether it's likely that
money will need to be repaid and whether he has the
financial wherewithal to do so.

          Mr. Thomas has agreed to escrow all the monies he
would receive under the proposed order, which the debtor
believes adequately addresses that concern and, really, the
spot in which potential re-characterization intersects with
what we're here to decide today -- the Court's here to
decide today. The Committee has voiced an objection to
that, that it would prefer the money not to be escrowed
because the debtor may need access to those funds. However,
as the Court heard last week and again this morning through
a proffer, the debtor's past position at the anticipated
time of the a sale is going to be approximately $15 million,
and the debtor is confident that it has sufficient funds on
hand that it can operate, even if monies are escrowed under
a cash collateral agreement for the benefit of Mr. Thomas.

          The -- if you take that issue off the table, Your
Honor, I think the only one that's left, it really comes

down to a carve-out for the Committee, where I think there
is significant disagreement between the parties.  On that
front, the debtor, again, has proposed a joint order or an
order jointly with the lender and, you know, it stands
behind it.  The Court heard the testimony that these are --
this was a negotiated document.  It was negotiated through a
lot of effort on the part of the debtor, and the debtor
attempted to cut the best deal that it could.  As with any
negotiation, the document does not read exactly the way the
debtor would prefer it to read, but hence, why it's a
negotiation and not a -- nothing that we get to dictate.

Your Honor, with the reservation of our rights,
it will take some to get to a contested cash collateral
argument.  I'm going to cede the podium to, I think, the
primary participants in today's argument, which I believe
Mr. Harkness will probably be going first.  Is that right?

MR. HARKNESS:  I believe so.

MR. CAPONI:  Okay.

THE COURT:  Is there any disagreement or issue
relating to who goes first?

MS. DAKIM-GRIMM:  We hadn't discussed it, but I
think it makes sense if Mr. Harkness goes first.

THE COURT:  Yes.  That's where I was leaning,
too.  Please, Mr. Harkness.  Thank you.

MR. HARKNESS:  We hadn't discussed, but that's

fine with me.

MS. DAKIM-GRIMM:  Sure.

MR. HARKNESS:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. HARKNESS:  As Mr. Caponi indicated, there rally were three issues going in before the hearing and I think Mr. Maer, when he stood up, in our view, took care of two of them.  I think there is a disagreement as to one of them, but Mr. Thomas has agreed to escrow any interest payments and agreed to escrow fees.  And whether or not he gets these escrowed or not, I think, is a point of dispute.  And then the third area of dispute is whether or not the Committee should get fees.

Now, with regard to the information we've just learned, I think that there's no question that the company continues -- can continue for its current trajectory into the middle of July or so with cash if Mr. Thomas's fees are escrowed.  So this is not something of -- this is not an issue of whether or not the escrowing fees actually impacts negatively the company's ability to proceed with the orderly sale of its assets.  The issue really is how we're going to handle -- and in my view, the issue is how we're going to handle the Committee's fees.  We have agreed, in the proposed order, to an amount of $50,000, and this is $50,000 that would be coming out of the collateral that Mr. Thomas

has.  And there is going to be an issue and might be a fight

about whether or not his interest in that collateral gets

re-characterized.  And that's really, I think, the subject,

what we spent most of our time on the other day and what I'd

like to spend my time on today.

In our view, there really is no need for more

than $50,000 for the Committee, from a practical point of

view, and I do look at these things rather practically.

This discussion we've had -- we've been having and the

discussion we had the other day and the evidence really goes

to really how the pot of money, this $30 million, is going

to get divided up.  It's not going in to the debtors.  It's

going out.  And the question is who gets it and who should

pay for that?  And when I say pay for that, I mean, pay for

the fight that might ensue with regard to dividing up the

$30 million.

In our view, the way, particularly with Mr.

Thomas agreeing to escrow the fees, he's only going to get

the money to pay his fees if he wins.  And as far as getting

to an appropriate resolution that doesn't distract the

debtor from doing its business and getting things done, we

think that, as Mr. Maer said the other day, "What's good for

the goose is good for the gander."  And we believe that we

have very moneyed opponents on the Creditors' Committee who

can ably fund a litigation, and we don't see why the debtors

-- why the collateral -- Mr. Thomas's collateral should go
to fund that.

And that's particularly true when you look at the
substantive issues because, really, what this is all about
is re-characterization and equitable subordination. And
when you look at the position and you strip away the emotion
and you look at the facts in light of the case law, I think
it's fair to say that with the Creditors' Committee, the
theories they propound in their brief are really rather
revolutionary. We turn the law on its head and really ask
the Court to re-write important parts of established case
law.

What do I mean? Well, let's take the November
transaction to begin with. We've heard a lot about the
$100,000 price. The fact is, it's black-letter law that the
price that someone pays for a claim is irrelevant, and there
are good and sound policy reasons for that. Every one of
these proceedings would turn into a fight, a discussion
about what an appropriate return is. And the fact is that
the price Mr. Thomas paid is, as a matter of law,
irrelevant, and to suggest otherwise would really be very
revolutionary. And it's not at all relevant to the main
issue in front of the Court today.

The fact is, the amount he paid has nothing to do
at all with whether or not his fees should be paid or he

should get interest.  And it really doesn't go to the
ultimate merits of what happened in that November
transaction.  You know, we've also heard a lot about Mr.
Thomas's wherewithal and the suggestion that maybe a
strategic buyer with more means would be better, and whether
or not a strategic buyer would have been better or not in
November is quite beside the point.  There is nothing in any
of the law cited by either party that suggests that a
strategic buyer somehow required under the law that Mr.
Redstone or NAI had some fiduciary duty to find one kind of
buyer as to -- as opposed to another.  On the contrary, the
law that we cite in our brief is quite clear that an equity
holder doesn't really have a duty.  He has no duty
whatsoever to be, you know, a source of cash for the entity
of which it has an equity stake, even if that person is a
controlling shareholder.

So what does that leave?  I mean, I think we have
a couple different issues with regard to the November
transaction.  First, was there a breach of fiduciary duty at
all?  We submit there is no evidence that there was.  And
was there damage?  Even if you assume there was -- and the
answer, quite clearly, based on the record that the Court
has is no.

On the first day hearing -- at the first day
hearing, the note holders raised a couple of issues, which

we've now taken a very close look at. One of them were related to the NOLs, and ironically, they even put in their brief that the NOLs were the most -- that through the transaction in November, that Mr. Redstone stripped the company of its most meaningful asset. Well, we've learned a couple of things, if nothing else, in the Wednesday hearing we had last week.

First of all, the NOLs were not the most meaningful asset in this company. The most meaningful asset of the company are the IP and the people that support that IP -- the games and the game teams, first thing. Second thing is Mr. O'Desky stood right there and testified Deanna Wells haven't been stripped, that they had at least $600 million worth of NOLs. I mean, the record before the Court -- and I realize that this is not the final word, but the record before the Court right now is that the NOLs are still there. And that's a very significant point. If there's any damage done from the November transaction -- and we submit that there is none -- it doesn't relate to the NOLs because they're still there practically available to the company. Second --

THE COURT: So when debtors come in and ask me to enter an order restricting trading, in the event of even a five percent change of control, I don't need to be concerned about that?

MR. HARKNESS:  I think it's something to
consider.  And certainly, when the debtors come in, in this
case on the first day hearing, they came in saying, "We
don't exactly know what this particular transaction did with
regard to these particular NOLs."  And then, if you look at
Mr. O'Desky's declaration from the first day, that's what he
said.  And his deposition testimony, he said, "You know,
we're still working it out."  In his deposition testimony,
he said, "You know, it could be between 3 and $600 million,
and we're not really sure.  We don't think it's the last
transaction.  We think it's the next transaction."  And
then, he stood here on the stand and testified that their
analysis, which has been reviewed by Ernst & Young and done
by their tax professions at Midway, is that this transaction
did not wipe out the NOLs.  And that's the testimony before
the Court with regard to this particular transaction.

And am I saying that it's never an issue?  No.
I'm saying in this particular case, it's not.  And there's
no evidence that it was.  We have no expert coming up to
testify to the contrary.  What we have is a record that
shows NOLs are still there.

The other thing that's in the record is that with
regard to the put is that the change of control certainly
vested the rights with the note holders to exercise their
rights, but the fact of the matter is, they're the ones who

made the choice to do it. Mr. O'Desky testified quite clearly, it was not something that was mandatory. Their choice in December was their choice. They made the choice. And it's really quite remarkable and disingenuous to have the note holders and the Committee now stand up and say, "Wait a second, your transaction, Mr. Thomas and Mr. Redstone, hurt us because it made us exercise our own rights." They're the ones who made the choice. They didn't have to make that choice and they did.

The other thing that is also, I think, quite remarkable is that the record before the Court suggests that that factoring agreement may not have been practically available to the company in December of '08 had the transaction not occurred. Mr. O'Desky testified that the getting the cash from the factoring agreement in December of '08 was critical to the company's being able to even make a go of it in the holiday season. And you know, there's some confidential matter in the record that suggested that might have been practically available to the company had the -- the Thomas -- the NAI HS transaction not occurred.

So I think there is a serious doubt within the law whether there is a fiduciary duty breach at all with regard to that transaction, even if you assume all of these terrible things stem from it. But even putting those things aside, there's no practical harm to the company because of

that transaction.  Mr. Thomas does not have the ability to replace board members and has not taken a move to do so.  He can't do -- the controlling shareholder, given the way the company works, really couldn't affect a change to the management of the company until June, and he's made no move to do that.  And that's the record before the Court.  So the other question is whether or not --

THE COURT:  Is it your view that National Amusement could have, in effect, opened the phonebook and gone down and said, "You know, we're going to give this away to the first person whose name -- we're going to offer this to the first person whose name we come across in the phone book"?

MR. HARKNESS:  Do I think they could have done that?  The answer is no, I don't think they could have done that.  I think that their obligations were -- and we actually cite this in our brief -- was not to hand the company blithely over to someone who might loot the company if they had reason to believe that they were giving it to a fraudster.  I think that would be an issue.  But that's not what happened here.  What happened here was the testimony is that there was a process.

Now, we haven't had full discovery into that process, and in all fairness, we have not.  But what we do have, and the record is quite clear, is that we have Mr.

Redstone and NAI going to their longtime counsel, and their

longtime counsel suggesting at least one person that they

had done business with. And I think that it's fair to infer

from that process that this was not someone just willy-nilly

handing out the company. The record also shows that there

was a process within NAI, and like I said, there is some

ambiguity as to exactly what that process entailed, but it

certainly entailed bankers and other advisors reaching out

to a number of individuals. And Mr. Redstone testified of

an approach that he made, and I think it's confidential in

the record. But this was not a record that shows NAI or Mr.

Redstone just willy-nilly going through the phone book.

That's not what we have here. Now, what we have here, I

would submit, comports with the law that we cited in our

brief and prevailing Delaware fiduciary duty law.

       THE COURT: Okay.

       MR. HARKNESS: So the real question is then, if

there's no problem with the November transaction, what do we

do with regard to the February transaction? Because the

February transaction is one where the company is having

difficulty, does have the threat of a going concern

qualification from Ernst & Young and needs to refinance, and

needs to refinance debt it already had. And the facts about

that transaction, I think, are for the most part, as you

said the other day, not in dispute. And the truth of the

matter is that, in Delaware, there is no deepening

insolvency cause of action. And I think, respectfully,

that's exactly what the Creditors' Committee is foisting on

the Court. And that's just not the law. And if you wanted

to contrast this case with the one case they cite, where

deepening insolvency is tied into a breach of loyalty, a

breach of loyalty issue, the In Re Brown Schools case.

THE COURT: Yes.

MR. HARKNESS: This is very different. It's very

different for a couple of reasons. First of all, we have an

independent special committee. Now, I think that the -- we

can anticipate the Creditors' Committees want to look behind

the special committee, but I think Mr. Waxman's testimony

about the special committee, his qualifications, and the

qualifications of the others are rather telling and support

a conclusion that that committee deserves deference. And

they deserve deference not because, you know, they did what

they did. They deserve deference because they had

sophistication.

Mr. Waxman is a man of experience; he's a CPA.

He took his responsibilities very, very seriously; in a

short timeframe, negotiated an arms-length transaction. You

can see the chart right in our brief where we show the

difference between the Wells Fargo transaction and the NAI

facility. And really, the terms are very advantageous to

the company.  And you have Mr. O'Desky, who's sitting right there on the stand, and I submit, very credibly explained why he thought -- why management believed this was in the best interest of the company.

The In Re Brown Schools case, what you had is a company engaging in refinancings to loot the company and to foist professionals onto the company, and that just didn't happen here.  We don't have a breach of loyalty issue with regard to the February transaction.  We just don't.  You have Shari Redstone and the others on the board who believe that this -- and I think the testimony is quite credible -- that this transaction was in the best interest in the company.  And when you have this kind of situation, a company that is having difficulty and decides to refinance, well, the law is quite clear.  You don't get to go look in hindsight and say, "You know what?  That wasn't a good call."  The Business Judgment Rule prevails.  And in this instance, the Business Judgment Rule supports the transaction.

I think to apply In Re Brown Schools, I think what you'd have to do is conclude that Mr. O'Desky and his colleagues were blind to a looting of the company as it was occurring.  The record does not support it.

Your Honor, you have before you some analyses that the company did that support the conclusion that the

board made, the independent committee made, then the board
voted on that this was a fair transaction for the company.
So at the end of the day, you're not going to have the
record to support equitable subordination or re-
characterization.  Certainly, this is a company that knew it
was taking on debt that treated the thing as a -- the
transaction as a loan.  And I think to suggest otherwise
really, as I said before, turns the law on its head.

          Then, you roll the tape forward.  What do we see?
We see a company that does struggle to meet its earnings-
per-share guidance.  Absolutely did.  But they never said,
"It's because of the debt we took on in February."  The
testimony is that the debt that was taken on in February was
not material enough to impact the EPS or other things going
on in the company.  And the truth of the matter is, this is
not an instance where it was a company lauded on with extra
debt that it couldn't handle in February, and somehow,
that's what led to the problems later in the year.  The
truth is that this is a company that took on $90 million,
used an independent committee to get the job done, to
understand whether this was good or not for the company.
That loan allowed the company to continue functioning,
continuing paying its bills.

          It's interesting, there's nothing in the record
to suggest any creditor, even though this transaction was

publicly disclosed, was in the 10K, was in the 10KA.  Anyone

said, "Wait a second.  No, this isn't right.  You know what?

You should really just go into a bankruptcy."  No one was

saying that.  And it was a business decision and one that

had a foundation in the new -- the experience of the new CEO

and the new CFO to move the TNA game that led to the

factoring agreement.

So here we have is a February transaction, a new

CEO in March.  Mr. Booty comes on, looks at the game, works

with Mr. O'Desky and says, "You know, we have to move this

game because if we wait a couple more months, this game

might be the kind of hit we need to turn this company

around."  But by changing it, they also changed their cash

flows, the cash flows that they base their $90 million on.

And that's why the -- that's what the factoring agreement

really is all about.  We do not believe that the factoring

agreement is indicia that the company was somehow hopelessly

lost.  We think that what this shows is a company changing

its business plan midstream to be more competitive with a

hope for getting their fiscal house in order and using a

short-term financing vehicle to get that done.  And the

factoring agreement worked exactly as it should, and I think

the record before you shows it's been paid off.

So what does all this mean?  This all means that

what we have here is we have a case in which we have a

fairly developed record.  We have a number of the facts
essentially not in dispute, and we have a body of fiduciary
duty law and equitable subordination law here in Delaware
that I think supports the conclusion that the claims the
Committee would assert are really tenuous.  So that gets to
how much would this company pay to have the investigation
into the transactions and the litigation move forward?  How
much of Mr. Thomas's cash collateral should be used to pay
for this -- for the litigation?  And we submit the $50,000
number is in line with what's happening in other cases in
this courthouse, in this courtroom.  We think that the
$50,000 number is, quite frankly, a fair number, given the
fact that Mr. Thomas is going to have his fees escrowed.
What's in the best interest in the company and what's in the
best interest of getting this particular issue resolved is
to have the committee do whatever it's going to do, have
both sides bear their own costs for the time being, and the
winner will be taken care of at the end.  Unless you have
any other questions, I leave it at that.

        THE COURT:  Well, I don't think that the members
of the Committee can fund the Committee's expenses at this
point.  Can the Committee members just volunteer fees for
its counsel?  Isn't that subject to the retention that's
under this Court's order?  In other words --

        MR. HARKNESS:  Fair enough, Your Honor.

THE COURT: -- in other words --

MR. HARKNESS: Fair enough.

THE COURT: -- if it's $50,000, it's $50,000. That is the sum total of what they may receive.

MR. HARKNESS: I think that that's fair to some degree, but they could also fund a junior DIP if they so wished. You know, if they really believe this was something -- this was a piece of litigation that really should be pursued. And really, what I'm trying to say is, given the fact that after the November transaction, there really is no evidence of damage here, that really, the company was -- given the situation NAI was in, in October and November, this company was going to have a problem in December. The question is, what exact problem were they going to have, and we would submit that the transaction that took place gave them the best shot. It gave them continued access to the factoring agreement for the critical holiday selling season. It gave them -- the note holders a choice of whether to put or not to put. And it did not wipe out the NOLs.

And going back to the February transaction, under the key cases that we cited in our brief, we believe it's a perfectly legitimate transaction. It's not subject to characterization, re-characterization or equitable subordination. And that as a result spending more than $50,000 out of the estate's pocket at this point, it's

really unfounded.

THE COURT: All right. Mr. Harkness, thank you, sir.

Ms. Dakim-Grimm.

MS. DAKIM-GRIMM: Thank you, Your Honor. Good morning, Your Honor.

THE COURT: Good morning.

MS. DAKIM-GRIMM: Linda Dakim-Grimm for the Official Committee of Unsecured Creditors. I would like to thank you sincerely for what has obviously been your careful attention to these proceedings since the first day hearing. While it is a bit unusual to have such an extensive evidentiary proceeding on a cash collateral motion, the extraordinary factual scenario at issue here, we believe, has justified the time and effort. Before I get into the remarks that I've prepared, I just can't help myself. I have to let Your Honor know that for the month of February alone, Mr. Thomas submitted to the debtor a bill for almost $400,000 in attorney's fees. That was before the investigation into this transaction began, and I can only guess that there is another bill in the offing for a half a million dollars. So for Mr. Harkness to stand up and say it with a straight face, that 50,000 is an appropriate amount to investigate this transaction, should give us all pause about the genuineness of his arguments.

As we pointed out in our opening brief, the
Airwalk Intern. case and the Exide Techs Case, the latter of
which was decided by Judge Kerry [ph] here in Delaware in
2003, both held that the question of whether there is --
whether there exists a prima facie case for such claims as
re-characterization, equitable subordination, and the like
is relevant to the issue of whether adequate protection
should be ordered.  Now, it is no secret that the committee
believes that re-characterization or equitable subordination
of the February 29th $90 million facility between the
Redstone entities and Midway, among other claims, should be
pursued here.  But let me start by being clear on what the
Committee is requesting in connection with the debtor's use
of cash of collateral motion.

THE COURT:  Yes.

MS. DAKIM-GRIMM:  We seek a final order that
permits the debtor to use its cash in accordance with a
reasonable budget that does not impede or interfere with
either the Committee's or the debtor's ability to perform
their statutory duties.  And we believe that what has been
proposed by Mr. Caponi and Mr. Harkness would do just that.

Now, let me take another aside and remind the
Court that the evidence that we heard, including the proffer
from Mr. Caponi this morning, established that there is at
least a $20 million cushion -- equity cushion -- above the

$30 million that Mr. Thomas contends is his secured

interest.  So despite the rhetoric, we're not talking about

Mr. Thomas's cash here.  Mr. Thomas doesn't have standing to

make the arguments.  Maybe at some point this year, he will

have that standing if the debtor uses the equity cushion.

But at the moment, we're not talking about using any cash to

which Mr. Thomas allegedly has any rights.  The evidence

established that there is that equity cushion, that the

company will be able to operate through August 1.  So at

best, the Committee believes that Mr. Thomas is entitled to

replacement liens and only to the extent of true diminution

of the value of his purported $30 million collateral.

Now, given the evidence that we saw here on

Wednesday and that the Court read in the depositions, the

Committee believes that that is all the order should entail.

To be absolutely clear, the Committee requests that the

previously ordered escrow of prepetition interests held in

the debtor's name, not in Mr. Thomas's name, should be

discontinued, and there should be no payments to or escrow

by the debtors of either interest or Mr. Thomas's

professional fees unless and until the serious claims

against him have been resolved in his favor.  In addition,

based on the prima facie case we believe we presented to you

on Wednesday, the Committee requests that today, the Court

grant it derivative standing to file adversary proceedings

against Mr. Thomas, the Redstone entities, and certain of Midway's directors, based on the evidence that we provided, and that's under the authorities that I cited a moment ago. And I would like to make a record of the fact that the Committee has twice requested from the debtor information about its DNO insurance so that a claim could be made to bring those entities to the table. We do not have that information, but I am sure that it's on its way.

Now, with respect to Mr. Thomas, the claims that the Committee would like to bring are for equitable subordination, re-characterization, aiding and abetting -- now, these are damages claims -- aiding and abetting breaches a fiduciary duty -- and unjust enrichment among others. With respect to the Redstones and NAI, the claims would be for re-characterization to the extent the Redstones don't have any interest the February, 2008 deal, fraudulent conveyance, breach of fiduciary duty, corporate waste, unjust enrichment, and unlawful conversion or usurpation of the opportunity among others. Claims against certain Midway directors would include negligence, breach of fiduciary duty, and unlawful conversion among other claims.

Now, based on the evidence that was adduced in the very limited or focused discovery taken today, the Committee believes that there exists strong claims for monetary damages against Mr. Thomas, the Redstones, and the

directors arising from their wrongful conduct.  We also believe that the February 29, 2008 insider transaction should be re-characterized from debt to equity or, in the alternative, equitably subordinated.  Now, these claims should have been investigated by the company and its professionals, and inexplicably, they were not.  But if successful, the claims could bring hundreds of millions of dollars into this debtor's estate and enhance the value of the debtor in any restructuring or sale.

Now, I want to take a brief walk, with your permission, Your Honor, through the actual evidence that we saw on Wednesday.

THE COURT:  Yes.

MS. DAKIM-GRIMM:  Starting with the state of play, if you will, at the end of 2007 going into the 2008 transaction, Midway has lost tens of millions of dollars every year for at least the past seven years.  In 2007, the year before the transactions at issue here, the company lost more than $78 million, while generating revenue of only $157 million.  These figures, Your Honor, come from Exhibit 4, the 10K of year-end 2007.  In 2006, the year before that, the company lost 72 million on revenues of 165 million.  In 2005, Midway lost 108 million on revenues of 150 million, and so on, and I would just refer Your Honor to the 10K.

THE COURT:  Yes.

MS. DAKIM-GRIMM: For almost a decade, the
evidence established that Midway has survived on equity
infusions from Sumner Redstone. The evidence established
that Midway was likely insolvent before the February 29,
2008 insider loan facility. Before that deal, the company
already have [sic] liabilities of $170 million, not
including its trade debt. And as of the filing of this
case, based on Mr. O'Desky's first day declaration, the
trade debt is currently estimated to be about 95 million.
We don't know what it was at the time, but it was obviously
some number more that added materially to the $170 million
number. And Your Honor, I'm sure, has in mind the values of
the bids and so forth. It defies credibility that the
company was not insolvent a year ago when the February, 2008
transaction was put into place.

Although the company itself purposely did not
conduct any kind of solvency analysis at the time of that
transaction, but we contend that it is beyond reasonable
dispute that if such a solvency analysis were performed now,
based on January, 2008 data, Midway's liabilities would have
exceeded its assets, rendering it insolvent as of the time
that transaction occurred. Now, were it not for the
repeated infusions of cash from Mr. Redstone over the years,
Midway would long ago have been in bankruptcy. In late
2007, management, meaning Mr. Booty and Mr. O'Desky and

others, were proposing drastic reductions in force, closing

facilities and so on to the board. That is in Exhibit 103.

In January of 2008, management advised the Midway board,

incidentally whose chairwoman was Shari Redstone, Sumner

Redstone's daughter, that if NAI did not provide 30 million

by March 1, Midway would get a going concern qualification

from its auditors at Ernst & Young and would breach

covenant in its Wells Fargo loan facility. The documents

that told that story were Exhibits 60, 62, 6, 63 and 7.

Now, either of those events would have led

swiftly to a Chapter 11 filing and, Your Honor, we submit,

should have led the board to take a close look at the

solvency of the company, but the Board bid not do that. On

February 7, 2008, management suddenly explained to the

board, including both Ms. Redstone, who was NAI's president,

and Mr. Steele, who reported to Ms. Redstone at NAI and was

a senior executive there, that they had uncovered what the

board members termed "deeply disturbing errors" in Midway's

cash forecasting system. And that meant that Midway was not

short the 30 million they had previously thought, but it was

short $90 million in the near term. And that's in Exhibit

10.

The written explanation for that astonishing

situation is in Exhibit 11, and Mr. O'Desky told us that he

drafted it, even though he didn't send it. And that

document attributed at least 19 million of the deficiency to the fact that Midway had not been paying its debts as they came due, another significant phrase, even to a non-bankruptcy lawyer like myself. In essence, the cash forecasting system had not taken the company's slow pay into account in predicting how much cash it was going to need going forward. Now, neither Midway nor the Redstone side of the deal seemed particularly perturbed by these events. Neither performed any meaningful analysis of whether Midway could actually afford to take on what was then an additional 70 million in debt, given that they anticipated using 20 million to pay off Wells Fargo.

In this regard, Your Honor, I would submit that Midway and its Board acted much like much of the consuming public in that time period. They weren't asking themselves whether they could afford to borrow anything or whether they stood a chance of ever repaying the money they were borrowing. They just asked, "How much do I want?" And remember, this was on top of the $170 million in existing debt. So in a three-week period, the board simply asked management to confirm to it, "How much cash do you need?" And then, they went to ask Dad for the money. There is not a speck of evidence that, consistent with their fiduciary duty, Midway's management or its directors considered the merits of the transaction -- February transaction with NAI,

in light of -- and these are P phrases from the case law --
Midway's then capitalization, solvency, collateral, ability
to pay cash interest, or its debt capacity ratios.  And we
have had full discovery on these issues, Your Honor.  We had
full discovery on those issues, both from Midway and from
the NAI side.  Both agreed to produce such documents if they
existed, and we got nothing.  The investment banking firm,
Houlihan Lokey, declined to give a fairness opinion on that
transaction that was devoid of qualifying language.  That's
Exhibit 69.

Instead of pausing to consider the significance
of that fact, the directors simply told Mr. O'Desky to draft
up his own fairness memorandum without even telling him that
they had tried to get one from Houlihan Lokey.  That was
particularly telling evidence of the Board's negligence.
And Mr. O'Desky himself admitted on the stand that his
memorandum, which was Exhibit 60 -- I'm sorry -- Exhibit 72,
shows no real attempt to find alternatives to the NAI deal,
no contact of any other financing sources other than NAI.
And Mr. O'Desky testified that he'd only been the CFO for a
few days, and he repeatedly told Your Honor that the board
directed him to negotiate the financing with NAI, not to
evaluate the appropriateness of the deal or to seek
financing from any other sources and he did not do either.
And the Redstone NAI side did not act like a bona fide

lender either.  Like they had many times in the past, the
Redstone side, in reality, made another equity contribution
to Midway in February of 2008.  But this time, the lawyers
dressed it up as a loan to avoid the affect of what was
called the super -- Redstone super priority provisions in
the note indentures that would have diluted Mr. Redstone's
holdings if his equity investment went over 90 percent of
the company.  And we saw that in Thomas's Exhibit 59 among
other places.

        The Redstones treated this as if it were equity,
however, as evidenced by several facts.  One, the Redstones
agreed to amend the facility within the first few months of
having put it in place to loosen the terms and ease the
direct of Midway's liquidity concerns that had arisen almost
as soon as the documents were dry.  And two, they sold the
supposedly debt facility to Mark Thomas, along with all of
the Redstone's other equity, only nine months later for
$100,000.  The Redstones plainly viewed that facility as out
of the money equity.  They plainly did not see it as 30
million of secured debt like Mr. Thomas now hopes you will
see it.

        NAI and the Redstones conducted no diligence like
a real lender would have done in deciding whether to make a
90 million loan to an entity that could not access the last
10 million of its existing $30 million loan facility.  No

one on the Redstone side performed or commissioned any

analysis of Midway's solvency or its ability to support the

increased debt burden over the long run, or ever to repay

it.  None of the Redstone entities produced a scrap of paper

evidencing that NAI, the purported lender, ever evaluated

Midway's key words -- capitalization, solvency, collateral,

ability to pay cash interest in the long term, or debt

capacity ratios.  In deciding whether to make this so-called

loan, those are the factors that are considered by Delaware

courts in a re-characterization analysis.

          And I want to make it abundantly clear that we

have had discovery on those issues.  If you have any

question about that, I would refer you, just by way of

example, to Exhibits 79 and 80.  And that is the subpoena to

Sumner Redstone and Mr. Redstone's response, prepared by

Shearman & Sterling, agreeing to produce documents if they

existed.  We served similar or identical subpoenas on NAI

and got identical responses, and no documents were produced.

And the only inference from that, Your Honor, is that they

don't exist.  This is not a matter where, let's go look a

little further and see if there are any documents.  They

don't exist, nor does there exist any evidence suggesting

that NAI required as a condition to obtaining the new cash

that Midway prepare any kind of plan showing how it was

going to repay the debt.  And remember, Your Honor, 40

million of the debt -- the unsecured piece, if you will -- was due in April of 2009, at least on its face. Nor did NAI ever bother to conduct a board meeting to discuss the $90 million facility, which we believe was simply an equity cash contribution. Instead, Ms. Redstone testified that they circulated a consent document without any discussion. Every NAI Redstone witness, which included Ms. Redstone, Mr. Jankowski, Mr. Steele, and Mr. Redstone himself, conceded that the $90 million transaction could not have happened if Sumner Redstone hadn't wanted it to. Although other Redstone witnesses had trouble -- and I'm sure Your Honor recalls when we had to call you in the middle of Mr. Jankowski's deposition -- conceding that Sumner Redstone was the controlling shareholder of Midway, Mr. Redstone himself, didn't have any trouble making that admission, and it's a fact that he -- it's obvious, it's repeatedly stated in Midway's 10K and other documents filed with the FCC, and those are documents that were approved by Mr. Redstone's daughter, Shari. And yet, when Mr. Redstone was asked about why he approved the transaction, he didn't sound like a lender. He testified that he did so because his daughter, Shari said, "Dad, Midway needs the money." When asked whether it would be prudent as a lender to lend to someone who doesn't have the wherewithal to repay the debt, Mr. Redstone said, quote, "It depends."

In this case, National controlled Midway, so they had a particular reason, apart from it wasn't like giving money to some stranger. They were loaning it to a company they controlled, and they wanted the company to survive. That's at Page 41, line 6 through 11. And when asked whether Mr. Redstone expected Midway to repay the money, he responded candidly, quote, "I don't know that I thought about it that way. But certainly, if you make a loan, you'd hope to get paid back." And that's at Page 95, line 22 to page 96, line 1. It should go without saying that those words are words that no true lender would ever utter. Mr. Thomas now defends this transaction by claiming that a special committee was formed by Midway's board to negotiate the deal. But the special committee, the evidence established, was devoid of any substance. The board never authorized the special committee to evaluate the deal, the merits of any further borrowing, or to explore any kind of other alternative like a Chapter 11 financing, an out-of-court restructuring, anything that might have brought some reason to the madness that was Midway.

Now, despite being authorized to do so, the special committee didn't bother to hire any professional financial advisor to determine whether the transaction was in Midway's best financial interest. And there, I would refer Your Honor to Exhibit 70. The so-called special

committee's role was simply to paper the terms forgetting

$90 million in cash from Mr. Redstone. And throughout the

three-week period in which this deal came together,

management, and in particular, Mr. O'Desky, repeatedly

reminded the special committee what would happen, quote, "if

the company failed to consummate the transaction and when."

And that's a quote from Exhibit 87. The evidence

established that while Ms. Redstone and Mr. Steele of NAI

abstained from actually voting on the transaction on the

Midway side, both of them participated in the meetings at

which it was discussed, just didn't vote in the end. And

Mr. Steele actually stayed on the audit committee to which

the special committee reported until the transaction was

approved. Ms. Redstone, Midway's chairman, voted for the

transaction on the NAI side after being briefed on it in at

least two memoranda by NAI's general counsel, Mr. Jankowski.

Now, what happened after that? Not surprisingly,

given the company's insolvent status before the transaction,

it took about five weeks for Midway's management to realize

that the $90 million from the Redstones wasn't going to be

enough. On April 3rd, 2008, Midway's CEO, Mr. Booty wrote

to the board, quote, "The bottom line, which I in no way

present lightly, is that a conservative, realistic 2008

plan, taking into account all known potential downside and

risks combined with moving the TNA shift date to August in

an attempt to maximize its success, would create the need for an additional 28 million beyond the current $90 million facility." That is from Exhibit 13. And of course, the company immediately turned to Dad, NAI, and Mr. Redstone, as Mr. Booty wrote in an email to Midway's general counsel on April 25th, quote, "Sounds like a next step regarding the factoring of receivables would be for you to have a conversation with Tad at NAI; is that right?" And Mr. Jankowski of NAI testified that when he got the call about factoring, that's when NAI started worrying that Midway was insolvent. The evidence demonstrated with regard to Mr. Thomas that Midway was insolvent during 2008 long before the Thomas was concocted and consummated by the Redstone professionals.

 Midway's management and its board never had a plan to deal with the looming obligation in April of 2009. Not only to respond to the note holders put, which apparently, Mr. Harkness believes is now the note holder's fault, but also to repay the 40 million of the unsecured piece owed to the Redstones. Those were both due April, 2009.

 THE COURT: Yes.

 MS. DAKIM-GRIMM: And I think we -- Mr. O'Desky and I agreed that that added up to 115 million and that it was viewed really throughout 2008 as the fire drill we'll

deal with some other time. We just can't deal with it right now. In fact, the evidence at the hearing was that in June of 2008, management presented to the board the sobering information that if another $32 million were not raised immediately, the company, quote, "would not be able to fund operations past October." That's in Exhibit 16.

Now, management presented an actual business plan to the board on July 2nd, and that was Exhibit 78. And I'm sure Your Honor will recall that the plan had four options: The drastic plan, the proposed plan, the growth plan, and the strategic growth plan. And all four of those options began with the assumption that the company would not have to repay 75 million to the note holders and that NAI would not require repayment of the 40 million. That latter assumption may have been fair, given that it wasn't really a loan to begin with. But even with those assumptions, the most conservative of the four plans stated that the company needed $65 million more to stay open into 2010.

So management's own plan contemplated either the outrageous fortuity that the note holders would not put the debt to the company or, more likely, that a restructuring of that debt and the NAI piece, if it were debt, was inevitable. Midway requested amendments to the NAIC -- to the NAI facility to, quote, "avoid restrictive covenance," end quote. That's a quote from Exhibit 15 in early July of

2008. And not having received the requested waivers, Mr. O'Desky wrote in an email we saw on July 29th, quote, "This is nuts. We must have a waiver. This is complete -- until this is complete, we cannot run the business otherwise," end quote. By October, 2008 it is beyond dispute that Midway recognized it was insolvent hopelessly. Ms. Redstone and Mr. Steele knew it, and they all knew that Midway was not going to be rescued any more by Mr. Redstone because of his problems with NAI's own lenders. They had been advised that they would get no more cash, and in that regard, you can look at Exhibit 120.

There was an October 29th board meeting, in which the minutes reflect that management was already working on the assumption that no additional funding would be obtained. The board was advised in that meeting, the minutes reflect, by their outside counsel from Sibley Austin about their quote "expanded fiduciary duties to all of the corporation's relevant stake holders, including its minority stockholders and creditors" end quote. And again, even as a non-bankruptcy lawyer, I know what that means, and I'm sure the Court recognizes the company was taking insolvency advice. And that's Exhibit 122.

THE COURT: Yeah.

MS. DAKIM-GRIMM: Now, Shari Redstone and Mr. Steele of NAI both attended that meeting. There is no doubt

they heard the advice, and there can be no doubt that NAI
knew that Midway was insolvent and had expanded fiduciary
duties at least as of that time, although our contention is
that they started before the February transaction.  On
November 5th, the Board considered a unanimous consent that
expressly recognized the possibility of filing a voluntary
petition under Chapter 11.  That's Exhibit 100.  And Mr.
O'Desky has admitted that the company had stopped paying
certain of its creditors several months before it actually
filed the case here.  And in fact, one of the creditors, in
his first day declaration -- the company had not paid them
$8 million that had accumulated over several months.

         The evidence established that on the NAI side,
the Redstones were desperate not to lose control of their
crown jewels, Viacom and CBS.  And in order to generate cash
to avoid that -- what they saw as that imminent disaster,
Mr. Redstone's longtime -- I think he agreed with me that he
had been using him since the '60s -- advisors at Shearman &
Sterling concocted a brazen plan to sell Mr. Redstone's
entire stake in Midway to generate for him a claim of over
$700 million in tax losses, which was in turn to generate a
tax refund that he would use to buy down his obligations to
NAI's creditors.  That plan might actually make some sense
viewed solely from the perspective of Mr. Redstone, Viacom,
CBS, and those lenders.  But the problem with the plan was

that Midway was insolvent, and as the controlling
shareholder, Mr. Redstone and NAI owed Midway's minority
shareholders and its creditors, as well as the company, the
same fiduciary duties under Delaware law that the directors
owed.

NAI's person most knowledgeable designee, its
general counsel, Tad Jankowski, testified that NAI
considered -- before it did the transaction, it considered
at least three ways that the sale of Mr. Redstone's stock in
the Thomas deal would harm Midway.  He testified that the
resulting change in control would affect Midway's ability to
use net operating loses and other tax assets.  He testified
that they considered that the transaction would adversely
affect Midway's stock price applicable to the minority
shareholders and that the change in control would accelerate
the put rights under the notes.  Nevertheless, NAI and Mr.
Redstone concluded the deal because the benefit they
obtained for themselves, they apparently viewed as more
important than any harm suffered by Midway.  Mr. Redstone
testified that he, for himself, didn't think about any harm
caused to Midway.  He said he just did what his lawyers told
him he had to do, and he had to do it so he wouldn't lose
Viacom and CBS.

Now, instead of seeking an appropriate, strategic
buyer who might pay a fair market price for Midway -- and on

this point, I also have to reiterate, Your Honor, that

contrary to what Mr. Harkness suggested, were their

documents justifying that a lot of buyers had been looked

at, we would have them because we served a subpoena on

Shearman & Sterling.  They responded to it and agreed to

produce such documents if they exist.  They did not produce

any.

Mr. Redstone's lawyers, who had represented his

entities for many years and had made a great deal of money

on those entities and, I would suggest Your Honor, were not,

themselves, particularly interested in seeing CBS and Viacom

go into restructuring, identified Mr. Thomas when they had

met in another transaction or transactions where he was an

employee of one of their other clients.  They didn't pick

Mr. Thomas out of the phone book, but they might as well

have.  It was like the Shearman & Sterling phone book they

looked at, rather than the general public phone book.  And

they lined him up to do this transaction by flattering him

that he was somehow an expert in mergers and acquisitions

and he could do this really quickly and he was on all on his

own, which frankly means he wasn't going to look into it too

deeply and somehow they knew that.  And when the Shearman &

Sterling lawyers, on behalf of Mr. Redstone, refused to

provide him with the requested indemnity -- his lawyers

requested that in Exhibit 28.  And they asked that he be

indemnified specifically against claims of corporate waste, fraudulent conveyance and the like. That's Exhibit 27.

Mr. Thomas was undeterred from pursuing the deal, what he viewed as his lottery ticket to the big leagues. He lowered his $1 million offer for Midway to $100,000, plainly factoring in that he would need to pay himself his own legal fees to defend those kinds of claims. Now, Mr. Thomas, I believe the evidence established, is not a particularly truthful individual, and he transferred his interest at that point in his home, or as he likes to call it, "his estate," to his wife for $1, and that's Exhibit 22.

He claimed on the stand that his estate planning lawyers in Massachusetts told him to do this for estate planning purposes, but he had already testified, as we saw his deposition, that he didn't have an estate planning lawyer, and he couldn't identify any estate planning reasons for that transfer, either. It's obvious that Mr. Thomas transferred the house to avoid claims against him for the kinds of causes of action his attorneys had warned him he would face. And of course, the issue of Mr. Thomas's transfer of his house was also relevant because after the first day hearing in this case, Mr. Thomas submitted -- and this was on March 5th, 2009 -- an unsolicited declaration to the Court claiming to have unencumbered assets of more than $10 million. That's Exhibit 21 in our binders.

In his deposition, Mr. Thomas expanded that figure to 20 million, and this is before he knew that we had found out about his house transfer. And he said that both the $10 million and the $20 million included what he perceived to be a $12.5 million value of his home. He didn't disclose until confronted the fact that he had transferred ownership two days before signing the deal here in the Kramer Levin offices in New York. And Mr. Thomas's evaluation of his estate at $12.5 million, because that's how much he put into it, shows either dishonesty or a fundamental lack of understanding of basic real estate economics in the year 2009. In any event, the transaction between Mr. Thomas and the Redstone side closed on the Friday after Thanksgiving, November 28, 2008, only two weeks after Shearman & Sterling first contacted him, and that is relevant under the case laws I'll discuss in a moment.

Although the Redstones plainly needed to sell all of their equity in the company to realize their plan of taking tax losses, Mr. Thomas testified that he viewed his $100,000 payment offer as for the debt. You may remember he repeatedly stated, "I bought the debt. I bought the debt." And he came to that conclusion once he realized that the company needed a lot of money invested and he didn't have it and wasn't willing to invest money in the company in any event. The purported sale to Mr. Thomas of the Redstone's

equity, in fact, was devastating to Midway, its minority shareholders, and its creditors. No witness has been able to identify a single way in which this deal was good for Midway. And it is beyond dispute that by contriving to take for the Redstone side the tax assets accumulated by Midway that would have been valuable in any restructuring negotiation, the company stripped Midway of a very meaningful asset.

Now, Mr. Harkness mentioned this in his remarks. Mr. O'Desky testified that an unidentified internal tax guy might be able to come up with a way for Midway still to use the 600 million in NOLs. But Mr. O'Desky said, "That isn't final," which makes the testimony meaningless in any event, and it is also lacking in credibility. It has not been adopted by any tax professional. Mr. O'Desky said Ernst & Young has not signed off on it. The law firm Blank Rome has not rendered at tax opinion, and it is beyond legitimate dispute that the IRS is not going to allow both Midway and the Redstones to use that same tax asset. The Thomas deal triggered Midway's redemption obligations under the indentures governing the notes, and it triggered defaults to the extent that there actually exists loans that are held by Mr. Thomas.

Now, it's, we believe, critically important to the resolution of this case in a prompt fashion that the

Court revisit the interim cash collateral order and modify

it to eliminate the payment on a current basis of Mr.

Thomas's professional fees. Now, he admitted on the stand

to having already received more than $300,000 in interest on

his $100,000 investment, a 300 percent return. Evidence at

the hearing suggests that he has received a million dollars,

but perhaps he hasn't collected that from the NAI side yet.

But most importantly, Your Honor, Mr. Thomas has almost

nothing to lose here. And he has a very strong incentive,

particularly if the debtor has to pay to litigate this case

not to win, but to the point of administrative insolvency,

at which point it becomes a Chapter 7 and he can just sell

off the assets and take them home with him without a

Creditors' Committee or opposition. Mr. Thomas should only

get his legal fees paid, and they should not be escrowed in

the unlikely event that he is successfully defends all of

the legal claims identified by the committee that I have

just described.

         And I want to use what remaining time I have,

Your Honor, to touch on the elements of the claims under the

law that the Committee seeks permission to pursue. First

is, obviously, re-characterization of the February 28th

transaction. As the Court knows much better than I,

bankruptcy courts re-characterize infusions of capital that

more properly represent equity than debt. The third circuit

case on point here is the <u>SubMicron Systems</u> case at 432 F.3d 448 from 2006. And that case says that "courts should be skeptical of transactions that are labeled as debt made when a company is undercapitalized," as was Midway. And the two basic questions that the Court will ask are, does the loan have the indicia of an arms length transaction. I would suggest to you, based on the overwhelming evidence presented in a very short time, that it does not. And what was the intention of the parties in creating the investment? And I believe, Your Honor, we also have a very strong case that the intention here was to get cash in the hands of Midway at whatever cost and avoid the restrictions and the indentures that would have diluted Mr. Redstone's equity holdings.

The Committee believes that based on all of that evidence, including the absence on either side of the deal of any consideration of Midway's capitalization, solvency, collateral, ability to pay cash interest in the long term, or debt capacity ratios in making this transaction, we've presented at a minimum a prima facie case for re-characterization of the February 28th facility. In the alternative, Your Honor, we would pursue claims for equitable subordination, which under Section 510(c) of the bankruptcy code permits Courts to cure an equity in a claim against a bankruptcy estate that would produce unfair results. And here, we would seek the subordination of the

purportedly secured claim to unsecured creditors.  The Court
is undoubtedly familiar with the three-pronged test for
equitable subordination, inequitable conduct by the claimant
resulting in an injury to the creditors of the estate, or an
unfair advantage to the claimant and the remedy that's not
inconsistent with the rest of the code.

        We believe that as an alternative remedy to re-
characterization, we have a strong claim for equitable
subordination.  And now the damage claims, breach of
fiduciary duty and aiding and abetting a breach of fiduciary
duty in the case of Mr. Thomas.  As the acknowledged 87
percent controlling shareholder of an insolvent company,
Sumner Redstone and NAI owed fiduciary duties to Midway, its
minority shareholders, and its creditors at the time of the
February transaction and the Thomas transaction.  We cited,
Your Honor, the controlling case law from Delaware
bankruptcy courts on this issue in our papers.  But that
includes the Miller versus McCown case, the Fleet Retail
case, which arose in the Hechinger bankruptcy, and the
Lozinski case, which arose in the High Strength Steel
bankruptcy.  The Redstone entities simply ignored this duty
because their backs were to the wall.  They made an advised
decision to throw Midway to the wolves to save their
interest in CBS and Viacom, but there are consequences to
that decision in this Court on the Midway side.

Mr. Thomas, for his part, knowingly aided and abetted that breach, took advice on the law, adjusted his offer, and went forward with the deal anyway while hiding his assets. And under the law cited in our papers, Mr. Thomas is, as a result, liable for the same damages as are the Redstone entities, a damage that resulted from their concerted actions. On fraudulent transfer, Your Honor, as to the Thomas transaction, that transaction bears all of the hallmarks of a fraudulent conveyance, a fraudulent transfer. Mr. Thomas knew that when he signed the documents. He asked for an indemnity against exactly that claim, and when he didn't get it, that's when he took the actions to hide his assets and so forth. Under the Bankruptcy Code, transfers means any act that has the effect of diminishing the debtor's estate from the standpoint of creditors. Intentional fraudulent conveyance -- although there is also constructive -- it might be applicable here, but intentional fraudulent transfer is one made with actual intent to hinder, delay, or defraud creditors. And we believe that here, actual intent is demonstrated by the grossly inadequate consideration paid by Mr. Thomas and the, quote, "secret and hasty transfer not in the ordinary course of business." That's a quote from the Rosner [ph] case from the Delaware bankruptcy court in 2005. As a result of this Thomas transaction, the Redstone entities took for

themselves hundreds of millions of dollars in tax assets,
leaving Midway with nothing.

Following the change in control Thomas knew would
be the result in the transaction, and he concluded it
anyway. Midway lost a meaningful asset and got nothing
other than Mr. Thomas's efforts to strangle the company,
keep it from paying for any investigation into his conduct
that continues here today with his attorney standing up and
saying, "Notwithstanding that Mr. Thomas's side has probably
spent $1 million to defend the allegations, the Committee
should not be allowed to pursue its statutory duty."

Unjust enrichment, another claim against Mr.
Thomas, and to prevail on that claim, the Committee would
only have to show that Mr. Thomas would be unjustly enriched
were he to obtain a 70,000 percent return on his $100,000
investment, that the debtor and the creditors were
impoverished, and that there's some relationship between the
enrichment and the impoverishment, and that there's no
justification for letting him keep the money. The Trevino
case from the District of Delaware in 2008 cited in our
papers addresses that claim. If the February 2008
transaction is not re-characterized, we would pursue that
claim, as well.

Your Honor, we believe that the law, and on the
other claims as discussed in our pre-hearing brief -- and

I'm not going to take that further, but in summary, I would like to reiterate that we believe the evidence showed a substantial equity cushion, more than $20 million over the $30 million Mr. Thomas claims to have secured.  So we're not talking about using any contested money.  Mr. Thomas has no right, as a result, to argue that there should be any restrictions on what the Committee spends, and respectfully, the Committee will abide by the law, and all of its fees will be carefully reviewed by the Court before anything is paid.  There is no authority in the statute for advancing Mr. Thomas his attorney's fees or escrowing them.  That may be something that happens and may even happen routinely when you have a legitimate party, but that's not what we have here.  And no one has cited to you any authority for permitting Mr. Thomas to have his attorney's fees escrowed or paid in advance.

We believe that the Court should enter a new final cash collateral order, providing only that Mr. Thomas gets the replacement liens, and only to the extent of diminution in the purported 30 million in capital.  And we respectfully request, Your Honor, that you enter an order today authorizing the Committee to pursue the identified claims I have discussed in adversary proceedings against Mr. Thomas, the Redstone entities, and certain other directors. Thank you.

THE COURT:  Thank you, Ms. Dakim-Grimm.

Mr. Caponi.

MR. CAPONI:  Your Honor, Steve Caponi again for the debtors.  I just want to touch on a couple issues.  One, as a matter of, I guess, housekeeping, make sure the Court's fully informed with respect to the NOLs and the attack on that.  This morning, Midway filed its 10K, which was reviewed by its outside auditors, Ernst & Young, which lists $750,092,000 in NOLs for the federal income tax purposes, which expire from 2021 through 2028.  That's a publicly filed document, you know, Your Honor.  It's a matter of public record.  So I think it's -- there were some certain liberties taken with the evidence that was put in.  I think, you know, the -- with respect to the NOLs, the record is fairly clear.  It is what it is.  It's now been publicly filed and reviewed by outside auditors.

THE COURT:  Well, it is what it is, but the fact is, before the transaction, there was no effort to determine what it is.

MR. CAPONI:  Your Honor, with respect to before the transaction, that is a -- Midway was not liable before the transaction.

THE COURT:  Understood.  Understood.

MR. CAPONI:  What we're talking about is, what's the practical impact of the transaction.  I mean, obviously,

you cannot bring a claim if there are no damages to be
recovered.  It's sort of a -- it's a threshold question that
needs to be answered at the courthouse steps.  And I'm not
passing judgment on that.

THE COURT:  Understood.

MR. CAPONI:  We're just saying there is a lot of,
you know, I just want to make sure the statement is clear
that to the extent we're arguing that there are, you know,
NOL damages, we have a contrary record, and it's the only
one before the Court.  Your Honor, circling back to why --
again, why we're here.  It's cash collateral, and it's the
debtor's urgent need for the use of cash collateral.  You
know, as someone who practices mainly outside of bankruptcy
and does some work in bankruptcy, I'm sensitive to the
concept that we're -- us litigators tend to use machetes and
hatchets in the district court.  Scalpels are more likely
what's in order in bankruptcy court.  I think they're -- you
know, Your Honor for the Court to conclude that Mr. Thomas
has absolutely no right to, you know, have a say in the use
of cash collateral would be a significant development at
this point in case based on a preliminary record.

I think all the parties admit there is a lot more
that needs to be said and the book has not been written on
this.  To go down that road puts the Courts that are in the
same position that the debtor was in when it was negotiating

the agreement, which is, do we risk a contested use of cash collateral fight.  In the risk, the debtor ends up with no cash collateral, or is better to put in place and agree to reasonable parameters for that use.  And I think in light of the willingness to escrow the funds, the fact that the funds are not needed by the debtor, it is a reasonable -- it's a scalpel approach that resolves the concerns of the Committee, gives the debtor what it needs which is access to the cash collateral and does it in a way that the lender is not going to object and we find ourselves ratcheting this thing up to the next level.  To me, that's a cash collateral fight, and there is -- obviously its open issue of a carve-out for the Committee.  And again, the debtor has started taking a strong position on that.

With respect to Ms. Grimm's request to -- for standing to pursue claims and -- now, there's only one motion before the Court today, and that's cash collateral. I think that needs to be brought to context of another motion.  Maybe if they draft up a complaint, we can look at it and everyone can have the opportunity to comment.  But I think there should not be, from the debtor's perspective, a rush to judgment.  You know, I think that a trial in evidence and et cetera will be necessary before, you know, a final determination is made.

The debtor has a serious concern here, Your

Honor, with respect to the proceeding with claims. And that
is the cost to be borne by this estate. Now, I think the
comment of, you know, potentially bringing in hundreds of
millions of dollars in claims -- one, there's no record for
that, but more importantly, I'm sure that caused our friends
at Shearman & Sterling to add another 10 more associates on
their side of it. They've been here at every proceeding.
I'm sure Dewey is gearing up. I know the lender is, and I
know the Committee is. Best case scenario for the debtor,
it's going to be paying the Committee's fees. Worst case
scenario, this thing goes the distance and it's paying both
the lender's fees and the Committee's fees. Given the firms
involved, what's at stake, this is not going to be a cheap
endeavor. Some, you know, 6 to $10 million in fees and
professional expenses is not going to be unreasonable in
this context. And we think before we launch down that road,
as Your Honor noted at the last hearing, the facts really
are not a dispute. It's how they're interpreted.

As the debtor playing somewhat a neutral role in
this fight, I think I can say from my personal perspective,
having been at the various depositions, having had numerous
conversations with the lead counsel for both sides here and
the lender and the Committee, there comes a point -- you
know, all litigators are all somewhat guilty of this, where
you tend to get too wrapped up in your own case. I think

there is a touch of that going on at the moment. The debtor would think it's a much more prudent use of its resources to order or compel a mediation between these parties now that the record is established, you know, for the most part, Your Honor, far more than you would get in a normal mediation. Let's bring somebody in that can look at this objectively and someone who the parties respect so, you know, someone that's such as a Magistrate Thyne [ph] or another practitioner who can, you know, look at the parties in the eye and say, "I know who you're going for, but here's how likely I think you are to succeed or not succeed. And Mr. Thomas, here is what you have at risk and where you stand," before we start spending a ton of money.

As an example, Your Honor, I mean there are -- there is -- Ms. Grimm was running through the potential claims, unjust enrichment and fraudulent transfer. They're claims for NAI's creditors, not this estate. This estate didn't transfer anything, so I mean, if, you know, if creditors of NAI think its assets were dissipated unfairly in a fraudulent transfer, I'm not sure -- again, I'm not passing judgment on the claim, but I'm not sure that that involves us. With respect to claims against the debtor's directors and officers and entering into the February transaction, at best, the evidence so far is a breach of the duty of care. There has been no suggestion that the

officers of this company engaged in a breach of duty of loyalty.

With the independent committee, again, I think it's the allegations they may have been negligent, something along those lines. Even if grossly negligent, this company has a 102(b)(7) provision in its charter. They cannot be held liable for that, so that well is dry. And I think mediation would be an opportunity for both sides to think it all the way through, brief it out, and have someone, you know, at the gate here say, "Here's where your strengths and weaknesses are," and you know, that may result in a resolution which could potentially save this estate a lot of money. We have a sale coming up -- hopefully, a sale coming up in a few months. I think a mediation should happen immediately after the sale. Your Honor, it's always easier to reach a resolution when everybody knows what the pot of money is and you're giving up the claim. You know the true value of it versus speculating. It would also give the debtor an opportunity to get done what it needs to get done without the specter of a major litigation hanging over its head, which would potentially be damaging to the sale process.

And so, Your Honor, with respect to -- again, the cash collateral and the issues are fairly narrow, but we seem to spend a lot more of our time on the next fight and

not this fight.  I think that if the Committee wants to proceed, it should file a motion, and at a minimum, Your Honor, if Your Honor grants that relief, mediation should be compelled before the estate risks a substantial payout in legal fees, which as we've all been talking, the cash cushion here is not dramatic.  $6, $7, $8, $10 million in fees and expenses is going to have a materially negative impact on this estate and its creditors, again, unless the Committee hits its home run.  So with that, I'll cede the podium to Mr. Harkness.

THE COURT:  Thank you, Mr. Caponi.

Mr. Harkness.

MR. HARKNESS:  Thank you.  I just have a few follow-up comments.  I hope you don't mind if I stole your page from the 10K.  I'm just trying to read it, here.

Just a couple of quick follow-up points.  First of all, with regard to the NOLs, I'm just reading this morning's 10K.  It does say we had a new operating loss carried forward of $750,920,000 for federal income tax purposes, which expires in 2021 and 2028, but then goes on to say, "The stockholder ownership changes, as defined under Section 382 of the Internal Revenue Code as amended, may limit the annual amount of net operating loss carried forward we may use to offset future taxable income."
So that's what the records says, just so we have full

disclosure here. And for good or ill, at one point in my
career, I actually litigated deferred tax assets, so I know
a little bit more about deferred tax assets than is probably
healthy. But you know, as I understand NOLs that you have a
pot of money in the NOL.

       THE COURT: Yes.

       MR. HARKNESS: And the company, if it later gets
taxable income, can use a portion of that every year. There
are pieces that are to expire, and there are portions that
you can recognize as to offset taxable income if you ever
get taxable income. And as I read this sentence, it says
that there may be some limit relating to the change in
control. I think that as I understand --

       THE COURT: Aren't NOLs -- aren't they also
valuable in a sale?

       MR. HARKNESS: They can be in certain context,
Your Honor. And I think the bottom line of this disclosure
is A, they did not get wiped out. B, there -- it says here
right here on its face there might be some limitation.
Quite frankly, we haven't had any testimony about this.
There always are limitations. And I guess that's something
if we go forward, we're going to learn more about with
expert witnesses and whatnot. But we were talking and Ms.
Dakim-Grimm was talking about a tax asset being transferred
from one person to another. And as a matter of tax law,

that's absolutely not what happened here.  It's not a
transfer of one thing from one person to another.  Whatever
NAI may have done, it didn't take NOLs from the company --
from Midway.  It may have recognized a loss on its own
balance sheet --

    THE COURT:  Right.

    MR. HARKNESS:  -- for tax purposes, but it's not
a transfer of an asset from one entity to another, and I
want to make sure that that's --

    THE COURT:  And I understood that, and I didn't
understand that argument to be made, but I certainly
appreciate the clarification, certainly.

    MR. HARKNESS:  A couple other things.  First of
all, with regard to NAI discovery, I think that for the most
part, you know, from a broad brush, we have had a lot of
facts established.  We are still -- I think, we are still
getting, I think, my last CD from NAI as far as their
documents came in Thursday or Friday last week.  So I think
that there may well be more to learn there.  Also, the
record is clear.  It wasn't just Shearman & Sterling getting
their Rolodex out.  The record is very clear that NAI
actually hired a banker and made other approaches separate
from what Shearman & Sterling did, so I want to make sure
that that's clear.

    But more importantly, Ms. Dakim-Grimm kept coming

back over and over again, they didn't do it this, they

didn't that, there were no solvency analysis. Were there

documents that say solvency analysis? No. But the

testimony that you heard here, the documentary record, and

now some of the documents we're getting from NAI confirm

that the company was doing weekly cash projections and they

had a three-year plan. And Mr. O'Desky sat right here and

said, "We had a plan of how we were going to get the

profitability that included how we were going to deal with

the NAI loans." So to say that the company was doing this

blindly or that NAI was doing this blindly just isn't true.

It's not what the facts show. And so I would commend to the

Court the Radner [ph] decision and actually parts of

SubMicron that indicate that undercapitalization of loan is

insufficient to justify subordination of an insider claim.

There must be evidence of some inequitable conduct.

So the Judge -- Your Honor, you're aware of the

law. We briefed it, they've briefed it, and we commend that

to you. One final point -- well, actually two. First, you

know, with regard to Mr. Thomas's credibility. I really --

I don't think the record sustains the serious question of

his character the way Ms. Dakim-Grimm did. You got a chance

to witness Mr. Thomas. You can make your own determination,

but I think this is a person who's really trying to explain

himself. He came in here and, I think, testified truthfully

to try to explain himself, and obviously, you'll be the one who makes the final determination. And finally, I think that I just want to leave with the point that there is no dispute that this is a secured claim. Mr. Thomas's claims are a secured claim. And so unless and until there is an adversary proceeding filed, which it sounds like is Ms. Dakim-Grimm and the Committee's intention and they are meritorious, he is entitled to interest and fees unless there is re-characterization or equitable subordination. So you know, I think that the idea of having him wait in line for an administrative claim is just really not supported by this record. Thank you.

      THE COURT: Thank you, Mr. Harkness.

      Ms. Dakim-Grimm.

      MS. DAKIM-GRIMM: I'll be very brief since I think I took the most time. Your Honor, my colleague, Mr. Zolkin, actually pulled up the new 10K that was filed, and I think Mr. Harkness did just clarify for you what it states. But I want to make sure since it is not in evidence --

      THE COURT: Right.

      MS. DAKIM-GRIMM: -- that the actual language that the Ernst & Young folks approved is -- where is it, David? "Stockholder ownership changes, as defined under section 382 of the Internal Revenue Code as amended, may limit the annual amount of net operating loss carry forward

we may use to offset future taxable income." That's the
point, Your Honor. That is the point. Ernst & Young has
not concluded, nor has this debtor, that it can use the 700-
and-some million of net operating losses that were generated
over the years. That's a fairly obvious point, but I
believe that there exists substantial damages.

I would like to address Mr. Caponi's somewhat
surprising resistance to the evidence that the Committee put
forward, and I do this with some reluctance. But, Your
Honor, you heard evidence from the witnesses that the
company itself -- Mr. O'Desky speaking as the company's
representative -- the company, itself did nothing to
investigate whether it had claims against either Mr. Thomas
or the Redstones, and -- other than to call up the Redstones
and say, "Did you really sign these documents?" That is
troubling, but the fact that bankruptcy counsel here also
did no investigation and is resisting such investigation is
equally troubling.

In that regard, I would refer Your Honor to
Exhibit 127 in the binders. And within that Exhibit on
bates page Midway 04516 is an email that Mark Richards, the
senior counsel at the Blank Rome firm, wrote to Mr. Thomas's
lawyers on Thursday, February 12 before the bankruptcy was
filed. Subject: Ray Cash Collateral Order. And I'll just
read it. It says:

1
2
3
4
5
6
7
8
9
10
11
12

      "Gordon, so does the client.  I know you would

      like it.  If you have the valid and enforceability

      provision, we, the debtor, are not seeking to re-

      characterize/subordinate.  That will be perhaps

      the Committee.  You are really not enhancing your

      position.  The debtor will not -- I repeat, will

      not lead, join in, or seek to subordinate, et

      cetera.  The risk remains, if at all, from the

      Committee or bondholders.  And more importantly,

      the board has directed us not to agree to this.

      Mark."

    Your Honor, you -- I'm confident you are aware

13
14

that you have the authorities to respond -- to authorize the

Committee to file --

15

    THE COURT:  Yes.

16

    MS. DAKIM-GRIMM:  -- the adversary proceedings.

17
18
19
20
21
22
23
24
25

It would, respectfully, be a waste of time, given all the

effort we've already put in to re-brief the issues, and if

anything is going to run up fees, I believe that would.  So

we would request that you would rule on that today.  And

then finally, with respect to Mr. Caponi's suggestion of a

mediation, as we discussed this weekend when he raised that

issue with me, settlement is always a good thing in civil

cases, in bankruptcy cases.  The Committee is happy to

accept any settlement proposals from Mr. Thomas.  We don't

have anything like that and no reason to expect that

something is coming.  However, a court-ordered mediation,

respectfully, is premature until we --

THE COURT:  We don't have -- we don't have

certain parties.

MS. DAKIM-GRIMM:  -- get all the parties at the

table.

THE COURT:  Yes.  Yes.

MS. DAKIM-GRIMM:  Thank you.

THE COURT:  Yes.  I sort of foresaw that.

MR. CAPONI:  Your Honor, if I may?

THE COURT:  Yes, Mr. Caponi.

MR. CAPONI:  Point of clarification.  The debtor

has, at no point, forwarded or stood in the front of any

investigation.  We traipsed all over the country, myself

included, many days away from the family to allow the

Committee to flip over every rock it could, and there is not

one stitch of evidence that we stood in the way.  The only

thing the Committee is raise -- excuse me, the debtor is

raising is the tendency that happens in bankruptcy court

where everyone likes to go to the mat using the debtor's

money, and we are in that position.  We held our tongue.

The Committee has indicated where it wants to go

and is indicating it's going to hurt a lot of parties and

it's going to be expensive and I think mediation --

meaningful    mediation -- not if Mr. Thomas wants to come
over and grovel and concede, I'll listen to it, and Mr.
Thomas saying, "The Committee wants to give me an extra 10
percent, I'll listen to them."  I'm talking honest broker
mediation.  And I'll stress again, everyone has stood up
here.  The facts are not in dispute.  It's how you interpret
them.  And people tend to get caught up in their own view of
the world.  I think it makes sense for both sides to hear
from an outside person.  I don't think we need to have
everyone at the table, but I think we could invite everyone
to the table.  Shearman & Sterling, again representing NAI.
The Redstones have been here at every proceeding, Dewey as
well.

          But fundamentally, Your Honor, the major claim is
against Mr. Thomas, and what we're arguing about is his
claim for, you know, the secured portion.  That could be
resolved in any future litigation once we go down the road
can go down the road.  But this estate is not going to be
required to pay for the fees of the Board or the fees of NAI
or Mr. Redstone.  If the Committee gambles and loses, this
debtor will be paying the fees of the lender.  And so that's
why it's a particular sensitivity with respect to this
party.  And I think that the issues are such that they can
get together and try to work it out.  And any upside that
may come from that down the line, this estate's not going to

complain about if their Committee can hit for a couple of hundred million dollars. But let's try to do it in a logical, thoughtful process and not just rush the war because we've already spent this much time doing it. Thank you.

THE COURT: Thank you, Mr. Caponi. Well, what I'd like to do is just take a short break and just go over my notes and sort of put together my thoughts. And then we'll come back, let's say, in 15 minutes. And then, of course, I know there are other matters on for today, but we'll proceed with those.

MS. DAKIM-GRIMM: Thank you, Your Honor.

THE COURT: Thank you.

(Recess at 10:49 a.m. to 11:08 a.m.)

THE CLERK: Please rise.

THE COURT: Thank you all. Please be seated. Well, thank you. I -- you know, I want to be careful here because we are here on a motion for use of cash collateral. And it's an unusual situation, as has been noted, when a Court is confronted with the amount of evidence that I have received on such a motion. And as I also indicated, I gave a tremendous amount of though and reading over the weekend to this matter because it's a troublesome matter. I certainly am not going to be making any findings on wrongdoing, but rather on whether or not a prima facie case

is made of the wrongdoing or the nature that the Committee

has put before the Court, whether or not, in effect, the

Committee has stated a claim for relief. And obviously,

it's more than a complaint that I'm viewing, which would be

the typical manner in which a Court would consider whether

or not a claim has been stated because I've received a

considerable amount of evidence, as I said. And based upon

the evidence, at the moment, I must tell you that the

conscience of the Court is sorely troubled by the facts

presented here.

We have a situation in which a controlling

stockholder -- it is not so much what's happened, which

obviously already a concern, but as much what didn't happen

that raises the Court's being so troubled. And what didn't

happen is the fiduciaries did not act, at least on the

present record, in a manner in which they're expected to

act. They did not consider -- it is not, for example, just

to address one of the issues, whether or not those NOLs are

still available, but the fact the transactions occurred

without investigating whether or not those NOLs might be

lost. It isn't so much whether or not, at the moment,

because we don't have a full record on this -- whether or

not Midway was insolvent at the time of the February, 2008

transactions, but the fact that as we sit here today, we

don't know whether it was involved or not. And a board and

controlling shareholder of National Amusements did not make

an effort to determine whether or not Midway was involved.

It's not so much that the transaction as it was

formulated with acquisition holdings was fair or whether

there were alternative transactions, but the fact that it

wasn't even considered.  And all that leads the Court to

understandably conclude that the Committee's raised

fundamental issues which place the transactions at issue in

serious question.  The fact, for example, that acquisition

holdings for an investment of $100,000 stands before

creditors who invested millions of dollars in Midway is

something that the Court can't ignore.  All of this will

remain to be further flushed out, I recognize, and given the

record and given the debtor's position on what it was

prepared and not prepared to do with respect to further

investigation and further potential litigation, I do find

that the Committee is entitled to derivative standing here,

and in fact, its efforts to date have certainly established

that it is more than capable of bringing these matters to a

final conclusion.

So I am not making findings today, but there has

been a breach of judiciary duty, or that re-characterization

is appropriate.  But I certainly am finding that the

Committee has made a strong prima facie case upon which the

Court can permit the litigation to proceed -- a litigation

to proceed, I should say, since we don't have one on file at
the moment.  And moreover, that certainly clouds the motion
for the use of cash collateral that was presented to the
Court.  I think that the evidence presented certainly
establishes that this is a transaction, a series of
transactions, and a course of conduct which creates serious
issues.

        And whether it's Acquisition Holdings, through
Mr. Thomas, selling a house on the eve of his purchase -- I
don't know whether or not Mr. Thomas -- I don't know that
I'm prepared to say that Mr. Thomas is untruthful of
undeserving of credibility at the moment.  It may be just a
matter of exaggeration.  But clearly, that transaction
speaks volumes for Mr. Thomas's state of mind going into the
transaction.  And this is a game company, but that did not
give National Amusement the right to treat a public company
as if it were a toy.  And I think that based upon this
evidence, the Court has to say that that is a matter of
very, very serious concern.  Having said that, the specific
issues on the motion for cash collateral, which are again
impacted by the evidence received, are three-fold.

        And the first has to do with the continue --
whether or not the continuing payment of interest should be
permitted and paid into escrow.  And for the same reason
that I believe that acquisition holdings has adequate

protection, mainly that equity cushion, that cash cushion, I will permit that to proceed, the payment of the interest into escrow until such time as it is brought to my attention by motion that the continued payment of interest, even into escrow, imperils the company. And so far as the payment of attorney's fees is concerned into escrow, based upon the evidence that I have heard today, my very serious concerns, I am not going to permit the payment of either Mr. Thomas's or acquisition holdings attorney's fees into escrow. And I am surely not going to limit the carve-out for Committee counsel because on one hand, to grant them standing, and on the other hand, to deny them their fees would be -- would make the former, the granting the standing -- the recognition of standing, I should say. It would make a futile act by this Court, and I'm not prepared to do that.

So with that in mind, I'm a little bit confused about the debtor's point that we can either have a consensual use of cash collateral or it can contested use of cash collateral because I think we've heard all that evidence, and I must ask, Mr. Caponi, what your position is on that.

MR. CAPONI: Your Honor, the debtor -- I mean, as of -- if the Court is ordering, essentially, nonconsensual use, then my concerns have been addressed. I mean --

THE COURT: Okay.

1    MR. CAPONI:  -- he submitted the motion in
2  consensual basis.
3    THE COURT:  Yes.
4    MR. CAPONI:  You know, I guess the question would
5  be, is the Court saying how far it's willing to go on a
6  consensual basis, or is it issuing an order saying
7  regardless of what the lender would like to see happen, this
8  is how we're going to proceed.  We can live with it either
9  way.
10    THE COURT:  Well, perhaps I should hear from the
11  lender because that may impact the pace at which the
12  litigation must proceed, as well.
13    MR. HARKNESS:  Your Honor, I think what Mr.
14  Caponi is referring to is the fact that we also have a
15  motion --
16    THE COURT:  Motion to lift stay.
17    MR. HARKNESS:  -- to lift the stay.
18    THE COURT:  Yes.
19    MR. HARKNESS:  And I've heard what you've had to
20  say, and I'd like a moment to confer to my -- with my client
21  before --
22    THE COURT:  Would you like five to ten minutes to
23  do so in private?
24    MR. HARKNESS:  I think that would be helpful,
25  yes.

1

2          THE COURT:  All right.  Then you certainly are

entitled to that.

3          MR. HARKNESS:  Thank you.

4          THE COURT:  And we stand in recess until you let

5 us know that you'd like to come -- like me to come back.

6     (Recess at 11:19 a.m. to 11:57 a.m.)

7          THE CLERK:  Please rise.

8          THE COURT:  Thank you, everyone.  Please be

9 seated.

10          MR. CAPONI:  Your Honor?

11          THE COURT:  Mr. Caponi.

12          MR. CAPONI:  Yes, as a housekeeping -- not a

13 housekeeping matter.  Mr. Timothy Karcher from Dewey

14 Ballantine, who represents the board, has asked for an

15 opportunity to address the Court briefly, I believe on the

16 topic of --

17          THE COURT:  Yes.

18          MR. CAPONI:  -- derivative standing of the

19 Committee.

20          THE COURT:  Thank you.  I'm sorry, I missed your

21 name, sir.

22          MR. CAPONI:  Dewey & LeBoeuf, sorry.  I think I

23 said Dewey Ballantine.

24          MR. KARCHER:  It's Dewey -- Dewey & LeBoeuf is

25 the name of the firm and --

1

2          THE COURT:  Yes, it's changed.

3          MR. KARCHER:  -- my name is Timothy Karcher, Your

   Honor.
4
           THE COURT:  Yes, Mr. Karcher.
5
           MR. KARCHER:  As Mr. Caponi stated, we represent
6
   the independent board of directors of Midway.
7
           THE COURT:  Of Midway, okay.
8
           MR. KARCHER:  And I -- before we close the book
9
   on the derivative standing issue, I really would like to
10
   address the Court with respect to our serious fundamental
11
   and procedural due process concerns that are implicated by
12
   granting the Committee's sua sponte motion for derivative
13
   standing to bring actions against the directors and officers
14
   of Midway.
15
           THE COURT:  Yeah.
16
           MR. KARCHER:  There are a few reasons I'd like to
17
   point out --
18
           THE COURT:  Okay.
19
           MR. KARCHER:  -- why we think that it would be
20
   more appropriate to give us an opportunity to brief the
21
   issue with respect to the directors and officers.  The first
22
   is the considerable costs for the estate to bring -- that it
23
   will cost the estates to fund the Committee's action against
24
   the directors and officers.  While we recognize that Your
25
   Honor is troubled by certain of the transactions that have

been discussed, much of those transactions revolve round the Thomas transaction, and the board -- the evidence indicated the board was not aware of that transaction, was not consulted with that transaction, found out about it after the fact.

So to the extent that the troubling matters that Your Honor believes that the Committee should look at revolve around the Thomas transactions. The Board had nothing to do with them. The -- and so a cost-benefit analysis, I believe, as required, would indicate that the burden to the estate ensuing the board of directors, which includes current management, would have a very devastating impact on the board and on the company. The second reason, Your Honor, why I think we should proceed perhaps by motion, and an opportunity for us to respond is because the board was not a party to the current application for use of cash collateral. And so we haven't an opportunity to be involved in these proceedings on an evidentiary level, on an argumentative level. We've simply been here observing. Now, we did produce a witness, Mr. Waxman, but like I said, we were not a party to the proceedings before Your Honor. And so that raises due process concerns for our client.

The third point I want to make is that I don't believe that there's any immediate harm in having us proceed by motion and an application with an opportunity for us to

fully respond and fully brief the issue. And when you think about the extreme, extreme prejudice to the board and to the company by having derivative standing to bring an action without an opportunity for us to fully respond and fully brief the issue, I think we do get into issues of extreme, extreme prejudice. And the slight delay occasioned by an opportunity to fully brief the matter certainly weighs much more in favor than just simply granting the derivative standing here at this point. And I think that after we have an opportunity to fully brief the -- to fully brief it, we'll find that there are no colorable claims against the directors and officers of Midway, and therefore, we have really done -- we've really served justice by permitting us the opportunity to look at this in a -- I would say a separate light, as opposed to, perhaps, clouded by the light of the Thomas transactions.

THE COURT: Well, of course, it's not just the Thomas transaction that is of great concern to the Court. It was the February, 2008 transaction, as well. But --

MR. KARCHER: We -- I can --

THE COURT: Is this a newly -- this is a newly constituted order?

MR. KARCHER: It's not a newly constituted order, although certain members of the board who were present during the February transaction are not members of the board

today.  Okay?  We've had Shari Redstone, who was on the

board, is not a current member of the board.

    THE COURT:  Correct.

    MR. KARCHER:  Okay?  We now have certain

management who has joined the board.  But the point is, in

the February transaction, there was a lot of evidence that

had been given to Your Honor about whether or not a fairness

opinion had been granted, and there was evidence that was

presented about whether or not Houlihan Lokey could give a

fairness opinion.

    THE COURT:  Yes.

    MR. KARCHER:  And whether or not is even --

whether it's even appropriate to give a fairness opinion in

the context of that type of transaction as opposed to a

sale, which this was not.  And none of that really was

presented to Your Honor because that -- we weren't really

here on that particular issue.  We were here on whether or

not it's appropriate to use cash collateral and whether or

not the Committee's objection to the use of cash collateral

would stand.  There's a time and a place for all of those

other arguments to be raised, including the fairness

opinion, the solvency, et cetera.  It was not, in this

particular context, and for Your Honor to grant this

standing based on that evidence seems to be prejudicial to

our clients because that's not what we're here to do.

THE COURT:  All right.  Mr. Karcher, I've

certainly heard from you.  I appreciate your comments.  Let

me hear from the Committee now if I may, sir.  Thank you.

Ms. Dakim-Grimm.

MS. DAKIM-GRIMM:  Good afternoon, Your Honor.

THE COURT:  Yes.

MS. DAKIM-GRIMM:  I'd like to just start with

clarifying who it is that Mr. Karcher represents.  He

represents current independent board members.

THE COURT:  Right.

MS. DAKIM-GRIMM:  And only current independent

board members.  He does not represent the officers of the

company, except to the extent that they might be a current

board member.

THE COURT:  Right.

MS. DAKIM-GRIMM:  I'm not sure that was clear.

And, Your Honor, maybe I took a different due process class

than Mr. Karcher did, but I am not aware of any due process

right that a defendant has to participate in a proceeding

asking for derivative standing to sue in any event.  If the

Committee sues current independent board members, which I

don't believe we've reached any conclusion about doing that.

THE COURT:  Right.

MS. DAKIM-GRIMM:  But were we to do something

like that, and if Mr. Karcher obtained permission from the

Court to represent those defendants in litigation, which presently he does not have, then he could bring a motion to dismiss, and that would be the point at which the evidence would be considered. But respectfully, I think he's putting the cart before the horse in trying to say that there's some kind of due process violation. If it ever got to the point where his clients were sued, he'd certainly have his day in Court at that point.

MR. KARCHER: That may have resolved all of my concerns, Your Honor. If they're not seeking to sue any of the independent members of the board and they won't do that without providing us with notice and an opportunity to be heard, then maybe perhaps I did speak too soon.

MS. DAKIM-GRIMM: Well, that's not exactly what I said, but I don't -- I'll stand on my comments.

THE COURT: Yes. Yes. Mr. Buchbinder, good afternoon.

MR. BUCHBINDER: Good afternoon, Your Honor. Dave Buchbinder on behalf of the United States Trustee, and I've been uncharacteristically silent so far today.

THE COURT: Yes.

MR. BUCHBINDER: I'm simply going to observe that, having watched these 12-plus hours of proceedings and heard argument and ruling, that I do have to report back to a client. And the issue that's currently before the Court

is a very serious one, and should there be any significant

delay, my client may be required, from what has been

produced before the Court, to take appropriate action under

Section 1104.

THE COURT: Thank you. Well, I've now heard the

arguments. It is a little bit uncertain whether or not the

board has any interest in the litigation, and under that --

on that basis, I will, in fact, sustain my prior ruling that

the Committee has standing. But I appreciate, Mr. Karcher,

always a party raising an issue of due process before me,

and certainly, I took that into serious consideration here.

Yes, Mr. Harkness.

MR. HARKNESS: I think when we last were together

--

THE COURT: Yes.

MR. HARKNESS: -- it was up to me.

THE COURT: Yes.

MR. HARKNESS: So really two points, Your Honor.

First of all, we just would like it noted for the record

that Acquisition Holdings is not consenting to the entry of

your order, and it's being entered pursuant to your order

over our objection.

THE COURT: I certainly appreciate that.

MR. HARKNESS: Number two is that there is a

motion to lift the stay. We -- at break, I reviewed the

motion, and I think one main basis -- the main basis of the

motion was that AHS was not oversecured, and I think based

on the Judge's rule -- your -- the Court's rulings on the

cash collateral order, we just ask that you enter an order

consistent with your other findings with regard to the

motion to lift the stay so we may pursue whatever remedies

at appellate as we can.

THE COURT:  I'll certainly be pleased to do so.
Thank you.

Yes, Mr. DeBaecke.

MR. DEBAECKE:  Your Honor, Michael DeBaecke for
the debtors.  I guess the question then becomes settling an
order --

THE COURT:  Yes.

MR. DEBAECKE:  -- to try and encompass all of the
cash collateral proceedings.  And I will --

THE COURT:  Thank you.  First -- will you take
the first hand at it, or --

MR. DEBAECKE:  We can certainly take a shot, Your
Honor.  Maybe one or the other may want to take a -- the
Committee or the lender may want to take a shot, too, but
I'll defer to Committee counsel as to what their thinking is
on that.

THE COURT:  Yes, Mr. Zolkin.  The bankruptcy
lawyer returns to the podium.

1           MR. ZOLKIN:  Good afternoon, Your Honor.  I think

2 what we're looking at is a very simple order here, one that

3 authorizes use of cash collateral subject to the comments

4 Your Honor made --

5           THE COURT:  For the reasons stated on the record.

6           MR. ZOLKIN:  For the -- no extensive findings,

7 here.  I think is a one or two-pager.

8           THE COURT:  Yes.

9           MR. ZOLKIN:  Unless Your Honor has additional

10 thoughts.

11           THE COURT:  No, I think that's right.

12           MR. ZOLKIN:  Okay.

13           THE COURT:  And would the Committee take the

14 first, you know, draft?

15           MR. ZOLKIN:  We will, Your Honor.

16           THE COURT:  All right.  Thank you.

17           MR. ZOLKIN:  Thank you.

18           THE COURT:  And obviously, you'll be passing it

19 back and forth between the other two parties.

20           Mr. Harkness.

21           MR. HARKNESS:  And I assume with regard to the

22 motion to lift the stay, you'd like something along the same

23 lines.

24           THE COURT:  Yes.  Yes, I think we should have

25 separate orders here.

1          MR. HARKNESS:  Okay.

2          THE COURT:  Thank you.

3          MR. DEBAECKE:  Your Honor, Mike --

4          THE COURT:  Next item on the agenda.

5          MR. DEBAECKE:  -- Mike DeBaecke.  We are now, I

6   guess, moving to number two on the agenda, which was the

7   Committee's motion to seal the objection that they filed to

8   the debtor's motion to approve a key employee incentive

9   plan.

10          THE COURT:  Yes.

11          MR. DEBAECKE:  And Your Honor may or may not have

12   received a message I left for Chambers this morning.  This

13   is not directly dealing with the Committee's motion to seal,

14   but the Committee also filed an objection to the motion --

15          THE COURT:  Correct.

16          MR. DEBAECKE:  -- obviously, under seal.  We have

17   reached agreement with the Committee to resolve that

18   objection to the KEIP, although obviously, there is still

19   out there the issue about what should be sealed or not, and

20   Mr. Buchbinder may have some comments about the sealing

21   motion --

22          THE COURT:  Yes.

23          MR. DEBAECKE:  -- before we get into the hearing

24   on the motion to approve the key employee incentive plan,

25   which I'll refer to as KEIP --

THE COURT:  All right.

MR. DEBAECKE:  -- for a purpose -- for ease of reference.  As to the KEIP itself, although we have reached agreement with the Creditors' Committee on resolving their objection, the objection filed by the Office of the United States Trustee has not been resolved, so we anticipate an evidentiary presentation on the motion.

THE COURT:  Yes.  Mr. Buchbinder, would you like to be heard first on the motion for filing under seal?

MR. BUCHBINDER:  Good afternoon, Your Honor. Dave Buchbinder again for the record.  With respect to the KEIP motion to place documents under seal --

THE COURT:  Yes.

MR. BUCHBINDER:  -- the only information that really is necessary to maintain confidential, if at all, are the names of the individuals involved, except for those individuals who are officers, whose information needs to be disclosed and is required to be disclosed in the statements and schedules.

THE COURT:  Yes.

MR. BUCHBINDER:  And the briefs, themselves, are not redacted in any significant way.  The only issue is really disclosure with respect to those individuals whose disclosure is required under the statements and schedules.

THE COURT:  Thank you.  MR. DeBaecke, I think

this is more your issue than the Committee's at this point.

MR. DEBAECKE: I think that's right, Your Honor. I don't think we have any objection to the disclosure of the officers who are included within the plan, and if the plan is approved, to receive payments under that plan. There are three of those. The plan's schedule is kind of separated into two groups and --

THE COURT: Yes.

MR. DEBAECKE: -- senior managers at the top, and then the non-senior management is below that. So as to those three people, I'm not sure if the schedules and SOFAs comes into play on that exactly. I'm not even too sure I understand that comment. But I think for purposes of today's hearing, we agree that the officers and what the proposed payment is to them would be, should the plan prove to pay out payments, we don't have an objection with that.

THE COURT: All right. So --

MR. DEBAECKE: We do -- our concern is the -- certainly the names of the participants other than senior management. And also, we have somewhat of a concern, and it's not necessarily every name, Your Honor, because there may be a couple names that are talked about today, which we should not care about, quite frankly, and that probably will come out on direct testimony from the debtors as perhaps by way of example. It's really the names of most of those

people in the second tier, and also the positions itself,

those -- themselves may also be confidential.

THE COURT: Because that may reveal indirectly
who the names are.

MR. DEBAECKE: That's exactly right, Your Honor.
So we've talked about this internally in preparing for
today's hearing, and we're going to try and have the
testimony come in in such a way that we don't raise those
issues in open Court, and we certainly would tenure the
proposed recipient schedule as an exhibit, but under seal so
that we can seal that. And then, I think at the end of the
day, we can see whether the testimony jives with Mr.
Buchbinder's view of what should be public and nonpublic,
and then we can maybe take it up at that point.

THE COURT: And then, perhaps figure out what
kind of a redacted version to be filed.

MR. DEBAECKE: Correct.

THE COURT: Okay. Is that sufficient, Mr.
Buchbinder? Let's see what the evidence is, and then we can
circle back to the confidentiality issue?

MR. BUCHBINDER: I prefer the Court's discretion.

THE COURT: All right. That's what we'll do.

MR. DEBAECKE: Okay. Thank you, Your Honor.
Moving to number three --

THE COURT: Yes.

1    MR. DEBAECKE:  -- and I hesitate to say this was

2  the main event for today, because I think with this

3  morning's events, maybe I would overstate that, but it is a

4  very important event for certainly the debtors.  And as Your

5  Honor has noted, the motion was filed, and there were two

6  objections filed.

7          THE COURT:  Correct.

8          MR. DEBAECKE:  One by the Creditors' Committee

9  and one by the Office of the United States Trustee.  And as

10  I indicated a few minutes ago, the debtors have been able to

11  resolve the Creditors' Committee objection to the motions.

12          THE COURT:  Due to modifications to the proposed

13  plan

14          MR. DEBAECKE:  By some modification to the

15  proposed plan, some further modification.  And I have a

16  clean version of the current proposed plan, although I can

17  tell you that parties did not -- that's -- the agreement

18  with the Committee was not really reached until yesterday

19  afternoon.

20          THE COURT:  Okay.

21          MR. DEBAECKE:  So we have tried to draft into the

22  proposed plan the terms reflecting that agreement.  I needed

23  to have people look at that, and they've done that today as

24  the proceedings earlier progressed.  So I do have some even

25  comments to the proposed plan that we brought over to Your

Honor.  So --

       THE COURT:  Certainly.

       MR. DEBAECKE:  -- I think what we're going to --
the best we can do is to use the proposed plan as currently
drafted with the understanding that it will have to be
finalized should -- we are able to get the Court to approve
the motion.

       THE COURT:  I certainly understand, Mr. DeBaecke.

       MR. DEBAECKE:  Okay.  And I can kind of -- well,
I guess what I'd ask to do the, Your Honor, is -- and we'll
use this as an exhibit in the testimony, but I have given
the parties the draft of the current proposed plan.  And if
I might hand up to Your Honor the blackline of the current
proposed plan, because I think it might be easier if the
testimony gets into that to go from the blackline.  I have
blacklined the proposed plan against the most recent version
that was file --

       THE COURT:  Okay.

       MR. DEBAECKE:  -- which was a revised proposed
plan to the one attached to the motion.  If anybody cares, I
have also blacklined it against the original form of the
plan, but I don't -- I haven't heard from anybody that they
really care to see that one, but I have it in case they do.
If I may approach, I can hand up the blackline, which shows
the changes that have been made since the final version.

THE COURT:  You certainly may.  Thank you, Mr. DeBaecke.  Thank you, sir.

MR. DEBAECKE:  And for the record, I've had some discussions with Mr. Zolkin for the Creditors' Committee, and he has asked for a couple additional language pieces to this proposed plan, and if I might briefly touch on those so that everybody know where we're -- what we're talking about.

THE COURT:  Okay.

MR. DEBAECKE:  On page two of the blackline, under milestone one --

THE COURT:  Yes.

MR. DEBAECKE:  -- down towards the bottom where we talk about the net proceeds of being $30 million, the target amount.  Mr. Zolkin has requested that the concept of Court approval of a stalking horse APA at the bid procedure stage should be built into this.  I'm looking at Mr. Zolkin, and he's nodding his head that that's the concept.  We'll have to draft it in, but to this language that's here, we're going to add a concept about the stalking horse APA being approved at the bid procedure stage so that we move on in the process.

THE COURT:  Okay.

MR. DEBAECKE:  On the next page, there is some language at the very bottom of Page 3 of the blackline which defines net sale proceeds.

THE COURT: Yes.

MR. DEBAECKE: And Mr. Zolkin has requested a couple modifications to that language talking about the good faith of cure amounts and the Committee having some kind of ability to review the cure amounts that are being proposed, and obviously that would factor into the --

THE COURT: Net proceeds.

MR. DEBAECKE: -- proposed calculation of the KEIP, in addition to calculating the net sale proceeds. So we will build that language into the language of the plan, as well.

THE COURT: Okay.

MR. DEBAECKE: And then finally, at the top of Page 4, Mr. Zolkin simply wanted to add a short phrase in the sentence that starts at the top of Page 4 for the avoidance of doubt, and that sentence talks about where we have a situation a purchaser may want to purchase its own contract.

THE COURT: Yes.

MR. DEBAECKE: And if they do and they somehow, as offered consideration, they deal with the claim that may be under that contract, and they can either waive it or otherwise deem as satisfied. The clarification is that that will not count as a cure amount. That would be paid by the purchaser, and therefore add to the net sale proceeds

calculations.  So he has asked that the language which

otherwise deems "to be satisfied" be added after the word

"waives" in that sentence.

THE COURT:  Okay.

MR. DEBAECKE:  And we certainly don't have a

problem adding that language.  Those were the changes that

we will have to build in when we have an opportunity after

this hearing, hopefully in connection with an approval of

the motion.  But at this time, I think I don't have any

further remarks other than I think we'd like to get to -- I

don't have any further remarks.  We would like to get to

testimony because I know Your Honor may have other matters

today, but Mr. Zolkin would like to address the Court.

THE COURT:  Of course.  Mr. Zolkin.

MR. ZOLKIN:  Your Honor, one last point, and I

did not raise this with Mr. DeBaecke only because I was so

fascinated by the proceedings that have gone on before.

That was not my focus.  But --

THE COURT:  Okay.

MR. ZOLKIN:  -- in focusing on Section 5 of the

plan draft, award determinations.

THE COURT:  Yes.

MR. ZOLKIN:  There is a provision that reads "the

Committee," meaning the Compensation Committee as opposed to

the Creditors' Committee, "will, in its sole discretion,

determine whether each milestone has been achieved, the
total amount of the award paid to a participant for
achievement of any milestone under the play --

THE COURT:  Yes.

MR. ZOLKIN:  -- may not exceed the amount
calculated as provided herein."  The second part is fine.
To the extent that a milestone is determined should be
pretty black and white, and we'd only suggest that it
shouldn't necessarily be left to the Compensation
Committee's sole discretion.  It should be either jointly
determined with the Committee, or the Committee should have
some ability to agree, or not unreasonably withhold its
consent that a milestone has been achieved.  I don't
envision in this instance there being any issue.
Nonetheless, the Committee would like that small degree of
oversight in that instance.

To the extent that there are additional amounts
that come due under the plan as a consequence of higher and
better sale prices, we would simply want to ensure that the
bonuses are paid out generally on sort of a proportional
basis as set forth in the original schedule that's been
submitted to Your Honor or that will be submitted to Your
Honor.  Obviously, we're not looking to, again, direct the
Debtor in connection with how it should be awarding bonuses,
but we don't want to see any vast variances from the pro

rata distributions contemplated under the original schedule.

THE COURT: Mr. DeBaecke

MR. DEBAECKE: On the first point of Paragraph 5, your Honor, I think we can probably take out the first sentence at this point. That should address Mr. Zolkin's concern. And then, on the second point that he raised about pro rata distributions as, I guess, the proceeds go up and the calculation under the KEIP amount goes up, I think there will be testimony on that, so that should answer the question, as well.

THE COURT: All right. Thank you. Anyone else?

You might be safer coming the other way, Mr. Buchbinder.

MR. BUCHBINDER: Your Honor, I'll keep that in mind, but it's just habit. I would like to -- Dave Buchbinder again for the record, Your Honor. I'll try to streamline this for your Court because I didn't see where Mr. DeBaecke actually reviewed the actual revised terms of the key.

THE COURT: Right.

MR. BUCHBINDER: But as I understand this revised proposal, which the Committee has agreed to, instead of there being three milestones, there would now be two milestones.

THE COURT: Right.

MR. BUCHBINDER:  The first milestone would either be the execution of a stalking horse agreement without contingency for financing or the filing of a plan of reorganization that will pay the lender's secured claim in full.  And either one of those events, whichever occurs first, as I understand it, would trigger within three business days thereafter the payment of $600,000 to the participants of milestone one.  The milestone two is now a pool of a million dollars and would be paid to the eligible participants upon the earlier of confirmation of a reorganization plan that pays the secured lender in full, or the close of sale.  We've reviewed this and we've had an -- we did not have as much of an opportunity to evaluate it as the committee did, but we have had an opportunity to consult.  And I will advise the Court that our objection based on this revised proposal is limited to the lack of achieving a result on milestone one.  The trigger is not the approved -- not the consummation of a sale, but the trigger is merely bringing a deal to the Court that doesn't have a financing contingency or filing a plan.  It's not triggered to approval.  It's not triggered to consummation, and to save a lot of us a lot of time, that is the remaining narrow focus of our objection.

THE COURT:  All right.  That certainly should be helpful here, Mr. Buchbinder.  Thank you.  I think it may

somewhat narrow the issues.

MR. DEBAECKE:  May I have a moment, Your Honor?

THE COURT:  Certainly.

MR. DEBAECKE:  Your Honor, Michael DeBaecke for the debtors.  We came over here on the KEIP intending to put evidence on because, A, we weren't resolved with the United States Trustee's office and --

THE COURT:  Sure.

MR. DEBAECKE:  -- we're still not resolved, although I guess we're closer, and I thank Mr. Buchbinder for that clarification.  But we also thought that Your Honor wanted to hear a record because Your Honor has expressed some concerns.

THE COURT:  Yes.

MR. DEBAECKE:  So given that and where we were, we fully intended to put evidence on, and I think at this point, we'd like to put evidence on, and then perhaps we can take up any -- mostly legal argument, which I think what Mr. Buchbinder was raising is mostly a legal argument.  But --

THE COURT:  Well, just so I'm clear, I don't believe Mr. -- and this is really a question for Mr. Buchbinder, whether or not your office is still raising an issue with the parties who are to receive the bonus and those sort of internal issues within the KEIP, or is it strictly whether or not that first milestone is, in effect,

a legitimate incentive.

MR. BUCHBINDER:  Your Honor, Dave Buchbinder again for the record.  I had an opportunity to consult with my client during a break.

THE COURT:  Okay.

MR. BUCHBINDER:  And to respond to your query, the concern is the trigger events of the first milestone more so than the underlying participants and the particular amounts they would receive.

THE COURT:  Okay.  Thank you.  That's helpful, I think, as far as -- I would share Mr. Buchbinder's suggestion of what the remaining issue is, and I would certainly be prepared to entertain a proffer from debtor's counsel as to the other issues.  And then, perhaps, we can hear some testimony on the appropriateness of that first milestone.

MR. DEBAECKE:  Your Honor, at this point, our thinking is that Mr. Booty takes the stand.

THE COURT:  Okay.

MR. DEBAECKE:  And then, we don't think it's going to be 20, 25, 30 minutes of testimony.

THE COURT:  Fine.  That's fine.

MR. DEBAECKE:  And then hopefully, we can get to that other issue.

THE COURT:  It's your motion, and I certainly

respect your right to make whatever record you deem is appropriate here.

MR. DEBAECKE:  Thank you.

MR. CAPONI:  With the Court's permission, Your Honor --

THE COURT:  Yes.

MR. CAPONI:  -- I would like to call Mr. Booty to the stand --

THE COURT:  Thank you.

MR. CAPONI:  -- for a witness.

THE COURT:  Mr. Booty.  Mr. Booty, if you'll just remain standing while you're sworn in, please.

THE CLERK:  Please raise your right hand and place your left hand on the Bible.  Please state your full name and spell your last name for the record.

MR. BOOTY:  Matthew Vernon Booty, B-O-O-T-Y.

THE CLERK:  Okay.

MATTHEW BOOTY, DEBTOR'S WITNESS, SWORN

THE CLERK:  Thank you.  You may be seated.

DIRECT EXAMINATION

BY MR. CAPONI:

Q     It's officially this afternoon, so good afternoon, Mr. Booty.

A     Hello.

Q     We'll try to hopefully move this along as briefly as

possible.  With whom are you currently employed?

A     Midway Games.

Q     And what is your position?

A.     President and CEO.

Q     Okay.  And since graduating college, whom have you been employed with?

A     The entire time with Midway Games.

Q     And with respect to your educational background, can you give the Court a brief snippet of your college experience?

A     I have a Bachelor of Science degree in electrical engineering, also a Bachelor of Science degree in computer engineering, and I also have a Master of Fine Arts degree.

Q     Okay.  With respect to your 18 years with Midway Games, can you tell us what your significant positions have been that led you from where you started to being the CEO?

A     I was hired in 1991.  I first came onboard as a software engineer, primarily working in the area of audio. I then was promoted after a couple years in the area of 1993 to manage our audio department, which included both the people responsible for making the music for our games, as well as for the audio software and audio hardware that went into the games.  In 1995, I moved over to become a video game programmer, moving over to a different division within Midway.  And it was in 1996 that I, then, was put in charge

of a game design team. I led the design of a game for two

years. In 1998, I was given another project to manage, the

management and design of a video game from '96 to '98.

During the time of 1998 to roughly 2000, 2001, I was put in

various positions that involved overseeing and managing and

leading multiple game teams, particularly some of our sports

games at the same. And in -- after that, I was promoted to

manage our Chicago studio, so I would have been in charge of

all product development and management of our Chicago

studio, about 200 people at the time. And then in 2004, I

was promoted to be the head of product development for all

of Midway, reporting to our CEO at the time, David Zucker.

In March of 2008, I was asked to step in as interim CEO, and

in October of last year, I was made president and CEO of

Midway.

Q    So with respect to your positions from software

engineer and the rise to the CEO, is it fair to say you have

personal experience in essentially all facets of Midway

Enterprise?

A    That would be accurate. I've asked if I could work as

a janitor for a week or two. I think that would cover all

the bases

Q    Okay.

A    Maybe I can still get that in.

Q    Since becoming CEO, and through the current -- let's

say from the CEO until filing for bankruptcy. Can you

describe your responsibilities?

A    Primarily, my responsibilities are to provide guidance

and oversight and leadership to our senior team, and

particularly to make sure that our product development and

the marketing and sales of our products stay on track, and

also to make sure that we, during the bankruptcy process,

adhere to the correct principals and the correct outcome

with -- during what has been a fairly stressful process.

Q    And since the Midway filed for bankruptcy, what -- how

do you occupy, you know, any given day?  What are -- sort of

what issues are you tackling?

A    Well, most of my time has been taken up less so with

daily oversight and management of our game teams.  A lot of

that has been pushed down to our studio heads.  My time is

primarily taken up working with the senior team with regards

to bankruptcy process, filings, and particularly a very

large amount of time with the due diligence that has gone on

to date.

Q    With respect to due diligence, are you referring to

due diligence by potential acquirors of Midway assets?

A    That's correct.

          MR. CAPONI:  With the Court's permission, Your

Honor, I'd like to have him -- a copy.

          THE COURT:  Yes, certainly.  Yes, Mr. Caponi.

BY MR. CAPONI:

Q    Mr. Booty, I just handed you a copy of the blackline version of the KEIP plan Mr. DeBaecke, a few minutes ago, handed up to the Court.

MR. CAPONI:  I believe Your Honor has a copy.

THE COURT:  I do.

MR. CAPONI:  Okay.  Okay.

THE COURT:  Thank you.

BY MR. CAPONI:

Q    Are you familiar with this document, Mr. Booty?

A    Yes, sir.

Q    Okay.  And this is a plan to pay certain employees of Midway incentive payments; is that right?

A    That's correct.

Q    Okay.  And let me ask you, if you could just briefly tell the Court why Midway determined it to be appropriate to request the right to pay -- make incentive payments to certain employees.

A    I believe that there are three sort of overriding reasons.  The first would be to ensure continued operations of the business for Midway to keep operating and to keep making games, to keep the teams together, to keep selling games.  It's important to everyone involved.  The second is to make sure that everyone complies with and is productive and cooperative with the due diligence process.  There's

been a lot of request for people to do work that is well

beyond the scope of their daily jobs and above and beyond

what they would do in any work week.  And the third, to make

sure that we keep the asset together that is the, in my

opinion, the most important thing in this whole process,

which is the game teams themselves, and make sure that

people on the teams stay together throughout this.

Q    Okay.  If you could turn to the second page of the

document, and if you look at the second page and just flip

over to the next page.  It refers to milestones.

A    Yes.

Q    And there are -- am I correct, it's currently two

milestones or triggers for the payment of bonuses?

A    That's correct.

Q    Okay.  In light of the comments earlier, we'll just

focus on milestone one since that seems to be the only one

at issue at the moment.  Can you briefly describe for the

Court your understanding of to when milestone one would be

triggered?

A    All right.  In general terms, and I'm not a lawyer, so

this is sort of in general terms.  But on the signup of a

stalking horse in the process and with an asset purchase

agreement that is free of any contingencies, so free of

financial contingencies, free of employee contingency, those

sorts of things.

Q    Okay.

A    And with a minimum bid amount of $30 million.

Q    Okay.  Taking that in two parts, the first part is actually getting someone to sign on the dotted line.  Now, has that occurred yet?

A    No, it has not.

Q    Has the debtor received a firm proposal for anyone to be a stalking horse bidder?

A    No.

Q    Okay.  With respect to the second part, the dollar value of the bid, without getting into specific companies, is there a -- where does $30 million stack up with respect to what the debtor anticipates receiving for the sale of its assets?

A    I believe that it currently represents a number that will be at the upper end of the expected value.  It is in terms of what the final bid amount would be.

Q    Has there been any trend with respect to the bids one way or the other, they've been going up from where you anticipated, or coming down, or staying the same?

A    All I can comment on that is what has actually happened, and with respect to one of the bidders, as they complete their due diligence, one of the main issues that comes up is the issue of employees agreeing to work with that bidder.  And as they get information about those

employees, as they learn more about the teams, to date, the

trend that we've seen is the bids go down, not up. And in

fact, we've seen one of the bids go down by a fairly

substantial amount once they completed some of their due

diligence.

Q    With respect to the bidders and the bids that the

debtor has received, have you been involved in the

discussions of the negotiating with potential acquirers?

A    Yes.

Q    Okay. Can you tell the Court what the main objectives

are of the acquirers other than obviously getting as much as

they can for as little as possible? But I mean from a

business standpoint, what are they looking for?

A    They are primarily interested in the game teams and by

game teams, I would mean specifically the personnel, the

people, and particularly those people coming together as a

functioning unit, and coming together as either a whole

studio or a whole team within that studio.

Q    If there was to be degradation of the game teams, if

they would start to fall apart, do you have an understanding

as to what impact, if any, that would have on the bids

you're receiving?

A    There's no question in my mind that it would reduce

the amount of the bid. I mean, the asset that is being bid

upon is the teams and the teams in a functioning units, all

1    as one.

2          MR. CAPONI:  Your Honor, at this time, I'm going

3    hand Mr. Booty another exhibit, which is the actual list of

4    individuals and the amounts.  I think we're going to refer

5    to it in his testimony generally without getting into

6    specific names --

7          THE COURT:  Okay.

8          MR. CAPONI:  -- but obviously, this document's

9    confidential.

10         THE COURT:  Yes.

11         MR. CAPONI:  Okay.

12         THE COURT:  You may approach the witness.

13         MR. CAPONI:  Does the Court have a copy already?

14         THE COURT:  I don't know if it's changed at all

15   since -- thank you, Mr. Caponi.

16         MR. CAPONI:  It has.

17         THE COURT:  Okay.

18   BY MR. CAPONI:

19   Q    Mr. Booty, ahead of you will be Exhibit 2.  Are you

20   familiar with this document?

21   A    Yes.

22   Q    And can you tell the Court what this document

23   represents?

24   A    It is a schedule or spreadsheet that lists the

25   participants in the key employee incentive proposal, and it

also lists the amounts that they are proposed to receive under that plan.

Q    Okay.  Now, the document is broken up into two groups. There is a group at the top and it has one, two, three, four, five individuals, and then there's a group at the bottom.  What does two different groups represent?

A    The group at the top is senior management, and also officers of the company.  The group at the bottom are leaders and senior people within the company, but they are not considered part of senior management, and the majority of them are not officers in the company.

Q    Okay.  Currently, how many employees does Midway have?

A    Roughly 400.

Q    Okay.  And what criteria -- I'm sorry, let me ask you this question.  Who decided who would be included on this list?

A    I did.

Q    Okay.  And what criteria did you use to determine which 20-some-odd employees out of the 400 would be on this list?

A    I roughly used three criteria.  The first would be those people that are on the front line of the bankruptcy process, so those are people that are at the core of the due diligence process or at the core of the bankruptcy

proceedings. The second would be people who are in a

position to most leverage or influence other employees. The

people that are on this list are either managers or leaders

of functional groups of perhaps ten, twenty, thirty, or

perhaps up to a hundred people. And they are in a position

to interact with these people on a daily basis and to

greatly influence their attitude, and also their

productivity during this process.

Q     With respect to folks on the non-senior management

individuals, the bulk of the list on the bottom, what

involvement, or how necessary are the efforts of these

individuals to achieving milestone one in the current plan?

A     Well, as an example, and this is one person that I

would mention by name is our VP of financing. Our

controller is absolutely a pivot point in the due diligence

process in terms of responding to requests and providing

information. She is, on a day-to-day basis, critical to

providing that information. On the product development

side, the bidders have primarily used as their point of

contact for each of the game teams our studio heads, and the

studio heads are really representative of the game teams.

They're sort of their voice. They would be doing any

negotiating for them on their behalf in terms of meeting

with the bidders. They also are much like a quarterback on

a football team. You know, the team looks to them for sort

of guidance and advice in terms of what the lay of the land

is, you know, sort of what their actions should be.  And

they certainly have the ability to influence a number of

people.

Q     So the individuals then are folks who others are going

to follow their lead in how they --

A     Absolutely.  Again, just to summarize what I just

said, I think these -- the people that we picked were either

very much on the front lines of the bankruptcy process,

particularly due diligence or the actual filings, or

secondarily, people that had the most ability and leverage

to keep the game teams together.

Q     Okay.  And with the individuals on, once again, the

non-senior management, if they were not to receive or have

the opportunity to potentially receive an incentive payment,

how, in your opinion, would that impact their work, if any,

for Midway, and then the ability of Midway to achieve

milestone one?

A     Yeah, I would break the answer down into two parts.  I

would separate the two groups.  I think for people that are

in finance and the people that are in accounting and some of

the ones in legal that all -- these people are

professionals.  I am continually impressed on a daily basis

with how hard they continue to work given the circumstances,

but at the end of the day, they're professions.

But that said, I can't see how it wouldn't seep into their day to day activities, their attitude, anything from how they might answer a phone call to the completeness of how they might satisfy a request, how much extra hours they might put in. Not receiving an incentive in this case could only, in my mind, be seen as a negative, and would negatively impact the work that still remains to be done until we get to the milestone one. With the product development people, I believe that the situation is actually a little more intense. These people are actively being recruited outside of the bid process. They're being actively recruited by other people within the industry. For the most part, these game teams and studio heads see themselves as somewhat apart from these proceedings. And in the absence of some incentive to stay, I think that they don't stay where they are, but perhaps have a different attitude. I believe that they very much actively go out and start looking for another position. And these senior people in product development have the ability to take a number of the senior team leads with them. They tend to travel in pods and groups. They've worked together for a number of years. And I think that the teams would look to them -- they would -- taken that -- if a studio head were to leave, it would be taken as a vote of no confidence in the team's ability to go to work with another bidder, and it would be -

- can amount to sort of an abandon ship call at that point if we were to lose a Studio Head.

Q    Okay.  So if a studio head were to leave prior to milestone one being achieved, am I correct in your assessment, it's likely that the game development teams would be -- some would leave with those studio heads, or begin to break apart?

A    Yeah, I think that's very likely.  I also think, you know, the best sort of indicator on this would just be to go back and look at what's happened in previous situations such as this and look at the trends within the game industry.  It's rare that you have one senior person leaving.  It's almost always the case that they take -- they developed working relationships and skill sets with a group of people.  They usually tend to travel in groups.

Q    Okay.  Since the filing of Midway's bankruptcy, has the workload or burden upon these individuals increased, decreased, or stayed the same?

A    It is greatly increased.  I would say that just in terms of just hours, that the number of hours they're putting in has increased from 1.5 to 2 times over where we were pre-bankruptcy.

Q    I think a question that's often thrown out when you're talking about incentive payments to employees, and I think what we've seen in objections, although not all are standing

at the moment, that it's a tough economy. Everybody should
be happy to have a job. No one needs an incentive payment
to help achieve a milestone or do what they're already being
paid to do. Do you have a view as to how that plays out in
this case?

A    Yeah, I'm obviously certainly sensitive to that. I
think that it's important to keep in mind context and the
industry in which these people would be looking for
employment. The video game industry is one of the few that
has defied the recession. The numbers would say that the
video game industry actually grew over this last holiday
period. Even, believe it or not, Midway actually even
gained market share over the last period, over the holiday
period. So the game industry is growing. There are jobs to
be had there, and although -- you know, again, these numbers
might seem out of place in the overall broader economic
context. Certainly, within the game industry, they're not
unreasonable, nor do they go against anything that these
employees could find with other publishers.

Q    Okay. Has Midway -- in the past, you've personally
been involved with luring talent away from competitors.

A    I have, yes.

Q    Okay. And what types of incentives has Midway offered
to lure someone away from a competitor?

A    The incentives to get someone onboard are typically in

the form of signing bonuses, and then it might also come in

the form of equity, stock options, those sorts of things.

Q    Okay.  And with respect to a signing bonus, is there

any customary range of bonuses, either percentage of salary

or fixed dollar amount that are offered to lure people of

the caliber that are on your list here?

A    Yeah, in terms of -- I mean senior studio heads,

senior executive producers of franchises, signing bonuses in

the range of 25 to 50 percent would not be uncommon.  And I

would say that there are probably examples out there of

numbers higher than that for what I would call sort of rock

star, very well-known game designers of which I would count,

for example, one of the people -- you know, the executive

producer of our Mortal Kombat franchise among those.

Q    With respect to the Exhibit 2, who decided the amount

that each employee would be eligible to receive?

A    I did.

Q    Okay.  And what methodology did you use to reach these

amounts?

A    So for the people in the bottom tier, I roughly broke

it into two pieces.  There is a group that is receiving

roughly 30 percent of salary, and those are people who are

individuals that are, for the most part, working as one-

person departments.  So for example, our vice president of

sales right now is essentially our entire sales department

and our entire sales team. So that person is responsible

for continuing to push the sales of our products, and is

also on the front line of driving collections and helping

with retailers who are primary people that will continue to

pay for our games, making sure that those relationships are

maintained and they're brought in. If that person were to

quit, I don't know how, at this point, given where we are,

we would get somebody to come in to replace that person.

And given that their job is primarily based on relationships

that have built up over years, it would be very difficult

for someone to step in. The same is true, for example, of

our VP of finance who has, at this point, you know, a level

of knowledge and just in their head, all the minutia and

details of everything that's gone on, it would be very

difficult to replace. So she is essentially a sort of one-

person operating unit. So those people that have been

identified in that manner, we've given a targeted 30

percent. The remaining people were set at 20 percent fairly

evenly across the board, and then the senior management and

officers were set at 60 percent.

Q     So with respect to the, again, non-senior officers,

the percentage, the payments they're eligible for as a

percentage of their salary are the low end of what a

competitor may offer as a signing bonus to lure them away

from Midway.

A      Yes, that's correct.

Q      Okay.  Other than yourself, did anyone at Midway's management or the board approve the incentive plan?

A      The Compensation Committee of our board of directors actually approved the plan.

Q      Now, if the plan is approved and a milestone is achieved, is it an automatic that these individuals will receive the amounts delineated on this paper?

A      No, it's not an automatic.  Obviously, it's contingent on the people working to hit the milestone and performing to their best and, I think, performing within good faith under what the purpose of the plan.  If there are people who fall short of that, if there are people who quit, if there are people who take on other duties, you know, we would, of course, have to reserve the right to adjust or withhold payment at that time.

Q      Okay.

A      But it is not a guarantee.

Q      And who will make the decision as to whether or not a person a performed at a sufficient level to warrant the payment?

A      I will.

Q      Okay.  If individuals do not warrant a payment or leave the company, what would happen to the amounts allocated for that person?

A    It would be redistributed on a pro rata basis, based on the distributions and percentages that I talked about earlier.

Q    Okay.  And with respect to the second milestone which is identified in the plan, are you familiar with the provision that provides for additional payments if the sale price is in excess of $30 million?

A    Yes.

Q    Okay.  If that milestone is triggered and additional bonuses are available, how will they be allocated?

A    They would also be on a pro rata basis along the lines of the percentages that I outlined earlier.

Q    Okay.  And just for the record, I assume that -- am I correct that milestone two has not been achieved at this point?

A    That's correct.

Q    Okay.  And again, Mr. Booty, obviously the issue before you got on the stand, the focus was on the milestone one and whether that is almost a given to be triggered.  Do you have an opinion, given your interaction with the bidders, how likely it is that milestone one -- I mean, you now, trip over it, knee high, you know, aspirational?

A    I would call it a running dive and leap would be required.  I don't think it's a foregone conclusion at all. A number of things have happened in this process, which have

been surprising.  A number of people have entered the
process that were perhaps unexpected and the due diligence
process has raised issues that I don't think were
anticipated.  To say that the signing of a stalking horse is
a foregone conclusion, I don't agree with that.

I would also just add that the importance of
milestone one is that it's likely for this process to take
several more months to conclude, and obviously the
employees, particularly the employees in this second tier of
this, their exposure to this process has perhaps made them
think that, you know, it will be very difficult, and perhaps
even unlikely that they would get paid anything.  So I am
faced with the difficulty of how to keep these people
incentivized to hit these goals over the next three months.
And obviously, during these sort of -- this tough time with
this process, three months is a very long time.  And I think
that if there is not some earlier incentive in front of an
actual close of the sale, in other words, the finality of
the process, the people are going to weigh the surety of a
job that they could get somewhere else versus in their minds
what they see as a chance that some of this might get paid
out when it's all said and done.  And I have been able to
keep a lot of people in the company just based on their good
faith, their loyalty to the company, and their willingness
to see this through.  But I really have to say that any

personal loyalty to myself and their leaders is definitely

starting to weigh in diminish.

Q    In your testimony, you've referred to game teams and

studios as being -- you describe -- I get the flavor that

there's semiautonomous.

A    With some respects.  They're creative entities.

They're much like producers and directors within the movie

industry.  And certainly part of creativity is they all need

to have their own identity, their own processes.  So we do

try to encourage that the studios have their own identities.

Also in some cases, the studios were in place as an entity

before we acquired them.  For example, our Seattle studio

was founded by a guy who got together with friends that he

had been with since elementary school.  Obviously, those

bonds and connections and sort of their culture and identity

existed long before Midway acquired them.  So we do

encourage our studios to have some level of autonomy, and

obviously within the game teams, we want them to have a

sense of identity and those teams will be structured

differently depending on what kind of game they're making.

Q    Given the identities of the game teams, let's focus on

them.  For the members of the game team, in your experience

having been one and managed them, how do they identify

themselves, as a game team member, a Midway member, or

something else?

A    I think that they are -- their sort of first thread of

identification is always with their product.  So if you were

to ask someone who works on the Mortal Kombat team, they

would say that their first level of allegiance is to the

team, and they would say, "I'm a member of the Mortal Kombat

team."  I would say it's sort of like someone saying, "And I

play for the Patriots," as opposed to, "I work for the NFL."

Midway is a lot like the NFL.  We have a number of studios,

i.e. teams, but people don't say, "I work for the NFL."

They say, "I play for the Bears.  I play for the Patriots."

So our employees would say, "I work on the Mortal Kombat

team," before they would say, "I work for Midway."

Q    With respect to the studios, is it the same issue?

A    Yeah, and in some -- it's only in certain cases.  For

the most part, our studios are one-team studios.  So our

Seattle studio is working on one game.  It's only in our

Chicago studio until we had layoffs recently that we had

more than one project underway underneath a studio.

Q    With respect to the individuals, the senior management

members on this list, which at the top of the page, I see

your name is the second on the list, is that correct?

A    Yes, that's correct.

Q    Am I correct in reading this, that you will not be

eligible or not be -- you will not be eligible for incentive

payment?

1

A    That's correct.

2

Q    Okay.  And why is that?

3

A    A number of reasons, some of which are personal.  As

4

this process became clear that the total amount would be in

5

dispute, I took myself out to increase the amounts that

6

would be eligible for other people.  I think also, as you

7

mentioned earlier in this economic climate, there certainly

8

has been a lot of flack about bonuses and CEOs, and by

9

taking myself out of it, my hope is that I would be able to

10

diffuse any negative attention on the other senior members

11

of the team, and hopefully sort of sidestep that kind of

12

attack or negative energy at the beginning.

13

Q    Okay.  With respect to the other senior members of

14

management who are eligible, how has the bankruptcy filing

15

impacted their day-to-day activities, their workload, their

16

commitment to Midway?

17

          MR. BUCHBINDER:  Objection, Your Honor.  I think

18

that assumes facts not in evidence.  It assumes that he

19

knows what each one of these people is thinking in their

20

head every day.  I haven't objected till now, but I think

21

this one is --

22

          THE COURT:  Yes, sustained.

23

          MR. CAPONI:  I'll -- yeah.

24

BY MR. CAPONI:

25

Q    Mr. Booty, with respect to other members of senior

management, to whom do they report?

A     They report directly to me.

Q     And do you supervise their day-to-day activities?

A     To say that I supervise, I direct and provide guidance on. But during bankruptcy, I would say that I've had greatly increased daily contact with them. I would say that perhaps pre-bankruptcy, I might meet with them casually day-to-day and perhaps in a more structured one-on-one once a week, and there would also be, perhaps, staff meetings. During bankruptcy, I'm probably spending three to four hours a day with Ryan, Debbie, and Miguel, at least.

Q     And were you familiar with the amount of hours these individuals were putting in at the office prior to the bankruptcy filing?

A     Yes.

Q     And are you familiar with the amount of time they're spending in the office since the bankruptcy filing?

A     Yes.

Q     Okay.

A     And I would say that it is conservatively between one and a half to two times the amount of work and the amount of hours. I mean, Debbie is routinely answering emails at 1:00 and 2:00 in the morning. I think as the Court might be aware, Ryan was almost scheduling the bankruptcy around the birth of his son. I think he made a lot of sacrifices.

He's been putting in a lot of hours. Miguel has completely

changes his schedule around to get in very early in the

morning, has worked a lot of weekends. I mean, everyone

has, again conservatively, I think, increased their workload

by one and a half to two times the amount of hours.

MR. CAPONI: A second, Your Honor?

THE COURT: Yes.

MR. CAPONI: All right. That would be -- that

would conclude my direct examination, if Mr. Buchbinder has

any cross.

THE COURT: Mr. Buchbinder, at your -- when

you're ready.

MR. BUCHBINDER: Thank you, Your Honor. Once

again, David Buchbinder for the record.

CROSS EXAMINATION

BY MR. BUCHBINDER:

Q     Good afternoon, Mr. Booty.

A     Hello, sir.

Q     First question, under milestone one, does the Court

have to approve a sale for the payment to be triggered?

A     I would defer to counsel to answer that question. I'm

not sure what -- where we've ended up in the final

negotiations --

Q     Well --

A     -- and I'm not a lawyer, so I would need to have them

1    answer that.

2    Q    Well, why don't you take a look at milestone one?  Do

3    you have Exhibit Number -- I believe it's Exhibit 1 in front

4    of you?

5    A    Yes.

6    Q    Take a look at Page 2.  And take a look at the

7    blackline portion commencing with the little I.  And why

8    don't you read that and see if it helps refresh your

9    recollection.

10   A         "The later of execution of asset purchase

11             agreements, singularly or collectively the APA,

12             with one or more stalking horse bidders that

13             provide for aggregate net sale proceeds of at

14             least $30 million, the target amount, and the date

15             upon which the APA does not contain a financing

16             due diligence or employee hire condition that has

17             not been waived, terminated, or satisfied, which

18             could be either at filing of the APA or at any

19             time thereafter, including at closing."

20   Q    Does --

21   A    As written, it does not.

22   Q    Thank you.  Now, there's a second trigger on Page 3;

23   is that correct?

24   A    Yes.

25   Q    And that's the filing by the company of a plan of

reorganization that pays the lender in full.

A     Plan of organization or a close of sale.  I think it's one or the other.

Q     Okay.  But the trigger event is the filing, correct?

A     That's correct.

Q     Or the close of sale.

A     Correct.

Q     If a plan is filed to trigger the first milestone, here, does this language suggest to you that the Court has to approve the plan?

A     It does not.

Q     Does this language suggest to you that if the Court does approve the plan, the plan has to be able to be performed?

A     I don't see language regarding performance in here, no.

Q     Now, historically, Midway has paid bonuses for incentives based upon profitability of the company; isn't that correct?

A     We have several bonus plans, and one of them is based on company profitability, yes.

Q     And isn't that in fact what has been represented by the company in its various 10Ks that are on file with the Securities and Exchange Commission?

A     Yes.

Q     Okay.  Now, on your direct testimony, you described

three primary reasons why Midway has adopted this plan.  Do

you recall that testimony, sir?

A     And by this plan, are you referring to the key --

Q     The plan that is now before the Court.

A     Yes.

Q     The one that is represented by Exhibit 1.

A     Yes.

Q     I believe you testified that the first major factor

you considered was to assure the continued operation of the

business, correct?

A     Yes.

Q     And the second one was to make sure that everyone

complies with the due diligence process.  Is that -- that's

not exactly what you said, but is that a fair

characterization?

A     Yes.

Q     And I believe the third item that you described was to

make sure that we keep the asset teams -- keep the main

asset together, which is the asset teams, and you described

that as the most important consideration.  Am I

characterizing your testimony correctly?

A     Well, just to clarify, it would be to make sure that

the game teams stay together since they represent the asset

that's being bid upon.

1   Q      So keeping them at Midway is your primary concern.

2   A      It is one of the concerns.

3   Q      Okay.  And you also testified that keeping your

4   creative teams together is important, correct?

5   A      Yes.

6   Q      Okay.  Has Midway historically had any retention plans

7   to retain personnel?

8   A      The only plan that I would consider retentive would be

9   a stock option plan where options vest over a number of

10  years, and those are generally designed as retention plans

11  since the employee doesn't see any value for several years.

12  Q      But there is no cash payout retention play that has

13  been adopted by the company?

14  A      There is not a plan that has any sort of label as

15  retention; however, I think that, for example, our design

16  team bonus, which is often paid out between six to nine

17  months after a game completes, and also has payments based

18  on the ongoing sales of the game are a big reason that

19  people stay and it has a retentive aspect to it.

20  Q      But to the -- on direct, you made some comparisons of

21  Midway to a film studio, correct

22  A      With respect to how people will work together in

23  groups, yes.

24  Q      Isn't paying a designer for designing a game and

25  compensating that person or team for producing the game and

paying them an ongoing cash stream from the sales, isn't that a royalty agreement?

A    It is technically a royalty agreement, yes.

Q    Isn't that similar to someone in the film industry receiving residuals or a percentage of the gross for a film?

A    I can't comment at that.  I only make the comparison as for the point of an analogy.  I don't know how those deals are structured.

Q    But isn't it a similar concept?

A    In general, yes.

Q    And isn't it similar to an author writing a book and getting paid a royalty contract?

A    Again, in a very general sense, yes.

Q    Because --

A    Assuming that it's based on ongoing sales.

Q    The person who exercised their creative abilities is rewarded for the creation, correct?

A    Yes.

Q    And to that extent, they're all similar, aren't they?

A    In a general high level, yes.

Q    Now, $30 million is approximately the amount that is owed to the secured creditor, correct?

A    Approximately.  I think the number is actually 28.9, but --

Q    Roughly the same number, correct, sir?

A      Yes.

Q      What, to the best of your recollection, was the -- is
the debtor's most recent representation as to the value of
its assets in its SEC reports?

A      I would defer to our CFO to answer that --

Q      Okay.

A      -- in terms of the actual number, or I would need to
see the document in front of me.

Q      I did not have a copy of the 10K that was referred to
earlier this morning, but I do have a copy.

          MR. BUCHBINDER:  And, Your Honor, it was marked
as Exhibit Number 42 in the AHS exhibits.  It was not an
exhibit in the Committee's exhibits for the prior hearing.
And Exhibit 42 was the debtor's 10Q for the period ending
September 30, 2008.  Is that correct?  Yes.

BY MR. BUCHBINDER:

Q      Do you have -- you don't have that in front of you, do
you, Mr. Booty?

A      No, I do not.

          MR. BUCHBINDER:  May I approach the witness, Your
Honor?

          THE COURT:  Yes, of course, Mr. Buchbinder.

BY MR. BUCHBINDER:

Q      Mr. Booty, I've handed you a copy to review of the
form 10K for Midway Games for the period ending September

30, 2008.  And I've directed your attention to page 3 of the document, which is a consolidated balance sheet; is that correct, sir?

A    Yes.

Q    And on the consolidated balance sheet, what does it state is the value of the total assets as of September 30, 2008?

A    167,523,000.

Q    And 30 million represents roughly what percentage of 167 million?

A    Under 20 percent.

Q    Okay.  Now, did you sign the 10Q?

A    Yes.

Q    Thank you.  I have no further questions, Your Honor.

        THE COURT:  All right.  Mr. Caponi, any redirect, sir?

        MR. CAPONI:  Yes, briefly, Your Honor.

        THE COURT:  Thank you, Mr. Buchbinder.

                    REDIRECT EXAMINATION

BY MR. CAPONI:

Q    First, Mr. Booty, has the condition of Midway changed in any material way since the filing of that document in front of you, the 10Q or K?

A    Yes, it has.

Q    Okay.  And how has it changed?

A     We are currently in bankruptcy.

Q     Okay.  And do you have an understanding how, if at all, the bankruptcy has impacted how one would describe the value of Midway?

A     All I can --

        MR. BUCHBINDER:  Objection, Your Honor.  This witness is not evaluation expert.

        MR. CAPONI:  Your Honor, Mr. Buchbinder opened the door, and Mr. Booty runs the company.  I think if anybody can testify as to what he thought the company was worth in a general sense, he's qualified.

        THE COURT:  I'll overrule the objection, and we'll hear from the witness to the extent --

BY MR. CAPONI:

A     Yeah, all I can comment on is that the 10Q represents what I would call -- and I'm neither a lawyer, nor an accountant, but I would call it the accounting book value.  It's an accounting value.  I would say that the most definitive indication we have of the company's value is based on the actual bids that have come in.  And while they have been perhaps lower than some might like, and perhaps disappointing to some who, like myself, have a lot of value -- you know, personal identification with the company, nonetheless, the market value has been what it's been with the bids, so it's much than this.

Q    And on a percentage basis, how much less have the bids
been compared to what's in the -- the number reflected in
the document in front of you?

A    Well, less than 20 percent.

Q    Okay.  Focusing on milestone one, if a plan were to be
adopted or ordered by the Court that required miles --
basically a confirmation and conclusion of a sale to occur
before any incentive payments are issued, what impact would
that have on your design teams, the studio heads, and the
individuals on Exhibit 2 that we've discussed?

A    I think it would have a negative impact, and I would
break that into two parts.  I think that people have been
working hard and driving towards these goals with the good
faith assumption that they understood that there would be
some incentive that would offer intermediate bonuses to be
paid.  I think that it would also -- as I mentioned earlier,
the perception of the employees based on what they read and
what they see and what they've seen of the motions that have
been posted, is that this process, there's been many things
that have been contested, objected to.

        There's been some things that have been fought
over.  And I think that they would begin to think that --
you know, they wouldn't trust that the bonuses would
eventually be paid out.  I've heard people say things like
that they're worried that they might get lost in the

shuffle, that by the time the sale completes, it's not clear

who would actually be lobbying for them in terms of getting

them paid.  They wouldn't consider it any kind of guarantee

in the absence of something being paid in the interim.

As evidence of how it would impact the game

teams, I would just refer to some of the stuff that hit the

popular press last week where our game teams are actually

contacting some of the more popular gaming websites with

outward verbal expressions of frustration saying that, you

know, they don't understand why this is taking so long.

They don't understand why these bonuses are being contested,

and they flat-out said that they're out shopping themselves

around to other publishers.  So again, I don't even really

need to depend on my personal opinion there.  I would say

just look at what's actually going on and what's being

reported on in the popular video game press that I think

there would be a severe impact to the game teams and their

willingness to stay at Midway as this process continues.

Q     In your cross-exam with Mr. Buchbinder, the discussion

came up regarding these payments as you're concerned, trying

to keep the quote design team together and the studios

together.  Do you recall that?

A     Yes.

Q     Okay.  What impact does keeping those teams and those

studios together have on the ability of Midway to achieve

milestone one?

A    I think it is the single biggest driver in the process.  The getting the game teams is -- that's what's being bid on.  That's what the bidders are after.  And if those game teams are fragmented, if they've gone to other publishers, if they break apart, there's nothing that I know of that will have more impact on devaluing the bids.

Q    Am I correct in your earlier testimony, in order to receive the payment, the person on the list has to be there at the end of the game when the second or the first milestone is triggered?

A    That's correct.

Q    So if a person were to work exceedingly hard, help the debtor sign with a stalking horse, and the sale -- the conclusion of the sale process drags out for several months and they're forced to take a job elsewhere, would they be eligible for a bonus?

A    As I understand it, no.

Q    Thank you, Mr. Booty.

         MR. CAPONI:  That's it, Your Honor.

         THE COURT:  Thank you.  Anything further, Mr. Buchbinder, in response?

         MR. BUCHBINDER:  Not with this witness, Your Honor.

         THE COURT:  All right.  Thank you.  Thank you,

Mr. Booty.  Mr. Booty, I'm sorry.  I do have just two quick

questions for you just so I'm clear.  The first is, could a

sale constitute individual studios?  Are we talking about

anything of that nature?

THE WITNESS:  I expect that the final bid will be

an aggregate of multiple bidders, so a bidder, for example,

might bid on just our Seattle studio, and a second bidder

might bid on everything but the Seattle studio.  We have had

a number of bids that break out the company into distinct

modules and different pieces.

THE COURT:  Okay.  And the second, I just want to

be sure.  When we're talking about that, for milestone one,

that a sale would not be contingent on -- I apologize.  I

had it here just one minute ago.  On employment, was it?

Here it is.  I'm sorry.  Does not contain the financing, due

diligence, or employee hire condition.

THE WITNESS:  Right.  So I'll state that in very

layman's terms, and again, I'm not a lawyer, but as I

understand it, we can't sell people.

THE COURT:  Right.

THE WITNESS:  So if, say, ABC game company were

wanting to buy our Chicago studio, they may put in their

purchase agreement that it's contingent on employees

agreeing to go work for them.  I, as management, have no --

I can't force people to go work.  They're not property to be

sold.  So that's entirely the burden of that is on the
person buying the asset, to get those people signed up ahead
of time.

THE COURT:  Okay.

THE WITNESS:  So we want those contingency
removed to make sure that they've talked to the people they
need to talk to and the people are onboard that they're
after.

THE COURT:  Understood.  Okay.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  You may step down then, Mr. Booty.
Thank you, sir.

(Witness excused)

MR. CAPONI:  That would probably be the totality
of our presentation as far as witnesses go.

THE COURT:  Okay.

MR. CAPONI:  I'm not sure how the Court would
want to proceed.

THE COURT:  I think we could probably proceed
with argument at this point.

MR. CAPONI:  Mr. Buchbinder, you have the
objection.  Do you want to go first?

MR. BUCHBINDER:  You're forgetting that I have
witnesses, too.

MR. CAPONI:  Oh, I didn't realize you had a

witness.  I'm sorry.

THE COURT:  Oh, I'm sorry.  I'm sorry, Mr. Buchbinder.

MR. CAPONI:  We jumped the gun, Your Honor.

MR. BUCHBINDER:  Your Honor, Dave Buchbinder again for the record, but I am going to make it simple.  We submitted with our objection the declaration of Michael C. West, bankruptcy analyst.  Mr. West was present in the courtroom earlier, but he is not present now.  I had some discussions with Mr. DeBaecke during the -- before the hearing and during the break earlier, and we have agreed that paragraph 7A and 7B of Mr. West's declaration will be stricken.

THE COURT:  7A and 7B stricken.

MR. BUCHBINDER:  7A and 7B are stricken.

THE COURT:  Thank you.

MR. BUCHBINDER:  And that Mr. West's declaration, as it remains, is our proffer of testimony for the Court to review.

THE COURT:  Okay.

MR. BUCHBINDER:  I can do the proffer on the record, or I can simply allow the Court, with counsel's consent, to review the declaration, which then avoids any of the potential underlying confidentiality issues the parties are concerned about.

1      THE COURT:  Well, as --

2      MR. CAPONI:  We're fine with that, Your Honor.

3      THE COURT:  All right.  That's fine with the

4  Court.  I will read this.

5      MR. DEBAECKE:  And with the Court reviewing the

6  declaration, I would rest my evidence, and we'd be prepared

7  to argue.

8      THE COURT:  Okay.  Thank you very much, Mr.

9  Buchbinder.

10      MR. CAPONI:  Your Honor, with respect to

11  arguments, we're down to one issue.

12      THE COURT:  Yes.

13      MR. CAPONI:  The understanding is, is milestone

14  one a sufficient trigger and, you know, I take it from that

15  from -- although it hasn't been framed this way, the

16  question really is, is it sufficiently uncertain and it is

17  going to require enough effort to warrant some form of

18  incentive to achieve it.  So you know, i.e., is it a fait

19  accompli, a foregone conclusion?  I think the testimony from

20  Mr. Booty has been fairly clear on this point.  You know,

21  given the nature of his business, its value are in the

22  individuals as much as in the intellectual property.  One

23  without the other really carries little value.  The

24  individuals themselves have loyalty more to their working

25  group and to their game title, to their studio, than they do

to Midway as an entity, and that we've also had a lot of
testimony that these individuals and studios are highly
sought after, and would come as no shock to the Court or to
anyone else in when a company enters bankruptcy, competitors
are actively looking to peel off assets. And why pay for
something you can get for free? If you wait long enough,
they'll just call you, especially in this economy.

So milestone one only occurs if everybody stays
in place. So this is not a -- it is not an issue of
inventory of cars or car parts and, you know, are they going
to stick around and, you know, replaceable middle
management. If even one of these game teams peels off, that
$30 million number is never going to be achieved. Because
the individuals -- given the circumstances they find
themselves now, if that payment is pushed off into the
future, they have -- the real question facing them is, "Do I
sit tight and be the last person on the deck of the Titanic
hoping to get a $40,000 bonus, or do I leave now and get a
30, 40, 50, $60,000 bonus and I know I've got a job? And my
whole team's going to come with me." And that's the real
situation we find ourselves in.

So you know, this is not a case where these are
inconsequential people to achieving milestone work. It only
-- we only get to milestone one, and then hopefully to
milestone two, if they stick around. Compressing milestone

one and milestone two puts at risk ever achieving milestone

two because again, you could have someone sign up, and if

teams leave, they're not going to consummate a sale. So I

think that it is the testimony also of Mr. Booty, and it's

unrefuted, is that achieving milestone one is no foregone

conclusion. It's required a lot of effort on the part of

the individuals on this list. This is not a cash cow for

the company. There's 400 employees and it's been narrowed

down to a very select group, and they were specifically

targeted because of their ability to have people follow.

And essentially, we're incentivizing the shepherds and not

the sheep.

So by doing that, this estate is wisely

maximizing the effectiveness of these payments it can issue

smaller payments, fewer payments, and get the same bang for

the buck as we're targeting the right people. So this is

not a willy-nilly, hey, everybody gets some cash because of

a sale's taking place. These are also people that are

bearing the brunt of the interaction with the bidders, which

is necessary to give the bidders comfort that the asset

they're buying, i.e. the people, is worth purchasing. If

these individuals pick up the phone and interact in a way

that is lethargic and sour and bitter, anyone looking to

acquire assets is going to have second thoughts about

acquiring the assets or what they're willing to offer for

the assets, and that ties into what they're willing to do to become a stalking horse bidder.

And so I think that, you know, the milestone one is -- it's not obviously far along in the process, but it's far enough out that it's going to actually require and require dedication from the employees, but it's close enough in that it's a real incentive. Because after all, you know, a promise is the old Popeye, "I'll gladly pay you Tuesday for a hamburger today," is meaningless when you never get paid every Tuesday. So, you know, to push it so far out that they don't feel that it's achievable is not worth the paper it's written on. Thank you, Your Honor.

THE COURT: Thank you.

MR. BUCHBINDER: Good afternoon, Your Honor. Dave Buchbinder again on behalf of the United States Trustee. When this motion was originally filed, the debtor sought payment of incentive -- or so-called incentive bonuses of close to $4 million.

THE COURT: Yes.

MR. BUCHBINDER: The amount that we're currently discussing has been reduced to $1.6 million, and really the amount that we are in dispute at the moment is really the first $600,000 piece of that. The testimony of Mr. Booty is rather clear and crisp, and beyond debate, this is a retention plan. It's -- he -- his testimony is painted all

over with retention.  The most important thing to keep for

this company are its creative teams.  We have to keep them.

Repeatedly, he said words like that or to that effect.  This

is a retention plan.  The problem is that the Debtor hasn't

proposed it as a retention plan, so we don't have any

evidence or facts upon which we can test this retention plan

under Section 503(c)(1).  The debtor has relied exclusively

on 503(c)(3).  The first piece of this doesn't require the

production of any tangible result to benefit the creditors

of this estate.  It requires the debtor to produce a

stalking horse agreement without financing contingency that

will pay the secured debt in full, period.  It doesn't

require that the Court approve the agreement.  It doesn't

require that if the agreement is approved, the sale closes.

These folks become entitled to $600,000 three

days later, but the case could go south on the fourth day,

but they still have their money.  That doesn't seem to be

what Judge Lithland [ph] had in mind when he wrote in Dana 1

[ph] that a completion bonus based solely upon emergence

from Chapter 11, quote, regardless of the outcome of the

cases.  Without tying this portion of the bonus to anything

other than staying with the company until the effective

date, this Court cannot categorize a bonus of this size and

form as an incentive bonus.  Similarly here, this first

$600,000 is not related to any tangible result for the

creditors.

It's not designed to put a penny into their pockets.  For the penny to go into their pockets, the sale has to be approved and consummated, or the plan has to be approved and consummated.  Then they would become entitled to these bonuses.  But in this present form, this is simply a retention plan, and to the extent that the first piece is an incentive plan, it has no meaningful incentive to produce a result for the benefit of the creditor body.  It just doesn't.  This is perhaps the lowest threshold that I have personally seen other than perhaps the earlier proposal by the Debtor that would have paid a portion of the bonus pool for facts that were accomplished before the motion was filed.  I've seen one or two others like that in other cases.  But to approve as a low threshold for an incentive bonus the mere production of an asset purchase agreement with minimum terms without more is a threshold to which we must not and should not descend.

When Congress adopted these new rules, it tried to make clear that it was not expanding the universe for the payment of bonuses to management and bankruptcy cases.  It was trying to limit them.  But as water tries to find a way around every obstacle, it seems that here, the water that flows downhill seems to find a wide gorge through which to flow that would result in the payment of bonuses in

virtually every case simply by producing an asset purchase

agreement without regard to the results obtained because we

don't have to close the deal; we just have to show up with a

deal.  That's not enough, Your Honor.  We submit that as

simply not enough.  And in its present form with milestone

one having, as a trigger, simply producing a document

without more cannot be approved.

        THE COURT:  Thank you, Mr. Buchbinder.

        MR. DEBAECKE:  Your Honor, may it please the

Court.

        THE COURT:  Yes.

        MR. DEBAECKE:  Michael DeBaecke on behalf of the

debtors.  May I respond?

        THE COURT:  Yes.  Could we just take a five-

minute recess?

        MR. DEBAECKE:  Of course.

        THE COURT:  Five minutes.  That'll be all.

        MR. DEBAECKE:  Yes, Your Honor.

        THE COURT:  Give people a chance to stretch a

minute and I'll be right back in.

        MR. DEBAECKE:  Thank you.

    (Recess taken at 1:25 p.m. to 1:30 p.m.)

        THE CLERK:  Please rise.

        THE COURT:  Thank you, everyone.  Please be

seated.  All right.  Mr. DeBaecke.

MR. DEBAECKE:  Your Honor, may it please the
Court, Michael DeBaecke on behalf of the debtors.  A few
quick points --

THE COURT:  Yes.

MR. DEBAECKE:  -- in response to Mr. Buchbinder's
argument.  The debtors have put this forth as an incentive
plan, not a retention plan.  Mr. Buchbinder is wishing the
Court to characterize it differently, and we respectfully
disagree on that point.  And Your Honor heard the testimony.
Your Honor has familiarity with this case as we've gotten
here from February 12th.  It's been -- seems like longer
than that.

THE COURT:  Yes.

MR. DEBAECKE:  It's been a long couple months.
And I'm confident the employees are feeling that, as well.
So this is an incentive plan.  We have no reservations about
putting this forth as an incentive plan.  In the papers that
were filed, both in the motion, as well as the objection
from the Office of the United States Trustee, there was some
disagreement, I think, or maybe at least they were just --
maybe they come at it at a different way as to what the
appropriate standard is in evaluating this.  And obviously,
Mr. Buchbinder is asking the Court to find this to be a
retention plan.

We did not file this as a retention plan, so we

certainly don't agree with that position.  We think, at a minimum, the standard is, as Your Honor and Judge Sontchi have written opinions on it, we think it's whether this plan gets approved as a sound and reasonable exercise in the debtor's business judgment.  One also could look at it under 503-C3 and determine whether or not based upon the record whether this plan is justified under the facts and circumstances of these cases.  And we believe that the answer on both standards, whichever one Your Honor thinks is applicable here, the answer is yes.

We believe the testimony is clear that this incentive plan is clearly a reasonable exercise of the Debtor's business judgment, and also is justified under the facts and circumstances of these cases.  Milestone one, I want to make sure we don't get lost on what milestone one is proposed to be.  Milestone one and the payment that would be paid under the proposed KEIP if milestone one were triggered is not simply just signing an APA.  There's a lot more to it.

It's signing a stalking horse agreement that doesn't contain a financing diligence or employee hire condition.  Those are going to be some conditions that, maybe in some cases, those are no-brainers.  Those are not no-brainers in this case, and Your Honor has heard plenty of that, both at the last hearing, as well as this hearing.

That is a significant achievement in this case, and that
milestone one is a significant achievement if we can get
there. Not normally do we need a stalking horse APA that
doesn't have those conditions; we need a stalking horse APA
that's for at least $30 million in net sale proceeds.
That's also going to be a significant achievement in this
case, and that's also a reason why milestone one is
appropriate under the facts and circumstances of these
cases.

Finally, I made a clarification prior to the
actual evidentiary portion of the hearing starting, and this
was a clarification that was requested by Mr. Zolkin, and we
agreed to make the change -- it's not actually in there at
the present time -- that the Court will have to approve the
stalking horse APA at the bid procedure stage. That gets us
further along in the process, and that locks somebody in.
And if all the under conditions under milestone one are met,
then we have a real story to tell as we go forward, and
that's the baseline. And we believe that will be a
significant achievement in this case for everybody involved,
including those who have an economic interest in these
cases. And as Creditors' Committee has now agreed to the
proposed plan, the lender was in agreement to the proposed
plan. We believe that that voice -- those voices should
speak loudly. Maybe that's the only thing the lender and

the Creditors' Committee have agreed on so far, but they have.

So we think that carries significant weight for Your Honor's determination. With that, I will rest my comments at this time. We would ask Your Honor to approve the proposed key employee incentive plan.

THE COURT: Thank you. All right. Well, I have heard significant evidence here. Mr. Booty's testimony was certainly very helpful in assisting to formulate my decision, and it is that the milestones in this case are legitimate milestones. They are certainly not faits accomplis as has been suggested, and I think that the amount is not at issue. The recipients of the benefits of the program are not at issue. The only issue that was remaining before me this afternoon was the issue of whether or not milestone one was a true incentive. And I do find that there are sufficient hurdles that milestone one is, in fact, a legitimate incentive. And on that basis, I am prepared to grant the motion and to sign the order, which I understand will be undergoing some minor revision.

MR. DEBAECKE: Correct, Your Honor. We will fix the proposed KEIP consistent with the comments today, and we will correspondingly fix the proposed order that goes with that, and we'll submit those under certification of counsel.

THE COURT: And I also should have noted that,

you know, I say this in all cases. Companies are as good as
their employees, and in this case where we are dealing with
largely creative employees, it becomes particularly
significant, and also recognizing the competition in the
gaming end of the -- I'm sorry, that's a whole different
industry -- in the game development industry, it is
particularly important that we provide these employees with
every incentive to remain focused upon their work and to
achieve and to accomplish on behalf of the debtors.

        MR. DEBAECKE:  Thank you very much, Your Honor.

        THE COURT:  Yes.  Any --

        MR. DEBAECKE:  The debtors have nothing further
at this time.

        THE COURT:  Anything further from anyone else?
All right.  I have a few orders to receive, and I will look
for them.  And in the meantime, I wish everyone a good day
and holiday.  Thank you all.

[Whereupon at 1:36 p.m., the hearing was adjourned.]


CERTIFICATION

        I certify that the foregoing is a correct
transcript from the electronic sound recording of the
proceedings in the above-entitled matter.

_____     13 April 2009
Alicia Jarrett                     Date
Transcriber

| Word | Page:Line | Word | Page:Line | Word | Page:Line | Word | Page:Line |
|---|---|---|---|---|---|---|---|
| **102(b)(7)**(1) 63:6 | | **action**(5) 23:2 49:19 80:23 82:3 86:3 | | **agreed**(14) 12:10 14:9 14:10 14:23 37:6 38:12 43:24 46:17 48:5 99:22 141:11 151:13 151:22 152:1 | | **amount**(33) 6:2 14:24 16:24 29:23 64:23 68:25 73:20 73:22 74:7 95:14 96:24 98:2 98:5 99:8 106:18 109:2 109:17 110:4 110:24 116:1 118:5 118:15 125:4 126:12 | |
| **12-plus**(1) 85:23 | | **actions**(4) 55:7 55:12 80:13 114:2 | | | | 126:16 126:21 126:21 127:5 128:14 132:21 | |
| **13-week**(1) 5:17 | | **actively**(4) 115:10 115:12 115:17 143:5 | | **agreeing**(4) 15:18 39:16 109:24 139:24 | | 145:20 145:22 152:12 | |
| **20-some-odd**(1) 112:20 | | **activities**(3) 115:2 125:15 126:3 | | **agreement**(25) 12:23 20:12 20:15 26:7 | | | |
| **503(C)(1**(1) 146:7 | | **actual**(12) 33:11 44:7 55:18 55:20 68:21 99:18 111:3 114:10 122:18 133:7 135:20 151:11 | | 26:15 26:17 26:22 28:17 60:1 89:17 90:4 93:17 93:22 100:2 108:23 132:2 132:3 | | **amounts**(10) 96:4 96:5 98:17 102:19 111:4 112:1 118:19 120:18 120:24 125:5 | |
| **503(c)(3**(1) 146:1 | | | | 139:23 146:11 146:13 146:14 147:16 148: | | | |
| **a.m**(6) 1:14 4:1 73:14 73:14 79:6 79:6 | | **actually**(27) 11:15 14:19 21:17 36:10 42:9 | | 150:20 151:23 | | **amusement**(3) 3:9 21:9 76:16 | |
| **abandon**(1) 116:1 | | 42:12 46:9 46:23 51:22 65:2 66:22 67:13 | | **agreements**(1) 128:11 | | **amusements**(1) 75:1 | |
| **abc**(1) 139:21 | | 67:19 68:17 99:18 109:4 109:21 115:9 | | **ahead**(2) 111:19 140:2 | | **analogy**(1) 132:7 | |
| **abetted**(1) 55:2 | | 117:11 117:12 120:5 132:23 137:2 137:7 | | **ahs**(3) 9:12 87:2 133:12 | | **analyses**(1) 24:24 | |
| **abetting**(3) 32:11 32:12 54:10 | | 137:15 145:5 151:13 | | **aided**(1) 55:1 | | **analysis**(9) 19:13 34:17 34:19 36:9 39:2 | |
| **abide**(1) 57:8 | | | | **aiding**(3) 32:11 32:12 54:10 | | 39:10 67:2 67:3 81:10 | |
| **abilities**(1) 132:16 | | **add**(5) 61:6 95:19 96:14 96:25 122:6 | | **airwalk**(1) 30:2 | | | |
| **ability**(19) 11:10 11:14 14:20 21:1 30:19 | | **added**(3) 34:11 43:24 97:2 | | **alicia**(1) 153:25 | | **analyst**(1) 141:8 | |
| 37:2 39:2 39:7 47:11 53:17 96:5 98:12 | | **adding**(1) 97:6 | | **all**(97) 6:5 6:14 6:14 7:15 8:23 9:13 10:2 | | **and-some**(1) 69:4 | |
| 114:3 114:11 114:17 115:19 115:25 137:2 | | **addition**(2) 31:22 96:9 | | 10:10 10:13 10:13 11:18 12:10 16:4 16:22 | | **andrew**(1) 2:15 | |
| 144:10 | | **additional**(8) 36:10 43:2 45:14 88:9 95:5 | | 16:25 17:20 18:8 20:22 20:23 21:24 23:10 | | **angeles**(2) 2:10 2:44 | |
| | | 98:17 121:16 121:9 | | 26:16 26:24 26:24 29:2 29:24 31:15 38:1 | | **annual**(2) 64:23 68:25 | |
| **able**(11) 12:5 20:16 31:9 44:5 51:2 51:11 | | | | 42:24 44:11 45:7 45:17 48:20 50:7 52:12 | | **another**(18) 17:11 29:21 30:22 36:3 38:2 | |
| 93:10 94:6 122:22 125:9 129:13 | | **address**(8) 6:17 11:16 69:7 74:18 79:15 | | 53:14 55:8 57:8 59:22 61:24 61:24 63:9 | | 44:4 48:13 56:12 60:18 61:6 62:8 65:25 | |
| | | 80:10 97:13 99:5 | | 64:5 64:17 66:14 70:8 70:17 71:6 71:15 | | 66:2 66:8 105:2 111:3 115:18 115:25 | |
| **ably**(1) 15:25 | | | | 73:16 75:6 75:12 77:19 79:1 83:20 84:1 | | | |
| **about**(60) 4:19 8:15 15:2 16:4 16:14 | | **addressed**(1) 77:24 | | 85:9 86:19 87:15 88:16 90:1 90:15 91:17 | | **answer**(10) 17:22 21:15 99:9 114:19 115:3 | |
| 16:19 17:3 18:25 22:23 23:14 26:16 29:23 | | **addresses**(2) 12:12 56:21 | | 92:22 99:11 100:24 105:9 105:11 105:18 | | 127:21 128:1 133:5 150:9 150:10 | |
| 31:2 31:6 32:6 34:9 39:13 40:19 41:8 | | **adduced**(1) 32:22 | | 105:21 108:20 109:21 110:25 111:14 | | | |
| 42:19 43:9 45:16 47:20 50:3 57:5 58:24 | | **adequate**(2) 30:7 76:25 | | 114:22 116:25 119:13 121:24 122:22 123: | | **answered**(1) 59:3 | |
| 65:3 65:20 65:22 65:24 72:15 73:1 77:17 | | **adequately**(1) 12:12 | | 127:8 132:19 134:15 135:3 135:5 135:15 | | **answering**(1) 126:22 | |
| 81:4 82:2 83:7 83:9 84:22 89:19 89:20 | | **adhere**(1) 106:8 | | 138:25 142:3 145:7 145:25 148:17 148:25 | | **anticipate**(2) 23:12 90:6 | |
| 91:22 91:23 92:6 95:7 95:15 96:15 96:3 | | **adjourned**(1) 153:18 | | 151:17 152:7 153:1 153:15 153:17 | | **anticipated**(5) 6:1 12:19 36:11 109:20 | |
| 96:16 99:6 105:10 109:25 110:1 116:24 | | **adjust**(1) 120:15 | | | | **anticipates**(1) 109:13 | |
| 121:2 125:8 139:3 139:12 141:25 144:24 | | **adjusted**(1) 55:2 | | **allegations**(2) 56:10 63:4 | | **any**(92) 6:7 10:3 10:17 10:18 11:11 13:8 | |
| 149:16 | | **adjustment**(1) 4:12 | | **allegedly**(1) 31:7 | | 13:19 14:9 17:7 18:17 25:25 27:19 31:6 | |
| **above**(2) 30:25 108:2 | | **administered**(1) 1:5 | | **allegiance**(1) 124:4 | | 31:7 32:16 33:9 34:7 36:9 37:19 37:24 | |
| **aboventitled** (1) 153:23 | | **administrativ**(2) 52:11 68:11 | | **allocated**(2) 120:25 121:10 | | 39:1 39:12 39:21 39:22 39:24 40:6 40:15 | |
| **absence**(3) 53:15 115:15 137:4 | | **admission**(2) 10:4 40:15 | | **allow**(5) 51:18 71:16 141:22 | | 41:15 41:17 41:17 41:22 45:8 47:19 47:20 | |
| **absolutely**(6) 25:11 31:16 59:19 66:1 | | **admit**(1) 59:22 | | **allowed**(2) 25:22 56:11 | | 48:7 49:16 50:12 50:24 51:6 51:13 51:15 | |
| 113:15 114:7 | | **admitted**(4) 10:14 37:16 46:8 52:3 | | **almost**(7) 29:18 34:1 38:14 52:8 116:13 | | 53:16 55:14 56:7 57:5 57:6 57:14 65:20 | |
| | | **adopted**(5) 51:15 130:2 131:13 136:6 | | 121:19 126:24 | | 70:25 71:14 72:17 72:24 73:24 81:24 | |
| **abstained**(1) 42:9 | | 147:19 | | | | 84:18 84:20 84:22 85:10 86:1 86:7 90:22 | |
| **abundantly**(1) 39:11 | | | | **alone**(1) 29:18 | | 91:3 97:9 97:11 98:14 98:25 101:15 | |
| **accelerate**(1) 47:15 | | **advance**(1) 57:16 | | **along**(8) 5:24 38:16 63:5 88:22 103:25 | | 106:11 108:3 108:23 109:18 110:21 113:22 | |
| **accept**(1) 70:25 | | **advancing**(1) 57:10 | | 121:11 145:4 151:16 | | 114:16 118:4 122:25 125:10 127:10 | |
| **access**(4) 12:17 28:16 38:24 60:8 | | **advantage**(1) 54:5 | | | | 128:18 131:6 131:11 131:14 134:15 134:22 | |
| **accompli**(1) 142:19 | | **advantageous**(1) 23:25 | | **already**(10) 22:23 34:6 45:13 49:14 52:4 | | 136:8 137:3 141:23 146:5 146:9 146:25 | |
| **accomplis**(1) 152:12 | | **adversary**(4) 31:25 57:23 68:6 70:16 | | 70:18 73:4 74:13 111:13 117:3 | | 153:11 | |
| **accomplish**(1) 153:9 | | **adversely**(1) 47:13 | | | | | |
| **accomplished**(1) 147:13 | | **advice**(4) 45:21 46:1 55:2 114:1 | | **also**(53) 9:7 9:23 17:3 20:10 22:5 26:13 | | **anybody**(3) 94:20 94:22 135:10 | |
| **accordance**(1) 30:17 | | **advise**(1) 100:15 | | 28:6 33:1 43:19 48:1 49:21 51:14 53:10 | | **anyone**(7) 26:1 99:11 109:7 120:2 143:4 | |
| **account**(2) 36:6 42:24 | | **advised**(4) 35:3 45:9 45:15 54:22 | | 55:16 63:18 65:14 66:19 69:16 73:21 | | 144:23 153:14 | |
| **accountant**(1) 135:17 | | **advisor**(1) 41:23 | | 78:14 89:14 91:20 92:1 92:2 94:21 101:1 | | | |
| **accounting**(3) 114:21 135:17 135:18 | | **advisors**(2) 22:8 46:18 | | 104:12 104:13 106:7 112:1 112:7 113:7 | | **anything**(13) 36:16 41:19 57:9 62:18 | |
| **accumulated**(2) 46:12 51:5 | | **afford**(2) 36:10 36:11 | | 113:24 116:8 118:1 119:3 121:11 122:6 | | 70:19 71:1 115:2 117:18 122:12 138:21 | |
| **accurate**(1) 105:20 | | **after**(18) 28:10 42:15 42:17 49:21 50:14 | | 123:11 125:6 126:9 131:3 131:17 136:16 | | 139:4 146:21 153:14 | |
| **achievable**(1) 145:11 | | 50:15 63:15 81:4 82:9 97:2 97:7 104:19 | | 143:1 144:4 144:18 150:5 150:13 151:6 | | | |
| **achieve**(6) 11:9 114:17 117:3 137:25 | | 105:7 131:17 138:4 140:8 143:3 145:7 | | 151:7 152:25 153:4 | | **anyway**(2) 55:3 56:5 | |
| 142:18 153:9 | | | | | | **apa**(9) 95:15 95:19 128:11 128:15 128:18 | |
| | | **afternoon**(11) 84:5 85:17 85:18 88:1 90:10 | | **alternative**(5) 33:4 41:18 53:21 54:7 75:5 | | 150:18 151:3 151:4 151:15 | |
| **achieved**(6) 98:1 98:13 116:4 120:7 | | 93:19 103:22 103:22 127:17 145:14 | | **alternatives**(1) 37:18 | | | |
| 121:14 143:13 | | 152:15 | | **although**(13) 34:16 40:10 46:3 50:17 | | **apart**(5) 41:2 110:20 115:14 116:7 138:6 | |
| | | **again**(32) 7:11 12:18 13:3 45:19 58:3 | | 55:16 82:24 89:18 90:3 93:16 101:10 | | **apologize**(1) 139:13 | |
| **achievement**(5) 98:3 151:1 151:2 151:6 | | 59:11 60:13 62:20 63:3 63:23 64:8 67:1 | | 116:25 117:15 142:15 | | **apparently**(2) 43:18 47:18 | |
| 151:20 | | 72:5 72:11 76:20 90:11 98:23 99:16 102: | | | | **appear**(1) 7:9 | |
| | | 114:7 114:13 117:15 119:21 121:17 127:4 | | **always**(6) 63:15 65:21 70:23 86:10 116:13 | | **appearances**(1) 2:37 | |
| **achieving**(5) 100:17 113:12 143:23 144:1 | | 127:14 132:13 137:13 139:18 141:6 144:2 | | 124:2 | | **appears**(1) 5:22 | |
| 144:5 | | 145:15 | | | | **appellate**(1) 87:7 | |
| | | **against**(19) 31:22 32:1 32:19 32:25 49:1 | | **ambiguity**(1) 22:7 | | **applicable**(5) 47:14 55:17 150:10 | |
| **acknowledged**(1) 54:11 | | 49:18 53:24 55:11 56:12 57:23 62:22 | | **amend**(1) 38:12 | | **application**(2) 81:16 81:25 | |
| **acquire**(1) 144:24 | | 69:13 72:15 80:13 80:23 82:11 94:16 | | **amended**(2) 64:22 68:24 | | **apply**(1) 24:20 | |
| **acquired**(2) 123:12 123:16 | | 94:21 117:18 | | **amendment**(1) 44:23 | | **appreciate**(4) 66:12 84:2 86:9 86:23 | |
| **acquirers**(2) 110:8 110:11 | | | | **americas**(1) 2:33 | | **approach**(5) 22:10 60:7 94:24 111:12 | |
| **acquiring**(1) 144:25 | | **agenda**(2) 89:4 89:6 | | **among**(6) 30:11 32:13 32:19 32:21 38:8 | | 133:20 | |
| **acquirors**(1) 106:21 | | **aggregate**(2) 128:13 139:6 | | 118:14 | | | |
| **acquisition**(7) 2:21 75:4 75:9 76:8 76:25 | | **ago**(6) 32:3 34:14 34:24 93:10 107:3 | | | | **approaches**(1) 66:22 | |
| 77:9 86:20 | | **agree**(6) 60:3 70:10 91:14 98:12 122:5 | | | | | |
| | | 150:1 | | | | | |
| **acquisitions**(1) 48:19 | | | | | | | |
| **across**(2) 21:12 119:19 | | | | | | | |
| **act**(5) 37:25 55:14 74:15 74:17 77:15 | | | | | | | |
| **acted**(1) 56:14 | | | | | | | |

| Word | Page:Line | Word | Page:Line | Word | Page:Line | Word | Page:Line |
|---|---|---|---|---|---|---|---|

**appropriate**(13) 15:20 16:19 29:23 47:24 75:23 80:20 83:13 83:18 86:3 103:2 107:16 149:22 151:8

**appropriateness**(2) 37:23 102:15
**approval**(3) 95:15 97:8 100:21
**approve**(11) 89:8 89:24 94:6 120:3 127:20 129:10 129:13 146:13 147:15 151:14 152:5
**approved**(14) 40:18 40:20 42:14 68:22 91:5 95:20 100:18 120:5 120:6 146:14 147:4 147:5 148:7 150:4

**approximately**(3) 12:20 132:21 132:23
**april**(8) 1:13 4:1 40:2 42:21 43:6 43:16 43:20 153:24

**are,"**(1) 63:11
**area**(3) 14:12 104:18 104:19
**areas**(1) 9:11
**aren't**(3) 65:14 65:14 132:19
**argue**(2) 57:6 142:7
**arguing**(2) 59:8 72:15
**argument**(11) 10:24 11:17 11:24 13:14 13:15 66:11 85:24 101:18 101:19 140:20 149:6
**argumentativ**(1) 81:19
**arguments**(5) 29:25 31:4 83:21 86:6
**arisen**(1) 38:14
**arising**(1) 33:1
**arms**(1) 53:6
**arms-length**(1) 23:22
**arose**(2) 54:19 54:20
**around**(7) 81:8 126:24 127:2 137:13 143:11 143:25 147:23

**around."**(1) 26:13
**arts**(1) 104:13
**aside**(2) 20:25 30:22
**ask**(12) 7:23 16:10 18:22 36:22 53:5 77:20 87:4 94:10 107:15 112:15 124:3 152:5
**asked**(12) 36:18 36:20 40:19 40:22 41:5 48:25 55:10 79:14 95:5 97:1 105:13 105:20
**asking**(3) 36:15 84:20 149:23
**aspect**(2) 11:13 131:19
**aspects**(1) 11:7
**aspirational**(1) 121:22
**assert**(1) 27:5
**assessment**(1) 116:5
**asset**(20) 18:5 18:9 18:9 51:8 51:19 56:5 65:24 66:8 108:4 108:22 110:24 128:10 130:19 130:20 130:20 130:24 140:2 144:22 147:16 148:1

**assets**(20) 14:21 34:21 47:12 49:24 51:5 52:13 55:4 55:13 56:1 62:5 62:5 65:3 106:21 109:14 133:4 134:6 143:5 144:24 144:25 145:1

**assisting**(1) 152:9
**associates**(1) 61:6
**assume**(4) 17:21 20:23 88:21 121:13
**assumes**(2) 125:18 125:18
**assuming**(2) 12:16 132:15
**assumption**(4) 44:12 44:14 45:14 136:14
**assumptions**(1) 44:16
**assure**(1) 130:10
**astonishing**(1) 35:23
**attached**(1) 94:20
**attack**(2) 58:6 125:12
**attempt**(2) 37:18 43:1
**attempted**(1) 13:8
**attended**(1) 45:25
**attention**(4) 29:11 77:3 125:10 134:1
**attitude**(3) 113:7 115:2 115:17
**attorney**(1) 56:8
**attorneys**(1) 49:19

**attorney's**(5) 29:19 57:11 57:15 77:6 77:9
**attributed**(1) 34:1
**audio**(4) 104:18 104:20 104:22 104:22
**audit**(1) 42:12
**auditors**(3) 35:7 58:8 58:16
**august**(2) 31:9 42:25
**austin**(1) 45:16
**author**(1) 132:11
**authorities**(2) 32:3 70:13
**authority**(2) 57:10 57:14
**authorize**(1) 70:13
**authorized**(2) 41:16 41:21
**authorizes**(1) 88:3
**authorizing**(1) 57:22
**automatic**(2) 120:7 120:9
**autonomy**(1) 123:17
**available**(5) 18:20 20:13 20:19 74:19
**avenue**(2) 2:33 3:12
**avoid**(4) 38:4 46:16 49:18 53:12
**avoidance**(1) 96:16
**avoids**(1) 141:23
**award**(2) 97:21 98:2
**awarding**(1) 98:24
**aware**(7) 6:6 8:24 67:17 70:12 81:3 84:18 126:24

**away**(6) 16:6 21:10 71:16 117:21 117:24 119:24

**b-o-o-t-y**(1) 103:16
**bachelor**(2) 104:11 104:12
**back**(11) 5:3 28:20 59:10 67:1 73:9 79:5 85:24 88:19 92:20 116:10 148:20

**back."**(1) 41:9
**background**(1) 104:8
**backs**(1) 54:22
**balance**(3) 66:5 134:2 134:5
**ballantine**(2) 79:14 79:23
**bang**(1) 144:15
**banker**(1) 66:22
**bankers**(1) 22:8
**banking**(1) 37:7
**bankruptcy**(40) 1:1 1:18 34:24 36:4 45:20 52:24 53:23 53:24 54:17 54:19 54:21 55:13 55:24 59:13 59:14 59:17 69:16 69:23 70:24 71:20 87:24 106:1 106:7 106:10 106:17 112:23 112:25 114:9 116:16 125:14 126:5 126:10 126:14 126:17 126:24 135:1 135:3 141:8 143:4 147:21

**bankruptcy."**(1) 26:3
**barksdale**(1) 1:37
**base**(1) 26:14
**based**(26) 17:22 31:23 32:2 32:22 34:8 34:20 53:7 53:14 59:21 74:7 76:17 77:6 83:24 87:2 100:16 119:9 121:1 122:23 129:18 129:20 131:17 132:15 135:20 136:17 146:19 150:6

**baseline**(1) 151:19
**bases**(1) 105:22
**basic**(2) 50:11 53:5
**basically**(2) 6:9 136:7
**basis**(15) 5:18 52:2 78:2 78:6 86:8 87:1 87:1 98:21 113:6 113:17 114:23 121:1 121:11 136:1 152:18

**bates**(1) 69:21
**bear**(1) 27:17
**bearing**(1) 144:19
**bears**(2) 55:8 124:10
**became**(1) 125:4

**because**(44) 12:17 16:4 18:19 20:7 20:25 22:19 23:17 23:18 25:12 26:11 40:21 45:8 47:17 48:4 49:21 50:9 54:22 73:4 73:18 73:23 74:6 74:22 77:11 77:19 78:11 81:15 83:16 83:25 91:21 92:3 93:2 94:14 97:12 97:16 99:17 101:6 101:12 132:14 143:13 144:2 144:10 144:17 145:7 148:2

**become**(4) 104:23 145:2 146:15 147:5
**becomes**(3) 52:12 87:12 153:3
**becoming**(1) 105:25
**before**(56) 1:17 5:7 7:23 14:6 18:14 18:15 19:15 20:11 21:6 24:24 25:8 26:23 29:15 29:19 33:18 33:22 34:5 34:5 42:18 43:12 46:4 46:9 47:8 50:2 50:7 57:9 58:18 58:20 58:21 59:10 60:17 60:23 61:16 62:13 64:4 69:23 74:2 75:10 78:21 80:8 81:21 85:5 85:25 86:3 86:10 89:23 97:17 121:18 123:12 123:16 124:12 130:5 136:8 141:10 147:13 152:15

**began**(2) 29:20 44:12
**begin**(4) 16:14 44:16 116:7 136:22
**beginning**(1) 125:12
**behalf**(8) 6:19 48:23 85:19 113:23 145:15 148:12 149:2 153:9

**behind**(2) 13:5 23:12
**believe**(48) 6:7 7:13 7:15 8:10 8:15 8:22 13:15 13:17 15:23 21:19 24:10 26:16 28:21 28:21 29:14 30:20 31:23 33:2 40:4 49:8 51:24 53:10 54:7 55:19 56:24 57:2 57:17 69:6 70:19 76:25 79:15 81:10 81:24 84:22 101:21 107:5 107:19 109:15 115:9 115:17 117:12 128:3 130:9 130:18 150:8 150:11 151:19 151:24

**believed**(1) 24:3
**believes**(8) 12:12 30:9 31:10 31:15 32:24 43:18 53:14 81:7

**below**(1) 91:10
**benefit**(4) 12:23 47:17 146:9 147:9
**benefits**(1) 152:13
**beside**(1) 17:7
**best**(15) 6:1 13:8 24:4 24:12 27:14 27:15 28:16 31:10 41:24 61:9 62:24 94:4 116:9 120:11 133:2
**better**(5) 17:5 17:6 52:23 60:3 98:19
**between**(10) 13:2 19:9 23:24 30:10 50:13 56:17 62:3 88:19 126:20 131:16

**beyond**(8) 34:18 43:2 45:5 51:4 51:17 108:2 108:2 145:24

**bible**(1) 103:14
**bid**(15) 35:13 95:15 95:20 109:2 109:11 109:17 110:24 110:24 115:11 130:25 138:7 139:5 139:7 139:8 151:15

**bidder**(6) 109:8 109:25 115:25 139:6 139:7 145:2
**bidders**(10) 109:22 110:6 113:19 113:24 121:21 128:12 138:4 139:6 144:19 144:20
**bids**(11) 34:13 109:18 110:2 110:3 110:6 110:21 135:20 135:25 136:1 138:7 139:9

**big**(2) 49:4 131:18
**biggest**(1) 138:2
**bill**(2) 29:18 29:21
**bills**(1) 25:23
**binder**(1) 9:15
**binders**(2) 49:25 69:20
**birth**(1) 126:25
**bit**(6) 4:11 4:13 29:12 65:3 77:16 86:6
**bitter**(1) 144:23
**black**(1) 98:8

**black-letter**(1) 16:15
**blackline**(5) 94:13 94:15 94:24 95:9 95:24 107:2 128:7

**blacklined**(2) 94:16 94:21
**blank**(4) 1:22 5:8 51:16 69:22
**blind**(1) 24:22
**blindly**(2) 67:11 67:11
**blithely**(1) 21:18
**board**(49) 21:2 24:10 25:1 25:1 35:2 35:3 35:12 35:13 35:15 35:18 36:14 36:20 37:21 40:3 41:1 41:15 42:12 42:23 43:15 44:3 44:8 45:12 45:15 46:5 70:10 72:19 74:25 79:14 80:6 81:2 81:3 81:8 81:11 81:13 81:15 82:2 82:24 82:25 83:2 83:2 83:5 84:9 84:12 84:14 84:21 85:11 86:7 119:19 120:3 120:4

**board's**(1) 37:15
**body**(2) 27:2 147:9
**bona**(1) 37:25
**bondholders**(1) 70:9
**bonds**(1) 123:15
**bonus**(14) 101:23 118:3 119:24 129:20 131:16 138:17 143:18 143:19 146:19 146:21 146:23 146:24 147:12 147:16

**bonuses**(16) 98:20 98:24 108:13 118:1 118:4 118:8 121:10 125:8 129:17 136:15 136:23 137:11 145:18 147:6 147:21 147:25

**book**(8) 22:12 48:15 48:16 48:17 59:23 80:8 132:11 135:17

**book"**(1) 21:13
**booty**(30) 26:9 34:25 42:21 43:5 102:18 103:7 103:11 103:11 103:16 103:16 103:18 103:23 107:2 107:10 111:3 111:19 121:17 125:25 127:17 133:18 133:24 134:21 135:9 138:19 139:1 139:1 140:11 142:20 144:4 145:23

**booty's**(1) 152:8
**borne**(1) 61:2
**borrow**(1) 36:16
**borrowing**(2) 36:18 41:17
**boston**(1) 3:6
**both**(19) 6:6 27:17 30:4 35:15 37:5 37:6 42:10 43:20 45:25 50:3 51:18 61:11 61:22 63:8 72:8 104:20 149:18 150:9 150:25

**bother**(2) 40:3 41:22
**bottom**(8) 42:22 65:17 95:12 95:24 112:6 112:8 113:10 118:20

**bought**(2) 50:21 50:21
**brazen**(1) 46:19
**breach**(14) 17:19 20:22 23:6 23:7 24:8 32:17 32:20 35:7 54:9 54:10 55:2 62:24 63:1 75:22

**breaches**(1) 32:13
**break**(9) 73:7 86:25 102:4 114:19 116:7 136:12 138:6 139:9 141:11

**brief**(19) 16:9 17:12 18:3 21:17 22:15 23:23 28:21 30:1 33:10 56:25 63:9 68:15 80:20 82:1 82:5 82:7 82:10 102:10 104:9

**briefed**(3) 42:15 67:18 67:18
**briefly**(6) 79:15 95:6 103:25 107:15 108:17 134:17

**briefs**(1) 90:21
**bring**(9) 32:7 32:10 33:7 59:1 62:6 80:13 80:22 82:3 85:9

**bringing**(3) 61:3 75:19 100:19
**broad**(1) 66:15
**broader**(1) 117:16

# MIDWAY GAMES, INC.4.6.09.DOC

| Word | Page:Line |
|------|-----------|

broke(1) 118:20
broken(1) 112:3
broker(1) 72:4
brought(5) 41:19 60:18 77:3 93:25 119:6
brown(3) 23:7 24:5 24:20
brunt(1) 144:19
brush(1) 66:15
buchbinder(60) 1:32 10:17 10:19 10:21 85:16 85:18 85:19 85:22 89:20 90:8 90:10 90:11 90:14 90:21 92:19 92:21 99:13 99:14 99:16 99:21 100:1 100:25 101:10 101:19 101:22 102:2 102:6 102:6 125:17 127:9 127:11 127:13 127:14 127:16 133:1 133:16 133:20 133:22 133:23 134:18 135:6 135:8 137:19 138:22 138:23 140:21 140:23 141:3 141:5 141:5 141:15 141:17 141:21 142:9 145:14 145:15 145:20 148:8 149:7 149:23

buchbinder's(4) 10:16 92:13 102:11 149:5
buck(1) 144:16
budget(1) 30:18
build(2) 96:10 97:7
built(2) 95:16 119:10
bulk(1) 113:10
burden(4) 39:3 81:11 116:17 140:1
burnett(1) 3:4
business(15) 15:21 22:3 24:17 24:18 26:4 26:19 44:7 45:4 100:7 107:21 110:13 130:11 142:21 150:5 150:13

business."(1) 55:23
buy(2) 46:22 139:22
buyer(5) 17:5 17:6 17:9 17:11 47:25
buyers(1) 48:3
buying(2) 140:2 144:21
calculated(1) 98:6
calculating(1) 96:9
calculation(2) 96:8 99:8
calculations(1) 97:1
caliber(1) 118:6
call(12) 40:12 43:9 49:10 69:14 103:7 115:3 116:1 118:11 121:23 135:16 135:17 143:7

call."(1) 24:17
called(1) 38:5
came(10) 5:9 19:3 36:3 42:3 50:22 66:18 67:25 101:5 104:17 137:20
candidly(1) 41:7
cannot(5) 45:4 59:1 63:6 146:23 148:7
can't(8) 21:3 29:16 44:1 75:12 115:1 132:6 139:19 139:25
capable(1) 75:19
capacity(3) 37:3 39:8 53:18
capital(2) 52:24 57:20
capitalization(3) 37:2 39:6 53:16
caponi(84) 1:23 4:6 4:9 4:10 4:14 4:18 4:21 5:6 5:8 5:11 5:16 5:22 6:6 6:11 6:15 10:6 10:22 10:23 10:25 11:2 11:4 11:19 11:21 13:18 14:5 30:21 30:24 58:2 58:3 58:3 58:20 58:24 59:6 64:11 71:11 71:12 71:13 73:6 77:20 77:22 78:1 78:4 78:14 79:10 79:11 79:12 79:18 79:22 80:5 103:4 103:7 103:10 103:21 106:23 106:25 107:1 107:5 107:7 107:9 111:2 111:8 111:11 111:13 111:15 111:16 111:18 125:23 125:24 127:6 127:8 134:15 134:17 134:20 135:8 135:14 138:20 140:14 140:17 140:22 140:25 141:4 142:2 142:10 142:13

caponi's(2) 69:7 70:21
car(1) 143:10
care(6) 4:22 14:7 27:18 62:25 91:23 94:23
career(1) 65:2
careful(2) 29:10 73:17
carefully(1) 57:9
cares(1) 94:20
carried(2) 64:19 64:23

carries(2) 142:23 152:3
carry(1) 68:25
cars(1) 143:10
cart(1) 85:5
carve(1) 60:12
carve-out(2) 13:1 77:10
case(56) 1:4 4:17 4:25 16:7 16:11 19:3 19:18 23:5 23:5 23:7 24:5 26:25 30:2 30:2 30:5 31:23 34:8 37:1 41:1 46:10 49:22 50:16 51:25 52:10 53:1 53:1 53:2 53:10 53:19 54:11 54:16 54:18 54:19 54:20 55:23 56:20 59:21 61:9 61:10 61:25 73:25 75:24 94:23 115:5 116:13 117:5 143:22 146:16 148:1 149:10 150:24 151:1 151:7 151:20 152:10 153:2

cases(15) 27:10 28:21 70:24 70:24 123:11 124:14 146:21 147:15 147:21 150:8 150:14 150:23 151:9 151:22 153:1
cash(66) 5:23 5:25 11:7 11:11 11:12 11:12 12:2 12:5 12:7 12:23 13:13 14:17 17:14 20:15 26:13 26:14 27:8 29:13 30:14 31:7 31:3 31:6 34:23 35:19 36:4 36:6 36:21 37:3 39:7 39:23 40:4 42:2 45:10 46:15 52:1 53:11 53:17 57:18 59:11 59:12 59:24 60:1 60:3 60:9 60:11 60:17 63:24 64:5 67:6 69:24 73:18 76:3 76:20 77:1 77:18 77:19 81:16 83:18 83:19 87:4 87:16 88:3 131:12 132:1 144:7 144:17

casually(1) 126:7
categorize(1) 146:23
caught(1) 72:7
cause(2) 4:14 23:2
caused(2) 47:21 61:5
causes(1) 49:19
cbs(5) 46:15 46:25 47:23 48:11 54:24
cede(2) 13:14 64:9
center(1) 3:5
ceo(11) 26:5 26:9 42:21 104:4 104:16 105:12 105:13 105:14 105:17 105:25 106:1
ceos(1) 125:8
certain(13) 32:1 32:19 46:9 57:24 58:12 65:16 71:5 80:25 82:24 83:4 107:12 107:18 124:14
certainly(41) 10:18 19:2 19:23 22:8 25:5 41:8 66:11 66:12 73:24 75:18 75:23 76:2 76:4 79:1 82:7 84:2 85:7 86:11 86:23 87:8 87:19 91:19 92:9 93:4 94:2 94:8 95:1 97:5 100:24 101:3 102:13 102:25 106:25 114:3 117:6 117:17 123:8 125:7 150:1 152:9 153:11

certification(2) 152:24 153:20
certify(1) 153:21
cetera(4) 12:2 60:23 70:8 83:22
cfo(3) 26:6 37:20 133:5
chairman(1) 42:14
chairwoman(1) 35:4
challenging(1) 11:10
chambers(1) 89:12
chance(4) 36:17 67:22 122:21 148:19
change(8) 18:24 19:23 21:4 47:11 47:15 56:3 65:12 151:13
changed(5) 26:13 80:1 111:14 134:21 134:25
changes(5) 64:21 68:23 94:25 97:6 127:2
changing(2) 26:13 26:18
chapter(6) 1:7 35:11 41:18 46:7 52:12 146:20
character(1) 67:22
characterization(5) 25:5 28:23 53:20 54:8 130:16

characterize(1) 149:8
characterize/subordinat(1) 70:4
characterizing(1) 130:22
charge(2) 104:25 105:8
chart(1) 23:23
charter(1) 63:6
cheap(1) 61:13
chicago(4) 105:8 105:9 124:17 139:22
choice(7) 20:1 20:3 20:3 20:3 20:8 20:9 28:18
circle(1) 92:20
circling(1) 59:10
circuit(1) 52:25
circulated(1) 40:6
circumstance(5) 114:24 143:14 150:8 150:14 151:8
cite(3) 17:12 21:17 23:5
cited(8) 17:8 22:14 28:21 32:3 54:15 55:4 56:20 57:14
civil(1) 70:23
claim(24) 16:16 32:6 46:20 53:23 54:1 54:8 55:11 56:12 56:13 56:21 56:23 59:1 62:21 63:17 67:15 68:4 68:5 68:11 72:14 72:16 74:3 74:6 96:21 100:4
claimant(2) 54:3 54:5
claimed(1) 49:12
claiming(2) 41:12 49:24
claims(32) 12:2 27:4 30:5 30:11 31:21 32:9 32:12 32:14 32:19 32:21 32:24 33:4 33:7 49:1 49:7 49:18 52:17 52:20 53:21 54:9 56:25 57:4 57:23 60:16 61:1 61:4 62:16 62:17 62:22 68:4 69:13 82:11
clarification(7) 5:12 66:12 71:13 96:23 101:11 151:10 151:12
clarify(2) 68:18 130:23
clarifying(1) 84:8
class(1) 84:17
clean(1) 93:16
clear(20) 17:12 21:25 24:15 30:12 31:16 39:11 58:15 59:7 66:20 66:21 66:24 84:16 101:20 125:4 137:1 139:2 142:20 145:24 147:20 150:11
clearly(4) 17:22 20:2 76:13 150:12
clerk(7) 4:2 73:15 79:7 103:13 103:17 103:19 148:23
client(6) 70:1 78:20 81:22 85:25 86:2
clients(3) 48:14 83:25 85:7
climate(1) 125:7
close(10) 18:1 35:12 80:8 100:12 122:18 129:2 129:6 145:6 145:18 148:3
closed(1) 50:13
closer(1) 101:10
closes(1) 146:14
closing(1) 35:1
closing."(1) 128:19
clouded(1) 82:15
clouds(1) 76:2
code(5) 53:23 54:6 55:13 64:22 68:24
cohn(1) 3:1
collateral(43) 11:7 11:11 11:12 11:22 12:2 12:6 12:7 12:23 13:13 14:25 15:2 16:1 16:1 27:8 29:13 30:14 31:2 37:2 39:6 52:1 53:17 57:18 59:11 59:12 59:20 60:2 60:3 60:9 60:11 60:17 60:25 69:24 73:18 76:3 76:20 77:18 77:19 81:17 83:18 83:19 87:4 87:16 88:3
colleague(1) 68:16
colleagues(1) 24:22
collected(1) 52:7

collections(1) 119:3
collectively(1) 128:11
college(2) 104:5 104:9
colorable(1) 82:11
combined(1) 42:25
come(19) 18:22 19:2 21:12 33:20 51:11 72:1 72:25 73:9 79:5 79:5 79:5 91:24 92:8 98:18 118:1 119:8 135:20 143:3 143:20 149:21
comes(5) 12:25 26:9 61:23 91:12 109:24
comfort(1) 144:20
coming(12) 6:7 11:25 14:25 19:19 63:13 63:13 66:25 71:2 99:12 109:20 110:16 110:17
commencing(1) 128:7
commend(2) 67:12 67:18
comment(6) 60:20 61:3 91:13 109:21 132:6 135:15
comments(11) 11:5 11:15 64:14 84:2 85:15 88:3 89:20 93:25 108:15 152:5 152:22
commission(1) 129:24
commissioned(1) 39:1
commitment(1) 125:16
committee(100) 2:4 2:39 5:2 5:11 6:16 6:25 11:10 12:15 13:1 14:13 15:7 15:24 16:8 20:5 23:3 23:11 23:13 23:14 23:16 25:1 25:20 27:5 27:16 27:21 27:22 29:9 30:8 30:13 31:10 31:15 31:16 31:24 32:5 32:10 32:24 41:13 41:14 41:16 41:22 42:5 42:12 42:13 52:14 52:17 52:21 53:14 56:10 56:13 57:7 57:8 57:22 60:8 60:13 61:9 61:23 63:1 64:1 64:9 65:3 70:5 70:9 70:14 70:24 71:12 71:19 71:23 72:3 72:20 73:1 74:1 74:3 75:17 75:24 77:10 79:19 81:7 84:3 84:21 86:9 87:21 87:22 88:13 89:14 89:17 90:4 93:8 93:11 93:18 95:4 96:4 97:24 97:25 98:11 98:11 98:15 99:22 100:14 120:4 151:22 152:1
committee,"(1) 97:24
committees(1) 23:12
committee's(18) 9:15 10:11 14:23 27:21 30:19 42:1 61:10 61:12 68:7 75:7 80:12 80:23 83:19 89:7 89:13 91:1 98:10 133:13
companies(2) 109:11 153:1
company(102) 5:18 5:22 14:15 18:5 18:9 18:10 18:20 20:13 20:19 20:25 21:4 21:5 21:18 21:18 22:5 22:20 24:1 24:4 24:6 24:6 24:7 24:13 24:14 24:22 24:25 25:2 25:5 25:10 25:15 25:16 25:19 25:21 25:22 26:12 26:17 26:18 27:6 27:14 28:11 28:13 31:9 33:5 33:18 33:22 34:5 34:14 34:16 35:13 38:8 41:3 41:4 42:6 43:4 44:5 44:12 44:17 44:21 45:21 46:8 46:11 47:3 50:18 50:23 50:24 51:7 53:4 54:12 56:6 63:1 63:5 65:7 66:3 67:6 67:10 69:11 69:12 76:15 76:16 77:5 81:13 82:3 84:13 112:8 112:9 112:11 120:24 122:23 122:24 128:25 129:18 129:21 129:23 131:13 135:9 135:10 135:23 139:9 139:21 143:4 144:8 146:2 146:22
company's(6) 14:20 20:16 36:5 42:18 69:11 135:19
compared(1) 136:2
comparison(1) 132:6
comparisons(1) 131:20
compel(1) 62:3
compelled(1) 64:4
compensating(1) 131:25
compensation(3) 97:24 98:9 120:4
competition(1) 153:4
competitive(1) 26:19
competitor(2) 117:24 119:24
competitors(2) 117:21 143:4
complain(1) 73:1

| Word | Page:Line | Word | Page:Line | Word | Page:Line | Word | Page:Line |
|---|---|---|---|---|---|---|---|
| complaint(2) 60:19 74:4 | | consult(2) 100:15 102:3 | | couple(14) 17:18 17:25 18:6 23:10 26:11 58:4 64:16 66:13 73:1 91:22 95:5 96:3 104:19 149:14 | | creditors(18) 29:9 46:9 46:10 46:23 47:3 51:2 54:1 54:4 54:14 55:15 55:19 56:16 62:17 62:19 64:8 75:11 146:9 147:1 | |
| complete(5) 4:24 7:4 45:3 45:4 109:23 | | consulted(1) 81:4 | | | | | |
| completed(1) 110:4 | | consuming(1) 36:14 | | | | creditors'(16) 2:4 2:39 6:11 11:10 15:24 16:8 23:3 23:12 52:14 90:4 93:8 93:11 95:4 97:25 151:22 152:1 | |
| completely(1) 127:1 | | consummate(2) 42:6 144:3 | | course(10) 43:3 49:20 55:22 73:10 76:6 82:17 97:14 120:15 133:22 148:16 | | | |
| completeness(1) 115:3 | | consummated(3) 43:13 147:4 147:5 | | | | | |
| completes(2) 131:17 137:1 | | consummation(2) 100:18 100:21 | | court(301) 1:1 4:3 4:8 4:11 4:16 4:19 4:23 5:10 5:15 5:21 6:5 6:9 6:14 6:20 6:24 7:3 7:10 7:12 7:17 7:20 8:8 8:11 8:13 8:18 9:1 9:4 9:6 9:9 9:13 9:18 9:25 10:2 10:8 10:10 10:13 10:22 10:24 11:1 11:3 11:6 11:18 11:19 11:20 12:4 12:18 13:5 13:19 13:23 14:4 16:11 16:23 17:22 18:14 18:16 18:22 19:16 20:11 21:6 21:8 22:16 23:4 23:8 27:20 28:1 28:3 29:2 29:7 30:15 30:23 31:14 31:24 33:13 33:25 41:19 43:22 45:21 45:23 49:24 52:1 52:22 53:5 54:1 54:25 55:24 57:9 57:17 58:1 58:17 58:23 59:5 59:10 59:16 59:17 59:18 60:17 64:11 65:6 65:14 66:6 66:10 67:13 68:13 68:20 70:15 71:4 71:8 71:10 71:12 71:20 73:6 73:13 73:16 73:20 74:2 74:5 74:9 75:6 75:12 75:25 76:4 76:18 77:15 77:23 77:25 78:3 78:5 78:10 78:16 78:18 78:22 79:1 79:4 79:8 79:11 79:15 79:17 79:20 80:1 80:4 80:7 80:10 80:15 80:18 82:17 82:18 82:23 83:3 83:11 84:1 84:6 84:10 84:15 84:23 85:1 85:8 85:16 85:21 85:25 86:3 86:5 86:15 86:17 86:23 87:8 87:14 87:17 87:24 88:5 88:8 88:11 88:13 88:16 88:18 88:24 89:2 89:4 89:10 89:15 89:22 90:1 90:8 90:13 90:20 90:25 91:8 91:17 92:3 92:9 92:15 92:18 92:22 92:25 93:7 93:12 93:20 94:2 94:6 94:8 94:18 95:1 95:8 95:11 95:15 95:22 96:1 96:7 96:12 96:19 97:4 97:13 97:14 97:19 97:22 98:4 99:2 99:11 99:17 99:20 99:25 100:15 100:19 100:24 101:3 101:8 101:14 101:20 102:5 102:10 102:19 102:22 102:25 103:6 103:9 103:11 104:9 106:25 107:4 107:6 107:8 107:16 108:18 110:10 111:7 111:10 111:12 111:13 111:14 111:17 111:22 125:22 126:23 127:7 127:11 127:19 129:9 129:12 130:5 133:22 134:15 134:18 135:12 136:6 138:21 138:25 139:11 139:10 140:4 140:9 140:11 140:16 140:17 140:19 141:2 141:14 141:16 141:18 141:20 141:22 142:3 142:3 142:4 142:5 142:8 142:12 143:3 145:13 145:19 146:13 146:23 148:8 148:1 148:11 148:14 148:17 148:19 148:24 149:2 149:4 149:8 149:13 149:23 | | creditors'(1) 45:19 | |
| complies(2) 107:24 130:14 | | contact(3) 37:19 113:20 126:6 | | | | crisp(1) 145:24 | |
| comports(1) 22:14 | | contacted(1) 50:15 | | | | criteria(3) 112:15 112:19 112:22 | |
| comprehensive(1) 7:7 | | contacting(1) 137:8 | | | | critical(3) 20:16 28:17 113:17 | |
| compressing(1) 143:25 | | contain(3) 128:15 139:15 150:21 | | | | critically(1) 51:24 | |
| computer(1) 104:12 | | contemplated(2) 44:19 99:1 | | | | cross(2) 127:10 127:15 | |
| concede(1) 72:2 | | contend(1) 34:18 | | | | cross-exam(1) 137:19 | |
| conceded(1) 40:8 | | contends(1) 31:1 | | | | crown(1) 46:15 | |
| conceding(1) 40:13 | | contention(1) 46:3 | | | | culture(1) 123:15 | |
| concept(5) 59:15 95:14 95:17 95:19 132:9 | | contested(8) 11:12 11:13 13:13 57:5 60:1 77:18 136:20 137:11 | | | | cure(4) 53:23 96:4 96:5 96:24 | |
| concern(12) 12:12 22:21 35:6 60:25 74:13 76:19 82:18 91:18 91:20 99:6 102:7 131: | | context(8) 11:13 60:18 61:16 65:16 83:14 83:23 117:7 117:17 | | | | current(15) 14:16 23:22 52:2 81:12 81:16 83:2 84:9 84:11 84:13 84:21 93:16 94:12 94:13 105:25 113:12 | |
| concerned(5) 10:15 18:24 77:6 137:20 141:25 | | contingencies(2) 108:23 108:24 | | | | | |
| | | contingency(5) 100:3 100:20 108:24 140:5 146:11 | | | | currently(9) 34:9 85:25 94:4 104:1 108:12 109:15 112:12 135:1 145:20 | |
| concerns(10) 10:16 38:14 60:7 77:7 77:24 80:11 81:22 85:10 101:13 131:2 | | contingent(3) 120:9 139:13 139:23 | | | | | |
| | | continually(1) 114:23 | | | | curt(1) 3:11 | |
| concerted(1) 55:7 | | continue(5) 14:16 25:22 76:22 114:24 | | | | cushion(6) 30:25 30:25 31:5 31:8 57:3 64:6 77:1 77:1 | |
| conclude(5) 24:21 59:18 75:7 122:8 127:9 | | continues(5) 2:2 28:16 77:4 107:20 130:10 | | | | | |
| concluded(3) 47:17 56:4 69:3 | | continues(3) 14:16 56:8 137:18 | | | | customary(1) 118:4 | |
| conclusion(12) 23:16 24:25 27:4 50:22 75:20 84:22 121:24 122:5 136:7 138:15 142:19 144:6 | | continuing(3) 25:23 76:23 119:2 | | | | cut(1) 13:8 | |
| | | contract(3) 96:18 96:22 132:12 | | | | dad(2) 36:22 43:4 | |
| concocted(2) 43:13 46:19 | | contrary(4) 17:11 19:20 48:2 59:9 | | | | daily(5) 106:14 108:2 113:6 114:23 126:6 | |
| condition(5) 39:23 128:16 134:21 139:16 150:22 | | contrast(1) 23:5 | | | | dakim-grimm(32) 4:5 6:12 13:21 14:2 29:4 29:5 29:8 29:8 30:16 33:14 34:1 43:23 45:24 58:1 65:24 66:25 67:22 68:7 68:14 68:15 68:21 70:16 71:6 71:9 73:12 84:4 84:5 84:7 84:11 84:16 84:24 85:14 | |
| | | contribution(2) 38:2 40:5 | | | | | |
| | | contriving(1) 51:4 | | | | | |
| conditions(3) 150:22 151:4 151:17 | | control(7) 18:24 19:23 46:14 47:11 47:15 56:3 65:13 | | | | | |
| conduct(7) 33:1 34:17 40:3 54:3 56:7 67:16 76:6 | | | | | | | |
| | | controlled(2) 41:1 41:4 | | | | dakin-grimm(1) 2:6 | |
| conducted(1) 38:22 | | controller(1) 113:15 | | | | damage(5) 17:18 18:18 28:11 54:9 55:6 | |
| confer(1) 78:20 | | controlling(8) 17:16 21:3 40:14 47:1 54:12 54:16 74:11 75:1 | | | | damages(6) 32:12 32:25 55:5 59:1 59:9 69:6 | |
| confidence(2) 12:4 115:24 | | | | | | | |
| confident(3) 12:21 70:12 149:15 | | | | | | damaging(1) 63:21 | |
| confidential(9) 8:16 8:22 8:24 9:23 20:18 22:10 90:15 92:2 111:9 | | conversation(1) 43:8 | | | | dana(1) 146:18 | |
| | | conversations(1) 61:22 | | | | daniel(1) 2:41 | |
| | | conversion(2) 32:18 32:21 | | | | data(2) 1:39 34:20 | |
| confidentiality(5) 9:2 10:15 10:18 92:20 141:24 | | conveyance(4) 32:17 49:2 55:9 55:16 | | | | date(7) 42:25 75:18 106:19 110:1 128:14 146:23 153:25 | |
| | | cool(1) 4:13 | | | | | |
| confirm(2) 36:21 67:5 | | cooperative(1) 107:25 | | | | daughter(3) 35:5 40:19 40:21 | |
| confirmation(2) 100:10 136:7 | | copy(7) 106:24 107:2 107:5 111:13 133:9 133:10 133:24 | | | | dave(6) 85:19 90:11 99:15 102:2 141:5 145:15 | |
| confronted(2) 50:6 73:20 | | | | | | | |
| confused(1) 77:16 | | | | court(5) 151:14 152:7 152:25 153:11 | | | |
| congress(1) 147:19 | | core(2) 112:24 112:25 | | court-ordered(1) 71:2 | | david(5) 1:32 2:7 68:23 105:12 127:14 | |
| connection(3) 30:13 97:8 98:24 | | corporate(2) 32:17 49:1 | | courthouse(2) 27:11 59:3 | | davis(1) 2:23 | |
| connections(1) 123:15 | | corporation's(1) 45:17 | | courtroom(3) 1:9 27:11 141:9 | | day(25) 5:19 15:4 15:10 15:22 17:24 17:24 19:3 19:6 22:25 25:3 29:11 34:8 46:11 49:22 85:7 92:12 106:11 114:25 115:2 115:2 125:20 126:7 126:11 146:16 153:16 | |
| conscience(1) 74:9 | | correct(37) 7:13 9:3 83:3 89:15 92:17 93:7 106:8 106:8 106:22 107:14 108:12 108:14 116:4 120:11 121:14 121:16 124:21 124:22 124:23 125:1 128:23 129:4 129:5 129:7 129:19 130:11 131:4 131:21 132:17 132:22 132:25 133:15 134:3 138:8 138:12 152:21 153:21 | | courts(5) 39:10 52:24 53:23 54:17 59:24 | | | |
| consensual(4) 11:9 77:18 78:2 78:6 | | | | court's(8) 12:14 27:24 58:5 74:14 87:3 92:21 103:4 106:23 | | | |
| consent(4) 40:6 46:5 98:13 141:23 | | | | | | | |
| consenting(1) 86:20 | | | | | | | |
| consequence(1) 98:18 | | | | | | | |
| consequences(1) 54:24 | | | | covenance(1) 35:8 | | | |
| conservative(2) 42:23 44:17 | | | | covenance,"(1) 44:24 | | days(5) 37:21 50:7 71:16 100:7 146:16 | |
| conservatively(2) 126:20 127:4 | | correctly(1) 130:22 | | cover(1) 105:21 | | deal(27) 4:20 13:8 32:16 34:5 36:8 37:18 37:23 41:14 41:16 42:3 43:16 44:1 44:1 47:10 47:17 48:9 49:3 50:7 51:3 51:19 53:15 55:3 67:9 96:21 100:19 148:3 148:4 | |
| consider(6) 19:2 37:11 74:5 74:17 131:8 137:3 | | correspondingly(1) 152:23 | | cow(1) 144:7 | | | |
| | | cost(3) 53:12 61:2 80:23 | | cpa(1) 23:20 | | | |
| considerable(2) 74:7 80:22 | | cost-benefit(1) 81:9 | | create(1) 43:1 | | | |
| consideration(5) 53:16 55:21 86:11 96:21 130:21 | | costs(2) 27:17 80:22 | | creates(1) 76:6 | | | |
| | | couldn't(3) 21:4 25:17 49:16 | | creating(1) 53:9 | | | |
| considered(10) 36:24 39:9 46:5 47:8 47:8 47:13 75:6 85:4 112:10 130:10 | | counsel(19) 7:13 7:15 7:23 9:11 22:1 22:23 27:23 42:16 43:5 45:16 47:7 61:22 69:16 69:22 77:11 87:22 102:14 127:21 152:24 | | creation(1) 132:17 | | dealing(2) 89:13 153:2 | |
| | | | | creative(5) 123:6 131:4 132:16 146:2 153: | | deals(2) 11:25 132:8 | |
| | | | | creativity(1) 123:8 | | deanna(1) 18:12 | |
| consistent(3) 36:23 87:5 152:22 | | | | credibility(4) 34:13 51:14 67:20 76:12 | | | |
| consolidated(2) 134:2 134:5 | | counsel's(1) 141:22 | | credible(1) 24:11 | | | |
| constitute(1) 139:3 | | count(2) 96:24 118:12 | | credibly(1) 24:2 | | | |
| constituted(2) 82:22 82:23 | | country(1) 71:15 | | creditor(3) 25:25 132:22 147:9 | | | |
| constructive(1) 55:17 | | | | | | | |

# MIDWAY GAMES, INC.4.6.09.DOC

| Word | Page:Line |
|---|---|

debaecke(68) 1:24 87:10 87:11 87:11 87:15 87:19 89:3 89:5 89:5 89:11 89:16 89:23 90:2 90:25 91:2 91:9 91:18 92:5 92:17 92:23 93:1 93:8 93:14 93:21 94:3 94:8 94:9 94:19 95:2 95:3 95:9 95:12 95:23 96:2 96:8 96:13 96:20 97:5 97:16 99:2 99:3 99:18 101:2 101:4 101:4 101:9 101:15 102:17 102:20 102:23 103:3 107:3 141:10 142:5 148:9 148:12 148:12 148:16 148:18 148:21 148:25 149:1 149:2 149:5 149:14 152:21 153:10 153:12

debate(1) 145:24
debbie(2) 126:11 126:22
debt(27) 22:23 25:6 25:12 25:13 25:17 33:3 34:7 34:9 36:11 36:20 37:3 38:16 38:20 39:3 39:7 39:25 40:1 40:24 44:21 44:22 44:22 50:20 50:21 52:25 53:3 53:13 146:12
debt."(1) 50:21
debtor(45) 1:22 6:2 11:4 12:11 12:17 12:21 13:3 13:7 13:7 13:10 15:21 29:18 30:17 31:5 32:5 33:9 52:10 56:16 59:25 60:2 60:6 60:8 60:13 60:25 61:6 61:19 62:1 63:19 69:3 70:3 70:6 71:13 71:19 72:21 77:22 98:24 109:7 110:3 110:7 138:14 145:16 146:4 146:7 146:10 147:12
debtors(19) 1:11 5:8 10:6 15:12 15:25 18:22 19:2 31:20 58:4 87:12 92:4 93:4 93:10 101:5 148:13 149:2 149:6 153:9 153:12
debtor's(21) 11:14 11:24 12:19 30:13 30:19 31:18 33:8 55:15 59:12 60:21 62:22 71:21 75:14 77:17 89:8 102:13 103:18 133:3 133:14 150:5 150:13

debts(1) 36:2
decade(1) 34:1
december(4) 20:3 20:13 20:15 28:13
decide(2) 12:14 12:15
decided(3) 30:3 112:16 118:15
decides(1) 24:14
deciding(2) 38:23 39:8
decision(6) 26:4 54:23 54:25 67:13 120:19 152:10

deck(1) 143:17
declaration(9) 19:6 34:8 46:11 49:23 141:7 141:12 141:17 141:23 142:6

declined(1) 37:8
decreased(1) 116:18
dedication(1) 145:6
deem(2) 96:23 103:1
deems(1) 97:2
deepening(2) 23:1 23:6
deeply(1) 48:22
defaults(1) 51:21
defend(2) 49:7 56:10
defendant(1) 84:19
defendants(1) 85:1
defends(2) 41:12 52:16
defer(3) 87:22 127:21 133:5
deference(3) 23:16 23:17 23:18
deferred(2) 65:2 65:3
deficiency(1) 36:1
defied(1) 117:10
defies(1) 34:13
defined(2) 64:21 68:23
defines(1) 95:25
definitely(1) 123:1
definitive(1) 135:19
defraud(1) 55:19
degradation(1) 110:19
degree(5) 28:6 98:15 104:11 104:12 104:1
delaware(12) 1:2 1:11 4:1 22:15 23:1 27:3 30:3 39:9 47:4 54:16 55:24 56:20

delay(1) 55:19 82:6 86:2

delineated(1) 120:8
demonstrated(2) 43:11 55:20
demonstrative(1) 8:12
deny(1) 77:12
department(2) 104:20 118:25
departments(1) 118:24
depend(1) 137:14
depending(1) 123:20
depends."(1) 40:25
deposition(5) 19:7 19:8 40:13 49:15 50:1
depositions(5) 7:2 7:6 7:9 31:14 61:21
derivative(8) 31:25 75:17 79:18 80:9 80:12 82:3 82:8 84:20

descend(1) 147:18
describe(4) 106:2 108:17 123:4 135:3
described(4) 52:18 130:1 130:18 130:20
deserve(2) 23:17 23:18
deserves(1) 23:16
design(6) 105:1 105:1 105:3 131:15 136:9 137:21

designated(1) 8:21
designed(2) 131:10 147:2
designee(1) 47:6
designer(1) 131:24
designers(1) 118:12
designing(1) 131:24
desperate(1) 46:14
despite(2) 31:2 41:21
details(1) 119:14
determination(4) 60:24 67:23 68:2 152:4
determinations(1) 67:23
determine(6) 41:23 58:18 75:2 98:1 112:19 150:6

determined(3) 98:7 98:11 107:16
devaluing(1) 138:7
devastating(2) 51:1 81:12
developed(2) 27:1 116:13
development(9) 59:20 105:9 105:11 106:5 113:18 115:9 115:19 116:5 153:6

devoid(2) 37:9 41:15
dewey(7) 61:8 72:12 79:13 79:22 79:23 79:24 79:24

diaz(1) 1:39
dictate(1) 13:11
didn't(22) 20:8 24:7 35:25 40:15 40:20 41:22 42:11 47:20 48:14 49:15 50:6 50:23 55:12 62:18 66:3 66:10 67:1 67:2 74:13 74:14 99:17 140:25

difference(1) 23:24
different(10) 17:18 23:9 23:10 84:17 104:24 112:6 115:16 139:10 149:21 153:5

differently(2) 123:20 149:8
difficult(3) 119:10 119:15 122:11
difficulty(3) 22:21 24:14 122:13
diffuse(1) 125:10
diligence(15) 38:22 106:18 106:20 106:21 107:25 109:23 110:5 112:25 113:15 114:1 122:2 128:16 130:14 139:16 150:21

diluted(2) 38:6 53:13
diminish(1) 123:2
diminishing(1) 55:14
diminution(2) 31:11 57:20
dip(1) 28:6
direct(8) 38:14 91:24 98:23 103:20 126:4 127:9 130:1 131:20

directed(3) 37:22 70:10 134:1
directly(2) 89:13 126:2

directors(16) 32:2 32:20 33:1 36:24 37:12 47:4 57:24 62:23 80:6 80:13 80:21 80:24 81:11 82:12 120:4 123:7

disagree(1) 149:9
disagreement(4) 13:2 13:19 14:8 149:20
disappointing(1) 135:22
disaster(1) 46:16
disclose(1) 50:6
disclosed(3) 26:1 90:18 90:18
disclosure(5) 65:1 65:17 90:23 90:24 91:3
discontinued(1) 31:19
discovery(6) 21:23 22:23 37:4 37:5 39:12 66:14

discretion(3) 92:21 97:25 98:10
discuss(2) 40:3 50:16
discussed(8) 13:21 13:25 42:11 56:25 57:23 70:22 81:1 136:10

discussing(1) 145:21
discussion(5) 15:9 15:10 16:18 40:6 137:1
discussions(3) 95:4 110:8 141:10
dishonesty(1) 50:10
disingenuous(1) 20:4
dismiss(1) 85:3
dispute(14) 11:24 14:11 14:12 22:25 27:2 34:19 45:5 51:4 51:18 61:18 68:4 72:6 125:5 145:22

dissipated(1) 62:19
distance(1) 61:11
distinct(1) 139:9
distract(1) 15:20
distributions(3) 99:1 99:7 121:2
district(3) 1:2 56:20 59:16
disturbing(1) 35:18
dive(1) 121:23
divided(1) 15:12
dividing(1) 15:15
division(1) 104:24
dno(1) 32:6
document(16) 9:19 13:6 13:9 36:1 40:6 58:11 107:10 108:9 111:20 111:22 112:3 133:8 134:2 134:22 136:3 148:6

documentary(1) 67:4
documents(17) 8:20 9:23 35:8 37:6 38:15 39:16 39:18 39:21 40:17 40:18 48:3 48:6 55:10 66:18 67:3 67:5 90:12

documents?"(1) 69:15
document's(1) 111:8
doesn't(15) 15:20 17:1 17:13 18:19 31:3 40:24 100:19 131:11 146:8 146:12 146:13 146:17 147:10 150:21 151:4

dollar(2) 109:10 118:5
dollars(9) 29:22 33:8 33:16 52:6 56:1 61:4 73:2 75:11 100:9

don't(61) 4:16 6:7 15:25 18:24 19:4 19:10 21:15 24:8 24:9 24:15 27:20 32:16 34:10 39:20 39:22 41:7 64:14 67:21 70:25 71:4 71:4 72:9 74:22 74:25 76:1 76:10 76:10 81:23 84:22 85:15 91:3 91:16 92:8 94:22 97:5 97:9 97:11 98:13 98:25 101:20 102:20 111:14 115:16 119:7 121:24 122:23 122:5 124:9 128:2 128:8 129:15 132:7 133:17 137:10 137:11 137:13 145:11 146:148:3 150:1 150:15

door(1) 135:9
dotted(1) 109:4
double-checking(1) 9:22
doubt(4) 20:21 45:25 46:1 96:16

down(20) 4:13 11:25 12:4 13:1 21:10 46:22 59:24 61:16 72:17 72:18 72:25 95:12 106:15 109:20 110:2 110:3 114:19 140:11 142:11 144:9

downhill(1) 147:24
downside(1) 42:24
draft(7) 37:12 60:19 88:14 93:21 94:12 95:18 97:21

drafted(2) 35:25 94:5
drags(1) 138:15
dramatic(1) 64:6
drastic(2) 35:1 44:10
dressed(1) 38:4
drill(1) 43:25
driver(1) 138:2
driving(3) 119:3 136:13
dry(2) 38:15 63:7
due(24) 36:3 40:2 43:20 80:11 81:22 84:17 84:18 85:6 86:10 93:12 98:18 106:18 106:20 106:21 107:25 109:23 110:4 112:24 113:15 114:10 122:2 128:16 130:14 139:15

during(12) 43:12 82:25 102:4 105:4 106:7 106:9 113:8 122:15 126:5 126:10 141:10 141:11
duties(6) 30:20 45:17 46:3 47:4 54:13 120:14

duty(17) 17:10 17:13 17:13 17:19 20:22 22:15 27:3 32:13 32:17 32:21 36:24 54:10 54:11 54:21 62:25 63:1 75:22

duty."(1) 56:11

each(4) 98:1 113:20 118:16 125:19
earlier(14) 7:8 93:24 100:10 108:15 121:3 121:12 122:17 125:7 133:10 136:16 138:8 141:9 141:11 147:11

early(2) 44:25 127:2
earnings(1) 25:10
ease(2) 38:13 90:2
easier(2) 63:15 94:14
economic(3) 117:16 125:7 151:21
economics(1) 50:12
economy(2) 117:1 143:7
ecro(1) 1:37
educational(1) 104:8
effect(5) 21:9 55:14 74:2 101:25 146:3
effective(1) 146:22
effectiveness(1) 144:14
effort(7) 13:7 29:15 58:18 70:18 75:2 142:17 144:6

efforts(3) 56:6 75:18 113:11
either(24) 10:4 17:8 30:19 31:20 35:10 37:24 38:1 44:19 49:17 50:10 53:15 69:13 77:8 77:17 78:8 96:22 98:10 100:1 100:5 110:17 113:3 114:8 118:4 128:18

electrical(1) 104:11
electronic(1) 1:44 153:22
elementary(1) 123:14
elements(1) 52:20
eligible(8) 109:8 118:16 119:22 124:24 124:24 125:6 125:14 138:17

eliminate(1) 52:2
elizabeth(1) 3:4
else(6) 18:6 99:11 122:20 123:25 143:4 153:14

elsewhere(1) 138:16
email(3) 43:5 45:2 69:21
emails(1) 126:22
emergence(1) 146:19
emotion(1) 16:6

| Word | Page:Line | Word | Page:Line | Word | Page:Line | Word | Page:Line |
|---|---|---|---|---|---|---|---|

**employed**(2) 104:1  104:6

**employee**(11) 48:14  89:8  89:24  108:24  111:25  118:16  128:16  131:11  139:16  150:21  152:6

**employees**(20) 107:12  107:18  109:24  110:1  112:12  112:20  113:2  116:24  117:19  122:7  122:9  124:11  136:17  139:23  144:8  145:6  149:15  153:2  153:3  153:7

**employment**(2) 117:9  139:14

**encompass**(1) 87:15

**encourage**(2) 123:10  123:17

**end**(18) 5:18  5:25  6:3  6:3  11:15  25:3  27:18  33:15  42:11  44:25  45:4  45:19  92:1  109:16  114:25  119:23  138:10  153:5

**endeavor**(1) 61:14

**ended**(1) 127:22

**ending**(2) 133:14  133:25

**ends**(1) 60:2

**energy**(1) 125:12

**enforceability**(1) 70:2

**engaged**(1) 63:1

**engaging**(1) 24:6

**engineer**(2) 104:18  105:17

**engineering**(2) 104:12  104:13

**enhance**(1) 33:8

**enhancing**(1) 70:5

**enough**(10) 25:14  27:25  28:2  42:21  142:17  143:6  145:5  145:6  148:4  148:5

**enriched**(1) 56:14

**enrichment**(5) 32:13  32:18  56:12  56:18  62:16

**ensue**(1) 15:15

**ensuing**(1) 81:11

**ensure**(2) 98:19  107:20

**entail**(1) 31:15

**entailed**(2) 22:7  22:8

**enter**(4) 18:23  57:17  57:21  87:4

**entered**(2) 86:21  122:1

**entering**(1) 62:23

**enterprise**(1) 105:19

**enters**(1) 143:4

**entertain**(1) 102:13

**entire**(4) 46:20  104:7  118:25  119:1

**entirely**(1) 140:1

**entities**(3) 30:11  32:1  32:7  39:4  48:9  48:10  54:21  55:6  55:25  57:24  123:6

**entitled**(6) 31:10  68:8  75:17  79:2  146:15  147:5

**entity**(5) 17:14  38:24  66:8  123:11  143:1

**entry**(1) 86:20

**envision**(1) 98:14

**eps**(1) 25:14

**equally**(1) 69:18

**equitable**(12) 12:1  16:5  25:4  27:3  28:23  30:6  30:9  32:10  53:22  54:3  54:8  68:9

**equitably**(1) 33:4

**equity**(21) 17:12  17:15  30:25  31:5  31:8  33:3  34:2  38:2  38:7  38:10  38:17  38:19  40:4  50:18  51:1  52:25  53:13  53:23  57:3  77:1  118:2

**ernst**(7) 19:13  22:22  35:7  51:15  58:8  68:22  69:2

**errors"**(1) 35:18

**escrow**(12) 12:10  14:9  14:10  15:18  31:17  31:19  60:5  76:24  77:3  77:5  77:6  77:9

**escrowed**(7) 12:16  12:22  14:11  14:18  27:13  52:15  57:15

**escrowing**(2) 14:19  57:11

**especially**(1) 143:7

**esq**(14) 1:23  1:24  1:32  2:6  2:7  2:14  2:15  2:23  2:31  2:32  2:41  3:3  3:4  3:11

**essence**(1) 36:4

**essentially**(7) 7:7  27:2  77:23  105:18  118:25  119:15  144:11

**established**(12) 16:11  30:24  31:8  34:2  34:3  41:15  42:8  46:13  49:8  62:4  66:16  75:18

**establishes**(1) 76:5

**estate**(21) 33:8  49:12  49:13  49:15  49:16  50:9  50:11  53:24  54:4  55:15  61:2  62:17  62:17  63:12  64:4  64:8  72:18  80:22  81:11  144:13  146:10

**estate,"**(1) 49:10

**estates**(1) 80:23

**estate's**(2) 28:25  72:25

**estimate**(1) 6:1

**estimated**(1) 34:9

**evaluate**(3) 37:23  41:16  100:13

**evaluated**(1) 39:5

**evaluating**(1) 149:22

**evaluation**(2) 50:9  135:7

**eve**(1) 76:9

**even**(27) 12:22  17:15  17:21  18:2  18:23  20:16  20:23  20:24  25:25  35:25  36:3  37:17  44:16  45:19  57:12  63:5  75:6  77:4  83:12  83:13  91:12  93:24  117:12  117:12  122:12  137:13  143:12

**evenly**(1) 119:19

**event**(9) 18:23  50:12  50:25  51:13  52:16  84:20  93:2  93:4  129:4

**events**(5) 35:10  36:8  93:3  100:5  102:7

**eventually**(1) 136:24

**ever**(8) 36:17  39:3  39:5  40:3  41:11  65:10  85:6  144:1

**every**(13) 16:17  33:17  40:6  61:7  65:8  71:17  72:12  91:21  125:20  145:10  147:23  148:1  153:8

**everybody**(6) 63:16  95:7  117:1  143:8  144:17  151:20

**everyone**(14) 4:3  4:14  60:20  71:21  72:5  72:10  72:10  79:8  107:23  107:24  127:3  130:13  148:24  153:16

**everything**(2) 119:14  139:8

**evidence**(57) 7:1  10:14  15:10  17:20  19:19  28:11  30:23  31:7  31:13  32:2  32:22  33:11  34:2  34:3  36:23  37:15  39:22  41:14  42:7  43:11  44:2  46:13  49:8  52:5  53:7  57:2  58:13  60:23  62:24  67:16  68:19  69:8  69:10  71:18  73:20  74:7  74:8  76:4  76:21  77:7  77:20  81:2  83:6  83:8  83:24  85:3  92:19  101:6  101:16  101:17  125:18  137:5  142:6  146:6  152:8

**evidenced**(1) 38:11

**evidencing**(1) 39:5

**evidentiary**(4) 4:25  5:9  29:13  81:18  90:7  151:11

**exact**(1) 28:14

**exactly**(11) 8:18  13:9  19:4  22:7  23:3  26:22  55:11  85:14  91:12  92:5  130:15

**exaggeration**(1) 76:13

**examination**(4) 103:20  127:9  127:15

**example**(12) 39:14  62:14  74:17  75:9  91:25  113:13  118:13  118:24  119:11  123:12  131:15  139:6

**examples**(1) 118:10

**exceed**(1) 98:5

**exceeded**(1) 34:21

**exceedingly**(1) 138:13

**excellent**(1) 7:5

**except**(2) 84:13  90:16

**excess**(1) 121:7

**exchange**(1) 129:24

**exclusively**(1) 146:7

**excuse**(1) 71:19

**excused**(1) 140:13

**execution**(2) 100:2  128:10

**executive**(3) 35:17  118:8  118:13

**exercise**(4) 19:24  20:7  150:4  150:12

**exercised**(1) 132:16

**exhibit**(38) 7:23  9:11  9:17  33:20  35:2  35:21  35:24  37:10  37:17  37:17  38:8  41:25  42:7  43:3  44:6  44:8  44:25  45:11  45:22  46:7  48:25  49:2  49:11  49:25  69:20  69:20  92:10  94:11  111:3  111:19  118:15  128:3  128:3  130:7  133:12  133:13  133:14  136:10

**exhibits**(25) 5:1  5:2  5:7  6:16  6:23  7:6  7:8  7:14  7:19  8:14  8:20  8:23  9:7  9:12  9:15  9:20  9:21  10:4  10:11  10:14  10:18  35:9  39:14  133:12  133:13

**exide**(1) 30:2

**exist**(4) 39:20  39:22  39:22  48:6

**existed**(3) 37:7  39:17  123:16

**existing**(2) 36:19  38:25

**exists**(4) 30:5  32:24  51:22  69:6

**expanded**(2) 46:2  50:1

**expanding**(1) 147:20

**expect**(2) 71:1  139:5

**expected**(3) 41:6  74:16  109:16

**expenses**(3) 27:21  61:15  64:7

**expensive**(1) 71:25

**experience**(5) 23:20  26:5  104:10  105:18  123:22

**expert**(4) 19:19  48:19  65:23  135:7

**expire**(2) 58:10  65:9

**expires**(1) 64:20

**explain**(2) 67:24  68:1

**explained**(2) 24:2  35:14

**explanation**(1) 35:23

**explore**(1) 41:17

**exposure**(1) 122:10

**expressed**(1) 101:12

**expressions**(1) 137:9

**expressly**(1) 46:6

**extensive**(2) 29:12  88:6

**extent**(12) 31:11  32:15  51:22  57:19  59:8  81:6  84:13  98:7  98:17  132:19  135:13  147:7

**extra**(3) 25:16  72:3  115:4

**extraordinary**(1) 29:14

**extreme**(4) 82:2  82:2  82:5  82:6

**eye**(1) 62:10

**f.3d**(1) 53:1

**face**(4) 29:23  40:2  49:20  65:19

**faced**(1) 122:13

**facets**(1) 105:18

**facie**(5) 30:5  31:23  53:19  73:25  75:24

**facilities**(1) 35:2

**facility**(11) 23:25  30:10  34:5  35:8  38:12  38:16  38:18  38:25  40:4  44:24  53:20

**facility."**(1) 43:3

**facing**(1) 143:16

**fact**(29) 6:10  16:15  16:19  16:24  19:25  27:13  28:10  32:4  36:2  37:12  40:16  44:2  46:10  50:6  51:1  58:17  60:5  69:16  74:19  74:24  75:5  75:9  75:18  78:14  81:5  86:8  110:3  129:22  152:17

**factor**(2) 96:6  130:19

**factoring**(10) 20:12  20:15  26:7  26:15  26:16  26:22  28:17  43:7  43:10  49:6

**factors**(1) 39:9

**facts**(15) 16:7  22:23  27:1  38:11  61:17  66:16  67:12  72:6  74:9  125:18  146:6  147:13  150:7  150:14  151:8

**factual**(1) 29:14

**failed**(1) 42:6

**fair**(12) 16:8  22:3  25:2  27:12  27:25  28:2  28:5  44:15  47:25  75:4  105:17  130:15

**fairly**(8) 27:1  58:15  63:24  69:5  106:9  110:3  119:18  142:20

**fairness**(7) 21:24  37:8  37:13  83:7  83:10  83:13  83:21

**fait**(1) 142:18

**faith**(4) 96:4  120:11  122:24  136:14

**faits**(1) 152:11

**fall**(2) 110:20  120:12

**familiar**(6) 54:2  107:10  111:20  121:5  126:12  126:16

**familiarity**(1) 149:10

**family**(1) 71:16

**far**(14) 10:15  15:19  62:5  62:24  66:17  77:5  78:5  85:20  102:11  140:15  145:4  145:5  145:10  152:1

**fargo**(3) 23:24  35:8  36:12

**fascinated**(1) 97:17

**fashion**(1) 51:25

**fault**(1) 43:19

**favor**(2) 31:22  82:8

**fcc**(1) 40:17

**february**(28) 22:19  22:20  24:9  25:13  25:17  26:8  28:20  29:17  30:10  32:16  33:2  34:4  34:14  35:14  36:25  38:3  46:4  52:22  53:20  54:15  56:21  62:23  69:23  74:23  82:19  82:25  83:6  149:11

**february."**(1) 25:12

**federal**(2) 58:9  64:19

**feel**(1) 145:11

**feeling**(1) 149:15

**fees**(32) 14:10  14:13  14:17  14:19  14:23  15:18  15:19  16:25  27:13  27:22  29:19  31:21  49:7  52:3  52:15  57:8  57:11  57:15  61:10  61:12  61:12  61:14  64:5  64:7  68:8  70:19  72:19  72:19  72:21  77:6  77:9  77:12

**ferris**(1) 3:1

**few**(10) 37:21  38:12  63:14  64:13  80:16  93:10  107:3  117:9  149:2  153:15

**fewer**(1) 144:15

**fide**(1) 37:25

**fiduciaries**(1) 74:15

**fiduciary**(15) 17:10  17:19  20:22  22:15  27:2  32:13  32:17  32:20  36:23  45:17  46:2  47:4  54:10  54:10  54:13

**fight**(8) 15:1  15:15  16:18  60:2  60:12  61:20  63:25  64:1

**figueroa**(2) 2:8  2:42

**figure**(2) 50:2  92:15

**figures**(1) 33:20

**file**(7) 31:25  64:2  70:14  76:1  94:17  129:23  149:25

**filed**(19) 40:17  46:10  58:7  58:11  58:16  68:6  68:17  69:24  89:7  89:14  90:5  92:16  93:10  96:16  106:10  129:8  145:16  147:14  149:18

**filing**(15) 34:7  35:11  46:6  90:9  100:3  100:20  106:1  116:16  125:14  126:14  126:17  128:18  128:25  129:4  134:22

**filings**(2) 106:17  114:10

# MIDWAY GAMES, INC.4.6.09.DOC

| Word | Page:Line |
|------|-----------|

**film**(3) 131:21 132:4 132:5
**final**(11) 18:15 30:16 57:18 60:24 67:19 68:2 75:20 94:25 109:17 127:22 139:5

**final,"**(1) 51:13
**finality**(1) 122:18
**finalized**(1) 94:6
**finally**(4) 68:2 70:21 96:13 151:10
**finance**(2) 114:21 119:12
**financial**(5) 3:5 12:9 41:23 41:24 108:24
**financing**(12) 26:21 37:19 37:22 37:24 41:18 100:3 100:20 113:14 128:15 139:15 146:11 150:21
**find**(12) 17:10 37:18 60:10 75:16 82:11 117:19 143:14 143:21 147:22 147:24 149:23 152:16

**finding**(1) 75:23
**findings**(4) 73:24 75:21 87:5 88:6
**fine**(10) 5:15 9:18 11:20 14:1 98:6 102:22 102:22 104:13 142:2 142:3

**finger**(2) 2:13 6:19
**fire**(1) 43:25
**firm**(5) 37:7 51:16 69:22 79:25 109:7
**firms**(1) 61:12
**first**(54) 13:16 13:20 13:22 17:19 17:24 17:24 18:8 18:11 19:3 19:6 21:11 21:12 23:10 29:11 34:8 38:12 46:11 49:22 50:15 52:21 64:16 66:13 67:19 76:22 80:21 86:19 87:17 87:18 88:14 90:9 99:3 99:4 100:1 100:6 101:25 102:7 102:15 104:17 107:20 109:3 112:22 124:1 124:4 127:19 129:8 130:9 134:21 138:10 139:2 140:22 145:23 146:8 146:24 147:7

**fiscal**(1) 26:20
**five**(6) 18:24 42:19 78:22 112:5 148:14 148:17

**fix**(2) 152:21 152:23
**fixed**(1) 118:5
**flack**(1) 125:8
**flat-out**(1) 137:12
**flattering**(1) 48:18
**flavor**(1) 11:24 123:4
**fleet**(1) 54:18
**flip**(2) 71:17 108:9
**floor**(3) 2:9 2:25 2:43
**flow**(1) 147:25
**flows**(3) 26:14 26:14 147:24
**flushed**(1) 75:13
**focus**(5) 97:18 100:23 108:16 121:18
**focused**(2) 32:23 153:8
**focusing**(2) 97:20 136:5
**foist**(1) 24:7
**foisting**(1) 23:3
**folks**(4) 68:22 113:9 114:5 146:15
**follow**(2) 114:6 144:10
**follow-up**(2) 64:14 64:16
**following**(3) 5:16 5:19 56:3
**football**(1) 113:25
**force**(2) 35:1 139:25
**forced**(1) 138:16
**forecast**(2) 5:17 5:20
**forecasting**(2) 35:19 36:5
**foregoing**(1) 153:21
**foregone**(4) 121:24 122:5 142:19 144:5
**foresaw**(1) 71:10
**forgetting**(2) 42:1 140:23
**form**(8) 94:21 118:1 118:2 133:25 142:17 146:24 147:6 148:5

**formed**(1) 41:13
**former**(1) 77:13
**formulate**(1) 152:9
**formulated**(1) 75:4

**forth**(6) 34:13 55:13 88:19 98:21 149:6 149:17

**fortuity**(1) 44:20
**forward**(10) 25:9 27:7 36:7 55:3 64:19 64:24 65:22 68:25 69:9 151:18

**forwarded**(1) 71:14
**fought**(1) 136:21
**found**(2) 50:3 81:4
**foundation**(1) 26:5
**four**(6) 9:23 44:9 44:11 44:17 112:5
**fourth**(1) 146:16
**fragmented**(1) 138:5
**framed**(1) 142:15
**franchise**(1) 118:14
**franchises**(1) 118:8
**frankel**(1) 2:30
**frankly**(5) 8:22 27:12 48:21 65:20 91:23
**fraudster**(1) 21:20
**fraudulent**(9) 32:16 49:2 55:7 55:9 55:9 55:16 55:18 62:16 62:20

**free**(4) 108:23 108:23 108:24 143:6
**friday**(2) 50:14 66:18
**friends**(2) 61:5 123:13
**front**(12) 13:16 16:23 71:14 112:23 114:9 119:3 122:17 128:3 133:8 133:17 134:23 136:3

**frustration**(1) 137:9
**full**(10) 21:23 37:4 37:5 64:25 74:22 100:5 100:11 103:14 129:1 146:12

**fully**(9) 58:6 82:1 82:1 82:4 82:4 82:7 82:10 82:10 101:16

**functional**(1) 113:4
**functioning**(3) 25:22 110:17 110:25
**fund**(6) 15:25 16:2 27:21 28:6 44:5 80:23
**fundamental**(3) 50:11 75:8 80:10
**fundamentally**(1) 72:14
**funding**(1) 45:14
**funds**(4) 12:17 12:21 60:5 60:5
**further**(14) 39:21 41:17 57:1 75:13 75:15 75:16 93:15 97:10 97:11 134:14 138:21 151:16 153:12 153:14

**futile**(1) 77:15
**future**(4) 64:24 69:1 72:17 143:16
**gained**(1) 117:13
**gambles**(1) 72:20
**game**(50) 18:11 26:6 26:9 26:11 26:11 76:15 104:24 105:1 105:1 105:3 105:6 106:14 108:6 110:14 110:15 110:19 113:2 113:21 114:12 115:13 116:5 116:11 116:17 117:11 117:14 117:17 118:12 123:3 123:18 123:20 123:21 123:22 123:24 124:16 130:24 131:17 131:18 131:24 131:25 137:7 137:7 137:16 137:17 138:3 138:5 138:10 139:21 142:25 143:12 153:6

**games**(12) 1:7 18:11 104:2 104:7 104:15 104:21 104:23 105:7 107:22 107:23 119:5 133:25
**gaming**(2) 137:8 153:5
**gander."**(1) 15:23
**gate**(1) 63:10
**gave**(4) 28:15 28:16 28:18 73:21
**gearing**(1) 61:8
**general**(10) 42:16 43:5 47:7 48:17 108:20 108:21 132:10 132:13 132:20 135:11

**generally**(4) 9:10 98:20 111:5 131:10
**generate**(3) 46:15 46:20 46:21
**generated**(1) 69:4
**generating**(1) 33:19
**genuineness**(1) 29:25

**get**(56) 4:15 5:7 5:12 13:11 13:13 14:13 15:12 15:18 17:1 24:15 25:10 26:21 29:15 35:6 37:14 41:9 45:10 52:15 53:11 55:12 61:25 62:5 63:19 63:19 65:11 65:18 67:8 71:6 72:7 72:24 82:5 89:23 94:6 97:10 97:11 102:23 105:24 109:25 115:8 117:25 119:8 122:12 122:20 122:21 123:4 127:2 136:25 140:2 143:6 143:18 143:18 143:24 144:15 145:9 150:15 151:2

**gets**(10) 14:11 15:2 15:13 27:5 57:19 65:7 94:15 144:17 150:4 151:15

**getting**(15) 15:19 15:21 20:15 26:20 27:15 66:17 66:20 67:5 109:4 109:11 110:11 111:5 132:12 137:2 138:3

**give**(13) 10:19 21:10 29:24 37:8 63:18 72:3 76:16 80:20 83:9 83:13 104:9 144:20 148:19
**given**(26) 21:3 27:12 28:9 28:12 31:13 36:11 42:18 44:15 61:22 70:17 75:13 75:14 83:7 94:11 101:15 105:2 106:11 114:24 119:7 119:9 119:17 121:19 121:20 123:21 142:21 143:14

**gives**(1) 60:8
**giving**(3) 21:19 41:2 63:17
**gladly**(1) 145:8
**glovsky**(1) 3:2
**goals**(2) 122:14 136:13
**goes**(7) 13:20 13:22 15:10 61:11 64:20 99:8 152:23

**going**(76) 9:16 11:14 12:20 13:14 13:16 14:6 14:21 14:22 15:1 15:11 15:12 15:13 15:18 21:10 21:11 22:17 22:21 22:21 25:3 25:14 27:13 27:16 28:13 28:14 28:20 33:15 35:6 36:6 36:7 39:25 42:20 45:8 48:21 51:18 57:1 60:10 61:10 61:13 61:15 62:1 62:10 64:7 65:22 67:8 67:9 70:19 71:24 71:25 72:18 72:25 73:24 76:14 77:7 77:10 78:8 85:22 92:7 94:3 95:19 102:21 109:19 111:2 111:4 114:5 122:19 137:15 141:6 142:17 143:10 143:13 143:20 144:3 144:24 145:5 150:22 151:6

**goldman**(1) 3:11
**gone**(6) 9:10 21:10 97:17 106:18 119:14 138:5

**good**(38) 4:3 4:5 4:6 4:7 4:9 4:10 5:4 5:5 6:18 6:20 6:21 8:2 14:3 14:4 15:22 15:23 16:17 24:16 25:21 29:5 29:7 51:3 65:1 70:23 84:5 85:16 85:18 88:1 90:10 96:3 103:22 120:11 122:23 127:17 136:13 145:14 153:1 153:16

**goose**(1) 15:23
**gordon**(1) 2:32
**gorge**(1) 147:24
**got**(9) 37:7 39:18 43:9 56:5 67:22 85:6 121:18 123:13 143:19

**gotten**(1) 149:10
**governing**(1) 51:21
**graduating**(1) 104:5
**grant**(4) 31:25 77:11 83:23 152:19
**granted**(1) 83:8
**granting**(3) 77:13 80:12 82:8
**grants**(1) 64:3
**great**(3) 4:20 48:9 82:18
**greatly**(3) 113:7 116:19 126:6
**grew**(1) 117:11
**grimm**(1) 62:15
**grimm's**(1) 60:15
**gross**(2) 1:17 132:5
**grossly**(2) 55:20 63:5

**group**(8) 112:4 112:5 112:7 112:8 116:14 118:21 142:25 144:9

**groups**(8) 91:7 112:3 112:6 113:4 114:20 115:21 116:15 131:23

**grovel**(1) 72:2
**growing**(1) 117:14
**growth**(2) 44:10 44:11
**guarantee**(2) 120:18 137:3
**guess**(12) 5:6 10:3 10:23 29:21 58:5 65:21 78:4 87:12 89:6 94:10 99:7 101:10

**guidance**(4) 25:11 106:3 114:1 126:4
**guilty**(1) 61:24
**gun**(1) 141:4
**guy**(2) 51:10 123:13
**habit**(1) 99:15
**hadley**(2) 2:4 2:39
**hadn't**(3) 13:21 13:25 40:10
**half**(3) 29:21 126:21 127:5
**hallmarks**(1) 55:9
**hamburger**(1) 54:9
**hand**(12) 5:23 5:25 12:22 21:17 77:11 77:12 87:18 94:13 94:24 103:13 103:14 111:3
**handed**(3) 107:2 107:4 133:24
**handing**(1) 22:5
**handle**(3) 14:22 14:23 25:17
**hands**(1) 53:11
**hanging**(1) 63:20
**happen**(9) 4:17 24:8 42:5 57:12 63:14 74:13 74:15 78:7 120:24

**happened**(10) 17:2 21:21 21:21 40:9 42:9 66:1 74:12 109:22 116:10 121:25

**happening**(1) 27:10
**happens**(2) 57:12 71:20
**happy**(2) 70:24 117:2
**hard**(3) 114:24 136:13 138:13
**hardware**(1) 104:22
**harkness**(56) 2:31 5:3 5:4 5:5 7:25 9:7 9:10 9:14 9:19 10:1 10:2 10:7 10:10 10:12 13:16 13:17 13:22 13:24 13:25 14:3 14:5 19:1 21:14 22:17 23:9 27:25 28:2 28:5 29:2 29:22 30:21 43:18 48:2 51:9 64:10 64:12 64:13 65:7 65:16 66:7 66:13 68:13 68:18 78:13 78:17 78:19 78:24 79:3 86:12 86:13 86:16 86:18 86:24 88:20 88:21 89:1

**harm**(5) 20:25 47:10 47:19 47:20 81:24
**harrisburg**(1) 1:41
**hasn't**(3) 52:7 142:15 146:4
**hasty**(1) 55:22
**hatchets**(1) 59:16
**haven't**(6) 18:13 21:23 65:20 81:17 94:22 125:20

**having**(16) 15:9 22:20 24:14 38:13 45:1 52:4 61:21 61:21 68:10 76:19 81:24 82:3 85:23 96:4 123:23 148:6

**head**(10) 16:10 25:8 63:21 95:17 105:11 115:23 116:2 116:3 119:13 125:20

**heads**(7) 106:15 113:20 113:21 115:13 116:6 118:7 136:9

**healthy**(1) 65:4
**hear**(6) 72:8 78:10 84:3 101:12 102:15 135:13

**heard**(22) 5:3 12:18 13:5 16:14 17:3 30:23 46:1 67:4 69:10 77:7 77:19 78:19 84:2 85:13 85:24 86:5 90:9 94:22 136:24 149:9 150:24 152:8

# MIDWAY GAMES, INC.4.6.09.DOC

| Word | Page:Line | Word | Page:Line | Word | Page:Line | Word | Page:Line |
|---|---|---|---|---|---|---|---|

**hearing**(21) 11:23 14:6 17:24 17:25 18:6 19:3 29:11 44:2 44:22 52:6 61:17 89:23 91:14 92:7 97:8 133:13 141:11 150:25 150:25 151:11 153:18

**hechinger**(1) 54:19
**held**(5) 30:4 31:17 51:22 63:7 71:22
**hello**(2) 103:24 127:18
**help**(3) 29:16 117:3 138:13
**helpful**(4) 78:24 100:25 102:10 152:9
**helping**(1) 119:3
**helps**(1) 128:8
**hence**(1) 13:10
**herein.''**(1) 98:6
**here's**(1) 62:10
**hesitate**(1) 93:1
**hey**(1) 144:17
**he'd**(2) 37:20 85:7
**he's**(7) 15:18 21:5 23:20 85:4 95:17 127:1 135:11

**hide**(1) 55:12
**hiding**(1) 55:3
**high**(3) 54:20 121:22 132:20
**higher**(2) 98:18 118:11
**highly**(1) 143:2
**him**(17) 31:22 37:13 37:22 46:18 46:20 47:22 48:18 48:18 48:24 49:13 49:18 49:19 50:15 52:13 56:19 68:10 106:24

**himself**(7) 37:16 40:8 40:14 47:20 49:6 67:25 68:1

**hinder**(1) 55:19
**hindsight**(1) 24:16
**hire**(4) 41:22 128:16 139:16 150:21
**hired**(2) 66:22 104:17
**his**(63) 5:17 15:2 15:19 16:25 19:7 19:8 23:14 23:21 24:21 27:13 29:25 31:1 31:12 31:22 37:13 37:16 38:7 40:21 45:8 46:11 46:22 47:21 48:8 48:20 48:24 49:4 49:5 49:6 49:9 49:10 49:11 49:12 49:15 49:19 49:21 50:1 50:3 50:5 50:9 50:19 51:9 52:5 52:15 55:1 55:2 55:4 55:12 56:7 56:8 56:15 57:11 57:15 67:22 72:15 76:9 85:7 85:7 95:17 111:5 126:25 127:2 142:21 145:25

**historically**(2) 129:17 131:6
**hit**(5) 26:12 73:1 120:10 122:14 137:6
**hits**(1) 64:9
**holder**(1) 17:13
**holders**(8) 17:25 19:24 20:5 28:18 43:17 44:13 44:20 45:18

**holder's**(1) 43:18
**holdings**(9) 2:21 38:7 53:13 75:4 75:10 76:8 76:25 77:9 86:20

**holiday**(5) 20:17 28:17 117:11 117:13 153:17
**home**(4) 49:10 50:5 52:13 64:9
**honest**(1) 72:4

**honor**(160) 4:5 4:7 4:10 4:21 5:5 5:6 5:14 6:11 6:12 6:18 6:21 7:1 7:5 7:19 7:22 8:3 8:9 9:3 9:5 9:8 10:6 10:9 10:12 10:23 11:4 11:12 12:25 13:12 14:3 24:24 27:25 29:5 29:6 29:17 33:11 33:20 33:24 34:12 35:11 36:13 37:4 37:21 39:19 39:22 40:11 41:25 44:9 48:1 48:10 52:8 52:20 53:10 53:21 54:16 55:7 56:24 57:21 58:3 58:11 58:20 59:10 59:18 61:1 61:17 62:5 62:14 63:15 63:23 64:3 64:3 65:17 67:17 68:16 69:2 69:10 69:19 70:12 71:11 72:14 73:12 77:22 78:13 79:10 80:3 80:25 81:7 81:14 81:21 83:7 83:16 83:23 84:5 84:17 85:10 85:18 86:18 87:11 87:20 88:1 88:4 88:9 88:15 89:3 89:11 90:10 91:2 91:21 92:5 92:23 93:5 94:1 94:10 94:13 97:12 97:15 98:22 98:23 99:4 99:14 99:16 101:1 101:4 101:11 101:12 102:2 102:17 103:5 106:24 107:5 111:2 125:17 127:6 127:13 133:11 133:21 134:14 134:17 135:6 135:8 138:20 138:24 141:4 141:5 142:2 142:10 145:12 145:14 148:4 148:9 148:18 149:1 149:9 149:10 150:2 150:9 150:24 152:5 152:21 153:10

**honorable**(1) 1:17
**honor's**(1) 152:4
**hope**(4) 26:20 41:9 64:14 125:9
**hopefully**(7) 4:12 63:13 97:8 102:23 103:25 125:11 143:24

**hopelessly**(2) 26:17 45:6
**hopes**(1) 38:20
**hoping**(1) 143:18
**horse**(15) 85:5 95:15 95:19 100:2 108:22 109:8 122:4 128:12 138:14 145:2 146:11 150:20 151:3 151:4 151:15

**houlihan**(1) 37:8 37:14 83:9
**hours**(9) 85:23 115:4 116:20 116:20 126:10 126:12 126:22 127:1 127:5

**house**(5) 26:20 49:18 49:21 50:3 76:9
**housekeeping**(3) 58:5 79:12 79:13
**however**(4) 12:17 38:11 71:2 131:15
**hundred**(2) 73:2 113:5
**hundreds**(3) 33:7 56:1 61:3
**hurdles**(1) 152:17
**hurt**(2) 20:7 71:24
**hypothetical**(1) 11:17
**i.e**(3) 124:9 142:18 144:21
**idea**(1) 68:10
**identical**(2) 39:17 39:18
**identification**(2) 124:2 135:23
**identified**(6) 7:8 48:12 52:17 57:22 119:17 121:5

**identify**(3) 49:16 51:3 123:23
**identities**(2) 123:10 123:21
**identity**(3) 123:9 123:15 123:19
**ignore**(1) 75:12
**ignored**(1) 54:21
**ill**(1) 65:1
**immediate**(1) 81:24
**immediately**(3) 43:4 44:5 63:15
**imminent**(1) 46:16
**impact**(14) 25:14 58:25 64:8 78:11 81:13 110:21 114:16 115:7 136:8 136:11 137:5 137:17 137:24 138:7

**impacted**(3) 76:21 125:15 135:3
**impacts**(1) 14:19
**impede**(1) 30:18
**imperils**(1) 77:5
**implicated**(1) 80:11
**importance**(1) 122:6
**important**(11) 16:11 47:19 51:24 93:4 107:23 108:5 117:7 130:21 131:4 146:1 153:7
**importantly**(4) 52:8 61:5 66:25 70:9

**impoverished**(1) 56:17
**impoverishment**(1) 56:18
**impressed**(1) 114:23
**inadequate**(1) 55:21
**inc**(2) 1:7 3:10
**incentive**(33) 52:9 89:8 89:24 102:1 107:13 107:17 111:25 114:15 115:5 115:11 116:24 117:2 120:3 122:17 124:24 136:8 136:15 142:18 145:7 145:17 145:17 146:2 147:8 147:8 147:15 149:6 149:16 149:17 150:12 152:6 152:16 152:18 153:8

**incentives**(3) 117:23 117:25 129:18
**incentivized**(1) 122:14
**incentivizing**(1) 144:11
**incidentally**(1) 35:4
**include**(1) 32:20
**included**(7) 40:7 50:4 67:9 71:16 91:4 104:20 112:16

**includes**(2) 54:18 81:12
**including**(8) 30:23 34:7 35:15 45:18 53:15 83:21 128:19 151:21

**income**(5) 58:9 64:19 65:8 65:10 65:11
**income.''**(2) 64:24 69:1
**inconsequential**(1) 143:23
**inconsistent**(1) 54:6
**increase**(1) 125:5
**increased**(6) 39:3 116:17 116:19 116:21 126:6 127:4

**indemnified**(1) 49:1
**indemnity**(2) 48:24 55:11
**indentures**(3) 38:6 51:21 53:12
**independent**(9) 23:11 25:1 25:20 63:3 80:6 84:9 84:11 84:21 85:11

**indicate**(2) 67:14 81:10
**indicated**(5) 14:5 71:23 73:21 81:2 93:10
**indicating**(1) 71:24
**indication**(1) 135:19
**indicator**(1) 116:9
**indicia**(2) 26:17 53:6
**indirectly**(1) 92:3
**individual**(2) 49:9 139:3
**individuals**(23) 22:9 90:16 90:17 90:23 111:4 112:5 113:10 113:12 114:5 114:13 116:17 118:23 120:7 120:23 124:19 126:13 136:10 144:22 142:24 143:2 143:14 144:7 144:22

**industry**(4) 115:12 116:11 117:8 117:9 117:11 117:14 117:17 123:8 132:4 153:6 153:6

**inequitable**(2) 54:3 67:16
**inevitable**(1) 44:23
**inexplicably**(1) 33:6
**infer**(1) 22:3
**inference**(1) 39:19
**influence**(3) 113:2 113:7 114:3
**information**(1) 8:16 12:3 14:14 32:5 32:8 44:4 90:14 90:17 109:25 113:17 113:18

**informed**(1) 58:6
**infusions**(3) 34:3 34:23 52:24
**initially**(1) 8:21
**injury**(1) 54:4
**insider**(3) 33:2 34:5 67:15
**insolvency**(4) 23:2 23:6 45:21 52:11
**insolvent**(11) 34:4 34:14 34:21 42:18 43:11 43:12 45:6 46:2 47:1 54:12 74:23

**instance**(4) 24:18 25:16 98:14 98:16
**instead**(4) 37:11 40:5 47:24 99:22
**insufficient**(1) 67:15
**insurance**(1) 32:6
**intellectual**(1) 142:22
**intended**(1) 101:16

**intending**(1) 101:5
**intense**(1) 115:10
**intent**(2) 55:18 55:20
**intention**(3) 53:9 53:11 68:7
**intentional**(2) 55:16 55:17
**interact**(2) 113:6 144:22
**interaction**(2) 121:20 144:19
**interest**(23) 14:9 15:2 17:1 24:4 24:12 27:14 27:15 31:2 31:20 32:16 37:3 39:7 41:24 49:9 52:4 53:17 54:24 68:8 76:23 77:2 77:4 86:7 151:21

**interested**(2) 48:11 110:14
**interesting**(1) 25:24
**interests**(1) 31:17
**interfere**(1) 30:18
**interim**(3) 52:1 105:13 137:4
**intermediate**(1) 136:15
**intern**(1) 30:2
**internal**(4) 51:10 64:22 68:24 101:24
**internally**(1) 92:6
**interpret**(1) 72:6
**interpreted**(1) 61:18
**intersects**(1) 12:13
**into**(53) 6:7 7:1 10:14 11:12 11:16 14:16 16:21 21:23 23:6 26:3 27:7 29:15 29:20 33:8 33:15 34:5 36:5 42:24 44:18 48:12 48:21 50:10 56:7 62:23 76:14 76:24 77:3 77:4 77:6 77:9 82:5 86:11 89:23 91:7 91:12 93:21 94:15 95:16 96:6 96:10 104:23 109:11 111:5 112:3 114:19 115:1 118:21 136:12 139:9 143:15 145:1 147:2 147:3

**inventory**(1) 143:10
**invest**(1) 50:24
**invested**(2) 50:23 75:11
**investigate**(2) 29:24 69:13
**investigated**(1) 33:5
**investigating**(1) 74:20
**investigation**(7) 27:6 29:20 56:7 69:17 69:17 71:15 75:16

**investment**(6) 37:7 38:7 52:5 53:9 56:16 75:10

**invite**(1) 72:10
**involved**(10) 61:13 74:25 75:2 81:17 90:16 105:5 107:23 110:7 117:21 151:20

**involvement**(1) 113:11
**involves**(1) 62:22
**irgens**(1) 2:15
**ironically**(1) 18:2
**irrelevant**(2) 16:16 16:21
**irs**(1) 51:18
**isn't**(12) 26:2 27:23 51:12 67:11 74:21 129:18 129:22 131:24 132:1 132:4 132:9 132:11

**issue**(52) 5:9 5:16 6:17 7:24 10:17 11:5 12:24 13:19 14:19 14:21 14:22 15:1 16:23 19:17 21:20 23:7 24:8 27:15 29:14 30:7 33:18 49:20 54:17 60:12 70:23 75:8 80:9 80:21 82:1 82:5 83:17 85:25 86:10 89:19 90:22 91:1 92:20 98:14 101:23 102:12 102:24 108:17 109:24 121:17 124:13 142:11 143:9 144:14 152:13 152:14 152:14 152:15

**issued**(1) 136:8
**issues**(26) 5:1 8:23 14:6 16:4 17:18 17:25 37:4 37:5 39:12 58:4 63:24 70:18 72:23 74:18 75:8 76:7 76:20 82:5 92:9 101:1 101:24 102:14 106:12 109:23 122:3 141:24

**issuing**(1) 78:6
**item**(2) 89:4 130:18
**itself**(6) 11:22 34:16 69:11 69:12 90:3 92:1
**it'll**(1) 4:14

| Word | Page:Line | Word | Page:Line | Word | Page:Line | Word | Page:Line |
|---|---|---|---|---|---|---|---|

**it's**(124) 4:8 4:11 4:20 5:14 6:9 8:12 9:1 9:11 9:19 10:24 12:7 13:10 15:12 15:12 16:8 16:15 16:22 19:1 19:10 19:11 19:17 19:18 20:4 22:3 22:10 23:9 25:24 26:23 27:16 28:3 28:21 28:22 28:25 32:8 40:15 40:16 40:16 49:7 51:24 58:11 58:12 58:15 59:2 59:2 59:9 59:11 59:11 60:6 61:10 61:11 63:18 62:2 63:4 63:15 66:1 66:7 67:12 71:24 71:25 72:6 72:22 73:19 73:23 74:4 75:3 76:8 78:5 79:24 80:1 82:17 82:23 83:13 83:18 86:21 91:2 91:25 99:15 100:20 100:21 102:20 102:25 103:22 107:23 108:12 111:14 116:5 116:12 116:12 117:1 117:7 120:9 120:9 121:24 122:7 122:22 124:6 124:14 124:16 128:3 129:2 132:15 135:18 135:24 135:25 137:1 139:23 144:4 144:6 144:8 145:4 145:4 145:5 145:6 145:7 145:11 145:12 145:25 147:2 149:11 149:14 150:3 150:20 151:13

**i'd**(9) 7:10 7:23 15:4 73:7 78:20 80:16 84:7 94:10 106:24

**i'll**(22) 5:13 5:13 7:18 10:18 11:6 50:16 64:9 68:15 69:24 72:2 72:4 72:5 85:15 87:8 87:22 89:25 99:14 99:16 125:23 135:12 139:17 148:20

**i've**(17) 4:19 9:10 9:14 29:16 74:6 78:19 84:1 85:20 86:5 95:3 105:20 126:5 133:24 134:1 136:24 143:19 147:14

**janitor**(1) 105:21
**jankowski**(4) 40:8 42:16 43:9 47:7
**jankowski's**(1) 40:13
**january**(2) 34:20 35:3
**jarrett**(1) 153:25
**jewels**(1) 46:15
**jives**(1) 92:12
**job**(6) 25:20 117:2 119:9 122:20 138:16 143:19
**jobs**(2) 108:2 117:14
**join**(1) 70:7
**joined**(1) 83:5
**joint**(1) 13:3
**jointly**(3) 1:5 13:4 98:10
**jones**(2) 2:22 2:23
**judge**(5) 1:18 30:3 67:17 146:18 150:2
**judge's**(1) 87:3
**judgment**(7) 24:17 24:18 59:4 60:22 62:21 150:5 150:13
**judiciary**(1) 75:22
**july**(5) 6:3 14:17 44:8 44:25 45:2
**jumped**(1) 141:4
**june**(3) 6:3 21:5 44:2
**junior**(1) 28:6
**just**(80) 4:22 5:7 7:10 9:1 9:16 9:22 11:6 11:14 14:14 22:4 22:12 23:4 24:7 24:9 26:3 27:22 29:16 30:21 33:24 36:18 39:13 42:11 44:1 47:21 52:12 52:18 58:4 59:6 59:7 64:13 64:15 64:16 64:17 64:25 66:20 67:11 68:3 68:11 68:18 69:24 73:3 73:7 73:7 74:17 76:12 82:8 82:17 84:7 86:19 87:4 99:15 101:20 103:11 107:2 107:15 108:9 108:15 114:7 114:7 116:9 116:19 116:20 119:13 121:13 122:6 122:23 130:2 137:6 137:15 139:1 139:2 139:7 139:11 139:14 143:7 147:9 148:3 148:14 149:20 150:18

**justice**(1) 82:13
**justification**(1) 56:19
**justified**(3) 29:15 150:7 150:13
**justify**(1) 67:15
**justifying**(1) 48:3
**kannel**(1) 3:3

**karcher**(19) 79:13 79:24 80:2 80:2 80:4 80:5 80:8 80:16 80:19 82:20 82:23 83:4 83:12 84:1 84:8 84:18 84:25 85:9 86:9
**keep**(18) 12:5 56:7 56:19 99:14 107:21 107:21 107:22 107:22 108:4 114:12 117:7 122:13 122:23 130:19 130:19 137:21 146:2
**keeping**(3) 131:1 131:3 137:24
**keip**(11) 89:18 89:25 90:3 90:12 96:9 99:8 101:5 101:24 107:3 150:17 152:22
**kept**(2) 8:25 66:25
**kerry**(1) 30:3
**kevin**(1) 1:17
**key**(8) 28:21 39:6 89:8 89:24 99:19 111:25 130:4 152:6
**kind**(14) 17:10 24:13 26:12 34:17 39:24 41:17 85:6 91:6 92:16 94:9 96:4 123:20 125:11 137:3
**kinds**(2) 49:7 49:19
**king**(2) 1:33 2:17
**knee**(1) 121:22
**knew**(8) 25:5 45:7 45:7 46:2 48:22 50:2 55:10 56:3
**know**(90) 4:12 4:25 10:15 11:5 11:8 11:22 13:4 17:3 17:14 19:4 19:7 19:9 20:17 21:10 23:17 24:16 26:2 26:10 28:7 29:17 34:10 41:7 45:20 58:11 58:14 59:7 59:8 59:13 59:18 59:19 60:22 60:23 61:3 61:8 61:9 61:14 61:24 62:4 62:7 62:9 62:10 62:18 63:10 63:11 63:17 65:2 65:4 66:15 67:20 68:10 70:1 72:16 73:10 73:17 74:25 76:10 76:10 78:4 79:5 88:14 95:7 97:12 106:11 111:14 113:25 114:2 116:9 117:15 118:13 119:7 119:12 120:14 121:22 122:1 132:7 135:23 136:23 137:10 138:6 142:1 142:18 142:20 143:10 143:11 143:19 143:22 145:3 145:7 145:10 153:1
**knowingly**(1) 55:1
**knowledge**(1) 119:13
**knowledgeable**(1) 47:6
**known**(1) 42:24
**knows**(3) 52:23 63:16 125:19
**kombat**(4) 118:14 124:3 124:5 124:11
**kramer**(2) 2:29 50:8
**label**(1) 131:14
**labeled**(1) 53:3
**lack**(2) 50:11 100:16
**lacking**(1) 51:14
**land**(1) 114:1
**language**(13) 37:9 68:21 95:5 95:18 95:24 96:3 96:10 96:10 97:1 97:6 129:9 129:12 129:15
**large**(1) 106:18
**largely**(1) 153:3
**last**(19) 5:9 6:2 11:23 12:18 18:7 19:10 38:24 61:17 66:17 66:18 86:13 97:15 103:15 105:14 117:11 117:13 137:7 143:1 150:25
**late**(1) 34:24
**later**(5) 25:18 38:17 65:7 128:10 146:16
**latter**(2) 30:2 44:14
**lauded**(1) 25:16
**launch**(1) 61:16
**launching**(1) 11:16
**laura**(1) 2:23
**law**(27) 16:7 16:10 16:12 16:15 16:20 17:8 17:9 17:12 20:22 22:14 22:15 23:4 24:15 25:8 27:3 27:3 37:1 47:4 51:16 52:21 54:16 55:2 55:4 56:24 57:8 65:25 67:18
**laws**(1) 50:16

**lawyer**(8) 36:4 45:20 49:16 87:25 108:20 127:25 135:16 139:18
**lawyers**(7) 38:3 47:21 48:8 48:23 48:24 49:13 69:23
**lay**(1) 114:1
**layman's**(1) 139:18
**layoffs**(1) 124:17
**layton**(2) 2:13 6:19
**lead**(3) 61:22 70:7 114:6
**leaders**(3) 112:9 113:3 123:1
**leadership**(1) 106:4
**leading**(1) 105:6
**leads**(2) 75:6 115:20
**leagues**(1) 49:4
**leaning**(1) 13:23
**leap**(1) 121:23
**learn**(3) 65:22 66:19 110:1
**learned**(2) 14:15 18:5
**least**(14) 18:13 22:2 30:25 33:17 36:1 40:2 42:16 46:3 47:9 74:15 126:11 128:14 149:20 151:5
**leave**(9) 17:17 27:19 68:3 115:23 116:3 116:6 120:24 143:18 144:3
**leaving**(2) 56:2 116:12
**leboeuf**(2) 79:22 79:24
**led**(6) 25:18 26:6 35:10 35:12 104:16
**left**(4) 12:25 89:12 98:9 103:14
**legal**(7) 49:6 52:15 52:17 64:5 101:18 101:19 114:22
**legitimate**(6) 28:22 51:17 57:13 102:1 152:11 152:18
**lend**(1) 40:23
**lender**(20) 6:17 11:9 13:4 38:1 38:23 39:5 40:21 40:23 41:11 60:9 61:8 61:23 72:21 78:7 78:11 87:21 100:11 129:1 151:23 151:25
**lenders**(2) 45:9 46:25
**lender's**(3) 11:10 61:12 100:4
**length**(1) 53:6
**less**(3) 106:13 136:1 136:4
**let**(7) 29:17 30:12 30:22 79:4 84:2 107:15 112:15
**lethargic**(2) 4:15 144:23
**letting**(1) 56:19
**let's**(8) 16:13 39:20 62:6 73:2 73:9 92:19 105:25 123:21
**level**(8) 60:11 81:18 81:19 119:12 120:20 124:14 132:20 132:20
**leverage**(2) 113:2 114:11
**levin**(3) 2:29 3:1 50:8
**lexington**(1) 3:12
**liabilities**(2) 34:6 34:20
**liable**(3) 55:5 58:21 63:7
**liberties**(1) 58:13
**liens**(2) 31:11 57:19
**lift**(5) 78:16 78:17 86:25 87:6 88:22
**light**(6) 16:7 37:1 60:4 82:15 82:15 108:15
**lightly**(1) 42:23
**like**(59) 4:22 5:11 7:10 11:14 15:5 22:6 29:9 30:6 32:4 32:10 36:4 36:14 37:25 38:1 38:20 38:22 40:20 41:2 41:18 43:6 48:16 49:2 57:2 68:6 69:7 70:2 71:1 73:7 78:7 78:20 78:22 79:5 79:9 80:9 80:16 81:20 84:7 84:25 86:19 88:22 90:8 97:10 97:11 97:13 98:15 99:15 101:17 103:7 106:24 113:24 123:7 124:6 124:8 135:21 135:22 136:24 146:3 147:14 149:11
**likely**(9) 12:7 34:4 44:21 59:16 62:11 116:5 116:8 121:21 122:7

**likes**(2) 49:10 71:21
**limit**(5) 64:23 65:12 68:25 77:10 147:22
**limitation**(1) 65:19
**limitations**(1) 65:21
**limited**(2) 32:23 100:16
**linda**(2) 2:6 29:8
**line**(13) 11:25 12:5 27:10 41:5 41:9 41:10 42:22 65:17 68:10 72:25 109:4 112:23 119:3
**lined**(1) 48:18
**lines**(5) 5:24 63:5 88:23 114:9 121:11
**liquidity**(1) 38:14
**list**(17) 5:2 6:22 7:7 7:14 7:18 8:1 9:7 111:3 112:17 112:21 113:3 113:10 118:6 124:20 124:21 138:9 144:7

**listen**(2) 72:2 72:4
**lists**(3) 58:8 111:24 112:1
**lithland**(1) 146:18
**litigate**(1) 52:10
**litigated**(1) 65:2
**litigation**(12) 15:25 27:7 27:9 28:8 63:20 72:17 75:16 75:25 75:25 78:12 85:1 86:7
**litigators**(2) 59:15 61:24
**little**(12) 4:11 4:13 4:15 4:15 39:21 65:3 77:16 86:6 110:12 115:10 128:7 142:23
**live**(1) 78:8
**llp**(5) 1:22 2:5 2:30 2:40 3:10
**loan**(12) 25:7 25:22 34:5 35:8 38:4 38:24 38:25 39:9 41:8 44:15 53:5 67:14
**loaning**(1) 41:3
**loans**(1) 51:22
**loans."**(1) 67:10
**lobbying**(1) 137:2
**locks**(1) 151:16
**logical**(1) 73:3
**lokey**(5) 37:8 37:14 83:9
**long**(11) 11:23 34:24 39:3 39:7 43:12 53:17 122:16 123:16 137:10 143:6 149:14
**longer**(1) 149:11
**longtime**(3) 22:1 22:2 46:17
**look**(29) 7:23 15:18 16:3 16:6 16:7 18:1 19:5 23:12 24:15 35:12 39:20 45:11 48:21 60:19 62:6 62:9 81:7 82:14 93:23 108:9 115:22 116:10 116:11 128:2 128:6 128:6 137:15 150:5 153:15
**looked**(3) 7:25 48:3 48:17
**looking**(9) 11:8 88:2 95:16 98:23 110:13 115:18 117:8 143:5 144:23
**looks**(2) 26:9 113:25
**looming**(1) 43:16
**loosen**(1) 38:13
**loot**(2) 21:18 24:6
**looting**(1) 24:22
**los**(2) 2:10 2:44
**lose**(4) 46:14 47:22 52:9 116:2
**loses**(2) 47:12 72:20
**loss**(4) 64:18 64:23 66:4 68:25
**losses**(3) 46:21 50:19 69:4
**lost**(9) 26:18 33:16 33:18 33:22 33:23 56:5 74:21 136:25 150:15
**lot**(27) 11:23 13:7 16:14 17:3 48:3 50:23 59:6 59:22 63:12 63:25 66:15 71:24 83:6 100:22 100:22 106:14 108:1 122:23 124:8 125:8 126:25 127:1 127:3 135:22 143:1 144:6 150:18
**lottery**(1) 49:4
**loudly**(1) 151:25
**low**(2) 119:23 147:15
**lower**(1) 135:21
**lowered**(1) 49:5

| Word | Page:Line | Word | Page:Line | Word | Page:Line | Word | Page:Line |
|---|---|---|---|---|---|---|---|
| lowest(1) 147:10 | | me."(1) 143:20 | | milestone(54) 95:10 98:1 98:3 98:7 98:13 | | morning's(2) 64:18 93:3 | |
| loyalty(7) 23:6 23:7 24:8 63:2 122:24 123:1 142:24 | | mean(17) 15:14 16:13 17:17 18:14 26:24 58:25 62:14 62:18 77:22 77:24 110:12 110:15 110:24 118:7 121:21 126:22 127:3 | | 100:1 100:8 100:8 100:17 101:25 102:7 102:16 108:16 108:18 113:12 114:18 115:16 116:4 117:3 120:6 120:10 121:4 121:17 121:14 121:18 121:21 122:7 127:19 128:2 129:8 136:5 138:1 138:11 139:12 142:13 143:8 143:23 143:24 143:25 143:25 144:1 144:1 144:5 144:5 148:5 150:14 150:15 150:16 150:17 151:2 151:7 151:17 152:16 152:17 | | mortal(4) 118:14 124:3 124:5 124:11 most(25) 15:4 18:3 18:5 18:18 18:9 22:24 44:16 47:6 52:8 62:4 66:14 68:16 91:25 94:16 106:13 108:5 113:2 114:11 115:13 118:23 124:15 130:21 133:3 135:18 146:1 | |
| lozinski(1) 54:20 | | | | | | | |
| lure(3) 117:24 118:5 119:24 | | meaning(2) 34:25 97:24 | | | | mostly(2) 101:18 101:19 | |
| luring(1) 117:21 | | meaningful(8) 18:5 18:9 18:9 36:9 51:8 56:5 72:1 147:8 | | milestones(6) 99:23 99:24 108:10 108:13 152:10 152:11 | | motion(40) 29:13 30:14 60:17 60:19 64:2 73:18 73:21 76:2 76:20 77:4 78:1 78:15 78:16 80:12 81:14 81:25 85:2 86:25 87:1 87:2 87:6 88:22 89:7 89:8 89:13 89:14 89:21 89:24 90:7 90:9 90:12 93:5 94:7 94:20 97:9 102:25 145:16 147:13 149:18 152:19 | |
| machetes(1) 59:15 | | | | | | | |
| made(26) 20:1 20:3 20:7 20:8 21:5 22:10 25:1 25:1 32:6 38:2 48:9 53:3 54:22 55:18 60:24 66:11 66:22 74:1 75:24 88:4 94:25 105:14 122:10 126:25 131:20 151:1 | | meaningless(2) 51:13 145:9 | | miller(1) 54:18 | | | |
| | | means(5) 17:5 26:24 45:20 48:21 55:14 | | million(79) 5:23 5:24 12:20 15:11 15:16 18:14 19:9 25:19 26:14 29:22 30:10 30:25 31:1 31:12 33:19 33:20 33:22 33:22 33:23 33:23 34:6 34:9 34:11 35:5 35:20 35:21 36:1 36:11 36:13 36:19 38:20 38:24 38:25 38:25 40:1 40:4 40:9 42:2 42:20 43:2 43:2 43:19 43:24 44:4 44:13 44:14 44:18 46:12 46:21 49:5 49:25 50:2 50:4 50:4 50:5 50:9 51:12 52:6 56:10 57:3 57:4 57:20 61:14 64:6 69:4 73:2 95:13 100:9 109:2 109:12 121:7 128:14 132:21 134:9 134:10 143:13 145:18 145:21 151:5 | | motions(2) 93:11 136:18 | |
| madness(1) 41:20 | | meant(1) 35:19 | | | | move(8) 6:25 21:2 21:5 26:6 26:10 27:7 95:20 103:25 | |
| maer(2) 14:7 15:22 | | meantime(1) 153:16 | | | | | |
| magistrate(1) 62:8 | | mediation(10) 62:3 62:5 63:8 63:14 64:3 70:22 71:2 71:25 72:1 72:5 | | | | | |
| main(7) 16:22 87:1 87:1 93:2 109:23 110:10 130:19 | | | | | | moved(1) 123:7 | |
| | | meet(2) 25:10 126:7 | | | | movie(1) 123:7 | |
| | | meeting(5) 40:3 45:12 45:15 45:25 113:23 | | | | moving(4) 42:25 89:6 92:24 104:24 | |
| mainly(2) 59:13 77:1 | | meetings(2) 42:10 126:9 | | | | much(31) 4:19 9:5 27:6 27:8 36:6 36:14 36:14 36:18 36:21 50:10 52:23 62:2 73:4 74:12 74:13 74:21 75:3 81:1 82:7 100:13 110:11 113:24 114:9 115:4 115:17 123:7 135:25 136:1 142:8 142:22 153:10 | |
| maintain(1) 90:15 | | member(5) 83:2 84:14 123:24 123:24 | | | | | |
| maintained(1) 119:6 | | members(15) 21:2 27:20 27:22 35:18 82:24 82:25 84:9 84:12 84:21 85:11 123:22 124:20 125:10 125:13 125:25 | | minds(1) 122:20 | | | |
| major(3) 63:20 72:14 130:9 | | | | minimal(1) 11:5 | | | |
| majority(1) 112:10 | | | | minimum(5) 53:19 64:2 109:2 147:17 | | | |
| make(37) 4:12 20:9 20:16 31:4 32:4 38:23 39:8 39:11 41:8 46:23 58:5 59:7 66:9 66:23 67:23 68:19 75:1 77:13 77:14 81:23 103:1 106:5 106:7 107:17 107:24 108:3 108:6 120:19 130:13 130:19 130:23 132:6 140:6 141:6 147:20 150:15 151:13 | | memoranda(1) 42:16 | | minor(1) 152:20 | | | |
| | | memorandum(2) 37:13 37:17 | | minority(5) 45:18 47:2 47:14 51:1 54:14 | | multiple(2) 105:6 139:6 | |
| | | mention(1) 113:14 | | minute(3) 139:14 148:15 148:20 | | music(1) 104:21 | |
| | | mentioned(6) 6:22 51:9 125:7 136:16 | | minutes(8) 45:13 45:15 73:9 78:22 93:10 102:21 107:3 148:17 | | must(6) 45:3 67:16 74:8 77:20 78:12 147:18 | |
| | | mere(1) 147:16 | | | | | |
| makes(4) 13:22 51:13 68:2 72:8 | | merely(1) 100:19 | | | | | |
| making(8) 40:15 53:18 73:24 75:21 104:21 107:22 119:5 123:20 | | mergers(1) 48:19 | | | | myself(7) 29:16 36:4 71:15 123:1 125:5 125:9 135:22 | |
| | | meritorious(1) 68:8 | | minutia(1) 119:13 | | | |
| | | merits(3) 17:2 36:25 41:17 | | missed(1) 79:20 | | | |
| man(1) 23:20 | | message(1) 89:12 | | modification(2) 93:14 93:15 | | naftalis(1) 2:29 | |
| manage(3) 104:20 105:2 105:8 | | met(2) 48:13 151:17 | | modifications(2) 93:12 96:3 | | nai(49) 17:10 20:20 22:1 22:6 22:11 23:24 28:12 32:14 35:5 35:16 36:25 37:6 37:18 37:19 37:22 37:25 38:22 39:5 39:17 39:23 40:2 40:7 42:8 42:15 43:4 43:8 43:9 43:10 44:13 44:22 44:24 45:25 46:1 46:13 47:2 47:7 47:16 52:7 54:13 62:19 66:3 66:14 66:17 66:21 67:5 67:10 67:11 72:11 72:19 | |
| managed(1) 123:23 | | methodology(1) 118:18 | | modify(1) 52:1 | | | |
| management(32) 21:5 24:3 24:3 34:25 35:3 35:14 36:21 36:24 42:4 42:19 43:15 44:3 44:7 45:13 81:12 83:5 91:10 91:20 105:3 105:9 106:14 112:7 112:10 113:9 114:14 119:19 120:3 124:19 125:14 126:1 139:24 143:12 147:21 | | michael(6) 1:24 87:11 101:4 141:7 148:12 149:2 | | modules(1) 139:10 | | | |
| | | | | moment(14) 9:2 31:6 32:3 50:16 62:1 74:8 74:21 76:2 76:12 78:20 101:2 108:17 117:1 145:22 | | | |
| | | middle(3) 14:17 40:12 143:11 | | | | | |
| | | midstream(1) 26:19 | | | | naic(1) 44:23 | |
| | | midway(96) 1:7 19:14 30:11 32:19 33:16 33:23 34:2 34:4 34:24 35:3 35:6 35:19 36:2 36:7 36:9 36:14 37:5 38:3 39:24 40:14 40:22 41:1 41:6 41:20 42:10 43:13 43:12 44:23 45:5 45:7 46:2 46:20 47:1 47:10 47:19 47:21 47:25 49:5 51:1 51:4 51:5 51:7 51:11 51:18 53:4 53:11 54:13 54:23 54:25 56:2 56:5 58:7 58:17 66:4 69:21 74:23 75:2 75:11 80:6 80:7 80:14 82:12 104:2 104:7 104:14 104:25 105:12 105:15 105:18 106:10 106:21 107:13 107:16 107:21 112:12 114:17 114:17 117:17 117:20 117:23 119:25 123:16 123:24 124:8 125:16 129:17 130:2 131:1 131:6 131:21 133:25 134:21 135:4 137:18 137:25 143:1 | | monday(1) 4:1 | | nai's(6) 35:15 42:16 45:9 46:23 47:6 62:17 | |
| managers(2) 91:9 113:3 | | | | monetary(1) 32:25 | | name(12) 21:11 21:12 31:18 31:18 79:21 79:25 80:2 91:21 103:15 103:15 113:14 124:21 | |
| managing(1) 105:5 | | | | money(23) 6:2 12:6 12:6 12:8 12:16 15:11 15:19 36:17 36:22 38:19 41:3 41:6 48:9 50:23 50:24 56:19 57:5 62:13 63:13 63:1 65:5 71:22 146:17 | | | |
| mandatory(1) 20:2 | | | | | | names(6) 90:16 91:19 91:22 91:25 92:4 111:6 | |
| manner(3) 74:5 74:16 119:17 | | | | | | | |
| many(5) 38:1 48:9 71:16 112:12 136:19 | | | | | | | |
| march(4) 26:9 35:6 49:23 105:13 | | | | | | narrow(3) 63:24 100:22 101:1 | |
| marcos(2) 2:14 6:18 | | | | money."(1) 40:22 | | narrowed(1) 144:8 | |
| mark(2) 38:16 69:21 | | midway."(1) 124:12 | | moneyed(1) 15:24 | | national(5) 3:9 21:8 41:1 75:1 76:16 | |
| mark."(1) 70:11 | | midway's(23) 32:2 34:20 35:18 36:24 37:2 38:14 39:2 39:6 40:17 41:13 41:24 42:14 42:19 42:21 43:5 43:15 47:2 47:11 47:14 51:20 53:16 116:16 120:2 | | monies(2) 12:10 12:22 | | nature(3) 74:1 139:4 142:21 | |
| marked(1) 133:11 | | | | month(1) 29:17 | | near(1) 35:21 | |
| market(6) 1:10 1:25 2:24 47:25 117:13 135:24 | | | | months(12) 26:11 38:12 38:17 46:9 46:12 63:14 122:8 122:14 122:16 131:17 138:15 149:14 | | necessarily(2) 91:21 98:9 | |
| | | | | | | necessary(4) 60:23 90:15 113:11 144:20 | |
| marketing(1) 106:6 | | | | | | need(19) 8:19 8:24 12:8 12:17 15:6 18:24 26:12 36:6 43:1 49:6 59:12 72:9 123:8 127:25 133:7 137:14 140:7 151:3 151:4 | |
| massachusetts(1) 49:13 | | might(31) 7:1 15:1 15:15 20:18 21:18 26:12 41:19 46:23 47:25 48:15 51:11 55:17 65:19 74:20 84:13 94:13 94:14 95:9 99:12 115:3 115:4 115:5 117:16 118:1 122:21 126:7 126:23 135:21 136:25 139:7 139:8 | | more(49) 4:15 5:24 11:17 15:6 17:5 26:11 34:23 34:23 34:19 34:11 44:18 44:23 45:6 45:10 47:18 49:24 52:25 57:3 59:16 59:22 61:5 61:6 62:2 62:5 63:25 65:3 65:22 66:19 66:25 70:9 74:4 75:19 80:20 82:8 91:1 102:8 110:1 115:10 122:8 124:18 126:8 128:12 137:8 138:7 142:24 147:17 148:7 150:18 | | need?"(1) 36:21 | |
| master(1) 104:13 | | | | | | needed(5) 44:18 50:17 50:23 60:6 93:22 | |
| mat(1) 71:21 | | | | | | needs(11) 8:16 22:22 22:23 40:22 59:3 59:23 60:8 60:18 63:19 90:17 117:2 | |
| material(2) 25:14 134:22 | | | | | | | |
| materially(2) 34:11 64:7 | | | | | | | |
| matter(17) 4:23 16:20 19:25 20:18 23:1 25:15 39:20 58:5 58:11 65:25 73:23 73:23 76:13 76:18 79:13 82:7 153:23 | | | | | | negative(5) 64:7 115:6 125:10 125:12 136:11 | |
| | | miguel(2) 126:11 127:1 | | | | | |
| | | mike(2) 89:3 89:5 | | | | | |
| matters(4) 73:10 75:19 81:6 97:12 | | milbank(2) 2:4 2:39 | | | | | |
| matthew(2) 103:16 103:18 | | miles(1) 136:6 | | | | negatively(2) 14:20 115:7 | |
| maximize(1) 43:1 | | | | moreover(1) 76:2 | | negligence(2) 32:20 37:15 | |
| maximizing(1) 144:14 | | | | morning(23) 4:3 4:5 4:6 4:7 4:9 4:9 4:10 5:4 5:5 6:18 6:20 6:21 12:18 14:3 14:4 29:6 29:7 30:24 58:7 89:12 126:23 127:3 133:10 | | negligent(2) 63:4 63:5 | |
| maybe(14) 4:14 17:4 31:4 60:19 84:17 85:13 87:20 92:14 93:3 105:24 149:20 149:21 150:23 151:25 | | | | | | negotiate(2) 37:22 41:13 | |
| | | | | | | negotiated(3) 13:6 13:6 23:22 | |
| | | | | | | negotiating(3) 59:25 110:8 113:23 | |
| mccloy(2) 2:5 2:40 | | | | | | negotiation(3) 13:9 13:11 51:7 | |
| mccown(1) 54:18 | | | | | | | |

# MIDWAY GAMES, INC.4.6.09.DOC

| Word | Page:Line |
|------|-----------|

negotiations(1) 127:23
neither(3) 36:7 36:9 135:16
net(11) 47:12 64:23 68:25 69:4 95:13 95:25 96:7 96:9 96:25 128:13 151:5

neutral(1) 61:19
never(6) 19:17 25:11 41:15 43:15 143:13 145:9

nevertheless(1) 47:16
new(12) 2:34 3:13 26:5 26:5 26:6 26:8 39:23 50:8 57:17 64:18 68:17 147:19

newly(3) 82:21 82:21 82:23
next(9) 10:3 19:11 43:6 60:11 63:25 89:4 95:23 108:10 122:14

nfl(1) 124:8
nfl."(2) 124:7 124:9
nickita(1) 1:37
night(1) 8:1
nine(2) 38:17 131:16
no-brainers(2) 150:23 150:24
nodding(1) 95:17
nol(2) 59:9 65:5
nols(19) 18:2 18:3 18:8 18:14 18:16 18:19 19:15 19:21 28:19 51:12 58:6 58:9 58:14 64:17 65:4 65:14 66:3 74:18 74:20

nols."(1) 19:5
non(2) 36:3 45:19
non-senior(4) 91:10 113:9 114:14 119:21
nonconsensual(1) 77:23
none(3) 18:19 39:4 83:15
nonetheless(2) 98:15 135:24
nonpublic(1) 92:13
nor(6) 36:7 39:22 40:2 69:3 117:18 135:1
normal(1) 62:5
normally(1) 151:3
north(2) 2:17 2:24
note(10) 5:6 17:25 19:24 20:5 28:18 38:6 43:17 43:18 44:13 44:20

noted(5) 61:17 73:19 86:19 93:5 152:25
notes(3) 47:16 51:21 73:8
nothing(13) 13:11 16:24 17:7 18:6 25:24 37:7 52:9 56:2 56:5 69:12 81:9 138:6 153:12
notice(1) 85:12
november(11) 16:13 17:2 17:7 17:18 18:4 18:18 22:18 28:10 28:12 46:5 50:14

novod(1) 2:32
now(47) 7:7 7:18 10:3 14:14 18:1 18:16 20:5 21:23 22:13 23:11 30:8 30:22 31:13 32:9 32:12 32:23 33:10 34:19 34:22 35:10 36:7 38:20 41:12 41:21 42:17 43:18 44:2 44:7 45:24 47:24 49:7 51:9 51:24 52:3 54:9 58:15 60:16 61:2 62:3 67:5 81:20 83:4 84:3 86:5 89:5 99:23 100:8 109:4 112:3 118:25 120:6 121:22 125:20 128:22 129:17 130:1 134:5 132:21 134:12 141:9 143:15 143:18 151:22

number(30) 7:2 8:10 22:9 27:1 27:10 27:12 27:12 34:11 34:12 86:24 89:6 92:24 109:15 114:3 115:19 115:21 116:20 121:25 122:1 124:8 125:3 128:3 131:9 132:23 132:25 133:7 133:12 136:2 139:9 143:13

numbers(4) 7:11 117:10 117:15 118:11
numerous(1) 61:21
nuts(1) 45:3
o'desky's(1) 45:2
object(1) 60:10
objected(2) 125:20 136:20

objection(23) 6:7 7:16 10:11 10:20 12:15 83:19 86:22 89:7 89:14 89:18 90:5 90:5 91:3 91:16 93:11 100:15 100:23 125:17 135:6 135:12 140:22 141:7 149:18

objections(4) 10:4 10:7 93:6 116:25
objectively(1) 62:6
objectives(1) 110:10
obligation(1) 43:16
obligations(3) 21:16 46:22 51:20
observe(1) 85:22
observing(1) 81:19
obstacle(1) 147:23
obtain(1) 56:15
obtained(4) 45:14 47:18 84:25 148:2
obtaining(1) 39:23
obvious(3) 40:16 49:17 69:5
obviously(26) 11:7 11:22 29:10 34:10 52:22 58:25 60:12 68:1 74:3 74:13 88:18 89:16 89:18 96:6 98:23 110:11 111:8 117:6 120:9 121:17 122:8 122:15 123:14 123:18 145:14 149:22

occasioned(1) 82:6
occupied(1) 4:20
occupy(1) 106:11
occur(1) 136:7
occurred(5) 20:14 20:20 34:22 74:19 109:
occurring(1) 24:23
occurs(2) 100:5 143:8
october(4) 28:12 45:5 45:12 105:14
october."(1) 44:6
off(8) 12:24 26:23 36:12 51:16 52:13 143:5 143:12 143:15

offer(7) 21:11 49:5 50:20 55:3 119:24 136:15 144:25

offered(3) 96:21 117:23 118:5
office(7) 90:5 93:9 101:7 101:22 126:13 126:17 149:19

officers(14) 62:23 63:1 80:13 80:21 80:24 82:12 84:12 90:17 91:4 91:14 112:8 112:11 119:20 119:21

offices(1) 50:8
official(1) 29:9
officially(1) 103:22
offing(1) 29:21
offset(3) 64:24 65:10 69:1
often(2) 116:23 131:16
okay(88) 5:14 6:9 7:12 7:15 7:17 8:2 8:8 8:13 9:1 9:4 11:19 11:21 13:8 22:16 77:25 80:7 80:18 83:1 83:4 88:12 89:1 92:18 92:23 93:20 94:9 94:18 95:8 95:22 96:12 97:4 97:19 102:5 102:10 102:19 103:17 104:5 104:14 105:23 107:7 107:7 107:12 107:15 108:8 108:15 109:1 109:3 109:10 110:10 111:7 111:11 111:17 112:3 112:12 112:15 112:19 114:13 116:3 116:1 117:20 117:23 118:3 118:18 120:2 120:17 120:23 121:4 121:9 121:13 121:17 125:2 125:13 126:19 129:4 130:1 131:3 131:6 133:6 134:12 134:25 135:2 136:5 137:24 139:11 140:4 140:9 140:16 141:20 142:8

old(1) 145:8
onboard(3) 104:17 117:25 140:7
once(6) 50:22 72:17 110:4 114:13 126:8 127:13

one(117) 2:16 3:5 5:9 10:15 11:5 11:7 12:25 14:8 16:17 17:10 18:1 22:2 22:20 23:5 26:3 26:4 37:14 38:11 39:1 46:10 48:14 55:18 57:14 58:4 59:9 60:16 61:4 65:1 65:25 66:2 66:2 66:8 67:19 68:1 71:18 74:18 76:1 77:11 86:1 87:1 87:20 88:2 88:7 93:8 93:9 94:20 94:23 95:10 97:15 100:5 100:8 100:17 108:16 108:16 108:18 109:18 109:22 109:23 110:3 111:1 112:4 113:12 113:13 114:18 115:8 116:4 116:12 117:2 117:9 118:13 118:23 119:15 121:19 121:21 122:7 123:23 124:16 124:18 125:19 125:21 126:20 127:5 127:19 128:12 129:3 129:20 130:7 130:13 131:12 135:3 136:5 138:1 139:12 139:14 142:11 142:14 142:22 143:8 143:12 143:24 144:7 144:9 144:25 145:3 147:14 148:6 150:5 150:9 150:14 150:15 150:16 150:17 151:2 151:7 151:17 152:16 152:17

one-on-one(1) 126:8
one-team(1) 124:15
ones(3) 19:25 20:8 114:22
ongoing(3) 131:18 132:1 132:15
only(37) 7:9 8:10 8:12 12:3 12:25 15:18 29:20 31:11 33:19 37:20 38:17 39:19 43:17 50:14 52:14 56:14 57:18 57:19 59:7 60:16 71:18 84:11 90:14 90:22 97:16 98:7 108:16 115:6 124:14 124:16 131:8 132:6 143:8 143:23 143:24 151:25 152:14

onto(1) 24:7
open(3) 44:18 60:12 92:9
opened(3) 5:12 21:9 135:8
opening(1) 30:1
operate(2) 12:22 31:9
operating(7) 47:12 64:18 64:23 68:25 69:4 107:21 119:16

operation(1) 130:10
operations(2) 44:6 107:20
opinion(7) 37:8 51:17 83:8 83:10 83:13 83:22 108:5 114:16 121:20 137:14

opinions(1) 150:3
opponents(1) 15:24
opportunity(20) 10:19 32:19 60:20 63:8 63:19 79:15 80:20 81:15 81:17 81:25 82: 82:7 82:10 82:14 85:12 97:7 100:13 100:14 102:3 114:15

opposed(6) 11:16 17:11 82:15 83:14 97:24 124:7

opposition(1) 52:14
option(1) 131:9
options(4) 44:9 44:11 118:2 131:9
order(31) 7:21 7:22 12:7 12:11 13:3 13:4 14:24 18:23 26:20 27:24 30:16 31:15 46:15 52:1 57:18 57:21 59:17 62:3 69:24 78:6 82:22 82:23 86:21 86:21 87:4 87:4 87:13 88:2 138:8 152:19 152:23

ordered(3) 30:8 31:17 136:6
ordering(1) 77:23
orderly(1) 14:20
orders(2) 88:25 153:15
ordinary(1) 55:22
organization(1) 129:2
original(3) 94:21 98:21 99:1
originally(1) 145:16

other(65) 8:1 9:23 15:4 15:10 15:22 19:22 20:10 21:7 22:8 22:25 25:14 27:10 27:19 27:24 28:1 30:11 32:21 37:19 37:24 38:9 38:17 40:10 40:17 41:18 44:1 47:12 48:14 56:6 56:25 57:24 66:13 66:22 69:14 73:10 77:12 83:21 87:5 87:20 88:19 91:19 97:10 97:12 99:12 102:14 102:24 109:19 110:11 113:2 115:12 115:19 120:2 120:14 122:18 125:6 125:10 125:13 125:25 129:3 137:13 138:5 142:23 146:22 147:11 147:14

others(7) 23:15 24:10 32:14 32:19 35:1 114:5 147:14

otherwise(4) 16:21 25:7 96:23 97:2
otherwise,"(1) 45:4
ought(1) 4:24
our(65) 13:12 14:7 15:4 15:6 15:17 17:12 20:7 21:17 22:14 23:23 28:21 30:1 46:3 49:25 54:17 55:4 56:20 56:25 61:5 63:25 71:22 80:10 81:22 83:25 86:22 91:18 100:15 100:23 102:17 104:20 104:21 105:5 105:8 105:9 105:12 106:4 106:5 106:6 106:14 106:15 113:14 113:14 113:20 118:14 118:24 118:25 119:1 119:2 119:5 119:12 120:4 123:12 123:17 124:11 124:15 124:15 124:16 124:15 133:5 137:7 139:7 139:22 140:15 141:7 141:18

ourselves(2) 60:10 143:21
out(43) 8:10 8:23 14:25 15:13 19:15 22:5 22:8 28:19 28:25 30:1 38:18 48:15 50:3 60:13 63:9 65:18 66:21 72:24 75:13 80:17 81:4 89:19 91:16 91:24 92:15 98:20 99:4 112:20 115:17 116:23 117:4 117:16 118:10 122:22 125:5 125:9 131:16 136:24 137:12 138:15 139:9 145:5 145:10

out-of(1) 41:18
out."(1) 19:8
outcome(2) 106:8 146:20
outlined(1) 121:12
outrageous(1) 44:20
outside(6) 45:16 58:8 58:16 59:13 72:9 115:11

outward(1) 137:9
over(35) 4:15 5:9 6:16 21:18 34:23 38:7 39:3 46:12 46:20 57:3 63:20 67:1 67:1 69:5 71:15 71:17 72:2 73:7 73:22 86:22 93:25 101:5 104:23 104:24 108:10 116:21 117:11 117:13 117:13 119:10 121:22 122:14 131:9 136:22 146:1

overall(1) 117:16
overriding(1) 107:19
overrule(1) 135:12
oversecured(1) 87:2
overseeing(1) 105:5
oversight(3) 98:18 106:4 106:14
overstate(1) 93:3
overwhelming(1) 53:7
owed(5) 43:20 47:2 47:5 54:13 132:22
own(15) 20:7 27:17 37:13 44:19 45:9 48:21 49:6 61:25 66:4 67:23 72:7 96:17 123:9 123:9 123:10

ownership(3) 50:7 64:21 68:23
o'desky(20) 5:17 18:12 20:1 20:14 24:1 24:21 26:10 34:25 35:24 37:12 37:16 37:20 42:4 43:23 46:8 51:10 51:12 51:15 67:7 69:11

o'desky's(3) 5:13 19:6 34:8
p.c(1) 3:2
p.m(3) 148:22 148:22 153:18
pace(1) 78:11
pachulski(1) 2:21

| Word | Page:Line |
|---|---|

**page**(17) 41:5 41:9 41:10 64:15 69:21 95:9 95:23 95:24 96:14 96:15 96:16 108:8 108:9 108:10 124:20 128:6 128:22 134:1

**paid**(29) 12:6 16:20 16:24 16:25 26:23 41:9 46:11 52:15 55:21 57:10 57:16 76:24 96:24 98:2 98:20 100:9 117:4 122:12 122:21 129:17 131:16 132:12 136:16 136:24 137:3 137:4 145:10 147:12 150:17

**painted**(1) 145:25

**paper**(4) 39:4 42:1 120:8 145:12

**papers**(4) 54:17 55:4 56:21 149:17

**paragraph**(2) 99:3 141:12

**parameters**(1) 60:4

**part**(14) 13:7 22:24 55:1 62:4 66:15 98:6 109:3 109:10 112:10 115:13 118:23 123:8 124:15 144:6

**participant**(1) 98:2

**participants**(6) 13:15 91:19 100:8 100:10 102:8 111:25

**participate**(1) 84:19

**participated**(1) 42:10

**particular**(12) 5:1 19:4 19:5 19:16 19:18 27:15 41:2 42:4 72:22 83:17 83:23 102:8

**particularly**(16) 9:15 15:17 16:3 36:8 37:15 48:11 49:8 52:10 105:6 106:5 106:17 110:16 114:10 122:9 153:3 153:7

**parties**(15) 6:6 13:2 53:9 59:22 62:3 62:7 62:9 71:5 71:6 71:24 88:19 93:17 94:12 101:23 141:24

**parts**(6) 16:11 67:13 109:3 114:19 136:12 143:10

**party**(6) 17:8 57:13 72:23 81:16 81:21 86:10

**passing**(3) 59:4 62:21 88:18

**past**(5) 12:19 33:17 38:1 44:6 117:20

**patriots,"**(1) 124:7

**patriots."**(1) 124:10

**pause**(1) 29:24

**pausing**(1) 37:11

**pay**(23) 15:14 15:14 15:14 15:19 27:6 27:8 36:5 36:12 37:3 39:7 47:25 49:6 52:10 53:17 72:19 91:16 100:4 107:12 107:17 119:5 143:5 145:8 146:12

**paying**(9) 25:23 36:2 46:8 56:7 61:10 61:11 72:21 131:24 132:1

**payment**(23) 50:20 52:2 76:23 77:2 77:4 77:5 77:9 91:15 100:7 108:13 114:15 117:2 120:16 120:21 120:23 124:25 127:2 138:9 143:15 145:17 147:21 147:25 150:16

**payments**(15) 14:10 31:19 91:5 91:16 107:13 107:17 116:24 119:22 121:6 131:1 136:8 137:20 144:14 144:15 144:15

**payout**(2) 64:4 131:12

**pays**(3) 16:16 100:11 129:1

**peel**(1) 143:5

**peels**(1) 143:12

**pennsylvania**(1) 1:41

**penny**(2) 147:2 147:3

**people**(63) 18:10 72:7 91:11 92:1 93:23 104:21 105:10 108:1 108:7 110:16 110:16 112:9 112:23 112:24 113:1 113:3 113:5 113:6 114:4 114:8 114:11 114:20 114:21 114:22 115:9 115:10 115:12 115:18 116:1 117:8 118:5 118:13 118:20 118:22 119:4 119:16 119:18 120:10 120:12 120:13 120:14 122:1 122:13 122:19 122:23 124:9 125:6 125:19 131:19 131:22 136:12 136:2 139:19 139:25 140:2 140:6 140:7 143:23 144:10 144:16 144:18 144:21 148:19

**per-share**(1) 25:11

**perceived**(1) 50:5

**percent**(13) 18:24 38:7 52:5 54:12 56:15 72:4 118:9 118:22 119:18 119:18 119:20 134:11 136:4

**percentage**(6) 118:4 119:22 119:23 132:5 134:9 136:1

**percentages**(2) 121:2 121:12

**perception**(1) 136:17

**perfectly**(1) 28:22

**perform**(1) 30:19

**performance**(1) 129:15

**performed**(5) 34:19 36:9 39:1 120:20 129:14

**performing**(2) 120:10 120:11

**perhaps**(24) 4:16 52:7 70:4 78:10 81:14 82:15 85:13 91:24 92:15 101:17 102:14 113:4 113:5 115:16 122:2 122:10 122:11 126:7 126:8 126:9 135:21 135:21 147:10 147:11

**period**(9) 36:15 36:20 42:3 117:12 117:13 127:14 132:13 133:14 133:25 146:12

**permission**(5) 33:11 52:21 84:25 103:4 106:23

**permit**(3) 75:25 77:2 77:8

**permits**(2) 30:17 53:23

**permitted**(1) 76:24

**permitting**(2) 57:15 82:13

**perry**(1) 2:41

**person**(24) 17:15 21:11 21:12 22:2 47:6 65:25 66:2 67:24 72:9 113:13 116:12 118:24 119:1 119:6 119:8 119:16 120:20 120:25 131:25 132:16 138:9 138:13 140:2 143:17

**personal**(6) 61:20 105:18 123:1 125:3 135:23 137:14

**personally**(2) 117:20 147:11

**personnel**(2) 110:15 131:7

**perspective**(4) 11:24 46:24 60:21 61:20

**perturbed**(1) 36:8

**petition**(1) 46:7

**phone**(7) 21:12 22:12 48:15 48:16 48:17 115:3 144:22

**phonebook**(1) 21:9

**phrase**(2) 36:3 96:14

**phrases**(1) 37:1

**pick**(2) 48:14 144:22

**picked**(1) 114:8

**piece**(7) 28:8 40:1 43:20 44:22 145:23 146:8 147:7

**pieces**(4) 65:9 95:5 118:21 139:10

**pivot**(1) 113:15

**place**(12) 28:15 34:15 38:13 60:3 75:8 83:20 90:12 103:14 117:16 123:11 143:9 144:18

**places**(1) 38:9

**plainly**(4) 38:18 38:19 49:5 50:17

**plan**(82) 26:19 39:24 42:24 43:16 44:7 44:9 44:10 44:10 44:11 44:19 46:19 46:23 46:25 50:18 67:7 67:8 89:9 89:24 91:4 91:4 91:5 91:15 93:13 93:16 93:22 93:25 94:4 94:12 94:14 94:16 94:22 95:6 96:10 97:21 98:18 100:3 100:11 100:20 107:3 107:12 112:2 113:12 120:3 120:5 120:6 120:12 121:5 128:25 129:2 129:8 129:10 129:13 129:13 130:2 130:4 130:5 131:8 131:9 131:14 136:5 145:25 146:4 146:5 146:6 147:4 147:7 147:8 149:7 149:9 149:17 149:24 149:25 150:3 150:7 150:12 151:23 151:24 152:6

**planning**(4) 49:12 49:14 49:15 49:16

**plans**(4) 44:17 129:20 131:6 131:10

**plan's**(1) 91:6

**play**(7) 33:15 91:12 98:3 124:7 124:10 124:10 131:12

**playing**(1) 61:19

**plays**(1) 117:4

**please**(14) 4:2 4:4 13:24 73:15 73:16 79:7 79:8 103:12 103:13 103:14 148:9 148:23 148:24 149:1

**pleased**(1) 87:8

**pleases**(1) 7:9

**pleasure**(1) 4:8

**plenty**(1) 150:24

**pocket**(1) 28:25

**pockets**(2) 147:3 147:3

**podium**(3) 13:14 64:10 87:25

**pods**(1) 115:21

**point**(52) 5:12 6:4 6:10 11:17 14:11 15:7 17:7 18:17 27:22 28:25 31:4 48:1 49:10 52:11 52:12 53:1 59:21 61:23 65:1 67:19 68:3 69:2 69:2 69:5 71:13 71:14 77:17 80:17 81:23 82:9 83:5 85:3 85:8 91:1 92:14 97:15 99:3 99:5 99:6 101:17 102:17 113:15 113:19 116:1 119:7 119:12 121:15 132:7 140:20 142:20 149:9

**pointed**(1) 30:1

**points**(3) 64:16 86:18 149:3

**policy**(1) 16:17

**pool**(2) 100:9 147:12

**popeo**(1) 3:2

**popeye**(1) 145:8

**popular**(3) 137:7 137:8 137:16

**portion**(6) 65:8 72:16 128:7 146:21 147:12 151:11

**portions**(1) 65:9

**position**(13) 12:19 16:6 59:25 60:14 70:6 71:22 75:14 77:20 104:3 113:2 113:5 115:18 150:1

**positions**(4) 92:1 104:15 105:5 105:16

**possibility**(1) 46:6

**possible**(3) 12:1 104:1 110:12

**possibly**(1) 11:12

**posted**(1) 136:19

**posture**(1) 11:15

**pot**(3) 15:11 63:16 65:5

**potential**(8) 11:25 12:13 42:24 62:15 75:16 106:21 110:8 141:24

**potentially**(4) 61:3 63:12 63:21 114:15

**ppearances**(2) 1:20 2:1

**practical**(3) 15:7 20:25 58:25

**practicality**(1) 11:6

**practically**(4) 15:8 18:20 20:12 20:19

**practices**(1) 59:13

**practitioner**(1) 62:9

**pre-bankruptcy**(2) 116:22 126:7

**pre-hearing**(1) 56:25

**predicting**(1) 36:6

**prefer**(3) 12:16 13:10 92:21

**prejudice**(2) 82:2 82:6

**prejudicial**(1) 83:24

**preliminary**(2) 4:23 59:21

**premature**(1) 71:3

**prepare**(1) 39:24

**prepared**(9) 29:16 39:15 75:15 75:15 76:11 77:15 102:13 142:6 152:18

**preparing**(1) 92:6

**prepetition**(1) 31:17

**present**(8) 42:23 74:16 82:24 141:8 141:9 147:6 148:5 151:14

**presentation**(2) 90:7 140:15

**presented**(10) 31:23 44:3 44:7 53:7 53:19 74:10 76:3 76:4 83:9 83:16

**presently**(1) 85:2

**president**(4) 35:15 104:4 105:14 118:24

**press**(2) 137:7 137:16

**pretty**(1) 99:8

**prevail**(1) 56:13

**prevailing**(1) 22:15

**prevails**(1) 24:17

**previous**(1) 116:10

**previously**(2) 31:17 35:20

**price**(6) 16:15 16:16 16:20 47:14 47:25 121:7

**prices**(1) 98:19

**prima**(5) 30:5 31:23 53:19 73:25 75:24

**primarily**(6) 104:18 106:3 106:16 110:14 113:19 119:9

**primary**(4) 13:15 119:4 130:2 131:1

**principals**(1) 106:8

**prior**(5) 86:8 116:3 126:13 133:13 151:10

**priority**(1) 38:5

**private**(1) 78:23

**pro**(4) 98:25 99:7 121:1 121:11

**probably**(9) 13:16 56:9 65:3 91:23 99:4 118:10 126:10 140:14 140:19

**problem**(6) 22:18 28:13 28:14 46:25 97:6 146:4

**problems**(2) 25:18 45:9

**procedural**(1) 80:11

**procedure**(3) 95:15 95:20 151:15

**proceed**(13) 4:22 14:20 64:2 73:11 75:25 76:1 77:2 78:8 78:12 81:14 81:24 140:18 140:19

**proceeding**(6) 29:13 61:1 61:7 68:6 72:12 84:19

**proceedings**(16) 1:16 1:44 16:18 29:11 31:25 57:23 70:16 81:18 81:21 85:23 87:16 93:24 97:17 113:1 115:14 153:23

**proceeds**(8) 95:13 95:25 96:7 96:9 96:25 99:7 128:13 151:5

**process**(41) 21:22 21:24 22:4 22:6 22:7 63:22 73:3 80:11 81:22 84:17 84:18 85:6 86:10 95:21 106:7 106:9 106:17 107:25 108:5 108:22 112:24 112:25 113:8 113:16 114:9 115:11 121:25 122:2 122:3 122:7 122:10 122:16 122:19 125:4 130:14 136:19 137:18 138:3 138:15 145:4 151:16

**processes**(1) 123:9

**produce**(8) 37:6 39:16 48:6 48:6 53:24 81:20 146:10 147:8

**produced**(4) 14:5 39:4 39:18 86:3

**producer**(1) 118:14

**producers**(2) 118:8 123:7

**producing**(3) 131:25 148:1 148:6

**product**(7) 105:9 105:11 106:5 113:18 115:8 115:19 124:2

| Word | Page:Line | Word | Page:Line | Word | Page:Line | Word | Page:Line |
|---|---|---|---|---|---|---|---|
| production(2) 146:9 147:16 | | qualifications(2) 23:14 23:15 | | reason(8) 21:19 41:2 41:20 71:1 76:24 81:13 131:18 151:7 | | reflected(1) 136:2 | |
| productive(1) 107:24 | | qualified(1) 135:11 | | | | reflecting(1) 93:22 | |
| productivity(1) 113:8 | | qualifying(1) 37:9 | | | | refresh(1) 128:8 | |
| products(2) 106:6 119:2 | | quarterback(1) 113:24 | | reasonable(6) 30:18 34:18 60:4 60:6 150:4 150:12 | | refund(1) 46:22 | |
| professional(5) 31:21 41:22 51:15 52:3 61:15 | | query(1) 102:6 | | | | refused(1) 48:23 | |
| | | question(22) 10:3 14:15 15:13 21:7 22:17 28:14 30:4 39:13 59:2 67:21 75:9 78:4 87:12 99:10 101:21 110:23 112:16 116:23 127:19 127:21 142:16 143:16 | | reasons(8) 16:17 23:10 49:16 80:16 88:5 107:20 125:3 130:2 | | regard(21) 5:1 10:17 14:14 15:15 17:18 19:5 19:16 19:23 20:23 22:19 24:9 36:13 43:11 45:10 64:17 66:14 67:20 69:19 87:5 88:21 148:2 | |
| professionals(4) 24:7 33:6 43:14 114:23 | | | | | | | |
| professions(2) 19:14 114:25 | | | | recall(1) 7:1 44:9 130:3 137:22 | | | |
| proffer(6) 5:13 12:19 30:23 102:13 141:18 141:21 | | | | recalls(1) 40:12 | | | |
| | | questions(4) 27:19 53:5 134:14 139:2 | | receivables(1) 43:7 | | regarding(3) 43:6 129:15 137:20 | |
| | | quick(3) 64:16 139:1 149:3 | | receive(12) 12:11 28:4 91:5 101:23 102:9 112:1 114:14 114:15 118:16 120:8 138:9 153:15 | | regardless(2) 78:7 146:20 | |
| profitability(3) 67:9 129:18 129:21 | | quickly(3) 4:15 7:10 48:20 | | | | regards(1) 106:16 | |
| program(1) 152:14 | | quit(2) 119:7 120:13 | | | | reiterate(2) 48:1 57:2 | |
| programmer(1) 104:24 | | quite(13) 11:23 17:7 17:12 17:22 20:1 20:4 20:10 21:25 24:11 24:15 27:12 65:20 91:23 | | received(9) 45:1 52:4 52:6 73:21 74:6 76:21 89:12 109:7 110:7 | | relate(1) 18:19 | |
| progressed(1) 93:24 | | | | | | related(4) 7:6 8:23 18:2 146:25 | |
| project(2) 105:2 124:18 | | | | | | relating(2) 13:20 65:12 | |
| projections(1) 67:6 | | quote(18) 40:25 41:7 42:5 42:7 42:22 43:6 44:5 44:24 44:25 44:25 45:3 45:2 45:5 45:17 45:19 55:21 55:23 137:21 146:20 | | receiving(5) 109:13 110:22 115:5 118:21 132:5 | | relationship(1) 56:17 | |
| promise(1) 145:8 | | | | | | relationships(3) 116:14 119:5 119:9 | |
| promoted(3) 104:19 105:7 105:11 | | | | | | relevance(1) 12:3 | |
| prompt(1) 51:25 | | | | recent(2) 94:16 133:3 | | relevant(5) 16:22 30:7 45:18 49:21 50:16 | |
| properly(1) 52:25 | | radner(1) 67:13 | | recently(1) 124:17 | | relied(1) 146:7 | |
| property(2) 139:25 142:22 | | raise(6) 10:19 11:6 71:19 92:8 97:16 | | recess(5) 73:14 79:4 79:6 148:15 148:22 | | relief(2) 64:3 74:3 | |
| proportional(1) 98:20 | | raised(7) 17:25 44:4 70:22 75:7 83:21 99:6 122:3 | | recession(1) 117:10 | | reluctance(1) 69:9 | |
| proposal(5) 99:22 100:16 109:7 111:25 147:11 | | | | recipient(1) 92:10 | | rely(1) 9:16 | |
| | | | | recipients(1) 152:13 | | remain(3) 75:13 103:12 153:8 | |
| | | raises(2) 74:14 81:22 | | recognition(1) 77:14 | | remaining(6) 5:1 52:19 100:22 102:12 119:18 152:14 | |
| proposals(1) 70:25 | | raising(4) 71:20 86:10 101:19 101:22 | | recognize(3) 65:10 75:13 80:24 | | | |
| proposed(30) 5:2 12:11 13:3 14:24 30:21 44:10 91:15 92:10 93:12 93:15 93:16 93:22 93:25 94:4 94:12 94:14 94:14 94:16 95:6 96:5 96:8 112:1 146:5 150:16 150:17 151:23 151:23 152:6 152:22 152:23 | | rally(1) 14:6 | | recognized(3) 45:6 46:6 66:4 | | remains(3) 70:8 115:7 141:18 | |
| | | ramos(21) 2:14 4:7 6:13 6:18 6:19 6:20 6:21 6:25 7:5 7:13 7:18 7:22 8:2 8:9 8:12 8:14 8:19 9:3 9:5 10:8 10:9 | | recognizes(1) 45:21 | | remarkable(2) 20:4 20:11 | |
| | | | | recognizing(1) 153:4 | | remarks(4) 29:16 51:9 97:10 97:11 | |
| | | | | recollection(2) 128:9 133:2 | | remedies(1) 87:6 | |
| proposing(1) 35:1 | | ran(1) 6:22 | | record(51) 4:24 4:25 5:7 5:11 6:8 17:22 18:14 18:16 19:20 19:22 20:11 20:18 21:6 21:25 22:5 22:11 22:11 24:23 25:4 25:24 26:23 27:1 32:4 58:12 58:14 59:9 59:21 61:4 62:4 66:20 66:21 67:4 67:21 68:12 74:16 74:22 75:14 86:19 88:5 90:11 95:3 99:16 101:12 102:3 103:1 103:15 121:13 127:14 141:6 141:22 150:6 | | remedy(2) 54:5 54:7 | |
| propound(1) 16:9 | | range(2) 118:4 118:9 | | | | remember(3) 36:19 39:25 50:20 | |
| protection(2) 30:7 77:1 | | rare(1) 116:12 | | | | remind(1) 30:22 | |
| prove(1) 91:15 | | rata(4) 99:1 99:7 121:1 121:11 | | | | reminded(1) 42:5 | |
| provide(6) 35:5 48:24 106:3 126:4 128:13 153:7 | | ratcheting(1) 60:10 | | | | removed(1) 140:6 | |
| | | rather(6) 15:8 16:9 23:15 48:17 73:25 145:24 | | | | rendered(1) 51:17 | |
| | | | | | | rendering(1) 34:21 | |
| provided(2) 32:2 98:6 | | ratios(3) 37:3 39:8 53:18 | | recorded(1) 1:44 | | reorganization(3) 100:4 100:11 129:1 | |
| provides(1) 121:6 | | ray(1) 69:24 | | recording(2) 1:44 153:22 | | repaid(1) 12:8 | |
| providing(4) 57:18 85:12 113:16 113:18 | | re-brief(1) 70:18 | | records(1) 64:25 | | repay(6) 39:3 39:25 40:24 41:6 43:19 | |
| provision(4) 63:6 70:3 97:23 121:6 | | re-characterization(12) 12:1 12:13 16:5 28:23 30:6 30:9 32:11 32:15 39:10 52:22 68:9 75:22 | | recovered(1) 59:2 | | repaying(1) 36:17 | |
| provisions(1) 38:5 | | | | recruited(2) 115:11 115:12 | | repayment(1) 44:14 | |
| prudent(2) 40:23 62:2 | | | | redacted(3) 8:16 90:22 92:16 | | repeat(1) 70:6 | |
| public(5) 36:15 48:17 58:12 76:16 92:13 | | re-characterize(1) 52:24 | | redemption(1) 51:20 | | repeated(1) 34:23 | |
| publicly(3) 26:1 58:10 58:15 | | re-characterized(3) 15:3 33:3 56:22 | | redirect(2) 134:15 134:19 | | repeatedly(5) 37:21 40:16 42:4 50:21 | |
| publishers(3) 117:19 137:13 138:6 | | re-ran(1) 5:20 | | redistributed(1) 121:1 | | replace(3) 21:2 119:8 119:15 | |
| pulled(1) 68:17 | | re-write(1) 16:11 | | redstone(55) 3:1 17:10 18:4 20:7 22:1 22:9 22:12 24:10 30:11 32:1 34:3 34:23 35:4 35:15 35:16 36:7 37:25 38:2 38:5 39:1 39:4 39:15 40:5 40:7 40:7 40:8 40:10 40:11 40:13 40:14 40:19 40:25 41:6 42:2 42:8 42:14 43:4 43:13 45:6 45:8 45:24 46:24 47:2 47:17 47:19 48:23 50:13 51:5 54:13 54:21 55:6 55:25 57:24 72:20 83:1 | | replaceable(1) 143:11 | |
| | | reached(4) 84:22 89:17 90:3 93:18 | | | | replacement(2) 31:11 57:19 | |
| purchase(7) 76:9 96:17 108:22 128:10 139:23 147:16 148:1 | | reaching(1) 22:8 | | | | report(5) 85:24 126:1 126:2 | |
| | | read(10) 8:10 13:9 13:10 31:14 64:15 65:11 69:25 128:8 136:17 142:4 | | | | reported(3) 35:16 42:13 137:16 | |
| | | | | | | reporting(1) 105:12 | |
| purchaser(2) 96:17 96:25 | | | | | | reports(1) 133:4 | |
| purchasing(1) 144:21 | | | | | | represent(6) 52:25 80:5 84:12 85:1 112:6 130:24 | |
| purported(4) 31:12 39:5 50:25 57:20 | | reading(4) 7:4 64:17 73:22 124:23 | | | | | |
| purportedly(1) 54:1 | | reads(1) 97:23 | | redstones(15) 32:14 32:15 32:25 38:10 38:11 38:18 38:22 42:20 43:20 46:14 50:17 51:19 69:14 69:14 72:12 | | | |
| purpose(2) 90:2 120:12 | | ready(1) 127:12 | | | | representation(1) 133:3 | |
| purposely(1) 34:16 | | real(8) 22:17 37:18 38:23 50:11 143:16 143:20 145:7 151:18 | | | | representative(2) 69:12 113:21 | |
| purposes(5) 49:14 58:9 64:20 66:7 91:13 | | | | | | represented(3) 48:8 129:22 130:7 | |
| pursuant(1) 86:21 | | | | redstone's(11) 35:5 38:6 38:17 39:15 40:18 46:17 46:19 47:9 48:8 50:25 53:13 | | representing(1) 72:11 | |
| pursue(7) 52:21 53:21 56:11 56:22 57:22 60:16 87:6 | | realistic(1) 42:23 | | | | represents(7) 79:14 84:8 84:9 109:15 111:23 134:9 135:15 | |
| | | reality(1) 38:2 | | | | | |
| | | realize(4) 18:15 42:19 50:18 140:25 | | reduce(1) 110:23 | | | |
| pursued(2) 28:9 30:12 | | realized(1) 50:22 | | reduced(1) 145:21 | | request(6) 57:21 60:15 70:20 107:17 108:1 115:4 | |
| pursuing(1) 49:3 | | really(56) 12:3 12:12 12:25 14:21 15:3 15:6 15:10 15:11 16:4 16:9 16:10 16:21 17:1 17:13 19:10 20:4 21:4 23:25 25:8 26:3 26:16 27:5 28:7 28:8 28:9 28:10 28:11 29:1 43:25 44:15 48:20 61:17 67:20 67:24 68:11 69:15 70:5 80:9 82:13 82:13 83:15 83:16 86:18 90:15 90:23 91:25 93:18 94:23 101:21 113:21 122:25 137:13 142:16 142:23 145:21 145:22 | | reductions(1) 35:1 | | | |
| push(2) 119:2 145:10 | | | | refer(7) 33:24 39:13 41:25 69:19 89:25 111:4 137:6 | | | |
| pushed(2) 106:15 143:15 | | | | | | requested(8) 32:5 44:23 45:1 48:24 48:25 95:14 96:2 151:12 | |
| put(26) 11:12 18:2 19:23 28:18 28:19 34:15 38:13 43:17 44:20 47:16 50:10 58:13 60:3 69:8 70:18 73:8 74:2 101:5 101:16 101:17 104:25 105:4 115:5 139:22 147:2 149:6 | | | | reference(1) 90:3 | | | |
| | | | | referred(2) 123:3 133:9 | | requesting(1) 30:13 | |
| | | | | referring(3) 78:14 106:20 130:4 | | requests(3) 31:16 31:24 113:16 | |
| puts(2) 59:24 144:1 | | | | refers(1) 108:10 | | require(8) 9:2 44:14 142:17 145:5 145:6 146:8 146:13 146:14 | |
| putting(6) 20:24 85:4 116:21 126:13 127:1 149:17 | | | | refinance(3) 22:22 22:23 24:14 | | | |
| | | | | refinancings(1) 24:6 | | required(10) 17:9 39:23 72:19 81:10 86:2 90:18 90:24 121:24 136:6 144:6 | |
| qualification(2) 22:22 35:6 | | | | reflect(2) 45:13 45:15 | | | |

| Word | Page:Line | Word | Page:Line | Word | Page:Line | Word | Page:Line |
|---|---|---|---|---|---|---|---|

**requires**(1) 146:10

**rescued**(1) 45:8

**reservation**(1) 13:12

**reservations**(1) 149:16

**reserve**(2) 11:14 120:15

**residuals**(1) 132:5

**resistance**(1) 69:8

**resisting**(1) 69:17

**resolution**(4) 15:20 51:25 63:12 63:16
91:9

**resolve**(2) 89:17 93:11

**resolved**(7) 27:15 31:22 72:17 85:9 90:6
101:6 101:9

**resolves**(1) 60:7

**resolving**(1) 90:4

**resources**(1) 62:2

**respect**(43) 6:15 8:9 11:9 11:13 12:2 32:9
32:14 58:6 58:14 58:20 60:15 61:1 62:7
62:22 63:23 70:21 72:22 75:15 80:10
80:21 90:11 90:23 103:1 104:8 104:14
105:16 106:20 109:10 109:12 109:18
109:22 110:6 113:9 118:3 118:15 119:21
121:4 124:13 124:19 125:13 125:25 131:2
142:10

**respectfully**(7) 23:2 57:7 57:21 70:17 71:3
85:4 149:8

**respects**(1) 123:6

**respond**(7) 43:17 70:13 81:15 82:1 82:4
102:6 148:13

**responded**(2) 41:7 48:5

**responding**(1) 113:16

**response**(3) 39:15 138:22 149:5

**responses**(1) 39:18

**responsibilities**(3) 23:21 106:2 106:3

**responsible**(2) 104:21 119:1

**rest**(3) 54:6 142:6 152:4

**restricting**(1) 18:23

**restrictions**(2) 53:12 57:7

**restrictive**(1) 44:24

**restructuring**(5) 33:9 41:19 44:21 48:12
51:6

**result**(11) 28:24 55:5 55:24 56:4 57:6
63:11 100:17 146:9 146:25 147:9 147:25

**resulted**(1) 55:6

**resulting**(2) 47:11 54:4

**results**(2) 53:25 148:2

**retail**(1) 54:18

**retailers**(1) 119:4

**retain**(1) 131:7

**retention**(14) 27:23 131:6 131:10 131:12
131:15 145:25 146:1 146:4 146:5 146:6
147:7 149:7 149:24 149:25

**retentive**(2) 131:8 131:19

**return**(3) 16:19 52:5 56:15

**returns**(1) 87:25

**reveal**(1) 92:3

**revenue**(3) 33:19 64:22 68:24

**revenues**(2) 33:22 33:23

**review**(4) 96:5 133:24 141:19 141:23

**reviewed**(7) 19:13 57:9 58:8 58:16 86:25
99:18 100:12

**reviewing**(1) 142:5

**revised**(4) 94:19 99:18 99:21 100:16

**revision**(1) 152:20

**revisit**(1) 52:1

**revolutionary**(2) 16:10 16:22

**revolve**(2) 81:1 81:8

**rewarded**(1) 132:17

**rhetoric**(1) 31:2

**richards**(3) 2:13 6:19 69:21

**right**(59) 6:5 6:14 6:14 9:13 9:22 10:2
10:10 10:13 11:18 13:16 18:12 18:16
23:23 24:1 26:2 29:2 44:1 57:6 59:19
65:19 66:6 67:7 68:20 76:16 79:1 84:1
84:10 84:15 84:19 84:23 88:11 88:16 90:
91:2 91:17 92:5 92:22 99:11 99:20 99:25
100:24 103:1 103:13 107:13 107:17 108:2
118:25 120:15 127:8 134:15 138:25
139:17 139:20 142:3 144:16 148:20 148:2
152:7 153:15

**right?"**(1) 43:8

**rights**(5) 13:12 19:24 19:25 31:7 47:16

**rights."**(1) 20:8

**rise**(5) 4:2 73:15 79:7 105:17 148:23

**risk**(5) 60:1 60:2 62:12 70:8 144:1

**risks**(2) 42:25 64:4

**road**(4) 59:24 61:16 72:17 72:18

**rock**(2) 71:17 118:11

**rodney**(1) 2:16

**role**(2) 42:1 61:19

**roll**(1) 25:9

**rolling**(1) 5:17

**rolodex**(1) 66:21

**rome**(4) 1:22 5:8 51:16 69:22

**roughly**(7) 105:4 112:14 112:22 118:20
118:22 132:25 134:9

**round**(1) 81:1

**routinely**(2) 57:12 126:22

**royalty**(3) 132:2 132:3 132:12

**rule**(4) 24:17 24:18 70:20 87:3

**rules**(1) 147:19

**ruling**(2) 85:24 86:8

**rulings**(1) 87:3

**run**(6) 7:10 7:18 39:3 45:4 64:9 70:19

**running**(2) 62:15 121:23

**runs**(1) 135:9

**rush**(2) 60:22 73:3

**ryan**(2) 126:11 126:24

**sacrifices**(1) 126:25

**safer**(1) 99:12

**said**(30) 7:23 15:22 19:7 19:7 19:9 21:10
22:6 22:25 25:8 25:11 26:2 40:22 40:25
47:21 50:3 51:12 51:15 59:23 67:8 74:7
76:19 79:23 81:20 85:15 114:8 115:1
122:22 130:15 137:12 146:3

**salary**(3) 118:4 118:22 119:23

**sale**(35) 6:1 12:10 14:21 33:9 47:9 50:25
63:13 63:13 63:15 63:21 65:15 83:15
95:25 96:9 96:25 98:19 100:12 108:18
109:13 121:6 122:18 127:20 128:13 129:2
129:6 136:7 137:1 138:14 138:15 139:3
139:13 144:3 146:14 147:3 151:5

**sales**(8) 106:6 118:25 118:25 119:1 119:2
131:18 132:1 132:15

**sale's**(1) 144:18

**same**(14) 9:19 47:4 51:19 55:5 59:25
76:24 88:22 105:7 109:20 116:18 119:11
124:13 132:25 144:15

**sat**(1) 67:7

**satisfied**(2) 96:23 128:17

**satisfied"**(1) 97:2

**satisfy**(1) 115:4

**save**(3) 54:23 63:12 100:22

**say**(49) 11:2 11:11 15:14 16:8 20:5 24:16
28:9 29:22 59:19 61:20 62:10 63:10 64:11
64:21 67:3 67:10 69:15 73:9 76:1 76:11
76:18 77:14 78:20 82:14 85:5 93:1 105:17
106:1 116:19 117:10 118:10 122:4 122:25
124:4 124:5 124:6 124:9 124:10 124:11
124:12 126:4 126:5 126:6 126:20 135:18
136:24 137:14 139:21 153:1

**saying**(12) 19:3 19:17 19:18 26:4 41:10
56:9 59:6 72:3 78:5 78:6 124:6 137:9

**says**(6) 26:10 53:2 64:25 65:11 65:18

**scalpel**(1) 60:7

**scalpels**(1) 59:16

**scenario**(3) 29:14 61:9 61:11

**schedule**(6) 91:6 92:10 98:21 99:1 111:24
127:2

**schedules**(3) 90:19 90:24 91:11

**scheduling**(1) 126:24

**school**(1) 123:14

**schools**(3) 23:7 24:5 24:20

**schuylkill**(1) 1:40

**science**(2) 104:11 104:12

**scope**(1) 108:2

**scrap**(1) 39:4

**seal**(8) 8:25 89:7 89:13 89:16 90:9 90:12
92:10 92:11

**sealed**(1) 89:19

**sealing**(1) 89:20

**season**(2) 20:17 28:17

**seated**(5) 4:4 73:16 79:9 103:19 148:25

**seattle**(4) 123:12 124:16 139:7 139:8

**sec**(1) 133:4

**second**(23) 18:11 18:21 20:6 26:2 81:13
92:1 98:6 99:6 107:23 108:8 108:9 109:10
113:1 121:4 122:9 124:21 127:6 128:22
130:13 138:10 139:7 139:11 144:24

**secondarily**(1) 114:11

**secret**(1) 30:8

**section**(6) 53:22 64:22 68:24 86:4 97:20
146:7

**secured**(11) 31:1 38:20 54:1 57:4 68:4
68:5 72:16 100:4 100:11 132:22 146:12

**securities**(1) 129:24

**seeing**(1) 48:11

**seek**(4) 30:16 37:23 53:25 70:7

**seeking**(3) 47:24 70:3 85:10

**seeks**(1) 52:21

**seem**(3) 63:25 117:16 146:17

**seemed**(1) 36:8

**seems**(5) 83:24 108:16 147:23 147:24
149:11

**seep**(1) 115:1

**select**(1) 144:9

**sell**(4) 46:19 50:17 52:12 139:19

**selling**(3) 28:17 76:9 107:22

**semiautonomous**(1) 123:5

**send**(1) 35:25

**senior**(19) 35:17 69:22 91:9 91:19 106:4
106:16 112:7 112:9 112:10 115:18 115:20
116:12 118:7 118:8 119:19 124:19 125:10
125:13 125:25

**sense**(6) 13:22 46:23 72:8 123:19 132:13
135:11

**sensitive**(2) 59:14 117:6

**sensitivity**(1) 72:22

**sentence**(5) 65:11 96:15 96:16 97:3 99:5

**separate**(4) 46:22 82:15 88:25 114:20

**separated**(1) 91:6

**september**(3) 133:15 133:25 134:6

**series**(1) 76:5

**serious**(11) 20:21 31:21 60:25 67:21 75:9
76:6 76:19 77:7 80:10 86:1 86:11

**seriously**(1) 23:21

**served**(3) 39:17 48:4 82:13

**service**(2) 1:39 1:45

**services**(1) 1:39

**set**(3) 98:21 119:18 119:20

**sets**(1) 116:14

**settlement**(2) 70:23 70:25

**settling**(1) 87:12

**seven**(1) 33:17

**several**(8) 8:20 38:11 46:9 46:12 122:8
129:20 131:11 138:15

**severe**(1) 137:17

**share**(2) 102:11 117:13

**shared**(1) 7:14

**shareholder**(6) 17:16 21:3 40:14 47:2
54:12 75:1

**shareholders**(4) 47:3 47:15 51:2 54:14

**shari**(7) 3:1 24:10 35:4 40:19 40:22 45:24
83:1

**shearman**(11) 3:10 39:16 46:18 48:5
48:16 48:22 50:15 61:6 66:20 66:23 72:11

**sheep**(1) 144:12

**sheet**(3) 66:5 134:2 134:5

**shepherds**(1) 144:11

**shift**(1) 42:25

**ship**(1) 116:1

**shock**(1) 143:3

**shopping**(1) 137:12

**short**(7) 23:22 35:20 35:21 53:8 73:7
96:14 120:13

**short-term**(1) 26:21

**shot**(3) 28:16 87:19 87:21

**should**(57) 7:22 9:23 14:13 15:13 16:1
16:25 17:1 26:3 26:22 27:8 28:8 29:24
30:8 30:11 31:5 31:18 31:19 33:3 33:5
35:12 41:10 52:14 52:15 53:2 56:11 57:6
57:17 60:21 63:14 64:2 64:3 76:1 76:23
77:14 78:10 81:7 81:14 86:1 88:24 89:19
91:15 91:23 92:13 94:6 95:16 98:7 98:10
98:11 98:24 99:5 99:9 100:24 114:2 117:1
147:18 151:24 152:25

**shouldn't**(1) 98:9

**show**(5) 10:25 23:23 56:14 67:12 148:3

**showed**(1) 57:2

**showing**(1) 39:24

**shows**(8) 19:21 22:5 22:11 26:18 26:23
37:18 50:10 94:24

**shuffle**(1) 137:1

**sibley**(1) 45:16

**sic**(1) 34:6

**side**(17) 10:5 36:7 37:6 37:25 38:2 39:1
42:10 42:15 46:13 50:13 51:5 52:7 53:15
54:25 56:9 61:7 113:19

**sides**(4) 27:17 61:22 63:8 72:8

**sidestep**(1) 125:11

**sign**(6) 69:15 109:4 134:12 138:14 144:2
152:19

**signed**(3) 51:16 55:10 140:2

**significance**(1) 37:11

**significant**(14) 13:22 18:17 36:3 59:20 86:1
90:22 104:15 151:1 151:2 151:6 151:20
152:3 152:8 153:4

**signing**(8) 50:7 118:1 118:3 118:8 119:24
122:4 150:18 150:20

**signup**(1) 108:21

**silent**(1) 85:20

**similar**(5) 39:17 132:4 132:9 132:11

**similarly**(1) 146:24

**simple**(2) 88:2 141:6

**simply**(16) 36:20 37:12 40:4 42:1 54:21
81:19 82:8 85:22 96:14 98:19 141:22
147:6 148:1 148:5 148:6 150:18

| Word | Page:Line |
|---|---|

since(18) 7:1 29:11 46:18 68:15 68:19 76:1 94:25 104:5 105:25 106:10 108:16 111:15 116:16 123:14 126:17 130:24 131:11 134:22
sincerely(1) 29:10
single(2) 51:3 138:2
singularly(1) 128:11
sir(11) 29:3 79:21 84:3 95:2 107:11 127:18 130:3 132:25 134:3 134:16 140:12

sit(2) 74:24 143:17
sitting(1) 24:1
situation(8) 24:13 28:12 35:24 73:19 74:11 96:17 115:9 143:21

situations(1) 116:10
six(1) 131:16
size(1) 146:23
skeptical(1) 53:3
skill(1) 116:14
slight(1) 82:6
slow(1) 36:5
small(1) 98:15
smaller(1) 144:15
snippet(1) 104:9
so-called(3) 39:8 41:25 145:17
sobering(1) 44:3
sofas(1) 91:11
software(3) 104:18 104:22 105:16
sold(2) 38:15 140:1
sole(2) 97:25 98:10
solely(2) 46:24 146:19

solvency(10) 34:17 34:19 35:13 37:2 39:6 53:16 67:2 67:3 83:22

some(62) 7:24 8:16 9:14 11:17 13:13 17:10 20:17 22:6 24:24 28:5 31:4 34:11 41:3 41:19 44:1 46:23 56:17 58:12 59:14 61:14 65:12 65:19 67:5 67:16 69:9 85:5 89:20 93:14 93:15 93:24 95:3 95:23 96:4 98:12 101:13 102:15 105:6 110:4 114:21 115:15 116:6 122:17 122:21 123:6 123:11 123:17 124:14 125:3 131:20 135:21 135:2 136:15 136:21 137:6 137:8 141:9 142:17 144:17 149:19 150:22 150:23 152:20

somebody(3) 62:6 119:18 151:16
somehow(6) 17:9 25:17 26:17 48:19 48:22 96:20

someone(16) 16:16 21:18 22:4 40:23 59:13 62:7 62:7 63:9 109:4 117:24 117:25 119:11 124:3 124:6 132:4 144:2

something(14) 14:18 19:1 20:2 28:7 57:12 63:4 65:21 71:2 75:12 84:24 88:22 123:22 137:4 143:6

somewhat(6) 61:19 61:24 69:7 91:20 101:1 115:14

somewhere(1) 122:20
son(1) 126:25
sontchi(1) 150:2
soon(2) 38:15 85:13
sophistication(1) 23:19
sorely(1) 74:9
sorry(10) 37:17 79:20 79:22 112:15 139:1 139:15 141:1 141:2 141:2 153:5

sort(23) 4:24 7:7 59:2 71:10 73:8 98:20 101:24 106:11 107:19 108:21 113:22 113:25 114:2 116:1 116:9 118:11 119:15 122:15 123:15 124:1 124:6 125:11 131:14

sorts(2) 108:25 118:2
sought(2) 143:3 145:17
sound(5) 1:44 16:17 40:20 150:4 153:22
sounds(1) 68:6
sour(1) 134:23

source(1) 17:14
sources(2) 37:19 37:24
south(3) 2:8 2:42 146:16
speak(2) 85:13 151:25
speaking(1) 69:11
speaks(1) 76:14
special(10) 23:11 23:13 23:14 41:13 41:14 41:16 41:22 41:25 42:5 42:13

specific(3) 76:19 109:11 111:6
specifically(3) 49:1 110:15 144:9
speck(1) 36:23
specter(1) 63:20
speculating(1) 63:18
spell(1) 103:15
spend(2) 15:5 63:25
spending(4) 28:24 62:13 126:10 126:17
spends(1) 57:7
spent(3) 15:4 56:10 73:4
sponte(1) 80:12
sports(1) 105:6
spot(1) 12:13
spreadsheet(1) 111:24
square(1) 2:16
stack(1) 109:12
staff(1) 126:9
stage(3) 95:16 95:20 151:15
stake(4) 17:15 45:18 46:20 61:13
stalking(14) 95:15 95:19 100:2 108:22 109:8 122:4 128:12 138:14 145:2 146:11 150:21 151:3 151:4 151:15

stand(13) 19:12 20:5 24:2 29:22 37:16 49:12 52:3 79:4 80:20 85:15 102:18 103:23 121:18

stand,"(1) 62:12
standard(2) 149:22 150:2
standards(1) 150:9
standing(19) 31:3 31:5 31:25 56:8 60:16 75:17 77:11 77:13 77:14 79:18 80:9 80:1 82:3 82:9 83:24 84:20 86:9 103:12 116:2

standpoint(2) 55:15 110:13
stands(2) 13:4 75:10
stang(1) 2:21
star(1) 118:12
start(5) 30:12 62:13 84:7 110:20 115:18
started(4) 43:10 46:4 60:13 104:16
starting(3) 33:14 123:2 151:11
state(5) 33:14 76:14 103:14 134:6 139:17
stated(7) 40:16 44:17 50:21 74:3 74:6 80:5 88:5

statement(1) 59:7
statements(2) 90:18 90:24
states(9) 1:1 1:18 68:18 85:19 90:6 93:9 101:7 145:15 149:19

status(1) 42:18
statute(1) 57:10
statutory(2) 30:20 56:11
stay(13) 44:18 78:16 78:17 86:25 87:6 88:22 106:6 108:7 115:15 115:16 130:24 131:19 137:18

stayed(2) 42:12 116:18
staying(2) 109:20 146:22
stays(1) 143:8
steel(1) 54:20
steele(6) 35:16 40:8 42:8 42:12 45:7 45:25
stem(1) 20:24
step(4) 43:6 105:13 119:11 140:11
steps(1) 59:3
sterling(11) 3:10 39:16 46:19 48:5 48:16 48:23 50:15 61:6 66:20 66:23 72:11

steve(2) 5:8 58:3
steven(1) 1:23

stick(2) 143:11 143:25
still(14) 18:16 18:20 19:8 19:21 51:11 66:16 66:16 74:19 89:18 101:9 101:22 105:24 115:7 146:17

stipulate(1) 6:9
stitch(1) 71:18
stock(4) 47:9 47:14 118:2 131:9
stockholder(2) 64:21 74:12
stockholders(1) 45:18
stole(1) 64:14
stood(7) 14:7 18:12 19:12 36:17 71:14 71:18 72:5

stopped(1) 46:8
story(2) 35:9 151:18
straight(1) 29:23
stranger(1) 41:3
strangle(1) 56:6
strategic(1) 17:5 17:6 17:9 44:11 47:24
stream(1) 132:1
streamline(1) 99:17
street(8) 1:10 1:25 1:33 1:40 2:8 2:17 2:24 2:42

strength(1) 54:20
strengths(1) 63:10
stress(1) 72:5
stressful(1) 106:9
stretch(1) 148:19
stricken(3) 141:13 141:14 141:15
strictly(1) 101:25
strip(1) 16:6
stripped(3) 18:4 18:13 51:7
strong(6) 32:24 52:9 53:10 54:8 60:14 75:24

structured(3) 123:19 126:8 132:8
struggle(1) 25:10
studio(23) 105:8 105:10 106:15 110:18 110:18 113:20 113:21 115:13 115:23 116:2 116:6 118:7 123:12 124:16 124:17 124:18 131:21 136:9 139:7 139:8 139:22 142:25

studios(12) 123:4 123:10 123:11 123:17 124:8 124:13 124:15 124:15 137:21 137:2 139:3 143:2

stuff(1) 137:6
sua(1) 80:12
subject(6) 7:16 15:3 27:23 28:22 69:24
submicron(2) 53:1 67:14
submit(1) 8:19 17:20 18:18 22:14 24:2 27:9 28:15 35:11 36:13 148:4 152:24

submitted(7) 7:2 29:18 49:22 78:1 98:22 98:22 141:7

subordinate(1) 70:7
subordinated(1) 33:4
subordination(14) 1:2 16:5 25:4 27:3 28:24 30:6 30:9 32:11 53:22 53:25 54:3 54:9 67:15 68:9

subpoena(2) 39:14 48:4
subpoenas(1) 39:17
substance(1) 41:15
substantial(4) 57:3 64:4 69:6 110:4
substantive(1) 54:40
succeed(2) 62:11 62:11
success(1) 43:1
successful(1) 33:7
successfully(1) 52:16
such(12) 29:12 20:5 34:19 37:6 48:6 62:8 69:17 72:23 73:21 77:3 92:8 116:10

suddenly(1) 35:14
sue(2) 84:20 85:10

sued(1) 85:7
sues(1) 84:21
suffered(1) 47:19
sufficient(6) 12:4 12:21 92:18 120:20 142:14 152:17

sufficiently(1) 142:16
suggest(9) 10:16 16:21 25:7 25:25 48:10 53:7 98:8 129:9 129:12

suggested(3) 20:18 48:2 152:12
suggesting(2) 22:2 39:22
suggestion(4) 17:4 62:25 70:21 102:12
suggests(1) 17:8 20:11 52:6
suite(1) 1:26
sum(1) 28:4
summarize(1) 114:7
summary(1) 57:1
sumner(6) 34:3 35:4 39:15 40:10 40:13 54:13

super(2) 38:5 38:5
supervise(2) 126:3 126:4
support(6) 18:10 23:15 24:23 24:25 25:4 39:2

supported(1) 68:11
supports(2) 24:18 27:4
supposedly(1) 38:16
sure(34) 14:2 19:10 32:8 34:12 40:11 44:9 45:20 58:5 59:7 61:5 61:8 62:20 62:21 66:9 66:23 68:19 84:16 91:11 91:12 101:8 106:5 106:7 107:24 108:4 108:6 119:5 127:22 130:13 130:19 130:23 139:12 140:6 140:17 150:15

surely(1) 77:10
surety(1) 122:19
surprising(2) 69:8 122:1
surprisingly(1) 42:17
survive(1) 41:4
survived(1) 34:2
sustain(1) 86:8
sustained(1) 125:22
sustains(1) 67:21
swiftly(1) 35:11
sworn(2) 103:12 103:18
system(2) 35:19 36:5
systems(1) 53:1
table(5) 12:24 32:7 71:7 72:10 72:11
tackling(1) 106:12
tad(2) 43:8 47:7
take(32) 4:22 12:24 13:13 16:13 30:22 33:10 35:12 36:10 51:4 52:13 57:1 66:3 73:7 86:3 87:17 87:19 87:20 87:21 88:13 92:14 99:4 101:18 115:19 116:13 120:14 122:7 128:2 128:6 128:6 138:16 142:14 148:14

taken(12) 18:1 21:2 25:13 27:18 32:23 36:5 58:13 106:13 106:16 115:23 115:24 148:22

takes(1) 102:18
taking(9) 25:6 42:24 45:21 50:19 60:14 109:3 125:9 137:10 144:18

talent(1) 117:21
talk(2) 95:13 140:7
talked(5) 8:15 91:22 92:6 121:2 140:6
talking(13) 31:2 31:6 57:5 58:24 64:5 65:23 65:24 72:4 95:7 96:3 116:24 139:3 139:12

talks(1) 96:16
tangible(2) 146:9 146:25
tape(1) 25:9
target(2) 95:14 128:14
targeted(2) 119:17 144:10
targeting(1) 144:16

**Word**    **Page:Line**

tax(18) 19:14 46:21 46:22 47:12 50:19 51:5 51:10 51:15 51:17 51:19 56:1 58:9 64:19 65:2 65:3 65:24 65:25 66:7

taxable(5) 64:24 65:8 65:10 65:11 69:1

team(16) 105:1 106:4 106:16 110:18 113:25 113:25 115:20 119:1 123:22 123:2 124:3 124:5 125:11 131:16 131:25 137:21

team,"(1) 124:12

team."(1) 124:6

teams(3) 18:11 105:6 106:14 107:22 108:6 108:7 110:1 110:14 110:15 110:19 110:25 110:25 113:21 113:21 114:12 115:13 115:22 116:5 123:3 123:18 123:19 123:21 124:9 130:19 130:20 130:24 131:4 136:9 137:6 137:7 137:17 137:24 138:3 138:5 143:12 144:3 146:2

team's(2) 115:24 143:20

technically(1) 132:3

techs(1) 30:2

telephonic(1) 2:37

tell(7) 74:8 93:17 104:15 107:16 110:10 111:22 151:18

telling(3) 23:15 37:13 37:15

ten(2) 78:22 113:4

tend(5) 59:15 61:25 72:7 115:20 116:15

tendency(1) 71:20

tens(1) 33:16

tenuous(1) 27:5

tenure(1) 92:9

term(3) 35:21 39:7 53:17

termed(1) 35:18

terminated(1) 128:17

terms(17) 23:25 38:13 42:1 93:22 99:18 108:20 108:21 109:17 113:16 113:23 114:1 116:20 118:7 133:7 137:2 139:18 147:17

terrible(1) 20:24

test(2) 54:2 146:6

testified(22) 5:17 5:19 5:24 18:12 19:12 20:1 20:14 22:9 37:20 40:5 40:21 43:9 47:7 47:10 47:12 47:20 49:14 50:19 51:10 67:25 130:9 131:3

testify(2) 19:20 135:10

testimony(36) 5:13 13:5 19:7 19:8 19:15 21:21 23:13 24:11 25:13 51:13 65:20 67:4 91:24 92:8 92:12 94:11 94:15 97:12 99:9 102:15 102:21 111:5 123:3 130:1 130:3 130:22 138:8 141:18 142:19 143:2 144:4 145:23 145:25 149:9 150:11 152:8

than(34) 15:7 28:24 33:19 37:19 47:19 48:17 49:24 52:4 52:23 52:25 56:6 57:3 62:5 65:3 69:14 74:4 75:19 82:8 84:8 91:1 91:19 97:10 102:8 110:11 118:11 120:2 124:18 135:21 135:25 136:4 142:25 146:22 147:11 149:12

thank(70) 4:3 6:14 7:5 8:2 9:4 9:5 9:6 10:2 10:21 13:24 29:2 29:5 29:10 57:25 58:1 64:11 64:13 68:12 68:13 71:19 73:4 73:6 73:12 73:13 73:16 73:17 79:3 79:8 79:20 84:3 86:5 87:9 87:17 88:16 88:17 89:2 90:25 92:23 95:1 95:2 99:11 100:25 101:10 102:10 103:3 103:9 103:19 107:8 111:15 127:13 128:22 134:14 134:18 138:19 138:21 138:25 138:25 140:9 140:10 140:12 141:16 142:8 145:12 145:13 148:8 148:21 148:24 152:7 153:10 153:17

thanksgiving(1) 50:14

that'll(1) 148:17

that's(97) 5:15 9:3 10:15 11:19 11:20 12:6 12:25 13:23 13:25 15:3 16:3 18:17 19:6 19:15 19:22 21:6 21:20 22:13 23:3 23:4 25:18 26:15 26:15 27:23 28:5 32:3 35:21 37:9 41:5 41:9 42:7 43:10 44:6 44:25 45:22 46:7 49:2 49:11 49:25 50:9 54:5 55:12 55:23 57:13 58:10 60:11 60:11 62:8 64:25 65:21 66:1 66:9 66:24 67:1 69:5 72:21 83:25 85:14 85:25 88:11 91:2 92:5 92:22 93:17 95:17 95:18 98:21 102:10 102:22 106:22 107:14 108:14 116:23 119:14 120:11 121:16 124:22 125:8 128:25 129:5 130:14 130:25 138:3 138:4 138:12 138:20 140:1 142:3 143:20 148:4 151:5 151:6 151:7 151:19 151:25 153:5

their(84) 9:16 16:9 18:2 19:12 19:14 19:24 20:2 20:3 21:16 22:1 22:1 26:13 26:14 26:20 27:17 30:20 33:1 36:23 45:16 45:16 46:14 48:2 48:14 50:18 50:18 54:22 54:23 55:6 61:7 66:17 66:21 72:7 73:1 77:12 87:22 90:4 108:2 109:23 110:4 113:7 113:7 113:19 113:22 113:23 114:2 114:6 114:16 115:2 115:2 119:9 119:13 119:23 120:11 122:10 122:20 122:23 122:24 122:24 123:1 123:9 123:9 123:10 123:15 124:1 124:2 124:4 125:15 125:15 125:15 125:19 126:3 127:4 130:12 131:17 137:17 139:22 142:24 142:25 142:25 144:10 146:17 147:2 147:3 153:2 153:8

them."(1) 72:4

themselves(12) 36:15 47:18 48:11 56:1 90:21 92:2 108:6 115:14 123:24 137:12 142:24 143:15

theories(1) 16:9

thereafter(2) 100:7 128:19

therefore(2) 82:12 96:25

there's(26) 6:7 11:7 14:15 17:8 19:18 20:17 20:25 22:18 25:24 56:17 56:18 60:16 61:4 81:24 83:20 85:5 107:25 110:23 112:5 123:5 128:22 136:19 136:21 138:6 144:8 150:18

they'll(1) 143:7

they're(31) 7:15 18:20 19:25 20:8 59:17 61:18 62:16 74:16 85:10 113:22 114:25 123:6 123:7 123:20 126:16 132:19 136:25 137:12 138:16 139:25 140:7 144:3 144:21 144:25 145:1

they've(8) 61:7 67:18 93:23 109:19 115:21 136:18 138:5 140:6

thing(13) 18:11 18:12 19:22 20:10 25:6 60:11 61:11 66:2 70:23 71:19 108:5 146:15 151:25

things(13) 15:8 15:21 18:6 20:24 20:24 25:14 66:13 108:25 118:2 121:25 136:19 136:21 136:24

think(161) 4:16 4:24 11:4 12:3 12:25 13:1 13:14 13:22 14:7 14:8 14:11 14:15 15:3 15:22 16:7 17:17 19:1 19:10 19:11 20:10 20:21 21:14 21:15 21:16 21:20 22:3 22:11 22:24 23:21 23:11 23:13 24:11 24:20 24:2 25:7 26:18 26:22 27:4 27:11 27:20 28:5 33:23 46:17 47:20 58:12 58:13 59:17 59:22 60:4 60:18 60:21 60:22 61:2 61:16 61:20 61:25 62:2 62:11 62:19 63:3 63:7 63:8 63:14 64:1 65:13 65:17 66:14 66:16 66:17 66:18 67:21 67:24 67:25 68:2 68:10 68:16 68:18 71:25 72:8 72:9 72:10 72:23 76:4 76:17 77:19 78:13 78:24 79:22 80:19 81:14 82:1 82:5 82:9 85:4 86:13 87:1 87:2 88:1 88:7 88:15 88:24 90:25 91:2 91:3 91:13 92:11 93:2 94:14 97:9 97:10 99:4 99:8 100:25 101:16 101:18 102:11 102:20 105:21 111:4 114:8 114:20 115:15 115:22 116:8 116:8 116:23 116:24 117:7 120:11 121:24 122:3 122:11 122:16 122:25 125:17 125:20 126:23 126:25 127:4 129:2 131:15 132:23 135:9 136:11 136:12 136:16 136:22 136:22 137:16 138:1 140:19 142:19 144:4 145:3 149:20 150:1 150:3 152:3 152:12

thinking(4) 4:19 87:22 102:18 125:19

thinks(1) 150:9

third(5) 14:12 52:25 81:23 108:3 130:18

thirty(1) 113:4

thomas(71) 12:5 12:10 12:23 14:9 14:25 15:18 16:20 20:6 20:20 21:1 27:13 29:18 31:1 31:3 31:7 31:10 32:1 32:9 32:25 38:16 38:20 41:12 43:13 47:10 48:12 48:15 49:3 49:7 49:17 49:22 50:1 50:13 50:19 50:25 51:19 51:23 52:8 52:14 54:11 54:15 55:1 55:5 55:8 55:10 55:21 55:25 56:3 56:13 56:14 57:4 57:5 57:11 57:15 57:18 57:24 59:18 62:12 67:23 69:13 70:25 72:1 72:3 72:15 76:9 76:10 76:11 81:2 81:8 82:16 82:18

thomas's(18) 14:17 16:1 17:4 27:8 31:3 31:18 31:20 38:8 49:20 50:8 52:3 56:6 56:9 67:20 68:4 69:22 76:14 77:8

though(3) 25:25 35:25 73:22

thought(6) 4:20 24:3 35:20 41:7 101:11 135:10

thoughtful(1) 73:3

thoughts(3) 73:8 88:10 144:24

thread(1) 124:1

threat(1) 22:21

three(15) 14:6 47:9 91:6 91:11 92:24 99:23 100:6 107:19 112:4 112:22 122:14 122:16 126:10 132:20 146:15

three-fold(1) 76:21

three-pronged(1) 54:2

three-week(2) 36:20 42:3

three-year(1) 67:7

threshold(4) 59:2 147:10 147:15 147:17

through(20) 6:3 6:3 6:22 7:10 7:18 9:10 12:18 13:6 18:3 22:12 31:9 33:11 41:5 58:10 62:15 63:9 76:8 105:25 122:25 147:24

throughout(3) 42:2 43:25 108:7

throw(1) 54:23

thrown(1) 116:23

thursday(5) 5:20 66:18 69:23

thyne(1) 62:8

ticket(1) 49:4

tied(1) 23:6

tier(3) 92:1 118:20 122:9

ties(2) 12:3 145:1

tight(1) 143:17

till(1) 125:20

time(48) 6:2 6:4 10:24 11:5 11:16 11:17 12:20 15:4 15:5 27:17 29:15 34:10 34:17 34:21 36:15 38:3 44:1 46:3 52:19 53:8 54:14 63:25 68:16 70:17 73:4 74:23 77:3 83:20 97:9 100:22 104:7 105:4 105:10 105:12 106:13 106:15 106:18 111:2 120:15 112:15 122:16 126:16 128:19 137:1 140:3 151:14 152:5 153:13

timeframe(2) 6:1 23:22

times(4) 38:1 116:21 126:21 127:5

timothy(3) 2:31 79:13 80:2

titanic(1) 143:17

title(1) 126:8

tna(2) 26:6 42:25

to-day(1) 126:8

today(21) 12:14 12:15 15:5 16:23 31:24 32:23 56:8 57:22 60:17 70:20 73:10 74:24 75:21 77:7 83:1 85:20 91:22 93:2 93:23 97:13 152:22

today,"(1) 145:9

today's(3) 13:15 91:14 92:7

together(19) 42:3 72:24 73:8 86:13 107:22 108:4 108:7 110:16 110:17 114:12 115:21 123:13 130:20 130:24 131:4 131:22 137:21 137:22 137:25

told(6) 35:9 35:24 37:12 37:21 47:21

ton(1) 62:13

tongue(1) 71:22

took(13) 14:7 23:21 25:12 25:19 28:15 42:19 55:2 55:12 55:25 68:16 84:17 86:11 125:5

top(7) 36:19 91:9 96:13 96:15 112:4 112:7 124:20

topic(1) 79:16

total(5) 9:24 28:4 98:2 125:4 134:6

totality(1) 140:14

touch(4) 52:20 58:4 62:1 95:6

tough(2) 117:1 122:15

towards(3) 5:18 95:12 136:13

toy(1) 76:17

track(1) 106:6

trade(2) 34:7 34:9

trading(1) 18:23

traipsed(1) 71:15

trajectory(1) 14:16

transaction(83) 16:14 17:3 17:19 18:4 18:18 19:4 19:11 19:14 19:16 20:6 20:14 20:20 20:23 21:1 22:18 22:19 22:20 22:24 23:22 23:24 24:9 24:12 24:19 25:2 25:7 25:25 26:8 28:10 28:15 28:20 28:22 29:20 29:24 33:2 33:16 34:15 34:18 34:22 36:25 36:25 37:9 40:9 40:20 41:12 41:23 42:6 42:9 42:13 42:15 42:18 46:4 47:8 47:13 48:13 48:18 50:12 52:23 53:6 53:18 54:15 54:15 55:8 55:8 55:25 56:4 56:22 58:18 58:21 58:22 58:25 62:24 75:3 76:5 76:13 76:15 81:2 81:3 82:18 82:19 82:25 83:6 83:14

transaction."(1) 19:11

transactions(13) 27:7 33:18 48:13 53:3 74:19 74:24 75:5 75:8 76:6 80:25 81:1 81:8 82:16

transcriber(1) 153:26

transcript(3) 1:16 1:45 153:22

transcription(2) 1:39 1:45

transfer(12) 49:17 49:21 50:3 55:7 55:9 55:18 55:22 62:16 62:18 62:20 66:2 66:8

transferred(4) 49:9 49:18 50:7 65:24

transfers(1) 55:13

travel(2) 115:20 116:15

treat(1) 76:16

treated(2) 25:6 38:10

# MIDWAY GAMES, INC.4.6.09.DOC

| Word | Page:Line | Word | Page:Line | Word | Page:Line | Word | Page:Line |
|---|---|---|---|---|---|---|---|

**tremendous**(1) 73:22
**trend**(2) 109:18 110:2
**trends**(1) 116:11
**trevino**(1) 56:19
**trial**(1) 60:22
**tried**(4) 9:14 37:14 93:21 147:19
**tries**(1) 147:22
**trigger**(9) 100:6 100:17 100:18 102:7 128:22 129:4 129:8 142:14 148:6

**triggered**(10) 51:20 51:21 100:20 100:21 108:19 121:9 121:19 127:20 138:11 150:1

**triggers**(1) 108:13
**trip**(1) 121:22
**trouble**(2) 40:11 40:15
**troubled**(3) 74:9 74:14 80:25
**troublesome**(1) 73:23
**troubling**(3) 69:16 69:18 81:6
**true**(7) 16:3 31:11 41:11 63:17 67:11 119:11 152:16

**trust**(1) 136:23
**trustee**(7) 1:31 1:31 85:19 90:6 93:9 145:16 149:19

**trustee's**(1) 101:7
**truth**(3) 22:25 25:15 25:19
**truthful**(1) 49:9
**truthfully**(1) 67:25
**try**(5) 68:1 72:24 73:2 87:15 92:7 99:16 103:25 123:10

**trying**(8) 4:12 11:8 28:9 64:15 67:24 85:5 137:20 147:22

**tuesday**(2) 145:8 145:10
**turn**(6) 6:16 16:10 16:18 26:12 46:21
**turned**(1) 43:4
**turning**(1) 11:21
**turns**(1) 25:8
**tweed**(2) 2:4 2:39
**twenty**(1) 113:4
**twice**(1) 32:5
**two**(38) 8:14 9:1 11:7 14:8 38:15 42:16 50:7 50:14 53:4 67:19 86:18 86:24 88:19 89:6 91:7 93:5 95:9 99:23 100:8 105:1 105:21 108:12 109:3 112:3 112:4 112:6 114:19 114:20 118:21 121:14 126:21 127:5 136:12 139:1 143:25 144:1 144:2 147:14

**two-pager**(1) 88:7
**tying**(1) 146:22
**type**(1) 83:14
**types**(1) 117:23
**typical**(1) 74:5
**typically**(1) 117:25
**ultimate**(1) 17:2
**unanimous**(1) 46:5
**uncertain**(2) 86:6 142:16
**uncharacteristically**(1) 85:20
**uncommon**(1) 118:9
**uncovered**(1) 35:17
**under**(46) 8:25 12:7 12:11 12:22 17:9 27:24 28:20 32:3 46:7 47:4 47:16 50:16 51:20 52:20 53:22 55:13 64:21 68:2 86:3 86:7 89:16 90:9 90:12 90:24 91:5 92:10 95:10 96:22 98:3 98:18 99:1 99:8 112:2 120:11 127:19 134:11 146:7 150:5 150:7 150:13 150:17 151:8 151:17 151:17 152:24

**undercapitalization**(1) 67:14
**undercapitalized,'**(1) 53:4
**undergoing**(1) 152:20
**underlying**(2) 102:8 141:24
**underneath**(1) 124:18

**understand**(14) 10:14 25:21 65:4 65:13 66:11 91:13 94:8 99:21 100:6 137:10 137:11 138:18 139:19 152:19

**understandably**(1) 75:7
**understanding**(6) 50:11 94:5 108:18 110:20 135:2 142:13

**understood**(6) 58:23 58:23 59:5 66:10 136:14 140:9

**underway**(1) 124:18
**undeserving**(1) 76:12
**undeterred**(1) 49:3
**undoubtedly**(1) 54:2
**unencumbered**(1) 49:24
**unexpected**(1) 122:2
**unfair**(2) 53:24 54:5
**unfairly**(1) 62:19
**unfounded**(1) 29:1
**unidentified**(1) 51:10
**unit**(2) 110:17 119:16
**united**(8) 1:1 1:18 85:19 90:5 93:9 101:6 145:15 149:19

**units**(1) 110:25
**universe**(1) 147:20
**unjust**(4) 32:13 32:18 56:12 62:16
**unjustly**(1) 56:14
**unlawful**(2) 32:18 32:21
**unless**(7) 4:21 27:18 31:21 64:8 68:5 68:3 88:9

**unlikely**(2) 52:16 122:12
**unreasonable**(2) 61:15 117:18
**unreasonably**(1) 98:12
**unrefuted**(1) 144:5
**unsecured**(4) 29:9 40:1 43:19 54:1
**unsolicited**(1) 49:23
**until**(14) 21:5 31:21 42:13 45:3 50:6 68:5 71:3 77:3 79:4 93:18 106:1 115:8 124:17 146:22

**untruthful**(1) 76:11
**unusual**(2) 29:12 73:19
**updated**(1) 5:18
**upon**(14) 74:7 75:24 76:17 77:6 100:10 110:25 116:17 128:15 129:18 130:25 146:16 149:16 150:6 153:8

**upper**(1) 109:16
**upside**(1) 72:24
**urgent**(1) 59:12
**use**(32) 11:9 11:12 30:13 30:17 46:22 47:12 51:11 51:19 52:19 59:12 59:15 59:19 60:1 60:4 62:2 64:24 65:8 69:1 69:3 73:18 76:3 77:18 77:18 77:24 81:16 83:18 83:19 88:3 94:4 94:11 112:19 118:18

**used**(4) 25:20 27:8 112:22 113:19
**uses**(1) 31:5
**using**(6) 26:20 31:6 36:11 46:18 57:5 usually(1) 116:15
**usurpation**(1) 32:18
**utter**(1) 41:11
**valid**(1) 70:2
**valuable**(2) 51:6 65:15
**value**(17) 31:12 33:8 50:5 63:18 109:11 109:16 131:11 133:3 134:6 135:4 135:17 135:18 135:19 135:22 135:24 142:21 142:23

**values**(1) 34:12
**variances**(1) 98:25
**various**(3) 61:21 105:5 129:23
**vast**(1) 98:25
**vehicle**(1) 26:21
**verbal**(1) 137:9
**vernon**(1) 103:16
**version**(5) 92:16 93:16 94:16 94:25 107:3
**versus**(3) 54:18 63:18 122:20

**vest**(1) 131:9
**vested**(1) 79:2
**viacom**(5) 46:15 46:24 47:23 48:11 54:24
**vice**(1) 118:24
**video**(5) 104:23 105:3 117:9 117:11 137:1
**view**(9) 14:7 14:22 15:6 15:8 15:17 21:8 72:7 92:13 117:4

**viewed**(6) 38:18 43:25 46:24 47:18 49:4 50:19

**viewing**(1) 74:4
**violation**(1) 85:6
**virtually**(1) 148:1
**voice**(2) 113:22 151:24
**voiced**(1) 12:15
**voices**(1) 151:24
**volumes**(1) 76:14
**voluntary**(1) 46:6
**volunteer**(1) 27:22
**vote**(2) 42:11 115:24
**voted**(2) 25:2 42:14
**voting**(1) 42:9
**wait**(3) 26:11 68:10 143:6
**waive**(1) 96:22
**waived**(1) 128:17
**waiver**(1) 45:3
**waivers**(1) 45:1
**walk**(1) 33:10
**wall**(1) 54:22
**want**(24) 4:22 23:12 33:10 39:11 52:19 58:4 59:7 66:9 66:23 68:3 68:19 73:17 81:23 87:20 87:21 96:17 98:19 98:25 123:18 139:11 140:5 140:18 140:22 150:1

**want?"**(1) 36:18
**wanted**(6) 6:25 23:4 40:10 41:4 96:14 101:12

**wanting**(1) 139:22
**wants**(4) 64:1 71:23 72:1 72:3
**war**(1) 73:3
**warm**(1) 4:11
**warned**(1) 49:19
**warrant**(3) 120:20 120:23 142:17
**wasn't**(8) 24:16 41:2 42:20 44:15 48:21 50:24 66:20 75:6

**waste**(3) 32:17 49:1 70:17
**watched**(1) 85:23
**water**(2) 147:22 147:23
**waxman**(2) 23:20 81:20
**waxman's**(1) 23:13
**way**(26) 4:21 7:3 13:9 15:17 21:3 32:8 39:13 41:8 42:22 51:3 51:11 60:9 63:9 67:22 71:18 79:8 90:22 91:25 92:8 99:12 109:19 134:22 142:15 144:22 147:22 149:21

**ways**(1) 47:9
**weaknesses**(1) 63:11
**websites**(1) 137:8
**wednesday**(5) 6:19 6:22 8:15 8:22 18:6 31:14 31:24 33:12

**week**(9) 5:19 11:23 12:18 18:7 66:18 105:21 108:3 126:9 137:7

**weekend**(4) 4:20 5:9 70:22 73:22
**weekends**(1) 127:3
**weekly**(2) 5:18 67:6
**weeks**(2) 42:19 50:14
**weigh**(2) 122:19 123:2
**weighs**(1) 82:7
**weight**(1) 152:3

**well**(42) 4:23 7:1 7:2 7:8 7:24 16:13 18:5 24:15 27:20 47:3 48:15 56:23 58:17 63:7 66:19 67:19 72:13 73:6 73:17 78:10 78:12 82:17 82:19 85:14 86:5 94:9 96:11 99:10 101:20 104:22 106:13 108:1 113:13 127:24 128:2 130:23 136:4 142:1 149:15 149:18 150:25 152:7

**well-known**(1) 118:12
**went**(5) 11:23 36:22 38:7 55:3 104:22
**were**(76) 4:25 7:6 8:14 8:20 8:21 8:23 14:6 18:1 18:3 18:8 21:16 21:19 24:22 28:14 33:6 34:19 34:22 35:1 35:9 36:17 38:10 38:15 39:18 40:18 41:3 43:20 44:4 44:22 46:14 48:2 48:10 54:22 56:15 56:16 58:12 62:19 65:23 67:2 67:2 67:8 67:9 69:4 75:5 76:17 81:21 82:24 83:17 84:24 85:7 86:13 93:5 97:6 101:15 114:8 114:14 115:23 116:2 116:3 116:22 119:6 119:18 119:20 122:2 122:3 123:11 124:2 126:12 126:13 136:5 138:13 139:21 144:9 147:13 149:18 149:20 150:17

**weren't**(3) 36:15 83:16 101:6
**west**(2) 141:8 141:8
**west's**(2) 141:12 141:17
**we'd**(4) 97:10 98:8 101:17 142:6
**we'll**(13) 4:15 8:19 43:25 73:9 73:11 82:11 92:22 94:10 95:17 103:25 108:15 135:13 152:24

**we're**(40) 4:12 8:10 11:8 11:8 12:14 14:21 14:22 19:8 19:10 21:10 21:11 31:2 31:6 57:4 58:24 59:6 59:8 59:11 59:15 65:22 67:5 72:15 78:8 83:25 88:2 92:7 94:3 95:7 95:7 95:18 98:23 101:9 101:10 111:4 139:12 142:2 142:11 144:11 144:16 145:20

**we've**(28) 7:14 14:14 15:9 15:9 16:14 17:3 18:1 18:5 53:18 64:5 70:18 73:4 77:19 81:19 82:13 83:1 84:22 92:6 100:12 100:12 110:2 110:3 116:25 119:17 127:22 136:10 143:1 149:10

**what**(147) 7:6 7:10 9:14 10:16 11:8 12:14 15:4 15:4 16:4 16:13 16:19 17:2 17:17 19:4 19:6 19:20 21:21 21:24 22:7 22:13 22:13 22:18 23:3 23:17 24:5 24:16 24:21 25:9 25:18 26:2 26:15 26:18 26:24 26:25 28:4 28:9 28:14 29:10 30:12 30:20 34:10 35:17 36:10 38:4 42:5 47:4 45:20 46:16 47:21 48:2 49:4 50:4 52:19 53:8 57:7 57:13 58:15 58:17 58:19 58:24 60:8 62:12 63:16 63:19 64:25 66:1 66:23 67:12 68:18 72:15 73:6 74:13 74:14 75:14 77:20 78:7 78:13 78:19 83:25 85:14 86:2 87:22 88:2 89:19 91:14 92:13 92:15 92:19 92:22 94:3 94:10 95:7 101:18 102:12 104:3 104:15 106:9 106:10 106:11 106:12 108:3 109:13 109:17 109:21 110:10 110:13 110:21 111:12 112:6 112:15 112:19 113:10 114:1 114:2 114:7 116:25 117:3 117:23 118:11 118:18 119:23 120:12 120:24 122:21 123:20 125:19 127:22 129:22 130:15 133:2 134:5 134:9 135:10 135:16 135:24 136:17 136:18 136:18 137:24 138:4 144:25 145:1 146:18 149:21 150:15

**whatever**(5) 27:16 53:12 66:2 87:6 103:1
**whatnot**(1) 65:23
**whatsoever**(1) 17:14
**what's**(12) 27:10 27:14 27:14 58:24 59:17 61:13 74:12 116:10 136:2 137:15 137:15 138:3

**when."**(1) 42:6
**whereupon**(1) 153:18
**wherewithal**(3) 12:9 17:4 40:24

# MIDWAY GAMES, INC.4.6.09.DOC

| Word | Page:Line | Word | Page:Line | Word | Page:Line |
|---|---|---|---|

**whether**(55) 12:4 12:7 12:8 14:10 14:12 14:19 15:2 16:25 17:5 20:22 21:7 25:21 28:18 30:4 30:5 30:7 36:9 36:16 36:16 38:23 39:8 40:23 41:6 41:23 69:13 73:25 74:2 74:5 74:18 74:20 74:21 74:22 74:25 75:2 75:4 76:8 76:10 76:23 83:7 83:9 83:12 83:13 83:17 83:18 86:6 92:12 98:1 101:22 101:25 120:19 121:19 150:3 150:6 150:7 152:15

**whichever**(2) 100:5 150:9
**while**(7) 29:12 33:19 42:8 55:3 80:24 103:12 135:20

**white**(1) 98:8
**who**(47) 13:20 15:13 15:13 15:24 19:25 20:8 21:18 24:10 35:15 35:16 40:24 47:25 48:8 59:13 62:7 62:9 62:10 68:2 75:11 79:14 82:24 83:1 83:5 84:8 90:17 91:4 92:4 101:23 112:16 112:16 113:1 114:5 118:15 118:22 119:4 119:12 120:12 120:1 120:14 120:19 123:13 124:3 125:14 132:16 135:22 137:2 151:21

**whole**(5) 108:5 110:17 110:18 143:20
**whom**(3) 104:1 104:5 126:1
**whose**(5) 21:11 21:12 35:4 90:17 90:23
**who's**(2) 24:1 67:24

**why**(21) 13:10 15:25 16:1 24:3 24:3 26:15 40:20 59:10 59:11 72:22 80:19 81:14 107:16 125:2 128:2 128:7 130:2 137:10 137:11 143:5 151:7

**wide**(1) 147:24
**wife**(1) 49:11
**will**(63) 4:13 4:17 5:22 6:16 12:5 12:8 13:13 13:16 27:18 31:4 31:9 33:15 38:20 40:1 44:9 53:5 57:8 57:9 60:23 70:4 70:6 70:6 72:21 75:12 77:2 80:23 86:8 87:16 87:17 88:15 91:23 94:5 96:10 96:24 97:7 98:22 99:9 100:4 100:15 109:16 111:19 119:4 120:7 120:19 120:22 121:10 122:11 123:19 124:23 124:24 131:22 138:7 139:5 141:12 142:4 146:12 151:14 151:19 152:4 152:20 152:21 152:23 153:15

**william**(1) 3:3
**willing**(4) 50:24 78:5 144:25 145:1
**willingness**(3) 60:5 122:24 137:18
**willy-nilly**(3) 22:4 22:12 144:17
**wilmington**(6) 1:11 1:27 1:34 2:18 2:26
**win**(1) 52:11
**winner**(1) 27:18
**wins**(1) 15:19
**wipe**(2) 19:15 28:19
**wiped**(1) 65:18
**wisely**(1) 144:13
**wish**(1) 153:16
**wished**(1) 28:7
**wishing**(1) 149:7
**withhold**(2) 98:12 120:15
**within**(16) 20:21 22:6 38:12 69:20 91:4 100:6 101:24 104:24 110:18 112:9 115:12 116:11 117:17 120:11 123:7 123:18

**without**(17) 37:13 40:6 41:10 52:13 63:20 74:20 82:4 85:12 100:2 109:11 111:5 142:23 146:11 146:21 147:17 148:2 148:7

**witness**(18) 40:7 51:2 67:23 81:20 103:10 103:18 111:12 133:20 135:7 135:13 138:2 139:5 139:17 139:21 140:5 140:10 140:13 141:1

**witnesses**(5) 40:11 65:23 69:10 140:15 140:24

**wolves**(1) 54:23
**won't**(1) 85:11
**word**(2) 18:15 97:2

**words**(7) 27:24 28:1 39:6 41:11 41:11 122:18 146:3

**work**(21) 59:14 72:24 105:20 108:1 108:3 109:24 114:16 114:24 115:7 115:25 124:7 124:9 124:11 124:12 126:21 131:22 138:1 139:24 139:25 143:23 153:8

**worked**(4) 8:23 26:22 115:21 127:3
**working**(10) 19:8 45:13 104:18 106:16 116:14 118:23 120:10 124:16 136:13 142:24
**workload**(3) 116:17 125:15 127:4
**works**(3) 21:4 26:9 124:3
**world**(1) 72:8
**worried**(1) 136:25
**worrying**(1) 43:10
**worst**(1) 61:10
**worth**(4) 18:14 135:11 144:21 145:11
**would**(213) 5:11 5:25 6:2 11:11 11:14 12:11 12:16 13:10 14:25 16:18 16:21 17:5 17:6 21:20 22:14 27:5 27:6 28:15 29:9 30:21 32:4 32:10 32:15 32:20 33:24 34:20 34:24 35:6 35:7 35:10 36:13 38:6 38:23 39:13 40:23 41:11 41:24 42:5 43:1 43:7 44:12 44:13 44:20 45:10 45:14 46:22 47:10 47:11 47:13 47:15 48:4 48:10 49:6 49:20 51:6 53:6 53:13 53:21 53:24 53:25 56:3 56:13 56:14 56:22 57:1 59:20 62:2 62:5 63:8 63:18 63:21 67:12 69:7 69:19 70:1 70:17 70:19 70:20 70:20 74:4 74:5 77:12 77:12 77:14 78:4 78:7 78:22 78:24 80:9 80:19 81:10 81:12 82:14 83:20 85:3 85:4 86:19 88:13 90:8 91:15 92:9 93:3 96:6 96:24 97:11 97:13 98:15 98:19 99:1 99:23 100:1 100:6 100:9 102:9 102:11 102:12 103:7 105:8 105:20 105:21 107:20 108:3 108:18 109:17 110:15 110:20 110:2 110:23 112:16 112:20 112:22 113:1 113:14 113:22 114:16 114:19 114:20 115: 115:22 115:23 115:24 115:25 116:6 116:9 116:19 116:19 117:8 117:10 118:9 118:10 118:11 118:12 118:16 119:8 119:10 119:14 120:14 120:24 121:1 121:11 121:23 121:23 122:6 122:12 124:4 124:5 124:6 124:11 124:12 125:4 125:6 125:9 126:5 126:6 126:9 126:20 127:8 127:9 127:21 127:25 130:23 131:8 131:8 133:5 133:7 135:3 135:16 135:17 135:18 136:8 136:11 136:11 136:14 136:15 136:16 136:22 136:23 137:2 137:5 137:6 137:14 137:17 138:16 139:13 140:14 140:17 142:6 143:3 147:5 147:12 147:25 150:16 152:5

**wouldn't**(4) 47:22 115:1 136:23 137:3
**wrapped**(1) 61:25
**writing**(1) 132:11
**written**(5) 35:23 59:23 128:21 145:12
**wrong**(1) 7:14
**wrongdoing**(2) 73:25 74:1
**wrongful**(1) 33:1
**wrote**(5) 42:21 43:5 45:2 69:22 146:18
**yeah**(10) 4:18 45:23 80:15 114:19 116:8 117:6 118:7 124:14 125:23 135:15

**year**(9) 25:18 31:4 33:17 33:18 33:21 34:14 50:12 65:8 105:14

**year-end**(1) 33:21
**years**(11) 33:17 34:23 48:9 69:5 104:14 104:19 105:2 115:22 119:10 131:10 131:11

**yesterday**(1) 93:18
**yet**(4) 5:3 40:19 52:7 109:5
**york**(3) 2:34 3:13 50:8
**young**(9) 19:13 22:22 35:7 51:16 58:8 68:22 69:2

**yourself**(1) 120:2

**you'd**(5) 4:22 24:21 41:8 79:5 88:22
**you'll**(3) 68:1 88:18 103:11
**you're**(10) 25:3 62:10 63:17 67:17 103:12 110:22 116:23 127:12 137:20 140:23

**you've**(3) 78:19 117:20 123:3
**ziehl**(1) 2:21
**zolkin**(21) 2:7 68:17 87:24 88:1 88:6 88:9 88:12 88:15 88:17 95:4 95:14 95:16 96:2 96:14 97:13 97:14 97:15 97:20 97:23 98:5 151:12

**zolkin's**(1) 99:5
**zucker**(1) 105:12
**"and**(1) 124:6
**"avoid**(1) 44:24
**"courts**(1) 53:2
**"dad**(1) 40:22
**"deeply**(1) 35:18
**"did**(1) 69:15
**"expanded**(1) 45:17
**"gordon**(1) 70:1
**"here's**(1) 63:10
**"his**(1) 49:10
**"how**(2) 36:18 36:21
**"it's**(1) 25:12
**"i'll**(1) 145:8
**"i'm**(1) 124:5
**"notwithstanding**(1) 56:9
**"secret**(1) 55:22
**"sounds**(1) 43:6
**"stockholder**(1) 68:23
**"that**(1) 51:12
**"this**(1) 45:2
**"the**(5) 42:22 64:21 72:3 97:23 128:10
**"wait**(2) 20:6 26:2
**"waives"**(1) 97:3
**"what's**(1) 15:22
**"will**(1) 97:25
**"would**(1) 44:5
**"you**(5) 19:7 19:9 21:10 24:16 26:10