## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------- x

In re:

MIDWAY GAMES INC., *et al.*,

       Debtors.

------------------------------------------------- 

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF MIDWAY
GAMES INC., *et al.*,

       Plaintiff,

v.

NATIONAL AMUSEMENTS INC., a
Maryland corporation, SUMCO INC., a
Delaware corporation, SUMNER M.
REDSTONE 2003 TRUST, SUMNER M.
REDSTONE, an individual, ACQUISITION
HOLDINGS SUBSIDIARY I LLC, a
Delaware limited liability company, MT
ACQUISITION HOLDINGS LLC, a
Delaware limited liability company, and
MARK E. THOMAS, an individual, SHARI
E. REDSTONE, an individual, ROBERT J.
STEELE, an individual, JOSEPH A.
CALIFANO, an individual, ROBERT N.
WAXMAN, an individual, WILLIAM C.
BARTHOLOMAY, an individual, and
PETER C. BROWN, an individual,

       Defendants.

------------------------------------------------- x

Chapter 11

Case No. 09-10465 (KG)

(Jointly Administered)

Adv. Proc. No. _____

**ADVERSARY COMPLAINT OF
THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS FOR:**

**(1) Fraudulent Transfer;**
**(2) Unlawful Conversion;**
**(3) Corporate Waste;**
**(4) Breach of Fiduciary Duty;**
**(5) Aiding and Abetting Breach of
    Fiduciary Duty;**
**(6) Equitable Subordination;**
**(7) Recharacterization; and**
**(8) Unjust Enrichment.**

Plaintiff, the Official Committee of Unsecured Creditors of Midway Games Inc., *et al.* (the "Committee") in the bankruptcy cases of the above-captioned debtors[1] (the "Debtors" or "Midway"), by and through its undersigned counsel, hereby files this Complaint, on behalf of the Debtors' estates and their creditors, against Defendants: (i) National Amusements Inc. ("NAI"), Sumco Inc. ("Sumco"), Sumner M. Redstone 2003 Trust ("Redstone Trust"), and Sumner M. Redstone (collectively with NAI, Sumco, and Redstone Trust, the "Redstone Defendants"); (ii) Acquisition Holdings Subsidiary I, LLC ("AHS"), MT Acquisition Holdings LLC ("MT Acquisition"), and Mark E. Thomas (collectively with AHS and MT Acquisition, the "Thomas Defendants"); and (iii) Shari E. Redstone, Robert J. Steele, Joseph A. Califano, Robert N. Waxman, William C. Bartholomay, and Peter C. Brown (the "Board Defendants"). The Committee reserves the right to amend this Complaint to supplement the parties and claims for relief included herein. In support of the requested relief, the Committee alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

1.    This action arises out of a series of disastrous and ill advised financial transactions that largely occurred during 2008. These transactions benefitted Midway's then-controlling shareholder, the Redstone Defendants, and its current controlling shareholder, the Thomas Defendants, to the detriment of Midway. The Board Defendants either approved of the transactions or, upon learning of them, looked the other way—taking no steps to investigate and unwind them. Starting at least in February 2008, the Board Defendants, in breach of their fiduciary duties of good faith and loyalty, put the interests of the Redstone Defendants above

---

[1]    The Debtors and the last four digits of their respective tax identification numbers are: Midway Games Inc., a Delaware corporation (6244); Midway Home Entertainment Inc., a Delaware corporation (3621); Midway Amusement Games, LLC, a Delaware limited liability company (4179); Midway Interactive Inc., a Delaware corporation (6756); Surreal Software Inc., a Washington corporation (1785); Midway Studios – Austin Inc., a Texas corporation (2584); Midway Studios – Los Angeles Inc., a California corporation (1153); Midway Games West Inc., a California corporation (8756); Midway Home Studios Inc., a Delaware corporation (8429); and Midway Sales Company, LLC, a Delaware limited liability company.

Midway's interests, and directed an apparently insolvent company to enter into a transaction with the Redstone Defendants, that piled $70 million in additional "debt" on the struggling Midway. Then, in November 2008, in a last ditch bid to escape their own financial woes, the Redstone Defendants sacrificed Midway by secretly transferring their 87% stake in Midway and their interest in $70 million of the supposed "debt" they had arranged in February 2008 to the Thomas Defendants, in exchange for the *de minimis* amount of $100,000.

2. The November 2008 transaction swiftly generated over $700 million in tax losses for the Redstone Defendants, which enabled them to obtain a massive tax refund. The transaction caused Midway irretrievably to lose the ability to take advantage of its valuable accumulated net operating losses and other tax assets.

3. As a result of the transaction, Midway became controlled by an individual, Thomas, who was completely unsuited to be the 87% owner of a publicly traded company. Nor did Thomas pay any realistic consideration for his ownership of Midway or the $70 million in "debt" he acquired. Thomas knew he was not an appropriate owner of Midway. He had no background in the video game industry. He had no assets to invest in Midway. Upon acquiring his controlling interest, he refused to speak with any officer or director of the company and even refused to disclose his middle initial so that an investigation could be made into his background.

4. Plaintiff, on behalf of the unsecured creditors of the Debtors and derivatively on behalf of the Debtors' estates, brings this action for: (1) fraudulent transfer against the Redstone Defendants and the Thomas Defendants for engaging in the November 2008 transaction; (2) unlawful conversion against the Redstone Defendants for participating in the November 2008 transaction; (3) corporate waste against the Redstone Defendants for engaging in the November 2008 transaction; (4) breach of fiduciary duty against the Board Defendants for approving the February 2008 transaction and failing to investigate and authorize claims in connection with the November 2008 transaction; (5) breach of fiduciary duty against the Redstone Defendants for approving the February 2008 transaction; (6) breach of fiduciary duty against the Redstone Defendants for engaging in the November 2008 transaction; (7) aiding and abetting the Redstone

Defendants' breach of fiduciary duty against the Board Defendants for approving the February 2008 transaction; (8) aiding and abetting the Redstone Defendants' breach of fiduciary duty against the Thomas Defendants for engaging in the November 2008 transaction; (9) aiding and abetting the Board Defendants' breach of fiduciary duty against the Redstone Defendants for facilitating the February 2008 transaction; (10) equitable subordination of the Thomas Defendants' interests; (11) recharacterization of the Thomas Defendants' interests as equity instead of debt; and (12) unjust enrichment against the Thomas Defendants.

