# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| MIDWAY GAMES INC., *et al.*, | : | Case No. 09-10465 (KG) |
|  | : | (Jointly Administered) |
| Debtors[1] | : |  |
|  | : |  |
|  | : | **Bid Procedures Hearing Date: 6/2/09 at** |
|  | : | **2:00 p.m. (EDT) (proposed)** |
|  | : | **Bid Procedures Objections Due: 5/29/09 at** |
|  | : | **4:00 p.m. (EDT) (proposed)** |
|  | : | **Sale Hearing Date: 7/1/09 at 1:00 p.m.** |
|  | : | **(EDT) (proposed)** |
|  | : | **Sale Objections Due: 6/24/09 at 4:00 p.m.** |
|  | : | **(EDT) (proposed)** |

**MOTION OF DEBTORS FOR ENTRY OF ORDERS UNDER 11 U.S.C. §§ 105(a), 363, AND 365 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004, 6006 AND 9014 (I) (A) APPROVING BIDDING PROCEDURES, BIDDING INCENTIVES FOR THE STALKING HORSE BIDDER, AND AUCTION PROCEDURES; (B) APPROVING NOTICE PROCEDURES FOR THE SOLICITATION OF BIDS, AN AUCTION, AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) SCHEDULING AN AUCTION FOR THE SALE OR SALES OF ALL OR SUBSTANTIALLY ALL OF DEBTORS' ASSETS; (II) APPROVING THE SALE OR SALES OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

Midway Games Inc. and certain of its direct and indirect subsidiaries, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors")[2], hereby file this motion (the "Motion") under sections 105(a), 363(b), (f), and (m), and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal

---

[1]    The Debtors are:  Midway Games Inc., Midway Home Entertainment Inc., Midway Amusement Games, LLC, Midway Interactive Inc., Surreal Software Inc., Midway Studios - Austin Inc., Midway Studios - Los Angeles Inc., Midway Games West Inc., Midway Home Studios Inc., and Midway Sales Company, LLC.

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for entry of: (A) an order substantially in the form annexed as **Exhibit A** hereto that (i) approves bidding procedures; (ii) approves the form and manner of notice of the sale or sales of all or substantially all of the Debtors' assets; (iii) approves the form and manner of notice of the assumption and assignment, including cure amounts, of executory contracts and unexpired leases; (iv) approves bidding incentives including a breakup fee, expense reimbursement, and overbid amount; (v) establishes a date for an auction; (vi) establishes a date for a sale hearing; and (vii) grants related relief; and (B) an order(s) substantially in the form annexed as **Exhibit E** hereto that: (i) approves the sale(s) of all or substantially all of the Debtors' assets pursuant to the asset purchase agreement attached hereto as **Exhibit B** (as such may be modified or amended from time to time, and including all schedules and exhibits attached thereto, the "Purchase Agreement") free and clear of all liens, claims, interests, and encumbrances to Warner Bros. Entertainment Inc. ("WBEI") or to another successful bidder(s) at the auction; (ii) authorizes the Debtors to assume and assign executory contracts and unexpired leases; and (iii) grants related relief. In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (M), (N), and (O). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement (as defined below).

2. The statutory bases for the relief requested herein are sections 105(a), 363(b), (f), and (m), and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rule 6004-1.

## BACKGROUND

3. On February 12, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code commencing these bankruptcy cases (the "Chapter 11 Cases"). The Debtors are continuing to manage their assets and operate their businesses as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4. Events and circumstances leading up to the Petition Date and supporting the relief requested herein are set forth in the Declaration of Ryan G. O'Desky in Support of Chapter 11 Petitions and First Day Relief (the "O'Desky Declaration") [Dkt. No. 2] filed on February 12, 2009 and incorporated herein by reference.

5. On February 23, 2009, the Office of the United States Trustee for the District of Delaware (the "OUST") appointed an official committee of unsecured creditors (the "Creditors' Committee"). The law firm of Milbank, Tweed, Hadley & McCloy LLC serves as lead counsel to the Creditors' Committee and FTI Consulting serves as its financial advisors.

## A. The Debtors' Business

6. Midway Games Inc. ("Midway Games") is a publicly held Delaware corporation with its corporate headquarters located at 2704 West Roscoe Street, Chicago, Illinois 60618. Midway Games is the ultimate corporate parent of all of the other above-captioned debtors and debtors in possession.

900200.00001/40178694v.4

7.    Midway Games also owns, directly or indirectly, the stock of certain non-debtor foreign subsidiaries (the "Foreign Subsidiaries").[3]  The Foreign Subsidiaries are not debtors in these cases and are not currently subject to insolvency proceedings in any location. With the exception of Newcastle, the Foreign Subsidiaries primarily distribute the Debtors' products overseas.  Newcastle operates as a studio and a developer of video games, and pursuant to a subcontract agreement with Midway Games Limited (U.K.), which in turn is party to a development agreement with Debtor Midway Home Entertainment Inc., Newcastle has served as the primary developer of the *Wheelman* game that is now the subject of a publishing agreement with Ubisoft Entertainment.

8.    The Debtors are a well-known developer and publisher of video games in the interactive entertainment software industry.  The Debtors distribute and sell video games primarily in North America, Europe, Asia and Australia for ultimate use on home consoles, handheld devices, and personal computers.  Customers include mass merchandisers, video rental retailers, software specialty retailers, internet based retailers and entertainment software distributors.

9.    The video games marketed and sold by the Debtors are developed either internally by Debtors' employee teams and/or in conjunction with third party developers who enter into contracts with the Debtors for the development of games.  The Debtors also enter into

---

[3]    The Foreign Subsidiaries include: Midway Studios - Newcastle Limited (U.K.) ("Newcastle"); Midway Australia Holdings Pty Ltd. (Victoria, Australia); Ratbag Holdings Pty Ltd (South Australia, Australia); Midway Studios - Australia Pty Ltd (South Australia, Australia); Midway Games Canada Corp. (Nova Scotia, Canada); Midway Games Limited (U.K.);  K.K. Midway Games (Japan); Midway Games GmbH (Germany); and Midway Games SAS (France).

agreements wherein the Debtors pay for rights to utilize the property and services of third party inventory manufacturers, video game platform manufacturers and intellectual property owners, and other third party providers in connection with the development, marketing, and sale of the Debtors' products.

10.     On the Petition Date, the Debtors were parties to certain unexpired leases of nonresidential real property. The Debtors currently operate studios in Chicago, Illinois; Seattle, Washington; and San Diego, California.

11.     In addition to video game sales to customers such as Walmart, Target, Best Buy, GameStop, and other large retailers, the Debtors earn license and royalty revenue from licensing the rights to some of their video games and related intellectual property to third parties.

12.     On April 23, 2009, each of the Debtors filed their respective schedules of assets and liabilities and statement of financial affairs (collectively, as such may be amended from time to time, the "Schedules and SOFAs"). Certain of the Schedules and SOFAs were amended on May 19, 2009.

