and on-site due diligence). In addition, the Bidding Procedures Order, the Bidding Procedures, the Original Purchase Agreement and the Sale Motion were delivered to or made available to each of the entities that had previously expressed an interest in the Purchased Assets.

I.  The Purchaser submitted the highest and best offer for the Purchased Assets on terms and conditions set forth in the Purchase Agreement (as defined below).

J.  The Bidding Procedures afforded a full, fair and reasonable opportunity for any entity to make a higher or better offer to purchase the Purchased Assets and no higher or better offer(s) for the Purchased Assets has been made than that of the Purchaser.

K.  The Debtors and the Purchaser have complied with the Bidding Procedures Order and the Bidding Procedures in all respects.

### The Sale of the Purchased Assets to the Purchaser

L.  The transactions effectuating, and the terms and conditions governing, the sale of the Purchased Assets to the Purchaser are embodied in the Asset Purchase Agreement attached hereto as Exhibit A (together with all schedules and exhibits attached thereto, the "Purchase Agreement"). A description of the Purchased Assets is contained in the Purchase Agreement. Moreover, Exhibit B attached hereto sets forth a description of the executory contracts and unexpired leases (the "Assigned Contracts") that the Debtors shall assume and assign to the Purchaser (the "Exhibit B Contracts").

M.  The Purchase Agreement contemplates that the sale of the Purchased Assets shall be free and clear of all liens, claims, interests, and other encumbrances within the meaning of section 363(f) of the Bankruptcy Code (collectively, "Liens"); provided, however, that all such Liens shall attach to the proceeds of the sale of the Purchased Assets in the order of their priority, and with the same validity, priority, force and effect which such holder has prior to

the sale of the Purchased Assets, subject to the rights, claims, defenses, and objections, if any, of the Debtors and all parties in interest.

N.    The Purchaser's obligation to consummate the transactions contemplated in the Purchase Agreement is subject to the specific conditions set forth in the Purchase Agreement, including Court approval. As of the date of entry of this Order, there is no known failure of any condition under the Purchase Agreement to the Purchaser's obligation to consummate the Sale that would entitle the Purchaser not to consummate the Sale pursuant to the Purchase Agreement or to terminate the Purchase Agreement.

O.    The Purchase Agreement was negotiated, proposed, and entered into by and between the Purchaser and the Debtors without collusion, in good faith, and from arm's length bargaining positions. Neither the Debtors nor the Purchaser has engaged in any conduct that would cause or permit the application of section 363(n) of the Bankruptcy Code to the Sale, including having the Purchase Agreement voided.

P.    The Purchaser is a good faith purchaser in accordance with section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. Absent a stay of the effectiveness of this Order, if any, the Purchaser will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions under the Purchase Agreement, including the assumption and assignment of the Assigned Contracts, after entry of this Order and, in the event of any stay of this Order, at any time after the expiration of such stay, whether pursuant to Bankruptcy Rules 6004(g), 6006, or otherwise.

Q.    The Assigned Contracts to be assumed and assigned to the Purchaser are valid and binding, in full force and effect, and enforceable in accordance with their terms, and are property of the Debtors' estates pursuant to section 541(a) of the Bankruptcy Code.

R.    The terms and conditions of the Purchase Agreement, including without limitation, that Sellers shall be jointly and severally liable to Purchaser for any monies due to Purchaser as a Purchase Price Adjustment under Section 3.5 of the Purchase Agreement and such amount shall be an administrative priority expense in the Sellers' bankruptcy cases: (i) are fair and reasonable, (ii) valid, binding and enforceable, (iii) constitute the highest and best offer for the Purchased Assets, (iv) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative and (v) constitute reasonably equivalent value and fair consideration for the Purchased Assets.

S.    The transactions contemplated by the Purchase Agreement will, upon consummation thereof (the "Closing"), (i) be a legal, valid, and effective transfer of the Purchased Assets to the Purchaser with no further action required on the part of the Debtors or their respective affiliates and (ii) vest the Purchaser with good title to the Purchased Assets free and clear of all Liens pursuant to section 363(f) of the Bankruptcy Code.

T.    The Purchaser would not have entered into the Purchase Agreement and will not consummate the transactions described in the Purchase Agreement (thus adversely affecting the bankruptcy estates and creditors) if the sale of the Purchased Assets and the assignment of the Assigned Contracts were not free and clear of all Liens.

U.    The relief sought in the Sale Motion, including approval of the Purchase Agreement and consummation of the transactions contemplated thereof, is in the best interests of the Debtors, their bankruptcy estates, creditors, and all parties in interest. The Sale must be approved and consummated promptly in order to maximize the value of the Debtors' estates.

V.     Upon entry of this Order, the Debtors have all the corporate or organizational power and authority necessary to consummate the transactions contemplated by the Purchase Agreement.

W.     Except as otherwise provided in this Order, no consents or approvals, other than this Order and those expressly provided for in the Purchase Agreement, are required for the Debtors to consummate the transactions contemplated by the Purchase Agreement.

X.     The Debtors have demonstrated good, sound and sufficient business purpose and justification, and it is a reasonable exercise of their business judgment and in the best interests of creditors, to (i) sell the Purchased Assets on the terms and conditions set forth in the Purchase Agreement; (ii) assume and assign the Assigned Contracts to the Purchaser; and (iii) consummate all transactions contemplated by the Purchase Agreement.

Y.     The provisions of sections 363 and 365 of the Bankruptcy Code have been complied with and are applicable to the sale of the Purchased Assets.

Z.     The Debtors may consummate the transactions and transfer the Purchased Assets free and clear of all Liens of any kind or nature whatsoever because one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. All parties with Liens of any kind or nature whatsoever in the Purchased Assets who did not object to the Sale Motion and the relief requested therein, or who withdrew their objections to the transactions, are deemed to have consented pursuant to sections 363(f)(2) and 365 of the Bankruptcy Code. All parties with Liens of any kind or nature whatsoever in the Purchased Assets, including all parties who objected to the Sale Motion and the relief requested therein, fall within one or more of the other subsections of sections 363(f) and 365 of the Bankruptcy Code and are adequately protected by having their Liens attach to the proceeds of the sale of the

Purchased Assets with the same validity, enforceability, priority, force and effect that such holder had prior to the sale of the Purchased Assets, subject to the rights, claims, defenses, and objections, if any, of the Debtors and all parties in interest.

AA.     Except as otherwise provided in the Purchase Agreement, consummation of the transactions will not subject the Purchaser to any debts, liabilities, obligations, commitments, responsibilities or claims of any kind or nature whatsoever, whether known or unknown, contingent or otherwise, existing as of the date hereof or hereafter arising, of or against the Debtors, any affiliate of the Debtors, or any other person by reason of such transfers and assignments, including, without limitation, based on any theory of antitrust or successor or transferee liability.

BB.     To the extent that the Purchased Assets constitute all or substantially all of the assets of any of the Debtors, substantial and sufficient business exigencies and reasons exist that permit the Purchased Assets to be sold outside of the context of a chapter 11 plan of reorganization or liquidation.

CC.     The Debtors and/or Purchaser have (i) cured, or have provided adequate assurance of prompt cure of, all defaults under the Assigned Contracts, if any, existing as of before the date of this Order, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, (ii) provided compensation or adequate assurance of prompt compensation to any party for any actual pecuniary loss to such party resulting from a default under the Assigned Contracts as of the date of this Order, if any, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and (iii) provided adequate assurance of its future performance of and under the Assigned Contracts, within the meaning of sections 365(b)(1)(C) and 365(f)(2) of the Bankruptcy Code.

ACCORDINGLY, THE COURT HEREBY ORDERS THAT:

## General Provisions

1.     The findings of fact entered above and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any finding of fact shall later be determined to be a conclusion of law, it shall be so deemed, and to the extent that any conclusion of law shall later be determined to be a finding of fact, it shall be so deemed.

2.     The Sale Motion is granted as set forth herein.

3.     All parties in interest have had the opportunity to object to the relief requested in the Sale Motion and to the extent that objections to the Sale Motion or the relief requested therein have not been withdrawn, waived or settled, such objections and all reservations of rights included therein, are overruled on the merits. The parties who did not object, or who withdrew their objections to the Sale Motion, are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

## Approval of the Purchase Agreement

4.     The Purchase Agreement and all of the terms and conditions contained therein are approved and are binding upon the parties thereto.

5.     The approval by the Debtors of the sale of the Purchased Assets and the terms and conditions contemplated by the Purchase Agreement, including, without limitation, the closing of the transactions contemplated by the Purchase Agreement, are hereby approved pursuant to sections 105(a), 363(b), (f), and (m), and 365 of the Bankruptcy Code.

6. The Debtors are authorized and directed, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, to perform all of their obligations pursuant to the Purchase Agreement and to execute such other documents and take such other actions as are reasonably necessary to effectuate the transactions contemplated by the Purchase Agreement.

### Transfer of the Purchased Assets to the Purchaser

7. The sale of the Purchased Assets, pursuant to this Order and the Purchase Agreement, will vest the Purchaser with good title to the Purchased Assets and will be a legal, valid and effective transfer of the Purchased Assets free and clear of all Liens, except as expressly permitted by the Purchase Agreement.

8. Sellers shall be jointly and severally liable to Purchaser and Purchaser shall have an administrative priority expense claim in each of the Sellers' bankruptcy cases for any monies due to Purchaser as a Purchase Price Adjustment under Section 3.5 of the Purchase Agreement.

9. Except as expressly provided in the Purchase Agreement, pursuant to sections 105(a), 363(f), and 365 of the Bankruptcy Code, upon the Closing, the Purchased Assets shall be sold, transferred or otherwise conveyed to Purchaser free and clear of all Liens, with all such Liens to attach to the net proceeds of sale of the Purchased Assets in the order of their priority, and with the same validity, priority, force and effect which such holder has prior to the sale of the Purchased Assets, subject to the rights, claims, defenses, and objections, if any, of the Debtors and all parties in interest.

10. All persons or entities holding Liens in, to or against the Purchased Assets shall be, and they hereby are, forever barred from asserting such Liens against Purchaser and its successors and assigns, or against such Purchased Assets after Closing.

11.     Upon Closing, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assumed Liabilities and all holders asserting claims in respect of such Assumed Liabilities are forever barred from asserting such claims against the Debtors, their estates, and their successors and assigns.

### Assumption and Assignment of the Assigned Contracts

12.     Subject to and conditioned on the Closing of the transactions contemplated in the Purchase Agreement, the Debtors are authorized pursuant to section 365(a) of the Bankruptcy Code to assume and assign the Assigned Contracts.    Any objections to the assumption and assignment of any of the Assigned Contracts to the Purchaser are hereby overruled.    Any objections to the Cure Amounts are resolved as set forth herein.    To the extent that any counterparty failed to timely object to its Cure Amount, such counterparty shall be deemed to have consented to such Cure Amount and the assumption and assignment of its respective Assigned Contract(s) to the Purchaser.

13.     Subject to and conditioned on the Closing of the transactions contemplated in the Purchase Agreement, pursuant to sections 105(a) and 365 of the Bankruptcy Code, the Debtors' assumption and assignment to the Purchaser, and the Purchaser's assumption on the terms contained in the Purchase Agreement, of the Assigned Contracts is approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are deemed satisfied.

14.     Upon Closing pursuant to the Purchase Agreement, the Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their terms, notwithstanding any provision in the Assigned Contracts (including, without limitation, those described in sections 365(b)(2) and (f) of the

Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further obligation or liability for any breach of the Assigned Contracts occurring or arising after such assumption and assignment.

15. Any undertakings (payment and/or performance) necessary to cure defaults under such Assigned Contracts (the "Cure Amounts") shall be paid or undertaken by Purchaser. Except as set forth in the Purchase Agreement or in this Order, Purchaser has not agreed to pay, shall not be required to assume, and shall have no liability or obligation with respect to, any liability or obligation, direct or indirect, absolute or contingent, of Sellers.

16. The Cure Amount set forth in (i) the Cure Amount Notice, (ii) any stipulation entered into between the Debtors and/or Purchaser on the one hand and the nondebtor party to an Assigned Contract on the other hand, or (iii) prior Order of this Court, shall be controlling notwithstanding anything to the contrary in any Assigned Contract or other document, and the nondebtor party to each Assigned Contract shall be forever barred from asserting against the Debtors or the Purchaser any other cure claim arising prior to the Closing.

17. The failure of the Debtors or the Purchaser to enforce any term or condition of any Assigned Contract shall not constitute a waiver of such term or condition or of the Debtors' or the Purchaser's rights to enforce every term and condition of the Assigned Contracts.

### Miscellaneous Provisions

18. The Sale does not implicate the provisions of sections 363(b)(1)(A) or 363(b)(1)(B) of the Bankruptcy Code.

19.     The consideration to be paid by the Purchaser for the Purchased Assets under the Purchase Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

20.     As a condition to the closing and in consideration of non-Debtor Midway Studios – Newcastle Ltd. ("Newcastle") terminating its interest in the Debtors' shared engine license agreement and entering into a restrictive technology license agreement with Purchaser, Debtor Midway Home Entertainment Inc., in is capacity as a creditor of Newcastle, shall release and agree not to assert any claims or causes of action whatsoever against Newcastle and/or any of its officers or directors for any reason whatsoever, including, without limitation, any claim of diminished value or claims of preferential undervalued transactions relating to the foregoing actions by Newcastle except that Debtor Midway Home Entertainment Inc. shall continue to have its claim against Newcastle for repayment of outstanding intercompany debt.

21.     This Order (a) is and shall be effective as a determination that, upon the Closing, except as expressly provided in the Purchase Agreement, all Liens existing as to the Purchased Assets prior to the Closing have been unconditionally released, discharged and terminated in each case as to the Purchased Assets and (b) shall authorize all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of fees, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities, who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments (including, without limitation, copies of this Order) that reflect that the Purchaser is the assignee of the Purchased Assets free and clear of all Liens.

22.     The provisions of this Order authorizing the sale and assignment of the Purchased Assets free and clear of Liens and the Excluded Liabilities shall be self-executing, and neither the Debtors, the Lender, nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order.

23.     Nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting or otherwise impair or diminish any right (including without limitation any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not a Purchased Asset.

24.     Except with respect to enforcing the terms of the Purchase Agreement and/or this Order, absent a stay pending appeal, no person shall take any action to prevent, enjoin or otherwise interfere with consummation of the transactions contemplated in or by the Purchase Agreement or this Order.

25.     The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties in accordance with the terms thereof without further order of the Court; provided, however, that any such modification, amendment or supplement is neither material nor changes the economic substance of the transactions contemplated hereby.

26.     In the absence of a stay of the effectiveness of this Order, in the event that the Purchaser and the Debtors consummate the transactions contemplated by the Purchase Agreement at any time after entry of this Order, then with respect to the transactions approved and authorized herein, the Purchaser, as a purchaser in good faith within the meaning of section 363(m) of the Bankruptcy Code, shall be entitled to all of the protections of section 363(m) of

the Bankruptcy Code in the event this Order or any authorization contained herein is reversed or modified on appeal.

27. Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement, including, without limitation, copies of this Order as evidence of the transactions authorized and contemplated hereby.

28. Until these cases are closed or dismissed, the Court shall retain exclusive jurisdiction (a) to enforce and implement the terms and provisions of the Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements, documents and instruments executed therewith; (b) to compel transfer of the Purchased Assets to the Purchaser; (c) to compel the Purchaser to perform all of its obligations under the Purchase Agreement; (d) to resolve any disputes, controversies or claims arising out of or relating to the Purchase Agreement, including without limitation the adjudication of any cure required under Assigned Contracts; and (e) to interpret, implement and enforce the provisions of this Order.

29. This Order shall be binding upon (i) the Debtors and their estates, (ii) all creditors of, and holders of equity interests in, any Debtor, (iii) all holders of Liens against or on all or any portion of the Purchased Assets, (iv) the Purchaser, and all successors and assigns of any of the foregoing, including any trustees that may be appointed in any of the Debtors' bankruptcy cases. This Order and the Purchase Agreement shall inure to the benefit of the Debtors, their estates and creditors, the Purchaser, and the respective successors and assigns of each of the foregoing.

30.     The failure to include any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of that provision, it being the intent of the Court and the parties that the Purchase Agreement be approved and authorized in its entirety.

31.     Any conflict between the terms and provisions of this Order and the Purchase Agreement shall be resolved in favor of this Order.

32.     The Debtors are hereby authorized to perform each of their covenants and undertakings as provided in the Purchase Agreement prior to closing without further order of the Court.

33.     This Order constitutes a final order pursuant to 28 U.S.C. § 158(a). As provided by Bankruptcy Rule 7062, this Order shall be effective and enforceable immediately. The provisions of Bankruptcy Rules 6004(g) and 6006(d) staying the effectiveness of this Order for ten (10) days are hereby waived, and this Order shall be effective, and the parties may consummate the transactions contemplated by the Purchase Agreement immediately upon entry of this Order. This Court has found that time is of the essence in closing the transaction and the parties to the Purchase Agreement shall be authorized to close the sale as soon as possible consistent with the terms of the Purchase Agreement.

Dated: July ____, 2009

_____
The Honorable Kevin Gross
United States Bankruptcy Judge

## FORM OF BILL OF SALE

BILL OF SALE dated as of _____, 2009, from Midway Games, Inc., a Delaware corporation, Midway Amusement Games, LLC, a Delaware limited liability company, Midway Home Entertainment Inc., a Delaware corporation, Surreal Software Inc., a Washington corporation, Midway Games West Inc., a California corporation, Midway Studios – Los Angeles Inc., a California corporation and Midway Studios – Austin Inc., a Texas corporation (collectively, "Sellers"), and Warner Bros. Entertainment Inc. a Delaware corporation, ("Purchaser").

WHEREAS, this Bill of Sale is being executed and delivered in connection with the consummation of the sale and purchase transaction contemplated in that certain Asset Purchase Agreement between Purchaser and Sellers, dated as of May 20, 2009 (hereinafter called the "Purchase Agreement"). Capitalized terms used but not otherwise defined in this Bill of Sale have the respective meanings set forth in the Purchase Agreement, the applicable terms of which are hereby incorporated by reference into this Bill of Sale; and

WHEREAS, pursuant to **Section 2.1** of the Purchase Agreement, Sellers have agreed to sell, transfer, convey, assign and deliver to Purchaser, and Purchaser has agreed to purchase and accept, all of Sellers' respective right, title and interest in and to the Purchased Assets; and

WHEREAS, pursuant to the Purchase Agreement, Sellers have agreed to execute and deliver this Bill of Sale with respect to the Purchased Assets to be conveyed by Sellers to Purchaser at the Closing.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, upon the terms and subject to the conditions set forth in the Purchase Agreement and the Sale Order, Sellers do hereby irrevocably and unconditionally sell, transfer, convey, assign and deliver to Purchaser all of Sellers' right, title and interest in and to the Purchased Assets, free and clear of all liens, claims, interests, and other encumbrances within the meaning of Section 363(f) of the Bankruptcy Code; provided that Sellers are not selling, transferring, conveying, assigning or delivering any Excluded Assets.

TO HAVE AND TO HOLD the same unto Purchaser and its successors and assigns, to and for its or their use, forever, subject, however, to all terms, conditions and provisions in the Purchase Agreement and the Sale Order.

Except as provided in the Purchase Agreement or the Sale Order, the Purchased Assets are sold and conveyed "as is", "where is", and with all faults and defects, and Sellers make no warranty, express or implied, as to condition, description, fitness for a particular purpose, merchantability, or as to any other matter.

By its execution hereof, Purchaser hereby accepts the foregoing sale, transfer, conveyance, assignment and delivery.

Sellers hereby covenant and agree that they shall, at any time or from time to time hereafter at the reasonable request of Purchaser, execute and deliver such further instruments of conveyance, sale, transfer and assignment to Purchaser for any of the Purchased Assets.

Sellers hereby constitute and appoint Purchaser and its successors and assigns as its true and lawful attorneys in fact in connection with the transactions contemplated by this instrument, with full power of substitution, in the name and stead of Sellers but on behalf of and for the benefit of Purchaser and its successors and assigns, to demand and receive any and all of the Purchased Assets hereby conveyed, assigned, and transferred or intended so to be, and to give receipt and releases for and in respect of the same and any part thereof, and from time to time to institute and prosecute, in the name of Sellers or otherwise, for the benefit of Purchaser or its successors and assigns, proceedings at law, in equity, or otherwise, which Purchaser or its successors or assigns reasonably deem proper in order to collect or reduce to possession or endorse any of the Purchased Assets and to do all acts and things in relation to the Purchased Assets which Purchaser or its successors or assigns reasonably deem desirable.

The terms and provisions of this Bill of Sale shall be binding upon Sellers and their respective successors and assigns, and shall inure to the benefit of Purchaser and its successors and assigns.

Nothing in this Bill of Sale is intended to or shall confer upon any Person other than the parties, and their respective successors and assigns, any rights, benefits, or remedies of any nature whatsoever under or by reason of this Bill of Sale or any transaction contemplated by this Bill of Sale.

This Bill of Sale shall be governed by and construed and enforced in accordance with (i) the laws of the State of Delaware, without regard to its conflict of laws, rules or principles and (ii) the Bankruptcy Code, to the extent applicable.

To the extent any term or provision herein is inconsistent with the Purchase Agreement, the terms and provisions of the Purchase Agreement shall control. To the extent that any term or provision herein or in the Purchase Agreement is inconsistent with the Sales Order, the Sales Order shall control.

This Bill of Sale may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** the parties hereto have caused this Bill of Sale to be duly executed and delivered as of the date first set forth above.

**SELLERS:**

MIDWAY GAMES INC.
MIDWAY AMUSEMENT GAMES, LLC
MIDWAY HOME ENTERTAINMENT INC.
SURREAL SOFTWARE INC.
MIDWAY GAMES WEST INC.
MIDWAY STUDIOS – LOS ANGELES INC.
MIDWAY STUDIOS – AUSTIN INC.

By: _____

       Name:    Matthew Booty
       Title:     Chief Executive Officer


**PURCHASER:**

WARNER BROS. ENTERTAINMENT INC.

By:_____

   Name:
   Title:

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

ASSIGNMENT AND ASSUMPTION AGREEMENT dated as of _____, 2009, by and among Midway Games, Inc., a Delaware corporation, Midway Amusement Games, LLC, a Delaware limited liability company, Midway Home Entertainment Inc., a Delaware corporation, Surreal Software Inc., a Washington corporation, Midway Games West Inc., a California corporation, Midway Studios – Los Angeles Inc., a California corporation and Midway Studios – Austin Inc., a Texas corporation (collectively, "Assignors"), and Warner Bros. Entertainment Inc., a Delaware corporation ("Purchaser").

WHEREAS, this Assignment and Assumption Agreement is being executed and delivered in connection with the consummation of the sale and purchase transaction contemplated in that certain Asset Purchase Agreement between Assignors and Purchaser dated as of May 20, 2009 (hereinafter called the "Purchase Agreement"). Capitalized terms used but not otherwise defined in this Assignment and Assumption Agreement have the respective meanings set forth in the Purchase Agreement, the applicable terms of which are hereby incorporated by reference into this Assignment and Assumption Agreement; and

WHEREAS, pursuant to **Section 2.1** of the Purchase Agreement, Assignors have agreed to sell, transfer, convey, assign and deliver to Purchaser, and Purchaser has agreed to purchase and accept, all of Assignors' respective right, title and interest in and to the Purchased Assets, including without limitation the Assigned Contracts; and

WHEREAS, pursuant to **Section 2.3** of the Purchase Agreement, Purchaser has agreed to assume the Assumed Liabilities; and

WHEREAS, the parties hereto acknowledge that pursuant to that certain Bill of Sale of even date herewith, Assignors irrevocably and unconditionally sold, transferred, conveyed, assigned and delivered to Assignee all of Assignors' right, title and interest in and to the Purchased Assets, which include the Assigned Contracts; and

WHEREAS, pursuant to the Purchase Agreement and subject to the Procedures Order and the Sale Order, the parties have agreed to execute this Assignment and Assumption Agreement with respect to the Assigned Contracts to be conveyed by Assignors to Purchaser at the Closing and with respect to Purchaser's assumption of the Assumed Liabilities.

NOW THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, Assignors and Purchaser hereby agree as follows:

1. Upon the terms and subject to the conditions set forth in the Purchase Agreement, Assignors hereby sell, transfer, convey, assign and deliver to Purchaser all of Assignors' right, title and interest in and to the Assigned Contracts, free and clear of all liens, claims, interests, and other encumbrances within the meaning of Section 363(f) of the Bankruptcy Code. Notwithstanding the foregoing, nothing in this Assignment and Assumption Agreement is

intended, or shall be construed, to result in the sale, transfer, conveyance, assignment or delivery of any Excluded Assets.

2. Upon the terms and subject to the conditions set forth in the Purchase Agreement, the Procedures Order and the Sale Order and in accordance with Section 365(k) of the Bankruptcy Code, Purchaser hereby acknowledges and accepts such sale, transfer, conveyance, assignment and delivery of such Assigned Contracts and hereby assumes and agrees to pay, satisfy and discharge when due, the Assumed Liabilities as set forth in **Section 2.3** of the Purchase Agreement. Notwithstanding the foregoing, Purchaser shall not assume or be obligated to pay, satisfy, discharge or perform, and shall not be deemed by virtue of the execution and delivery of this Assignment and Assumption Agreement, or as a result of the consummation of the transactions contemplated by this Assignment and Assumption Agreement, to have assumed, or to have agreed to pay, satisfy, discharge or perform any liabilities or obligations of Assignors other than the aforementioned Assumed Liabilities.

3. If any provision of this Assignment and Assumption Agreement is held to be illegal, invalid, or unenforceable under any present or future law, and if the rights or obligations under this Assignment and Assumption Agreement of Assignors on the one hand and Assignee on the other hand will not be materially and adversely affected thereby, (a) such provision shall be fully severable; (b) this Assignment and Assumption Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Assignment and Assumption Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Assignment and Assumption Agreement; and (d) in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Assignment and Assumption Agreement a legal, valid, and enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible.

4. The assumption by Assignee of the Assumed Liabilities as provided herein shall not be construed to defeat, impair or limit in any way any rights of Assignors or Assignee to dispute the validity or amount thereof.

5. The terms and provisions of this Assignment and Assumption Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

6. This Assignment and Assumption Agreement may not be amended or modified except by an instrument in writing signed by Purchaser and Assignor, and no performance, term or condition can be waived in whole or in part except by a writing signed by the party against whom enforcement of the waiver is sought.

7. Nothing in this Assignment and Assumption Agreement is intended to or shall confer upon any Person other than Purchaser and Assignors, and their respective successors and assigns, any rights, benefits, or remedies of any nature whatsoever under or by reason of this Assignment and Assumption Agreement or any transaction contemplated by this Assignment and Assumption Agreement.

8. To the extent any term or provision herein is inconsistent with the Purchase Agreement, the terms and provisions of the Purchase Agreement shall control. To the extent that any term or provision herein or in the Purchase Agreement is inconsistent with the Sales Order, the Sales Order shall control.

9. This Assignment and Assumption Agreement shall be governed by and construed and enforced in accordance with (i) the laws of the State of Delaware, without regard to its conflict of laws rules or principles and (ii) the Bankruptcy Code, to the extent applicable. Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in **Section 12.7** of the Purchase Agreement; *provided, however*, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware and any appellate court thereof, for the resolution of any such claim or dispute. Each party irrevocably consents to and confers personal jurisdiction on the courts referred to above, and irrevocably and unconditionally waives any objection to the venue of such courts, and further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any lawsuit, action or other Proceeding brought in any such court has been brought in an inconvenient forum. Each party hereto further agrees that service of process may be made on such party by mailing a copy of the pleading or other document by registered or certified mail, return receipt requested, to its addresses for the giving of notice provided for in **Section 12.7** of the Purchase Agreement, with service being deemed ·to be made five (5) Business Days after the giving of such notice. PURCHASER AND ASSIGNORS HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS ASSIGNMENT AND ASSUMPTION AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

10. This Assignment and Assumption Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Assumption Agreement to be duly executed and delivered as of the date first written above.

MIDWAY GAMES INC.
MIDWAY AMUSEMENT GAMES, LLC
MIDWAY HOME ENTERTAINMENT INC.
SURREAL SOFTWARE INC.
MIDWAY GAMES WEST INC.
MIDWAY STUDIOS – LOS ANGELES INC.
MIDWAY STUDIOS – AUSTIN INC.

By: _____

    Name:    Matthew Booty
    Title:     Chief Executive Officer

WARNER BROS. ENTERTAINMENT INC.

By:_____

   Name:
   Title:

## MASTER COPYRIGHT ASSIGNMENT

WHEREAS, [Seller], a corporation organized under the laws of _____, having offices at _____ (hereinafter "Assignor"), is the owner of the U.S. copyright registrations listed on Schedule A attached hereto (hereinafter such registrations and the works that are the subject of the registrations, the "Works").

WHEREAS, Warner Bros. Entertainment Inc., a Delaware corporation, having a place of business at _____ (hereinafter, "Assignee"), desires to obtain ownership of the Works.

NOW, THEREFORE, for good and valuable consideration already provided, the sufficiency of which is hereby acknowledged, Assignor hereby assigns all of its rights, title and interest in and to the Works to Assignee, including the right to sue and recover for any and all infringements of said Works which may have occurred prior to the date of this assignment.

IN WITNESS WHEREOF, Assignor has signed this Assignment this __ day of _____, 2009.

[SELLER]

By: _____
     Name:
     Title:

STATE OF                     )

                              ) ss.:

COUNTY OF                  )

## ACKNOWLEDGMENT

On this __ day of _____, 2009, before me came _____, who stated

that he/she is the _____ of [Seller] and acknowledged that he/she executed the above

instrument as the act and deed of [Seller] with full authority to do so.


                                      _____

                                      Notary Public

## SCHEDULE A

### The Works

| Country | Copyright | Reg. No. |
|---------|-----------|----------|
|         |           |          |

## Exhibit I

## UNITED STATES MASTER TRADEMARK ASSIGNMENT

WHEREAS, [Seller] is a company organized under the laws of _____ having offices at _____ (hereinafter, "Assignor"), is the owner of the United States trademark applications and registrations listed on Schedule A attached hereto (collectively, the "Marks").

WHEREAS, Warner Bros. Entertainment Inc., a Delaware corporation, having a place of business at _____ ("Assignee"), is desirous of acquiring the Marks and the goodwill associated therewith.

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, Assignor hereby assigns and transfers to Assignee all of Assignor's right, title and interest in and to the Marks, together with the goodwill of the business symbolized by such Marks, and the right to sue for and take action with respect to past infringements.

IN WITNESS WHEREOF, Assignor has signed this Assignment this __ day of _____, 2009.

[SELLER]

By: _____
     Name:
     Title:

STATE OF                          )

                                  ) ss.:

COUNTY OF                         )

## ACKNOWLEDGMENT

On this __ day of _____, before me came _____, who stated that he/she is the

_____ of [Seller] and acknowledged that he/she executed the above instrument as

the act and deed of [Seller] with full authority to do so.


                                        _____

                                        Notary Public

# SCHEDULE A

## The Marks

| Country | Trademark | App. No. | Reg. No. |
|---------|-----------|----------|----------|
|         |           |          |          |

## WORLDWIDE MASTER TRADEMARK ASSIGNMENT

WHEREAS, [Seller], a company organized under the laws of _____ having offices at _____ ("Assignor"), is the owner of the worldwide (excluding the United States) trademark applications and registrations listed on Schedule A attached hereto (collectively, the "Marks").

WHEREAS, Warner Bros Entertainment Inc., a Delaware company, having a place of business at _____ ("Assignee"), is desirous of acquiring the Marks and the goodwill associated therewith.

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, Assignors hereby assign and transfer to Assignee all of Assignors' right, title and interest in and to the Marks, together with the goodwill of the business symbolized by such Marks, and the right to sue for and take action with respect to past infringements.

IN WITNESS WHEREOF, Assignors have signed this Assignment this __ day of _____, 2009.


[SELLER]


By: _____
      Name:
      Title:

STATE OF              )

                            ) ss.:

COUNTY OF        )

ACKNOWLEDGMENT

On this __ day of _____, before me came _____, who stated that he/she is the

_____ of [Seller] and acknowledged that he/she executed the above instrument as

the act and deed of [Seller] with full authority to do so.


                                   _____

                                   Notary Public

# SCHEDULE A

## The Marks

| Country | Trademark | App. No. | Reg. No. |
|---------|-----------|----------|----------|
|         |           |          |          |

## PATENT ASSIGNMENT

WHEREAS, [Seller], a _____ corporation having its principal place of business at _____ (hereinafter "Assignor"), owns all right and title to the applications and patents listed on Schedule A attached hereto (collectively, the "Patents");

WHEREAS, Warner Bros. Entertainment Inc., a Delaware corporation having its principal place of business at _____ (hereinafter "Assignee"), is desirous of acquiring an interest therein;

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, Assignor hereby assigns and transfers to Assignee all of Assignor's right, title and interest that Assignor may have in and to the Patents, including the inventions as described in the specifications of the Patents, in the United States, its territorial possessions and in all foreign countries, and the entire right, title and interest in and to any and all letters patent for the Patents which may be granted in the United States, its territorial possessions and in any and all foreign countries, including the right, title and interest in and to any and all divisions, reissues, continuations and extensions thereof of such listed Patents (including, but not limited to, all proceeds thereof and the rights to sue for past, present and future infringements), and all applications for letters patent which may hereafter be filed for said patents in any country, and all letters patent which may be granted for said patents in any country.

Assignor hereby authorizes and requests the patent office officials in the United States and any applicable foreign countries to record Assignee as the owner of the Patents and to issue any letters patent for the Patents to Assignee as the assignee of Assignor's entire right, title and interest in and to the same, for the sole use of Assignee, its successors, legal representatives and assigns, in

accordance with the terms of this Assignment. The transferred rights include the right to collect any royalties, license fees, or other amounts related to the Patents owing from third parties, as well as the right to bring infringement or similar actions that may have accrued prior to this Agreement. This Assignment includes the right to claim priority based on the filing date of each of the Patents under the International Convention for the Protection of Industrial Property, the Patent Cooperation Treaty, the European Patent Conventions, and all other treaties of like purposes.

Assignor covenants for itself and its respective heirs, legal representatives and assigns to provide to Assignee promptly upon the request of Assignee and at the expense of Assignee all pertinent facts and documents relating to said inventions and said Patents and legal equivalents as may be known and accessible to Assignor and promptly to execute and deliver to Assignee or its legal representative any and all papers, instruments, or affidavits required to apply for, obtain, maintain, issue or enforce said inventions, improvements, said Patents and said equivalents thereof which may be necessary or desirable to carry out the purposes thereof.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Assignor has signed this Assignment this __ day of _____, 2009.

[SELLER]

By: _____
     Name:
     Title:

STATE OF                 )

                       ) ss.:

COUNTY OF            )

<u>ACKNOWLEDGMENT</u>

On this __ day of _____, before me came _____, who stated that he/she is the authorized representative of [Seller] and acknowledged that he/she executed the above instrument as the act and deed of [Seller], with full authority to do so.

_____
Notary Public

## Schedule A

# DISCLOSURE SCHEDULE

Terms defined in the Asset Purchase Agreement, dated as of May 20, 2009 (the "*Purchase Agreement*"), among the Sellers listed on Schedule A thereto, and Warner Bros. Entertainment Inc., a Delaware corporation (the "*Purchaser*"), and not otherwise defined in this Disclosure Schedule have the meanings given in the Purchase Agreement. The section numbers below correspond to the section numbers of the representation and warranties in the Purchase Agreement which are modified by the disclosures; *provided, however*, that any information disclosed herein under any section number shall be deemed to be disclosed and incorporated in any other section of the Purchase Agreement or this Disclosure Schedule where such disclosure would be reasonably apparent on the face of such disclosure.

To the extent that any representation or warranty contained in the Purchase Agreement is limited to or qualified by the materiality of the matters to which the representation or warranty is given, the inclusion of any matter in this Disclosure Schedule does not constitute a determination that such matters are material. The disclosure of a particular item of information in this Disclosure Schedule will not be an admission of any liability or obligation by the Sellers, to any third party nor any admission against the interest of the Sellers.

## Schedule A

### Sellers

Midway Amusement Games, LLC
Midway Home Entertainment Inc.
Surreal Software Inc.
Midway Games West Inc.
Midway Studios – Los Angeles Inc.
Midway Studios – Austin Inc.

**Schedule 1.1**

**<u>Knowledge of Sellers</u>**

Matthew Booty
Miguel Iribarren
Ryan O'Desky
Deborah Fulton
Steve Marrin

## Purchased Assets

(a)     Except for the Excluded Games referenced on **Schedule 2.2**, all video games of the Sellers (whether completed or not), including, without limitation, all previously released titles, all video games based on the *Mortal Kombat* universe and *This is Vegas* universe, all *Game Party* video games, all *Touchmaster* video games, all *Area 51* video games, all *Spy Hunter* video games, all *Wheelman* video games, all of the Sellers' arcade and coin-operated games including, but not limited to, *Gauntlet, Rampage, Joust,* and *Rampart,* and all "back catalog" and "classic intellectual property" library video games, and with respect to all of the foregoing, all Game Assets thereof (collectively, the "*Seller Games*"). For purposes hereof, "*Game Assets*" means with respect to any video game, all (i) titles, characters, names and trademarks; (ii) storylines, back stories, text, dialog, rules, guides, game-specific user documentation, puzzles and other similar materials; (iii) concepts, game play, structure, look and feel, art, settings, locations, environments, vehicles, weapons, gadgets and other similar elements; (iv) music and sound; (v) technology, codes (source, object, byte), engines, files (source, data, log, executable), databases, and other similar items; (vi) domain names, web site assets, user-generated content and end-user lists; (vii) development materials; (viii) development and test kits, development tools or the like; (ix) marketing materials; (x) Contracts relating to any such video games; and (xi) any and all intellectual property rights in and to the foregoing, including all publishing rights. For the avoidance of doubt, the Excluded Games shall not be deemed to be included within the definition of Seller Games;

(b)     All Assigned Contracts, including, without limitation, all leasehold interests in and to the real property located at the Acquired Studios;

(c)     All tangible personal property owned by the Sellers, including, without limitation, all office equipment, computer hardware, servers, furniture and furnishings, accessories, supplies, and related infrastructure, in each case located at, or otherwise relating to the operations of the Sellers conducted at, the Acquired Studios, and such of the foregoing which is located at the Headquarters but is used primarily in Sellers' game development operations. For the avoidance of doubt, this shall include, without limitation, the motion capture equipment located in the motion capture studio at the Headquarters and all computer hardware and servers supporting product development activities located at the Headquarters;

(d)     All software products (other than software used for employee, accounting or legal functions performed at the Headquarters and software related to the Sellers' publishing business including the software that interfaces with customers and warehouses as referenced on **Schedule 2.2**), all intellectual property rights (including, without limitation, trade secrets, inventions, patents and patent applications, registered copyrights and applications for copyright registrations, registered trademarks, service marks, trade names and applications for registration thereof, technology, and know-how), and all other proprietary rights owned or used by the Sellers in connection with the operations of the Sellers at the Acquired Studios or relating to the Seller Games, including, without limitation, all technology, codes (source, object, byte), development tools, engines, files (source, data, log, executable), databases, and other similar items relating

thereto;

      (e)     All Inventory of Sellers;

      (f)     All books, records, files, papers, ledgers, documents, correspondence, lists, plats, architectural plans, drawings, specifications, creative materials, advertising and promotional materials, studies, and reports, all exclusive and non-exclusive information, lists and files, and all other printed or written materials relating to the Purchased Assets;

      (g)     All permits, licenses, registrations, filings, authorizations, approvals or indicia of authority (and any pending applications for any thereof), orders, certificates, variances, and similar rights obtained from governments and governmental agencies, in each case to the extent transferable, relating to the Purchased Assets;

      (h)     All deposits or prepaid charges and expenses paid in connection with or relating to any Purchased Assets;

      (i)     All goodwill in or associated with the Purchased Assets, including, without limitation, all goodwill in the Game Assets relating to the Seller Games;

      (j)     All insurance proceeds, or claims and causes of action relating thereto, of any Seller arising prior to or after the Closing Date with respect to, or arising in connection with, any Purchased Asset, *including* with respect to injury, loss, damage or destruction of any Purchased Asset, but specifically *excluding* all insurance claims, proceeds and causes of action retained by Sellers as described in clause (h) of **Schedule 2.2**;

      (k)     All Accounts Receivable included in the Accounts Receivable Amount and all of the Sellers' rights to receive such payments; and

      (l)     Any rights, claims or causes of action of Sellers against Purchaser relating to the assets, properties, business or operations of Sellers arising out of events occurring on or prior to the Closing Date, *including*, but not limited to, causes of action involving commercial tort and all causes of action under chapter 5 of the Bankruptcy Code, but specifically *excluding* Sellers' rights, claims or causes of action in connection with the Purchase Agreement and related documents, as such are described in clause (j) of **Schedule 2.2**.

## Schedule 2.2

## Excluded Assets

(a)    The shares of capital stock, limited liability company membership interests and other equity interests, of Midway and all of its direct or indirect Subsidiaries;

(b)    The assets of any foreign Subsidiary, unless specifically included in the Purchased Assets;

(c)    All cash, cash equivalents, bank deposits or similar cash items of Sellers and all marketable securities and other investments of Sellers;

(d)    All intercompany receivable and payable balances that exist among Sellers and/or the Subsidiaries on the Closing Date, including any unpaid interest accrued on any such receivable;

(e)    All of Sellers' deposits or prepaid charges and expenses not specifically included in or arising in connection with the Purchased Assets;

(f)    Any claim, right or interest of Sellers in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date;

(g)    Insurance polices maintained by any Seller;

(h)    All insurance proceeds, and claims and causes of action relating thereto, of any Seller arising prior to or after the Closing Date with respect to, or arising in connection with, any Excluded Asset, or any liability or obligation of Sellers not included in the Assumed Liabilities, and for the avoidance of doubt, all insured or insurable claims and causes of action against Sellers (or any of them) in the nature of commercial tort, breach of fiduciary duty, fraud, fraudulent conveyance, or breach of loyalty arising prior to and after the Closing Date shall be Excluded Assets;

(i)    Any rights, claims or causes of action of Sellers against third parties other than Purchaser relating to the assets, properties, business or operations of Sellers arising out of events occurring on or prior to the Closing Date, including, but not limited to, causes of action involving commercial tort and all causes of action under chapter 5 of the Bankruptcy Code, including without limitation, all claims and causes of action made or which may be brought (including all claims to any insurance policies that may arise therefrom) in connection with the complaint brought by The Official Committee of Unsecured Creditors of Midway Games, Inc,. et al. against National Amusements, Inc., et al. (Adv. Proc. No. 09-50968(KG);

(j)    Any rights of Sellers under the Purchase Agreement or, except with respect to any Purchased Assets, any other agreement, document or instrument contemplated by the Purchase Agreement, including the consideration delivered by Purchaser to Sellers for the Purchased Assets pursuant to the Purchase Agreement;

(k)     All personnel records and other records that any Seller is required by Law to retain in its possession;

(l)     All real property and any leasehold interests relating to any real property leased by Sellers other than the real property and the leasehold interests in and to the real property located at the Acquired Studios (which shall be Assigned Contracts), including, without limitation, the real property located at the Headquarters and the San Diego Studio;

(m)     Except as specified in clause (c) of **Schedule 2.1**, all other tangible personal property owned or leased by the Sellers, including all office equipment, computer hardware, servers, furniture and furnishings, accessories, supplies, and related infrastructure (but excluding all development and test kits, development tools or the like relating to the Seller Games which shall be Purchased Assets);

(n)     All software used for employee, accounting or legal functions performed at the Headquarters and software related to the Sellers' publishing business, including the software that interfaces with customers and warehouses; *provided, however,* that Purchaser shall be entitled to reasonable access and use of such software and related information management systems on a royalty-free basis for the purpose of obtaining any data relating to the operation of the Purchased Assets following the Closing in addition to any other access rights granted to Purchaser under the Purchase Agreement;

(o)     All *TNA Wrestling* video games, all Game Assets related thereto, all Inventory relating thereto, and any rights of any Seller under any Excluded Contracts relating to such video games and the right to the "Midway" trademark for the sole purpose of reordering and selling existing *TNA Wrestling* video games as set forth in **Section 8.20(b)**;

(p)     All *NBA/NHL/MLB* video games, *Lord of the Rings* video games, *Mechanic Master* video games, and any new game, demo or prototype games worked on exclusively in the Newcastle Studio on and after January 1, 2009 (but not including the *Wheelman* video game), and with respect to such video games, all Game Assets thereof and Inventory relating thereto and any rights of any Sellers under any Excluded Contracts relating to any such video games; and

(q)     Each of the following additional Contracts, and for the avoidance of doubt, any rights of Sellers under any Contract described in this **Schedule 2.2**:

(i)     the Wheelman Distribution Agreement and the right to receive payments thereunder as set forth in **Section 8.17**;

(ii)     all platform agreements between any Seller and any Person, including without limitation, any Platform Manufacturers, and all consents or approvals thereunder;

(iii)     all employment agreements and all agreements relating to any welfare benefit or other plan, arrangement or understanding of Sellers providing benefits to any current or former employee, officer or director of any Seller;

(iv)     Agreement of Purchase and Sale, dated July 7, 2008, between Midway Games Inc., as Seller, and Lexington Homes L.L.C., as Buyer, relating to the property

located at 2633 W. Roscoe St., Chicago, Illinois, USA 60618, including the right of any Sellers to receive the Purchase Price Premium as defined in, and pursuant to, such Contract;

(v)     Redevelopment Agreement, dated January 31, 2000, between The City of Chicago and Midway Games Inc., relating to the property located at 2633 W. Roscoe St., Chicago, Illinois, USA 60618;

(vi)     any Contracts other than the Assigned Contracts that relate solely to the Headquarters, the San Diego Studio and those properties located at: (i) the Newcastle Studio; (ii) Heimeranstrasse 35, Munich, Germany 80339; (iii) 13 Rue Vivienne, Paris, France 75002; (iv) 43 Worship Street, London, EC2A 2DX United Kingdom; and (v) any other property located outside of the United States, including, without limitation, Contracts related to utilities, rent and maintenance at such properties;

(vii)     Replication, Packaging, Distribution and Returns Processing Services Agreement, effective as of May 15, 2007, by and between Technicolor and Midway Home Entertainment Inc. (the "*Technicolor Agreement*");

(viii)     Any distribution rights with respect to the Mechanic Master video game with Midway Games Ltd. or with respect to the *Jungle Book* video game; and

(ix)     Property Lien and Post-Closing Agreement, dated as of November 6, 2008 by and between 2623 Roscoe L.L.C., Lexington Homes L.L.C. and Midway Games Inc.

(r)     All rights in the Licensed Assets granted to Sellers pursuant to the license or other similar agreement(s) referenced in **Section 8.18** and the Gold Master Candidate Assets granted to Midway and its Subsidiaries pursuant to the license referenced in **Section 8.20(b)**.

**Schedule 5.4**

**Financial Advisors-Sellers**

Lazard Fréres & Co. LLC

**Schedule 5.9**

**Environmental Matters**

There is an underground storage tank located at 2727 W. Roscoe St., Chicago, Illinois, USA 60618.

**Schedule 6.3(b)**

**Conflicts; Consent of Third Parties**

Purchaser believes it is required to comply with certain regulatory filing requirements in Germany under applicable competition law with respect to the transactions contemplated by the Purchase Agreement.

## Schedule 9.1

### Closing Conditions

1.    It shall be a condition of the Closing that, with respect to the Unreal Engine 3 License Agreement, dated January 14, 2005, as amended December 5, 2005, between Midway Home Entertainment Inc. and Epic Games, Inc. (the "***Unreal Engine License***"), Purchaser (or its applicable Affiliate) shall receive all of Sellers' rights and benefits under the Unreal Engine License, including its pricing, for Seller Games that use the Unreal Engine License and which are included in the Purchased Assets, and any sequels to any Seller Games which are included in the Purchased Assets. It is not a condition to the Closing that the terms of such agreement apply to any other video games or any other Affiliates of Purchaser. Sellers shall be entitled to enter into any amendment to the foregoing license agreement to limit its application to Seller Games and sequels thereof without the consent of Purchaser.

2.    Sony Computer Entertainment America Inc. and Sony Computer Entertainment Europe Ltd. (with respect to the PlayStation 2, PlayStation 3 and PlayStation Portable platforms), Nintendo Co. Ltd. and Nintendo of America Inc. (with respect to the GameBoy Advance, DS, DSi and Wii platforms), and Microsoft Licensing GP (with respect to the Xbox and Xbox360 platforms) (collectively, "***Platform Manufacturers***") shall each approve Purchaser (or its applicable Affiliate) as the "publisher of record" ( or other similar concept as typically used and understood in the console game industry) with respect to all Seller Games included in the Purchased Assets which have previously been published on the applicable platforms or which have been submitted to the applicable Platform Manufacturer, so that Purchaser (or its applicable Affiliate) is authorized to publish and distribute such Seller Games subject to compliance with the terms of Purchaser's (or its applicable Affiliate's) Licensed Publisher Agreements with such Platform Manufacturers; *provided, however,* that it shall not be a condition to the Closing that any such Platform Manufacturer provide any other consent or approval with respect to the Seller Games under Purchaser's (or its applicable Affiliate's) Licensed Publisher Agreements. The condition set forth in this Paragraph 2 of **Schedule 9.1** shall be referred to as the "***Platform Condition***".