## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

In re :

MIDWAY GAMES, INC., et al.,

                Debtors.

Chapter 11
Case No. 09-10465 (KG)
Jointly Administered

**Related D.I. 357**

### OBJECTION OF EPIC GAMES, INC. TO: (1) DEBTORS' PROPOSED SALE OF ASSETS; (2) PROPOSED ASSUMPTION AND ASSIGNMENT OF LICENSE AGREEMENTS AND PURCHASING AGREEMENT AND (3) NOTICE OF CURE AMOUNT

TO:   **THE HONORABLE KEVIN GROSS**
      **UNITED STATES BANKRUPTCY JUDGE**

Epic Games, Inc. ("Epic"), by and through undersigned counsel, and pursuant to sections 365(c)(1), 365(b)(1), 365(e)(2)(A), and 105(a) of the Bankruptcy Code, and applicable federal law, hereby objects to the Debtors' proposed sale and to the assumption and assignment of certain intellectual property publishing and license agreements between Epic and Debtor Midway Home Entertainment, Inc. ("MHE"),[1] because Epic has not consented to that assumption and assignment. Should the Court find that Epic has consented, which it denies, to

---

[1] The agreements are:

    (1)     Publishing Agreement dated July 15, 2004, as amended by Amendment No. 1 - October 29, 2004, Amendment No. 2 - April 15, 2005, Amendment No. 3 - May ___, 2006, Amendment No. 4 - July 5, 2007, and Amendment No. 5 - September 29, 2008 (as amended, "the Publishing Agreement"). A copy of the Publishing Agreement has been filed under seal as Exhibit A to this Objection.

    (2)     Unreal Engine Master License Agreement, dated July 15, 2004 ("the UE Master License Agreement"). A copy of the UE Master License Agreement has been filed under seal as Exhibit B to this Objection.

    (3)     Unreal Engine 3 License Agreement, dated January 14, 2005, as amended on December 5, 2005 (as amended, "the UE3 License Agreement," together with the UE Master License Agreement, "the License Agreements"). A copy of the UE3 License Agreement has been filed under seal as Exhibit C to this Objection.

the assumption and assignment of the Publishing Agreement, the UE Master License Agreement and the UE3 License Agreement (collectively, "the Epic Agreements"), Epic objects to the proposed cure amounts identified by the Debtors and requests that the Court strictly construe the terms of the License Agreements to limit their application to Games, as defined in the License Agreements, which exist on the date of confirmation of the Sale, in order to protect the intent of the bargain between Epic and MHE. In support of its Objection, Epic shows the court as follows:

## PRELIMINARY STATEMENT

1.     Under the Epic Agreements, Epic licensed its proprietary game development technology and the publication rights to several of its most valuable game properties to MHE. In return, MHE became the exclusive publisher of Epic's *UNREAL* series of games, and obtained an unusual blanket non-exclusive license to use the Unreal Engine 3 to develop its future games. The License Agreements are non-assignable under applicable non-bankruptcy law because they are non-exclusive, nontransferable licenses of copyrights, trademarks, trade secrets, patents and other intellectual property. Accordingly, they cannot be assumed or assigned without Epic's consent.

2.     Epic does not consent to the assumption or assignment of the License Agreements, because the Sale as proposed would fundamentally alter the bargain between the parties and destroy the business relationship Epic entered into with MHE. The Sale would allow Warner Home Entertainment, Inc. ("Warner") to cherry-pick Epic's License Agreements, together with other valuable intellectual property of MHE, and leave behind significant portions of the entities and strengths which Epic relied upon in that relationship. Epic protected itself against this kind of assignment by making the license agreement non-assignable other than to an "Affiliate" of MHE, or in the context of a sale of "substantially all" of the assets of MHE.

Warner understandably desires to use Epic's industry leading engine technology for the creation of video games, and in fact has structured the proposed Sale so that one of the few substantive conditions to closing is confirmation of the assignment of MHE's license rights to that technology. Warner also evidently does not want to acquire "substantially all" of the Debtors' assets, thereby taking on the associated costs and complications attendant to those assets. The Debtors and Warner, however, cannot have it both ways.

3.     Epic specifically negotiated for contract provisions that preclude assignment by MHE except in the context of the sale of *substantially all* of MHE's assets. This Court should not allow Warner and the Debtors to utilize the bankruptcy laws to structure a transaction designed to give a purchaser the use of Epic's valuable technology under a structure, and on substantive terms, that would not have been available to them outside of the bankruptcy process. Because the proposed Sale would leave behind material assets and entire subsidiaries of MHE, the Sale is not a sale of "substantially all" the assets of MHE, and Epic will not consent to the assignment of the License Agreements.

4.     Epic also objects to the assumption and assignment of the Publishing Agreement that is related to the Licensing Agreements because MHE is currently in default of that agreement, including both monetary and non-monetary defaults, some of which cannot be cured.

5.     Epic further objects to the Cure Amount proposed by Debtors because the determination of the amount of royalties owed under the Epic Agreements is dependent upon reporting from MHE as to the sales of licensed Games. MHE currently is in default under the Publishing Agreement with respect to those reports, and Epic, upon information and belief, believes the actual amount required to cure MHE's defaults to be significantly higher with respect to the royalty payments for the game *Unreal Tournament 3*.

6.      Epic also objects to the proposed Sale because the list of assumed contracts provided by the Debtors indicates only that executory contracts with Epic Games for "game development" are being assumed by the Debtors in Possession and assigned under the proposed Asset Purchase Agreement, which description falls far short of the requirements of Rule 6006 of the Federal Rules of Bankruptcy Procedure. In reviewing the related exhibits provided with the Sale Motion, the Asset Purchase Agreement appears to be conditioned only on the assignment of the UE3 License Agreement. Epic objects to the assumption or assignment of the UE3 License Agreement, or any of the other License Agreements, to the extent the Debtors seek to assume and assign them alone without also assuming and assigning the UE Master License Agreement and the Publishing Agreement, as those documents are integrated, interdependent and non-severable.

7.      Finally, should the Court conclude, notwithstanding all of the fatal flaws in the Debtors' requests, that applicable law allows the assumption and assignment of the Epic Agreements, Epic submits that the Court must limit the scope of the assignment to preserve the bargain Epic entered into with MHE. Failure to do so would again permit MHE, through the simple expediency of commencing a bankruptcy case, to effect a fundamental change in the nature of the business arrangement reflected in the Epic Agreements.

**RELEVANT FACTS**

**I.      Epic Games**

8.      Epic is a well known developer and publisher of cutting-edge video and computer games as well as game development tools. Among the proprietary computer programs developed by Epic is a program called the "Unreal Engine." A game engine is the core software component of a computer video game or other interactive application with real-time graphics. It provides the underlying technologies, simplifies development, and often enables the game to run on multiple

platforms such as game consoles and desktop operating systems. The core functionality typically provided by a game engine includes a rendering engine for two dimension or three dimension graphics, a physics engine, sound, scripting, animation, artificial intelligence, streaming and scene graphics. In essence, the game engine is what allows sophisticated imagery and actions that customers demand. The process of game development is economized in large part by reusing the same game engine to create multiple different games.

9. The Unreal Engine, originally created for Epic's revolutionary three-dimensional first-person Unreal computer game, is a proprietary and copyrighted suite of software tools that has been written and compiled to provide computer programmers with a complete solution for computer software game development. One of the most mature tool pipelines in the computer software game industry, the Unreal Engine software is constantly being improved and updated for the development of ultra-complex, next-generation software games content and for use with applications that require cutting-edge graphics, artificial intelligence (AI), texture mapping and networking. Many of the most popular video and computer games on the market are based on the Unreal Engine.

10. Epic has utilized the Unreal Engine to develop and co-develop a series of extremely popular, best-selling video and computer games, including *Unreal, Unreal Championship, Unreal Championship 2, Unreal Tournament, Unreal Tournament 2003, Unreal Tournament 2004, Unreal II The Awakening, Unreal II XMP Edition*, and *Unreal Tournament 3*, (collectively, the "Unreal Game Family"), in addition to *Gears of War*, and *Gears of War 2*, which are among the best selling video games in the history of the industry. Epic also produces or licenses the right to produce ancillary products and services such as books, action figures, Internet domain names, and computer software development services.

11.     The third generation Unreal Engine ("Unreal Engine 3" or "UE3") was designed specifically for personal computers and for the most current and widely used video game consoles, including the Xbox 360 and PlayStation3. Building upon tools available in previous versions of the engine, the UE3 utilizes advanced techniques and coding to meet the demands of development for these advanced consoles. The Unreal Engine 3 and its proprietary and copyrighted software is among Epic's most valuable assets.

## II.     The Publishing Agreement

12.     On July 15, 2004, Epic and MHE entered into the Publishing Agreement and the UE Master License Agreement.

13.     Under the Publishing Agreement, MHE became the exclusive publisher of several of Epic's most valuable video game properties, including most of the Unreal Game Family (the "Licensed SKUs"), including most current and future versions of the bestselling Unreal Tournament. *See* Publishing Agreement at § 3.1 and at Amendment 4.

14.     In the Publishing Agreement, Epic granted to MHE and its Affiliates "an exclusive right and license to utilize the Epic Marks and the other Intellectual Property Rights relating to the Licensed SKUs and Deliverables (collectively the "Properties") to copy, manufacture, have manufactured, market, distribute, sell, promote and advertise the Licensed SKUs in the Territory during the Term." *Id.* "Intellectual Property Rights" are defined as "any and all rights existing from time to time in the Territory under all laws relating to intellectual property or proprietary rights, such as patent law, copyright law, moral rights law, trade-secret law, semiconductor chip protection law, trademark law, unfair competition law, laws pertaining to rights of publicity or personality, and industrial design laws, or other similar rights." *Id.* at § 1.19.

15.     In essence, the Publishing Agreement required Epic to produce certain additional Unreal video game properties on a milestone schedule agreed upon between the parties, and made MHE the exclusive publisher of those games, in exchange for royalty payments to Epic. As publisher, Midway marketed, advertised, sold, distributed the Licensed SKUs and provided online game servers and customer support.

16.     Epic retained all ownership rights in the Licensed SKUs, Derivative works and related Intellectual Property licensed under the Publishing Agreement. *See id.* at 7.1. Other than the license, MHE acquired no right, title or interest in any of the Properties under the Publishing Agreement. *See id.* at §§ 7.2, 7.3.

17.     The Publishing Agreement required MHE to provide to Epic, within 45 days from the end of each quarter, a quarterly statement of its Net Receipts (as defined in the Publishing Agreement), Net Revenues and Net Sales from the sale of each Licensed SKU along with other financial information, from which MHE was to determine and pay the royalties owed under Exhibit B to the agreement. *See id.* § 8.4.1.

18.     After four years of cooperation, Epic and MHE agreed on September 29, 2008 that the Publishing Agreement was terminated with respect to all obligations relating to *future* games to be developed by Epic. *See* Amendment 5 to Publishing Agreement. The parties agreed that Epic had completed the "last Final Version of the last Licensed SKU" and that there would be no further games developed which would be subject to the Publishing Agreement. *Id.* However, under the terms of the Publishing Agreement, MHE was still required to meet its royalty obligations on all sales of the existing Licensed SKUs until the expiration of the Publishing Agreement three years after the publication of the last Licensed SKU. *See* Publishing Agreement § 2.

### III. The UE Master License Agreement

19. Also on July 15, 2004, as part and parcel of the same transaction, MHE and Epic entered into the UE Master License Agreement, pursuant to which Epic licensed MHE to "obtain a license to, at its option, any one of the then-commercially available versions of the Unreal Engine," by giving Epic written notice of the game title it wished to develop and the platform on which the game would run. *See* UE Master License Agreement at § I.3.0. Upon receipt of that information and payment of an "Initial License Advance," MHE would be deemed to have received a worldwide license to use the Unreal Engine in the development of the identified Game, subject to the terms of the UE Master License Agreement. *Id.* This license agreement was effective "during the term of the Publishing Agreement." *Id.*

20. Section II.2 of the UE Master License Agreement granted MHE a "*nonexclusive, nontransferable* perpetual license" to use the Unreal Engine to develop, enhance, manufacture, distribute and sell a "Game," as defined in the agreement.[2] *Id.* § II.2(a) (Emphasis added.).

21. The License terms also contained certain restrictions, including that MHE shall not "license, sub-license, distribute, make available or disclose the Licensed Technology to any third party except as authorized in this Agreement." *Id.* § II.2(e)(i).

22. In exchange for the License for the development of a specific, identified Game, MHE agreed to pay certain royalties to Epic based on the sale of copies of the Game. *Id.* § II.3(b). As with the Publishing Agreement, MHE agreed to render an accounting of the sales and royalties owed during each quarter within 45 days of the end of that quarter, and to pay that

---

[2] "Game" means "the game Licensee desires to develop using the Licensed Technology" and all adaptations, enhancements and "level packs" for that game. The name of the game Licensed would be listed on Exhibit A of each individual license agreement. *See* UE Master License Agreement at § II.1(d). The UE Master License specifically excluded the right to make sequels. *See id.* at § II.2(c).

amount to Epic. *Id.* The royalty fee under the UE Master License Agreement was a percentage of the Net Receipts from each copy of a Licensed Product sold and may be seen in Exhibit B, filed under seal. *Id.*

23.     Section II.10 of the UE Master License Agreement provided that Epic may immediately terminate the agreement if MHE or an entity owning 50% equity in MHE petitioned for bankruptcy. *See id.* § II.10(a)

24.     The UE Master License Agreement also contained a non-assignment provision, which states in pertinent part that:

> This Agreement may not be assigned or sublicensed by either party in whole or in part (by contract, operation of law or otherwise) (except as to sublicensing expressly permitted under this Agreement), except that it may be assigned by either party, without the requirement to consult the other party, ***to an affiliate or in connection with any merger, acquisition or reorganization involving substantially all of its assets or capital stock.***

*Id.* § II.12 (emphasis added).

## IV.     The UE3 License Agreement

25.     During 2004, Epic was developing the Unreal Engine 3. MHE and Epic, satisfied with the success of the arrangement to date, decided to restructure the terms of their licensing relationship while maintaining the Publishing Agreement. Once the engine was available for licensing, MHE wished to use the Unreal Engine 3 in the development of the majority of its games for the XBox360, Playstation3 and PC. However, MHE wanted to enter into one license agreement which would give it the right to use the Unreal Engine 3 on those new games without the need to enter into a separate license agreement for each game.

26.     This proposal offered synergies to Epic. Because of its status as Publisher of Epic's Unreal Licensed SKUs, MHE had a particular interest in protecting the UNREAL Marks

and Epic's reputation. Because of the history of the parties and the success of their relationship to date under the Publishing Agreement and MHE's particular expertise and history with the *Mortal Kombat* franchise, the two companies' products matched well. Most importantly, because MHE would use the Unreal Engine 3 to produce games for the current generation of consoles (Xbox 360, Playstation3 and PC), the proposal offered the opportunity to greatly expand the Unreal Engine 3's exposure in the marketplace, to associate the Unreal Engine 3 with a major game developer and publisher, and to establish Unreal Engine 3 as the standard in the marketplace on these newer platforms. In addition, it offered Epic the opportunity to earn royalties on the majority of MHE's major titles for the current generation of consoles, for which Epic estimated an 8-12 year window of revenues.

27.     Solely because of these synergies, Epic agreed to a royalty payment structure lower than that set forth in the UE Master License Agreement and among the lowest Epic had negotiated with *any* licensee. *See* UE3 License Agreement at § 3(b). These royalty payments are well below the market rate for a license of the Unreal Engine 3.

28.     On January 14, 2005, Epic and MHE entered into the UE3 License Agreement, under which MHE obtained a nonexclusive, nontransferable license to use the Unreal Engine 3, to develop, market, and sublicense Games. *See* UE3 License Agreement § 2.

29.     Because MHE indicated its intention to make the Unreal Engine 3 the standard engine technology used across MHE's organization and in its key studios for the development of games for the current generation of game consoles, the UE3 License Agreement contained specific "Milestone" development provisions, attached to the UE3 License Agreement as Exhibit B, which were unique to the MHE UE3 License Agreement.

30.     As with the Publishing Agreement and the UE Master License Agreement, MHE

is required to report quarterly on its Net Receipts for each Licensed Product and to submit

royalty payments to Epic. *Id.* § 3(b)

31.     The License granted in the UE3 License Agreement is substantially similar to that

granted in the UE Master License, as follows:

> Epic hereby grants to Licensee, and Licensee hereby accepts from Epic, a
> *nonexclusive, nontransferable* (except as set forth in Section 12),
> perpetual license, with the right to sublicense, within the Territory to (i)
> use and copy the Licensed Technology[3] for the purpose of developing
> Games[4]; (ii) use and distribute the Licensed Technology (in object code
> only) as an embedded component of Games; (iii) develop Enhancements
> for use in Games; and (iv) to utilize the Licensed Technology to
> manufacture, distribute and sell copies of Games.  The foregoing license
> is a license of all Intellectual Property Rights in the Licensed Technology.
> Epic acknowledges that Licensee may use contractors in the exercise of
> its rights under the foregoing License including software development
> contractors [with the exception of people identified in Exhibit C] . . .

*Id.* § 2(a).

32.     The UE3 License Agreement also contains provisions clarifying that it did not

grant MHE the right to the Licensed Technology "apart from the Games," *id.* § 2(b), and

---

[3] "Licensed Technology" under the UE3 License Agreement "means the proprietary computer
software program known as the Unreal Engine 3, as such program may exist for use with any and
all video game platforms from time to time throughout its development and upon its completion
and including all documentation pertaining thereto, all commercially available platform ports,
and any improvements, enhancements, updates, fixes and other changes thereto which may, from
time to time, at Epic's sole option, be made available to Licensee or Epic's licensees of the
Licensed Technology generally and which are not marketed as separate stand alone programs
(collectively, "Upgrades")."  UE3 License Agreement at § 1(s).

[4] "Game" is defined in section 1(n) of the UE3 License Agreement to mean "a video game
Licensee or its Affiliate commences to develop (or engages a contractor to develop) using the
Licensed Technology at any time during the seven (7) years after the date of this Agreement, all
adaptations of such game to any video game platform (whether or not developed by Licensee or
its Affiliate, and regardless of when developed), all localized versions of such game (whether or
not developed by Licensee or its Affiliate, and regardless of when developed), all patches of such
game (whether or not developed by Licensee or its Affiliate, and regardless of when developed),
and all Executing Level Packs and all Non-Executing Level Packs (whether or not developed by
Licensee or its Affiliate, and regardless of when developed).  A *"Licensed Product"* means a
version of a Game that contains any portion of the Licensed Technology.  UE3 License

reserving all rights not granted in the license. *Id.* § 2(c). MHE may also not, "(C) use or distribute the Licensed Technology separately from Games in any manner; or (D) license, sublicense, distribute, make available or disclose the Licensed Technology to any third party except as authorized in this Agreement." *Id.* § 2(e). Epic further retains all right, title and interest in and remained the owner of all Intellectual Property Rights in and to the Licensed Technology (i.e., the Unreal Engine 3). *Id.* § 6.

33. The UE3 License Agreement provides further that, in the event of the Bankruptcy or reorganization of MHE or any entity owning an equity interest of more than 50% of MHE "Epic shall have the immediate right to terminate this Agreement by giving licensee written notice." *Id.* § 10(g).

34. In the event of a change of control of MHE, section 10(e) of the UE3 License Agreement states that Epic would have a right to terminate the UE3 License Agreement upon 20 days written notice of an uncured material breach of its terms. *Id.* at § 10(e). If the UE3 License Agreement were terminated under this specific provision, "the [UE Master License Agreement] shall, simultaneous with such termination, be reinstated and in full force and effect, with each Game then under development being considered a "Game" for which Licensee has obtained a license to the Unreal Engine 3...." *Id.* § 10(e).

35. The UE3 License Agreement is nonassignable, except in certain specific situations:

> (a)  Assignment. This Agreement may not be assigned or sublicensed by either party in whole or in part (by contract, operation of law or otherwise) (except as to sublicensing expressly permitted under this Agreement), except that it may be assigned by either party, without the requirement to consult the other party, ***to an Affiliate or in connection with any merger, acquisition, or***

Agreement at § 1(n).

> *reorganization involving substantially all of its assets or capital stock.*

*Id.* § 12(a) (emphasis added).

## V.    Continued Relationship and Debtors' Organization

36.    In the years since the Publishing Agreement and the License Agreements were signed, Epic's UNREAL family of games have remained some of the most popular video games in the world.  In particular, *Unreal Tournament 3* has sold well through MHE's marketing and distribution efforts.  At the same time, MHE has developed and produced games with the Unreal Engine 3, including such popular games as *John Woo presents Stranglehold, TNA iMPACT!, Mortal Kombat v. DC Universe, Area51,* and *Wheelman.*  As anticipated by the UE3 License Agreement, MHE's internal game studios, including Midway Studios-Newcastle (UK) ("Newcastle Studios") and the Midway Studio in San Diego ("the San Diego Studio") have worked closely with Epic to become proficient at using that engine to develop games, with the San Diego Studio producing *TNA iMPACT!* and Newcastle Studios producing *Wheelman.*

37.    That relationship has continued post-petition, with the release in March 2009 of the *Wheelman* game, which was developed with Unreal Engine 3.  Newcastle Studios also is presently in the development of another Unreal Engine 3 game, an immersive detective game called *Necessary Force.*

38.    Newcastle Studios, in particular, is poised to bring real value to the Epic / MHE relationship.  Newcastle Studios' personnel have now produced a major game franchise -- *Wheelman* -- and brought it to market.  Based upon prior relationships with such studios, Epic now expects that Newcastle Studios could expand to a two-team studio and produce an additional 9-12 games over the lifetime of the current generation of consoles and PCs. Newcastle Studios' current project, *Necessary Force,* is consistent with that expectation.

39. As set forth in the Midway organizational chart attached as Exhibit A to the February 12, 2009 Declaration of Ryan G. O'Desky in Support of Chapter 11 Petitions and First Day Relief, the following foreign subsidiaries are 100% subsidiaries of MHE: Midway Games, Ltd. (U.K.), Newcastle Studios (a 100%-owned subsidiary of Midway Games, Ltd.), K.K. Midway Games (Japan), Midway Games Canada Corp. (Nova Scotia, Canada); Midway Games GmbH (Germany), and Midway Games SAS (France).

40. Moreover, in its most recent Form 10-K Annual Report, filed with the SEC on April 6, 2009 for the year 2008 (the "Midway 2008 Annual Report") (Part I attached as Exhibit D), Midway Games, Inc. ("MGI") stated that international revenues made up 34.5% of the Net Revenues of Midway in 2008, 38.5% in 2007, and 25% in 2006. (Midway 2008 Annual Report at 14.)

41. Indeed, in the Midway 2008 Annual Report, Midway praised its international operations by stating:

> Our United Kingdom, German and French subsidiaries are responsible for sales, marketing and distribution in Europe, Australia, the Middle East and Africa. . . . We believe that directly marketing our products in foreign markets will produce higher sales and lower costs than if we relied solely on the use of third-party distributors. In addition, to expand our presence outside of North America, we have developed titles such as *Wheelman*, which is set in Barcelona, Spain, that we believe will have a stronger global appeal. We are also publishing and distributing third-party games in Europe that we believe will generate significant sales.

*See* Midway 2008 Annual Report at 10.

42. MGI's filing provided that its product development process was focused on internal product development teams based in "studio environments that encourage creativity, productivity and cooperation." Midway 2008 Annual Report at 12. "This environment, together with a compensation structure that rewards development teams for the success of their games,

enables us to attract and retain highly talented game developers. We currently have product development studios in Chicago, Illinois; San Diego, California; Seattle, Washington; and Newcastle, England." *Id.*

## VI.    The Proposed Sale and Cure Amount

43.    In their May 21, 2009 Sale Motion, Debtors seek approval of a Sale of what they state is "All or Substantially All of Debtors' Assets." However, the proposed Asset Purchase Agreement excludes a significant portion of the Debtors' assets from the sale, including the assets of any foreign subsidiary, *see* Asset Purchase Agreement, Schedule 2.2, at ¶(b), and certain "Excluded Games," defined as:

> *"Excluded Games"* -means all *TNA Wrestling* video games, *NBA/NHL/MLB* video games, *Lord of the Rings* video games, *Mechanic Master* video games, any new game, demo or prototype games worked on exclusively in the Newcastle Studio on and after January 1, 2009 (but not including the *Wheelman* video game), and any Seller Game that automatically becomes an Excluded Game pursuant to **Section 2.1(b)(ii)**.

Asset Purchase Agreement (Exhibit B to Sale Motion) at 5 (emphasis in original).

44.    The Asset Purchase Agreement also does not contemplate the sale of either the San Diego Studio or the Newcastle Studio to Warner. Asset Purchase Agreement § 1.1 (defining "Acquired Studios" to the exclusion of San Diego and Newcastle).

45.    Among the assets Debtors seek to Assign as part of an approved Asset Purchase Agreement is the UE3 License Agreement. In fact, Schedule 9.1 of the Asset Purchase Agreement makes the entire agreement contingent on the assignment of that license. *See* Asset Purchase Agreement, Schedule 9.1

46.    On or about June 8, 2009, Debtors served on Epic a copy of the Notice of (I) Debtors' Request for Authority to Assume, Assign and Sell Certain Executory Contracts and

Unexpired Leases, and (II) Debtors' Proposed Cure Amounts (the "Cure Notice"). The Cure

Notice identified the following executory contracts with Epic Games, along with the proposed

Cure Amount for each:

| Counterparty | Contract Description | Cure Amount |
|---|---|---|
| Epic Games | Game Development (Hour of Victory) | $573.73 |
| Epic Games | Game Development (Blacksite Area 51) | $4,666.10 |
| Epic Games | Game Development (Mortal Kombat v. DC Universe) | $398,750.44 |
| Epic Games | Game Development (Unreal Tournament 2004) | $22,749.34 |
| Epic Games | Game Development (Unreal Tournament 3) | $1,472,658.21 |
| Epic Games, Inc. | Game Development (Various Games) | $0 |

47.     While impossible to tell for sure given the Debtors' failure to properly identify the

various agreements between the parties, Epic has reason to suspect that the Debtors also seek to

assume and assign the Publishing Agreement and the UE3 License Agreement (based on the

names of the Licensed Properties listed). Specifically, *Unreal Tournament 3* is a Licensed SKU

under the Publishing Agreement and, prior to its recent default, MHE regularly paid royalties

under that agreement. *Unreal Tournament 2004* also is a Licensed SKU under the Publishing

Agreement. *Hour of Victory, Blacksite Area 51* and *Mortal Kombat v. DC Universe* are Games

developed under the UE3 License Agreement. Because of the integrated and interdependent

nature of the Publishing Agreement, the UE Master Licensing Agreement, and the UE3 License

Agreement, Epic must assume that the Debtors seek to assume and assign all three agreements.


## ARGUMENT

## I.     THE UE3 LICENSE AGREEMENT AND UE MASTER LICENSE AGREEMENT MAY NOT BE ASSUMED OR ASSIGNED WITHOUT THE CONSENT OF EPIC.

48.     Epic objects to the assumption or assignment of the UE3 License Agreement and

the UE Master License Agreement because both are executory contracts regarding Intellectual

Property that cannot be assumed or assigned without Epic's consent. As set forth above, Epic has not and does not consent to any such assumption or assignment.

A.     *Non-exclusive Intellectual Property License Agreements May Not be Assigned Without Consent of the Licensor.*

49.     Section 365(c)(1)(A) of the Bankruptcy Code serves as an exception to the general rule that assignments are favored. Moreover, the provides that a Trustee may not assume or assign any executory contract if "applicable law" would excuse a party, other than the debtor, from accepting performance from an assignee.

50.     Under § 365(c)(1)(A) and the Third Circuit Court of Appeals' adopted the "hypothetical test." *See, In re West Electronics, Inc.*, 852 F.2d 79, 83 (1988) (finding that contract could not be assumed by Debtor in possession where federal law prevented even its hypothetical assignment, regardless of whether Trustee intended to assign it or not). Therefore, even if the Debtors did not intend to assign the License Agreements, the Debtors cannot assume the License Agreements.

51.     Where the contract at issue is a license of intellectual property, such as in this case, whether it may be assigned without the consent of the licensor requires a determination of whether the license is exclusive or non-exclusive. *See In re: Golden Books Family Entertainment, Inc.*, 269 B.R. 311, 314 (Bankr. Del. 2001) ("*Golden Books II*"). "Under copyright law, 'a nonexclusive license . . . has only a personal and not a property interest in the intellectual property,' which 'cannot be assigned unless the [intellectual property] owner authorizes the assignment . . ." *Id*. at 315 (*quoting In re Patient Educ. Media,* 210 B.R. 237, 242-43 (Bankr. S.D.N.Y. 1997) and *citing* 3 Melvin B. Nimmer & David Nimmer, Nimmer on Copyright § 10.02[A] at 10-23 (1996); *see also In re Catapult Entertainment*, 165 F.3d 747, 750 (holding nonexclusive licenses do not give rise to ownership rights and are not assignable over

the objection of the licensor); *In re Access Beyond Tech.*, 237 B.R. 32, 44 (Bankr. Del. 1999) (holding that nonexclusive patent license is not assignable). Because copyright and other "applicable law" renders such licenses non-assignable without consent outside the context of bankruptcy, they may not be assumed and assigned in the bankruptcy context without the consent of the licensor.

52.     Both the UE3 License Agreement and the UE Master License Agreement are, by their explicit terms, non-exclusive licenses of intellectual property rights. These agreements may not be assumed or assigned without the consent of Epic Games.

B.      *The License Agreements are Not Assignable Except to Affiliates or in a Sale of "Substantially All" of the Assets of MHE.*

53.     As noted above, section 12 of the UE3 License Agreement and section II.12 of the UE Master License Agreement provide:

> This Agreement may not be assigned or sublicensed by either party in whole or in part (by contract, operation of law or otherwise) (except as to sublicensing expressly permitted under this Agreement), except that it may be assigned by either party, without the requirement to consult the other party, to an Affiliate or *in connection with any merger, acquisition, or reorganization involving substantially all of its assets or capital stock*.

54.     These provisions do not provide Epic's consent to the assumption or assignment of the License Agreements contemplated by the proposed Sale. Indeed, in all but two circumstances -- (1) assignment to an Affiliate, or (2) in connection with any merger, acquisition, or reorganization involving *substantially all of its assets* or capital stock -- permission for assignment is specifically withheld. The rationale for these exceptions is clear. In the first instance, Epic's Licensed Technology would still be licensed by a related entity that it knew. In the second instance, Epic could be assured that the qualities and assets of the licensee with which it had done business would carry on.

55.     MHE is the counterparty to both License Agreements.  Both License Agreements authorize assignment *only* to an Affiliate or as a consequence of a sale of "substantially all" of the assets or capital stock of MHE.  In construing these terms, both license agreements require the application of the laws of North Carolina.  *See* UE3 License Agreement at § 12(f); UE Master License Agreement at § II.12.

56.     The North Carolina Business Corporation Act, in N.C. Gen. Stat. § 55-12-02, uses the phrase "substantially all" in the context of the sale of a business in requiring shareholder approval of a sale of corporate assets other than in the regular course of business:

> A corporation may sell, lease, exchange, or otherwise dispose of all, or substantially all, of its property, otherwise than in the ordinary course of business, on the terms and conditions and for the consideration determined by the corporation's board of directors, if the board of directors proposes and the shareholders approve the proposed transaction.

N.C. Gen. Stat. § 55-12-02 (2008)

57.     The leading commentator on North Carolina Corporations Law interprets "substantially all" in the context of N.C. Gen. Stat. § 55-12-02 as follows:

> The standard phrase "all or substantially all" was intended to mean literally what it says.  The "substantially all" part is included to make it clear that the retention of a *minimal or nonoperating portion of the assets*, such as cash and cash equivalents in an otherwise *complete* asset sale, will not avoid the requirement of shareholder approval.  Conversely, though, the transfer of a *substantial portion* of the corporate assets will not be "substantially all" if a significant portion is retained, *such as one line of business retained out of several or even most sold*, or even the sale of all operating assets, such as the whole plant, with retention of nonoperating assets, such as accounts receivable and goodwill, for the purpose of continuing operations elsewhere.

Robinson, Russell L. II, *Robinson on North Carolina Corporation Law* § 25.01[1] (7th Ed. 2008) (citing the Model Corporations Act Official Comment § 12-01, ¶ 1 (1984) and *Hollinger, Inc. v.*

*Hollinger Intern., Inc.*, 858 A.2d 342, 348-49 (Del. Ch. 2004) (emphasizing that the sale of a major asset or assets is not a sufficient trigger, but that the test is whether the assets being sold, quantitatively and qualitatively, constitute "substantially all" of the corporation's assets).) (emphasis added); *c.f. Budd Tire Corp. v. Pierce Tire Co., Inc.*, 90 N.C. App. 684, 687-88, 370 S.E. 2d 267, 269 (1988) (finding in the successor liability context that, despite contrary evidence, which went only to credibility, trial court did not err in finding that a going concern sale of equipment and goodwill of tire store, where goodwill was primary asset and "main reason" purchaser was interested in purchasing the business, was a sale of all or substantially all assets, and low purchase price amounted to fraudulent conveyance, opening purchaser to liability to creditors of original company).

58.     Under North Carolina law, "it is a well-settled principle of legal construction that it must be presumed the parties intended what the language used clearly expresses, and the contract must be construed to mean what on its face it purports to mean." *Hagler v. Hagler*, 319 N.C. 287, 294, 354 S.E.2d 228, 234 (1987). "The heart of a contract is the intention of the parties, which is to be ascertained from the expressions used, the subject matter, the end in view, the purpose sought, and the situation of the parties at the time." *Gould Morris Electric Co. v. Atlantic Fire Insurance Co.,* 229 N.C. 518, 520, 50 S.E.2d 295, 297 (1948); *see also, Lane v. Scarborough,* 284 N.C. 407, 409-10, 200 S.E.2d 622, 624 (1973) (When a court is asked to interpret a contract, its primary purpose is to ascertain the intention of the parties.). "The intention of the parties is gleaned from the entire instrument and not from detached portions." *International Paper Co. v. Corporex Constructors, Inc.,* 96 N.C.App. 312, 316, 385 S.E.2d 553, 555 (1989).

59.     Applying these North Carolina contract interpretation rules to this case, and

taking the UE3 License Agreement as a whole, and in the context of "the expressions used, the subject matter, the end in view, the purpose sought, and the situation of the parties at the time," the interpretation of the phrase "substantially all" which is applied by Robinson is consistent with the clearly expressed intent of the parties. Epic would not consent to an assignment unless the successor party was affiliated with or had substantially the same assets as MHE because to do so would fundamentally change the nature of the bargain struck between Epic and MHE.

C.     *The Asset Purchase Agreement Does Not Provide for the Sale of "Substantially All" of the Assets of MHE.*

60.     The License Agreements are not assignable to an unaffiliated third party. Nor are they assignable in the context of an acquisition or sale of less than *substantially all* of MHE's assets. The Sale does not provide for the sale of substantially all of the assets of MHE. Among other things, the Asset Purchase Agreement expressly provides that none of the non-debtor foreign subsidiaries are being sold. *See* Asset Purchase Agreement, Schedule 2.2 (b). Four of those foreign subsidiaries -- Midway Games, Ltd. (U.K.), Midway Games GmbH (Germany), Midway Games SAS (France) and K.K. Midway Games (Japan) are direct subsidiaries of MHE. Moreover, Newcastle Studios is a 100% wholly owned subsidiary of Midway Games, Ltd. (U.K.), which is not being sold. In addition, the Asset Purchase Agreement specifically does not provide for the sale of the San Diego Studio (and its personnel and main product, *TNA iMPACT!*).

61.     MGI reported in the Midway 2008 Annual Report that international revenues have constituted up to 38.5% percent of the net revenue of the entire MGI corporate group, as reported in the Midway 2008 Annual Report, over the last three years. *See* Midway 2008 Annual Report at 14. In fact, prior to the disastrous debt transactions which led to the bankruptcy case, one of MGI's primary focus areas for future growth was the international subsidiaries of MHE:

We believe we can further expand our presence in international markets. In fiscal 2000, we opened an office in the united Kingdom to sell our products in Europe and Australia. In January 2005, we expanded our international operations through the formation of a wholly-owned German subsidiary, Midway Games GmbH. Germany currently is the third largest console market and the largest PC market in Europe. Our German subsidiary is responsible for our sales, marketing and distribution in Germany, Austria and Switzerland. In November 2005, we also formed a French subsidiary, Midway Games SAS, to further bolster our European distribution capabilities. In April 2007, our French subsidiary began selling our products directly to retailers in France. France currently is the second largest console and PC market in Europe.

*See* Midway 2007 Annual Report, part I attached as Exhibit E, at 9.

62.     The foreign subsidiaries, particularly Newcastle Studios, retain value to MHE, as shown by the fact that *the proposed transaction specifically anticipates their continued operation by the Debtors. See* Asset Purchase Agreement at § 8.18. Specifically, the Asset Purchase Agreement provides that "the parties acknowledge that certain Purchased Assets are desirable for *the continued operation by Sellers or their Affiliates of the Newcastle Studio and the San Diego Studio from and after the Closing Date.* Accordingly Purchaser shall . . . grant to each applicable Seller a perpetual, worldwide, non-exclusive, irrevocable, royalty-free, freely transferable license . . . to the Licensed Assets." *Id.* (emphasis added.)[5]

63.     Additionally, the Asset Purchase Agreement excludes Games that, in its last two 10k Annual Reports, Midway Games, Inc. has trumpeted as key to the companies strategy: "over the top" sports games and *TNA Wrestling* games (*see* Midway 2008 Annual Report at 9; Midway 2007 Annual Report at 7-8):

_____

[5] This provision indicates one problem with the proposed Sale. The sublicense of the technology back to the Sellers under § 8.18 would result in the possibility of the purchasers of separate parts of MHE (Warner and any buyer of the remaining foreign subsidiaries or the San Diego studios) having rights to Epic's game engine, which *cannot* be sublicensed except as allowed under the

> *"Excluded Games"* -means all *TNA Wrestling* video games,
> *NBA/NHL/MLB* video games, *Lord of the Rings* video games,
> *Mechanic Master* video games, any new game, demo or prototype
> games worked on exclusively in the Newcastle Studio on and after
> January 1, 2009 (but not including the *Wheelman* video game),
> and any Seller Game that automatically becomes an Excluded
> Game pursuant to **Section 2.1(b)(ii)**.

64.     While the Asset Purchase Agreement does provide for the sale of the *Wheelman*

game, it leaves behind any game currently in development by Newcastle Studios - which would

necessarily include *Necessary Force* - and a stable of venerable franchises which could be

licensed or developed into new games. Thus, the Asset Purchase Agreement leaves MHE with a

significant overseas distribution network and a successful game studio that will, according to the

Asset Purchase Agreement, be equipped for "continued operation." Asset Purchase Agreement

at § 8.18.

65.     Thus, this transaction does not qualify as a sale of "substantially all" the assets of

MHE under North Carolina law and would alter the reasonable expectations of Epic at the time

the Epic Agreements were executed. MHE has left itself and its foreign subsidiaries (the stock

of which is an asset of MHE) much more than *"one line of business retained out of several or*

*even most sold."* Robinson, *supra.* "Quantitatively and qualitatively," this Asset Purchase

Agreement is for less than substantially all of the assets of MHE. *See Gimbel v. Signal Cos.*, 316

A.2d 599, 608 (1974).

66.     Epic, by agreeing to the Assignment provision, barred all assignments that would

not keep the development team and assets of Midway intact and paired with the valuable UE3

License and Publishing Agreements. The royalty structure under the UE3 License Agreement

shows that intent, because of the aggressive bargain Epic cut for MHE on royalty fees. What

---

terms of the UE3 License Agreement.

Epic did *not* intend, and specifically negotiated the assignment provisions to avoid, was the assignment of a license to its valuable and proprietary technology at a rock-bottom price and royalty, to another company as part of the cherry-picking of the most valuable MHE intellectual property, without the accompanying benefit of MHE's investment in the *UNREAL* franchise, the studios and their game developers, and the game development skills that made MHE such a valuable partner.

67.     As a result of this Sale, the proposed purchaser will acquire certain games and intellectual property, but will leave behind much of what brought Epic to agree to the terms of the UE3 License Agreement with MHE. Upon the consummation of the Sale, if the License Agreements are assigned to the current stalking horse bidder, Epic would be faced with a purchaser, Warner, which is not currently a licensee of Epic's products, gaining full access as a licensee to Epic's most valuable game development asset, at a rate and on terms which are far more lenient than what Warner could be expected to pay if it negotiated with Epic independently. Warner will obtain this value even though it is not obtaining the assets, particularly the Newcastle Studio and the San Diego Studio, that helped make the UE3 License Agreement viable for Epic. This is *precisely* the scenario that Section 12 of the License Agreements is designed to prevent. Epic cannot be deemed to have consented to an assignment that it specifically sought to prevent.

*D.     Even if the Court Finds that Epic Did Consent to the Assignment, Epic Did Not Consent to Assumption of the Contract by a Debtor-in-Possession*

68.     Even if the Court were to find that Epic consented to an assignment of the License Agreements in the context of this Sale, which it does not, the language clearly does not consent to an *assumption* of the License Agreements by a debtor or trustee in bankruptcy. Indeed, the Fourth Circuit Court of Appeals, also applying the hypothetical test, considered language very

similar to that in the License Agreements and found that such language does not connote consent to assumption by a debtor-in-possession or trustee. *See In re Sunterra Corp.*, 361 F.3d 257, 271 (4th Cir. 2004).

69.    In *Sunterra*, the Fourth Circuit concluded that the licensor:

> consented to Sunterra's assignment of the License to a successor in interest under certain circumstances. The Transfer Provision, however, does not apply to an *assumption* of the Agreement by a Chapter 11 debtor in possession. Because the terms assumption and assignment describe "two conceptually distinct events," *In re Catapult,* 165 F.3d at 752, and because the Transfer Provision pertains to an assignment rather than an assumption, RCI did not consent to Sunterra's assumption of the Agreement. Without RCI's consent, Sunterra was precluded from assuming the Agreement.

*Id.* As in *Sunterra*, in this case, Epic's assignment provision constituted a consent under certain circumstances to an assignment, but it was not a consent to an assumption. Accordingly, Epic objects to the assumption of the License Agreements and such assumption cannot occur without such consent.

## II.    THE UE3 LICENSE AGREEMENT CANNOT BE ASSIGNED WITHOUT ALSO ASSIGNING THE UE MASTER LICENSE AGREEMENT

70.    Because the list of assumed contracts provided by the Debtors indicates only that a contract with Epic Games for "game development" is being assumed by the Debtors and assigned under the Sale,[6] and the Asset Purchase Agreement is conditioned only on assignment of the UE3 License Agreement, Epic objects to the assumption and assignment to the extent the Debtors seek to assume and assign the UE3 License Agreement without also assuming and assigning the UE Master License Agreement and the Publishing Agreement, as the documents are integrated and interdependent.

---

[6] Epic also objects to the proposed assumption and assignment of the Epic Agreements because the Debtors utterly failed to comply with Rule 6006 of the Federal Rules of Bankruptcy

71.     If the Court concludes that Debtors may assume and assign the UE3 License

Agreement, it must be assigned in its entirety, and it must be assigned together with all integrated

contracts. *See In re Exide Techs.*, 340 B.R. 222, 228 (Bankr. Del. 2006) ("an executory contract

must be assumed or rejected *in toto*. . . Correspondingly, all of the contracts that comprise an

integrated agreement must be assumed or rejected, since they all make up one contract." *Id.*) ;

*see also In re Philip Svcs. (Delaware), Inc.*, 303 B.R. 574, 576 (D. Del. 2003) ("the parties'

intentions determine whether two separately executed documents constitute one agreement." *Id.*)

72.     The Epic Agreements are integrated. First, the Publishing Agreement and the UE

Master License Agreement were entered into at the same time, in order to memorialize the

entirety of relationship between Epic and MHE. The Master License Agreement was attached to

the Publishing Agreement as an exhibit, and the term of the Master License Agreement is

"during the term of the Publishing Agreement." *See* UE Master License Agreement § 3.0.

73.     Section 10(e) of the UE3 License Agreement provides that in the event of a

change in control of MHE, (acquisition of the stock, merger, or sale of all or substantially all of

its assets to another entity),[7] a material breach of the terms of the agreement which goes uncured

30 days after written notice gives Epic the right to terminate the UE3 License Agreement, in

which case:

> (A) the First Master Agreement [the UE Master License
> Agreement] shall, simultaneous with such termination, be
> reinstated and in full force and effect, with each Game then under
> development being considered a "game" for which Licensee has
> obtained a license to the Unreal Engine 3 for all platforms under
> the First Master Agreement pursuant to Section 1.3 of the First

Procedure. Neither the Sale Motion nor the Notice of Intent comply with Rule 6006(f).

[7] Such a change of control occurred in November 2008, prior to the petition date. *See* Midway 2008 Annual Report at 23. Absent the Automatic Stay, any material breach subsequent to that date would be subject to notice and termination under § 10(e), invoking the UE Master License Agreement.

Master Agreement;

74.     Thus, the UE Master License Agreement is an integral part of the UE3 License Agreement, and provides the sole method of licensing the Unreal Engine 3 after breach by Warner and termination by Epic. In such an event, Warner would no longer be entitled to pay the low royalty payments under the UE3 License Agreement for the Games developed by MHE with the Unreal Engine 3. Rather, the higher royalty figures of the UE Master License Agreement, and the greater restrictions on the use of the Licensed Technology would apply, including the need to relicense for every proposed game and sequel.

75.     Therefore, Epic objects to the assignment of the UE3 License Agreement without the additional assignment of the UE Master License Agreement. If in fact the Debtors intend to Assign only the UE3 License Agreement without the UE Master License Agreement, Epic objects to the Sale and the assumption and assignment of the UE3 License Agreement on the grounds that such an assignment would materially change the obligations under the UE3 License Agreement and would be contrary to *In re Exide Techs.*

## III.    EPIC OBJECTS TO THE ASSUMPTION AND ASSIGNMENT AND PROPOSED CURE AMOUNT FOR PUBLISHING AGREEMENT

76.     Epic objects to the assumption and assignment of the Publishing Agreement because MHE is currently in breach, post-petition, of the terms of that agreement, specifically section 8.4.1. That section requires MHE to provide a quarterly accounting of its sales and Net Receipts for each of the Licensed SKUs under the Publishing Agreement. Since the Petition Date, MHE has failed to comply with the terms of Section 8.4.1 with respect to the royalty calculations for *Unreal Tournament 3*, a Licensed SKU under the terms of the Publishing Agreement, and the most lucrative game remaining under that agreement.

77.     MHE has not paid the royalties due for Fourth Quarter 2008 (pre-petition) or First Quarter 2009 (post petition). The Cure Notice filed by the Debtors on June 8, 2009, provides a proposed Cure Amount to Epic Games for "Game Development (Unreal Tournament 3)" in the amount of $1,472,658.21. Without the statement of account required by section 8.4.1 of the Publishing Agreement, however, Epic cannot determine the adequacy of that Cure Amount. Upon information and belief, the Cure Amount is too low, because the total Cure Amount offered by Debtors is equal to their calculation of Epic's unsecured pre-petition claim. *See* Schedule F for Debtor MHE - Creditors Holding Unsecured Non-Priority Claims at 29.

78.     MHE, however, also owes Epic payments as a result of Post-Petition sales of Unreal Tournament 3 in the First Quarter of 2009. Moreover, this obligation is ongoing, and as of June 30, 2009, one day prior to the scheduled Sale hearing in this matter, MHE will have completed its second quarter of post-petition operations. As a result, within 45 days of that date, under the Publishing Agreement and the UE3 License Agreement, MHE must provide reports of Net Revenue and payments of royalties to Epic.

79.     Under section 365(b) of the Bankruptcy Code, the trustee, or debtor, may not assume a contract if the debtor has breached the contract unless the debtor can cure the breach or provide adequate assurance that the breach will be cured. This rule "applies to contracts for which default has occurred either before or after the commencement of the case." *See* 2 Collier Bankr. Manual, ¶365.05[2] (Alan N. Resnick & Henry J. Sommer eds. 3rd ed. Rev. 2009). As a result, without cure of the nonmonetary breach of failing to provide the required accounting and the payment of the actual pecuniary loss to Epic (which cannot be calculated without compliance with section 8.4.1 of the Publishing Agreement), the Publishing Agreement cannot rightfully be assumed by the debtors and assigned as part of the Sale. Epic therefore objects to that

assumption and assignment.

80.　Furthermore, because the Epic Agreements are integrated and interdependent, the License Agreements cannot, under *In re Exide Techs,* be assumed and assigned without the Publishing Agreement. Because Debtor is in breach of the Publishing Agreement, it cannot assume or assign the Publishing Agreement, and because the UE3 License Agreement is interrelated with the Publishing Agreement and the UE Master License Agreement, neither of those License Agreements may be assumed or assigned, and Epic objects to that assumption and assignment.

## IV.　EPIC OBJECTS TO THE ASSIGNMENT OF THE UE3 LICENSE AGREEMENT ON THE TERMS SET FORTH IN THE ASSET PURCHASE AGREEMENT.

81.　Should the Court conclude, despite applicable non-bankruptcy law, that the Debtors may assume and assign the UE3 License Agreement, Epic objects to the assignment of the UE3 License Agreement on the terms provided in the Sale Motion.

82.　Schedule 9.1 of the Asset Purchase Agreement with Warner Bros. Entertainment, Inc. attached as Exhibit B to the Sale Motion states:

> It shall be a condition of the Closing that, with respect to the Unreal Engine 3 License Agreement, dated January 14, 2005, as amended December 5, 2005, between Midway Home Entertainment Inc. and Epic Games, Inc. (the ***"Unreal Engine License"***), Purchaser (or its applicable Affiliate) shall receive all of Sellers' rights and benefits under the Unreal Engine License, including its pricing, for Seller Games that use the Unreal Engine License and which are included in the Purchased Assets, and any sequels to any Seller Games which are included in the Purchased Assets. It is not a condition to the Closing that the terms of such agreement apply to any other video games or any other Affiliates of Purchaser. *Sellers shall be entitled to enter into any amendment to the foregoing license agreement to limit its application to Seller Games and sequels thereof without the consent of Purchaser.*

(emphasis added).

83.     However, the UE3 License Agreement already restricts the use of the Licensed Technology to the Games developed under the UE3 License Agreement.  Section 2(b) of the UE3 License Agreement provides:

> (b)     *Nothing contained in this agreement shall be construed to grant to Licensee the right to sell, disclose, distribute or sublicense the Licensed Technology apart from the Game.*  Licensee acknowledges and agrees that it has no rights or claims of any type to the Licensed Technology except such rights as are created by this Agreement, and Licensee irrevocably waives and releases any claim to title and ownership rights (including trade secret and copyright ownership) in the Licensed Technology.

84.     Epic objects to the proposed assignment of the UE3 License Agreement on these terms, because the license conveyed under the UE3 License Agreement is specifically limited to the use of the Unreal Engine 3 with the games ***developed by MHE***.  The Asset Purchase Agreement purports to transfer the UE3 License Agreement without such restriction, unless Sellers, as set forth in the italicized portion of the above paragraph, *choose* to enter into an "amendment" to the UE3 License Agreement.  *See* Asset Purchase Agreement, Schedule 9.1.  This is contrary to the terms of the UE3 License Agreement, and any transfer of the UE3 License Agreement that is not restricted to the Seller's Games would purport to convey more than allowed in the UE3 License Agreement itself.

85.     Therefore, in the event the Court decides that Epic has consented to the assignment of the License Agreements, which it has not, Epic respectfully requests that the Order specifically include language making clear that the assignment of the License Agreements does not apply to any other video games other than those conveyed by MHE to the Purchaser as part of the Sale.  To allow the assignment under the terms set forth in the Asset Purchase Agreement, without that restriction, would grant Warner, or any eventual purchaser, a bargain they have not

earned, and would deprive Epic of the bargain it entered into with MHE. Without the corresponding benefit of the Newcastle Studios and San Diego Studios, and the business arrangement between MHE and Epic, an unrestrained assignment of the License Agreements would simply assign the right to Epic's valuable intellectual property at a bargain-basement rate. Such a result would be inequitable and would result in severe economic impact to Epic. Moreover, because Warner has already indicated in Schedule 9.1 that it cannot object to the negotiation of such an "amendment," the restriction would not result in any corresponding disadvantage to the bankruptcy estate or its creditors.

WHEREFORE, for all the foregoing reasons, Epic Games, Inc. respectfully requests that this Court: (i) deny the Debtors' request to assume or assign the Publishing Agreement and the License Agreements; (ii) exclude the License Agreements from the proposed Sale; (iii) or, in the alternative, expressly state that the assignment of the UE3 License Agreement does not apply to any other video games other than those conveyed by MHE to the Purchaser as part of the Sale; (iv) find that Debtors have not cured or given adequate assurance of cure of the breach of the Publishing Agreement related to the accounting and payment of royalty payments for *Unreal Tournament 3*; and (v) grant such other and further relief as is just and appropriate.

Dated: June 24, 2009.

WOMBLE CARLYLE SANDRIDGE & RICE, PLLC

By: _____

Michael G. Busenkell (Del. Bar No. 3933)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone: 302-252-4320
Facsimile: 302-252-4330

-and-

John D. Burns (N.C. Bar No. 24152)
Jason W. Harbour (Del. Bar No. 4176,
    Va. Bar No. 68220)
HUNTON & WILLIAMS LLP
Post Office Box 109
Raleigh, North Carolina 27602
Telephone: 919-899-3000