## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MIDWAY GAMES INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 09-10465 (KG)<br>(Jointly Administered) |
| THRESHOLD ENTERTAINMENT, INC.,<br><br>Plaintiffs<br><br>v.<br><br>MIDWAY GAMES INC., MIDWAY AMUSEMENT GAMES, LLC, MIDWAY HOME ENTERTAINMENT INC., SURREAL SOFTWARE INC. MIDWAY GAMES WEST INC., MIDWAY STUDIOS-LOS ANGELES INC. and MIDWAY STUDIOS-AUSTIN INC.,<br><br>Defendants. | Adversary Proceeding No. |

## COMPLAINT FOR DECLARATORY AND RELATED RELIEF

Plaintiff Threshold Entertainment, Inc. ("Threshold"), for its Complaint against adversary

Defendants Midway Games Inc., Midway Amusement Games, LLC, Midway Home

Entertainment Inc., Surreal Software Inc., Midway Games West Inc., Midway Studios-Los

Angeles Inc. and Midway Studios-Austin Inc. (collectively, "Midway"), states as follows:

---

[1] The Debtors are: Midway Games Inc., Midway Home Entertainment Inc., Midway Amusement Games, LLC, Midway Interactive Inc., Surreal Software Inc., Midway Studios – Austin Inc., Midway Studios – Los Angeles Inc., Midway Games West Inc., Midway Home Studios Inc., and Midway Sales Company, LLC.

## NATURE OF THE CASE

1. This adversary proceeding seeks declaratory relief to protect Threshold's licenses and property interests in certain intellectual property based on Midway's series of "Mortal Kombat" videogames.

2. Threshold holds at least four categories of intellectual property interests: (i) a perpetual exclusive license to prepare derivative works in film and television based on Mortal Kombat; (ii) copyrights in certain of its own derivative works based on Mortal Kombat, including, without limitation, the copyrights to certain characters in effect created by Threshold; (iii) implied non-exclusive licenses to use Midway's Mortal Kombat-related intellectual property that has been incorporated into derivative works prepared by Threshold; and (iv) trademark rights in the word mark MORTAL KOMBAT for use in connection with entertainment services (collectively, the "Threshold Intellectual Property").

3. Midway's actions and conduct, together with the proposed sale of its Mortal Kombat-related intellectual property gives rise to an actual controversy with respect to the Threshold Intellectual Property. In the case of Threshold's exclusive license to prepare derivative works in film and television, Midway has expressly disputed that Threshold has any such exclusive license. Midway does not appear to dispute that Threshold has a non-exclusive license to use Mortal Kombat property incorporated into Threshold's derivative works, or that Threshold owns copyrights in certain of those derivative works. However, Midway has not assumed or rejected the licenses. Nor has it acknowledged or made any provision to preserve Threshold's licenses or property interests in either its "Sale Motion"[2] or the Asset Purchase

---

[2] Motion for Entry of Orders Under 11 U.S.C. §§ 105, 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004, 6006 and 9014 (I) (A) Approving Bidding Procedures, Bidding Incentives for the Stalking Horse

Agreement ("APA") under which the Debtors propose to sell substantially all of their assets—*including intellectual property related to Mortal Kombat*.

4.     Midway's Sale Motion asks the Court to approve the sale of all purchased assets "free and clear of all liens, claims, interests and encumbrances pursuant to 11 U.S.C. § 363(b)." Threshold does not object to Midway's proposed sale of intellectual property *that Midway owns*, subject to Threshold's licenses. However, the sale of Midway's assets should not have the effect of divesting Threshold of its intellectual property licenses and/or ownership interests in Mortal Kombat-related intellectual property.

5.     Therefore, to protect and preserve its interests, Threshold seeks a judgment declaring the existence and scope of its licenses, interests and intellectual property rights in Mortal Kombat-related intellectual property, and further declaring that Midway has no right to sell, assign or otherwise impair the Threshold Intellectual Property.

## PARTIES

6.     Plaintiff Threshold is a Delaware corporation with its principal place of business in Santa Monica, California. Among other things, Threshold is in the business of providing the services of Lawrence Kasanoff ("Kasanoff"), its Chairman and Chief Executive Officer, to Threshold's clients and customers.

7.     Defendant Midway Games Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois. Midway Games Inc. is one of the Debtors and is one of the

---

Bidder, and Auction Procedures; (B) Approving Notice Procedures for the Solicitation of Bids, an Auction, and the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Scheduling an Auction for the Sale or Sales of All or Substantially All of the Debtor's Assets and Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief (Docket No. 357).

proposed Sellers identified in the Sale Motion. On information and belief, Midway Games Inc. was formerly known as, or is the successor to, Midway Manufacturing Company.

8.  Defendants Midway Amusement Games, LLC, Midway Home Entertainment Inc., Surreal Software Inc., Midway Games West Inc., Midway Studios-Los Angeles Inc., and Midway Studios-Austin Inc. are each Debtors and proposed Sellers identified in the Sale Motion.

9.  On February 12, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have managed their business and possessed property pursuant to Sections 1107 and 1108 of the Bankruptcy Code. The cases commenced by these petitions are being jointly administered.

## JURISDICTION AND VENUE

10.  This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

11.  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (N) and (O).

12.  Venue is proper in this District pursuant to 28 U.S.C. § 1409.

## BACKGROUND

### Kasanoff and Threshold Entertainment

13.  Kasanoff founded Threshold (then "Amalgamated Widgets") in 1992. Threshold is now a leading intellectual property management and production company. The company develops, manages, produces, and publishes intellectual properties in all media, including feature films, television shows, live stage tours, animation, video games and websites. Threshold currently holds licenses to some of the best-known entertainment brands in the world.

14.  Kasanoff has produced or executive produced more than 25 films. Before founding Threshold, Kasanoff was President of Lightstorm Entertainment. Among other films,

the company produced *Terminator 2 Judgment Day* under Kasanoff's leadership. That film, released in 1991, was the basis for a successful videogame developed by Midway.

## The Original Mortal Kombat Game

15.     Mortal Kombat began as a series of coin-operated arcade games in 1992, centered around a fighting tournament. Mortal Kombat was launched for home consoles in 1993.

16.     In the early games, the "plot" involved a tournament between several warriors of "Earthrealm" against the warriors of "Outworld." While most video games of the time used hand-drawn "sprites" (the moving characters integrated into a background scene), Mortal Kombat was innovative for its use of digitized sprites based on performances by live martial artists and dancers.

17.     But apart from this innovative new graphics technology, the Mortal Kombat videogame did not develop or "bring to life" its characters. The first version of Mortal Kombat identified ten different playable and non-playable characters, but each character was no more than a stock character based on popular archetypes from film and other games, *e.g.*, a Chinese martial arts expert; a headstrong heroine; a wizard with supernatural powers; a preening actor thrown in as comic relief, and a few generic ninjas. The "story" for each character was limited to a brief, scrolling piece of introductory text that ran in the background of the game, identifying each character by role.

18.     Indeed, the first game was infamous for "palette swapping," or merely recoloring certain sprites to appear as different fighting characters. Multiple characters in the first game were essentially the same character, just with differently-colored attire. No attempt was made to further delineate these flat, cookie-cutter characters.

**The 1993 Agreement**

19.     In 1993, Kasanoff visited Midway and its CEO, Neil Nicastro, with an idea to launch the Mortal Kombat concept in a totally new direction. Specifically, Kasanoff proposed to develop derivative works in various media based on the original game, including a full feature-length motion picture, a television series, and other productions. Midway was initially skeptical, as Kasanoff's idea was revolutionary at the time. Although the Mortal Kombat game had tested well in arcades, at that time, no one had ever successfully transitioned a video game concept into motion pictures and other media, and Midway had made no effort to move beyond videogames with the Mortal Kombat concept.

20.     But Kasanoff was ultimately able to persuade Midway to go along with his vision. On September 28, 1993, Kasanoff and Midway executed a letter memorializing their agreement (the "1993 Agreement") related to the motion picture and television rights to the Mortal Kombat video game. A true and correct copy of the 1993 Agreement is attached as Exhibit A.

21.     Under the 1993 Agreement, Kasanoff had up to 180 days to set up an initial deal (with a major studio, independent production company or other financier) for the development of a feature film or television series based on the Mortal Kombat video game (defined in the 1993 Agreement as the "Property"). Kasanoff was granted limited rights and authority to "represent" the Property in order to set up the initial deal, and his ability to obtain a deal was a condition precedent to his full rights vesting under the 1993 Agreement.

22.     Kasanoff was not paid any monetary fee under the 1993 Agreement; rather, if he was successful in procuring a deal for an initial Mortal Kombat film, Kasanoff was to be granted the following two rights that together amounted to a perpetual, exclusive license to prepare (or "produce," in film-industry terms) derivative works in the media of film and television:

a. The right to "represent the Property" in order to develop a "feature film and television series based thereon"; and

b. The right to "be attached to such feature film or television series as the producer thereof, and to any sequel thereto."

23. Lastly, under the 1993 Agreement, Kasanoff received a right to a percentage (to be negotiated in good faith) of the revenues derived from the merchandising of any derivative works in film or television developed by Kasanoff.

24. In agreeing to this arrangement, Kasanoff took a significant risk, staking his time, money and reputation on a project with a low probability of success, with no guarantee of compensation, whatsoever.

## The Initial Mortal Kombat Film

25. Within his initial period of exclusive representation, Kasanoff sought and successfully obtained a deal with New Line Cinema to produce a martial arts action film based on the Mortal Kombat video game. The film was entitled *Mortal Kombat*. Thus, as a result of fulfilling all conditions precedent, Kasanoff's full rights vested under the 1993 Agreement.

26. Pursuant to his license under the 1993 Agreement, Kasanoff entered into an agreement (the "Picture Agreement") directly with New Line Productions, Inc. (together with New Line Cinema, "New Line") to produce the film.

27. As producer, Kasanoff drove, created and shepherded the entire project from start to finish. Kasanoff shaped the story, located the cast, hired the crew, and participated in shooting the film. Kasanoff was consulted on, and often ran, all aspects of the film, including screenplay, director, principal cast, budget, production schedule, locations and music. Kasanoff shaped the film to ensure it met run-time and ratings restrictions and photographed and furnished "cover

7

shots" and alternate scenes and dialogue to create a version of the film suitable for airing on network television.

28. Finally, and most importantly, under the Picture Agreement, Kasanoff assumed ultimate responsibility for delivery of the final product—*i.e.*, the completed film. Kasanoff was the master architect and author responsible for the preparation of the entire derivative work.

29. Recognizing that Kasanoff had independent rights of copyright in and to the Mortal Kombat derivative works he had created, New Line required Kasanoff to assign his rights in the *Mortal Kombat* film via a "Grant of Rights" in the Picture Agreement, confirming that New Line would be the sole and exclusive owner of the copyright in the final derivative work. New Line subsequently obtained Copyright Registration No. PA0000644136 for "Mortal Kombat/New Line Cinema presents a Threshold Entertainment production." (*See* Copyright Registration, attached as Exhibit B).

30. New Line also included in the Picture Agreement a "Certificate of Results and Proceeds" whereby Kasanoff certified and warranted that all literary and other material created by him specifically for the project was original to Kasanoff, and would be considered a "work-made-for-hire," such that New Line would be deemed the sole owner of the copyrights in that material. This certification was limited to the "results and proceeds" of Kasanoff's "services in connection with the Picture," and therefore did not include the characters themselves.

31. As consideration for Kasanoff's development of the film and assignment of rights to New Line under the Picture Agreement, Kasanoff was compensated financially by New Line. Midway was not a party to the Picture Agreement; rather, Midway entered into a wholly separate, short-form "Rights Acquisition" agreement with New Line.

32.     *Mortal Kombat* was distributed by New Line and opened on August 18, 1995. During its opening weekend, the film earned the top box-office spot with $23 million in gross revenues. It held the top spot for three weeks. At the time, this was the second-highest August opening ever. *Mortal Kombat* was highly successful financially, ultimately earning $122 million worldwide (not including DVD and television revenues) on a budget of $25 million.

### The 1995 Amendment to the 1993 Agreement

33.     Subsequent to entering into the 1993 Agreement and the separate Picture Agreement with New Line, Kasanoff transferred all of his rights under the 1993 Agreement to Threshold. The assignment was ratified by Midway.

34.     In connection with the initial *Mortal Kombat* film, Threshold and Midway entered into an Amendment to the 1993 Agreement on June 23, 1995 dealing with merchandising of Mortal Kombat-related consumer products (the "1995 Amendment"). A true and correct copy of the 1995 Amendment is attached as Exhibit C.

35.     The 1995 Amendment acknowledged that Threshold had successfully obtained agreements between New Line and Midway for production of a feature-length film, and sequels or remakes thereof, and for one or more fully-animated home video releases. It also noted that Threshold was negotiating the financing and production of a live-action television series and a live stage show.

36.     Under the 1995 Amendment, Threshold was entitled to receive a specific percentage share of Midway's merchandising revenues with respect to (i) the *Mortal Kombat* film and (ii) all sequels and remakes and the live action television series.

### Kasanoff's and Threshold's Mortal Kombat Productions

37.     In addition to the *Mortal Kombat* feature film, Threshold developed and produced Mortal Kombat-related projects across a broad range of media. Threshold produced each of

9

these projects with the full knowledge and approval of Midway. The following represents a non-exhaustive list of those derivative works:

a.  In the Spring of 1995, several months prior to the release of the initial film, Threshold launched the Mortal Kombat world wide website, mortalkombat.com. Threshold continues to own, operate, and create content for the site. The site was one of the top ten entertainment-based websites, drawing nearly a million Mortal Kombat fans per month.

b.  In the Summer of 1995, Threshold produced a television special, entitled "Mortal Kombat: Behind the Dragon." The special aired on TNT.

c.  Also in the Summer of 1995, Threshold launched the Mortal Kombat live stage show. The show opened at Radio City Music Hall and then embarked on a nationwide tour. The stage show began a worldwide tour in the Summer of 1996.

d.  In the Fall of 1995, shortly after the release of the initial Mortal Kombat film, Threshold produced a direct-to-video animated special. The special was the most technologically-advanced direct-to-video animation of its time and quickly advanced to the number one slot on the Billboard sales and rental charts.

e.  In the Winter of 1995-1996, the *Mortal Kombat* film soundtrack, also produced by Threshold, achieved Platinum status. It eventually became the biggest selling "Techno" album in history.

f.  Also in the Winter of 1995-1996, Threshold released "The Ultimate Guide to Mortal Kombat" CD ROM.

g.  In the Fall of 1996, Threshold produced and launched, along with USA Networks, a 13-episode Saturday morning animated series, entitled "Mortal Kombat:

Defenders of the Realm." Threshold owns the rights to that series, which continues to air on the martial arts cable network Blackbelt TV.

h.  In the Fall of 1996, TVT Records released a sequel album to the original soundtrack. This album was one of the few sequels to a soundtrack ever produced.

i.  A full-length motion picture sequel, *Mortal Kombat: Annihilation*, opened in the Fall of 1997. The film was produced by Threshold and distributed by New Line, and Kasanoff and Threshold employee Joshua Wexler were each credited as writers. The sequel was also financially successful, opening in the top box office spot (beating out other major films in the same weekend) and grossing $51 million domestically on a budget of $30 million.

j.  The *Mortal Kombat: Annihilation* soundtrack was released in the Fall of 1997. Like its predecessors, this "Techno" album was highly successful.

k.  In the Fall of 1998, Threshold launched its "Mortal Kombat Conquest" live-action television series, which became the number one new syndicated television show of the year.

38.  The Mortal Kombat franchise, as it stands today, is far more a creation of Threshold and Kasanoff than of Midway. Midway's creative input was almost entirely limited to the videogames. On their own, the videogames provided only minimal back-story and mythology, and only flat, "stock" characters with virtually no character development. Kasanoff and Threshold were responsible for virtually all of the creative input that went into turning the videogame concept into a multimedia enterprise. The in-depth back-story, mythology, development of original characters and creation of new ones, visual imagery, and musical and

audio accompaniment that went into the films, television series, live show, website, soundtracks, other non-videogame Mortal Kombat productions, were developed almost entirely by Threshold. In some instances, Threshold's work was even incorporated back into the later Mortal Kombat videogames.

39.     Threshold's input was especially important with respect to the characters inhabiting the Mortal Kombat universe—including, without limitation, core characters such as Liu Kang, Sonya Blade, and Scorpion. Threshold was responsible for transforming each of the pattern or "stock" characters present in the underlying Mortal Kombat video game from an unprotectable idea into a fully-realized, completely-delineated and independently copyrightable expression. Over the course of years, Threshold in effect brought these characters "to life" by developing their mannerisms, costume, story, abilities and personality. Each such character represents a separate protectable, derivative work for which the copyright is owned by Threshold. A true and complete list of the Mortal Kombat Characters developed or fully realized by Threshold is attached as Exhibit D.

40.     Threshold expressed its original ideas, character development, mythology and stories in "bibles" and other development tools, as well as in the multimedia productions themselves. Threshold continues to own all rights to the bibles and development tools, the mortalkombat.com website and the "Mortal Kombat: Defenders of the Realm" animated series.

41.     Each of Threshold's Mortal Kombat productions was prepared with Midway's full knowledge and approval. Threshold holds an implied non-exclusive license to use Midway's copyrighted material in these derivative works.

42.     New Line (now a division of Warner Bros.) owns both Mortal Kombat feature films, as well as the "Mortal Kombat Konquests" series, the direct-to-DVD animated special, and

12

the CD ROM. Threshold initially owned the copyrights to those stand-alone derivative works but assigned its rights to New Line. TVT Records has distribution rights on the Mortal Kombat soundtrack albums, and (on information and belief) David Fishof Presents owns rights to the Mortal Kombat live tour.

43.     Largely due to the efforts of Kasanoff and Threshold, the Mortal Kombat franchise has generated an enormous amount of revenue. On information and belief, the franchise has grossed more than $4 billion to date. It was rated at one point by *Playthings* Magazine as the fifth largest entertainment property in the world, behind Star Wars and Batman. Threshold's efforts and creative contributions have substantially enhanced the value of the enterprise as a whole, including the value of Midway's videogames. Kasanoff truly is "The maestro of 'Mortal Kombat'," as noted by *The Hollywood Reporter* in 1998. (*See Hollywood Reporter* Story, attached as Exhibit E).

## Future Productions

44.     Mortal Kombat remains popular and retains considerable future value, both for new videogames and for new films and multimedia productions.

45.     Threshold is in the process of producing a third feature film in the Mortal Kombat series. Threshold has developed a script and a unique visual package for the film, has lined up staff, talent and a foreign sales company, and has scouted shooting locations.

46.     Threshold has also offered to finance and produce a direct-to-video animated film, to be distributed by Universal Studios.

47.     Threshold has regularly updated Midway regarding its work on these projects, and Midway has on numerous occasions signaled its awareness of, and encouragement for, the work going forward. In fact, David Zucker, Midway's former CEO, expressly encouraged Threshold on several occasions to proceed with the production of a third film.

## The Mortal Kombat Trademarks

48.     Currently, Midway owns two federal trademark registrations for the word mark "MORTAL KOMBAT" (the "Mark") namely, Registration Nos. 2,080,146 and 1,912,102. These registrations cover, collectively, use of the MORTAL KOMBAT mark in connection with collector's knives (International Class 8); paper goods (International Class 16); and video game cartridges, software for video games, and toy action figures (International Class 28).

49.     Midway owns additional federal trademark registrations incorporating the Mark, including MORTAL KOMBAT SHAOLIN MONKS, MORTAL KOMBAT DEADLY ALLIANCE, MORTAL KOMBAT ARMAGEDDON, MORTAL KOMBAT UNCHAINED and MORTAL KOMBAT DECEPTION. Each of these composite marks is registered for goods in International Class 9 (e.g., computer and video game programs), and/or in International Class 16 (strategy guides). Notably, none of Midway's current trademark registrations covers entertainment services in International Class 41.

50.     At one point, Midway did, in fact, own federal trademark Registration No. 1,951,720 on the Mark for use on "entertainment services in the nature of a TV show" in International Class 41. But that registration was cancelled in 2006, as a result of Midway's abandonment of the mark for use on such services. Midway also had a federal trademark application (Ser. No. 78/110,020) for MORTAL KOMBAT on slightly different entertainment services in International Class 41, namely "entertainment in the nature of on-going television programs and television movies in the field of live action and animation; entertainment services, namely providing on-line computer games." That application was filed on an "intent-to-use" basis rather than based on actual use, and like the 1,951,720 Registration, the 78/110,020 Application was abandoned by Midway, in 2002. Thus, by the mid-2000's, Midway had

14

expressly abandoned its rights to use the MORTAL KOMBAT mark on "entertainment services" in International Class 41.

51.     Since 1993, Kasanoff and Threshold have used the Mark in connection with entertainment and production services, pursuant to an exclusive license to prepare certain Mortal Kombat derivative works. Following Midway's final abandonment of the Mark for use in connection with entertainment services in the early 2000's, Threshold has been the exclusive provider of such services under that Mark in U.S commerce.

52.     Threshold has continuously pursued development opportunities for the Mortal Kombat franchise in film, television and other media, including most recently a third Mortal Kombat film, presently in pre-production. (*See* IMDB Page, attached as Exhibit F.) Threshold is therefore viewed by the market as the sole source for Mortal Kombat entertainment programming and related services, as the following media events illustrate:

a.      A Fox News broadcast recorded on October 15, 1997 introduced Kasanoff as the "producer responsible for the Mortal Kombat cottage industry ...".

b.      On November 20, 1997, Kasanoff gave an interview on CNN, and was introduced with the following statement: "I'm talking about Mortal Kombat. And the man who has grown that property into something worth three billion dollars is joining us tonight. His name is Larry Kasanoff." Kasanoff explained that Threshold had "licensed the rights to translate Mortal Kombat across the multimedia spectrum." When asked by the interview to give "a list of what you've done with Mortal Kombat," Kasanoff responded as follows:

Our second Mortal Kombat movie opens tomorrow, we have an
animated tv series called Mortal Kombat: Defenders of the Realm,
we had a Mortal Kombat live-on-stage show, we have a Mortal
Kombat CD-rom, direct to video Mortal Kombat special, three

soundtrack albums, first of which is double platinum, we're developing a live action tv show and of course on one of the biggest websites in the world, mortalkombat.com.

c.     On November 3, 1999, *KNBC Ch. 4 News at 6* introduced Kasanoff by claiming "He's the guy who brought Mortal Kombat to the world."

d.     On April 5, 2000, Reportertv.com's *Film Daily Show* described Threshold as "the people who bring you the Mortal Kombat films ..."

e.     In February 2001, a Reuters report described Kasanoff: "His production company scored a huge hit with the Mortal Kombat movies, not to mention more than a dozen spin-offs including CD-roms, DVDs, and an animated tv series."

53.     As such, the Mark has come to be uniquely associated with Threshold and its services. Notwithstanding Midway's rights to the Mark and its variants in connection with software, video game cartridges and a limited set of other goods, Threshold is the sole owner of service mark rights in and to Mark.

## The Threshold's Intellectual Property

54.     As a result of the 1993 Agreement, subsequent agreements and promises, Threshold's exploitation of Mortal Kombat intellectual property in derivative works, and the parties' course of conduct, Threshold holds licenses and ownership interests in various aspects of Mortal Kombat. In particular:

a.     Threshold holds an exclusive license to prepare ("produce") derivative works in the nature of any motion picture, animated film or television series based on Mortal Kombat.

b.     Threshold holds copyrights in the original elements of derivative works it has authored based on Mortal Kombat. In the case of the feature films, the "Mortal Kombat Konquests" series, the direct-to-DVD animated special, and the CD

ROM, Kasanoff and Threshold have assigned the rights to their original content to New Line Cinema (now Warner Brothers), which owns the productions. Threshold continues to retain full rights to the mortalkombat.com website, the "Mortal Kombat: Defenders of the Realm" animated series, its "bibles" and development tools, and the script and development works created in connection with the planned third film and animated direct-to-video animated film. And, of course, Threshold continues to retain ownership of the copyrights in the characters it has created for the franchise.

c.      Threshold holds implied, non-exclusive licenses to use Midway's content in the mortalkombat.com website, the "Mortal Kombat: Defenders of the Realm" animated series, the various "bibles" and development tools Threshold has created, and the script and other development work done for the planned third film and direct-to-video animated film.

d.      Threshold owns trademark rights to the word mark MORTAL KOMBAT for use in connection with entertainment services related to television and film production.

**Midway's Attempts to Rewrite Its Agreements**

55.      Starting in or about 2000, Threshold and Midway have discussed on a number of occasions the possibility of entering into a written agreement modifying and supplementing Threshold's claimed rights and interests. However, no such agreement was ever reached or executed, primarily because Midway attempted to reject or limit the scope of Threshold's existing rights, contrary to the terms of the 1993 Agreement and the parties' course of dealing.

56.      On information and belief, Midway's efforts to re-write the original 1993 Agreement were part of an effort by Midway—already experiencing the financial troubles that

17

would ultimately lead to this bankruptcy—to recover the broad grant of exclusive rights given to Kasanoff under the 1993 Agreement. When the 1993 Agreement was originally negotiated, Midway did was skeptical that a videogame could become a successful multimedia franchise – at that time, this had never been done. Due to Threshold's extensive efforts and phenomenal success, Threshold's licenses and property interests have become immensely valuable. Midway has no legitimate right to take back the interests granted to Kasanoff and Threshold now that they have become more valuable than Midway initially foresaw.

## The Contemplated Bankruptcy Sale

57. Nevertheless, Midway now apparently seeks to strip Threshold of its licenses and improperly sell Threshold's interests through a sale under 11 U.S.C. § 363.

58. On May 21, 2009, the Debtors filed their Sale Motion. Among other things, the Sale Motion requests that the Court enter an order approving the sale pursuant to 11 U.S.C. § 363 of all or substantially all of the assets relating to the Debtor's business described in and pursuant to the APA, dated as of May 20, 2009, to Warner Bros. Entertainment Inc.

59. Under Schedule 2.1 of the APA the "Purchased Assets" specifically include "all video games based on the *Mortal Kombat* universe." The "Game Assets" with respect to any video game purport to include titles, characters, names, storylines, back stories, text, dialog, concepts, look and feel, art, settings, locations, environments, vehicles, weapons, gadgets and other similar elements, music and sound, web site assets, development materials, development tools or the like, and any and all intellectual property rights in and to the foregoing.

60. Despite the broad scope of the purported "Purchased Assets," neither the APA nor the Sale Order acknowledges or makes any provision for Threshold's licenses to or ownership interests in Mortal Kombat-related intellectual property.

18

## The Current Controversy

61. A controversy has developed between Midway on one hand and Threshold on the other regarding the scope of Threshold's interests with respect to Mortal Kombat-related intellectual property.

62. Midway has suggested at times that it does not fully accept Threshold's exclusive license. On information and belief, Midway contends that Midway has the right, on its own, to prepare derivative works in film and television. In fact, Threshold understands that recently, and in breach of the 1993 Agreement, Midway has sought other potential producers for a Mortal Kombat sequel.

63. Threshold disputes Midway's position. Based on the 1993 Agreement, Threshold has an exclusive license to prepare/produce new derivative works based on the Mortal Kombat-franchise, in film or television, in perpetuity. Midway cannot produce or have someone other than Threshold produce *any* Mortal Kombat-related feature film or television series.

64. In addition to Threshold's exclusive license, it owns copyrights in the original elements of those derivative works and in the characters Threshold has developed, and holds implied, non-exclusive licenses to use Midway's content in the derivative works it has prepared. Threshold also holds trademark rights on the word mark MORTAL KOMBAT for use in connection with entertainment services in International Class 41.

65. Although Midway has not (to plaintiffs' knowledge) denied the existence of these licenses and interests, Midway has neither assumed nor rejected Threshold's licenses, and now proposes to sell all of Midway's Mortal Kombat-related assets free of liens, claims and encumbrances. Likewise, neither the APA nor the Sale Motion acknowledges or makes any provision to preserve Threshold's interests in Mortal Kombat-related intellectual property.

66. Midway's Sale Motion asks the Court to approve the sale of all purchased assets "free and clear of all liens, claims, interests and encumbrances pursuant to 11 U.S.C. § 363(b)." While Threshold does not object to the sale going forward,[3] the sale of Midway's intellectual property cannot have the effect of extinguishing Threshold's interests. Midway cannot purport to sell interests in intellectual property owned by Threshold and cannot purport to assign its own intellectual property interests free and clear of Threshold's rights under licenses.

## COUNT I

### Declaratory Relief

67. Plaintiff incorporates paragraphs 1 through 66 in this Count as if set forth fully herein.

68. Threshold claims to have the following licenses and interests in Mortal Kombat-related intellectual property:

    a.    Threshold holds an exclusive license to prepare derivative works in film or television based on Mortal Kombat.

    b.    To the extent not assigned, Threshold owns copyrights in the original elements of derivative works it has authored based on Mortal Kombat, including without limitation the copyrights on multiple Mortal Kombat characters developed by Threshold.

    c.    Threshold holds implied, non-exclusive licenses to use Midway's content in the mortalkombat.com website, the "Mortal Kombat: Defenders of the Realm" animated series, the various "bibles" and development tools Threshold has

---

[3] Threshold is concurrently filing a Limited Objection to the Sale Motion. The Limited Objection objects to the sale only insofar as it would purport to modify or extinguish Threshold's interests in the Threshold Intellectual Property.

prepared, and the script and other development work done for the planned third film and direct-to-video animated film.

d. Threshold holds trademark rights to the word mark MORTAL KOMBAT for use in connection with entertainment services in International Class 41.

69. An actual and justifiable controversy exists between Threshold on the one hand and Midway on the other regarding (i) the existence and scope of Threshold's licenses and interests with respect to the Threshold Intellectual Property; and (ii) the effect of the sale of substantially all of the Debtors' assets on Threshold's claimed licenses and interests.

70. Pursuant to 28 U.S.C. §§ 2201 and 2202 this Court may declare the rights and legal relations of the parties and grant further necessary or proper relief based on its declaration.

WHEREFORE, plaintiff requests that the Court:

(i) enter judgment in its favor;

(ii) issue a declaration that (a) Threshold holds an exclusive license to prepare derivative works in film and television based on Mortal Kombat, in perpetuity; (b) Threshold holds implied, non-exclusive licenses to use Midway's content in the mortalkombat.com website, the "Mortal Kombat: Defenders of the Realm" animated series, the various "bibles" and development tools Threshold has prepared, and the script and other development work done for the planned third film and direct-to-video animated film; (c) to the extent not assigned, Threshold owns copyrights in the original elements of derivative works it has authored based on Mortal Kombat, including without limitation the copyrighted characters created by Threshold; and (d) Threshold is the sole and exclusive owner of trademark rights to the word mark MORTAL KOMBAT for use in connection with entertainment services in International Class 41; and

(iii) issue a declaration that the sale of substantially all of the Debtors' assets does not impair Threshold's licenses and ownership interests in the Threshold Intellectual Property and that the buyer takes the Debtors' assets subject to those licenses and interests; and

(iv) grant whatever additional relief the Court deems just and proper.

Date: June 24, 2009
Wilmington, Delaware

SULLIVAN · HAZELTINE · ALLINSON LLC

William D. Sullivan (No. 2820)
4 East 8th Street, Suite 400
Wilmington, DE 19801
Telephone: (302) 428-8191
Facsimile: (302) 428-8195

-and-

Jonathan W. Young
W. Allen Woolley
Jami A. Gekas
Jeffrey Chang
WILDMAN, HARROLD, ALLEN & DIXON LLP
225 West Wacker Drive
Suite 2800
Chicago, IL 60606
Phone: (312) 201-2000
Fax: (312) 201-2555

*Attorneys for Threshold Entertainment*