# Exhibit A

This letter will confirm the terms of the exclusive representation agreement dated as of September 28, 1993 between Lawrence Kasanoff ("Producer") and Midway Manufacturing Company ("Company") in respect to Producer's representation of the motion picture and television rights ("Rights") in and to the video game "Mortal Kombat" owned by Company ("Property"), as follows:

1. In consideration of Producer's agreement to use his best efforts to obtain a deal for the financing and production of a feature film and television series based on the Property, upon execution of this agreement, Producer will have a 90 day period during which he will have the exclusive right to represent the Property to third parties in order to obtain a deal with a major studio, major independent production company or other reputable, financially responsible third party financier acceptable to Company for the financing and production of such projects ("initial representation period"). If prior to the expiration of the initial representation period, Producer has obtained a bona fide offer from an above-referenced entity to enter into such a deal or deals with Company, then the initial representation period will be automatically extended for another 90 days to allow for negotiation of the deal or deals ("extension period"). If Producer fails to obtain a bona fide offer within the initial representation period, or if Producer fails to finalize an approved deal (i.e., obtain signed written confirmation from both Company and the third party production company of all material terms of the agreement) during the extension period, then Producer will no longer have any rights or involvement in respect to the Property or any productions based thereon, and Company may engage any other third party to represent it in connection with the Property, provided, the Company has provided its response to Producer to the terms of the proposed deal in a timely and good faith manner.

2. In the event that Producer does finalize an approved deal for the financing and production of a television series or feature film based on the Property, then Producer shall be attached to such feature film or television series as the producer thereof. In such event, Producer agrees that he will not receive any commissions from the licensing, optioning or sale of the Rights to the production company for such film or series, or from any of the fees or other compensation payable to Company in connection with such film or television series. Producer agrees that his entire compensation (except as set forth below) shall be limited to a separate producer's fee and profit participation which shall be negotiated with, and paid to him by, the applicable production company and which shall not come out of or reduce any of the monies payable to Company in connection with such productions.

3. If Producer successfully obtains the deal referred to in Paragraph 1 for Company, Company and Producer agree to negotiate

and to any sequel thereto negotiated and finalized in accordance with the terms of this Agreement.

Kasanoff Letter
As of September 28, 1993
Page 2

in good faith the percentage of the revenues derived from the merchandising from such productions which are to be paid to Producer (excluding any revenues derived from coin-operated games which shall be retained 100% by Company). Producer and Company agree that in respect to any other merchandising based on the Property which is in existence before, and does not result from, any feature film or television series based on the Property, Company and Producer shall determine in good faith a "floor" amount of the number of units of such merchandise that are sold independent of such feature film or television series. Producer's percentage of merchandising revenues, and any approved percentage of merchandising revenues that is given to any third party in connection with the feature film or television series, in respect to such merchandise will then be computed based solely on merchandising revenues received in excess of the floor amount.

4. Producer agrees to promptly present in writing to Company and its general counsel any and all offers and other material communications he obtains from third parties in connection with the Property for Company's and its general counsel's review, consideration, and negotiation. Producer shall not have the right or authority to make, finalize, or bind Company to, any agreements for the license, sale or other transfer of Rights in the Property to any third party without the express written approval and signature of Company. Company reserves the absolute right to withhold approval of any proposed deal without cause or explanation whatsoever. No agreements in respect to the Property shall be deemed to be valid or binding upon Company unless and until they have been approved and signed by Company.

*[margin note: ided .cts in good faith.]*

5. During the period of this agreement, Producer shall have the exclusive right (as to all parties other than the Company) to represent the Property in respect to seeking to obtain a deal for the financing and production of a feature film and television series based thereon (excluding merchandising licenses). Producer's rights and authority in respect to the Property are limited to the right to seek to obtain a deal on Company's behalf for the financing and production of a feature film and television series based thereon, and all other rights of every kind and nature in the Property are reserved to Company for Company's use and disposition.

6. Producer warrants and represents that he will not solicit or negotiate any agreements in respect to the Property in any manner contrary to the terms of this agreement. Producer agrees to indemnify and hold Company, its subsidiaries, and its and their officers, agents, employees, assigns and licensees harmless from and against all liabilities, claims, damages and expenses (including reasonable outside attorney's fees) arising out of any breach by Producer of the above warranty.

provided a reasonable basis has been established for a particular category of merchandise prior to the date which is six months before the movie or television series airs.

7. Nothing contained herein shall be construed to place the parties in the relationship of partners or joint venturers, and Producer shall have no power to obligate or bind Company in any manner whatsoever. This agreement constitutes the complete and entire agreement between the parties hereto in respect to the subject matter hereof, supersedes any and all prior oral or written agreements in respect to the subject matter hereof, and may not be modified or amended except by a separate written instrument signed by both parties.

ACCEPTED AND AGREED TO BY:

MIDWAY MANUFACTURING COMPANY

By: _____          Date: 9/28/93
    Kenneth J. Fedesna
    Vice President & General Manager


    _____          Date: 9/28/93
    LAWRENCE KASANOFF

# Exhibit B

```
Type of Work:        Motion Picture

Registration Number / Date:
                     PA0000644136 / 1995-09-25

Title:               Mortal kombat / New Line Cinema presents a Threshold
                        Entertainment production.

Description:         6 film reels ; 35 mm.

Copyright Claimant:
                     New Line Productions, Inc.

Date of Creation:    1995

Date of Publication:
                     1995-08-29

Authorship on Application:
                     Katja Motion Picture Corporation, employer for hire.

Names:               New Line Cinema
                     Threshold Entertainment
                     New Line Productions, Inc.
                     Katja Motion Picture Corporation
```
================================================================================

# Exhibit C

## AMENDMENT AGREEMENT

This Agreement entered into as of the 23rd day of June, 1995 (the "Amendment") amends the letter agreement dated as of September 28, 1993 (the "Agreement") entered into between **LAWRENCE KASANOFF** d/b/a Threshold Entertainment with a principal place of business at 2321 West Olive Avenue #C, Burbank, California 91506 (the "Producer") and **MIDWAY MANUFACTURING COMPANY** with a principal place of business at 3401 North California Avenue, Chicago, Illinois 60618 (the "Company").

### W I T N E S E T H :

**WHEREAS**, Producer has successfully obtained agreements between New Line Cinema Corporation and New Line Productions, Inc. (jointly "New Line") and the Company pursuant to which New Line has been granted rights to finance and produce: (a) a feature-length live action theatrical motion picture (the "Picture") and sequels or remakes thereof ("Sequels") based on the Company's original coin-operated video arcade game Mortal Kombat® and all derivative versions thereof and audio/visual elements embodied therein (the "Arcade Game"); and (b) one or more fully-animated forty-four minute programs for direct home video release; and

**WHEREAS**, on the date hereof the Company is negotiating other agreements for the financing and production of a live action television series based on the Arcade Game (the "Live Action TV Series") and a series of live action stage productions based on the Arcade Game (the "Tour"); and

**WHEREAS**, the parties desire in this Amendment to the Agreement to set forth the rights and obligations of the parties with respect to the Company's merchandising of consumer products directly or through licensees or affiliates based on the Arcade Game and on the above-referenced productions;

**NOW, THEREFORE**, the parties agree as follows:

1. **Amendment.** The parties agree that the Agreement is hereby amended by the terms of this Amendment.

2. **Merchandising Revenues.** The parties agree that the Company owns and exclusively controls all merchandising rights related to the Arcade Game and the New Line productions above set forth and that agreements have been reached with New Line with respect to the Picture and Sequels dated October 1, 1993, as amended June 19, 1995 (the "Picture Agreement") and with respect to the Live Action TV Series dated as of December 31, 1994 (the "TV Agreement").

It is hereby agreed that with respect to (a) the Picture and (b) the Sequels and Live Action TV Series, if any, provided Producer has been retained by New Line to serve as the producer thereof, Producer shall be entitled to share "Merchandising Revenues" (as defined in the Picture Agreement) and shall be entitled to accountings with respect thereto on the same basis and for the same time periods as New Line is so entitled under the terms of the Picture Agreement and the TV Agreement, provided: (a) Producer's share shall be limited to seven-and-one-half percent (7 ½%) of said Merchandising Revenues; and (b) in

computing Merchandising Revenues, no deduction shall be made by the Company for commissions paid to the Licensing Group Ltd.

There shall be no double payment to Producer of Merchandising Revenues because of overlapping merchandising periods. With respect to all revenues generated by the Tour, Producer's share thereof will be governed by the agreement to be entered into by and among the Company, Producer, David Fishof Presents, Inc. and the Licensing Group Ltd.

3. **Miscellaneous**.

(a) Both parties shall have the right to assign any of their rights and obligations hereunder.

(b) The entire understanding between the parties hereto relating to the subject matter hereof is contained herein. This Agreement cannot be changed, modified, amended or terminated except by an instrument in writing executed by both the Company and Producer.

(c) No waiver, modification or cancellation of any term or condition of this Agreement shall be effective unless executed in writing by the party to be charged therewith. No written waiver shall excuse the performance of any act other than those specifically referred to therein and no waiver shall be deemed or construed to be a waiver of such terms or conditions for the future or any subsequent breach thereof.

(d) This Agreement does not constitute and shall not be construed as constituting a partnership or joint venture between Producer and the Company and Producer shall have no right

6002409 -3-

to obligate or bind the Company in any manner whatsoever, and nothing herein contained shall give or is intended to give any rights of any kind to any third persons.

(e) This Agreement shall be governed by the laws of the State of Illinois applicable to contracts made and to be wholly performed in the State of Illinois.

(f) If any provision of this Agreement is or becomes or is deemed invalid, illegal or unenforceable under the applicable laws or regulations of any jurisdiction, either such provision will be deemed amended to conform to such laws or regulations without materially altering the intention of the parties or it shall be stricken and the remainder of this Agreement shall remain in full force and effect.

(g) In the event of litigation or arbitration between the parties arising out of or relating to this Agreement, the prevailing party will be entitled to recover court or arbitration costs and reasonable fees of attorneys, accountants and expert witnesses incurred by such a party in connection with the action or arbitration.

(h) Each of the parties hereto consents to the exclusive jurisdiction and venue of the courts of the State of Illinois, located in Chicago, and the United States District Court in Chicago with respect to any matter relating to this Agreement, and each party hereto consents to the personal jurisdiction of such courts and shall subject itself or himself to such personal jurisdiction. The parties agree that service of

process may be made upon them in any manner permitted by the rules of such courts and the laws of the State of Illinois.

4. **Confidential Information.**

Producer and the Company shall keep in confidence and not disclose to any third party, without the written permission of the other party, the terms of this Agreement. Producer shall keep in confidence and not disclose to any third party the proprietary information of the Company made known to him other than as may be required by Producer in fulfilling his obligations hereunder. These requirements of confidentiality shall not apply to information that is (a) in the public domain through no wrongful act of the receiving party; (b) rightfully received by the receiving party from a third party who is not bound by a restriction of nondisclosure; (c) already in the receiving party's possession without restriction as to disclosure, or (d) is required to be disclosed by applicable rules and regulations of government agencies or judicial bodies. This obligation of confidentiality: (i) shall survive termination of this Agreement and (ii) shall extend to any subcontractor of Producer and Producer agrees to obtain from each such subcontractor a written agreement to abide by the foregoing confidentiality requirements.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first set forth.

PRODUCER

_____
Lawrence Kasanoff
d/b/a Threshold Entertainment, Inc.

MIDWAY MANUFACTURING COMPANY

_____

Barbara M. Norman
Vice President & Secretary

6002409

-5-

# Exhibit D

**MORTAL KOMBAT CHARACTERS DEVELOPED BY THRESHOLD ENTERTAINMENT**

- Ankha
- Asgarth
- Baraka
- Baron Reyland
- Cyrax
- Ermac
- Genevier "Jen" Reyland
- Goro
- Jade
- Jax
- JohnnyCage
- Kabal
- Kano
- Karbrac - Nomad/Tarkatan (Baraka leader)
- Kiri
- Kitana
- Komodai from Zaterra (a race of Raptors/Reptile)
- KungLao
- LiuKang
- Mileena
- Motaro
- Nightwolf
- NoobSaibot
- Omegis
- Oniro (Lin Kuei Grandmaster)
- Qali
- QuanChi
- Raiden
- Rain
- Reiko
- Reptile
- Sareena
- Scorpion
- Sektor
- ShangTsung
- ShaoKahn
- Sheeva
- Shinnok
- Siann
- Sindel
- Siro
- Smoke
- Smoke(human)
- Sonya Blade
- Sora
- Stryker
- SubZero
- SubZero(original)
- Taja
- Tanya
- Vorpax
- Zara

# Exhibit E

# THE HOLLYWOOD REPORTER

Thursday, February 19, 1998

## Q & A

# LARRY KASANOFF

*The maestro of 'Mortal Kombat' has seen the future of film production — and it's right around the corner.*



In the wake of the astounding city it reaped in "Mortal Kombat," whose master creator has envisioned the future of film production and the future of film direction in Hollywood as we know it.

That's the promise of Larry Kasanoff of Threshold Digital Research Labs, a venture between Threshold Entertainment, Sony Digital Equipment Corp. DEC, about creates collaborations among directors and producers in a wide range of production tasks from special effects to editing. Kasanoff's vision of the studio is nothing short of revolutionary, offering a new paradigm for production as well as special effects.

Kasanoff's background includes stations first as home video chief at Vestron, then as co-founder with James Cameron of Lightstorm Entertainment, where he co-executive-produced "True Lies." He formed Threshold Entertainment with the acquisition of film rights for the immensely popular video game, somewhat aptly named "Mortal Kombat." The film went on to gross $150 million worldwide. Threshold announced a one-hour weekly TV series "Mortal Kombat," which debuts this fall. To produce it, Kasanoff and Kasanoff and TDRL president Alison Savitch bring to bear the production and special effects experience learned from the first-run "Mortal Kombat" film.

Having just wrapped principal photography on Threshold's latest feature film, "Bedazzled," starring Christopher Lambert, Kasanoff sat with The Hollywood Reporter's S. V. McKim to discuss the future of production, the brave new world of digital asset management and how someday soon everyone will be able to work in Hollywood without being in Hollywood.

**The Hollywood Reporter:** In forming Threshold Digital Research Labs (TDRL), why did you feel you needed an in-house effects unit?

**Larry Kasanoff:** A number of reasons. TDRL is the outgrowth of the prior success experience of Alison Savitch, president of TDRL, and I and everyone else here have had for years. And we found a long time ago that it was better for us as filmmakers to gather a diverse group of talent, in other words, multiple shops, to make the movie. Why? Because the reality is that when you're hiring shops, you're actually hiring good animators who specialize in certain things. So we found ourselves in one movie with 14 different shops, and we found ourselves wanting to go to 40 different animators, but to get to those animators we had to hire all these shops, and these shops are all over the place. Also, we found that this diverse group of talent sat not only in L.A. but in other parts of the country and other parts of the world. When we started out, we knew that while were made around the film business, the technology business, and television business which we're in.

So we found ourselves wondering, first, are we a victim or should we do this by the new paradigm which makes sense: You get the best talent. But if you get the best talent they get here they start acting like Armani jackets and want to have lunch at Le Dome every day. So we came up with a pool, which is how we can broaden the problems of geography and distance from our production. Through an alliance we set up with Sprint and DEC, we figured out how to build an entire worldwide digital production network. We feel that all production is going digital. So where is every way you might say. This is interesting. You guys are in this new kind of something called digital production. We feel that in five years this is what production will be, and we started to be there first.

We will soon announce our first digitally-animated feature project.

TDRL is much more than a shop that does effects for our own shows. It's a digital production tool.

**THR:** Will TDRL be the main production site for the new television series, "Mortal Kombat Konquest?"

**Kasanoff:** TDRL will be the official computer for "Konquest," and it will be the worldwide entire digital production network that makes "Konquest." But everyone won't be sitting there. Here we've got about 25 workstations. We are a kind of global morphing shop, a global quality control shop, a global animation shop. TDRL will be doing it in conjunction with our worldwide partners. That could mean a lot in Brazil, New York, a big facility on the east coast or smaller things all over the place.

# Exhibit F



| All | | go more | tips |
|---|---|---|---|

IMDb > Mortal Kombat (2010)



# Mortal Kombat (2010) More at IMDbPro »

## Overview

| | |
|---|---|
| MOVIEmeter: | Up 11% in popularity this week. See rank & trends on IMDbPro. |
| Director: | mink |
| Writer: | Sean Catherine Derek (screenplay) |
| Contact: | View company contact information for Mortal Kombat on IMDbPro. |
| Release Date: | 2010 (USA) more |
| Genre: | Action | Adventure | Fantasy more |
| Plot: | full synopsis |
| Plot Keywords: | Martial Arts | Re Boot | Underground Fighting | Mortal Kombat | Based On Video Game more |

Watch It

Own the rights?

Buy it at Amazon

Discuss in Boards
More at IMDb Pro
Add to My Movies
Update Data

**Quicklinks**
main details

**Top Links**
trailers and videos
full cast and crew
trivia
official sites
memorable quotes

**Overview**
main details
combined details
full cast and crew
company credits
tv schedule

**Awards & Reviews**
user comments
external reviews
newsgroup reviews
awards
user ratings
parents guide
recommendations
message board

**Plot & Quotes**
plot summary
plot synopsis
plot keywords
Amazon.com summary
memorable quotes

## Production Notes from IMDbPro

| | |
|---|---|
| Status: | Pre-production | See complete list of 12,000 in-production titles » |
| Comments: | Script completed - Currently Casting |
| Status Updated: | 19 January 2009 |
| More Info: | See more production information about Mortal Kombat (2010) only on IMDbPro. |
| Note: | Because this project is categorized as being *in production*, the data is subject to change; some c... completely. |

## Cast

 Christopher Lambert ... Lord Rayden (rumored)

more

## Sponsored Links (What's This?)

Mortal Kombat Movie Trailers
controlcenter.net * Find Resources, Guides & Info Fast. Mortal Kombat Movie Trailers

Blockbuster Official Site
www.Blockbuster.com * Blockbuster Total Access Online. Over 85,000 Titles. Learn More!

## Additional Details

| | |
|---|---|
| Also Known As: | Mortal Kombat 3 (USA) (working title) |
| | Mortal Kombat: Devastation (USA) (working title) |
| | more |
| Parents Guide: | Add content advisory for parents |

**Fun Stuff**

trivia
goofs
soundtrack listing
crazy credits
alternate versions
movie connections
FAQ

**Other Info**

merchandising links
box office/business
release dates
filming locations
technical specs
laserdisc details
DVD details
literature listings
NewsDesk

**Promotional**

taglines
trailers and videos
posters
photo gallery

**External Links**

showtimes
official sites
miscellaneous
photographs
sound clips
video clips

USA

English

Color

Louisiana, USA

Threshold Entertainment  more

## Fun Stuff

Spin off from Mortal Kombat (1992) (VG)  more

## FAQ

Who are officially involved?
Who were rumoured to be in this movie?
What's the plot?
more

## User Comments   (Comment on this title)

## Message Boards

Discuss this movie with other users on IMDb message board for Mortal Kombat (2010)

| Recent Posts (updated daily) | User |
|---|---|
| is this a remake | bigdave13 |
| My Cast for Mortal Kombat! | casale2 |
| Threshold Entertainment rights | torpian |
| Finished writing my own script! | torpian |
| My cast i know this would be the millionth one but i was bored | killerkyle64 |
| I didn't know... | mpformpre |

more

## Related Links

Full cast and crew                Company credits              IMDb Action section
IMDb USA section                  Add this title to MyMovies

Update

You may report errors and omissions on this page to the IMDb database managers. They will be examined and if app in a future update. Clicking the 'Update' button will take you through a step-by-step process.