**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| MIDWAY GAMES INC., *et al.*, | : | Case No. 09-10465 (KG) |
| | : | (Jointly Administered) |
| Debtors[1] | : | |
| | : | |
| | : | **Sale Hearing Date: 8/18/09 at 12:00 p.m. (EDT) (proposed)** |
| | : | **Objections Due: 8/14/09 at 12:00 p.m. (EDT) (proposed)** |

**MOTION OF DEBTORS FOR ENTRY OF ORDER UNDER 11 U.S.C. §§ 105(a) AND 363 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004, 9014, AND 9019 APPROVING (I) THE SALES OF DEBTOR MIDWAY HOME ENTERTAINMENT INC.'S EQUITY INTERESTS IN CERTAIN NON-DEBTOR FOREIGN SUBSIDIARIES, (II) A CERTAIN AGREEMENT RESOLVING INTERCOMPANY CLAIMS IN CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), hereby file this motion (the "Motion") under sections 105(a) and 363(b), (f), and (m) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 9014, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for entry of an order approving the sales of all of Debtor Midway Home Entertainment Inc.'s ("MHE") equity interests (collectively, the "Shares") in its wholly owned non-debtor foreign subsidiaries (A) Midway Games SAS ("Midway SAS"), a French societe par actions simplifiee, and Midway Games Limited ("Midway Limited"), an

---

1 The Debtors are: Midway Games Inc., Midway Home Entertainment Inc., Midway Amusement Games, LLC, Midway Interactive Inc., Surreal Software Inc., Midway Studios - Austin Inc., Midway Studios - Los Angeles Inc., Midway Games West Inc., Midway Home Studios Inc., and Midway Sales Company, LLC.

English limited liability private company, pursuant to the stock purchase agreement attached hereto as **Exhibit "A"** (as such may be modified or amended from time to time, and including all schedules and exhibits attached thereto, the "MGS/MGL Stock Purchase Agreement"); and (B) Midway Games GmbH ("Midway GmbH", and together with Midway SAS and Midway Limited, the "Acquired Foreign Subsidiaries"), a limited liability company registered under the commercial registry of the Local Court (Amtsgericht) of Munich, pursuant to the stock purchase agreement attached hereto as **Exhibit "B"** (as such may be modified or amended from time to time, and including all schedules and exhibits attached thereto, the "Midway GmbH Stock Purchase Agreement", and together with the MGS/MGL Stock Purchase Agreement, the "Stock Purchase Agreements"). The Debtors seek entry of an order approving the sales of the Shares pursuant to the Stock Purchase Agreements, free and clear of all liens, claims, interests, and encumbrances. In connection with these two proposed private sales, the Debtors seek Court approval of the settlement and resolution of certain intercompany claims pursuant to that certain form of agreement attached hereto as **Exhibit "C"** (the "Intercompany Claims Agreement"). The sales of the Shares as contemplated by the Stock Purchase Agreements together with the settlement of the intercompany claims contemplated by the Intercompany Claims Agreement are referred to herein collectively as the "Transactions" and such agreements are referred to herein collectively as the "Transaction Agreements".

In support of this Motion, the Debtors respectfully state as follows:

**JURISDICTION**

1. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (M), (N), and (O). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory basis for the relief requested herein are sections 105(a) and 363(b), (f), and (m) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9014, and 9019, and Local Rule 6004-1.

## BACKGROUND

3. On February 12, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code commencing these bankruptcy cases (the "Chapter 11 Cases"). The Debtors are continuing to manage their assets and operate their businesses as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4. On February 23, 2009, the Office of the United States Trustee for the District of Delaware (the "OUST") appointed an official committee of unsecured creditors (the "Creditors' Committee"). The law firm of Milbank, Tweed, Hadley & McCloy LLC serves as lead counsel to the Creditors' Committee and FTI Consulting serves as its financial advisors.

5. Events and circumstances leading up to the Petition Date and supporting the relief requested herein are set forth in the Declaration of Ryan G. O'Desky in Support of Chapter 11 Petitions and First Day Relief (the "O'Desky Declaration") [Dkt. No. 2]. The O'Desky Declaration is incorporated herein by reference.

6. Debtor Midway Games Inc. ("Midway Games") is a publicly held Delaware corporation with its corporate headquarters located at 2704 West Roscoe Street, Chicago, Illinois 60618. Midway Games is the ultimate corporate parent of all of the other above-captioned debtors and debtors in possession, including MHE.

7. Midway Games also owns, either directly or indirectly through MHE, the stock of certain non-debtor foreign subsidiaries, including the Acquired Foreign Subsidiaries

(collectively, all foreign subsidiaries shall be referred to as the "Foreign Subsidiaries").[2] The Foreign Subsidiaries, including the Acquired Foreign Subsidiaries, are not debtors in these cases and, other than Newcastle, are not currently subject to insolvency proceedings in any location.[3] With the exception of Newcastle, the Foreign Subsidiaries primarily distribute the Debtors' products overseas. Prior to its closure on July 14, 2009, Newcastle operated as a studio and a developer of video games. Newcastle served as the primary developer of the recently released *Wheelman* game that is the subject of a publishing agreement with Ubisoft Entertainment.

8. As detailed in the O'Desky Declaration, beginning in early December 2008, the Debtors and their investment banker Lazard Freres & Co., LLC ("Lazard") analyzed strategic restructuring alternatives and sought prospective purchasers and investors both within the Debtors' industry and among potential strategic and financial buyers, in order to address the Debtors' financial needs. Prior to the Petition Date, the Debtors and their advisors met with multiple interested parties at several of the Debtors' facilities and the Foreign Subsidiaries' facilities, and contacted numerous other parties in respect of a purchase of some or all of the Debtors' assets, including without limitation the Shares.

9. On May 21, 2009, the Debtors filed a motion to sell all or substantially all of their assets to then-proposed stalking horse purchaser Warner Bros. Entertainment Inc. ("WBEI"), subject to higher and/or better offers and a possible public auction process. [Dkt. No. 357]

---

2 The Foreign Subsidiaries include: Midway Studios - Newcastle Limited (U.K.) ("Newcastle"); Midway Australia Holdings Pty Ltd. (Victoria, Australia); Ratbag Holdings Pty Ltd (South Australia, Australia); Midway Studios - Australia Pty Ltd (South Australia, Australia); Midway Games Canada Corp. (Nova Scotia, Canada); K.K. Midway Games (Japan); along with the three Acquired Foreign Subsidiaries.

3 Newcastle currently is in liquidation in the U.K. The liquidator was appointed on July 31, 2009. Its operations were shut down on July 14, 2009.

10. On June 3, 2009, the Court entered an order (the "Bidding Procedures Order") approving bidding procedures and certain bidding incentives in connection with the Debtors' proposed sale of all or substantially all of their assets to WBEI. [Dkt. No. 389] Pursuant to the approved bidding procedures and auction process, the Debtors continued to seek competing bidders for any or all of their assets, including the Shares. No qualified competing bids were received for substantially all of the Debtors' assets, or for the Shares, and therefore no public auction was held.

11. On July 1, 2009, the Court entered an Order under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004, 6006 and 9014 (A) Approving the Sale of the Purchased Assets Free and Clear of All Liens, Claims, Interests and Encumbrances Pursuant to 11 U.S.C. § 363, (B) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief (the "Sale Order") [Dkt. No. 477]. Pursuant to the Sale Order, the selling Debtors sold substantially all of their assets to WBEI. The sale to WBEI closed on July 10, 2009. The Shares were not included as part of the WBEI sale.

12. The recent asset sale to WBEI culminated months of marketing all of the Debtors' assets for sale, including the Shares. During the marketing process, a comprehensive electronic data room was established and made available to potential buyers who executed confidentiality agreements. The Debtors and Lazard utilized their extensive resources to contact over 80 individuals and entities, including both strategic and financial entities, located domestically and internationally to determine potential interest in the Debtors' assets, including the Shares. Multiple potential buyers and investors performed extensive due diligence, participated in multiple meetings with Lazard and the Debtors' management and employee

teams, and submitted expressions of interest with respect to some or substantially all of the Debtors' assets. But no offers were received for the Shares prior to expiration of the bidding deadline established by the Bidding Procedures Order.

13. Following the recent sale closing with WBEI, the Debtors have been in the process of marshaling and managing remaining assets while continuing to operate their remaining businesses as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108. The Debtors have been a well-known developer and publisher of video games in the interactive entertainment software industry. The Debtors, with assistance from the Foreign Subsidiaries, distributed and sold video games primarily in North America, Europe, Asia and Australia for ultimate use on home consoles, handheld devices, and personal computers. Customers include mass merchandisers, video rental retailers, software specialty retailers, internet based retailers and entertainment software distributors.

14. Following the sale to WBEI, there were no offers for the Foreign Subsidiaries or their assets. The only parties interested in the Acquired Foreign Subsidiaries were the proposed purchasers. The Debtors and their advisors continued to negotiate with the proposed purchasers herein, for a possible sale or sales of assets relating principally to the operations of the Foreign Subsidiaries. A significant obstacle to the proposed sales, however, were the intercompany balances. After conducting multiple rounds of negotiations over a period of several months, the Debtors and their advisors, in close consultation with the Creditors' Committee and its legal and financial advisors (including those advisors located in UK and German offices), have determined that the Transaction Agreements represent the best opportunity (in fact, the Stock Purchase Agreements represent the only bids received to date for the Shares) for the Debtors to maximize the value of the Acquired Foreign Subsidiaries for the

estates. Copies of the Stock Purchase Agreements are attached hereto as **Exhibits A and B, respectively** and a copy of the Intercompany Claims Agreement is attached hereto as **Exhibit "C"**.

15. By this Motion, the Sellers seek Court approval to sell the Shares in private sales to the proposed purchasers Spiess Media Holding UG and F+F Publishing GmbH on the terms set forth in the Transaction Agreements.

16. Spiess Media Holding UG ("Spiess Media") is a German enterprise company with limited liability formed by Martin Spiess for the purchase of the Shares of Midway SAS and Midway Limited under the MGS/ MGL Stock Purchase Agreement. Mr. Spiess has served as the Executive Vice President - International for Midway Limited since April 2008. Prior to that, he served Midway Limited as its Managing Director-Europe from May 2005 to April 2008. Before joining the Debtors' organization, Mr. Spiess was the Senior Vice President of European marketing for Atari, Inc., a video game publisher and distributor. Mr. Spiess currently is the sole legal representative (*président*) of Midway SAS. (*See* MGS/MGL Stock Purchase Agreement, §4.1(a))

17. F+F Publishing GmbH ("F+F Publishing") is a German limited liability company primarily in the business of distributing video games and other products to retailers. F+F Publishing has been operated for several years by Uwe Fürstenberg and Hans Meyer, the sole shareholders of F+F Publishing. F+F Publishing and Midway GmbH conduct business with each other.

18. Messrs. Furstenberg and Meyer are current members of management of Midway GmbH. Mr. Furstenberg is the current General Manager of Midway GmbH and has served in that capacity since February 2005 when Midway GmbH commenced operations. Prior

to February 2005, he was the General Manager of Acclaim's German distribution subsidiary. Mr. Meyer serves as finance director of Midway GmbH.

## The Transaction Agreements

19. The MGS/MGL Stock Purchase Agreement contemplates the private sale of all of MHE's equity interests in Midway SAS and Midway Limited on terms that include the following:[4]

- **Purchase Price**. Spiess Media shall pay One Euro for all of MHE's shares in Midway SAS and Midway Limited. Fifty percent (50%) of the Purchase Price shall be allocated to the Shares being sold and purchased in the capital of Midway Limited and the balance of the Purchase Price shall be allocated to the Shares being sold and purchased in the capital of Midway SAS.

- **Intercompany Claims Agreement**. At or prior to the Closing, and as a condition to the Closing, MHE and Midway Games on the one hand and Midway SAS, Midway Limited, and Midway GmbH on the other hand shall enter into the Intercompany Claims Agreement to resolve certain of their intercompany obligations so that there shall be no intercompany obligations outstanding between Midway SAS, Midway Limited, Midway GmbH, and Newcastle on the one hand, and any of MHE or its other Affiliates, on the other hand, at the Closing Date. Pursuant to the terms of the Intercompany Claims Agreement, Midway Limited will pay to MHE the sum of One Million Seven Hundred Thousand Dollars ($1,700,000). (MGS/MGL Stock Purchase Agreement, §7.2; Intercompany Claims Agreement, ¶ 6)

- **Closing**. Subject to the satisfaction of certain conditions set forth in the MGS/MGL Stock Purchase Agreement (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Shares shall occur at the offices of Blank Rome LLP located at 405 Lexington Avenue, New York, New York at 10:00 a.m. (Eastern time) on the date designated by Seller that is not more than two (2) Business Days following the satisfaction or waiver of the required conditions, unless another time or date, or both, or place or places or manner are agreed to in writing by the parties thereto.

---

4 The following summary is not comprehensive and is provided for convenience only. In the event of any inconsistency between the summary and the MGS/MGL Stock Purchase Agreement, the latter shall control. Parties are encouraged to review the MGS/MGL Stock Purchase Agreement in its entirety.

- **Payment of Attorneys' Fees**. Under the MGS/MGL Stock Purchase Agreement, Purchaser shall pay to the firm of SKW Schwarz Rechtsanwälte an amount equal to the Attorneys Fees (as defined in the MGS/MGL Stock Purchase Agreement). (MGS/MGL Stock Purchase Agreement, § 3.3(b))

20. The Midway GmbH Stock Purchase Agreement contemplates the private sale of all of MHE's equity interests in Midway GmbH on terms that are substantially similar to the terms of the MGS/MGL Stock Purchase Agreement, with such terms to include the following:[5]

- **Purchase Price**. F+F Publishing shall pay One Euro for all of MHE's shares in Midway GmbH.
- **Intercompany Claims Agreement**. At or prior to the Closing, and as a condition to the Closing, MHE and Midway Games on the one hand and Midway SAS, Midway Limited, and Midway GmbH on the other hand shall enter into the Intercompany Claims Agreement to resolve certain intercompany obligations so that there shall be no intercompany obligations outstanding between Midway SAS, Midway Limited, Midway GmbH, and Newcastle on the one hand, and any of MHE or its other Affiliates, on the other hand, at the Closing Date. Pursuant to the terms of the Intercompany Claims Agreement, Midway Limited will pay to MHE the sum of One Million Seven Hundred Thousand Dollars ($1,700,000) (Midway GmbH Stock Purchase Agreement, §7.2; Intercompany Claims Agreement, ¶ 6)
- **Closing**. Subject to the satisfaction of certain conditions set forth in the Midway GmbH Stock Purchase Agreement (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Shares shall occur at the offices of Blank Rome LLP located at 405 Lexington Avenue, New York, New York at 10:00 a.m. (Eastern time) on the date designated by Seller that is not more than two (2) Business Days following the satisfaction or waiver of the required conditions, unless another time or date, or both, or place or places or manner are agreed to in writing by the parties thereto

5 The following summary is not comprehensive and is provided for convenience only. In the event of any inconsistency between the summary and the Midway GmbH Stock Purchase Agreement, the latter shall control. Parties are encouraged to review the Midway GmbH Stock Purchase Agreement in its entirety.

- **Payment of Attorneys' Fees and Notarization Fees**. Under the Midway GmbH Stock Purchase Agreement, MHE shall pay to the firm of SKW Schwarz Rechtsanwälte an amount equal to 50% of the Attorneys Fees (as defined in the Midway GmbH Stock Purchase Agreement). (Midway GmbH Stock Purchase Agreement, § 3.2(e)) MHE shall also pay 50% of the Notarization Fees (as defined in the Midway GmbH Stock Purchase Agreement) (*Id.* at § 3.2(f))

21. By the Intercompany Claims Agreement, the parties thereto have agreed to resolve certain intercompany obligations between and/or among them, as more particularly set forth in the Intercompany Claims Agreement, a copy of which is attached hereto as **Exhibit "C"**. The various intercompany obligations resolved and/or canceled pursuant to the Intercompany Claims Agreement relate to, among other things, intercompany obligations such as (i) Midway GmbH's asserted secured loan receivable from Midway Games pursuant to certain agreements dated as of August 29, 2008 in the approximate amount of $3.1 million, (ii) certain other intercompany obligations owing to Debtors resulting from transfer pricing transactions, and (iii) other ordinary course of business transactions among the various companies over the years. The amounts alleged to be due from Debtors to the Acquired Foreign Subsidiaries is approximately $8 million in the aggregate as of May 31, 2009. The Debtors assert claims in excess of $25 million against the Acquired Foreign Subsidiaries. The parties to the Intercompany Claims Agreement acknowledge and agree that the transactions and adjustments set forth in the Intercompany Claims Agreement result in the elimination of all intercompany balances and obligations between any of Midway Limited, Newcastle, Midway SAS and Midway GmbH on the one hand and Midway Games and MHE on the other, and between Midway Limited and Midway GmbH. The Intercompany Claims Agreement is not intended to eliminate intercompany balances between Midway Limited and Newcastle; between Midway Limited and Midway SAS; and between Midway Games and MHE.

22. The respective legal and financial advisors employed by the Debtors and Creditors' Committee have spent significant time and resources analyzing the various claims and legal issues involved and have concluded that entry into the Transaction Agreements is in the best interests of the Debtors' estates.

23. The Stock Purchase Agreements and related Intercompany Claims Agreement are the culmination of a marketing process that began prepetition in late 2008 and continued throughout 2009. Consummation of all of the Transactions is a condition to the consummation of any Transaction and they are not severable and should be considered as a whole. The bids submitted by the respective purchasers are the only binding and satisfactory bids received to date for the Shares. The Debtors therefore do not propose that the Stock Purchase Agreements be subject to a further auction process.

**Relief Requested**

24. By this Motion, the Debtors are requesting entry of orders under sections 105 and 363 of the Bankruptcy Code approving the private sales of the Shares pursuant to the terms and conditions of the respective Stock Purchase Agreements, free and clear of all liens, claims, interests, and encumbrances, and approving the Intercompany Claims Agreement in connection therewith.

## Basis for Relief Requested

**A. The Proposed Sales Should Be Approved As A Product Of The Debtors' Exercise Of Sound And Reasonable Business Judgment When Viewed Under The Facts And Circumstances Of These Cases.**

25. Section 363(b)(1) of the Bankruptcy Code provides: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."

26. Section 105(a) of the Bankruptcy Code provides in relevant part: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

27. Generally, to obtain approval of a proposed sale of assets under section 363(b), a debtor should demonstrate that the proffered purchase price is the highest or best offer under the circumstances of the case. *See e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

28. This Court should approve the proposed sale if the Debtors demonstrate a sound business reason or justification in support thereof. *Myers v. Martin* (*In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 179 (D. Del. 1991); *In re Phoenix Steel Corp.,* 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (section 363 sale should be

approved if "the proposed sale is fair and equitable, ...a good business reason [exists] for completing the sale and the transaction is in good faith"); *In re Lionel Corp.,* 722 F.2d 1063, 1070 (2d Cir. 1983).

29. A debtor may seek court approval of a private sale of assets. *See* Bankruptcy Rule 6004(f)(1); *Beal Bank, S.S.B. v. Waters Edge Limited, Partnership*, 248 B.R. 668, 680 (D. Mass. 2000) (no requirement that bankruptcy sale, even one to an insider, be by public auction) (citations omitted). While the Debtors seek approval of two private sales pursuant to this Motion, the Debtors are confident that the Shares have been marketed (both prior to the Petition Date and then pursuant to the competitive bidding procedures approved by the Bidding Procedures Order) to the fullest extent in an effort to generate the highest or best recovery for the benefit of the bankruptcy estates. The offers represented by the Stock Purchase Agreements are the highest and best offers (and in fact, are the only binding offers) received to date for the respective Shares, notwithstanding the lengthy marketing process engaged in by the Debtors.

30. Here, the proposed sales of assets easily meets the "sound business reason" test and it is clear the proposed sales are necessary to preserve the value of the Shares. The Stock Purchase Agreements are the only bona fide and firm offers received to date in connection with the Shares. The Stock Purchase Agreements are the good faith product of intense and extensive negotiations among the parties and their respective counsel over a period of several months. The consideration to be received in connection with the Transaction Agreements is fair and reasonable. In short, the Debtors and the Creditors Committee believe that a prompt sale of the Shares to the proposed purchasers, combined with entry into the

Intercompany Claims Agreement that ultimately should lead to MHE's receipt of $1.7 million, presents the best opportunity to realize the maximum value to the bankruptcy estate.

31. The Debtors further believe that the net benefit to their creditors may be adversely affected absent prompt sale. Absent prompt sales, the Acquired Foreign Subsidiaries likely would need to be liquidated under applicable foreign law, thereby potentially damaging if not eliminating any prospect of realizing any recoveries or distributions in connection with the Shares or intercompany claims asserted by any of the Debtors and creating a need to address the significant claims of the Acquired Foreign Subsidiaries that are being resolved pursuant to the Intercompany Claims Agreement.

32. In light of the current circumstances, the decision to sell the Shares and enter into the Intercompany Claims Agreement at this time is fully consistent with and should be approved as an exercise of sound business judgment by the Debtors.

33. Moreover, pursuant to Bankruptcy Rule 9019(a), the Intercompany Claims Agreement should be approved as a reasonable settlement and compromise of claims. *See e.g. In re TSIC, Inc.*, 393 B.R. 71, 78 (Bankr. D. Del. 2008) (bankruptcy courts may approve settlements that are "fair, reasonable, and in the best interests of the estate"). The settlement need not result in the best possible outcome for the debtor, but merely need be "above the lowest point in the range of reasonableness". *Id.* at 78-79.

34. The following factors apply in determining whether a settlement should be approved: (i) the probability of success in litigation, with due consideration for the uncertainty in fact or law; (ii) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; (iii) the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement; and (iv) the extent to which the settlement is truly

the product of arm's-length bargaining and not the product of fraud or collusion. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

35. All of the above factors weigh heavily in favor of the proposed settlement embodied in the Intercompany Claims Agreement. Litigation of the myriad legal and factual issues and claims that are being resolved under the Intercompany Claims Agreement would be complex, time-consuming and expensive, to say the least. The Transaction Agreements were heavily negotiated, with the Creditors' Committee involved every step of the way. Approval of the Intercompany Claims Agreement will decrease the amount of claims asserted in these cases by millions of dollars and will result in MHE's receipt of $1.7 million. The standards for approval of the Intercompany Claims Agreement pursuant to Bankruptcy Rule 9019 are easily satisfied.

36. As stated above, the Creditors' Committee has been involved in the negotiation and drafting of the Transaction Agreements. The Creditors' Committee supports the relief requested by this Motion.

37. For all of the above reasons, the Motion should be approved.

**B. The Sales Of The Shares Should Be Approved Free And Clear Of Liens Pursuant to Section 363(f) Of The Bankruptcy Code.**

38. Pursuant to section 363(f) of the Bankruptcy Code, the Debtors seek authority to sell and transfer the Shares free and clear of all liens, claims, interests, and encumbrances (the "Liens"), with any such Liens to attach to the proceeds of the sale in the same order of priority, and to the same extent as such Liens were valid, perfected, and/or enforceable immediately prior to the sale, subject to any rights and defenses of the Debtors and other parties

in interest with respect thereto. Section 363(f) of the Bankruptcy Code is written in the disjunctive and provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

39. Pursuant to at least one of sections 363(f)(1)-(f)(5) of the Bankruptcy Code, the Shares may be sold free and clear of any Liens. With the recent consummation of the recent Court-approved settlement between the Creditors' Committee and the Thomas Parties, the Debtors do not believe that any third party asserts a valid and perfected lien against the Shares. In any event, in the exercise of caution, any Lien that exists immediately prior to the Closing of either sale of Shares will attach to the applicable sale proceeds with the same validity, priority, force and effect as it had immediately prior to Closing, subject to the rights and defenses of the Debtors or any party in interest. Moreover, any holder of a Lien that receives notice of the proposed sale and which fails to object should be deemed to consent to the proposed sale, thereby satisfying section 363(f)(2) of the Bankruptcy Code.

**C. Notice Of The Proposed Sales Is Reasonable Under The Circumstances.**

40. The Debtors intend to provide notice of this Motion to (i) taxing authorities, (ii) the OUST, (iii) counsel to the Creditors' Committee, (iv) the Office of the United States Attorney, (v) parties who have requested service pursuant to Bankruptcy Rule 2002, and (vi) all known creditors, including those persons or entities on the creditor matrix previously filed with the Court. Accordingly, the Debtors submit that the notice to be provided to parties in interest of the proposed sales is reasonable and appropriate under the circumstances.

**D. The Automatic Ten Day Stay Under Bankruptcy Rule 6004(g) Should Be Waived.**

41. Pursuant to Bankruptcy Rule 6004(g), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for ten days after entry of the order.

42. Although Bankruptcy Rule 6004(g) and Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, Collier on Bankruptcy suggests that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. 10 *Collier on Bankruptcy* ¶ 6004.09 (15th ed. 1999). Furthermore, Collier on Bankruptcy provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

43. To preserve and maximize the value of the Shares, and at the request of the respective purchasers, the Debtors seek to close the proposed sales immediately after all closing conditions have been met or waived. Thus, waiver of any applicable stay afforded by the Bankruptcy Rules is appropriate under the facts and circumstances of these cases.

## NOTICE

44. Notice of this Motion has been provided to: (a) the OUST; (b) the United States Securities and Exchange Commission; (c) the Office of the United States Attorney for the District of Delaware; (d) the Internal Revenue Service; (e) counsel to the Creditors' Committee; (f) all parties requesting notice pursuant to Bankruptcy Rule 2002; and (g) all known creditors. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary or required.

WHEREFORE, for the foregoing reasons, the Debtors respectfully request entry of an order substantially in the form annexed as **Exhibit D** hereto (i) approving the Stock Purchase Agreements and approving the Intercompany Claims Agreement; and (ii) granting related relief.

Dated: August 6, 2009

**BLANK ROME LLP**

By: /s/ Michael DeBaecke

Michael D. DeBaecke (No. 3186)
David C. Carickhoff (No. 2443)
Victoria Guilfoyle (No. 5183)
1201 North Market Street
Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6412

-and-

Jeffrey N. Siegel
Pamela E. Flaherty
Marc Richards
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Telephone: (212) 885-5000

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION