## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MIDWAY GAMES, INC., *et al.*, | ) | Case No. 09-10465 (KG) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Re Dkt No. 830** |

## MEMORANDUM OPINION[1]

### INTRODUCTION

Warner Bros. Entertainment Inc. ("Warner"), on its own behalf and on behalf of its subsidiary companies (including Warner Bros. Home Entertainment Inc. and WB Games Inc.) seeks by motion (the "Motion") the allowance and payment of an administrative expense pursuant to 11 U.S.C. § 503(b)(1)(A) [D.I. 830].  The Court will deny the Motion.

### JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory basis for the relief sought herein includes 11 U.S.C. § 503(b) and Rule 9014 of the Federal Rules of the Bankruptcy Procedure (the "Bankruptcy Rules").  This is a core proceeding pursuant to 28 U.S.C. §157 (b)(2).

---

[1] "The court is not required to state findings or conclusions when ruling on a motion under Rule 12 . . . ."  Fed. R. Bankr. P. 7052(a)(3).  Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

The debtors ("Debtors" or "Midway") commenced their bankruptcy cases under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.* ("Bankruptcy Code") on February 12, 2009 ("Petition Date"). The Debtors have continued in possession of their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

Prior to commencement of the Cases, Midway was in the business of development, manufacturing, publishing, distributing and/or selling video games. Midway entered into licensing agreements with Warner relating to the titles *Ant Bully*, *Happy Feet*, and *Mortal Combat vs. DC Universe* (the "Warner Licenses").

As of the Petition Date, the Debtors owed Warner an aggregate amount of $7,867,820 in unpaid royalties and/or other payments due to Warner under its license agreements with Warner on the Warner Licenses ("Warner Cure Claim").

On July 1, 2009, the Court entered its Order ("Sale Order"), which, *inter alia*, approved and authorized the sale of assets of certain of the Debtors, free and clear of liens and encumbrances, to Warner, pursuant to that Certain Asset Purchase Agreement, dated as of May 20, 2009 ("APA") [D.I. 447].

In accordance with the Sale Order and the terms of the APA, the Debtors, pursuant to 11 U.S.C. § 365(b), assumed and sold and assigned to Warner certain of the Debtors' executory contracts including, without limitation, certain of the Debtors' license agreements

("Third Party Licenses") with third party licensors ('Third Party Licensors") pertaining to games Debtors developed, manufactured, published, distributed and/or sold in the course of their businesses. Any and all claims of Third Party Licensors under such Third Party Licenses arising prior to the Petition Date were cured and/or extinguished pursuant to the Sale Order and 11 U.S.C. §§ 365(b)(1) and (f)(2).

The Sale Order and the terms of the APA resulted in waiving the Warner Cure Claim of $7,867,820 for pre-Petition Date unpaid royalties which was deemed satisfied in full upon the closing of the sale. APA § 3.1. The sale of assets to Warner pursuant to the APA closed on July 10, 2009 (the "Closing Date"). Between the Petition Date and the Closing Date, Midway continued to manufacture and sell product pursuant to the Warner Licenses. The dispute before the Court centers on the royalties on the Warner Licenses during the Petition Date to Closing Date period.

It is difficult for the Court to discern the amount Warner is seeking in royalties. While claiming that Midway estimated it would pay it $2.3 million to $2.5 million under the APA[2], Warner also states that Midway owes it in excess of $1.4 million in royalties. However, the issue is not the amount, it is if any royalties are due to Warner. The Debtors and the Committee take the position that Midway does not owe any royalties to Warner in accordance with the APA, which imposes the payment obligations upon Midway. The Debtors and the Committee rely upon the following provisions of the APA:

---

[2] Warner directly contradicted this assertion, admitting that it "concluded" Debtors would make a royalty payment. See Declaration of Stephen Chalk, §§ 3-4.

Section 2.1(b)(1):

Buyer shall assume the obligations of Sellers under the Assigned Contracts arising from and after the Closing Date and shall, subject to Section 2.5, pay any Cure Amounts associated therewith.

Section 2.3:

On the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms, (i) all of Sellers' liabilities and obligations arising from and after the Closing Date under the Assigned Contracts, (ii) all of Sellers' liabilities and obligations under the Allowance and General Allowances relating to the Accounts Receivable included in the Accounts Receivable Amount, and (iii) the Cure Amounts (collectively, the "Assumed Liabilities").

Section 2.5 (second sentence):

Purchaser shall be responsible to pay all amounts arising from and after the Closing Date under each Assigned Contract, and shall provide adequate assurance of future performance, where applicable.

The Committee insists that the foregoing provisions of the APA unequivocally require Warner, as "Purchaser," to pay obligations of Assigned Contracts.

The Debtors and the Committee also rely upon the Sale Order to support their claim that the sale extinguished post-Closing Date obligations. They point to the following Sale Order provisions:

Paragraph 11:

Upon Closing, the Debtors and their estates shall have no further liabilities or obligations with respect to an Assumed Liabilities and all holders asserting claims in respect of such Assumed Liabilities are forever barred from asserting such claims against the Debtors.

Paragraph 14:

Upon Closing pursuant to the Purchase Agreement, the Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their terms, notwithstanding any provision in the Assigned Contracts (including, without limitation, those described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further obligation or liability for any breach of the Assigned Contracts occurring or arising after such assumption and assignment.

## DISCUSSION

The Court first observes that Warner did not provide documentary evidence or testimony for its claim, which is its burden. Warner is relying on an "audit" by Deloitte and Touche LLP which is not yet complete and not in evidence. Although the absence of evidence to establish a precise, or at least determinable, claim amount would normally be fatal to the claim, that is not the case here. The amount is not the Court's primary concern at this time; it is whether Debtors have any obligation to Warner for royalty payments. Thus, the Court has a legal issue to resolve, namely, the interpretation of the APA.

The starting point for the Court's discussion is whether the APA is ambiguous. Debtors and the Committee urge the Court to find that there is no ambiguity. Warner, too, argues there is no ambiguity – provided its interpretation carries the day. If not, Warner asks the Court to find ambiguity in the APA and conduct an evidentiary hearing. The legal analysis is governed by Delaware law. APA § 12.6. Delaware law provides that "ambiguity" exists when the contractual provisions in dispute are "reasonably or fairly susceptible to different interpretations," seen as "what a reasonable person in the position of the parties would have thought the contract meant." *Kuhn Construction, Inc. v. Diamond State Port Corporation*, 2010 WL 779992 at *2 (March 8, 2010, Del.), quoting *Kaiser Alum. Corp. v. Matheson*, 681 A.2d 392, 395 (Del. 1996); and *Rhone-Poulenc Basic Chem. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1197 (Del. 1992).

The other principle involved is that a court should interpret a contract as a whole and in a manner that gives a reasonable, lawful and effective meaning to all of the terms of the contract. *Kuhn Construction*, at *2.

The Court has overseen this entire case including the sale and entered the Sale Order approving the APA. The Court is in the unusually prime position to assess the disputed language in view of the totality of the facts. The Court's vantage compels it to find that the APA is not ambiguous. Further, applying the plain meaning of the disputed language which governs the parties' rights and obligations, the Court agrees totally with the Debtors' and Committee's interpretation. In baseball parlance and in honor of opening day, Warner's

pitch is high and far outside.

The APA is clear that, any obligation which arose under an Assigned Contract after the Closing Date is Warner's responsibility, since Warner purchased Debtors' assets and is the assignee of the Assigned Contracts. The Sale Order also clearly and expressly provides that Debtors are released from all obligations and liabilities for any breach of an Assigned Contract which occurred or arose after Debtors assigned an Assigned Contract. Specifically, the APA requires Warner to take responsibility for Debtors' "liabilities and obligations arising from and after the Closing Date. . . . "

Warner interestingly anticipated that, in objecting to the Motion, Debtors would rely on the Third Circuit's analysis of "arising from and after" in *Centerpoint Properties v. Montgomery Ward Holding Corp.* (*In re Montgomery Ward Holding Corp.*), 268 F.3d 205 (3d Cir. 2001), a case involving a tax obligation and Bankruptcy Code Section 365. In *Montgomery Ward*, the Third Circuit held that an obligation <u>arises</u> when the legally enforceable duty to perform – to pay – arises under a lease. *Id.* at 211. Although Warner argues that *Montgomery Ward* is not controlling here because it is limited to Section 365, Warner does not provide a cogent reason for the limitation and the Court can find no basis to limit the Third Circuit's rationale to leases. *Montgomery Ward* addressed a contract, just as the Court is addressing in this case. The only difference is that it was a lease in *Montgomery Ward* and a sale contract here – a difference without significance.

Warner presented no evidence that any royalty became due – was payable – prior to

7

the Closing Date. The Committee showed, to the contrary, that the licenses with Warner and others did not become due until as many as 45 days after the end of a calendar quarter, or after the Closing Date. It therefore follows that Warner, rather than Debtors, is responsible for the Warner Licenses royalties.

Reading the APA and the Sale Order in their entirety in order to give meaning to all their terms, the Court has no doubt that Warner's effort to establish entitlement to an administrative claim is ill-founded.

- Warner is a sophisticated corporation with legal representation at all relevant time.

- Warner waived a $7.87 million prepetition claim.

- In Section 11.2 of the APA, Debtors and Warner agreed to prorate certain expenses, without mention of royalties.

- Section 3.5 of the APA concerns adjustments after the Closing Date – without mention of adjustment for unpaid royalties.

- The APA and the Sale Order clearly and unambiguously release Debtors from post-Closing Date breaches of Assigned Contracts, obligate Warner to assure future performance of Assigned Contracts and impose responsibility upon Warner for all liabilities, obligations and amounts "arising from and after the Closing Date."

Finally, there are two related matters requiring the Court's comment. The first is the objection of Epic Games, Inc. ("Epic") (D.I. 834) which is more of a protective position than an objection. Epic is owed royalties for the pre-Closing Date period, payable post-Closing

Date. Epic expects to be paid by Debtors or Warner. The Court's ruling determines Epic can look to Warner for payment.

The second miscellaneous issue involves Warner's claim that Sony paid download revenues to Debtors instead of to Warner which was entitled to receive the payments. The APA, Section 2.1. The Court agrees with the Committee that Warner is entitled to such sums upon proper proof.

## **CONCLUSION**

The Court denies the Motion in accordance with this Opinion. Order to issue.

Dated: April 5, 2010

*[signature]*
KEVIN GROSS, U.S.B.J.