## JURISDICTION AND VENUE

5. This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

6. This Court has original jurisdiction under 28 U.S.C. § 1334(b), in that this is a civil proceeding relating to the underlying case arising under title 11 of the United States Code.

7. This adversary proceeding is a "core" proceeding pursuant to 28 U.S.C. § 157(b).

8. This Court has personal jurisdiction over each Defendant pursuant to Rule 7004(f) of the Federal Rules of Bankruptcy Procedure.

9. Venue of this adversary proceeding in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## STANDING

10. Pursuant to paragraph 8 of this Court's April 9, 2009 *Final Order Authorizing Use of Cash Collateral, Granting Adequate Protection and Granting Related Relief* [Docket No. 251], the Court granted the Committee the right to "investigate, assert and/or prosecute on behalf of Debtors' estates any and all claims of the estates against any party that arise out of, or relate to (a) any transaction by and between NAI or any of its affiliates or shareholders on the one hand, and any of the Debtors on the other hand, (b) transactions that led to AHS, and/or any of AHS' affiliates, insiders or shareholders, becoming the majority owner of the Debtors and the owner of claims against the Debtors previously held by NAI and (c) any action or omission of any insider or affiliate of the Debtors including, without limitation, NAI, AHS, or any of their respective

affiliates, insiders or shareholders, in connection with any of the Debtors" in these bankruptcy cases.

## THE PARTIES

11. The Committee, as Plaintiff in this adversary proceeding, on behalf of the Debtors' estates and their unsecured creditors, was appointed on February 24, 2009 pursuant to section 1103 of the Bankruptcy Code.[2]

12. Defendant NAI is a privately-held corporation organized and existing under the laws of the State of Maryland with its principal place of business in Norwood, Massachusetts. NAI is controlled by Defendant Sumner M. Redstone.

13. Defendant Sumco is a privately-held corporation organized and existing under the laws of the State of Delaware with its principal place of business in Norwood, Massachusetts. Sumco is controlled by Defendant Sumner M. Redstone.

14. Defendant Sumner M. Redstone is a citizen of the State of California.

15. Defendant Redstone Trust is a trust, settled by Mr. Redstone, that owned, held, and/or controlled Midway shares directly or on behalf of, and/or for the benefit of, Mr. Redstone.

16. At all material times referenced herein, each of NAI, Sumco, Redstone Trust, and Mr. Redstone acted as the agent of the other.

17. Defendant MT Acquisition is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at the home of Defendant Mark E. Thomas in Concord, Massachusetts. MT Acquisition is wholly-owned and controlled by Defendant Mark E. Thomas.

18. Defendant AHS is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at the home of Defendant Mark E.

---

[2] The Committee consists of the following of Midway's noteholders and trade creditors: Wells Fargo Bank, N.A., Highbridge International LLC, NBA Properties, Inc., Farsight Technologies, Inc., and Multi Packaging Solutions, Inc.

Thomas in Concord, Massachusetts. AHS is a wholly-owned subsidiary of MT Acquisition, which in turn is wholly-owned and controlled by Defendant Mark E. Thomas.

19. Defendant Mark E. Thomas is a citizen of the Commonwealth of Massachusetts.

20. At all material times referenced herein, each of MT Acquisition, AHS, and Thomas was authorized to act and acted as the agent, and alter-ego, of the other. Defendants MT Acquisition and AHS have no officers, directors or employees other than Defendant Mark E. Thomas.

21. Defendant Shari E. Redstone is a citizen of the Commonwealth of Massachusetts. At all material times referenced herein, Ms. Redstone was the President of NAI (and Sumco) and a member of NAI's Board of Directors, while simultaneously serving as a member of Midway's Board of Directors. Ms. Redstone was appointed Chairman of the Midway Board of Director's on December 17, 2007. Ms. Redstone resigned from Midway's Board of Directors on November 7, 2008. Ms. Redstone is the daughter of Defendant Sumner Redstone.

22. Defendant Robert J. Steele is a citizen of the Commonwealth of Massachusetts. At all material times referenced herein, Mr. Steele was the Vice President of Strategy and Corporate Development of NAI, while simultaneously serving as a member of Midway's Board of Directors. At NAI, Mr. Steele reports directly to Ms. Redstone. Mr. Steele resigned from Midway's Board of Directors on December 1, 2008.

23. Defendant Joseph A. Califano is a citizen of the State of Connecticut. At all material times referenced herein, Mr. Califano was a member of Midway's Board of Directors. Mr. Califano is also a member of the Board of Directors of CBS, Inc., which is controlled by NAI and ultimately, Mr. Redstone.

24. Defendant Robert N. Waxman is a citizen of the State of New York. At all material times referenced herein, Mr. Waxman was a member of Midway's Board of Directors.

25. Defendant William C. Bartholomay is a citizen of the State of Illinois. At all material times referenced herein, Mr. Bartholomay was a member of Midway's Board of Directors.

LAI:# 6402253
RLF1-3395450-1

26. Defendant Peter C. Brown is a citizen of the State of New Jersey. At all material times referenced herein, Mr. Brown was a member of Midway's Board of Directors. Mr. Brown was also Co-Chair and Co-Chief Executive Officer (along with Shari E. Redstone) of MovieTickets.com, which is controlled by NAI, and ultimately, Mr. Redstone. Mr. Brown resigned from Midway's Board of Directors on January 29, 2009.

## GENERAL FACTUAL ALLEGATIONS

### A.    By at Least January 2008, Midway is Insolvent

27. Midway produces and publishes videogames, including the well-known *Mortal Kombat* series.

28. In 2008, Mr. Redstone and his affiliates (NAI and Sumco) owned and controlled 80,339,266 shares of Midway's common stock, representing 87.2% of Midway's then-outstanding common stock.

29. By virtue of his majority shareholder stake in Midway, Mr. Redstone controlled Midway's affairs by, *inter alia*, electing all members of Midway's Board of Directors. Midway's directors chosen by Mr. Redstone included his daughter Defendant Shari E. Redstone (President of NAI), Defendant Robert J. Steele (Vice President of Strategy and Corporate Development of NAI), Joseph A. Califano (who also served as Mr. Redstone's selection on the Board of Directors of CBS, a company Mr. Redstone controls), and Peter C. Brown (who also served as Co-Chair and Co-Chief Executive Officer of MovieTickets.com, another company Mr. Redstone controls).

30. At the end of 2007, Midway was deeply financially distressed and likely insolvent. Midway had suffered annual losses for the prior seven fiscal years. In 2007, the company lost more than $78 million (on revenues of $157 million). In 2006, the company lost more than $72 million (on revenues of $165 million).

31. In addition, at year-end 2007, Midway's liabilities far exceeded its true assets. Aside from its trade debt, Midway had $150 million in outstanding notes (the "Notes") and

approximately $20 million in loan obligations due under a June 29, 2007 secured loan agreement (the "Wells Fargo Facility") between Midway and Wells Fargo Foothill, Inc. ("Wells Fargo"). Midway's true assets were less than the combined amount of its debt.

32. In January 2008, Midway's then-management informed the Board Defendants that the company was in immediate danger of running out of cash, and would in a matter of months breach a liquidity covenant in the Wells Fargo Facility.

33. At this time, Midway's management also informed the Board Defendants that Midway's auditor, Ernst & Young, had determined to issue a "going-concern" qualification in its annual opinion on Midway's 2007 financial statements.

34. Midway management advised the Board Defendants that, in the absence of a significant cash infusion, the company could not continue its operations.

**B.      Without Conducting any Meaningful Analysis of Solvency or Alternatives, the Board Defendants Authorize Midway to Obtain an Infusion of Capital from Its Controlling Shareholder**

35. The Board of Directors conducted no analysis whatsoever of Midway's solvency or of alternatives that might be implemented in light of the company's dire financial situation. Instead, the Board Directors turned immediately and solely to Sumner M. Redstone. During the January 15, 2008 Board meeting, the Board formed a Special Committee of the Board of Directors (the "Special Committee") to consider a "possible financing arrangements the Corporation might make with National Amusements [...]" and to address the obvious conflicts of interest created by a transaction between Midway and its controlling shareholder. The Special Committee consisted of Board Defendants Robert N. Waxman, William C. Bartholomay, Joseph A. Califano, and Peter C. Brown (who served as Chairman of the Committee).

36. The formation of the Special Committee was bereft of any substance. The Board did not authorize the Special Committee to seek out financing from any third-party lender or investor, nor did the Board authorize the Special Committee to consider a Chapter 11 filing, an out-of-court restructuring or any other alternative.

37. The Special Committee did consider different ways for the Redstone Defendants to inject capital into Midway, including whether to structure the transaction as an equity infusion or debt. Instead of considering Midway's interests or needs, the Special Committee considered the Redstone Defendants' interests. They concluded that characterizing the capital contribution as "equity" could have adverse consequences *for the Redstone Defendants*, as an equity contribution would cause the Redstone Defendants to hold over 90% of Midway's common stock, which in turn would trigger conversion rights in the indentures governing Midway's Notes that would dilute the value of the Redstone Defendants' holdings. Although an equity contribution would plainly have been better for Midway, the Special Committee concluded that characterizing the capital contribution as "equity" would not be favorable for the Redstone Defendants and, accordingly, the Special Committee agreed to characterize the capital contribution as a "loan" from the Redstone Defendants notwithstanding the total absence of any consideration of how Midway would ever be able to repay the "loan."

38. The Special Committee did absolutely nothing to determine what was in Midway's best interests (as opposed to the Redstone Defendants' interest). The Special Committee did not: (i) conduct any review of Midway's solvency, (ii) evaluate Midway's ability to support, or ultimately to repay, any additional debt, or (iii) engage a professional to conduct an analysis of Midway's solvency. Nor did the Special Committee attempt to expand its authority so that it could (i) seek financing from a third-party lender, or investor, or (ii) determine whether a Chapter 11 bankruptcy or out-of-court restructuring would provide a better solution to Midway's problems. Nor did the Board Defendants acting as a whole undertake any of these actions.

39. With permission from the Board Defendants, Defendants Robert J. Steele and Shari E. Redstone approached the Redstone Defendants for an unrestricted $30 million infusion of cash into Midway.

40. On or about February 7, 2008, the situation became even more urgent for Midway. Management advised the Board that Midway's cash forecasting system contained massive, "deeply disturbing" errors. The most significant error was based on the fact that Midway had not

been paying its debts to creditors as such debts became due (one of the hallmark definitions of insolvency). Management advised the Board that the cash forecasting system, upon which the need for $30 million had been based, had assumed that debts *were* being paid as they became due. The upshot was that Midway needed not $30 million, but $90 million in a matter of weeks—or it could not continue its operations.

41. In response to this new, deeply troubling information, the Special Committee and Board Defendants did not: (i) commission a review of Midway's solvency by management or a financial professional, or (ii) demand that Midway's management present a plan for how Midway would repay any additional indebtedness, including any proposed funding from NAI.

42. Neither did the Board Defendants nor the Special Committee consider whether a funding transaction with NAI would be in Midway's best financial interests in light of Midway's insolvency, capitalization, collateral, ability to pay cash interest, or debt capacity ratios, or hire a professional to issue an opinion that the proposed transaction with NAI was fair.

### C. The Redstone Defendants Make No Effort to Investigate Midway's Solvency Before Investing an Additional $90 Million

43. The Redstone Defendants, for their part, did not perform any of the diligence that a *bona fide* lender would have performed in determining whether to approve a $90 million loan to a company that had not been profitable in seven years. NAI conducted no analysis or review of Midway's solvency, capitalization, ability to pay cash interest, or debt capacity ratios.

44. Sumner M. Redstone testified that the only consideration that NAI weighed was NAI's own existing equity position in Midway: "In this case, National controlled Midway, so they had a particular reason apart from—it wasn't like loaning money to some stranger. They were loaning [...] money to a company they controlled and they wanted the company to survive." Although he used the term "they," Mr. Redstone was and is the controlling shareholder of NAI.

45. The only conceivable reason that the Redstone Defendants contrived to label this cash infusion "debt" was because, as noted above, the Redstone Defendants were prohibited by

the indentures in the Notes from acquiring over 90% of the publicly traded shares of Midway. By labeling the transaction "debt," the Redstone Defendants were able to evade protections previously provided to Midway's noteholders, while at the same time taking for themselves the secured debt.

46. On or about February 22, 2008, NAI's Board of Directors, including Defendants Shari E. Redstone (then Chair of Midway's Board of Directors) and Sumner M. Redstone, unanimously approved the $90 million facility to Midway.

47. On February 29, 2008, only weeks after Midway approached the Redstone Defendants for the $90 million in financing, Midway replaced the Wells Fargo Facility with three separate loans from NAI: (a) a $30 million loan facility (consisting of a term loan and a revolving credit facility) secured by substantially all of Midway's assets, (b) a $40 million unsecured loan facility, and (c) a $20 million unsecured subordinated loan facility (collectively, the "NAI Facility").

48. The Redstone Defendants, Midway's controlling shareholder, and the Board Defendants consummated an insider transaction that benefitted the Redstone Defendants to Midway's detriment without performing any meaningful analysis of Midway's solvency or ability to repay debt or considering the harm that the additional leverage would cause the insolvent company and its unsecured creditors.

### D. One Month After Closing the NAI Facility, Midway Requests an Additional $28 Million from the Redstone Defendants

49. Not surprisingly, Midway's management behaved as if the February 2008 Transaction was anything other than "debt."

50. On April 3, 2008, just one month after securing access to $90 million in capital, management apprised the Board Defendants that it needed an additional $28 million in cash.

51. By June 2008, management was requesting that the Board Defendants authorize it to approach NAI to raise an additional $28 million in liquidity through a factoring transaction.

52. NAI has admitted that after learning that Midway desired to factor its receivables, NAI became concerned about Midway's solvency. But despite this concern, neither NAI nor the other Redstone Defendants conducted any analysis to determine whether Midway was solvent.

53. By June 2008, less than four months after consummating the February 2008 transaction, management requested permission from the Board Defendants to approach NAI to request a waiver of the April 2009 maturity date for $40 million of the new (four month old) NAI Facility. In addition, management informed the Board Defendants of a second looming financial obligation that it would be unable to meet: an April 30, 2009 "put" date for holders of Midway's 6% Convertible Senior Notes due 2025 (the "6% Notes") that would require Midway to repurchase up to $75 million of the 6% Notes. This put date was not unknown to Midway or its directors—Midway's Board simply had ignored it when approving the NAI Facility.

54. Management requested the Midway Board of Directors' authority to retain a financial professional to revise the terms of the $90 million NAI Facility and broadly restructure the company's capital structure in light of Midway's apparent insolvency—only months after layering on additional $90 million in debt (without bothering to engage a financial professional).

55. The Board Defendants subsequently authorized Midway to enter into another insider arrangement, whereby NAI would factor Midway's receivables (the "NAI Factoring Agreement").

56. By the Fall of 2008, Midway had completely halted payments to many of its creditors.

57. On or about September 15, 2008, again without having conducting a solvency analysis or any meaningful diligence, or making a reasonable effort to consider or explore alternatives that would be in Midway's best interests, the Board Defendants directed Midway to enter into the NAI Factoring Agreement.

58. Less than two months later, on October 29, 2008, the Board Defendants formed another Special Committee (the "Second Special Committee") and authorized the Second Special Committee to retain restructuring professionals and file a Chapter 11 case. During the

October 29, 2008 meeting, the Board Defendants—including the NAI insiders on the Midway Board, Defendants Robert J. Steele and Shari E. Redstone—were advised by counsel of their expanded fiduciary duties to an insolvent company, including duties to creditors of Midway.

59. Nine days later, on November 7, 2008, Shari E. Redstone resigned from Midway's Board of Directors.

### E. Desperate to Save His Financial Empire, Sumner Redstone Secretly Contrives to Sacrifice His Interest in Midway to Capture Hundreds of Millions in Tax Losses for the Redstone Parties

#### 1. The Redstone Empire Faces Financial Peril

60. As was widely reported in the media, by November 2008, Mr. Redstone's media empire was on the verge of collapse. Defendant NAI, which also owns CBS, Viacom Inc., and other well-known entertainment businesses, had defaulted on its debt, and its creditors were poised to enforce their interests.

61. In order to generate enough cash to avoid bankruptcy and the loss of control over CBS and Viacom, the Redstone Defendants determined to liquidate their entire stake in Midway in order to realize and claim over $700 million in tax losses that Defendant NAI could use to offset taxable income and generate tax refunds to satisfy its obligations to its creditors.

62. The Redstone Defendants, as Midway's controlling shareholder, did not inform Midway of this plan.

63. The Redstone Defendants actually knew that this scheme would be detrimental to Midway: they considered the fact the transaction would eliminate Midway's ability to use its full net operating losses and other tax assets, adversely impact Midway's stock price, and accelerate the put rights under Midway's Notes. Nevertheless, the Redstone Defendants went forward with the scheme because the benefit to the Redstone Defendants was more important to them than the harm to Midway.

### 2. The Redstone Defendants Dump Their Interest in Midway with Thomas in Exchange for a *De Minimis* Amount

64. On or around November 14, 2008, the Redstone Defendants, through their long-time attorneys, approached an individual that the attorneys had met in an unrelated business deal, Defendant Mark E. Thomas, with a proposal to transfer to him the Redstone Defendants' entire interest in Midway.

65. Thomas, an individual of relatively limited means and sophistication, was a wholly unsuitable acquirer of the Redstone Defendants' interest in Midway.

66. Within a week of limited discussions and diligence, on or around Friday, November 21, 2008, Thomas offered to pay $1 million for the Redstone Defendants' 87% of Midway's common stock, and interest in the $30 million secured and the $40 million unsecured facility with NAI.

67. After learning that the Redstone Defendants would not agree to indemnify him against "claims of unjust enrichment, corporate waste and the like," Thomas, on or around Monday, November 24, 2008, lowered his offer to $100,000.

68. The Redstone Defendants accepted Thomas's offer without making a counter-offer.

69. On November 28, 2008, the Redstone Defendants transferred their approximately 87% equity stake in Midway and a majority of their participation interest in the NAI Facility to Thomas for an aggregate purchase price of $100,000 (the "Redstone-Thomas Transaction").

70. On December 1, 2008, three days after the Redstone-Thomas Transaction, Defendant Robert J. Steele resigned from Midway's Board of Directors.

71. Upon learning of the Redstone-Thomas Transaction, the remaining Board Defendants conducted no analysis of the propriety of deal or its negative impact on Midway. And the remaining Board Defendants directed Midway's attorneys not to bring any action on behalf of Midway against the Redstone Defendants or Thomas.

### 3. Thomas and His Alter-Egos Take Steps to Hide His Assets in Connection with the Purchase of Midway

72. In connection with the transaction, attorneys acting for Mark E. Thomas created Defendants MT Acquisition and AHS. Neither entity has any employees, officers or directors, other than Thomas. Neither entity has any assets other than those acquired in the Midway transaction. Defendant Thomas is the sole principal, officer, and owner of both entities. The mailing address for both entities is the offices of Thomas' attorneys in New York. The business address for both entities is Thomas's house. MT Acquisition and AHS have failed to observe corporate formalities, including holding regular meetings and keeping up to date board minutes. Defendants MT Acquisition, AHS, and Thomas operate as a single economic entity.

73. One business day before the closing of the Redstone-Thomas Transaction, on November 26, 2008, after analyzing the litigation risks involved with the transaction, being told that the Redstone Defendants would not give him an indemnity in connection with the transaction, and being well aware of the potential damage to Midway resulting from the transaction, Thomas transferred title and ownership in his house to his wife for $1.

### F. The Redstone-Thomas Transaction Devastates Midway

#### 1. Midway Immediately Loses Millions in Tax Attributes

74. As a result of the Redstone-Thomas Transaction, the Redstone Defendants realized over $700 million in net operating losses that they were able to use to their benefit.

75. But the Redstone-Thomas Transaction triggered a "change in ownership" for Midway under Internal Revenue Code § 382 ("IRC § 382") and a concomitant loss of those same tax assets on Midway's part.

76. Under IRC § 382, a change in ownership of a company with favorable tax attributes, or deferred tax assets, including, without limitation, net operating loss carry forwards, capital loss carry forwards and built-in losses (collectively, the "Tax Attributes") limits the ability of that company to carry forward those Tax Attributes in subsequent years to a percentage of the

value of the company. IRC § 382 determines the value of the company by the company's sale price.

77. Before the Redstone-Thomas Transaction, Midway had well over $700 million in Tax Attributes. Because the Redstone-Thomas Transaction effectively set Midway's value at $100,000, Midway immediately and irretrievably lost its ability to claim some or all of its Tax Attributes in a manner consistent with the tax laws.

78. But for the Redstone-Thomas Transaction, Midway would have been able to utilize its full Tax Attributes over time, in connection with a restructuring, sale, or other transaction. Indeed, if Midway became profitable as a result of a merger, joint venture, or other restructuring, those Tax Attributes would be highly valuable to a prospective purchaser or partner, and would make Midway an attractive target.

### 2. The Failure to Conduct a *Bona Fide* Sale Process Deprives Midway of an Appropriate Strategic Buyer

79. Neither NAI nor its advisors conducted a reasonable, appropriate and *bona fide* sale process to identify appropriate potential buyers of the Redstone Defendants' interest in Midway.

80. Despite having been served with subpoenas requiring production of such information, neither NAI nor its lawyers produced any evidence suggesting that NAI or its advisors approached any known strategic buyer in connection with the Redstone Defendants' sale of their interest in Midway. Indeed, Thomas claims that the Redstone Defendants' advisors specifically informed him that they were not seeking an institutional buyer because none of those buyers could complete the transaction in the fire-sale timeframe that the advisors had determined was necessary.

81. As noted above, Thomas was a completely unsuitable buyer of the Redstone Defendants' interest in Midway. Thomas had no experience or interest in the video game industry. Nor did Thomas have any meaningful financial resources. Thomas purchased the Redstone Defendants' interest in Midway for the sole and exclusive purpose of enforcing the debt under the NAI Facility in a Midway bankruptcy.

82. The Redstone Defendants, as controlling shareholder, owed a fiduciary duty to Midway and (because the company was insolvent) to its creditors in connection with the sale of their interest in Midway. Nevertheless, the Redstone Defendants did not approach the existing creditors of Midway, who held over $150 million in debt in Midway, before making the sale.

83. As a result of this irresponsible behavior, Midway and its creditors were denied the ability to secure a *bona fide* strategic partner in restructuring the company's business.

### 3. The Transaction Triggers Defaults in Midway's Obligations Under the Notes and the NAI Facility, and Forces Midway into Chapter 11 Bankruptcy

84. The Redstone-Thomas Transaction had other immediate adverse consequences, *inter alia*, the triggering of (i) redemption obligations under each of the indentures governing the 6% Notes and $75 million in aggregate principal amount of 7.125% Convertible Senior Notes due 2026 that Midway failed to satisfy and (ii) defaults under the NAI Facility.

85. Midway thereafter filed for Chapter 11 bankruptcy protection before this Court.

## CLAIMS FOR RELIEF

### First Claim for Relief

### (Fraudulent Transfer Against the Redstone Defendants and the Thomas Defendants)

86. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 85 as if fully set forth herein.

87. The Thomas Defendants' claim with respect to the NAI Facility should be avoided as a fraudulent transfer.

88. On November 28, 2008, the Redstone Defendants (the initial transferees and entities for whose benefit the transfer was made) transferred their entire interest in Midway to the Thomas Defendants (the immediate transferees of the Redstone Defendants).

89. As a result of the Redstone-Thomas Transaction, the Redstone Defendants took for themselves millions of dollars in Tax Attributes that Midway had accumulated over the years.

90. In exchange for the taking of its Tax Attributes, Midway received absolutely no value from the Redstone Defendants.

91. The Redstone-Thomas Transaction was completed in less than two weeks and the Redstone Defendants kept the transaction secret from Midway's Board of Directors and management.

92. Midway was insolvent throughout 2008 because its liabilities exceeded its assets and it could not pay its obligations as they became due (or intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured). Moreover, the Redstone-Thomas Transaction triggered Midway's obligations under the Notes and NAI Facility, forcing Midway into Chapter 11 bankruptcy.

93. At all relevant times hereto, there were actual creditors of the Debtors holding unsecured claims allowable against the Debtors' estates within the meaning of 11 U.S.C. §§ 502 and 544. These creditors, *inter alia*, have the right to void the Redstone-Thomas Transaction under applicable law.

94. As a result of the foregoing, the Thomas Defendants' claims with respect to the NAI Facility should be avoided under 11 U.S.C. § 544, or in the alternative § 548, and Plaintiff is entitled to recover the value of the amounts transferred under the Redstone-Thomas Transaction, pursuant to § 550, and other compensatory damages to be determined in this action.

## Second Claim for Relief

### (Unlawful Conversion Against the Redstone Defendants)

95. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 94 above as if fully set forth herein.

96. Prior to the Redstone-Thomas Transaction, Midway owned valuable Tax Attributes.

97. However, as a result of the Redstone-Thomas Transaction, Plaintiff immediately and irretrievably lost its ability to use the Tax Attributes, while the Redstone Defendants realized over $700 million in Tax Attributes for their own use.

98. The Redstone Defendants converted Midway's Tax Attributes for their own use without receiving any permission from, or giving any consideration to, Midway.

99. As a result of the Redstone Defendants' actions, Plaintiff has been damaged in a total amount to be determined in this action.

### Third Claim for Relief

### (Corporate Waste Against the Redstone Defendants)

100. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 99 above as if fully set forth herein.

101. On November 28, 2008, the Redstone Defendants, Midway's controlling shareholder, entered into the Redstone-Thomas Transaction.

102. As a result of the Redstone-Thomas Transaction, the Redstone Defendants received over $700 million in tax benefits. As to Thomas, the transfer of the Redstone Defendants' interest in Midway was a gift to Thomas, he received his purported interest in Midway in return for a *de minimis* payment of cash.

103. Midway, on the other hand, lost millions of dollars in Tax Attributes. And Midway received nothing of value in connection with the Redstone-Thomas Transaction.

104. No person of ordinary sound business judgment could view the benefits that Midway's controlling 87% shareholder, the Redstone Defendants, received from the Redstone-Thomas Transaction as fair in light of the destruction of valuable Tax Attributes at Midway.

105. As a result of the participation of the Redstone Defendants in the Redstone-Thomas Transaction, Plaintiff has been damaged in a total amount to be determined in this action.

### Fourth Claim for Relief

### (Breach of Fiduciary Duty Against the Board Defendants)

106. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 105 above as if fully set forth herein.

107. As members of the Board of Directors, the Board Defendants owed Midway and, as of at least January 2008, its creditors fiduciary duties of loyalty and care.

108. The Board Defendants breached their fiduciary duty of loyalty to Midway by consciously abdicating their duties to Midway and acting in the interests of the Redstone Defendants in approving the NAI Facility with the Redstone Defendants in February 2008.

109. In a knowing abdication of their directorial duties, the Board Defendants failed to consider all material information reasonably available to them in approving the NAI Facility. Among other things, the Board Defendants did not: (i) seek out financing from any third-party lender or investor, (ii) consider or investigate filing for Chapter 11 bankruptcy protection, (iii) determine whether a bankruptcy or out-of-court restructuring would be in Midway's best interests, (iv) conduct any review of Midway's solvency, (v) evaluate Midway's ability to support any additional debt, or (vi) engage professionals to conduct an analysis of Midway's solvency or the fairness of the NAI Facility to Midway.

110. The Board Defendants' failure to act to protect Midway's best interests, by preventing the company from assuming additional "debt" obligations under the NAI Facility that it could not possibly hope to satisfy, demonstrates the Board Defendants' conscious disregard for their duties to Midway.

111. In approving the NAI Facility, the Board Defendants also breached their fiduciary duty of care to Midway. The Board Defendants acted in a grossly negligent manner in approving the NAI Facility. The NAI Facility was enormously destructive to the interests of Midway's *bona fide* creditors, layering on tens of millions of dollars in additional debt that Midway had no hope of repaying. The Board Defendants did not use the amount of care that a reasonably prudent board of directors would have used under similar circumstances, nor did the Board Defendants consider all material information reasonably available to them. The Board Defendants simply approved management's request for tens of millions of dollars in additional capital without even bothering to consider the full impact of the transaction on Midway or any alternatives to the transaction.

112. In addition, the Board Defendants (except Robert J. Steele and Shari E. Redstone) breached their duties of loyalty and care to Midway with respect to the Redstone-Thomas

Transaction. After learning of the Redstone-Thomas Transaction, these remaining Board Defendants conducted no analysis of the propriety of deal or its negative impact on Midway, and directed Midway's attorneys not to bring any action on behalf of Midway against the Redstone Defendants or the Thomas Defendants.

113. As a result of the Board Defendants' breach of their fiduciary duties, Plaintiff has been damaged in a total amount to be determined in this action.

### Fifth Claim for Relief

### (Breach of Fiduciary Duty Against the Redstone Defendants: The NAI Facility)

114. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 113 above as if fully set forth herein.

115. The Redstone Defendants, as Midway's controlling shareholder, owed fiduciary duties to Midway and, as of at least January 2008, Midway's creditors.

116. The Redstone Defendants breached their fiduciary duties of care and loyalty to Midway and its creditors by entering into the $90 million NAI Facility in February 2008 without considering whether to cause Midway to (i) seek out financing from any third-party lender or investor, (ii) file for Chapter 11 bankruptcy protection, (iii) determine whether a bankruptcy or out-of-court restructuring would be in Midway's best interests, (iv) conduct any review of Midway's solvency, (v) evaluate Midway's ability to support any additional debt, or (vi) engage professionals to conduct an analysis of Midway's solvency or the fairness of the NAI Facility to Midway.

117. The Redstone Defendants also breached their fiduciary duties to Midway by causing the transaction to be structured to make it appear as if the investment were debt rather than equity so as to evade protections against additional equity investments by the Redstone Defendants negotiated by Midway's *bona fide* creditors.

118. As a result of the Redstone Defendants' breach of their fiduciary duties, Plaintiff has been damaged in a total amount to be determined in this action.

## Sixth Claim for Relief

### (Breach of Fiduciary Duty Against the Redstone Defendants: The Thomas Transaction)

119. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 118 above as if fully set forth herein.

120. The Redstone Defendants, as Midway's controlling shareholder, owed fiduciary duties to Midway and, as of at least January 2008, Midway's creditors.

121. The Redstone Defendants breached their fiduciary duty of loyalty to Midway and its creditors by placing their own interests above Midway and its creditors and selling their entire stake in Midway to Thomas in November 2008 for the sole purpose of capturing hundreds of millions of dollars in net operating losses, while depriving Midway of its Tax Attributes, denying Midway a *bona fide* strategic partner, and effectively forcing Midway into bankruptcy.

122. In consummating the Redstone-Thomas Transaction, the Redstone Defendants breached their fiduciary duty of care by engaging in a self-interested decision-making process that was irrational and constituted an extreme departure from the ordinary standard of care. The Redstone Defendants did nothing to identify a *bona fide* strategic buyer for Midway. The Redstone Defendants considered that the Redstone-Thomas transaction would harm Midway and proceeded with the transaction anyway. Indeed, the Redstone Defendants did not even inform Midway or its *bona fide* creditors of the transaction until after it had been consummated.

123. As a result of the Redstone Defendants' breach of their fiduciary duties, Plaintiff has been damaged in a total amount to be determined in this action.

## Seventh Claim for Relief

### (Aiding and Abetting Breach of Fiduciary Duty Against the Board Defendants)

124. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 123 above as if fully set forth herein.

125. The Redstone Defendants, as Midway's controlling shareholder, had a fiduciary relationship with Midway and its creditors and owed Midway and its creditors duties of loyalty, good faith, and care.

126. The Redstone Defendants breached their fiduciary duties to Midway and its creditors by, *inter alia*, imposing significant additional "debt" on Midway through the NAI Facility without any consideration of the detriment to Midway.

127. The Board Defendants knew that the Redstone Defendants would breach their fiduciary duties to Midway by entering into the NAI Facility. The Board Defendants knowingly participated in the Redstone Defendants' breach by encouraging and approving the transaction.

128. As a result of the NAI Facility, which the Board Defendants aided and abetted, Plaintiff has been damaged in a total amount to be determined in this action.

## **Eighth Claim for Relief**

### **(Aiding and Abetting Breach of Fiduciary Duty Against the Thomas Defendants)**

129. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 128 above as if fully set forth herein.

130. The Redstone Defendants, as Midway's controlling shareholder, had a fiduciary relationship with Midway and its creditors and owed Midway and its creditors duties of loyalty, good faith, and care.

131. The Redstone Defendants breached their fiduciary duties to Midway and its creditors by engaging in the Redstone-Thomas Transaction.

132. Thomas knew that the Redstone Defendants would breach their fiduciary duties to Midway by entering into the Redstone-Thomas Transaction. In fact, Thomas considered the harm that the Redstone-Thomas Transaction would cause Midway when determining the amount to pay under the Redstone-Thomas Transaction and knowingly participated in the Redstone Defendants' breach.

133. As a result of the Redstone-Thomas Transaction, which Thomas aided and abetted, Plaintiff has been damaged in a total amount to be determined in this action.

## Ninth Claim for Relief

### (Aiding and Abetting Breach of Fiduciary Duty Against the Redstone Defendants)

134. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 133 above as if fully set forth herein.

135. The Board Defendants, as Midway's Board of Directors, had a fiduciary relationship with Midway and, by January 2008, its creditors and owed Midway and its creditors duties of care, good faith, and loyalty.

136. The Board Defendants breached their fiduciary duties to Midway by, *inter alia*, imposing significant additional debt on Midway through the NAI Facility without any meaningful consideration of the detriment to Midway or Midway's best interests.

137. The Redstone Defendants knew that the Board Defendants would breach their fiduciary duties to Midway by entering into the NAI Facility. The Redstone Defendants knowingly participated in the Redstone Defendants' breach by engaging in the transaction.

138. As a result of the NAI Facility, which the Redstone Defendants aided and abetted, Plaintiff has been damaged in a total amount to be determined in this action.

## Tenth Claim for Relief

### (Equitable Subordination of the NAI Facility Against the Thomas Defendants)

139. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 138 above as if fully set forth herein.

140. The equities in this case dictate that the amounts allegedly owed to the Thomas Defendants on account of the NAI Facility should be subordinated to all other claims except those of equity interest holders under 11 U.S.C. § 510(c).

141. The Redstone Defendants and Thomas engaged in substantial inequitable conduct. Without conducting any diligence or analysis of Midway's solvency or Midway's best interests, the Redstone Defendants extended Midway a $90 million equity investment, disguised as a partly secured "loan" under the NAI Facility, while Midway was severely undercapitalized and overleveraged. Subsequently, the Redstone Defendants concocted a scheme that limited

Midway's ability to utilize favorable Tax Attributes by transferring their interests in Midway and the NAI Facility to Thomas for *de minimis* consideration. This constituted a breach of the Redstone Defendants' fiduciary duties to Midway. Thomas willingly and knowingly aided and abetted the Redstone Defendants' breach.

142. The Redstone Defendants' and Thomas's inequitable conduct in connection with entering the Redstone-Thomas Transaction caused substantial harm to Midway and its creditors by causing Midway to lose substantial Tax Attributes that would have generated significant recoveries for the estate, and concomitantly increased the amount of funds available to pay the general unsecured creditors. Also, the Redstone-Thomas Transaction resulted in defaults under the indentures governing the Notes and defaults under the NAI Facility.

143. In addition, the Redstone-Thomas Transaction conferred an unfair advantage on Thomas in that it created a purported first-in-line claim against Midway's assets, founded on the Redstone Defendants' breach of their fiduciary duties to Midway.

144. Thomas obtained his purported interests in the NAI Facility, subject to the rights and liabilities associated with NAI's interests in the NAI Facility.

145. Subordinating amounts owed under the NAI Facility is not inconsistent with the other provisions of the Bankruptcy Code.

146. For the reasons set forth above, the Thomas Defendants' claim with respect to the NAI Facility should be equitably subordinated to equity.

## Eleventh Claim for Relief

### (Recharacterization of the NAI Facility Against the Thomas Defendants)

147. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 146 above as if fully set forth herein.

148. The NAI Facility, while asserted as a claim on account of debt owed by Midway, is, in reality, an equity contribution, and should be recharacterized as equity.

149. Considering the totality of the circumstances, the NAI Facility is equity, not debt.

LA1:# 6402253
RLF1-3395450-1

150. NAI entered into the NAI Facility at a time when Midway was severely undercapitalized and overleveraged. No third party lender would have loaned Midway money on this basis.

151. When deciding whether to extend the cash infusion to Midway under the NAI facility, NAI and the Redstone Defendants were not concerned whether the money would be considered a loan or an equity contribution.

152. After entering the NAI Facility, the Redstone Defendants maintained and exercised control over Midway's affairs through its appointed officers on Midway's Board of Directors.

153. Thomas obtained his purported interests in the NAI Facility, subject to the rights and liabilities associated with NAI's interests in the NAI Facility.

154. For the reasons set forth above, the Thomas Defendants' claim with respect to the NAI Facility should be recharacterized as equity.

## Twelfth Claim for Relief

### (Unjust Enrichment Against the Thomas Defendants)

155. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 154 above as if fully set forth herein.

156. The Redstone-Thomas Transaction gave Thomas a controlling stake in Midway worth tens of millions of dollars and the right to receive interest and principal payments on a $30 million secured loan and $60 million in unsecured loans (both obligations created in breach of the Redstone Defendants' fiduciary duties to Midway) for a mere $100,000.

157. The Redstone-Thomas Transaction caused Midway to lose valuable Tax Attributes, which would have put Midway in a better position to pay its unsecured creditors, and caused Midway to default on its debt obligations, forcing the company to file for bankruptcy protection.

158. Midway's and the unsecured creditors' impoverishment was directly related to, and caused by, Thomas's enrichment from the Redstone-Thomas Transaction.

159. Thomas reaped an extraordinary benefit from the NAI Facility and the Redstone-Thomas Transaction, all at Midway's expense. It would be unjust for Thomas to retain the benefits of the Redstone-Thomas Transaction.

160. There exists no remedy provided by law because Midway's Tax Attributes are irretrievably gone.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

a. On the First Claim for Relief (Fraudulent Transfer) against the Redstone Defendants and the Thomas Defendants, (i) avoiding the Thomas Defendants' claims with respect to the NAI Facility as a fraudulent transfer and (ii) awarding compensatory damages in an amount to be determined in this action;

b. On the Second Claim for Relief (Unlawful Conversion) against the Redstone Defendants, awarding compensatory damages in an amount to be determined in this action;

c. On the Third Claim for Relief (Corporate Waste) against the Redstone Defendants, awarding compensatory damages and punitive damages as appropriate in an amount to be determined in this action;

d. On the Fourth Claim for Relief (Breach of Fiduciary Duty) against the Board Defendants, awarding compensatory damages in an amount to be determined in this action;

e. On the Fifth Claim for Relief (Breach of Fiduciary Duty: The NAI Facility) against the Redstone Defendants, awarding compensatory and punitive damages as appropriate in an amount to be determined in this action;

f. On the Sixth Claim for Relief (Breach of Fiduciary Duty: The Thomas Transaction) against the Redstone Defendants, awarding compensatory and punitive damages as appropriate in an amount to be determined in this action;

g.      On the Seventh Claim for Relief (Aiding and Abetting Breach of Fiduciary Duty) against the Board Defendants awarding compensatory damages in an amount to be determined in this action;

h.      On the Eighth Claim for Relief (Aiding and Abetting Breach of Fiduciary Duty) against the Thomas Defendants awarding compensatory damages and punitive damages as appropriate in an amount to be determined in this action;

i.      On the Ninth Claim for Relief (Aiding and Abetting Breach of Fiduciary Duty) against the Redstone Defendants, awarding compensatory damages and punitive damages as appropriate in an amount to be determined in this action;

j.      On the Tenth Claim for Relief (Equitable Subordination) against the Thomas Defendants, equitably subordinating the Thomas Defendants' claims arising under the NAI Facility under 11 U.S.C. § 510(c) to all claims except as to Midway's equity interest holders;

k.      On the Eleventh Claim for Relief (Recharacterization) against the Thomas Defendants, recharacterizing Thomas's claims arising under the NAI Facility as equity;

l.      On the Twelfth Claim for Relief (Unjust Enrichment) against the Thomas Defendants, restituting the benefits conferred on the Thomas Defendants from the Redstone-Thomas Transaction to Midway in an amount to be determined in this action; and

m.      On all Claims for Relief, awarding:

(i)      interest at the applicable rates until such time as the judgments rendered in Plaintiff's favor are paid in full;

(ii)      costs (including attorneys' fees and costs taxable and non-taxable under applicable law) incurred in bringing this action; and

(iii)      such other and further relief as the Court may deem proper.

Dated: May 11, 2009
        Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**

By:    _Marcos A. Ramos_

Mark D. Collins (No. 2981)
Marcos A. Ramos (No. 4450)
Maris J. Finnegan (DE admission pending)
Andrew C. Irgens (No. 5193)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

- and-

**MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP**

Gregory A. Bray (*pro hac vice*)
Linda Dakin-Grimm (*pro hac vice*)
David B. Zolkin (*pro hac vice*)
601 S. Figueroa St., 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4000
Facsimile: (213) 629-5063

*Counsel for the Official Committee of Unsecured Creditors*