13.     Since the Petition Date, the Debtors have continued to operate their business while continuing to market their assets for sale as a going concern. A comprehensive electronic data room has been established and made available to potential buyers who have executed confidentiality agreements. The Debtors and their investment banker, Lazard Freres & Co. LLC ("Lazard"), have utilized their extensive resources to contact over 80 individuals and entities, including both strategic and financial entities, located domestically and internationally to determine potential interest in the Debtors' assets. Multiple potential buyers and investors have performed extensive due diligence, participated in multiple meetings with Lazard and the Debtors' management and employee teams, and have submitted expressions of interest with

900200.00001/40178694v.4

respect to some or substantially all of the Debtors' assets. The Debtors and their advisors intend to continue these efforts throughout the proposed sale process described below.

14.     The Debtors have not been successful in obtaining any debtor in possession financing during these cases, but the Debtors have obtained orders authorizing their continued use of cash collateral, the most recent of which was obtained following a contested evidentiary hearing held on April 1 and 6, 2009, respectively. [Dkt. No. 251][4]

**B.     WBEI**

15.     WBEI is a holding company. WBEI, its subsidiaries and certain affiliates are known collectively as the Warner Bros. Entertainment Group of companies ("Warner Bros."). Collectively they produce and distribute theatrical motion pictures, television shows, animation and other programming and videogames, distribute home video product, and license rights to feature films, television programming, and characters. Warner Bros. is a world leader in filmed entertainment, and in 2008 released internationally 14 English-language motion pictures and 35 local-language films that it either produced or acquired, including such titles as *The Dark Knight*, *I Am Legend*, *10,000 B.C.*, *The Bucket List* and *Sex and the City: The Movie*. Its television programs include prime time series such as *Two and a Half Men*, *Without a Trace*, *Cold Case*, *ER* and *Smallville* and *The Closer* and *Nip/Tuck* on cable networks.

16.     Warner Bros. has a significant presence in the videogame industry. Among the WBEI subsidiaries that comprise the Warner Bros. group is Warner Bros. Home Entertainment Inc. ("WBHE") which, through its Warner Bros. Interactive Entertainment ("WB Interactive") division, develops, publishes and licenses interactive videogames for a variety of

---

[4]     Acquisition Holdings Subsidiary I, LLC (the "Lender") and the independent directors on the Midway Games board have filed notices of appeal with respect to the cash collateral order (or certain portions contained therein).

platforms based on Warner Bros., DC Comics properties and original game properties. Games published by WB Interactive include the *LEGO Star Wars* videogame franchise, *LEGO Batman*, *Speed Racer* and *Guinness World Records*, and *LEGO Indiana Jones*, which it co-publishes. Warner Bros. distributes video games through its Warner Home Video worldwide distribution network.

17.     In 2008, Warner Bros. generated revenues of $11.398 billion, $1.228 billion in operating income before depreciation and amortization, and over $800 million in operating income.

18.     Warner Bros. is a creditor in these cases, having entered into prepetition agreements with Sellers pertaining to the games *Mortal Kombat v. DC Universe*, *Happy Feet*, and *Ant Bully*. The Debtors owed Warner Bros. an aggregate of $7,867,820 on a prepetition basis in connection with these games.

## THE SALE PROCESS

19.     By this Motion, the Debtors seek authority to market and ultimately sell all or substantially all of their assets. The Debtors are proposing sale procedures as a means by which to facilitate the sale of assets. The Debtors submit that a successful sale or sales of all or substantially all of their assets is the best way to maximize the value of the Debtors' estates under the facts and circumstances of these cases.

20.     As detailed in the O'Desky Declaration, beginning in early December 2008, the Debtors and Lazard analyzed strategic restructuring alternatives and sought prospective purchasers and investors both within the Debtors' industry and among potential strategic and financial buyers, in order to address the Debtors' financial needs. Prior to the Petition Date, the Debtors and their advisors met with multiple interested parties at several of the Debtors' facilities

900200.00001/40178694v.4

and contacted numerous other parties in respect of a purchase of some or all of the Debtors' assets.

21.     After conducting negotiations with several potential purchasers, the Debtors and their advisors have determined that the Purchase Agreement with WBEI represents the best opportunity for the Debtors to maximize the value of their assets and serve as a basis for conducting an auction to seek higher and/or better offers. A copy of the Purchase Agreement is attached hereto as **Exhibit B**.

22.     The Purchase Agreement contemplates the sale of substantially all of the selling Debtors'(the "Sellers")[5] assets, subject to higher and/or better bids, on terms that include the following:[6]

- **Consideration**. Cash at Closing of Thirty-Three Million Dollars ($33,000,000), subject to certain adjustments based on an inventory valuation and a certain Side Letter (the "Cash Consideration"), and exclusive of WBEI's payment of Cure Amounts and the Accounts Receivable Amount. (Purchase Agreement, §§ 2.5, 3.1, 3.5, 8.3(b))

- **Assets to be Sold**. The assets being sold under the Purchase Agreement are described in **Schedule 2.1** of the Purchase Agreement and include: (a) except for the **Excluded Games** referenced on **Schedule 2.2**, all of the Sellers' video games (whether completed or not), with such video games to include, without limitation, all previously released titles, all video games based on the ***Mortal Kombat*** universe and ***This is Vegas*** universe, all ***Game Party*** video games, all ***Touchmaster*** video games, all ***Area 51*** video games, all ***Spy Hunter*** video games, all **Wheelman** video games (but for the avoidance of doubt, not the Wheelman Distribution Agreement (Purchase Agreement, §8.17; Schedule 2.2)), all of the Sellers' arcade and coin-operated games including, but not limited to, ***Gauntlet, Rampage, Joust,*** and ***Rampart,*** and all "back catalog" and "classic

---

[5]     The Sellers are: Midway Games Inc., Midway Amusement Games, LLC, Midway Home Entertainment Inc., Surreal Software Inc., Midway Games West Inc., Midway Studios-Los Angeles Inc. and Midway Studios-Austin Inc.

[6]     The following summary is not comprehensive and is provided for convenience only. In the event of any inconsistency between the summary and the Purchase Agreement, the latter shall control. Parties are encouraged to review the Purchase Agreement in its entirety.

intellectual property" library video games, and with respect to each such video game, all Game Assets thereof (collectively, the "*Seller Games*"); (b) all Assigned Contracts, including, without limitation, all leasehold interests in and to the real property located at the Acquired Studios; (c) all tangible personal property owned by the Sellers, including, without limitation, all office equipment, computer hardware, servers, furniture and furnishings, accessories, supplies, and related infrastructure located at, or otherwise relating to the operations of the Sellers conducted at, the Acquired Studios, and such of the foregoing which is located at the Headquarters but is used primarily in Sellers' game development operations; for the avoidance of doubt, this shall include, without limitation, the motion capture equipment located in the motion capture studio at the Headquarters and all computer hardware and servers supporting product development activities located at the Headquarters; (d) all software products (other than software used for employee, accounting or legal functions performed at the Headquarters and software related to the Sellers' publishing business including the software that interfaces with customers and warehouses as referenced on **Schedule 2.2**), all intellectual property rights (including, without limitation, trade secrets, inventions, patents and patent applications, registered copyrights and applications for copyright registrations, registered trademarks, service marks, trade names and applications for registration thereof, technology, and know-how), and all other proprietary rights owned or used by the Sellers in connection with the operations of the Sellers at the Acquired Studios or relating to the Seller Games (which do not include the Excluded Games), including, without limitation, all technology, codes (source, object, byte), development tools, engines, files (source, data, log, executable), databases, and other similar items relating thereto; (e) all Inventory of Sellers; (f) all books, records, files, papers, ledgers, documents, correspondence, lists, plats, architectural plans, drawings, specifications, creative materials, advertising and promotional materials, studies, and reports, all exclusive and non-exclusive information, lists and files, and all other printed or written materials relating to the Purchased Assets; (g) all permits, licenses, registrations, filings, authorizations, approvals or indicia of authority (and any pending applications for any thereof), orders, certificates, variances, and similar rights obtained from governments and governmental agencies, in each case to the extent transferable, relating to the Purchased Assets; (h) all deposits or prepaid charges and expenses paid in connection with or relating to any Purchased Assets; (i) all goodwill in or associated with the Purchased Assets, including, without limitation, all goodwill in the Game Assets relating to the Seller Games; (j) all insurance proceeds, claims and causes of action of any Seller arising prior to the Closing Date with respect to, or arising in connection with, any Purchased Asset, but specifically excluding all insurance claims, proceeds, and causes of action retained by Sellers as described in clause (h) of **Schedule 2.2**; (k) all Accounts Receivable included in the Accounts Receivable Amount and all

900200.00001/40178694v.4

of the Sellers' rights to receive such payments; and (l) **any rights, claims or causes of action of Sellers against Purchaser relating to the assets, properties, business or operations of Sellers arising out of events occurring on or prior to the Closing Date, including, but not limited to, causes of action involving commercial tort and all causes of action under chapter 5 of the Bankruptcy Code,** but specifically excluding Sellers' rights, claims, or causes of action in connection with the Purchase Agreement and related documents, as such are described in clause (j) of Schedule 2.2;

- **Assumed Liabilities and Cure Amounts**. In addition to payment of the Cash Consideration, WBEI has agreed to assume, effective as of the Closing, and to timely perform and discharge in accordance with their respective terms, (i) all of Sellers' liabilities and obligations arising from and after the Closing Date under the Assigned Contracts, (ii) all of Sellers' liabilities and obligations under the Allowances and general Allowances relating to the Accounts Receivable included in the Accounts Receivable Amount, and (ii) the Cure Amounts (Purchase Agreement, §§ 2.3, 2.5)

- **Excluded Assets**. WBEI has not agreed to purchase and Sellers have not agreed to sell the Excluded Assets, as set forth in **Schedule 2.2** of the Purchase Agreement, including (a) the shares of capital stock, limited liability company membership interests and other equity interests of Midway Games and all of its direct or indirect Subsidiaries; (b) the assets of any foreign Subsidiary, unless specifically included in the Purchased Assets; (c) all cash, cash equivalents, bank deposits or similar cash items of Sellers and all marketable securities and other investments of Sellers; (d) all intercompany receivable and payable balances that exist among Sellers and/or the Subsidiaries on the Closing Date, including any unpaid interest accrued on any such receivable; (e) all of Sellers' deposits or prepaid charges and expenses not specifically included in or arising in connection with the Purchased Assets; (f) any claim, right or interest of Sellers in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date; (g) insurance polices maintained by any Seller; (h) all insurance proceeds, and claims and causes of action relating thereto, of any Seller arising prior to or after the Closing Date with respect to, or arising in connection with, any Excluded Asset or any liability or obligation of Sellers not included in the Assumed Liabilities, and for the avoidance of doubt, all insured or insurable claims and causes of action against Sellers (or any of them) in the nature of commercial tort, breach of fiduciary duty, fraud, fraudulent conveyance, or breach of loyalty arising prior to and after the Closing Date shall be Excluded Assets; (i) any rights, claims or causes of action of Sellers against third parties other than WBEI relating to the assets, properties, business or operations of Sellers arising out of events occurring on or prior to the Closing Date, including, but not limited

to, causes of action involving commercial tort and all causes of action under chapter 5 of the Bankruptcy Code, including without limitation, all claims and causes of action made or which may be brought (including all claims to any insurance policies that may arise therefrom) in connection with the complaint filed by the Creditors' Committee at Adv. Pro. No. 09-50968(KG); (j) any rights of Sellers under the Purchase Agreement or, except with respect to any Purchased Assets, any other agreement, document or instrument contemplated by the Purchase Agreement, including the consideration delivered by WBEI to Sellers for the Purchased Assets pursuant to the Purchase Agreement; (k) all personnel records and other records that any Seller is required by Law to retain in its possession; (l) all real property and any leasehold interests relating to any real property leased by Sellers other than the real property and the leasehold interests in and to the real property located at the Acquired Studios (which shall be Assigned Contracts), including, without limitation, the real property located at the Headquarters and the San Diego Studio; (m) except as specified in clause (c) of **Schedule 2.1** of the Purchase Agreement, all other tangible personal property owned or leased by the Sellers, including all office equipment, computer hardware, servers, furniture and furnishings, accessories, supplies, and related infrastructure (but excluding all development and test kits, development tools or the like relating to the Seller Games which shall be Purchased Assets); (n) all software used for employee, accounting or legal functions performed at the Headquarters and software related to the Sellers' publishing business, including the software that interfaces with customers and warehouses; *provided, however*, that WBEI shall be entitled to reasonable access and use of such software and related information management systems on a royalty-free basis for the purpose of obtaining any data relating to the operation of the Purchased Assets following the Closing in addition to any other access rights granted to WBEI under the Purchase Agreement; (o) all *TNA Wrestling* video games, all Game Assets related thereto, all Inventory relating thereto, and any rights of any Seller under any Excluded Contracts relating to such video games and the right to the "Midway" trademark for the sole purpose of reordering and selling existing *TNA Wrestling* video games as set forth in **Section 8.20(b)** of the Purchase Agreement; (p) all *NBA/NHL/MLB* video games, *Lord of the Rings* video games, *Mechanic Master* video games, and any new game, demo or prototype games worked on exclusively in the Newcastle Studio on and after January 1, 2009 (but not including the *Wheelman* video game), and with respect to such video games, all Game Assets thereof and Inventory relating thereto and any rights of any Sellers under any Excluded Contracts relating to any such video games; (q) each of the following additional Contracts, and any rights of Sellers under any Contract described in **Schedule 2.2**: (i) the Wheelman Distribution Agreement and the right to receive payments thereunder as set forth in **Section 8.17** of the Purchase Agreement; (ii) all platform agreements between any Seller and

900200.00001/40178694v.4

any Person, including without limitation, any Platform Manufacturers, and all consents or approvals thereunder; (iii) all employment agreements and all agreements relating to any welfare benefit or other plan, arrangement or understanding of Sellers providing benefits to any current or former employee, officer or director of any Seller; (iv) Agreement of Purchase and Sale, dated July 7, 2008, between Midway Games Inc., as Seller, and Lexington Homes L.L.C., as Buyer, relating to the property located at 2633 W. Roscoe St., Chicago, Illinois, USA 60618, including the right of any Sellers to receive the Purchase Price Premium as defined in, and pursuant to, such Contract; (v) Redevelopment Agreement, dated January 31, 2000, between The City of Chicago and Midway Games Inc., relating to the property located at 2633 W. Roscoe St., Chicago, Illinois, USA 60618; (vi) any Contracts other than the Assigned Contracts that relate solely to the Headquarters, the San Diego Studio and those properties located outside of the United States, including without limitation Contracts related to utilities, rent and maintenance at such properties; (vii) Replication, Packaging, Distribution and Returns Processing Services Agreement, effective as of May 15, 2007 by and between Technicolor and Midway Home Entertainment Inc. (the "Technicolor Agreement"); (viii) any distribution rights with respect to the Mechanic Master video game with Midway Games Ltd. or with respect to the **Jungle Book** video game; and (ix) Property Lien and Post-Closing Agreement dated as of November 6, 2008 by and between 2623 Roscoe L.L.C., Lexington Homes L.L.C. and Midway Games Inc.; and (r) all rights in the Licensed Assets granted to Sellers pursuant to the license or other similar agreement(s) referenced in **Section 8.18** of the Purchase Agreement and the Gold Master Candidate Assets granted to Midway and its Subsidiaries pursuant to the license referenced in **Section 8.20(b)** of the Purchase Agreement.

- **Waiver of Purchaser Cure Amount**. In the event that a final order of the Bankruptcy Court is entered approving the sale of the Purchased Assets to WBEI, WBEI shall waive and release any right to receive payment of $7,867,820 as a cure amount (**"*Purchaser Cure Amounts*"**) that would be payable to WBEI pursuant to Section 365(b) of the Bankruptcy Code as a condition to the Sellers' assumption and assignment of existing prepetition executory contracts with WBEI, including without limitation, contracts relating to the video games *Mortal Kombat vs. DC Universe, Happy Feet,* and *Ant Bully* (Purchase Agreement §§ 3.1)

- **Deposit**. Cash deposit of $5,000,000 (Purchase Agreement, § 3.4)

- **Break-Up Fee**. $1,000,000 (the "Break-Up Fee"), which is equal to approximately 3.1% of the estimated Cash Consideration (exclusive of payment by WBEI of the Accounts Receivable Amount and the Cure Amounts) to be received under the Purchase Agreement, with the Break-Up Fee to be payable in the event that, as a result of an Auction, all or substantially all of the Purchased Assets are sold by reason of a Qualified

Bid(s), or if the Purchase Agreement is terminated by WBEI pursuant to **Section 4.4(e)** of the Purchase Agreement. WBEI shall have a joint and several administrative priority expense claim in each of Sellers' Bankruptcy Cases, without duplication, for payment of the Break-Up Fee and Expense Reimbursement and a return of the Deposit (Purchase Agreement, § 7.2(a));

- **Expense Reimbursement**. Reasonable and documented out-of-pocket expenses of WBEI, not to exceed $100,000 (the "Expense Reimbursement") (Purchase Agreement, § 7.2(a))

- **Employees**. WBEI intends to hire certain of the Sellers' employees, including key designers and employees on design teams for certain of the Sellers' Games that are included in the Purchased Assets. There is no closing condition with respect to the hiring of any specific employees or a minimum number of employees

- **Release of Claims**. Section 2.6 of the Purchase Agreement provides for a release of Sellers' claims against WBEI, and a covenant not to sue WBEI. This release and covenant not to sue would release WBEI from any and all rights, claims, or causes of action of Sellers against WBEI relating to the assets, properties, business or operations of Sellers arising out of events occurring on or prior to the Closing Date, including, but not limited to, causes of action involving commercial tort and all causes of action under chapter 5 of the Bankruptcy Code, but specifically excluding Sellers' rights, claims, or causes of action in connection with the Purchase Agreement and related documents, as such are described in clause (j) of Schedule 2.2 of the Purchase Agreement. To effect the foregoing, at the Closing, Sellers shall execute and deliver to WBEI the Release.

- **Closing.** A Closing shall take place on the date that is not more than two (2) Business Days following the satisfaction or waiver of the conditions set forth in Article IX of the Purchase Agreement, unless another time or date, or both, are agreed to by the parties. (Purchase Agreement, §4.4(a)). The Purchase Agreement may be terminated by either party if the Closing has not occurred by the close of business on July 15, 2009; provided, however, that, if the Closing shall not have occurred because a Sale Order has not yet been entered, but all other closing conditions that are capable of being fulfilled by such date shall have been fulfilled or waived, then no party may terminate the Purchase Agreement prior to July 31, 2009.

- **Preservation of Records**. Each of the parties to the Purchase Agreement agree to preserve, segregate and keep the records held by it or its Affiliates relating to the Purchased Assets, Assumed Liabilities and employees of the Sellers hired by WBEI for a period of one (1) year from the Closing Date and shall make such records and personnel available to the other, subject to compliance with applicable Law, as may be

900200.00001/40178694v.4

reasonably required by such party in connection with, among other things, the Bankruptcy Case or any matters or proceedings in connection therewith, any insurance claims by, Legal Proceedings or Tax audits against or governmental investigations of Sellers or WBEI or any of their Affiliates or in order to enable Sellers or WBEI to comply with their respective obligations under the Purchase Agreement and each other agreement, document or instrument contemplated thereby.

23. Although the Purchase Agreement is the culmination of a marketing process begun prepetition, the Purchase Agreement is subject to higher or better offers. The Debtors propose that the Purchase Agreement be further "tested" in the marketplace by the sale and bidding process described below so as to ensure that every effort has been made to realize maximum value for the Debtors' assets. In connection therewith, the Debtors request that this Court approve the following bidding procedures (the "Bidding Procedures"):[7]

- **Initial Bids**. Any third party (other than WBEI) interested in acquiring any of the Debtors' assets must be a Qualified Bidder who submits an "Initial Bid" in conformance with the following procedures at or prior to the date set forth in the Bidding Procedures Order, currently proposed as **June 24, 2009 at 4:00 p.m. (E.T.)** (the "Bid Deadline"). For purposes of the Bidding Procedures, the Purchase Agreement shall be deemed to be a Qualified Bid. For any Initial Bid to constitute a Qualified Bid, such Initial Bid must:

  a) Contain a signed definitive asset purchase agreement (together with a copy marked to show changes to the Purchase Agreement) (a "Qualified APA") and identify the assets the party seeks to purchase with, at a minimum, the following requirements: (i) having terms and conditions no less favorable to the Debtors than those of the Purchase Agreement except with higher or better consideration, which can be determined by aggregating bids made on different portions of the Debtors' assets ("Aggregate Bids") (provided that no Initial Bid shall provide for the payment to such bidder of any breakup fee, topping fee, expense reimbursement, or other similar arrangement); (ii) providing for consideration that is, alone or in conjunction with other Competing Bids when weighed against the transaction contemplated by the

---

[7] The following summary is not comprehensive and is provided for convenience only. In the event of any inconsistency between the summary and the Bidding Procedures, the latter shall control. Parties are encouraged to review the Bidding Procedures in their entirety.

Purchase Agreement, in Sellers' reasonable business judgment likely to result in value to Sellers (taking into account the impact of any delay in closing the transaction contemplated by such Competing Bid(s), purchase price adjustments, arrangements regarding Sellers' Inventory and Accounts Receivable, Cure Amounts, Contracts to be assumed and assigned, closing conditions, certainty of completion and any other relevant factors) greater than the sum of (A) the Cash Consideration of $33,000,000 provided for in the Purchase Agreement (as the same may be adjusted pursuant to the terms of the Purchase Agreement), plus (B) the amount of the Break-Up Fee, (C) if and only if the contracts between Midway Home Entertainment Inc. and Warner Bros. Interactive Entertainment with respect to Sellers' games entitled *Happy Feet*, *Ant Bully* and *Mortal Kombat v. DC Universe* are to be assigned, then so much of the amounts of $359,218, $166,126 and $7,342,476, respectively, that is to be paid to the extent that such Competing Bid(s) provide for payment thereof as a cure pursuant to Section 365(b) of the Bankruptcy Code, plus (D) the amount of the Expense Reimbursement, plus (E) $300,000 (the "Overbid Amount"); (iii) providing for a deposit in the aggregate amount of at least equal to five million dollars ($5,000,000); and (iv) not being subject to any (w) financing contingency, (x) contingency relating to the completion of unperformed due diligence, (y) contingency relating to the approval of the bidder's board of directors or other internal approvals or consents, or (z) any conditions precedent to the bidder's obligation to purchase the Assets other than those included in the Purchase Agreement (*See* Purchase Agreement, §7.2(c));

b) Be accompanied by a certified or bank check, wire transfer, or letter of credit reasonably acceptable to the Debtors in the aggregate amount of at least $5 million as a good faith deposit (the "Deposit"), to be held in escrow and credited to the closing payment if the Bidder(s) are ultimately determined to be the Successful Bidder(s) or to be returned to the bidder(s) otherwise, and a written statement that the bidder(s) agree to be bound by the terms of the Bidding Procedures and the Bidding Procedures Order;

c) To the extent not previously provided to Debtors, be accompanied by evidence satisfactory to Debtors in their commercially reasonable discretion that the bidder(s) are willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under the Qualified APA (or its equivalent) in the event that they submit the Successful Bid(s) at the Auction;

d) Remain open and irrevocable until the earlier of the end of the second business day following the closing of the transaction and fifteen (15) days after entry of a final order approving a definitive agreement

providing for the sale of the subject assets; and be submitted to (i) counsel for the Debtors: Blank Rome LLP, The Chrysler Building, 405 Lexington Avenue, New York, NY 10174, Attn: Pamela Flaherty, Esq., Fax (212) 885-5001, and 1201 North Market Street, Suite 800, Wilmington, DE 19899, Attn: Michael D. DeBaecke, Esq. Fax: (302) 425-6464; (ii) counsel for the Lender: Kramer Levin Naftalis & Frankel, LLP, 1177 Avenue of the Americas, New York, NY 10036, Attn: Gordon Novod, Esq., Fax (212) 715-8192; (iii) counsel for the Creditors' Committee: Milbank, Tweed, Hadley & McCloy LLC, 601 South Figueroa Street, 30th Floor, Los Angeles, CA 90017, Attn: David B. Zolkin, Esq., Fax (213) 892-4767; (iv) the OUST, 844 North King Street, Suite 2207, Wilmington, DE 19801, Attn: David Buchbinder, Esq., Fax (302) 573-6497; and (v) counsel for WBEI: Andrews Kurth LLP, 601 South Figueroa Street, Los Angeles, CA 90017, Attn: Jon L.R. Dalberg, Esq., Fax (213) 896-3137 (collectively, the "Notice Parties"); in each case so as to be received not later than the Bid Deadline.

The Debtors may in their sole discretion extend the Bid Deadline without further notice and for one or more bidders, but shall not be obligated to do so.

- **Auction**. In the event that the Debtors timely receive a conforming Qualified Bid or Qualified Bids, individually or in the aggregate, then the Debtors will conduct an auction (the "Auction") currently proposed to be held on **June 29, 2009 at 10:00 a.m. (EDT)** with respect to the sale(s) of the Debtors' assets at the time and place set forth in the Bidding Procedures Order, subject to change. In order to participate in the Auction, each prospective purchaser must be a Qualified Bidder and shall be required to comply with the requirements of the Bidding Procedures. At the Auction, Qualified Bidders may submit successive bids in increments of at least $150,000 greater than the prior bid (the "Incremental Bid Amount") for the purchase of the assets until there is only one (or more, in the case of Aggregate Bids) offer that Debtors determine, subject to Bankruptcy Court approval, is the highest and/or otherwise best offer(s) (the "Successful Bid"). When bidding at the Auction, WBEI shall receive a "credit" in the amount of the Break-Up Fee and maximum Expense Reimbursement. If no conforming Initial Bid from a Qualified Bidder shall have been received at or prior to the Bid Deadline, the Auction will not be held and the Sale Hearing will proceed with respect to the Purchase Agreement. All bids made at the Auction shall remain open until the earlier of the end of the second business day following the closing of the transaction and fifteen (15) days after the entry of an order(s) by the Court approving a definitive agreement providing for the sale(s) of the assets;

900200.00001/40178694v.4

- **Sale Hearing**. The Debtors intend to present the Successful Bid(s) for approval by the Court pursuant to the provisions of sections 105, 363(b), 363(f), 363(m), and 365 of the Bankruptcy Code at the final hearing to approve the Sale Motion (the "Sale Hearing") to be scheduled by the Court and currently proposed as **July 1, 2009 at 1:00 p.m. (EDT)**. The Debtors shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing. Upon the failure to consummate a sale of the assets after the Sale Hearing because of the occurrence of a breach or default under the terms of the Successful Bid, the next highest or otherwise best bid(s), if any, as disclosed at the Sale Hearing, shall be deemed the Successful Bid(s) without further order of the Court and the parties shall be authorized to consummate the transaction contemplated by the backup Successful Bid(s) without further notice or court order.

- **Notice of Auction and Sale Hearing**. Prior to the Sale Hearing, the Debtors will cause (i) the Notice of Auction and Sale Hearing, and (ii) the schedule of Contracts to be assumed and assigned along with any proposed Cure Amounts in connection therewith, to be served in accordance with the Bidding Procedures Order. The notice shall specify that objections to the relief requested by the Sale Motion, including objections relating to the proposed assumption and assignment of executory contracts and unexpired leases and any proposed Cure Amounts, shall be set forth in writing and shall specify with particularity the grounds for such objections or other statements of position. Objections shall be filed and served in accordance with the Bidding Procedures Order. The failure to file and serve objections in accordance with the Bidding Procedures Order shall be deemed a waiver of such objections and the objecting party shall be forever barred from asserting such objections with respect to the consummation and closing of the Sale, including without limitation, any objections to the proposed assumption and assignment of the Contracts and any objections to the Cure Amounts. Any objections timely filed and served in accordance with the Bidding Procedures Order shall be heard by the Court at the Sale Hearing or at such other hearing as the Court may determine.

- **Highest and/or Best Bid**. The Debtors shall retain full discretion and right to determine, after consultation with the Lender and Creditors' Committee, which bid(s) should be selected as the Successful Bid(s), all subject to final approval by the Court. The Debtors may adopt rules for the Auction that will better promote the goals of the Auction and that are not inconsistent with any of the other Bidding Procedures or of any Court order.

- **Sale Implementation**. Following the approval of the Successful Bid at the Sale Hearing, the Debtors will be authorized to take all commercially

reasonable and necessary steps to complete and implement the transaction(s) contemplated by the Successful Bid.

## Relief Requested

24.     By this Motion, the Debtors are requesting entry of certain orders concerning sale(s) of the Debtors' assets. First, the Debtors seek prompt entry of an order approving the Bidding Procedures as set forth above (the "Bidding Procedures Order"). This relief requested by the Debtors is intended to provide for a competitive bidding and auction process with the goal of maximizing value for the Debtors' estates, creditors and other stakeholders. The Break-Up Fee, Expense Reimbursement, and Overbid Amount (collectively, the "Bidding Incentives") would be approved by entry of the Bidding Procedures Order.

25.     Following completion of the sale process and any Auction, the Debtors intend to request entry of an order(s) (a) approving the sale(s) of assets free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "Liens") (with such Liens attaching to the proceeds of sale in the same order of priority and to the same extent as such Liens were valid, perfected and enforceable prior to entry of the sale order), to the Successful Bidder(s) and (b) authorizing the Debtors to assume and assign executory contracts and unexpired leases.

## Basis for Relief Requested

**A.     Entry Of The Bidding Procedures Order Is Necessary And Appropriate Under The Facts And Circumstances Of These Cases.**

26.     After notice and a hearing, a debtor may sell assets outside the ordinary course of business. 11 U.S.C. § 363(b). Generally, to obtain approval of a proposed sale of assets under section 363(b), a debtor should demonstrate that the proffered purchase price is the highest or best offer under the circumstances of the case. *See e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in

bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

27.     The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets outside the ordinary course of business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest or best recovery for a debtor's estate.  The proposed Bidding Procedures and the opportunity for competitive bidding embodied therein are both reasonable and designed to maximize the value received for the Debtors' assets by facilitating a competitive bidding process in which all potential and qualified bidders are encouraged to participate and submit competing bids.

28.     The Debtors desire to receive the greatest value possible for their assets. The Bidding Procedures were developed so as to be consistent with the Debtors' need to expedite the sale process but with the object of promoting active bidding that will result in the highest and/or best offer(s) possible.  In addition, the proposed Bidding Procedures reflect the Debtors' objective of conducting an Auction in a controlled, but fair and open, manner that promotes maximum interest in the Debtors' assets by financially capable, motivated bidders who are likely to close a transaction(s), while simultaneously discouraging offers from persons the Debtors do not believe are sufficiently capable or likely to actually consummate a transaction.

29.     In the event Qualified Bids are received by the Bid Deadline, the Debtors currently propose to hold an auction of the Debtors' assets on **June 29, 2009 at 10:00 a.m.**

**(Eastern Time)** at the Delaware or New York offices of Blank Rome LLP, or such other location determined by the Debtors. At the Auction, the Debtors may select the highest and/or best Qualified Bid for any particular asset of the Debtors. **ALL BID(S) SHALL BE SUBJECT TO THE APPROVAL OF THE BANKRUPTCY COURT.**

30.     WBEI, parties who submit Qualified Bids prior to the Bid Deadline, representatives of the Lender, Creditors' Committee, OUST, and the Debtors, and professionals representing the foregoing shall be entitled to attend and be heard at the Auction. Any creditor of the Debtors that wishes to attend the Auction may do so as long as it provides written notice of its planned attendance to undersigned counsel for the Debtors at least two business days prior to the Auction.

31.     During the Auction, bidding with respect to the Debtors' assets as a whole shall begin with the highest Qualified Bid, continue with the first Incremental Bid Amount of $150,000 over and above the previous highest Qualified Bid, and continue thereafter in minimum increments of at least $150,000. The Debtors shall also consider bids for less than all of their assets, provided that such bids exceed in the aggregate the highest or otherwise best bid for all or substantially all of the assets.

32.     All participating bidders will be permitted sufficient time, to be determined by the Debtors in consultation with the Lender and Creditors' Committee, in which to respond to the previous bid made at the Auction. The Debtors, in consultation with the Lender and Creditors' Committee, shall determine when bidding for certain or all of the assets shall conclude.

900200.00001/40178694v.4

33.     WBEI has the right to credit the amount of the Break-Up Fee and the maximum possible Expense Reimbursement as part of any subsequent bid made by the WBEI at the Auction.

34.     Subject to the terms and provisions of the Purchase Agreement, the Debtors will have no obligation to accept or submit for Bankruptcy Court approval any offer presented prior to or at the Auction. Subject to the terms and provisions of the Purchase Agreement, the Debtors reserve the right to reject any offer at any time prior to entry of an order approving a sale of the Debtors' assets.

35.     Given the current circumstances of these cases, the Debtors, the Lender, and the Creditors' Committee believe that implementation of a prompt sale process is the best way to maximize the value of the Debtors' assets. Prompt entry of the Bidding Procedures Order will permit the sale process contemplated by the proposed Bidding Procedures to begin as expeditiously as possible.

**B.      The Proposed Bidding Incentives Are Fair And Reasonable And Should Be Approved Under Applicable Standards And Practice Of This Court.**

36.     In recognition of WBEI's significant expenditure of time, energy, and resources invested and to be invested in this process, and the benefits afforded by the Purchase Agreement to the Debtors' estates, the Debtors request approval of the proposed Bidding Incentives.

37.     The use of bidding incentives such as those proposed here has become an established practice in chapter 11 cases involving the sale of significant assets. Bidding incentives enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor and its bankruptcy estate with the potential of obtaining an enhanced price through an auction process. Historically, bankruptcy courts have

approved bidding incentives similar to the Bidding Incentives by reference to the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (holding that bidding incentives "may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal citation omitted); *see also In re Integrated Resources*, 147 B.R. 650, 657-58 (S.D.N.Y. 1992).

38.     The Third Circuit Court of Appeals has clarified the standard for determining the appropriateness of bidding incentives in the bankruptcy context. In *Calpine Corp. v. O'Brien Envtl Energy, Inc. (In re O'Brien Envtl Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999), the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide benefit to a debtor's estate. *Id.* at 532-33.

39.     *O'Brien* identified at least two instances in which bidding incentives may provide benefit to the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the incentives "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induced a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its

true worth." *Id; see also O'Brien* at 536 (reviewing nine factors set forth by the lower court as relevant in deciding whether to award a breakup fee, which factors include the reasonableness of the breakup fee relative to the purchase price and the support of the principal secured creditors and creditors committee).

40.     The Bidding Incentives are consistent with the "business judgment rule" and satisfy *O'Brien*. Potential purchasers will be afforded an opportunity to submit competing bids modeled on the Purchase Agreement. The proposed $1,000,000 Break-Up Fee and up to $100,000 Expense Reimbursement aggregate to just over 3% of the estimated Cash Consideration of $33,000,000 (subject to certain adjustments as described in Sections 3.1, 3.5 and 8.3 of the Purchase Agreement), exclusive of any additional amounts paid by WBEI as the Accounts Receivable Amount and the Cure Amounts. The proposed Bidding Incentives are consistent with the range of bidding protection regularly approved by bankruptcy courts in this district.

41.     Further, the Bidding Incentives have already encouraged bidding, in that the Bidding Incentives were a material inducement for, and a requirement by, WBEI to enter into the Purchase Agreement. The Bidding Incentives have thus "induce[d] a bid that otherwise would not have been made and without which bidding would [be] limited." *O'Brien* at 537. Similarly, the Purchase Agreement will serve as a minimum or floor bid upon which other bidders will rely, thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

42.     The Debtors frequently have consulted the Creditors' Committee and Lender and their respective professionals in connection with the sale process and the negotiation of the Bidding Incentives and Purchase Agreement. Based upon the involvement of the

Creditors' Committee and Lender thus far, the Debtors do not believe the Lender and Creditors' Committee will object to approval of the Bidding Incentives.

43.     Finally, the existence of the Bidding Incentives will permit the Debtors to insist that competing bids for the Debtors' assets be materially higher or otherwise better than that offered by WBEI, a clear benefit to the Debtors' estates and creditors if Qualified Bids are received.

44.     The proposed Bidding Incentives are fair and reasonable in view of, among other things, (a) the intensive analysis, due diligence investigation and negotiations WBEI has and will have undertaken in connection with the proposed sale and (b) the fact that if the Bidding Incentives are triggered, the efforts of WBEI will have generated the opportunity for the Sellers to receive the highest or otherwise best offer for their assets, to the benefit of the Debtors' estates, creditors, employees, and customers.  Because the proposed Bidding Incentives are (i) fair and reasonable, (ii) reasonably calculated to produce the highest and/or best offers for the Sellers' assets and thereby confer actual benefits upon the estates herein, and (iii) within the range of bidding incentives customarily approved by courts in this district, the Bidding Incentives should be approved by this Court.

## C.     The Proposed Sale Of Assets Should Be Approved As A Product Of The Debtors' Exercise Of Sound And Reasonable Business Judgment.

45.     Section 363(b)(1) of the Bankruptcy Code provides: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."[8]  Section 105(a) of the Bankruptcy Code provides in relevant part: "[t]he

---

[8]     Because the Debtors do not sell directly to consumers, the requirements of section 332(b)(1) of the Bankruptcy Code are inapplicable. *See* 11 U.S.C. §363(b)(1).

Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

46. Under Delaware law, the business judgment rule operates as a presumption that "directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest." *Continuing Creditors' Comm. of Star Telecomm., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (*quoting Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988)); *see also Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 555 n. 111 (D. Del. 2008). Thus, this Court should approve the proposed sale if the Debtors demonstrate a sound business reason or justification in support thereof. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 179 (D. Del. 1991); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (section 363 sale should be approved if "the proposed sale is fair and equitable, ...a good business reason [exists] for completing the sale and the transaction is in good faith"); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983).

47. Additionally, courts have permitted a proposed sale of all or substantially all of the assets of a debtor outside the ordinary course of business if such sale is necessary to preserve the value of assets. *See In re Lionel Corp.*, 722 F.2d at 1068-69.

48. Here, the proposed sale procedures and proposed sale of assets easily meet the "sound business reason" test and it is clear the proposed sale is necessary to preserve the value of the assets. First, the fairness and reasonableness of the consideration to be paid for the Purchased Assets by WBEI or other Successful Bidder will be demonstrated by continued exposure of the opportunity to the marketplace via the sale process proposed herein, on notice to

potential purchasers, creditors, and other parties in interest. The Purchase Agreement is the good faith product of intense and extensive negotiations among the parties and their respective counsel. Likewise, the final proposed purchase agreement(s) will be the product of good faith, arm's length negotiations between the Debtors and the highest and/or best bidder(s) with respect to the price and other terms of the sale(s) of the Debtors' assets. Moreover, the Debtors have insufficient liquidity to continue funding operations indefinitely and the Debtors have not been successful to date in obtaining postpetition financing that would enable the Debtors to continue operating their business over the next several months. In short, the Debtors and their major creditor constituencies believe that a prompt sale of the Debtors' assets via the Purchase Agreement or other Successful Bid(s) presents the best opportunity to realize the maximum value of the assets.

49. The Debtors further believe that the net benefit to their creditors may be adversely affected absent a prompt sale. Absent a prompt sale, the Debtors will continue to incur expenses that likely will erode recoveries for creditors. Such expenses include maintenance, utility charges, employee wages, salary, benefits, and overhead.

50. In light of the current circumstances and the fact the Sellers have been able to reach a signed agreement with WBEI, an experienced and financially strong buyer, the decision to sell the Purchased Assets at this time is fully consistent with and should be approved as an exercise of sound business judgment.

**D. The Sale of Assets Should Be Approved Free And Clear Of Liens Pursuant to Section 363(f) Of The Bankruptcy Code.**

51. Pursuant to section 363(f) of the Bankruptcy Code, the Debtors seek authority to sell and transfer their assets to all Successful Bidders free and clear of all Liens, with such Liens to attach to the proceeds of the sale in the same order of priority, and to the same

extent as such Liens were valid, perfected, and/or enforceable immediately prior to the sale, subject to any rights and defenses of the Debtors and other parties in interest with respect thereto. Section 363(f) of the Bankruptcy Code is written in the disjunctive and provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

48.     A sale free and clear of Liens is necessary to maximize the value of the Debtors' assets. A sale subject to Liens would result in a lower purchase price and be of substantially less benefit to the Debtors' estates. A sale free and clear of Liens is particularly appropriate under the circumstances because any Lien that exists immediately prior to the closing of any sale will attach to the sale proceeds with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtors or any party in interest. The Debtors submit that holders of Liens will be adequately protected by the availability of sale proceeds to satisfy their Liens. Thus, the proposed sale(s) satisfies section 363(f) of the Bankruptcy Code. Moreover, any holder of a Lien that receives notice of the

900200.00001/40178694v.4

proposed sale and which fails to object should be deemed to consent to the proposed sale, thereby complying with section 363(f)(2) of the Bankruptcy Code.

**E.  The Court Should Approve The Assumption And Assignment Of Executory Contracts And Unexpired Leases.**

49.    Under section 365 of the Bankruptcy Code, a debtor may assume, reject, or assume and assign executory contracts and unexpired leases.

50.    In accordance with section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).   The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See Sharon Steel Corp. v. Nat'l Fuel Gas Dist. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989).   The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the executory contract will benefit the estate."  *Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (*quoting In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D. N.Y. 1984).

51.    Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for a debtor to assume an executory contract or unexpired lease.  This subsection provides:

> (b)(1)    If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any

actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

52. With respect to assignment of an executory contract or unexpired lease, Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

The trustee may assign an executory contract or unexpired lease of the debtor only if --

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

53. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 593 (S.D.N.Y. 1992). Adequate assurance does not mean absolute assurance or a guarantee that the assignee will thrive and make all payments required under the subject contract. *See In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D. N.Y. 1985).

54. Among other things, adequate assurance may be provided by demonstrating the proposed assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

900200.00001/40178694v.4

55.     To the extent any defaults exist under any Contract that is an Assigned Contract, any such default will be promptly cured by WBEI or the Successful Bidder or adequate assurance that such default will be cured will be provided prior to the assumption and assignment.

56.     As set forth in paragraphs 15-18 above, WBEI and the Warner Bros. group of companies of which it is a part generated more than $800 million in operating income during 2008 and have a well-established presence in the video game industry. As such, there can be no doubt as to WBEI's ability to perform under the Purchase Agreement and to provide the adequate assurances of future performance and cure of existing defaults under executory Assigned Contracts that is required under 11 U.S.C. § 365(b). If necessary, the Debtors will adduce facts at the Sale Hearing to show the financial wherewithal and credibility of WBEI or other Successful Bidder and its willingness and ability to perform under the contracts to be assumed and assigned. The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the proposed purchaser to provide adequate assurance of future performance under the contracts to be assumed and assigned. The Court should therefore authorize the Sellers to assume and assign the Assigned Contracts as set forth herein.

57.     To facilitate the sale, assumption, and assignment of the Contracts, the Debtors propose to serve the Cure Amount Notice, in substantially the form attached hereto as **Exhibit C**, upon the non-debtor parties to the Contracts as soon as practicable after entry of the Bidding Procedures Order and request that the Court approve the procedure set forth below for fixing any cure amounts owed on the Contracts.

58.     The Debtors will attach to the Cure Amount Notice their calculation of the cure amounts (the "Cure Amounts") that the Debtors believe must be paid by the Successful Bidder(s) at Closing to cure defaults under all Contracts subject to assumption and assignment. If the amount listed is zero ($0), the Debtors believe there is no Cure Amount to be paid in connection with assumption and assignment. The Debtors request that any non-debtor party to a Contract that wishes to file an objection (the "Cure Amount Objection") to its scheduled Cure Amount must do so (and serve a copy so as to be received by the Notice Parties) on or before **June 24, 2009** at **4:00 pm** (prevailing Eastern Time).

59.     If no timely Cure Amount Objection is received, the Debtors seek entry of an order providing that such non-debtor party (a) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Contracts, and the Debtors shall be entitled to rely solely upon the Cure Amount; and (b) be deemed to have consented to the assumption and assignment of such Contract and shall be forever barred and estopped from asserting or claiming against the Debtors or the Successful Bidder that any additional amounts are due or defaults exist or conditions to assumption and assignment must be satisfied under such Contract.

60.     In the event that a timely Cure Amount Objection is filed, the Cure Amount Objection must set forth (i) all grounds for the objection and (ii) the amount the party asserts to be the correct Cure Amount. After receipt of the Cure Amount Objection, the Debtors will attempt to reconcile any differences in the Cure Amount. If agreement cannot be reached, the Court will resolve the disputed issues at the Sale hearing or other hearing scheduled by the Court.

900200.00001/40178694v.4

**F.    Notice Of The Proposed Sale Is Reasonable Under The Circumstances.**

61.    As noted above, the Debtors are confronted with business and economic circumstances dictating a prompt sale process and sale hearing.  In order to receive the highest and/or best price for their assets, the Debtors are seeking to conduct the Auction and hold the Sale Hearing on an accelerated track.  The Debtors continue to incur costs associated with preserving the value of their assets.  In order to yield the greatest possible return for the benefit of creditors and to limit potential administrative expenses, the Debtors believe that an expedited auction and sale process is warranted and necessary.

62.    Following entry of the Bidding Procedures Order, the Debtors will provide notice of the Bidding Procedures Order, the Bidding Procedures, the Purchase Agreement, the Cure Amounts and the Cure Amount Objection Deadline, the time and place of the Auction, the Sale Hearing, and the Sale Objection Deadline.  The Debtors propose to send the Notice of Auction and Sale Hearing, substantially in the form attached to this Motion as **Exhibit D**, to (i) taxing authorities or recording offices which have a reasonably known interest in the relief requested, (ii) the OUST, (iii) counsel to the Creditors' Committee and counsel to the Lender, (iv) federal, state, and local regulatory authorities with jurisdiction over the Debtors, (v) the Office of the United States Attorney, (vi) insurers, (vii) non-debtor parties to relevant contracts or leases, (viii) parties known to have expressed an interest in the Debtors' assets or to have executed confidentiality agreements in connection therewith; and (viii) parties who have requested service pursuant to Bankruptcy Rule 2002.

63.    Accordingly, the Debtors submit that the notice to be provided to parties in interest is reasonable and appropriate and will be adequate to ensure that the value of the assets has been tested in the marketplace and that all interested parties have the opportunity to

900200.00001/40178694v.4

object to the proposed sale of the Debtors' assets and assumption and assignment of executory contracts and unexpired leases.

## G. The Automatic Ten Day Stay Under Bankruptcy Rules 6004(g) And 6006(d) Should Be Waived.

64.     Pursuant to Bankruptcy Rule 6004(g), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for ten days after entry of the order. Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of executory contracts or unexpired leases are automatically stayed for ten days after entry of the order.

65.     Although Bankruptcy Rules 6004(g) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, Collier on Bankruptcy suggests that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. 10 *Collier on Bankruptcy* ¶ 6004.09 (15th ed. 1999). Furthermore, Collier on Bankruptcy provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

66.     To preserve and maximize the value of their assets for the benefit of all creditors, the Debtors seek to close the Sale immediately after all closing conditions have been met or waived. Thus, waiver of any applicable stays afforded by the Bankruptcy Rules is appropriate under the facts and circumstances of these cases.

## NOTICE

67.     Notice of this Motion has been provided to: (a) the OUST; (b) the United States Securities and Exchange Commission; (c) the Office of the United States Attorney for the

District of Delaware; (d) the Internal Revenue Service; (e) counsel to the Creditors' Committee and counsel to Lender; (f) all parties requesting notice pursuant to Bankruptcy Rule 2002; and (g) all known creditors. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary or required.

### NO PRIOR REQUEST

68. No prior motion for the relief requested herein has been made to this or any other Court.

900200.00001/40178694v.4

WHEREFORE, for the foregoing reasons, the Debtors respectfully request entry of: (A) an order substantially in the form annexed as **Exhibit A** hereto (i) approving the Bidding Procedures and the Bidding Incentives; (ii) approving the form and manner of notice of the sale or sales of the Debtors' assets; (iii) approving the form and manner of notice of the proposed assumption and assignment, including cure amounts, of executory contracts and unexpired leases; (iv) establishing the date for an Auction; (v) establishing the date for the Sale Hearing; and (vi) granting related relief; and (B) an order substantially in the form annexed as **Exhibit E**: (i) approving the sale(s) of all or substantially all of the Debtors' assets free and clear of all Liens (with such Liens attaching to the proceeds of sale as described above); (ii) authorizing the Debtors to assume and assign the Assigned Contracts; and (iii) granting related relief.

Dated: May 21, 2009

**BLANK ROME LLP**

By: _Michael DeBaecke_

Michael D. DeBaecke (No. 3186)
David C. Carickhoff (No. 2443)
Victoria Guilfoyle (No. 5183)
1201 North Market Street
Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6412
Facsimile: (302) 425-6464

-and-

Jeffrey N. Siegel
Pamela E. Flaherty
Marc Richards
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Telephone: (212) 885-5000
Facsimile: (212) 885-5001

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION